Colin Proksel (034133)
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
State Bar No. 034133
Telephone:     (602) 640-9000
Facsimile:     (602) 640-9050
Email:           cproksel@omlaw.com

*Attorney for Plaintiffs*
*Additional counsel listed in signature block*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
### TUCSON DIVISION

| | |
|---|---|
| Jane Doe, by her next friends and parents Helen Doe and James Doe; and Megan Roe, by her next friends and parents, Kate Roe and Robert Roe,<br><br>Plaintiffs,<br><br>v.<br><br>Thomas C. Horne, in his official capacity as State Superintendent of Public Instruction; Laura Toenjes, in her official capacity as Superintendent of the Kyrene School District Kyrene School District; The Gregory School; and Arizona Interscholastic Association, Inc.,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT** |

1

## **INTRODUCTION**

2    1.    Generations of children across America have enjoyed playing sports with

3    their friends and classmates. They have benefited physically, mentally, socially, and

4    developmentally from doing so. For many children, playing sports is an important part of

5    their school experience.

6    2.    Plaintiffs want nothing more than an equal opportunity to enjoy that same

7    experience: to try out for and participate on the girls' volleyball, soccer, basketball, and

8    cross-country teams at their schools. Arizona law, however, denies Plaintiffs that

9    opportunity because Plaintiffs are transgender girls. Ariz. Rev. Stat. § 15-120.02 (the

10   "Ban"). Plaintiffs bring this suit to challenge the application of the Ban to them because it

11   violates the U.S. Constitution and federal law.

12   3.    The Ban's exclusion of Plaintiffs from participating in school sports

13   because they are transgender denies them equal treatment under the law, excludes them

14   from a critical school activity, causes them to experience shame and stigma, denies them

15   well-known physical and mental health benefits that arise from playing school sports, and

16   directly contributes to negative physical and emotional health consequences.

17   4.    The Ban, as applied to Plaintiffs, violates the Equal Protection Clause

18   because it impermissibly discriminates based on Plaintiffs' transgender status and on

19   account of their sex because being transgender is a sex-based trait. Accordingly, Arizona

20   may apply the Ban to Plaintiffs only if it has an "exceedingly persuasive justification" for

21   doing so, *U.S. v. Virginia*, 518 U.S. 515, 533 (1996), which here is absent. In fact, the

22   Ban's impermissible discrimination cannot survive any level of scrutiny.

23

5.     The application of the Ban to Plaintiffs also violates Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX"), the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Rehabilitation Act").

6.     Plaintiffs seek declaratory and injunctive relief to enjoin the Ban's enforcement as applied to them. Without the injunctive relief sought, Plaintiffs will suffer immediate irreparable injury.

**PARTIES**

**I. Plaintiffs**

7.     Plaintiff Jane Doe[1] is an 11-year-old transgender girl who resides in Maricopa County, Arizona. She proceeds in this case by her next friends and parents Helen Doe and James Doe.

8.     Plaintiff Megan Roe is a 15-year-old transgender girl who resides in Pima County, Arizona. She proceeds in this case by her next friends and parents Kate Roe and Robert Roe.

**II. Defendants**

9.     Defendant Thomas C. Horne is the State Superintendent of Public Instruction. Defendant Horne is the chief executive officer of the Arizona Department of Education. Ariz. Rev. Stat. § 15-231(B)(2). He is charged with superintending the schools of Arizona and executing all education laws. Ariz. Rev. Stat. § 15-251. Upon

---

[1]     Plaintiffs are filing herewith a motion to proceed via pseudonym.

information and belief, Defendant Horne is a grant recipient of federal funds because he has administrative control over the Arizona Department of Education. He is sued in his official capacity only.

10.     Defendant Laura Toenjes is the Superintendent of Kyrene School District. Defendant Toenjes executes her official duties in Maricopa County and is responsible for the administration and oversight of the Kyrene School District. She is sued in her official capacity only.

11.     Defendant Kyrene School District is a public school district serving parts of Maricopa County. Kyrene School District oversees the Kyrene Aprende Middle School. Upon information and belief, it receives federal financial assistance.

12.     Defendant The Gregory School is a private middle and high school located in Tucson. Upon information and belief, it receives federal financial assistance.

