Colin M. Proksel
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
State Bar No. 034133
Telephone: (602) 640-9000
Facsimile: (602) 640-9050
Email: cproksel@omlaw.com

*Attorney for Plaintiffs*

*Additional counsel on signature block*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
TUCSON DIVISION

| | |
|---|---|
| Jane Doe, by her next friends and parents Helen Doe and James Doe; and Megan Roe, by her next friends and parents, Kate Roe and Robert Roe,<br><br>Plaintiffs,<br><br>v.<br><br>Thomas C. Horne, in his official capacity as State Superintendent of Public Instruction; Laura Toenjes, in her official capacity as Superintendent of the Kyrene School District; Kyrene School District; The Gregory School; and Arizona Interscholastic Association, Inc.,<br><br>Defendants. | Case No.:_____<br><br>**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT THEREOF**<br><br>ORAL ARGUMENT REQUESTED |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

    I. PLAINTIFFS ARE TRANSGENDER GIRLS AND STUDENT ATHLETES ................................................................................................ 2

        A. Medical Background on Transgender Youth and Treatment for Gender Dysphoria ........................................................................ 2

        B. Jane Doe .................................................................................... 4

        C. Megan Roe ................................................................................ 5

    II. THE ARIZONA INTERSCHOLASTIC ASSOCIATION'S PRIOR POLICY ON TRANSGENDER STUDENT PARTICIPATION ................ 6

    III. THE ARIZONA SPORTS BAN IS ENACTED ......................................... 7

    IV. DIFFERENCES IN ATHLETIC ABILITY BETWEEN BOYS AND GIRLS STEM FROM POST-PUBERTAL TESTOSTERONE LEVELS, NOT A PERSON'S SEX AT BIRTH ......................................... 7

ARGUMENT .................................................................................................................. 8

    I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ............... 8

        A. Applying the Ban to Plaintiffs Violates Title IX .............................. 9

        B. The Ban Also Violates Plaintiffs' Rights Under the Equal Protection Clause ...................................................................................... 10

        1. The Ban Is Subject to Heightened Scrutiny .................................. 10

        2. The Ban Cannot Survive Heightened Scrutiny ............................. 11

    II. THE BAN IRREPARABLY HARMS PLAINTIFFS ............................... 12

    III. THE PUBLIC INTEREST AND BALANCE OF EQUITIES FAVOR INJUNCTIVE RELIEF ............................................................. 13

    IV. PLAINTIFFS SHOULD NOT BE REQUIRED TO POST A BOND ....... 14

CONCLUSION ............................................................................................................. 14

# TABLE OF AUTHORITIES

**Cases**

*A.M. v. Indianapolis Pub. Sch.*, --- F. Supp. 3d ---, 2022 WL 2951430 (S.D. Ind. July 26, 2022) ............................................................................................. 8, 10

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ................................ 8

*Anders v. Cal. State Univ., Fresno*, 2021 WL 1564448 (E.D. Cal. Apr. 21, 2021) ............................................................................................................................ 12

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ......................................................... 9

*Diaz v. Brewer*, 656 F.3d 1008 (9th Cir. 2011) .............................................................. 14

*Doe v. Snyder,* 28 F.4th 103 (9th Cir. 2022) ............................................................... 9, 10

*D.T. v. Christ*, 552 F. Supp. 3d 888 (D. Ariz. 2021) ...................................................... 10

*Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal*, 546 U.S. 418 (2006) ............................................................................................................................ 8

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) ............................... 13

*Hecox v. Little*, 479 F. Supp. 3d 930 (D. Idaho 2020) ................................... 8, 11, 12, 13

*Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017) .................................................... 12

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) .................................................... 14

*Jorgensen v. Cassiday*, 320 F.3d 906 (9th Cir. 2003) .................................................... 14

*Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) ........................................................ 10

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ....................................................... 13

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................................... 8, 13

*Obergefell v. Hodges*, 576 U.S. 644 (2015) ................................................................... 13

*Porretti v. Dzurenda*, 11 F.4th 1037 (9th Cir. 2021) ....................................................... 8

*Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963 (D. Minn. 2016) ........................... 12

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ................................................... 14

*Roe v. Utah High Sch. Activities Ass'n*, 2022 WL 3907182 (Utah Dist. Ct. Aug. 19, 2022) .................................................................................................. 8

