**WILENCHIK & BARTNESS**
A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW
The Wilenchik & Bartness Building
2810 North Third Street  Phoenix, Arizona  85004

Telephone: 602-606-2810   Facsimile: 602-606-2811

Dennis I. Wilenchik, #005350
Karl Worthington, #018703
admin@wb-law.com

Maria Syms, Bar No. 02309
Director of Legal Services
Arizona Department of Education
1535 W Jefferson, BIN #50
Phoenix, AZ 85007
602-542-5240
Maria.Syms@azed.gov

*Attorneys for Defendant Thomas C. Horne*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| **Jane Doe, by her next friends and parents Helen Doe and James Doe; and Megan Roe, by her next friends and parents, Kate Roe and Robert Roe,**<br><br>Plaintiffs,<br><br>v.<br><br>**Thomas C. Horne, in his official capacity as State Superintendent of Public Instruction; Laura Toenjes, in her official capacity as Superintendent of the Kyrene School District; Kyrene school District; the Gregory School; and Arizona Interscholastic Association, Inc.,**<br><br>Defendants. | Case No. 4:23-cv-00185-JGZ<br><br>**DEFENDANT HORNE'S RESPONSE TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |



## I. FACTS

This case turns on one crucial fact: can plaintiffs prove that pre-puberty boys have no sports advantage over girls? They cannot. Attached as Exhibit "A" is a sworn declaration submitted in a similar lawsuit in Idaho by Dr. Gregory Brown, which states under oath at page 16: "A number of studies indicate that males' athletic advantages over females begin before puberty, and may be apparent as early as six years of age." **Ex. A** (06-03-20 Expert Declaration of Gregory A. Brown, Ph.D FACSM submitted in *Hecox v. Little*, Case No. 1:20-cv-00184-DCN in the United States District Court for the District of Idaho). Other scientific studies show that increased testosterone in males aged one to six months during mini-puberty correlates with higher growth velocity, BMI and bodyweight. **Ex. B** (Lanciotti, L., et al., *Up-to-date review about minipuberty and overview on hypothalamic-pituitary-gonadal axis activation in fetal and neonatal life*, Frontiers in Endocrinology, (July 23, 2018). https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6070773/). A study of 9 to 17-year-old children showed that compared to 9 year old females, 9 year old males were faster over short sprints (9.8%) and 1 mile (16.6%), could jump 9.5% further from a standing start, could complete 33% more push-ups in 30 seconds and had a 13.8% stronger grip. **Ex. C** (Catley, Mark Jon et al., *Normative health-related fitness values for children: analysis of 85347 test results on 9-17 year old Australians since 1985*, British J. of Sports Med., (October 21, 2011)). In another study of 6-year-olds, the males completed 16.6% more shuttle runs in a given time and could jump 9.7% further from a standing position. **Ex. D** (Tambalis KD, et al., *Physical fitness normative values for 6-18-year-old Greek boys and girls, using the empirical distribution and the lambda, mu, and sigma statistical method*, Eur. J. Sport Sci. 2016; 16(6):736-46). Even if Plaintiffs could prove that pre-puberty boys had no advantage, which they cannot, the state had a valid public purpose for passing the statute at issue.

Regardless of the fact dispute discussed above, the Save Women's Sport Act, A.R.S. § 15-120.02 (the "Act") is valid under intermediate scrutiny. As discussed below, under intermediate scrutiny, the government only needs to show an important purpose and that the challenged action is "substantially related" to the purpose. We cite Supreme Court authority that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons.

2

Perfection is not always obtainable. Legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality.

We will be submitting more evidence in support of the above cited scientific evidence that pre-puberty males have advantages over girls. Timing is significant with respect to this attempt to obtain a preliminary injunction. The case is brought by two major national organizations, represented by major NY law firms. Defendant Horne at this time is the only Defendant defending the Act and the Arizona Attorney General has both refused to defend him, despite being her client, and has refused to pay for his independent counsel. When Defendant Horne was Attorney General, he had that office pay for independent defense costs where he claimed conflict of interest. In addition, Plaintiffs have even small-mindedly opposed intervention by the Arizona legislative leaders. In order for this to be a fair contest, national organizations may want to become involved to counter the national organizations and major law firms behind this case. In addition, Defendant Horne will need at least 90 days to fully develop more evidence in support of the scientific evidence referenced above. Defendant Horne therefore respectfully requests that, in the interest of justice and fairness, consideration of the preliminary injunction be postponed for at least 90 days, or, in the alternative, that the motion be denied. The following facts support the conclusion that, even if Plaintiffs could prove that pre-puberty boys have no advantage (which they cannot) the legislature had a proper purpose in enacting the Save Women's Sports Act.

