James K. Rogers (Ariz. Bar No. 027287)
 *Senior Counsel*
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave., SE #231
Washington, D.C. 20003
Phone: (202) 964-3721
James.Rogers@aflegal.org
*Attorneys for Proposed Defendant-Intervenors Anna Van Hoek, Lisa Fink,*
*Amber Zenczak, and Arizona Women of Action*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA
## TUCSON DIVISION

| | |
|---|---|
| Jane Doe, *et al.*, <br><br> Plaintiffs, <br> v. <br><br> Thomas C. Horne, in his official capacity as State Superintendent of Public Instruction, *et al.*. <br><br> Defendants. | Case No. 4:23-cv-00185-JGZ <br><br> **Motion to Intervene of Anna Van Hoek, Lisa Fink, Amber Zenczak, and Arizona Women of Action** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

Introduction ............................................................................ 1

Background ............................................................................. 2

I.    The Save Women's Sports Act ........................................... 2

II.   This Lawsuit ................................................................. 2

III.  Proposed Intervenors .................................................... 3

    A.   Anna Van Hoek, Lisa Fink, and Amber Zenczak ............. 3

    B.   Arizona Women of Action ........................................ 8

Argument ............................................................................. 9

I.    This Court Should Grant Intervention as of Right. ................... 9

    A.   The Parent Representatives' Motion to Intervene Is Timely. ............... 9

    B.   The Parent Representatives Have Significant Protectable Interests That Will Be Impaired Absent Intervention. ...................... 10

    C.   The Parent Representatives' Interests Will Be Impaired If Plaintiffs' Requested Relief is Granted. ......................... 12

    D.   The Parent Representatives' Interests Are Not Adequately Represented. ......... 13

        1.   Defendants Will Not Undoubtedly Make the Same Arguments as the Parent Representatives. ................. 14

        2.   Superintendent Horne Is not Capable of Making the Parent Representatives' Arguments. ................. 15

        3.   The Parent Representatives Will Offer Necessary Elements Other Parties Would Neglect ................. 16

II.   Permissive Intervention Is Warranted. ................................. 16

# TABLE OF AUTHORITIES

**CASES**

*Alabama Legislative Black Caucus v. Alabama,*
    575 U.S. 254 (2015) ............................................................................... 11

*Arakaki v. Cayetano,*
    324 F.3d 1078 (9th Cir.2003) ............................................................. 13

*B.P.J. v. W. Virginia State Bd. of Educ.,*
    2021 WL 5711547 (S.D.W. Va. Dec. 1, 2021) ................................. 1, 16

*Butler, Fitzgerald & Potter v. Sequa Corp.,*
    250 F.3d 171 (2d Cir. 2001) ................................................................. 16

*California v. EPA,*
    2018 WL 6069943 (N.D. Cal. Nov. 20, 2018) ................................... 16

*Californians For Safe & Competitive Dump Truck Transp. v. Mendonca,*
    152 F.3d 1184 (9th Cir. 1998) ........................................................ 14, 15

*Citizens for Balanced Use v. Montana Wilderness Ass'n,*
    647 F.3d 893 (9th Cir. 2011) ............................................................. 9, 10

*Clark, ex rel. Clark v. Arizona Interscholastic Ass'n,*
    695 F.2d 1126 (9th Cir. 1982) ........................................................ 11, 12

*Ctr. for Biological Diversity v. Kempthorne,*
    2009 WL 10673068 (D. Ariz. Jan. 16, 2009) ................................... 13

*Greene v. Raffensperger,*
    2022 WL 1045967 (N.D. Ga. Apr. 7, 2022) ..................................... 14

*Hecox v. Little,*
    479 F. Supp. 3d 930; 2023 WL 1097255 (D. Idaho 2020) .......... 1, 11

*Hines v. Rapides Parish School Bd.,*
    479 F.2d 762 (5th Cir. 1973) ........................................................... 1, 11

*Johnson v. San Francisco Unified Sch. Dist.,*
    500 F.2d 349 (9th Cir. 1974) ................................................... 1, 11, 14

*Linton v. Commissioner of Health & Env't,*
    973 F.2d 1311 (6th Cir.1992) ............................................................. 13

*Michigan State AFL-CIO v. Miller,*
    103 F.3d 1240 (6th Cir. 1997)..............................................................13

*Miller v. Ghirardelli Chocolate Co.*
    2013 WL 6776191 (N.D. Cal. Dec. 20, 2013) .........................................16

*Nw. Forest Res. Council v. Glickman,*
    82 F.3d 825 (9th Cir.1996)...................................................................10

*Parents for Privacy v. Barr,*
    949 F.3d 1210 (9th Cir. 2020)..............................................................11

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007)...........................................................................11

*Prete v. Bradbury,*
    438 F.3d 949 (9th Cir.2006)....................................................................9

*Smith v. Los Angeles Unified Sch. Dist.,*
    830 F.3d 843 (9th Cir. 2016).....................................................1, 11, 13