13.     Defendant Arizona Interscholastic Association, Inc. ("AIA") is a membership organization of public and private high schools that regulates and oversees interscholastic athletic competition in the State of Arizona. The Kyrene School District and The Gregory School's athletic teams participate in competitions regulated by the AIA and comply with the AIA's guidelines and policies. The AIA is subject to Title IX because it indirectly receives federal funding from its member schools. *See* 34 C.F.R. § 106.2(i). It is also a government actor subject to the Fourteenth Amendment. *Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1128 (9th Cir. 1982).

1

**JURISDICTION AND VENUE**

2      14.     This action arises under 42 U.S.C. § 1983 to redress the deprivation under

3   color of state law of rights secured by the Fourteenth Amendment to the United States

4   Constitution and under Title IX, the ADA, and the Rehabilitation Act.

5      15.     This Court has original jurisdiction over the subject matter of this action

6   pursuant to 28 U.S.C. §§ 1331 and 1343 because the controversy arises under the laws of

7   the United States, including laws providing for the protection of civil rights, and because

8   this suit seeks redress for the deprivation, under color of state law, of rights secured by

9   the United States Constitution.

10      16.     Venue is proper in the District of Arizona under 28 U.S.C. § 1391(b)(1) and

11   (2) because Defendants reside in the District and because a substantial part of the events

12   or omissions giving rise to the claims occurred in the District.

13      17.     This Court has the authority to enter a declaratory judgment and to provide

14   preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal

15   Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

16      18.     This Court has personal jurisdiction over Defendants because they are

17   domiciled in Arizona and because their denial of Plaintiffs' rights under the United States

18   Constitution and the laws of the United States occurred within Arizona.

19

**FACTUAL ALLEGATIONS**

20   **I. Arizona's Ban**

21      19.     Prior to the enactment of the Ban, transgender girls were permitted to play

22   on girls' sports teams. Each school or school district set its own rules governing the

23

5

participation of transgender students in intramural sports, and the AIA set rules for transgender students' participation in interscholastic sports.

20.    In October 2014, the AIA Executive Board approved for the first time a transgender student's request to compete on a sports team consistent with that student's gender identity.[2] Subsequently, the AIA considered requests for transgender students to play on the teams consistent with their gender identity on a case-by-case basis.[3]

21.    By December 2018, the AIA in conjunction with its Sports Medicine Advisory Committee formalized and revised its policy to permit transgender students to play on teams consistent with their gender identity so long as the student's parent or guardian made the request to the school administrator or athletic director and explained when their child realized they were transgender.[4]

22.    This policy's goal was to ensure that transgender students felt supported and did not need to provide intrusive medical documentation.[5] At that time, the AIA had

[2]    Robert Obert, *AIA Approves First Transgender Athlete to Play a Sport*, AZ Central Sports (Oct. 22, 2014), https://www.azcentral.com/story/sports/high-school/2014/10/22/aia-approves-first-transgender-athlete-play-sport/17718485/.

[3]    Erin Buzuvis, *"As Who They Really Are": Expanding Opportunities for Transgender Athletes to Participate in Youth and Scholastic Sports*, 34 L. & Ineq. 341, 346–47 (2016).

[4]    *Minutes: Executive Board Meeting*, Arizona Interscholastic Association (Dec. 10, 2018), https://aiaonline.org/files/16539/executive-board-meeting-minutes-december-10-2018.pdf; Arizona Interscholastic Association, *AIA Policies and Procedures*, Art. 41 (2022-2023), https://aiaonline.org/files/16362/article-41-sports-medicine.pdf.

[5]    *AIA alters language of transgender policy for Arizona student-athletes*, ABC 15 (Dec. 17, 2018), https://www.abc15.com/sports/aia-alters-language-of-transgender-policy-for-arizona-student-athletes.

received only two or three requests by transgender students to play on teams consistent with their gender identity and had approved all of them.

23.     Arizona's schools and teams were thus including the small number of transgender students who sought to be treated in accordance with their gender identity, and no problems or complaints regarding their participation in school sports arose.

24.     Despite the AIA's successful policies, the Arizona Legislature passed the Ban at issue in this case on March 24, 2022.

25.     The Ban requires each interscholastic or intramural athletic team or sport that is sponsored by a public school or a private school whose students or teams compete against a public school to be designated as a boys', a girls', or coed team based on the students' "biological sex." Ariz. Rev. Stat. § 15-120.02(A). The Ban prohibits athletic teams or sports designated for females, women, or girls to be open to members of the "male sex." *Id.* § 15-120.02(B).