*United States v. Virginia*, 518 U.S. 515 (1996) ...................................................... 8, 10, 12

*United States v. Windsor*, 570 U.S. 744 (2013) ............................................................... 12

**Statutes**

20 U.S.C. § 1681 ............................................................................................... *passim*

Ariz. Rev. Stat. § 15-120.02 .............................................................................. *passim*

S.B. 1165, 55th Leg., 2d Reg. Sess. (Ariz. 2022) .......................................................... 7, 9

**Other Authorities**

34 C.F.R. § 106.2(i) .................................................................................................. 9

34 C.F.R. § 106.31(b) ............................................................................................... 9

**Constitutional Provisions**

U.S. Const. amend. XIV ................................................................................... *passim*

**INTRODUCTION**

Plaintiffs Jane Doe and Megan Roe are transgender girls who want an equal opportunity to try out for and participate on the girls' volleyball, soccer, basketball, and cross-country teams at their schools. They are prohibited from doing so by Ariz. Rev. Stat. § 15-120.02 (the "Ban"), which categorically bars transgender girls from playing on girls' interscholastic or intramural sports teams, regardless of their individual circumstances or qualifications for doing so. The Ban bars Plaintiffs from playing on girls' teams because they are transgender even though Plaintiffs have not undergone male puberty and do not have a competitive or physiological advantage over their non-transgender peers.

Plaintiffs have filed suit in this Court alleging that, as applied to them, the Ban violates their rights to equal treatment under the Equal Protection Clause of the Fourteenth Amendment, Title IX, the ADA, and the Rehabilitation Act. Plaintiffs now move for a preliminary injunction on their Title IX and Equal Protection claims so they can have an equal opportunity to play school sports on girls' teams during the upcoming school year while this case proceeds. Tryouts for the earliest sport start in mid-July of this year.

The Ban singles out transgender girls and therefore impermissibly discriminates "on the basis of sex" under Title IX. The Ban also violates the Equal Protection Clause because it discriminates against Plaintiffs based on their transgender status and cannot survive rational basis review, much less the heightened scrutiny required here. If enforced against Plaintiffs, the Ban will cause Plaintiffs irreparable mental, physical, and emotional harm, in addition to the violation of their constitutional rights. The public interest and balance of equities favor a preliminary injunction. For these reasons and those set forth below, the Court should preliminarily enjoin the Ban as to Plaintiffs.

# STATEMENT OF FACTS

## I. PLAINTIFFS ARE TRANSGENDER GIRLS AND STUDENT ATHLETES

### A. Medical Background on Transgender Youth and Treatment for Gender Dysphoria

A transgender person is one whose gender identity differs from the person's assigned sex at birth. (Budge Decl. ¶ 18.) "Gender identity" is the medical term for a person's internal, innate, deeply-held sense of their own gender. (Shumer Decl. ¶ 18.) Everyone has a gender identity. (*Id.*) There is a medical consensus that a person's gender identity is not subject to voluntary change and has a significant biological foundation. (*Id.* ¶ 23.)

When a child is born, a health care provider identifies the child's sex based on the child's observable anatomy. (*Id.* ¶ 27.) In medical terminology, this is often referred to as the person's "assigned sex." (*Id.*) In most cases, that initial designation turns out to be accurate. (*Id.*) Most children who are identified as female at birth grow up to be female, and most children who are identified as male at birth grow up to be male. (*Id.*) For a transgender person, however, that initial designation does not match the person's gender identity. (*Id.*)

Gender dysphoria is a serious medical condition characterized by intense and, in some cases, disabling distress due to the incongruence between a person's gender identity and assigned sex. (Budge Decl. ¶ 23.) The treatment for gender dysphoria is well-established and highly effective. (*Id.* ¶ 25; Shumer Decl. ¶ 28.) When individuals with gender dysphoria are diagnosed and receive appropriate medical care, they can thrive. (Shumer Decl. ¶ 29.) If untreated, however, gender dysphoria causes serious harms, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicide. (Budge Decl. ¶ 33; Shumer Decl. ¶ 28.)

The major associations of medical and mental health providers in the United States, including the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, and the Pediatric Endocrine Society, have adopted medical standards of care for treating gender dysphoria in adolescents, which were developed by the World Professional Association for Transgender Health and the Endocrine Society. (Shumer Decl. ¶ 31.) The goal of treatment is to permit transgender adolescents to live consistent with their gender identity in all aspects of their lives. (*Id.* ¶ 30.) In addition, when a child begins puberty, doctors may prescribe puberty-blocking medication and, for older adolescents, hormone therapy. (*Id.* ¶¶ 35–36.)