**A.   Facts Supporting the Reasonableness of the Statute Being Challenged.**

Imagine if Dennis Rodman, who likes to dress as a woman, suddenly announced that he was transgender and would compete in the WNBA, or if Floyd Mayweather said he is transgender and now will compete in women's boxing? They would dominate every competition, and cause serious injuries if competitions did occur. Progress in women's sports would be wiped out and the enactment of Title IX would be relegated to a historical footnote.

We don't have to imagine these scenarios because they are today's reality. Transgender athletes like Lia Thomas are beating some of our best women athletes, notably Olympic silver medalists Emma Weyant and Erica Sullivan. High school female athletes Selina Souie, Alanna Smith, Chelsea Mitchell and Ashley Nicoletti are having their championships and potential

college scholarships thwarted by transgender competitors. **Ex. E** (Casey Harper, *'No Chance of Winning'" Four female athletes challenge high school transgender policy,* thecentersquare.com (September 30, 2022) https://www.thecentersquare.com/national/article_eef6fe80-40d4-11ed-b716-ef3255a8ad7e.html). Arizona's Save Women's Sports Act prevents these scenarios by maintaining a level playing field for biological women while still allowing transgender females claiming no physical advantage to play on coed teams.

In recent years, a number of instances of biologically-female athletes being defeated or injured by biological males/transgender female athletes have aroused serious public concern. For example, transgender woman Lia Thomas had previously competed as a male swimmer on the University of Pennsylvania's men's swim team from 2017 to 2020. When Thomas competed in the 500-yard freestyle on the men's swim team, Thomas was 65th in the country in that event. **Ex. F** (Samarveer Singh, *What Rank Did Lia Thomas Stand at While Competing in Men's Swimming Division,* Essentially Sports (March 22, 2022), https://www.essentiallysports.com/us-sports-ncaa-news-what-rank-did-lia-thomas-stand-at-while-competing-in-the-mens-swimming-division/) Thomas then transitioned and competed on the University of Pennsylvania's women's swim team from 2021 to 2022. In March 2022, Thomas won the national championship in the women's 500-yard freestyle event, meaning that Thomas was faster than every female collegiate swimmer in the country. **Ex. G** (Katie Barnes, *Amid protests, Penn swimmer Lia Thomas becomes first known transgender athlete to win Division I national championship,* ESPN.com (March 17, 2022) https://www.espn.com/college-sports/story/_/id/33529775/amid-protests-pennsylvania-swimmer-lia-thomas-becomes-first-known-transgender-athlete-win-division-national-championship). Absent Thomas's participation, one of the biological women who had devoted extraordinary time and effort to achieving their sports goals would have won the national championship. But Thomas's participation deprived those biological women of a fair opportunity to prove they were the best female collegiate swimmer in that event. This is cosmically unfair to women athletes.

In Connecticut, Selina Soule was a dedicated high school track athlete who had devoted extensive time training to shave fractions of a second off her race times. Selina trained to win and

4

deserved a fair opportunity to prove her ability. However, after the Connecticut Interscholastic Athletic Conference allowed biological males/transgender girls to compete on their high school track team, two transgender athletes won 15 state titles that were previously held by nine different girls. After months of training for the 55-meter dash, Selina was one spot away from qualifying for the final race and to compete for a spot in the New England regional championships, where college scouts would be in attendance to determine which athletes should be offered collegiate sports scholarships. Two transgender girls took first place and second place in the race, depriving Selina of the opportunities that otherwise would have been available to her. **Ex. H** (Maureen Collins, *Why Male Athletes Who Identify as Transgender Should Not Compete in Women's Sports*, adflegal.org (September 23, 2022, revised March 10, 2023) https://adflegal.org/article/why-male-athletes-who-identify-transgender-should-not-compete-womens-sports).