*Spangler v. Pasadena City Bd. of Educ.,*
    552 F.2d 1326 (9th Cir. 1977)..................................................1, 11, 17

*Teague v. Bakker,*
    931 F.2d 259 (4th Cir. 1991).............................................................15, 16

*Trbovich v. United Mine Workers of Am.,*
    404 U.S. 528 (1972)...........................................................................14

*Troxel v. Granville,*
    530 U.S. 57 (2000)............................................................................10

*U.S. ex rel. McGough v. Covington Techs. Co.,*
    967 F.2d 1391 (9th Cir. 1992).............................................................13

*United States v. Aerojet Gen. Corp.,*
    606 F.3d 1142 (9th Cir. 2010)........................................................13, 16

*United States v. State of Oregon,*
    839 F.2d 635 (9th Cir. 1988)...............................................................13

**FEDERAL RULES**

Federal Rules of Civil Procedure Rule 17(c)(1)................................................................. 10

Federal Rules of Civil Procedure Rule 24.......................................................................... 1

**STATE STATUTES**

A.R.S. § 1-601(A)……………………………………………………………………10

A.R.S. § 15-120.02……………………………………………………………………*passim*

**OTHER AUTHORITIES**

Proceedings of Ariz. House Judiciary Com. ...................................................................... 2

Proceedings of Ariz. Senate Judiciary Com....................................................................... 2

## Introduction

Proposed Intervenors Anna Van Hoek, Amber Zenczak, Lisa Fink, and USA Women of Action (d/b/a "Arizona Women of Action") move under Federal Rule of Civil Procedure 24 to intervene in this action. The proposed intervenors (collectively, the "Parent Representatives") have a strong protectable interest in defending Arizona's Save Women's Sports Act, A.R.S. § 15-120.02. They offer a critical and unique perspective as yet unrepresented in this action: that of Arizona parents and their student-athlete daughters who support the Save Women's Sports Act.

Counsel contacted counsel for all parties to this case and asked their position on this Motion. Superintendent Horne and the Intervenor Legislators support this Motion. The Arizona Interscholastic Association does not oppose intervention. The Gregory School takes no position. Defendants Kyrene School District and Superintendent Toenjes are unlikely to take a position on any proposed intervention. The Plaintiffs oppose intervention.

In other actions similar to this one, district courts have routinely allowed student-athletes to intervene, *E.g., B.P.J. v. W. Virginia State Bd. of Educ.*, No. 21-CV-00316, 2021 WL 5711547, at *3 (S.D.W. Va. Dec. 1, 2021); *Hecox v. Little*, 479 F. Supp. 3d 930, 951 (D. Idaho 2020), aff'd, 2023 WL 1097255 (9th Cir. Jan. 30, 2023). Moreover, the Ninth Circuit has consistently held that parents may intervene to defend their and their children's interests, even when public officials are already defending the case. *Spangler v. Pasadena City Bd. of Ed.*, 552 F.2d 1326, 1329 (9th Cir. 1977) (quoting *Hines v. Rapides Parish School Bd.*, 479 F.2d 762, 765 (5th Cir. 1973)); *see also, Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 853-64 (9th Cir. 2016) (reversing district court's denial of parent group's intervention motion and remanding); *Johnson v. San Francisco Unified Sch. Dist.*, 500 F.2d 349, 353–54 (9th Cir. 1974) (same).

This Court should do likewise and grant the Parent Representatives' motion.[1]

---

[1] In conformity with Rule 24(c), attached as Exhibit 1 is a proposed Motion to Dismiss.

**Background**

I.     **The Save Women's Sports Act**

The Arizona legislature adopted the Save Women's Sports Act, S.B. 1165, in March 2022, and Governor Ducey signed it on March 30, 2022. Codified at A.R.S. § 15-120.02, the Save Women's Sports Act went into effect on September 24, 2022.

The Save Women's Sports Act is focused on protecting the students harmed by violations of the Act. It creates a private right of action for "[a]ny student who is deprived of an athletic opportunity or suffers any direct or indirect harm as a result of a school knowingly violating this section" or "who is subject to retaliation ... by a school or an athletic association or organization." A.R.S. § 15-120.02(E)-(F).

In the Senate Judiciary Committee, Senator Warren Peterson explained that his "yes" vote was because the Act's intent was protecting girls: "kids will be harmed if we don't prevent this.… This bill protects our daughters and our granddaughters."[2] Senator Nancy Barto explained to the Arizona House Judiciary Committee that the bill was in part prompted by policies of the Canyon Athletic Association and the Defendant Arizona Interscholastic Association that "opened the door to this type of unfair play by allowing biological males to play on girls and women's sports teams."[3]

II.    **This Lawsuit**

On April 17, 2023, the Plaintiffs filed this suit to challenge the Act on Equal Protection, Title IX, and ADA grounds. (Doc. 1, ¶¶ 68-85.) The same day, the Plaintiffs also filed a motion for preliminary injunction alleging the Save Women's Sports Act will cause them to "suffer severe and irreparable mental, physical, and emotional harm," even though the law had already been in effect for almost seven months.