26.     The Ban does not define the terms "biological sex," "male sex," or "sex" generally. The Legislative findings, however, suggest "sex" as being determined at "[fertilization] and revealed at birth or, increasingly, *in utero*." S.B. 1165, 55th Leg., 2d Reg. Sess. (Ariz. 2022), § 2.

27.     The law also forbids an interscholastic association—such as the AIA—from permitting transgender girls to play on girls' teams in interscholastic competitions. Ariz. Rev. Stat. § 15-120.02(A), (D).

28.     In addition to regulating schools and interscholastic associations directly, the law creates a private cause of action for any student to sue a school or athletic

association that permits transgender girls to play on girls' teams if that student believes that they have "suffer[ed] any direct or indirect harm" from a violation of the law. *Id.* § 15-120.02(E), (G).

## II. Transgender People and Sports

29.     "Gender identity" is the medical term for a person's internal, innate, deeply held sense of their own gender. Everyone has a gender identity. There is a medical consensus that a person's gender identity is not subject to voluntary change and has a significant biological foundation.

30.     From a medical perspective, a person's sex encompasses several different biological attributes, including sex chromosomes, certain genes, gonads, the body's production of and response to sex hormones, internal and external genitalia, secondary sex characteristics, and gender identity. Those attributes are not always aligned in typical ways.

31.     When a child is born, a health care provider designates the child's sex to be marked on the child's birth certificate based on the child's observable anatomy. In the vast majority of cases, that initial designation turns out to be consistent with the individual's gender identity. For a transgender person, however, that initial designation turns out to be inaccurate because it does not reflect the person's gender identity.

32.     Gender dysphoria, which results from physical impairments, is the distress caused by incongruence between a person's gender identity and their designated sex at birth. If untreated, gender dysphoria may cause anxiety, depression, eating disorders, substance abuse, self-harm, and suicide. Gender dysphoria is a diagnosable and treatable

condition recognized by the American Psychiatric Association[6] and is articulated in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V").[7]

33.     Under the medical standards of care for the treatment of gender dysphoria in adolescents, the only safe and effective treatment for gender dysphoria is to permit transgender adolescents to live consistent with their gender identity in all aspects of their lives. In addition, when a child begins puberty, doctors may prescribe puberty blocking medication and, for older adolescents, hormone therapy. Forcing a transgender girl to be treated as male contradicts the medical standards of care and can result in serious negative health consequences, including, for example, severe anxiety, depression, substance abuse, self-harm, and suicidality.

34.     There is a scientific consensus that the biological driver of average group differences between girls and boys with respect to athletic performance is differences in their respective levels of testosterone, which begin to diverge significantly only after the onset of puberty.

35.     Transgender girls who receive puberty-blocking medication do not go through male puberty. As a result, they do not experience the physiological changes caused by the increased production of testosterone associated with male puberty. If those

---

[6]     *What is Gender Dysphoria?*, American Psychiatric Association, https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria (last visited Apr. 12, 2023).

[7]     American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (DSM-5-TR)* (2022).

girls subsequently receive hormone therapy, their bodies develop the skeletal structure, fat distribution, and muscle and breast development typical of other girls.

36.    Transgender girls who receive puberty-blocking medication and those who receive hormone therapy typically have testosterone levels in the same range as other girls and significantly lower than boys who have begun pubertal development.

37.    For transgender youth, research has shown that being accepted and supported as who they are is enormously beneficial to their health and well-being. Conversely, being denied recognition and support can cause significant harm, exacerbate gender dysphoria, and expose them to the risk of discrimination and harassment.

**III. The Benefits of School Sports**

38.    For children and young adults, school-sponsored sports offer benefits they will experience throughout life and often have a positive developmental impact that is second only to family support. For example, students who participate in high school sports are more likely to finish college and more likely to be actively engaged in planning for their future. Participation in sports has a documented positive effect on academic achievement, with student athletes generally experiencing better academic achievement than students who are not athletes.