Before puberty, boys and girls do not differ significantly in athletic performance. (*Id.* ¶ 38.) After puberty, adolescent boys begin to produce higher levels of testosterone, which over time causes them to become, on average, stronger and faster than adolescent girls. (*Id.* ¶¶ 38–39.) There is a scientific consensus that the biological driver of average group differences in athletic performance between adolescent girls and boys is differences in their respective levels of testosterone, which begin to diverge significantly only after the onset of puberty. (*Id.* ¶ 39.)

Transgender girls who receive puberty-blocking medication do not have an athletic advantage over other girls because they do not go through male puberty. (*Id.* ¶¶ 40–42.) As a result, they do not experience the physiological changes caused by the increased production of testosterone associated with male puberty. (*Id.* ¶ 35.) When those girls subsequently receive hormone therapy, their bodies develop the skeletal structure, fat distribution, and muscle and breast development typical of other girls. (Budge Decl. ¶ 29; Shumer Decl. ¶¶ 35–36.) Transgender girls who receive these medical treatments typically have testosterone levels in the same range as other girls. (Shumer Decl. ¶ 36.)

For transgender youth, research has shown that being accepted and supported is enormously beneficial to their health and well-being. (*Id.* ¶ 29; Budge Decl. ¶ 22.) Conversely, being denied recognition and support can cause significant harm, exacerbate gender dysphoria, and expose them to the risk of discrimination and harassment. (Shumer Decl. ¶ 28.)

### B. Jane Doe

Plaintiff Jane Doe is an 11-year-old transgender girl who will begin middle school in the Kyrene School District in July. (J. Doe Decl. ¶ 1.) Jane was diagnosed with gender dysphoria when she was seven years old and lives as a girl in all aspects of her life. Jane has not yet started puberty. (H. Doe Decl. ¶¶ 7, 11.) Jane's doctors are currently monitoring her for signs for the onset of puberty as part of her medical treatment for gender dysphoria. (*Id.* ¶ 11.) As a result, Jane has not experienced any of the physiological changes that increased testosterone levels would cause in a pubescent boy. (Shumer Decl. ¶ 45; Budge Decl. ¶ 28.)

Sports are a vital part of Jane's life. (J. Doe Decl. ¶¶ 5–8.) Her family places a high value on sports' benefits. (H. Doe Decl. ¶¶ 12–13.) Jane particularly loves playing soccer and has played soccer on girls' club and recreational sports teams for nearly five years. (J. Doe Decl. ¶¶ 6–8.) In addition to her passion for the sport, soccer has allowed Jane to make new friends and establish a sense of community. (*Id.* ¶ 7.) The friendships she has made through soccer are enriching and meaningful. (H. Doe Decl. ¶ 13.) Jane has shared that she is a transgender girl with her coaches and soccer teammates, who are highly supportive of her identity. (*Id.* ¶ 9.)

The Ban will apply to Jane when she enters Kyrene Aprende Middle School this July. Jane intends to try out for the girls' soccer team in the winter 2023-2024 athletic season, the cross-country team in the 2023 summer season (which starts in mid-July), and the girls' basketball team in the spring 2024 season. (J. Doe Decl. ¶ 9.) Both soccer and

basketball at Kyrene Aprende Middle School have separate teams for boys and girls. (*Id.*) While the cross-country team practices co-educationally, the sexes compete separately. (*Id.*) Jane is excited to play on the girls' teams with her friends and peers. (*Id.* ¶¶ 8–9.) However, if the Ban applies to her, Jane will be banned from trying out for and playing and competing on the girls' soccer, cross-country, and basketball teams.

Jane will not participate in sports at all if she is forced to be on a boys' team. (*Id.* ¶¶ 10–11.) Her health depends on her ability to live her life fully as a girl, and playing sports on a boys' team and competing with boys would contradict her medical care and jeopardize her health. (H. Doe Decl. ¶¶ 15–16.) It would also be painful and humiliating to Jane—who is accepted as a girl—to be forced to play on the boys' teams. (J. Doe Decl. ¶¶ 11–12.)