Biological girls forced to compete against biological males/transgender girls in contact sports, are at a potentially higher risk of physical injury due to the average size, speed, and strength advantages males have over females. And unlike a biological girl who **chooses** to play on a boys' team, such risks are being **imposed** on female athletes who are simply competing in what they thought was a female sport. There are many examples of women sustaining potentially permanent injuries from transgender athletes.

High school volleyball player Payton McNabb suffered a concussion and neck injury in September 2022 when a biologicalmale/transgender female hit the ball into her face. She testified before the North Carolina legislature that her "life has forever been changed" as she still struggles with the side effects of her injuries, including impaired vision, partial paralysis of the right side of her body, headaches, anxiety and depression. **Ex. I** (*High School Volleyball Player Payton McNabb Urges Ban on Transgender Athletes After Serious Injury,* Marca.com (April 21, 2023) https://www.marca.com/en/ncaa/2023/04/22/64435531e2704e-470a8b45ed.html).

Biological male/transgender female mixed martial arts competitor Fallon Fox broke the skull of her opponent Tamikka Brents who later remarked "I have struggled with many women and I have never felt the strength I felt in a fight like that night…I've never felt so overpowered ever in my life. . . . I could usually move around in the clinch against… females but couldn't move

5

at all in Fox's clinch." **Ex. J** (Laura Meyers, *Transgender MMA Fighter Destroys Female Opponent,* thelibertarianrepublic.com https://thelibertarianrepublic.com/transgender-mma-fighter-destroys-female-opponent/).

A biological male/transgender female hockey player recently caused serious and possibly permanent injury to a biological female player when the larger, heavily-muscled player collided with the smaller opponent. One reporter described the incident, noting "the size imbalance between the two skaters was so great that the [far smaller] Team player ended up being propelled head first into the boards with enough force to deliver a concussion." **Ex. K** (Holt Hackney, *Professor Maintains that Trans Athletes Causing Serious Injuries to Girls,* sportslawexpert.com (December 12, 2022) https://sportslawexpert.com/-2022/12/12/professor-maintains-that-trans-athletes-causing-serious-injuries-to-girls/?utm_source=rss&utm_medium=rss&utm_campaign=professor-maintains-that-trans-athletes-causing-serious-injuries-to-girls).

### B. Legislative History Supports This Single Goal.

Motivated by the well documented, diminished opportunities for women athletes and high physical risks created by transgender participation in women's sports, the Arizona legislature enacted the Save Women's Sports Act, A.R.S. § 15-120.02, ("the Act"). It was intended to protect biological female student athletes from being compelled to compete against biological males, who identify as females, and who are, on average, larger, stronger, and faster than biological females.

In its form as Senate Bill 1165, the legislation was praised in public remarks by Jadis Argiope who identified herself as a transgender woman and said the measure simply deals with "biological reality." We agree. Argiope said, "[t]he reality is we're stronger. We have bigger bones, can take in more oxygen . . . have a better fat distribution that gives us an advantage in taking hits. We have stronger ligaments." **Ex. L** (Howard Fisher, *AZ Senate Advances Bill to Ban Transgender Kids from School Sports,* KAWC.org (January 21, 2022) https://www.kawc.org/2022-01-21/az-senate-advances-bill-to-ban-transgender-kids-from-school-sports).

Arizona Senate President Warren Petersen described the purposes of the Save Women's Sports Act as protecting female student athletes: "Female athletes deserve equal opportunities in

sporting events, which will not happen so long as males are allowed to compete against them." **Ex. M** (Gloria Rebecca Gomez, *Top Arizona Republicans ask to defend trans athlete ban in court,* TucsonSentinel.com (May 2, 2023) https://www.tucsonsentinel.com/local/report/050223_trans-ban_defense/top-arizona-republicans-ask-defend-trans-athlete-ban-court/).

Representative Nancy Barto, who introduced the bill similarly described the purpose of the Save Women's Sports Act: "Women are being displaced in their own sport. The playing field is no longer level." **Ex. N** (Sophie Lewis, *Arizona House passes bill banning transgender student athletes from participating in girls sports,* CBSNews.com (March 4, 2020) https://www.cbsnews.com/news/arizona-house-passes-bill-banning-transgender-student-athletes-girls-sports/). These statements express the important government purpose behind the legislation: not to discriminate, but rather to **prevent** discrimination in the form of unfairness against females in sports.