On May 1, 2023, Senator Warren Peterson and Representative Ben Toma (the

---

[2] Daily Independent, *Proceedings of Ariz. Senate Judiciary Com.*, *Arizona Senate Committee Passes "Save Women's Sports Act,"* YouTube at 1:20:19-1:21:00, (Mar. 24, 2022), https://tinyurl.com/ezxkfye9.
[3] Arizona Senate Republicans, *Proceedings of Ariz. House Judiciary Com. After passing the Senate, the 'Save Women's Sports Act' just passes the House*, YouTube at 2:03-2:19, (Mar. 24, 2022), https://tinyurl.com/yt4k8du5.

"Legislators"), acting on behalf of the Arizona Legislature, filed a Motion to Intervene. (Doc. 19.) On June 12, 2023, this Court denied in part and granted in part their motion, "grant[ing] permissive intervention on a limited basis ... to present argument and evidence in opposition to [the] Motion for Preliminary Injunction." (Doc. 79 at 1.)

## III.   Proposed Intervenors

### A.   Anna Van Hoek, Lisa Fink, and Amber Zenczak

Anna Van Hoek is a resident of Gilbert, Arizona. She has one 13-year-old daughter who is still a minor and another daughter who is 18. Exh. 2, Decl. of Anna Van Hoek ("Van Hoek Decl.") ¶¶ 1-2, 6. This school year, her daughter will attend high school in the Chandler Unified School District and play softball on the school team, which participates in the Arizona Interscholastic Association (AIA). She attended middle school in the Higley Unified School District and played softball on a team that also participates in the AIA. She has played on girls' sports teams since she was nine years old and on school teams since seventh grade. *Id.* ¶ 3.

Lisa Fink is a resident of Glendale, Arizona and is the mother of five daughters. Exh. 3, Decl. of Lisa Fink ("Fink Decl.") ¶ 1. Her 17-year-old daughter plays volleyball on a girls' team at a publicly funded charter school in Phoenix, Arizona. *Id.* ¶ 2. Mrs. Fink is the coach of the team. *Id.* ¶ 4. Her daughter has played volleyball since she was 11. *Id.* ¶ 4. Mrs. Fink's daughter's school is "a member of the Canyon Athletic Association (CAA), which is an Arizona non-profit that organizes and facilitates interscholastic activities among its members. CAA member schools include charter schools [and] public schools." *Id.* ¶ 3.

Amber Zenczak is a resident of Maricopa, Arizona and is the mother of three daughters, two of whom are still minors. Exh. 4, Decl. of Amber Zenczak ("Zenczak Decl.") ¶¶ 1-2. Her "middle daughter is 14 years old and will enter ninth grade this school year. She has played on girls' sports teams in school since she was 11 years old. She plays on her school's teams for soccer and basketball and is also considering adding tennis and track this year." *Id.* ¶ 4. Her "youngest daughter is 13 years old and

will enter eighth grade this school year. She has played on girls' sports teams in school since she was nine years old.... She plays on her school's basketball, softball, and soccer teams and plans to do track and field in high school." *Id.* ¶ 5. The girls' school is a member of the CAA.

Kyrene School District's "open enrollment policy [] allows students from the City of Maricopa to enroll.... Kyrene … provides bus service for children who live in Maricopa and are enrolled in" certain Kyrene schools. *Id.* ¶ 3. "Kyrene maintains a bus stop in a subdivision" close to Ms. Zenczak's house. *Id.* "Kyrene School District covers kindergarten through eighth grade and then feeds students into Tempe Union School District for high school. It is possible that [Ms. Zenczak's] daughters could go to Kyrene School District or Tempe Union School District for better sports opportunities and improved prospects for college sports scholarship opportunities." *Id.*

All three mothers believe that "[p]articipating in girls' team sports has dramatically benefited [their] daughters' personal and social development. Their experiences have built their self-confidence and allowed them to experience a type of camaraderie and friendship that could not be replicated anywhere else. If their teams also included persons born as biological males, virtually all those benefits would evaporate." Zenczak Decl. ¶ 8; *see also* Van Hoek Decl. ¶ 4; Fink Decl. ¶ 5.

Ms. Van Hoek believes these benefits would disappear because "the presence of biological boys creates a significant obstacle to girls achieving their best performance." Van Hoek Decl. ¶ 5. Her two daughters have experienced these obstacles firsthand, and her "younger daughter would give up on softball if she were forced to play on a team with biological boys, or to compete against biological boys." *Id.* ¶¶ 5-7.

Mrs. Fink coaches her daughter's school volleyball team. Fink Decl. ¶ 2. Mrs. Fink "also played sports as a student." *Id.* ¶ 7. She and her daughter have had years of opportunities "to closely observe both pre- and post-pubescent biological males playing ... sport[s] ... and have been able to observe and compare biological males and females in athletic situations." *Id.* Ms. Van Hoek and Ms. Zenczak, and their daughters, have

4

had similar opportunities to observe the differences between the athletic performance of biological males and females. Van Hoek Decl. ¶ 8; Zenczak Decl. ¶ 13. All three mothers, and their daughters, believe that "biological boys have an innate athletic advantage that would give them an unfair advantage in girls' sports. Because of [their] daughters' longstanding participation in athletics, [they] have been able to observe and compare the athletic performance of biological girls and boys, and [their] observation is that boys enjoy an athletic advantage over girls at all ages, including before puberty." Van Hoek Decl. ¶ 8; *see also* Fink Decl. ¶ 9; Zenczak Decl. ¶ 13.