39.    Sports provide an opportunity to gain confidence, to build social connections, and to develop important social, emotional, and coping skills. Participation in sports provides students the opportunity to make friends and become part of a supportive community of teammates and peers. It also reduces the effects of factors, such as stressful life events, that lead to an increased likelihood of experiencing anxiety,

depression, poor academic performance, dropping out of school, and engaging in risky behaviors. Learning how to manage stressful events at a young age provides benefits to student athletes throughout their lives, even after the competitions have ended. In contrast, when young people are excluded from participating in youth sports, or do not feel accepted or respected, they do not have the opportunity to experience these benefits. In addition, when youth are excluded from an equal opportunity to participate because they are transgender, the negative impact on their emotional and social development is severe; in addition to losing the benefits that participation in sports provides, they internalize the shame and stigma of being officially excluded for a personal characteristic (being transgender) over which they have no control and that already subjects them to prejudice and social stigma.

40.     Participation in sports also allows students to build teamwork and discipline skills. Students learn the importance of working as part of a group to achieve a common goal and the necessity of each individual member's role in bringing about success. Students also experience the success and personal fulfillment achieved from discipline, hard work, and perseverance through countless hours of practice and competition.

41.     Through sports, students develop social skills and emotional maturity that allow them to create and sustain lifelong friendships. Sportspersons spend considerable time with their teammates, often experiencing high-pressure situations together that lead to deeper and more meaningful social bonds and friendships. These sports experiences in turn result in reduced anxiety and higher self-esteem. These benefits positively affect students throughout their entire lives.

42.     Coaches and other staff members provide students who participate in sports access to meaningful mentorship and guidance. This mentorship extends beyond school sports, guiding students through academics and life.

43.     Students who participate in sports also derive physical and mental health benefits. In general, students who play sports in school have fewer physical and mental health problems than those who do not. Students who participate in sports further learn how to regulate their emotions, and they experience significantly lower levels of emotional problems and distress as a result. Participation in sports at a young age also encourages continued participation as an adult, in turn reducing the morbidity and mortality of many diseases that arise later in life.

**IV. Plaintiffs' Medical Treatment and Participation in Sports**

**A.      Jane Doe**

44.     Plaintiff Jane Doe is an 11-year-old girl who attends a public elementary school in the Kyrene School District. She will attend Kyrene Aprende Middle School starting in July 2023. Jane is transgender. This will be the first school year the Ban will apply to Jane.

45.     Jane was diagnosed with gender dysphoria when she was seven years old and has lived her life as a girl since she was five years old. She is accepted by her family, soccer teammates, classmates, coaches, and teachers.

46.     As part of her medical treatment for gender dysphoria, Jane's doctors are monitoring her for signs of the onset of puberty. Because she has not yet started puberty,

12

Jane has not experienced any of the physiological changes, including muscle development, that increased testosterone levels would cause in a pubescent boy.

47.   Jane has played soccer on girls' club and recreational sports teams for nearly five years. She enjoys playing soccer and making new friends through it. The friendships she has made through soccer are real and meaningful, and Jane has shared with her soccer teammates that she is a transgender girl. Jane's teammates and coaches have been highly supportive of her identity.

48.   For Jane's family, playing sports is also an important value.

49.   Jane intends to try out for the girls' soccer team at Kyrene Aprende Middle School—which has separate teams for boys and girls—in the winter 2023-2024 athletic season.

50.   Jane also intends to try out for the girls' cross-country team in the summer 2023 season, which starts in mid-July 2023, and the girls' basketball team in the spring 2024 season at Kyrene Aprende Middle School. Like soccer, basketball has separate teams for boys and girls. While cross-country practices co-educationally, boys and girls compete separately.

51.   Jane's health and well-being depend on being able to follow her medically-prescribed treatment, including living as a girl in all aspects of her life.

52.   Playing on boys' teams or not being able to compete with other girls is not an option for Jane. It would be painful and humiliating for Jane to be forced to play on boys' teams. It would also contradict her medical treatment for her gender dysphoria.

13

53.     The Ban thus denies Jane the opportunity to participate in school sports at all and the numerous social, educational, and physical and emotional health benefits that school sports provide.

54.     But for the Ban, the Kyrene School District would permit Jane to play on girls' sports teams. In fact, the members of the Kyrene School District's Governing Board have denounced the Ban.[8]

55.     If the Ban is not enjoined as to Jane, it will cause Jane to suffer irreparable emotional, psychological, and developmental harm that will irreparably and negatively affect her educational and social experience.

**B.      Megan Roe**

56.     Plaintiff Megan Roe is a 15-year-old transgender girl who attends The Gregory School.

57.     Megan has identified as a girl since she was very young. She was diagnosed with gender dysphoria when she was 10 years old.