### C.  Megan Roe

Megan Roe is a 15-year-old transgender girl who resides in Pima County, Arizona and attends The Gregory School. (M. Roe Decl. ¶¶ 2, 5.) Megan was diagnosed with gender dysphoria when she was 10 years old. (K. Roe Decl. ¶ 6.) Before starting at The Gregory School, Megan's parents shared with administrators and teachers at the school that Megan is a transgender girl, and The Gregory School is highly supportive of Megan and her identity. (M. Roe Decl. ¶ 5.) As part of her medically-prescribed treatment for gender dysphoria, Megan has been receiving puberty-blocking medication since she was 11 years old, after clinical documentation of the initial signs of puberty. (K. Roe Decl. ¶ 6.) This medication has prevented her from undergoing male puberty. (*Id.*) Megan also started to receive hormone therapy when she was 12 years old. (*Id.*) As a result of these medical treatments, she has not experienced the physiological changes that increased testosterone levels would cause in a pubescent boy. (*Id.*) Instead, the hormone treatment she has received has caused her to develop physiological changes associated with puberty in females. (Shumer Decl. ¶ 47; Budge Decl. ¶ 29.)

Megan enjoys playing volleyball and intends to try out for the girls' volleyball team at The Gregory School for this year's fall season. (M. Roe Decl. ¶ 7.) Volleyball is one of the most important sports in the school's social fabric—the matches are an important social occasion, which are well-attended by the school community. (*Id.* ¶ 8; K. Roe Decl. ¶ 8.) Her school friends are also on the girls' volleyball team. (M. Roe Decl. ¶ 7.) Megan's teammates, coaches, and school are highly supportive of her and would welcome her participation in the girls' volleyball team. (*Id.* ¶ 5; K. Roe Decl. ¶¶ 5, 12.) However, if the Ban applies to Megan, she will not be able to play on the girls' volleyball team and will be deprived of the opportunity to play school sports.

Megan will not compete on the boys' volleyball team, as her health and well-being depend on her ability to live her life as a girl in all aspects. (M. Roe Decl. ¶ 9; K. Roe Decl. ¶ 10.) Playing on the boys' team contradicts her medical care, and it would also be painful and humiliating. (M. Roe Decl. ¶ 9; K. Roe Decl. ¶¶ 9–11.) The Ban will deny Megan the opportunity to participate in school sports and enjoy the physical, emotional, and social benefits of playing on a school sports team. She will lose her chance to be on the volleyball team, maintain her friendships, and foster a sense of community at her school.

## II.   THE ARIZONA INTERSCHOLASTIC ASSOCIATION'S PRIOR POLICY ON TRANSGENDER STUDENT PARTICIPATION

Prior to the enactment of the Ban, transgender girls were permitted to play on girls' sports teams. Each school or school district set its own rules on transgender students' participation in intramural sports, and the Arizona Interscholastic Association, Inc. (the "AIA") set rules for transgender students' participation in interscholastic sports. (Compl. ¶ 19.) In October 2014, the AIA Executive Board for the first time approved a transgender student athlete's request to participate on a team consistent with that student's gender identity. (*Id.* ¶ 20.) By December 2018, the AIA formalized its policy to

permit transgender students to play on teams consistent with their gender identity so long as they had a letter of support from their parent or guardian explaining when their child realized they were transgender. (*Id.* ¶ 21.) At that time, the AIA received only two or three requests from transgender students. (*Id.* ¶ 22.)

### III.     THE ARIZONA SPORTS BAN IS ENACTED

Despite the AIA's successful policies, Arizona enacted the "Save Women's Sports Act" (S.B. 1165) on March 30, 2022. *See* Ariz. Rev. Stat. § 15-120.02. The Ban requires each public school team and private school team that competes against a public school team to be designated as male, female, or co-ed based on "the biological sex of the students who participate." *Id.* § 15-120.02(A). The Ban's Legislative Findings provide that for purposes of school sports a student's sex is determined at "fertilization and revealed at birth or, increasingly, *in utero*." S.B. 1165, 55th Leg., 2d Reg. Sess. (Ariz. 2022), § 2 (internal citation and brackets omitted). The Ban, therefore, defines Plaintiffs, who are transgender girls, as male. The Ban requires that "athletic teams or sports designated for 'females,' 'women,' or 'girls,' may not be open to students of the male sex." Ariz. Rev. Stat. § 15-120.02(B).