## II. LAW AND ARGUMENT

### A. Plaintiffs' Position is Illogical on its Face.

Plaintiffs' position can be shown to be incorrect with logic alone. Almost all of life is integrated between males and females. Sport is an exception PRECISELY because biological boys have an advantage over girls, so girls need their own teams to be able to compete fairly against pre-pubescent males. The point of enacting Title IX fifty years ago was to provide women with the same opportunities in sports as men. Allowing transgender females to participate in women's teams eliminates that level playing field and erodes all the progress celebrated in women's sports. The alternative is not only illogical but unfair.

If pre-puberty biological males have an advantage over females, then they should not be allowed to ruin girls' chances to succeed by unfairly competing on girls' teams. If, on the other hand, they have no advantage, as Plaintiffs' assert, then there should be co-ed teams. The whole reason sports is an exception to the rest of life is negated if, indeed, males have no advantage in sports. Even if that were true, the logical solution then is not to put biological males on girls' teams, but to make those sports like the rest of life, coed. That is the solution that best addresses the needs of transgender females wishing to participate in sports who claim no physical advantage over biological females while still maintaining a level field for women's sports.

### B. Standard for a Preliminary Injunction.

The Supreme Court has called preliminary injunctions "drastic and extraordinary". *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 311-12 (1982) ("An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course."). A preliminary injunction therefore "should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (quotations and citation omitted) (emphasis added in *Mazurek); accord Winter,* 555 U.S. at 22 (recognizing that a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief") (citing *Mazurek).*

"A plaintiff seeking a preliminary injunction must establish (1) that [the plaintiff] is likely to succeed on the merits, (2) that [the plaintiff] is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in [the plaintiffs] favor, and (4) that an injunction is in the public interest." *Winter v. Nat. Res. Def Council, Inc.,* 555 U.S. 7, 20 (2008) (citations omitted). Plaintiffs here do not establish these factors. A preliminary injunction "is an extraordinary remedy . . . that grants relief *pendente lite* of the type available after the trial." *Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.,* 550 F.2d 189 (4th Cir. 1977)), *cert. granted, judgment vacated on other grounds and remanded,* 559 U.S. 1089 (2010). Preliminary injunctions are "never awarded as of right .... " *Munaf v. Geren,* 553 U.S. 674,690 (2008).

### C. Plaintiffs Are Unlikely to Succeed on the Merits Because the Save Women's Sports Act Does Not Violate the Equal Protection Clause or Title IX.[1]

#### 1. *Title IX Actually Was Adopted to Promote Sex Equality by Permitting Sex-Separated Sports and the Act Does Not Violate Title IX.*

First, Regulations adopted under Title IX expressly permit separation of athletes by sex determined at birth. A Title IX recipient is permitted to "operate or sponsor **separate [sports] teams for members of each sex** where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  34 C.F.R. § 106.4l(b) (emphasis added). The regulations also require recipients to "provide equal athletic opportunity for members of both

---

[1] Plaintiffs do not cite the ADA and Horne therefore does not address the ADA.

sexes," including by considering whether the "levels of competition effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c). *Lafler v. Athletic Bd. of Control,* 536 F. Supp. 104, 106 (W.D. Mich. 1982) ("Although many courts have recognized a woman's right to an equal opportunity to participate in sports, . . . courts have also recognized that such equal opportunity may be provided through separate teams or competitions for men and women .... The regulations promulgated under Title IX ... specifically permit the establishment of separate male and female teams in contact sports. The United States Congress, in calling for the provision of 'equal opportunity to amateur athletes ... to participate ... without discrimination on the basis of ... sex ...' in the Amateur Sports Act, 36 U.S.C. § 391(b)(6), anticipated that such equal opportunity would sometimes be provided through the use of separate programs for men and women ....") (citations omitted).

And the Ninth Circuit has recognized cases that affirm the exclusion of biologic boys from biologic girls' teams as "a legitimate means of providing athletic opportunities for girls" due to physical differences between boys and girls. *Clark, By and Through Clark v. Arizona Interscholastic Ass'n,* 695 F.2d 1126, 1130 (9th Cir. 1982). *See also, O'Connor v. Bd. of Ed. of Sch. Dist. No. 23,* 645 F.2d 578, 582 (7th Cir. 1981) ("Title IX aims to provide equal opportunity in educational programs" and permits "separate-sex teams and ... exclusion of girls from" certain boys' teams).