Mrs. Fink and her daughter "believe that a biological male on their team would have an unfair advantage to be able to get a starting position on the team and achieve other similar benefits and advantages. This would create an environment on the team of disunity and corrosive rivalry. Furthermore, if biological males were allowed to play on" competing teams, "those teams would have an unfair advantage. It would create a strong sense that the competition was not on a level playing field." Fink Decl. ¶ 7.

These threatened harms are not hypothetical for the daughters of Mrs. Fink and Ms. Zenczak. For Mrs. Fink's daughter, "in 2020, an opposing team had a player who very clearly appeared to be a biological male. The girls on the team came to [Mrs. Fink] as their coach and told [her] that they were very upset about having to compete against a biological male because they felt that this made the game unfair." Fink Decl. ¶ 7. Similarly, last school year,  Ms. Zenczak's "youngest daughter's girls' basketball team played a game against another school's girls' team that had one player who was transgender—in other words, this player was a biological male. This transgender player played in a style very different from the norm for girls' basketball. The player was more aggressive than the other players and unnecessarily touched the other players all over the court." Zenczak Decl. ¶ 9. This transgender player violently fouled Ms. Zenczak's daughter, but "[t]he referees did not make any calls on this obvious foul," evidently "because of fear of accusations of discrimination and to avoid retaliation from trans activists." *Id.* ¶ 9. "The game was unfair because this player had an obvious inherent

advantage—the player ran considerably faster, was noticeably taller, and had a thicker build. All these intrinsic advantages made it hard even for this player's own teammates to keep up… The presence of this player caused noticeable distress and anguish to the biological girls on [Ms. Zenczak's] daughter's team, and even to the other members of the player's own team. It also caused considerable distress and anguish to [Ms. Zenczak] and the other parents at the game." *Id.*

The experience of Ms. Zencak's daughter "permanently changed [her] outlook and approach to sports. She has a persistent fear that she will one day have to compete against biological males for the limited number of spots on her girls' sports team or the limited number of college scholarship opportunities for female athletes." *Id.* ¶ 10. This experience has even affected Ms. Zenczak's older daughter, who has decided "she would refuse to ever play against a team with a biological male on it because of the much greater risk of suffering severe injury that may cause lifelong damage and chronic pain." *Id.* ¶ 11. Similarly, Ms. Van Hoek's 18-year-old daughter played on girls' soccer teams since she was three and "had realistic hopes that she would get a college soccer scholarship." Van Hoek Decl. ¶ 6. However, her local city league does not have girls-only teams for girls older than 15, and she was forced to play on co-ed teams. *Id.* "On her girls' teams, she had been a star player who scored most of the goals as a center striker. On the co-ed team, she was rarely ever even able to touch the ball because the boys dominated the games. She became so discouraged that she ended up quitting soccer.... Unfortunately, playing with the boys ruined her love for the game and ended her soccer career prematurely." *Id.*

Mrs. Fink and her daughter "believe that biological females have a right to have their own spaces for socialization and collaboration. Adolescence for biological females is a period of significant physical and mental change" that "can cause significant stress and anxiety for biological females. One of the most important ways that biological girls deal with that stress and anxiety is by supporting each other." Fink Decl. ¶ 8. "A biological male on the team would not be able to relate in the same way with the

6

biological females," however, because "[a] biological male who has been taking puberty blockers or hormones does not go through the exact same process of change and development as a biological female." *Id.* They thus support the Save Women's Sports Act because "[t]he presence of a biological male will destroy the value of the team as a female-only space for girls to socialize and support each other. It will eliminate much of the benefit of having girls-only sports teams." Fink Decl. ¶ 8.

Ms. Zenczak and her daughter believe that "allowing biological males to compete on female teams discriminates against biological females" because "when biological males participate in girls-only sports teams, they have obvious natural advantages that degrade the integrity of the sport and make a fair and level playing field for the biological females impossible." Zenczak Decl. ¶ 14. Thus, they see their support of the Save Women's Sports Act "as a fight against discrimination, the same fight women have been fighting since before President Nixon signed Title IX into law in 1972. Allowing biological males who identify as female to compete in girls' and women's sports will reverse more than 50 years' worth of progress." *Id.*

Additionally, for all three mothers, "the prospect of having biological males in female-only spaces, such as locker rooms, makes [their] daughters very uncomfortable. They would feel self-conscious and frustrated by having to change clothes or shower in the presence of a teammate having male genitalia in the locker room." Zenczak Decl. ¶ 15; Fink Decl. ¶ 6; Van Hoek Decl. ¶ 9.