58.     Before starting at The Gregory School, Megan's parents informed administrators and teachers at the school that Megan is a transgender girl.

59.     As part of her medically-prescribed treatment for gender dysphoria, Megan has been receiving puberty-blocking medication since she was 11 years old, after clinical documentation of the initial signs of puberty. This medication has prevented her from

---

[8]   Paul Maryniak, *Kyrene Board Rips Transgender, Other State Laws*, Ahwatukee Foothills News (Sept. 21, 2022, last updated Oct. 25, 2022), https://www.ahwatukee.com/news/article_50d6aaa4-3907-11ed-baa2-5b5183664658.html.

14

undergoing male puberty. Megan then started to receive hormone therapy when she was 12 years old. As a result, she has not experienced the physiological changes, including muscle development, that increased testosterone levels would cause in a pubescent boy. Instead, the hormones she has received have caused her to develop many of the physiological changes associated with puberty in females.

60.     Megan's health and well-being depend on being able to follow her medically-prescribed treatment, including living as a girl in all aspects of her life.

61.     Megan started to play volleyball a couple of years ago and has found it fun and enjoyable. Before volleyball, Megan enjoyed other sports, including swimming and dance. Megan's schoolfriends are on the girls' volleyball team. Megan's teammates, coaches, and The Gregory School have been highly supportive of her transgender identity and would welcome her participation on the girls' volleyball team.

62.     At The Gregory School, volleyball is one of the most important sports in the school's social fabric. The matches are an important social occasion, which are well-attended by the school community.

63.     The Gregory School has separate volleyball teams for boys and girls. Megan intends to try out for the girls' volleyball team at The Gregory School this fall.

64.     The Gregory School participates in the AIA and complies with its rules so that students can play in interscholastic competitions.[9] But for the Ban, The Gregory School would permit Megan to play on the girls' volleyball team.

---

[9]     *The Gregory School Athletics Program*, The Gregory School, https://www.gregoryschool.org/athletics (last visited Apr. 13, 2023).

65.    Competing on a boys' volleyball team is not an option for Megan. It would be painful and humiliating for Megan to be forced to be on a boys' team and would also contradict her medical care.

66.    The Ban thus denies Megan the opportunity to participate in school sports at all. She will be prohibited from participating in school sports and therefore will be denied the numerous social, educational, and physical and emotional health benefits that school sports provide.

67.    If the Ban continues to apply to Megan, she will suffer irreparable emotional, psychological, and developmental harm that will irreparably and negatively affect her educational and social experience.

### CLAIMS FOR RELIEF

### COUNT I
Deprivation of Equal Protection
U.S. Const. Amend. XIV
(Against Defendants Horne, Toenjes, Kyrene School District, and the Arizona
Interscholastic Association)

68.    Plaintiffs incorporate all preceding paragraphs of the Complaint as though fully set forth herein.

69.    Plaintiffs bring this Count against Defendants Thomas C. Horne and Laura Toenjes in their official capacities, as well as against Defendants Kyrene School District and the Arizona Interscholastic Association.

70.    The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

16

71.     The Ban singles out and categorically bars Plaintiffs from competing on girls' teams because they are transgender girls. In so doing, the Ban impermissibly discriminates based on Plaintiffs' transgender status and, because being transgender is a sex-based trait, it also discriminates against Plaintiffs based on sex.

72.     Under the Equal Protection Clause, classifications based on sex are subject to heightened scrutiny and are therefore presumptively unconstitutional absent a showing by the government that the discrimination has an "exceedingly persuasive" rationale and is substantially related to an important state interest.

73.     The Ban fails heightened scrutiny as to Plaintiffs because it is not substantially related to any important state interest. Plaintiffs, who identify and live as girls and who have not and will not undergo male puberty, are similarly situated to other girls with respect to their participation on girls' sports teams at school. The Ban, therefore, undermines the health and well-being of Plaintiffs by denying their access to school sports without any exceedingly persuasive rationale to support it. The Ban cannot survive even rational basis review because it lacks any rational basis, rests on stereotypes and misconceptions, and undermines rather than advances any alleged purpose.

**COUNT II**
Violation of Title IX
20 U.S.C. § 1681 *et seq.*
(Against All Defendants)

74.     Plaintiffs incorporate all preceding paragraphs of the Complaint as though fully set forth herein.

75.     Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

76.     Plaintiffs bring this Count against all Defendants.

77.     Under Title IX, discrimination "on the basis of sex" encompasses discrimination against individuals because they are transgender. *See Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) (holding that discrimination against transgender individuals violates Title IX).