### IV.     DIFFERENCES IN ATHLETIC ABILITY BETWEEN BOYS AND GIRLS STEM FROM POST-PUBERTAL TESTOSTERONE LEVELS, NOT A PERSON'S SEX AT BIRTH

An individual's genetic makeup and anatomy at birth are not reliable indicators of athletic performance because sex chromosomes and genitals alone do not meaningfully affect athletic performance. (Shumer Decl. ¶ 37.) Rather, the performance differences between adolescent girls and boys in sports are due to differences in their levels of testosterone, which do not diverge significantly until puberty. (*Id.* ¶¶ 38–39.)

Transgender girls who receive medical treatment, such as puberty-blocking medication, do not undergo male puberty or experience physiological changes caused by

7

increased testosterone production. (*Id.* ¶¶ 35, 41.) There is no physiological reason that transgender girls who have not undergone male puberty would have any athletic advantage over other girls. (*Id.* ¶¶ 37, 42.) Simply knowing that a girl is transgender reveals nothing about her athletic ability. (*Id.* ¶ 42.)

**ARGUMENT**

A preliminary injunction is warranted here because Plaintiffs can establish: (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). When the government is a party, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). Where, as here, the burden to justify the Ban under the Equal Protection Clause "rests entirely on the State," *United States v. Virginia*, 518 U.S. 515, 533 (1996), the burden to show a likelihood of success shifts to Defendants at the preliminary injunction stage for the Equal Protection claim. *See Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal*, 546 U.S. 418, 429–30 (2006).

**I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

Courts across the country, including within this Circuit, have held that excluding transgender girls from girls' sports teams violates the Equal Protection Clause and Title IX. *See, e.g.*, *A.M. v. Indianapolis Pub. Sch.*, --- F. Supp. 3d ---, 2022 WL 2951430, at *11 (S.D. Ind. July 26, 2022) (granting preliminary injunction to stop enforcement of a similar law because it violates Title IX); *Hecox v. Little*, 479 F. Supp. 3d 930, 988 (D. Idaho 2020) (same under Equal Protection Clause); *see also Roe v. Utah High Sch. Activities Ass'n*, 2022 WL 3907182, at *4 (Utah Dist. Ct. Aug. 19, 2022) (holding that

transgender sports ban violated Utah's "state-law counterpart to the federal Equal Protection Clause"). The Court should find the same here.

### A. Applying the Ban to Plaintiffs Violates Title IX

Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a).[1] Because Defendants Kyrene School District (administered and overseen by Defendant Toenjes), The Gregory School, and the AIA receive federal financial assistance, and because Defendants Horne is a grant recipient of federal funds, they must comply with Title IX's requirements. *See* Compl. ¶¶ 9–13.[2]

Plaintiffs are likely to prevail on the merits of their Title IX claim because the Ban discriminates against them based on their transgender status. As the Supreme Court held in *Bostock v. Clayton County*, "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." 140 S. Ct. 1731, 1741 (2020). Applying that analysis, the Ninth Circuit has held that discrimination based on transgender status also constitutes impermissible discrimination under Title IX. *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022).

---

[1] Among other things, an institution covered by Title IX may not: (1) treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service; (2) provide different aid, benefits, or services or provide aid, benefits, or services in a different manner; (3) deny any person any such aid, benefit, or service; (4) subject any person to separate or different rules of behavior, sanctions, or other treatment. 34 C.F.R. § 106.31(b).

[2] Defendant AIA is bound by Title IX because it receives federal financial assistance indirectly from its member schools. *See* 34 C.F.R. § 106.2(i).

9

That precedent is controlling here. The Ban discriminates against Plaintiffs based on their status as transgender girls by providing that for purposes of school sports a student's sex is fixed "at birth." S.B. 1165, 55th Leg., 2d Reg. Sess. (Ariz. 2002), § 2. By design, the Ban classifies all transgender girls as male. Because the Ban prohibits students who are "male" under this definition from playing on girls' teams, Ariz. Stat. § 15-120.02(B), it intentionally excludes all transgender girls, including Plaintiffs, from participating on girls' teams and deprives them of the benefits of sports programs and activities that their non-transgender classmates enjoy. Under *Snyder*, this discrimination violates Title IX. 28 F.4th at 114; *see also A.M.*, 2022 WL 2951430, at *11 (granting a preliminary injunction of a similar Indiana law that banned transgender girls from playing on girls' sports teams based on Title IX).