Plaintiffs ignore these sex differences and the absence of any established alternative standards to apply.  Plaintiffs instead deny they have a competitive advantage over biological girls, because Plaintiffs also identify as girls, and take medication to prevent male puberty. The legislature properly chose to avoid these kinds of non-uniform criteria, and instead to limit teams to either biological boys, girls or alternative coeducational participation.

Title IX permits such sex-separated teams for the very purpose of promoting sex equality, because sex-related physical differences effect the fairness of sports competition and it is understood that girls would generally have a competitive disadvantage.  Requiring girls to compete against boys was understood to be inherently unfair, because girls would likely lose out on opportunities for participation.  For example, opportunities to start on or even play for a team

create an overall sense of responsibility and well-being, and opportunities for scholarships. Here, it is undisputed that the plaintiffs are biologically born as males, and that they or their parents have chosen to provide them drugs to try to inhibit their puberty.  Girls competing against biological males in contact sports may cause girls to suffer more physical injuries and a loss of self- esteem.  The whole point of Title IX would be frustrated by what Plaintiffs seek here.

Sex-separated sports are lawful, and have been upheld for these important reasons, and far from violating Title IX, the "Save Women's Sports Act" powerfully promotes the same goal of sex equality in athletics, in compliance with, and consistent with, Title IX.  Plaintiffs therefore are not likely to prevail on their Title IX claim, and the Court should deny the requested preliminary injunction based on this.

### 2. *The Save Women's Sports Act Does Not Violate the Equal Protection Clause Because it is Substantially Related to an Important Government Purpose.*

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws. It is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432,439 (1985)).  Here, biological boys are to be treated the same as biological girls in being able to participate in their relative sports teams based on their sex. They are not discriminated on the basis of sex. The Act allows them to be similarly situated to others of the same sex.  And the Supreme Court instructs judges to recognize "the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans,* 517 U.S. 620, 631 (1996).  "[L]egislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality." *Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992) (quotations omitted).  In assessing an Equal Protection claim a court must therefore first determine whether the statute at issue fails to treat all "similarly-situated" persons equally.  If it does not, then the Equal Protection claim fails under any scrutiny.

However, even if it is shown that the challenged statute does treat similarly-situated persons differently, then the government must show: (1) the government's action has a purpose, and (2) the government action is sufficiently tailored to the purpose. Based on the type of classification at issue, the test is refined to address (1) the importance of the government's purpose (e.g., a "compelling" or "important" purpose), and (2) how closely related the challenged statute is to achieving that purpose (e.g., "narrowly tailored" or "substantially related"). *United States v. Virginia,* 518 U.S. 515, 533 (1996). Equal Protection challenges based on sex, as here, are subject to intermediate scrutiny. *Clark v. Jeter,* 486 U.S. 456, 461, (1988) (applying intermediate scrutiny under the Equal Protection Clause to sex-based classifications). Under intermediate scrutiny, the governmental purpose need only be "important," and the challenged governmental action need only be "substantially related" to that purpose. *United States v. Virginia,* 518 U.S. at 524. While we contend that similarly situated persons are treated alike here, even were it otherwise, there is an important government purpose here closely related to the Act's rational distinctions between the sexes. The fact that Plaintiffs assert an as applied challenge does not help them. An as applied challenge is usually made with respect to an application inconsistent with an otherwise valid constitutional statute. In this case, the application is completely consistent with the intention of a valid constitutional statute.

### a) *The Save Women's Sports Act Treats Similarly-Situated Students Equally.*

All biological boys are prevented from competing on girls' teams under the Act—regardless of their gender identity. The Save Women's Sports Act closes biological girls' teams to all biological boys, *regardless of their gender identity,* because it is not the athlete's <u>gender identity</u> that causes the harm the Act aims to prevent, but the physical reality of being <u>biologically male</u> with the attendant physical advantages over females. Even though Plaintiffs allege they are repressing their sexual development as males through drugs, their individual treatments are not uniformly applied universally to all transgender girls, and such disparate, individualized treatments cannot be fully monitored or tested under any uniform standard known. Instead, it is the athlete's biological sex that is undeniable, that raises the unfairness and safety issues the Save Women's Sports Act seeks to remedy, particularly here for young growing female athletes.