All three mothers have long supported the Save Women's Sports Act. Fink Decl. ¶¶ 10-11; Zenczak Decl. ¶ 16; Van Hoek Decl. ¶ 10. For example, Mrs. Fink "believe[s] that it is very important for maintaining the integrity and value of girls' sports in our state." Fink Decl. ¶ 11. Mrs. Fink has "advocated for [the Act] since the Arizona Legislature first started considering it as a bill." *Id.* Her advocacy included seeking "witnesses to testify in support of the bill" and "coordinat[ing] support for the bill by, among other things, encouraging members of the community to ... submit comments in support of the bill and also to email and call legislators in support of the

bill." *Id.* Ms. Zenczak "gave a speech to an Arizona Senate committee in favor of the Act." Zenczak Decl. ¶ 16. Ms. Van Hoek has "spoken out in favor of [the Act] since the legislature first started considering it." Van Hoek Decl. ¶ 10.

All three mothers "know many parents in [their] communit[ies] who feel the same way" in supporting Act, "but are reluctant to come forward because they are scared of the potential backlash, both online and in the real world, from activists who oppose the law." Van Hoek Decl. ¶ 10; *see also* Fink Decl. ¶ 10; Zenczak Decl. ¶ 16.

**B.     Arizona Women of Action**

Proposed intervenor USA Women of Action "started in October 2020 as a text chain of 8 action-oriented women with a shared love of America and a passion for reviving communities and protecting families. It formally organized a political action committee on March 24, 2021 and then formally incorporated as a domestic nonprofit corporation on November 8, 2021." Exh. 5, Decl. of Kimberly J. Miller (Miller Decl.) ¶ 2. It conducts business under the name Arizona Women of Action ("AZWOA"), which it has registered with the Arizona Secretary of State's Office as a trade name. *Id.* ¶¶ 3-4.

"AZWOA has grown into one of the largest and most effective grassroots organizations in the State of Arizona. AZWOA maintains an active email list with over 2,700 subscribers," who have a very high engagement level. *Id.* ¶ 5. "AZWOA also has about 13,700 followers across its social media platforms.... [T]he PAC and the 501(c)(4) have collectively received donations from 645 individuals and entities." *Id.*

AZWOA's "donors, subscribers, and followers ... view AZWOA as the public voice for their concerns" because they "feel unable to express their views in private discussions, let alone in public debates, because of the risk of online and real-world backlash, including the threat of violence" caused by "the contentious and polarized nature of modern public discourse." *Id.* ¶ 6. "As an organization that speaks for Arizona women and mothers, AZWOA has a particular focus on improving education and on helping children, and one of its three main purposes is to revive the American dream of

thriving kids." *Id.* ¶ 7. AZWOA established itself as "an important and prominent voice in challenging policies that it views as harmful to biological girls." *Id*. ¶ 8.

A recent survey of AZWOA email subscribers showed that 99.6% support the Save Women's Sports Act. *Id.* ¶ 9. Furthermore, "51% [of respondents] reported a daughter who played sports through school," "4% ... reported that their daughters had ever played on a sports team with a biological male," and "3% ... reported having a daughter forced to compete against a team with a member who was a biological male." *Id.* Seventy-two percent said they "would ... consider removing [their] daughter from an all-girls' sports team/league if a biological male participated." *Id.*

"AZWOA has always been a vocal supporter of the Save Women's Sports Act," using "email newsletter and social media platforms to encourage ... donors, subscribers, and followers to contact their legislators" and Governor Ducey to support it. *Id.* ¶ 12.

## Argument

### I.   This Court Should Grant Intervention as of Right.

"An applicant seeking to intervene as of right under Rule 24 must demonstrate that four requirements are met: '(1) the intervention application is timely; (2) the applicant has a significant protectable interest ... ; (3) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the existing parties may not adequately represent the applicant's interest.'" *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (quoting *Prete v. Bradbury*, 438 F.3d 949, 954 (9th Cir.2006)).

The Parent Representatives satisfy each of these requirements.

### A.   The Parent Representatives' Motion to Intervene Is Timely.

The "traditional features of a timely [intervention] motion" are 1) "[t]he motion to intervene was made at an early stage of the proceedings; 2) "the parties would not have suffered prejudice from the grant of intervention at that early stage," and 3) "intervention would not cause disruption or delay in the proceedings." *Id.* Thus, the Ninth Circuit has held that an intervention motion was timely when it was filed "less

than three months after the complaint was filed and less than two weeks after the [defendant] filed its answer to the complaint." *Id.*

The Parent Representatives meet the Ninth Circuit's timeliness standard by having filed their intervention motion less than eleven weeks after the complaint was filed on April 17 (Doc. 1), about six weeks after Defendant Superintendent Horne filed his answer to the complaint on May 18 (Doc. 18), about five weeks after Defendant AIA filed its May 25 answer (Doc. 50), and four-and-a-half weeks after Defendant Kyrene School District filed its May 30 stipulation in lieu of answer. (Doc. 59.)