78.     Title IX forbids sex discrimination in athletic programs. The implementing regulations for Title IX permit sports teams to be separated by sex but do not mandate such separation.

79.     Neither Title IX, its regulations, nor its guidance purport to define "sex" as something that is determined at fertilization and revealed at birth or in utero.

80.     By barring Plaintiffs from playing on girls' sports teams because they are transgender, Defendants exclude them from, deny them the benefits of, and subject them to discrimination in educational programs and activities "on the basis of sex," in violation of their rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.

**COUNT III**
Discrimination On Basis of Disability
Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*
Section 504 of the Rehabilitation Act, 29 U.S.C. § 794
(Against All Defendants)

81.     Plaintiffs incorporate all preceding paragraphs of the Complaint as though fully set forth herein.

82.     The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act extends that protection to "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

83.     Plaintiffs bring this Count against all Defendants.

84.     Plaintiffs have a disability within the meaning and scope of 42 U.S.C. § 12102 based on their gender dysphoria, which results from physical impairments. 42 U.S.C. § 12102(1); 29 U.S.C. § 705(9). Defendants are therefore required to afford Plaintiffs the protections of the ADA and Section 504 of the Rehabilitation Act.

85.     By depriving Plaintiffs of the opportunity to try out for and compete on girls' sports teams, denying Plaintiffs meaningful access to sports programs and activities, and subjecting Plaintiffs to discrimination, all because of Plaintiffs' gender dysphoria, Defendants violate Plaintiffs' rights under the ADA and Section 504 of the Rehabilitation Act. Playing on boys' sports teams is not an available option for Plaintiffs

1  because it would exacerbate Plaintiffs' disabilities, be detrimental to their health, and

2  contradict their prescribed medical treatment.

3  **PRAYER FOR RELIEF**

4  **WHEREFORE**, Plaintiffs respectfully request that this Court enter orders and

5  judgment:

6  A.      Declaring that the enforcement by Defendants of Ariz. Rev. Stat. § 15-

7  120.02 violates Plaintiffs' rights under the Equal Protection Clause of the Fourteenth

8  Amendment to the United States Constitution, Title IX, 20 U.S.C. § 1681 *et seq.*, the

9  Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, and Section 504 of the

10  Rehabilitation Act, 29 U.S.C. § 794, *et seq.*

11  B.      Preliminarily and permanently enjoining enforcement or any threat of

12  enforcement of Ariz. Rev. Stat. § 15-120.02 by Defendants and their employees, agents,

13  appointees, or successors as to Plaintiffs, and requiring Defendants and their employees,

14  agents, appointees, or successors to permit Plaintiffs to try out for and play on the school

15  sports' teams consistent with their gender identity;

16  C.      Waiving the requirement for the posting of a bond as security for entry of

17  preliminary injunctive relief;

18  D.      Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees

19  pursuant to 42 U.S.C. § 1988 and other applicable laws; and

20  E.      Granting such other and further relief as the Court deems just and proper.

21

22

23

1

2          Respectfully submitted this 17th day of April,
           2023.

3
           */s/ Colin M. Proksel*
4          Colin M. Proksel (034133)
           OSBORN MALEDON, P.A.
5          2929 North Central Avenue, 21st Floor
           Phoenix, Arizona 85012-2793
6          Telephone: (602) 640-9000
           Facsimile: (602) 640-9050
7          Email: cproksel@omlaw.com

8          Jyotin Hamid*
           Justin R. Rassi*
9          Amy C. Zimmerman*
           DEBEVOISE & PLIMPTON LLP
10         66 Hudson Boulevard
           New York, New York 10001
11         Telephone: (212) 909-6000
           Facsimile: (212) 909-6836
12         Email: jhamid@debevoise.com
           Email: jrassi@debevoise.com
13         Email: azimmerman@debevoise.com

14         Amy Whelan*
           Rachel Berg*
15         NATIONAL CENTER FOR LESBIAN RIGHTS
           870 Market Street, Suite 370
16         San Francisco, California 94102
           Telephone: (415) 343-7679
17         Facsimile: (415) 392-8442
           Email: awhelan@nclrights.org
18         Email: rberg@nclrights.org

19         *Pro hac vice application forthcoming

20

21

22

23                            21