### B. The Ban Also Violates Plaintiffs' Rights Under the Equal Protection Clause

#### 1. The Ban Is Subject to Heightened Scrutiny

The Ban also violates the Equal Protection Clause because it fails the applicable heightened scrutiny review. The Ninth Circuit has held that laws that discriminate against transgender people are sex-based classifications and, as such, warrant heightened scrutiny. *See Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019) (analyzing a policy barring transgender people from military service as sex-based discrimination and applying heightened scrutiny); *see also D.T. v. Christ*, 552 F. Supp. 3d 888, 896 (D. Ariz. 2021) ("Discrimination against transgender people is discrimination based on sex; as such, heightened scrutiny applies.").

Under heightened scrutiny, the burden is on the government to show "an exceedingly persuasive justification" for the discrimination, *Virginia*, 518 U.S. at 531, which must not be based on "generalizations" or "stereotypes." *Id.* at 549–50, 565. Rather, "[t]he justification 'must be genuine, not hypothesized or invented *post hoc* in

10

response to litigation[.]'" *Karnoski*, 926 F.3d at 1200 (quoting *Virginia*, 518 U.S. at 533). The government cannot meet that burden here.

### 2. The Ban Cannot Survive Heightened Scrutiny

Categorically banning all transgender girls from all girls' sports is not substantially related to any important governmental interest. Proponents of the Ban claim it is necessary to protect girls' sports by barring girls who have a purportedly unfair athletic advantage over other girls.[3] But this is based on overbroad generalizations and stereotypes that erroneously equate transgender status with athletic ability. *See Hecox*, 479 F. Supp. 3d at 982 (holding the asserted advantage between transgender and non-transgender female athletes "is based on overbroad generalizations without factual justification"). There is no rational basis, much less one that meets heightened scrutiny, for treating a girls' transgender status as an accurate proxy for athletic ability.

From a medical perspective, boys may have an athletic advantage over girls because of the increased testosterone associated with male puberty, which results in increased muscle mass and muscle strength. (Shumer Decl. ¶¶ 38–39.) Before male puberty, boys have no significant athletic advantage over girls. (*Id.*) Here, Plaintiffs live as girls in all aspects of their lives and are similarly situated to other girls their age. Jane has not started male puberty and therefore has no competitive or physiological advantages over her teammates or opponents. (*Id.* ¶ 45.) Megan has received hormone blockers and hormone replacement therapy and therefore has never experienced male

---

[3]  *See* Letter from Governor Douglas A. Ducey, State of Arizona, to J. Katie Hobbs, Arizona Sec'y of State (Mar. 30, 2022), https://azgovernor.gov/sites/default/files/sb1138_sb1165_signing_letter.pdf ("S.B. 1165 creates a statewide policy to ensure that biologically female athletes at Arizona public schools, colleges, and universities have a level playing field to compete . . . This legislation simply ensures that the girls and young women who have dedicated themselves to their sport do not miss out on hard-earned opportunities . . . due to unfair competition.").

11

puberty. (*Id.* ¶ 47.) Accordingly, she has no competitive or physiological advantages over her teammates or opponents. (*Id.*) Yet, purely because they are transgender, Plaintiffs are treated differently than other girls; unlike all other girls, they are barred from playing on girls' teams.

Rather than advancing an "exceedingly persuasive justification" for discrimination, *Virginia*, 518 U.S. at 524, the Ban's "avowed purpose and practical effect are to impose a disadvantage, a separate status, and so a stigma" upon transgender athletes. *United States v. Windsor*, 570 U.S. 744, 770 (2013) (explaining that "[t]he Constitution's guarantee of equality must at the very least mean that a bare [legislative] desire to harm a politically unpopular group cannot justify disparate treatment of that group") (internal quotation marks and citation omitted). Accordingly, the Ban cannot survive rational basis review, much less heightened scrutiny.