Because the Save Women's Sports Act excludes ***all biological boys*** from girls' teams, ***regardless of their voluntary choice of gender identity*** (i.e., both (1) biological boys who identify as girls and (2) biological boys who identify as boys), the Act does not discriminate on the basis of gender identity. In addition, choosing to identify as another sex does not render the Act violative of any federal law or constitutional right to force participation on a girls' sports team. Rather, the Plaintiffs "situation" is that by virtue of *being biological boys*—not by virtue of their gender identity—allowing them to play on girls' teams with biological girls will be physically unfair and dangerous to biological girls. Not only are these Plaintiffs not being treated differently from similar persons who identify as girls, but even were that so, there is an important governmental purpose to protect girls' sports teams as such that Title IX was adopted to also protect.

### b) *Safety and Fairness in School Sports are Important Governmental Interests.*

The purposes of the Save Women's Sports Act is to prevent the physical differences between biological boys (regardless of their gender identity) and biological girls from causing a competitive disadvantage and/or injury to biological girls of equivalent physical development. While Plaintiffs demand perfection in the Act, the Court should bear in mind that the Act need not have perfect or even "compelling" purposes (as is the case with strict scrutiny). To pass muster under intermediate scrutiny, the Save Women's Sports Act need only have "important" goals. *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997).

The goal of the Act is important. It is clear that providing safety and fairness to girls in sports competition are important governmental purposes. *United States v. Virginia,* 518 U.S. at 533 ("The heightened review standard our precedent establishes does not make sex a proscribed classification. Supposed 'inherent differences' are no longer accepted as a ground for race or national origin classifications. Physical differences between men and women, however, are enduring: '[T]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both.'") (citations omitted).

### c) *Limiting Girls' Sports to Biological Girls is Substantially Related to Safety and Fairness in School Sports.*

#### (1) Biological boys are, on average, bigger, stronger, and faster than biological girls.

The Ninth Circuit has already determined that biological males have inherent and real physical advantages over biological girls in sports competition:

> "The record makes clear that due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team. Thus, athletic opportunities for women would be diminished. As discussed above, there is no question that the Supreme Court allows for these average real differences between the sexes to be recognized or that they allow gender to be used as a proxy in this sense if it is an accurate proxy."

*Clark, By & Through Clark v. Ariz. Interscholastic Ass'n,* 695 F.2d 1126, 1129-31 (9th Cir. 1982) (collecting cases).[2]  It follows then that biological girls who are forced to play against biological boys, regardless of their gender identity, will more likely face unfairness and danger and injuries more often than if they played only against, and with, other biological girls of their age in competition.  Classifications in the Save Women's Sports Act only need to be "substantially" related to its goals.  They are substantially related and serve important fairness and safety purposes for the different biological sexes. That is sufficient to uphold the statute.

A classification that relies to some degree on generalizations about the class averages can be "substantially" related to its end and satisfy the requirements of intermediate scrutiny correctly

---

[2] *See also O'Conner v. Board of Education,* 645 F.2d 578 (7th Cir.) (examining other cases excluding participation based on a student's sex and holding "the exclusion was a legitimate means of providing athletic opportunities for girls," noting "that the classification of teams based on sex was based on the innate physical differences between the sexes, [rather than on] generalizations that are archaic [or attitudes of] romantic paternalism," acknowledging "that the sexual classification could be avoided by classifying directly on the basis of physical differences such as height or weight, but concluded that such classifications would be too difficult to devise, primarily because of strength differentials between the sexes," noting that "[h]andicapping competitions ... would be difficult and contrary to the interest of achieving the best competition possible," noting that "multi-tiered teams ... [ would be] too expensive to impose on the schools," and concluding "that sex was the only feasible classification to promote the legitimate and substantial state interest of providing for interscholastic athletic opportunities for girls") (quotations, citations, and parallel citations omitted), cert. denied, 454 U.S. 1084 (1981).

applied. A classification based on average differences such as the one here can withstand intermediate scrutiny. *Califano v. Webster,* 430 U.S. 313, 318 n.5 (1977) (social security rule that favored women satisfied intermediate scrutiny because "women *on the average* received lower retirement benefits than men."). For that reason, it does not matter that any particular students—including Plaintiffs—might not have yet gone through puberty. A perfect, or even best-possible, fit between a government's chosen means (*i.e.,* the classification) and its important goals is not required under intermediate scrutiny. Intermediate scrutiny tolerates classifications based on averages even though they may be imperfect.[3] Therefore, making reasonable distinctions based on biological sex is at least substantially related to fairness and safety in sports.