The Parent Representatives do not seek to change or delay any case deadlines.

**B.      The Parent Representatives Have Significant Protectable Interests That Will Be Impaired Absent Intervention.**

Protectable interest "is a practical, threshold inquiry, and no specific legal or equitable interest need be established. To demonstrate a significant protectable interest, an applicant must establish that the interest is protectable under some law and that there is a relationship between the legally protected interest and the claims at issue." *Citizens for Balanced Use*, 647 F.3d at 897 (cleaned up) (quoting *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 836 (9th Cir.1996)).

As a threshold matter, Ms. Van Hoek, Mrs. Fink, and Ms. Zenczak have standing under federal and Arizona law to sue to protect their daughters' interests. "[T]he interest of parents in the care, custody, and control of their children ... is perhaps the oldest of the fundamental liberty interests...." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Federal Rule of Civil Procedure 17(c)(1) states "a general guardian" "may sue or defend on behalf of a minor." Furthermore, Rule 17(b)(3) establishes that "[c]apacity to sue or be sued is determined ... by the law of the state where the court is located." Under Arizona law, they have the "fundamental right" "to direct the upbringing, education, health care and mental health of [her] children." A.R.S. § 1-601(A).

Similarly, AZWOA has standing to sue to defend the interests of the parents it represents. The Supreme Court has held that a parent's group with "members whose elementary and middle school children may be" affected has standing where "the

10

members ... can validly claim [injury] on behalf of their children." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718–19 (2007); *see also, Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 285 (2015) (Scalia, J., dissenting) ("[t]he organization of parents in [*Parents Involved in Community Schools*] had established organizational standing in the lower court by showing that it had members with children who would be subject to the school district's" actions).

Thus, "[t]he proper course for parental groups seeking to question current deficiencies ... is for the group to petition the district court to allow it to intervene." *Spangler*, 552 F.2d at 1329 (quoting *Hines*, 479 F.2d at 765; *see also, Smith*, 830 F.3d at 853-64 (reversing district court's denial of parent group's intervention motion and remanding); *Johnson*, 500 F.2d at 353–54 (same). The rule in the Ninth Circuit thus "allow[s] intervention by parents as a matter of right where the issues that emerge during the litigation are such that intervention is warranted." *Spangler v. Pasadena City Bd. of Ed.*, 552 F.2d 1326, 1329 (9th Cir. 1977).

The Parent Representatives are aware of only one other case in this circuit analogous to this one, in which a transgender plaintiff challenged a state law that regulates the sex of participants on sports teams. In that case, *Hecox v. Little*, several student-athletes who were biological females moved to intervene, and the court granted them intervention as of right. 479 F. Supp. 3d 930, 951 (D. Idaho 2020), aff'd, No. 20-35813, 2023 WL 1097255 (9th Cir. Jan. 30, 2023). The *Hecox* court noted that, while "the Ninth Circuit has held cisgender students do not have a legally protectable interest in excluding transgender students from single-sex spaces,... the Ninth Circuit has also held that redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes is unquestionably a legitimate and important interest, which is served by precluding males from playing on teams devoted to female athletes." *Id.* at 951–52 (citing *Parents for Privacy v. Barr*, 949 F.3d 1210, 1228 (9th Cir. 2020) and *Clark, ex rel. Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982)). Thus, the court explained, "[r]egardless of how the

11

Proposed Intervenors' interest is characterized—either as a right to a level playing field or as a more invidious desire to exclude transgender athletes—they do claim a protectable interest in ensuring equality of athletic opportunity." *Id.* at 952. Just so here.

"The importance of this interest [in ensuring equality of athletic opportunity] is the basic premise of almost fifty years of Title IX law as it applies to athletics, and, as recognized by the Ninth Circuit, is unquestionably a legitimate and important interest." *Id.* Just like the Parent Representatives here, the intervenors in *Hecox* argued that "the only way to protect equality in sports is through sex segregation without regard to gender identity. Whether this argument is accurate or constitutional is not dispositive of the issue of whether the Proposed Intervenors have an interest in this suit." *Id.*

Like the *Hecox* intervenors*,* the Parent Representatives' interest in protecting equality of athletic opportunity through sex segregation is a protectable interest. "[T]o find the Proposed Intervenors are without a protectable interest in the subject matter of this litigation would be to hold that no party has an interest in this litigation." *Id.*

### C.    The Parent Representatives' Interests Will Be Impaired If Plaintiffs' Requested Relief is Granted.

Ms. Van Hoek has a daughter who plays on teams that participate in the AIA, and thus she may be forced to play against Plaintiff Jane Doe. Van Hoek Decl. ¶ 3. Ms. Zenczak has two daughters for whom attending a Kyrene school (or the corresponding high school district, Tempe Union) is a realistic possibility, thus raising the prospect they may have to play against or with Plaintiff Jane Doe. Zenczak Decl. ¶ 3. Therefore, their interest in maintaining athletic competition only between biological females would be directly impaired if relief is granted in this case.