## II.   THE BAN IRREPARABLY HARMS PLAINTIFFS

Plaintiffs face irreparable harm if this Court does not enjoin the Ban as to them. First, enforcement of the Ban in violation of the Equal Protection Clause—in and of itself—is sufficient to presume irreparable harm to justify a preliminary injunction. *Hernandez v. Sessions*, 872 F.3d 976, 994–95 (9th Cir. 2017) ("It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury.") (internal quotation marks and citation omitted); *Hecox*, 479 F. Supp. 3d at 987 (noting this "dispositive presumption"). A violation of Title IX also causes irreparable harm. *See Anders v. Cal. State Univ., Fresno*, 2021 WL 1564448, at *18 (E.D. Cal. Apr. 21, 2021) (finding irreparable harm under Title IX given the "presumption of irreparable injury where plaintiff shows violation of a civil rights statute" and in light of "the insult that comes from unequal treatment"); *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 973 (D. Minn. 2016) ("Plaintiffs have a fair chance of succeeding on their Title IX claim, and Congress passed the Title IX pursuant to its power to enforce the Fourteenth Amendment.

12

Plaintiffs' expectation that they may be treated unequally in violation of Title IX's terms is an irreparable harm.") (footnote omitted).

Moreover, Plaintiffs will suffer severe and irreparable mental, physical, and emotional harm if the Ban applies to them. Plaintiffs' mental health is dependent on living as girls in all aspects of their lives. (Budge Decl. ¶ 27; Shumer Decl. ¶ 24.) Playing on a boys' team would directly contradict Plaintiffs' medical treatment for gender dysphoria and would be painful and humiliating. (Budge Decl. ¶¶ 27, 39–41; Shumer Decl. ¶ 51.) If Defendants are permitted to enforce the Ban against them, Plaintiffs will be excluded from school sports and deprived of the social, educational, and physical and emotional health benefits that come from school sports. (Budge Decl. ¶¶ 35–38.) They will also suffer the shame and humiliation of being unable to participate in a school activity simply because they are transgender—a personal characteristic over which they have no control. (*Id.* ¶ 40.)

Plaintiffs will further suffer the stigmatic injury of exclusion. (*Id.*); *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 625 (4th Cir. 2020) (explaining that the stigma of exclusion "publicly brand[s] all transgender students with a scarlet 'T'") (internal quotation marks and citation omitted). They will also suffer the cognizable and irreparable "dignitary wounds" associated with the passage of a law expressly designed to communicate the state's moral disapproval of their identity, wounds that "cannot always be healed with the stroke of a pen." *Obergefell v. Hodges*, 576 U.S. 644, 678 (2015); *Hecox*, 479 F. Supp. 3d at 987 (finding such wounds to constitute irreparable harm).

### III. THE PUBLIC INTEREST AND BALANCE OF EQUITIES FAVOR INJUNCTIVE RELIEF

When an injunction is sought against a governmental entity, the public interest and balance-of-the-hardships factors merge. *Nken*, 556 U.S. at 435–36. As an initial matter, "it is always in the public interest to prevent the violation of a party's constitutional

rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal citation and quotation marks omitted). Moreover, the balance of equities tips heavily in Plaintiffs' favor. Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Plaintiffs, however, are continuing to face serious and current ongoing harm, as detailed above and in the accompanying declarations. Accordingly, the public interest and balance of equities favor a preliminary injunction.

## IV.  PLAINTIFFS SHOULD NOT BE REQUIRED TO POST A BOND

The District Court has discretion not to require the moving party to post a bond before granting a preliminary injunction. *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (citing *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)). The Court should exercise that discretion here. Waiving this requirement is particularly appropriate where "there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). As discussed above, the requested injunction will not harm Defendants. Further, imposing a bond would improperly burden Plaintiffs' efforts to vindicate their constitutional rights.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant their motion for a preliminary injunction.

Respectfully submitted this 17th day of April, 2023.

*s/ Colin M. Proksel*
Colin M. Proksel (034133)
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
Telephone: (602) 640-9000
Facsimile: (602) 640-9050
Email: cproksel@omlaw.com

14

Jyotin Hamid\*
Justin R. Rassi\*
Amy C. Zimmerman\*
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
Telephone : (212) 909-6000
Facsimile: (212) 909-6836
Email: jhamid@debevoise.com
Email: jrassi@debevoise.com
Email: azimmerman@debevoise.com

Amy Whelan\*
Rachel Berg\*
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone: (415) 343-7679
Facsimile: (415) 392-8442
Email: awhelan@nclrights.org
Email: rberg@nclrights.org

*Pro hac vice application forthcoming*