(2) Plaintiffs' focus on testosterone levels is misplaced.

Plaintiffs' factual argument against the Save Women's Sports Act relies almost entirely on the notion that participation on girls' sports teams should be determined—not based on biological sex—but on voluntarily applied testosterone levels. The scientific evidence cited above proves that male advantage relates to more than post-puberty testosterone levels.

**D.    Plaintiffs Will Not Suffer Irreparable Harm Absent Preliminary Relief.**

Plaintiffs are also required to prove that they would be "irreparably harmed" if they are not permitted to try out for and presumably join an all-girls' sports team. Plaintiffs primarily argue *per se* irreparable harm based on the alleged violations of the Equal Protection Clause and Title IX. Pl. Br. at 12-13. But as explained above, the Save Women's Sports Act does not violate either the Equal Protection Clause or Title IX. Therefore, no irreparable harm exists on that basis.

Plaintiffs also allege irreparable harm in the form of mental, physical, and emotional harm, and dignitary or stigmatic injury, ignoring the very harm their participation might cause girls (of which the number is much larger than biological males/transgender females who seek to compete against biological girls) in being forced to compete against biological males/transgender females.

---

[3] A rule limiting draft registration to men, for example, satisfied intermediate scrutiny even "assuming that a small number of women could be drafted for noncombat roles" because "Congress simply did not consider it worth the added burdens of including women in draft and registration plans." *Rostker v. Goldberg,* 453 U.S. 57, 81 (1981).

14

Pl. Br. at 13.  A recent Title IX case rejected such claims as this of Plaintiffs.  That case involved a female student who wanted to participate on the boys' team, instead of the girls', soccer team at her high school.  *Gregor v. W. Va. Secondary Sch. Activities Comm'n,* No. 2:20-CV-00654, 2020 WL 6292813, at *1 (S.D. W. Va. Oct. 27, 2020).  The Court noted that the plaintiff had no other option "for playing soccer because she had missed any opportunity to try out for the girls' team or private club team." *Id.* at *4. The Court nevertheless found that the plaintiff would not be irreparably harmed if she was not permitted to play on the boys' team:

> "Courts are divided over whether not being able to participate in athletics constitutes irreparable harm. **But most courts seem to lean toward the harm being irreparable only when the person cannot participate in the sport at all.** *Reed v. Nebraska School Activities Assoc.,* 341 F. Supp. 258 (D. Neb. 1972) ( finding irreparable harm when a girl would not be able to play golf at all if not permitted to play on the boys' golf team); *D.M. by Bao Xing v. Minnesota State High School League,* 917 F.3d 994, 1003 (8th Cir. 2019) (finding irreparable harm when boys would have no school dance team to compete on if not permitted to join the girls' dance team). Other courts have found that students are not irreparably harmed even when the student is barred from competition for an entire season."

2020 WL 6292813, at *4 (emphasis added). Addressing the same issue, another District Court likewise stated that "[t]his Court, as well as all other federal courts, have previously and consistently held that ineligibility for participation in interscholastic athletic competitions alone does not constitute irreparable harm."  *Dziewa v. Penn. Interscholastic Athletic Ass'n, Inc.,* No. 08-CV-5792, 2009 WL 113419, at *7 (E.D. Pa. Jan. 16, 2009); *see also Revesz ex rel. Revesz v. Penn. Interscholastic Athletic Ass'n, Inc.,* 798 A.2d 830, 837 (Pa. Commw. Ct. 2002) (holding that "the loss of an opportunity to play interscholastic athletics for one year does not constitute irreparable harm").  Because Plaintiffs will not be irreparably harmed according to the relevant caselaw, the Court should deny the Preliminary Injunction Motion for this reason as well.

### E.  <u>The Balance of Equities and the Public Interest Favor Denying Preliminary Relief</u>

We have discussed above the public interest behind the Save Women's Sports Act.  In *Yakus v. United States,* 321 U.S. 414, 440-41 (1944), the U.S. Supreme Court held "where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold

relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff."