Furthermore, if relief is granted in this case, the inevitable decision on appeal will establish precedent in this Circuit that will impair the interests of *all* the Parent Representatives. For this reason, the Ninth Circuit has held that a case's prospective *stare decisis* effect was sufficient to establish that the intervenors' interests would be impaired. "Such determinations [of the district court] when upheld by an appellate ruling will have a persuasive *stare decisis* effect in any parallel or subsequent litigation.

12

We have said that such a *stare decisis* effect is an important consideration in determining the extent to which an applicant's interest may be impaired." *United States v. State of Oregon*, 839 F.2d 635, 638 (9th Cir. 1988) (reversing district court's denial of intervention); *see also U.S. ex rel. McGough v. Covington Techs. Co.*, 967 F.2d 1391, 1396 (9th Cir. 1992) (reversing district court's denial of intervention motion and noting that there was "not serious[] dispute" that the proposed intervenor's "interest may be impaired or impeded if intervention is not granted" because the proposed intervenor's "claims could be impaired if the doctrine of *stare decisis* were applied"); *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1247 (6th Cir. 1997) (reversing district court's denial of intervention and holding that "potential *stare decisis* effects can be a sufficient basis for finding an impairment of interest"); *Linton v. Commissioner of Health & Env't*, 973 F.2d 1311, 1319 (6th Cir.1992) (same).

Furthermore, "[i]f not made a party to this action, [the proposed intervenors] would have no legal means to challenge ... an injunction while it remains in effect, and their interests would be impaired as a consequence of the fact that parties to the litigation are bound by the Court's judgment." *Ctr. for Biological Diversity v. Kempthorne*, No. CV08-8117-PCT-NVW, 2009 WL 10673068, at *4 (D. Ariz. Jan. 16, 2009) (granting intervention).

### D.   The Parent Representatives' Interests Are Not Adequately Represented.

The Ninth Circuit "considers three factors in determining the adequacy of representation: (1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect." *United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1153 (9th Cir. 2010) (quoting *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir.2003)) (reversing district court's denial of intervention motion). Intervention as of right "requires only a 'minimal' showing that existing parties' representation 'may be' inadequate." *Smith v.*

13

*Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 864 (9th Cir. 2016) (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)).

The Parent Representatives easily satisfy this lenient standard.

**1.    Defendants Will Not Undoubtedly Make the Same Arguments as the Parent Representatives.**

As this Court has acknowledged, Superintendent Horne is the only Defendant in this action who is "vigorously defending" the Save Women's Sports Act. (Doc. 79 at 7.) Superintendent Horne has the statutory duty to "[s]uperintend the schools of" Arizona and to "[e]xecute ... the policies that have been decided on by the state board" of education. A.R.S. § 15-251(1), (5). His statutory duties, and hence his interests in defending this suit, are far broader than those of the Parent Representatives, which focus solely on the interests of biological girls on sports teams.

When the defendant in an action is a public official or agency, intervention as of right by private parties is appropriate if the intervenor's interests are "potentially more narrow and parochial than the interests of the public at large" because in such cases "the representation of [the intervenor's] interests by the [public agency defendant] may have been inadequate." *Californians For Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1190 (9th Cir. 1998) (affirming grant of intervention). Thus, the Ninth Circuit has held that parents of students in a school district could intervene even though the school district was already a defendant in the case because "we cannot agree with the district court's conclusion that the school district, which is charged with the representation of all parents within the district ... adequately represents appellants." *Johnson v. San Francisco Unified Sch. Dist.*, 500 F.2d 349, 353–54 (9th Cir. 1974).

Superintendent Horne "represent[s] broader public and institutional interests, not shared by Intervenors, that will factor into how [he] respond to this action." *Greene v. Raffensperger*, No. 22-CV-1294-AT, 2022 WL 1045967, at *4 (N.D. Ga. Apr. 7, 2022) (quoting party's brief) (granting intervention). Superintendent Horne's interests are far broader because they cover all students, including the interests of biological males,

transgender students, and students who do not play sports, as well as institutional concerns and interests of schools and school districts. None of those interests overlap with those of the Parent Representatives, whose interests are "more narrow and parochial" and thus will not be adequately represented. *Mendonca*, 152 F.3d at 1190.

### 2. Superintendent Horne Is not Capable of Making the Parent Representatives' Arguments.

Even if Superintendent Horne's interests were precisely coterminous with the Parent Representatives (which they are not), the Parent Representatives' interests will not be adequately represented because Superintendent Horne is not capable of making the Parent Representatives' arguments because he lacks the resources to do so.

No party has disputed Superintendent Horne's statement that "the Arizona Attorney General has both refused to defend him, despite being her client, and has refused to pay for his independent counsel." (Doc. 40 at 3; *see also* Doc. 20 at 2 ("counsel for Superintendent Horne was only retained and only became aware of the Motion for Preliminary Injunction ... after the Attorney General informed Superintendent Horne her office would not represent him in the lawsuit").) Superintendent Horne's resources are so limited that he "need[ed] at least 90 days to fully develop more evidence in support of the scientific evidence" submitted by Plaintiffs. (*Id.*) Superintendent Horne's lack of resources has forced him to rely on the Legislators' resources to defend this case (*e.g.*, Doc 73 (Superintendent Horne's adoption by reference of Legislator's submitted expert declaration).) Indeed, this Court granted limited permissive intervention to the Legislators precisely *because* Superintendent Horne was forced "to rely on the expert declarations submitted by the Legislators in opposition to the motion for preliminary injunction." (Doc. 79 at 9.)