Moreover, although Plaintiffs allege they refuse to play sports on the boys' teams, they do have that option. They can also seek an order requiring a co-ed team if this Court ultimately finds that pre-puberty males have no advantage, which would be a much more reasonable proposed remedy. The Save Women's Sports Act in no way precludes them from obtaining the benefits of sports competition they claim to be deprived of, that would accrue from participation on the boys' teams or coed teams. That Plaintiffs decline to avail themselves of those benefits in no way indicts the Act. Respectfully, this case is about more than Plaintiffs' voluntary choices and decisions. It is about the fairness to and safety of many, many biological girls who, absent the Save Women's Sports Act, may have to compete against biological boys and be precluded from excelling. Those girls may face emotional injury, physical injury, and competitive disadvantage from such a situation as Plaintiffs demand. Superintendent Horne and the State also face harm if a preliminary injunction is issued. There are simply no other uniform standards established to monitor the mess that would be created by Plaintiffs were they to succeed here.

Plaintiffs finally argue that "it is always in the public interest to prevent the violation of a party's constitutional rights." Pl. Br. at 13-14. What about the rights of girls who cannot compete against biological boys? Plaintiffs' argument is circular and should be applied in reverse. It requires assuming up front something that has not been decided yet: *i.e.,* that Plaintiffs have a valid claim. Accepting this argument would render the equity balancing and public interest factors a complete nullity.

The public interest also supports not interfering with the implementation of a law that will provide substantial benefits to female athletes. The disruption and unfairness caused to others by Plaintiffs insisting on unfairly competing against biological girls is undeniable. If the preliminary injunction were to be granted, a number of schools would permit biological males/transgender females to compete against girls. The Department of Education has a vital interest in the well-being of its students. This would be devastating to girls who hope to excel, but cannot because they're competing against biological boys and being deprived of scholarships.

16

In addition, the issuance of a preliminary injunction would be an encouragement to those boys who desire to excel in sports, and may be willing to transition to girls in order to do so. If they resort to puberty blockers, or other medical treatment to make them into what appear to be girls, this could do tremendous physical and psychological damage to those boys. With the dramatic rise of adolescents experiencing gender dysphoria in recent years often attributed to peer influence, social media, as well as social and political pressure, we should be mindful of the fluid nature of adolescence. At least one recent study found that 60% of the participants who detransitioned did so because they became more comfortable with their natal sex. 40% of the detransitioners stated their gender dysphoria was caused by a mental health condition and 62% felt medical professionals did not investigate whether trauma was a factor in their transition decisions. **Ex. O** (Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners,* Archives of Sexual Behavior, (October 5, 2020) https://link.springer.com/content/pdf/10.1007/s10508-021-02163-w.pdf). Recognizing the dangers, many European countries have halted hormone treatments for adolescents experiencing gender dysphoria. In February 2022, Sweden halted hormone therapy for minors except in very rare cases. **Ex. P** (*Sweden puts brakes on treatments for trans minors*, france24.com (February 8, 2023) https://www.france24.com/en/live-news/20230208-sweden-puts-brakes-on-treatments-for-trans-minors.) As the first country in the world to allow a legal option for gender reassignment in 1972, Sweden's decision should give those pushing hormone therapy pause. Finland made a similar decision and France called for "the utmost reserve" on hormone treatments for young people. A policy that encourages fast-track, irreversible medical treatments for young people who are still developing their own identity is not only irresponsible but will cause irreparable harm.

## CONCLUSION

Defendant Horne respectfully requested to grant Defendant an additional 90 days to compile evidence as Plaintiffs did at leisure, and then deny the Motion for Preliminary Injunction.

**RESPECTFULLY SUBMITTED** on May 18, 2023.

                                **WILENCHIK & BARTNESS, P.C.**

                                */s/ Dennis I. Wilenchik*
                                Dennis I. Wilenchik, Esq.
                                Karl Worthington, Esq.
                                The Wilenchik & Bartness Building
                                2810 North Third Street
                                Phoenix, Arizona 85004
                                admin@wb-law.com
                                *Attorneys for Defendant Thomas C. Horne*

                                */s/ Maria Syms, Esq.*
                                Director of Legal Services
                                Arizona Department of Education
                                1535 W Jefferson, BIN #50
                                Phoenix, AZ 85007
                                Maria.Syms@azed.gov

                                *Attorneys for Defendant Thomas C. Horne*

18

CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrant:

*By:/s/ Hilary Myers*