When defendants have "limited financial resources," this alone suffices to make the minimal required showing of inadequacy of representation. *Teague v. Bakker*, 931 F.2d 259, 262 (4th Cir. 1991) (reversing district court's denial of intervention). A party's lack of resources is enough, by itself, to show inadequacy of representation

because "[g]iven the financial constraints on the [parties'] ability to defend the present action, there is a significant chance that they might be less vigorous than the [proposed intervenors] in defending their claim." *Id.*; *see also Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 181 (2d Cir. 2001) ("an existing party's proven lack of financial resources to continue litigation may signify inadequate representation").

Thus, even when an intervenor's interests are precisely identical with those of an existing party, and which thus creates a presumption of adequacy of representation, "[t]he presumption may be overcome by evidence of ... lack of financial resources." *Miller v. Ghirardelli Chocolate Co.*, No. C 12-04936 LB, 2013 WL 6776191, at *8 (N.D. Cal. Dec. 20, 2013); *see also California v. EPA*, No. 18-CV-03237-HSG, 2018 WL 6069943, at *3 (N.D. Cal. Nov. 20, 2018) (same (quoting *Miller*)). That presumption is easily overcome here, and intervention should thus be granted.

### 3.   The Parent Representatives Will Offer Necessary Elements Other Parties Would Neglect

The Parent Representatives will offer "necessary elements to the proceeding that other parties would neglect." *Aerojet Gen. Corp.*, 606 F.3d at 1153. In an analogous transgender sports case in the Southern District of West Virginia, the court allowed permissive intervention specifically because biological female athletes "add a perspective not represented by any of the current defendants." *B.P.J. v. W. Virginia State Bd. of Educ.*, No. 2:21-CV-00316, 2021 WL 5711547, at *3 (S.D.W. Va. Dec. 1, 2021). The same is true here. The Parent Representatives will bring to this case the vital perspective of biological females, who are the very class of persons whom the Save Women's Sports is designed to protect.

## II.   Permissive Intervention Is Warranted.

Even if the Court declines to grant the Parent Representatives' motion to intervene as of right, this is precisely the type of case where permissive intervention is warranted. Rule 24(b) allows courts to grant permissive intervention to anyone who "has a claim or defense that shares with the main action a common question of law or

fact." A court's discretion in granting permissive intervention may be guided by factors such as "the nature and extent of the intervenors' interest, their standing to raise relevant legal issues, the legal position they seek to advance, and its probable relation to the merits of the case." *Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977). Courts "may also consider ... whether the intervenors' interests are adequately represented by other parties, whether intervention will prolong or unduly delay the litigation, and whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." *Id.*

There are six reasons this Court should grant permissive intervention, most of which are also discussed above in the context of intervention as of right.

*First*, the Parent Representatives' defenses to the Save Women's Sports Act share common questions of law and fact with the main action here, and the legal position that they seek to advance—that the Act does not violate the Equal Protection Clause, Title IX, the ADA, or the Rehabilitation Act, and is vital to the well-being of biological girls—is closely related to the merits of this case.

*Second*, the Parent Representatives have a significant interest in defending the Act.

*Third*, the Parent Representatives have standing to protect their unique interests.

*Fourth*, the Parent Representatives' interests are not adequately represented.

*Fifth*, the Parent Representatives' motion to intervene is timely and will not delay this litigation, which is only in its initial stages.

*Sixth*, the Parent Representatives will bring to this case the unique perspective of the biological girls who will be harmed by the enjoining of the Save Women's Sports Act. Their participation in this case will contribute significantly to the full development of the underlying factual and legal issues in the suit and to the just and equitable adjudication of the legal questions presented.

## Conclusion

Accordingly, Parent Representatives' motion to intervene should be granted.

1    Respectfully submitted this 30th of June, 2023.

2

3                                          America First Legal Foundation

4                                          By: /s/ *James K. Rogers*

5                                              James K. Rogers (Ariz. Bar No. 027287)

6                                              611 Pennsylvania Ave., SE #231
                                               Washington, D.C. 20003
7                                          *Attorney for Proposed Defendant-Intervenors*

8                                          *Anna Van Hoek, Lisa Fink, Amber Zenczak, and*
                                           *Arizona Women of Action*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of June, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Arizona using the CM/ECF filing system. Counsel for all Defendants who have appeared are registered CM/ECF users and will be served by the CM/ECF system pursuant to the notice of electronic filing.

 /s/ *James K. Rogers*
*Attorney for Proposed Defendant-Intervenors*
*Anna Van Hoek, Lisa Fink, Amber Zenczak, and*
*Arizona Women of Action*