1   Colin Proksel (034133)
2   OSBORN MALEDON, P.A.
    2929 North Central Avenue, 21st Floor
3   Phoenix, Arizona 85012-2793
    State Bar No. 034133
4   Telephone:     (602) 640-9000
5   Facsimile:     (602) 640-9050
    Email:         cproksel@omlaw.com
6   *Attorney for Plaintiffs*
    *Additional counsel listed in signature block*
7

8                  **UNITED STATES DISTRICT COURT**
                  **FOR THE DISTRICT OF ARIZONA**
9                      **TUCSON DIVISION**

10  Jane Doe, by her next friend and parents      | Case No. 4:23-cv-00185-JGZ
    Helen Doe and James Doe; and Megan Roe,       |
11  by her next friend and parents, Kate Roe and  | **PLAINTIFFS' PROPOSED FINDINGS OF**
    Robert Roe,                                   | **FACT AND CONCLUSIONS OF LAW**
12                       Plaintiffs,
13           v.

14  Thomas C. Horne in his official capacity as
    State Superintendent of Public Instruction;
15  Laura Toenjes, in her official capacity as
    Superintendent of the Kyrene School
16  District; Kyrene School District; The
    Gregory School; and Arizona Interscholastic
17  Association Inc.,

18                       Defendants.
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

PROPOSED FINDINGS OF FACT....................................................................................1

    I.       GENDER IDENTITY AND GENDER DYSPHORIA ...............................1

    II.     PLAINTIFFS JANE DOE AND MEGAN ROE ARE
          TRANSGENDER GIRLS WHO HAVE NOT AND WILL NOT
          EXPERIENCE MALE PUBERTY.................................................................3

    III.    PRIOR TO THE ENACTMENT OF ARIZONA REVISED
          STATUTE 15-120.02, PLAINTIFFS WOULD HAVE BEEN
          ALLOWED TO PLAY ON GIRLS' SPORTS TEAMS. ............................5

    IV.    THE BAN WILL PREVENT PLAINTIFFS FROM PLAYING ON
          GIRLS' SPORTS TEAMS AT THEIR SCHOOLS. ...................................5

    V.      PLAINTIFFS WANT TO PLAY ON THEIR SCHOOLS' GIRLS'
          SPORTS TEAMS BUT THE BAN PREVENTS THEM FROM
          DOING SO. ..................................................................................................7

            A.      Jane Doe Wants to Play Soccer, Basketball, and Cross-
                  Country at Her Middle School. ...........................................................7

            B.      Megan Roe Wants to Play High School Volleyball...........................8

    VI.    SCHOOL SPORTS PROVIDE NUMEROUS BENEFITS, AND
          EXCLUDING PLAINTIFFS FROM PLAYING SPORTS DENIES
          THEM THOSE BENEFITS. ........................................................................9

    VII.   TRANSGENDER GIRLS WHO HAVE NOT UNDERGONE
          MALE PUBERTY DO NOT HAVE AN ATHLETIC
          ADVANTAGE OVER OTHER GIRLS.....................................................10

    VIII.  PLAINTIFFS CANNOT PLAY ON BOYS' SPORTS TEAMS. ..............11

            A.      Jane Doe Cannot Play on a Boys' Team..........................................11

            B.      Megan Roe Cannot Play on a Boys' Team. .....................................11

PROPOSED CONCLUSIONS OF LAW ........................................................................12

    I.       PLAINTIFFS ARE ENTITLED TO A PRELIMINARY
          INJUNCTION ON THEIR EQUAL PROTECTION CLAUSE AND
          TITLE IX CLAIMS. .................................................................................12

            A.      Plaintiffs Are Likely to Succeed on the Merits of Their
                  Claims. .............................................................................................12

1.    The Ban Violates Plaintiffs' Rights Under the Equal Protection Clause. .............................................. 13

    a.    The Ban Is Subject to Heightened Scrutiny ............... 13

    b.    The Ban Is Not Substantially Related to Any Important Government Interest .................................... 14

    c.    The Ban Fails Rational Basis Review ....................... 16

2.    The Ban Violates Title IX. ................................................... 17

B.    Plaintiffs Will Suffer Irreparable Harm if Relief Is Not Granted. .......................................................................................... 18

C.    The Public Interest and Balance of Equities Favor Injunctive Relief. ........................................................................................... 20

II.    PLAINTIFFS ARE NOT REQUIRED TO POST A BOND ...................... 21

CONCLUSION ........................................................................................................... 21

ii

# TABLE OF AUTHORITIES

**Cases**

*A.M. v. Indianapolis Pub. Sch.,* 617 F. Supp. 3d 950 (S.D. Ind. 2022) .......... 12, 13, 18, 20

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ................................ 12

*Anders v. Cal. State Univ., Fresno*, 2021 WL 1564448 (E.D. Cal. Apr. 21, 2021) ................................................................................................ 18

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ................................................................ 17

*B.P.J. v. W. Va. State Bd. of Educ.*, 550 F. Supp. 3d 347 (S.D. W. Va. 2021) ................ 13

*Buettner-Hartsoe v. Balt. Lutheran High Sch. Ass'n*, 2022 WL 2869041 (D. Md. July 21, 2022) ............................................................................. 17

*Clark v. Arizona Interscholastic Association*, 695 F.2d 1126 (9th Cir. 1982)............ 15, 16

*D.T. v. Christ*, 552 F. Supp. 3d 888 (D. Ariz. 2021) ......................................................... 13

*E.H. by & Through Herrera v. Valley Christian Acad.*, 616 F. Supp. 3d 1040 (C.D. Cal. 2022) ........................................................................... 17

*Diaz v. Brewer*, 656 F.3d 1008 (9th Cir. 2011) ................................................................... 21

*Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022) ....................................................................... 17

*Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal*, 546 U.S. 418 (2006) ................................................................................................... 12

*Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110 (9th Cir. 2023) ...................... 17, 18, 19

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) ................................. 19

*Hecox v. Little*, 479 F. Supp. 3d 930 (D. Idaho 2020) ................................................. *passim*

*Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017) ....................................................... 18

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) ....................................................... 21

*Jorgensen v. Cassiday*, 320 F.3d 906 (9th Cir. 2003) ....................................................... 21

*Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) .................................................... 13, 14

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ........................................................... 20

iii

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................ 12, 20

*Obergefell v. Hodges*, 576 U.S. 644 (2015) ...................................................................... 19

*Porretti v. Dzurenda*, 11 F.4th 1037 (9th Cir. 2021) ........................................................ 12

*Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963 (D. Minn. 2016) .............................. 19

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ....................................................... 20

*Roe v. Utah High Sch. Activities Ass'n*, 2022 WL 3907182 (Utah Dist. Ct.
    Aug. 19, 2022) ................................................................................................................ 12

*Romer v. Evans*, 517 U.S. 620 (1996) .............................................................................. 16

*U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) ...................................................... 16

*United States v. Virginia*, 518 U.S. 515 (1996) .................................................. 12, 13, 14

*United States v. Windsor*, 570 U.S. 744 (2013) .......................................................... 16, 17

**Statutes**

20 U.S.C. § 1681(a) ............................................................................................................ 17

Ariz. Rev. Stat. § 15-120.02 ...................................................................................... 5, 6, 18

**Other Authorities**

*Consideration of Bills:  Hearing on S.B. 1165 Before S. Comm. on
    Judiciary*, Jan. 20, 2022, 55th Leg., 2d Reg. Sess. (Ariz. 2022) .............................. 6, 7

S.B. 1165, 55th Leg., 2d Reg. Sess. (Ariz. 2022), § 2 .................................................. 6, 17

iv

1  **PROPOSED FINDINGS OF FACT**

2  **I.      GENDER IDENTITY AND GENDER DYSPHORIA**

3       1.      "Gender identity" is the medical term for a person's internal, innate,

4  deeply-held sense of their own gender.  (Dkt. 5, Declaration of Dr. Daniel Shumer

5  ("Shumer Decl.") ¶ 18.)  Everyone has a gender identity.  (*Id.*)

6       2.      There is a consensus among medical organizations that gender identity is

7  innate and cannot be changed through psychological or medical treatments.  (Dkt. 65-1,

8  Rebuttal Declaration of Dr. Stephanie Budge ("Budge Rebuttal Decl.") ¶ 31; Dkt. 4,

9  Declaration of Dr. Stephanie Budge ("Budge Decl.") ¶ 21; Dkt. 65-2, Rebuttal

10  Declaration of Daniel Shumer ("Shumer Rebuttal Decl.") ¶¶ 54–58; Shumer Decl. ¶ 23.)

11       3.      When a child is born, a health care provider identifies the child's sex based

12  on the child's observable anatomy.  (Budge Decl. ¶ 18; Shumer Decl. ¶ 27.)  This

13  identification is known as an "assigned sex," and in most cases turns out to be consistent

14  with the person's gender identity.  (Budge Decl. ¶ 18; Shumer Decl. ¶ 27.)

15       4.      For a transgender person, that initial designation does not match the

16  person's gender identity.  (Budge Decl. ¶ 18; Shumer Decl. ¶ 27.)

17       5.      Gender dysphoria is a serious medical condition characterized by

18  significant and disabling distress due to the incongruence between a person's gender

19  identity and assigned sex.  (Budge Decl. ¶ 23; Shumer Decl. ¶ 28.)

20       6.      Gender dysphoria, however, is highly treatable.  Every major medical

21  association in the United States agrees that medical treatment for gender dysphoria is

22  necessary, safe, and effective.  (Budge Decl. ¶ 25; Shumer Decl. ¶ 30.)

23       7.      The major associations of medical and mental health providers in the

24  United States, including the American Medical Association, the American Academy of

25  Pediatrics, the American Psychiatric Association, the American Psychological

26  Association, and the Pediatric Endocrine Society, have endorsed medical standards of

27  care for treating gender dysphoria in adolescents, which were developed by the World

28

Professional Association for Transgender Health ("WPATH") and the Endocrine Society. (Shumer Decl. ¶ 31.)

8.    The goal of medical treatment for gender dysphoria is to alleviate a transgender patient's distress by allowing them to live consistently with their gender identity.  (Budge Decl. ¶ 27; Shumer Decl. ¶ 30.)

9.    Undergoing treatment to alleviate gender dysphoria is commonly referred to as "transition" and includes one or more of the following components:  (i) social transition, including adopting a new name, pronouns, appearance, and clothing, and correcting identity documents; (ii) medical transition, including puberty-delaying medication and hormone-replacement therapy; and (iii) for adults, surgeries to alter the appearance and functioning primary- and secondary-sex characteristics.  (Budge Decl. ¶¶ 26–27; Shumer Decl. ¶ 34.)

10.    For social transition to be clinically effective, it must be respected consistently across all aspects of a transgender individual's life.  (Budge Decl. ¶ 27.)

11.    At the onset of puberty, adolescents with gender dysphoria may be prescribed puberty-delaying medications to prevent the distress of developing physical characteristics that conflict with the adolescent's gender identity.  (Budge Decl. ¶ 28; Shumer Decl. ¶ 35.)

12.    For older adolescents, doctors may also prescribe hormone therapy to induce the puberty associated with the adolescent's gender identity.  (Budge Decl. ¶ 28; Shumer Decl. ¶ 36.)

13.    When transgender adolescents are provided with appropriate medical treatment and have parental and societal support, they can thrive.  (Shumer Decl. ¶ 29.)

14.    Untreated gender dysphoria can cause serious harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicide.  (Budge Decl. ¶ 33; Shumer Decl. ¶ 28.)

15.     Being denied recognition and support can cause significant harm, exacerbate gender dysphoria, and expose transgender adolescents to the risk of discrimination and harassment.  (Budge Decl. ¶¶ 33–34; Shumer Decl. ¶ 28.)

**II.     PLAINTIFFS JANE DOE AND MEGAN ROE ARE TRANSGENDER GIRLS WHO HAVE NOT AND WILL NOT EXPERIENCE MALE PUBERTY.**

**A. Jane Doe**

16.     Plaintiff Jane Doe is an 11-year old transgender girl who will attend Kyrene Aprende Middle School beginning on July 19, 2023.  (Dkt. 6, Declaration of Jane Doe ("J. Doe Decl.") ¶ 1; Dkt. 78, Second Declaration of Helen Doe ("Second H. Doe Decl.") ¶ 3.)

17.     Jane has lived as a girl in all aspects of her life since she was five years old. (J. Doe Decl. ¶ 2; Dkt. 7, Declaration of Helen Doe ("H. Doe Decl.") ¶¶ 3, 5.)

18.     Jane was diagnosed with gender dysphoria when she was seven years old. (H. Doe Decl. ¶ 7.)

19.     Jane has changed her name through a court order to a more traditional female name and has a female gender marker on her passport.  (Pls.' Exs. 13, 15.)

20.     Jane has been monitored by her doctor for signs of the onset of puberty as part of her medical treatment for gender dysphoria.  (H. Doe Decl. ¶ 11.)

21.     At an appointment on June 27, 2023, Jane's doctor prescribed a Supprelin implant, which is a puberty-blocking medication.  (Dkt. 97-1, Third Declaration of Helen Doe ("Third H. Doe Decl.") ¶ 4.)

22.     Jane is in the process of scheduling the implant procedure for as soon as possible.  (*Id.*)

23.     Accordingly, Jane has not and will not experience any of the physiological changes that increased testosterone levels would cause in a pubescent boy.  (*See* Shumer Decl. ¶ 45; Budge Decl. ¶ 28.)

1

    **B. Megan Roe**

2        24.    Plaintiff Megan Roe is a 15-year-old transgender girl who attends The

3   Gregory School ("TGS").  (Dkt. 8, Declaration of Megan Roe ("M. Roe Decl.) ¶¶ 2, 5.)

4        25.    Megan has always known she is a girl.  (Dkt. 9, Declaration of Kate Roe

5   ("K. Roe Decl.") ¶ 3.)

6        26.    Megan has lived as a girl in all aspects of her life since she was seven years

7   old.  (M. Roe Decl. ¶ 3; K. Roe Decl. ¶¶ 4–5.)

8        27.    Through a court order, Megan has changed her name to a more traditional

9   female name and her gender to female.  (Pls.' Ex. 14.)  She also has a female gender

10  marker on her passport. (Pls.' Ex. 16.)

11       28.    Megan was diagnosed with gender dysphoria when she was ten years old.

12  (K. Roe Decl. ¶ 6.)

13       29.    Before starting school at TGS, Megan's parents shared with administrators

14  and teachers at the school that Megan is a transgender girl.  (M. Roe Decl. ¶ 5.)  TGS has

15  been very supportive of Megan and her identity.  (*Id*.; Dkt. 37, Defendant TGS Motion to

16  Dismiss ("TGS Mot. to Dismiss") at 3.)

17       30.    Megan has been taking puberty blockers since she was 11 years old as part

18  of her medical treatment for gender dysphoria.  (M. Roe Decl. ¶ 6; K. Roe Decl. ¶ 6.)

19  This prevented Megan from undergoing male puberty.  (K. Roe Decl. ¶ 6.)

20       31.    Megan began receiving hormone therapy when she was 12 years old.  (M.

21  Roe Decl. ¶ 6; K. Roe Decl. ¶ 6.)

22       32.    As a result of the puberty blockers and hormone therapy, Megan has not

23  experienced the physiological changes that increased testosterone levels would cause in a

24  pubescent boy.  (K. Roe Decl. ¶ 6; Shumer Decl. ¶ 47; *see also* Budge Decl. ¶ 29.)

25       33.    The hormone treatment that she has received has caused Megan to develop

26  many of the physiological changes associated with puberty in females.  (Shumer Decl.

27  ¶ 47; *see also* Budge Decl. ¶ 29.)[1]

28

---

[1] Defendant Horne and Permissive Intervenors submit expert declarations discussing, in part, the effects and appropriateness of medical treatment for gender dysphoria—mainly

1
2
3

**III.      PRIOR TO THE ENACTMENT OF ARIZONA REVISED STATUTE 15-120.02, PLAINTIFFS WOULD HAVE BEEN ALLOWED TO PLAY ON GIRLS' SPORTS TEAMS.**

4
5
6
7
8
9

34.     Prior to the enactment of the Arizona Revised Statute 15-120.02 (the "Ban"), transgender girls in Arizona were permitted to play on girls' sports teams.  (Dkt. 51-1, ¶ 41.9 ("[A]ll students should have the opportunity to participate in Arizona Interscholastic Association (AIA) activities in a manner that is consistent with their gender identity, irrespective of the sex listed on a student's eligibility for participation in interscholastic athletics or in a gender that does not match the sex at birth.").)

10
11

35.     Defendant Arizona Interscholastic Association, Inc. (the "AIA") set rules for transgender students' participation in interscholastic sports.  (*Id.* ¶ 41.9.)

12
13
14
15
16

36.     Each school or school district set its own rules on transgender students' participation in intramural sports.  (*Id.* ¶¶ 2.5.2–3 ("Final authority and ultimate responsibilities in all matters pertaining to interscholastic activities of each school shall be vested in the school principal. . . . The school administration must assume responsibility for verification of all student eligibility rules.").)

17
18
19
20

37.     By December 2018, the AIA formalized its policy to permit transgender students to play on teams consistent with their gender identity so long as they had a letter of support from their parent or guardian explaining when they realized they were transgender.  (Compl. ¶ 21; Dkt. 50, AIA Answer, ¶ 21; Dkt. 51-1, ¶ 41.9.)

21
22

**IV.      THE BAN WILL PREVENT PLAINTIFFS FROM PLAYING ON GIRLS' SPORTS TEAMS AT THEIR SCHOOLS.**

23
24

38.     On March 30, 2022, Arizona enacted the "Save Women's Sports Act" (S.B. 1165).[2]  Ariz. Rev. Stat. § 15-120.02.

25
26

27
28

the declaration of Dr. James Cantor.  Plaintiffs' experts respond to this topic in their rebuttal declarations.  The Court need not consider this evidence, however, because the appropriateness of medical treatment for gender dysphoria is not at issue in this case.
[2] *See* Pls.' Ex. 25 (dated March 30, 2022, stating "Today I signed S.B. 1138 and S.B. 1165…").

39.     The Ban requires each team that is sponsored by a public school and private school team that competes against a public school team to be designated as "male," "female," or "coed," based on the "biological sex of the students who participate."  Ariz. Rev. Stat. § 15-120.02(A).

40.     "Biological sex" is not defined in the statute.  Ariz. Rev. Stat. § 15-120.02.  However, the S.B. 1165 Legislative Findings state that for purposes of school sports, a student's sex is determined at "fertilization and revealed at birth, or, increasingly, *in utero*."  S.B. 1165, 55th Leg., 2d Reg. Sess. (Ariz. 2022), § 2.

41.     The Ban requires that "athletic teams or sports designated for 'females', 'women' or 'girls' may not be open to students of the male sex."  Ariz. Rev. Stat. § 15-120.02 (B).

42.     The Ban was enacted for the purpose of excluding transgender girls from playing on girls' sports teams.  *See, e.g. Consideration of Bills:  Hearing on S.B. 1165 Before S. Comm. on Judiciary*, Jan. 20, 2022, 55th Leg., 2d Reg. Sess. 1:17:32–39 (Ariz. 2022) (statement of Sen. Vince Leach, Member, S. Comm. on Judiciary) (explaining his vote for the bill by stating, "if we allow transgenders to take over female sports, you will not have females participating"); *id.* at 28:28–55 (statement of Sen. Warren Petersen, Chairman, S. Comm. on Judiciary) (questioning whether those opposing the bill would "be opposed to having just a trans league, so that they can all compete in their own league"); (Pls.' Ex. 25, Gov. Douglas Ducey Signing Letter) ( "S.B. 1165 creates a statewide policy to ensure biologically female athletes at Arizona public schools, colleges, and universities have a level playing field to compete…This legislation simply ensures that the girls and young women who have dedicated themselves to their sport to do not miss out… due to unfair competition.")

43.     Prior to the Ban's enactment, there had not been any problem in Arizona related to transgender girls replacing non-transgender girls on sports teams. *Consideration of Bills:  Hearing on S.B. 1165 Before S. Comm. on Judiciary*, Jan. 20, 2022, 55th Leg., 2d Reg. Sess. 1:15:30–36 (Ariz. 2022) (statement of Sen. Warren

Petersen, Chairman, S. Comm. on Judiciary) (admitting to another Senator that "we're not aware of a specific instance" where any cisgender girl had lost a place on a team to a transgender girl).

**V.      PLAINTIFFS WANT TO PLAY ON THEIR SCHOOLS' GIRLS' SPORTS TEAMS BUT THE BAN PREVENTS THEM FROM DOING SO.**

   **A. Jane Doe Wants to Play Soccer, Basketball, and Cross-Country at Her Middle School.**

44.      Sports are very important to Jane and her parents.  (J. Doe Decl. ¶ 5; H. Doe Decl. ¶ 12.)

45.      Jane particularly loves playing soccer and has played soccer on girls' club and recreational sports teams for nearly five years.  (J. Doe Decl. ¶¶ 6–8; H. Doe Decl. ¶ 12.)

46.      Aside from its physical and emotional health benefits, soccer has helped Jane make new friends and connect with other girls.  (J. Doe Decl. ¶ 7; H. Doe Decl. ¶ 13.)

47.      Jane's teachers, coaches, friends, and members of her soccer team have all been supportive of Jane's identity.  (H. Doe Decl. ¶ 9; Dkt. 59, Stipulation in Lieu of Answer ("Kyrene/Toenjes Stip.") ¶ 1.)

48.      When Jane enters Kyrene Aprende Middle School this July, she intends to participate and compete with the cross-country team and try out for the girls' soccer and basketball teams.  (J. Doe Decl. ¶ 9; Second H. Doe Decl. ¶ 4.)

49.      Both the soccer and basketball teams at Kyrene Aprende Middle School have separate teams for boys and girls.  (J. Doe Decl. ¶ 9.)

50.      The cross-country team trains together, but boys and girls compete separately.  (*Id.*)

51.      Registration for the cross-country team began on July 1, 2023.  (Second H. Doe Decl. ¶ 6.)

52.     The registration occurs online and involves the submission of registration forms and supporting documents, such as a physical report signed by a doctor.  (*Id.*)

53.     Typically, a student's registration takes at least two to three days to process after it is submitted.  (*Id.*)

54.     The first practice for cross country is on July 31, 2023 and the first cross-country competitive meet will occur the week of August 14, 2023.  (*Id.* ¶ 7.)

55.     Jane is excited to participate and compete on the girls' teams with her friends and peers.  (J. Doe Decl. ¶¶ 8–9.)

56.     If not for the Ban, the Kyrene School District would permit Jane Doe to play on girls' sports teams.  (Kyrene/Toenjes Stip. ¶ 1.)

57.     However, if the Ban is applied to Jane, she will not be able to play on the girls' soccer and basketball teams or compete with the girls' cross-country team.  (*Id.*)

**B. Megan Roe Wants to Play High School Volleyball.**

58.     Sports have always been a part of Megan's life.  (M. Roe Decl. ¶ 4.)

59.     When she was about seven years old, Megan joined a swim team.  (K. Roe Decl. ¶ 7.)

60.     The coach of the swim team was supportive of Megan and her gender identity.  (*Id.*)

61.     Megan intends to try out for the girls' volleyball team at TGS for this year's fall season.  (M. Roe Decl. ¶ 7.)

62.     Volleyball is an important part of the TGS community and many students attend the games.  (M. Roe Decl. ¶ 8; K. Roe Decl. ¶ 8.)

63.     Megan is excited to play on the girls' volleyball team with her friends.  (M. Roe Decl. ¶ 7; K. Roe Decl. ¶ 8.)

64.     Megan's teammates, coaches, and school are highly supportive of her and would welcome her participation on the girls' volleyball team.  (M. Roe Decl. ¶ 5; K. Roe Decl. ¶ 5; Dkt. 37, Defendant TGS Motion to Dismiss, at 3; Dkt. 37-1, Declaration of Dr. Julie Sherrill ("Sherrill Decl.") ¶ 5.)

65.     If not for the Ban, TGS would permit Megan to play on the girls' volleyball team.  (Sherrill Decl. ¶ 5.)

66.     If the Ban is applied to Megan, she will not be able to compete with the girls' volleyball team.  (*Id.*)

## VI.     SCHOOL SPORTS PROVIDE NUMEROUS BENEFITS, AND EXCLUDING PLAINTIFFS FROM PLAYING SPORTS DENIES THEM THOSE BENEFITS.

67.     School sports offer social, emotional, physical, and mental health benefits. (Budge Decl. ¶¶ 35–38.)

68.     The social benefits of school sports include the opportunity to make friends and become part of a supportive community of teammates and peers.  (*Id.* ¶ 35.)

69.     School sports provide an opportunity for youth to gain confidence and reduce the effects of risk factors that lead to increases in depression.  (*Id.* ¶ 36.)

70.     Students who play school sports have fewer physical and mental health concerns than those that do not.  (*Id.* ¶ 37.)

71.     Students who participate in high school sports are more likely to finish college and participation in high school sports has a positive impact on academic achievement.  (*Id.* ¶ 38.)

72.     It would be psychologically damaging for a transgender girl to be banned from playing school sports on equal terms with other girls.  (*Id.* ¶ 39; Budge Rebuttal Decl. ¶ 10.)

73.     Transgender girls will internalize the shame and stigma of being excluded for a personal characteristic (being transgender) over which they have no control and which already subjects them to prejudice and social stigma.  (Budge Decl. ¶ 40.)

74.     For transgender girls who are already playing on girls' teams, a law that requires them to be excluded from continued participation on girls' teams would have a further negative impact on their health and well-being, causing them to feel isolated,

rejected, and stigmatized, and thereby putting them at high risk for severe depression and/or anxiety.  (*Id.*)

**VII.     TRANSGENDER GIRLS WHO HAVE NOT UNDERGONE MALE PUBERTY DO NOT HAVE AN ATHLETIC ADVANTAGE OVER OTHER GIRLS.**

75.     Before puberty, there are no significant differences in athletic performance between boys and girls.  (Shumer Rebuttal Decl. ¶¶ 9–13; Shumer Decl. ¶ 38; Pls.' Exs. 19–20, 22–23.)

76.     After puberty, adolescent boys begin to produce higher levels of testosterone, which over time causes them to become, on average, stronger and faster than adolescent girls.  (Shumer Decl. ¶ 39; Pls.' Exs. 18–19.)

77.     The biological driver of average group differences in athletic performance between adolescent boys and girls is differences in their respective levels of testosterone, which only begin to diverge significantly after the onset of puberty.  (Shumer Rebuttal Decl. ¶¶ 4, 8; Shumer Decl. ¶ 39; Pls.' Exs. 18–19.)

78.     Transgender girls who receive puberty-blocking medication do not have an athletic advantage over other girls because they do not undergo male puberty and do not experience the physiological changes caused by the increased production of testosterone associated with male puberty.  (Shumer Rebuttal Decl. ¶¶ 15–16; Shumer Decl. ¶¶ 35, 38–42.)

79.     Transgender girls who receive hormone therapy after receiving puberty-blocking medication will develop the skeletal structure, fat distribution, and muscle and breast development typical of other girls.  (Budge Decl. ¶ 29; Shumer Rebuttal Decl. ¶ 22; Shumer Decl. ¶¶ 35–36.)

80.     A transgender girl who receives hormone therapy will typically have the same levels of circulating estrogen and testosterone as other girls.  (Shumer Decl. ¶ 36.)

81.     Knowing that a girl is transgender reveals nothing about her athletic ability. (Shumer Rebuttal Decl. ¶¶ 26–27; Shumer Decl. ¶ 42.)

82.     Similarly, transgender girls who have not yet undergone male puberty or who have received puberty-blocking medication at the onset of puberty do not present any unique safety risk to other girls.  (Shumer Rebuttal Decl. ¶ 41.)

**VIII.     PLAINTIFFS CANNOT PLAY ON BOYS' SPORTS TEAMS**.

**A. Jane Doe Cannot Play on a Boys' Team.**

83.     Jane will not participate in sports at all if she is forced to be on a boys' team.  (J. Doe Decl. ¶ 11; H. Doe Decl. ¶ 15.)

84.     Her medical health depends on her ability to live her life fully as a girl, and playing on a boys' sports team and competing against boys would directly contradict her medical treatment for gender dysphoria and jeopardize her health.  (H. Doe Decl. ¶ 15; Budge Decl. ¶¶ 33–34.)

85.     Jane would find it humiliating and embarrassing to play on a boys' team because everyone at school knows her as a girl.  (J. Doe Decl. ¶ 11; H. Doe Decl. ¶ 15.)

86.     If she is not allowed to play sports on a girls' team, Jane will be very upset. (J. Doe Decl. ¶ 10; H. Doe Decl. ¶ 16.)

87.     Jane will also lose the opportunity to receive the physical, social, and emotional benefits that school sports provide.  (H. Doe Decl. ¶ 16; *see supra* Section VII.)

**B. Megan Roe Cannot Play on a Boys' Team.**

88.     If she is not allowed to play on the girls' volleyball team, Megan will not compete on the boys' volleyball team.  (M. Roe Decl. ¶ 9; K. Roe Decl. ¶ 10.)

89.     Playing on a boys' team would directly conflict with Megan's medical treatment for gender dysphoria and would be painful and humiliating for her.  (M. Roe Decl. ¶ 9; K. Roe Decl. ¶ 10.)

90.     Megan will be distraught if she loses the opportunity to try out for the girls' volleyball team.  (K. Roe Decl. ¶ 11.)

91.     Megan will also lose the opportunity to receive the physical, social, and emotional benefits that school sports provide.  (*Id.* ¶ 9; *see supra* Section VII.)

11

1

**PROPOSED CONCLUSIONS OF LAW**

2

I.      **PLAINTIFFS ARE ENTITLED TO A PRELIMINARY**

3

**INJUNCTION ON THEIR EQUAL PROTECTION CLAUSE AND**

4

**TITLE IX CLAIMS.**

5

      92.    A party seeking a preliminary injunction must establish that: (1) they are

6

likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable

7

harm in the absence of preliminary relief; (3) the balance of equities tips in their favor;

8

and (4) an injunction is in the public interest. *See All. for the Wild Rockies v. Cottrell*,

9

632 F.3d 1127, 1131 (9th Cir. 2011).

10

      93.    When the government is a party, the third and fourth factors merge. *Nken*

11

*v. Holder*, 556 U.S. 418, 435 (2009); *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir.

12

2021). Where, as here, the burden to justify the Ban under the Equal Protection Clause

13

"rests entirely on the State," *United States v. Virginia*, 518 U.S. 515, 533 (1996), the

14

burden to show a likelihood of success shifts to Defendants at the preliminary injunction

15

stage for the Equal Protection claim. *See Gonzales v. O Centro Espirita Beneficente*

16

*Uniao de Vegetal*, 546 U.S. 418, 429–30 (2006).

17

      94.    Plaintiffs have established the requisite factors for a preliminary injunction.

18

*See Wild Rockies*, 632 F.3d at 1131.

19

      **A. Plaintiffs Are Likely to Succeed on the Merits of Their Claims.**

20

      95.    Excluding Jane and Megan from girls' sports teams violates the Equal

21

Protection Clause and Title IX. *See, e.g.*, *A.M. v. Indianapolis Pub. Sch.,* 617 F. Supp. 3d

22

950, 965–66 (S.D. Ind. 2022) (granting preliminary injunction to stop enforcement of a

23

similar law because it violates Title IX); *Hecox v. Little*, 479 F. Supp. 3d 930, 988

24

(D. Idaho 2020) (same under Equal Protection Clause); *see also Roe v. Utah High Sch.*

25

*Activities Ass'n*, 2022 WL 3907182, at *4 (Utah Dist. Ct. Aug. 19, 2022) (holding that

26

transgender sports ban violated Utah's "state-law counterpart to the federal Equal

27

Protection Clause").

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**1. The Ban Violates Plaintiffs' Rights Under the Equal Protection Clause.**

a. *The Ban Is Subject to Heightened Scrutiny*

96. Laws that discriminate against transgender people are sex-based classifications and, as such, warrant heightened scrutiny. *See Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019) (analyzing a policy barring transgender people from military service as sex-based discrimination and applying heightened scrutiny); *see also D.T. v. Christ*, 552 F. Supp. 3d 888, 896 (D. Ariz. 2021) ("Discrimination against transgender people is discrimination based on sex; as such, heightened scrutiny applies.").

97. Under heightened scrutiny, the burden is on the government to show "an exceedingly persuasive justification" for the discrimination, *Virginia*, 518 U.S. at 531, which must not be based on "generalizations" or "stereotypes." *Id.* at 549–50, 565. "The justification 'must be genuine, not hypothesized or invented post hoc in response to litigation[.]'" *Karnoski,* 926 F.3d at 1200 (quoting *Virginia*, 518 U.S. at 533).

98. Defendant Horne's and Permissive Intervenors' argument that the Ban does not discriminate based on transgender status or gender identity is unavailing. The Ban's disparate treatment of transgender girls because they are transgender is clear on the face of the statute. *See, e.g.*, *Hecox*, 479 F. Supp. 3d at 975 (rejecting defendants' argument that similar Idaho statute "does not ban athletes on the basis of transgender status, but rather on the basis of the innate physiological advantages males generally have over females"); *A.M.*, 617 F. Supp. 3d at 965–66 (holding that a virtually identical Indiana statute discriminated against transgender individuals despite not using the term "transgender"); *B.P.J. v. W. Va. State Bd. of Educ.*, 550 F. Supp. 3d 347, 353–54 (S.D. W. Va. 2021) (holding that a virtually identical West Virginia statute "discriminates on the basis of transgender status").

99.    Moreover, the legislative history demonstrates that the purpose of the Ban is to exclude transgender girls from girls' sports teams. (Pls.' Exs. 17, 25.) *See supra* Section IV, ¶ 42.

b.    *The Ban Is Not Substantially Related to Any Important Government Interest.*

100.    Defendant Horne and Permissive Intervenors have not established that categorically banning all transgender girls from playing girls' sports is substantially related to an important government interest. *See Virginia*, 518 U.S. at 524.

101.    Defendant Horne's and Permissive Intervenors' argument that the Ban is necessary to protect girls' sports by barring girls who have a purportedly unfair athletic advantage over other girls or by barring girls who purportedly pose a safety risk to other girls is based on overbroad generalizations and stereotypes that erroneously equate transgender status with athletic ability. *See Hecox*, 479 F. Supp. 3d at 982 (holding that the asserted advantage between transgender and non-transgender female athletes "is based on overbroad generalizations without factual justification"). This justification does not withstand heightened scrutiny. *See Karnoski*, 926 F.3d at 1200 (quoting *Virginia*, 518 U.S. at 533).

102.    The well-established scientific consensus is that, before puberty, there are no significant differences in athletic performance between boys and girls. (Shumer Reb. Decl. ¶¶ 9, 11–12.) There is also no evidence that transgender girls who do not undergo male puberty because they have taken puberty suppressing medication at the onset of male puberty have an athletic advantage over other girls. (*Id.* ¶¶ 14–16, 23–26.) There are no studies that have documented any such advantage, and there is no medical reason to posit that any such advantage would exist. (*Id.* ¶ 26.)

103.    In support of their contention that boys have at least some biological advantages in athletic performance before puberty, Defendant Horne and Permissive Intervenors' expert Dr. Brown rely primarily on data from physical fitness tests or athletics in which there is a small difference in performance between prepubertal non-

14

1   transgender boys and prepubertal non-transgender girls.  (*Id.* ¶ 13.)  However, this data

2   merely observes phenomena across a population sample in isolated areas and does not

3   determine a cause for whatever is observed.  There is no basis for Dr. Brown to attribute

4   those small differences to physiology or anatomy instead of to other factors, such as

5   greater societal encouragement of athleticism in boys, greater opportunities for boys to

6   play sports, or differences in the preferences of the boys and girls surveyed.  (*Id.*)

7       104.   As the *Hecox* court noted, several studies cited by Dr. Brown support

8   Plaintiffs' position.  *Hecox*, 479 F. Supp. 3d at 980 (highlighting study on which Dr.

9   Brown relied that stated that "evidence makes it highly likely that the sex difference in

10  circulating testosterone of adults explains most, if not all, of the sex differences in

11  sporting performance").  Similarly, the World Rugby Transgender Women's Guidelines

12  2020, which Dr. Brown cites throughout his declaration, allow transgender girls and

13  women to participate in women's rugby if they did not experience endogenous male

14  puberty, stating: "Transgender women who transitioned pre-puberty and have not

15  experienced the biological effects of testosterone during puberty and adolescence can

16  play women's rugby."  (Pls.' Ex. 24.)

17      105.   Neither plaintiff has undergone male puberty.  Plaintiff Jane Doe has not

18  undergone male puberty and will soon be starting to take puberty blocking medication.

19  (H. Doe Decl. ¶ 11; Third H. Doe Decl. ¶¶ 4–5.)  Plaintiff Megan Roe took puberty-

20  blocking medication at the onset of male puberty and later hormone replacement therapy

21  to undergo female puberty.  (K. Roe Decl. ¶ 6.)

22      106.   Because there is no basis to conclude that Jane or Megan have a

23  competitive advantage over other girls, there is also no basis for Permissive Intervenors'

24  and Defendant Horne's assertion that they pose a safety risk to other girls.  (Shumer Reb.

25  Decl. ¶¶ 32–38, 41.)

26      107.   Permissive Intervenors and Defendant Horne discuss *Clark v. Arizona*

27  *Interscholastic Association*, 695 F.2d 1126, 1131 (9th Cir. 1982) throughout their briefs.

28  However, as the Court in *Hecox* noted, that case strongly supports Plaintiffs.  In *Clark*,

15

1   the Ninth Circuit held that it was lawful to exclude boys from girls' volleyball teams

2   because: (1) women had historically been deprived of athletic opportunities in favor of

3   men; (2) as a general matter, men had equal athletic opportunities compared to women;

4   and (3) according to the stipulated facts in the case, average physiological differences

5   meant that males would displace females to a substantial extent if permitted to play on

6   women's volleyball teams.  *See id.* at 1131.

7          108.   But as the *Hecox* court recently recognized, none of those premises holds

8   true for girls who are transgender: (1) far from being favored in athletics, "women who

9   are transgender have historically been discriminated against;" (2) transgender women—

10  unlike the boys in *Clark*—would not be able to participate in any school sports; and (3)

11  based on the very small numbers of transgender girls in the population, "transgender

12  women have not and could not 'displace' cisgender women in athletics 'to a substantial

13  extent.'" *Hecox*, 479 F. Supp. 3d at 977 (quoting *Clark*, 695 F.2d at 1131).  *Hecox*'s

14  analysis of *Clark* is even more compelling here, where there is no question that Plaintiffs,

15  who have not experienced male puberty, have no physiological advantage over other

16  girls.  *See Hecox*, 479 F. Supp. 3d at 981 (transgender girls who do not experience male

17  puberty "do not have an ascertainable advantage over cisgender female athletes").

18                          c.   *The Ban Fails Rational Basis Review*

19         109.   Defendant Horne and Permissive Intervenors concede that rational basis

20  review does not apply.  Regardless, the Ban cannot survive rational basis review because

21  the sweeping exclusion of all transgender girls from participating in athletics, regardless

22  of their individual circumstances, "is so far removed from the[] particular justifications"

23  put forward in support of it that it is "impossible to credit them." *Romer v. Evans*, 517

24  U.S. 620, 635 (1996).

25         110.   The legislative findings and history of the Ban make clear that it was

26  enacted to exclude all transgender girls from school sports in Arizona.  Because a

27  "bare . . . desire to harm a politically unpopular group cannot constitute a legitimate

28  governmental interest," the Ban cannot survive rational basis review.  *U.S. Dep't of*

1    *Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *see also United States v. Windsor*, 570 U.S.

2    744, 770 (2013) (holding the Defense of Marriage Act unconstitutional where "[t]he

3    avowed purpose and practical effect of the law" was to "impose a disadvantage, a

4    separate status, and so a stigma" upon same-sex married couples).

5          111.    Accordingly, the Ban violates the Plaintiffs' Equal Protection rights.

6                           **2.  The Ban Violates Title IX.**

7          112.    Title IX provides, in relevant part, that no person "shall, on the basis of sex,

8    be excluded from participation in, be denied the benefits of, or be subjected to

9    discrimination under any education program or activity receiving Federal financial

10   assistance[.]" 20 U.S.C. § 1681(a).

11         113.    Defendants Kyrene School District (administered and overseen by

12   Defendant Toenjes), TGS, and the AIA receive federal financial assistance, and

13   Defendants Horne is a grant recipient of federal funds; they all must therefore comply

14   with Title IX's requirements.  (*See* Compl. ¶¶ 9–13.)[3]

15         114.    Discriminating against an individual on the basis of transgender status is

16   discrimination based on sex.  *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020)

17   ("[I]t is impossible to discriminate against a person for being . . . transgender without

18   discriminating against that individual based on sex.").

19         115.    Accordingly, the Ninth Circuit has held that discrimination based on

20   transgender status also constitutes impermissible discrimination under Title IX.

21   *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023) (holding that

22   *Bostock* applies to Title IX); *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022).

23         116.    The Ban discriminates against Plaintiffs based on their status as transgender

24   girls by providing that for purposes of school sports a student's sex is fixed "at birth."

25   S.B. 1165, 55th Leg., 2d Reg. Sess. (Ariz. 2002), § 2.

26

27   ───────────────
     [3] TGS's tax-exempt status under section 501(c)(3) of the Internal Revenue Code is
28   sufficient to obligate it to comply with Title IX's requirements.  *Buettner-Hartsoe v. Balt.
     Lutheran High Sch. Ass'n*, 2022 WL 2869041, at *3, *5 (D. Md. July 21, 2022); *E.H. by
     & Through Herrera v. Valley Christian Acad.*, 616 F. Supp. 3d 1040, 1050 (C.D. Cal.
     2022).

117.    The Ban's classification of all transgender girls as male and its prohibition of students who are "male" from playing on girls' teams, Ariz. Stat. § 15-120.02(B), intentionally excludes all transgender girls, including Plaintiffs, from participating on girls' teams.

118.    Exclusion from athletics on the basis of sex is a cognizable harm under Title IX because it deprives Plaintiffs of the benefits of sports programs and activities that their non-transgender classmates enjoy.  *See Grabowski*, 69 F.4th 1121–22 (holding that being removed from the team was an adverse action under Title IX); *see also A.M.*, 617 F. Supp. 3d at 970 (granting a preliminary injunction of a similar Indiana law that banned transgender girls from playing on girls' sports teams based on Title IX).

119.    Moreover, contrary to Permissive Intervenors' and Defendant Horne's assertions, the fact that Plaintiffs' schools offer teams for both boys and girls is of no consequence here; playing on a boys' team would be shameful and humiliating for Plaintiffs, as well as in direct conflict with their medical treatment.  (J. Doe Decl. ¶ 11; H. Doe Decl. ¶ 15; M. Roe Decl. ¶ 9; K. Roe Decl. ¶ 10; Budge Decl. ¶¶ 39–40; Shumer Decl. ¶ 51; Budge Reb. Decl. ¶¶ 9–10.)

### B.  Plaintiffs Will Suffer Irreparable Harm if Relief Is Not Granted.

120.    Plaintiffs face irreparable harm if this Court does not enjoin the Ban as to them.

121.    Enforcement of the Ban in violation of the Equal Protection Clause in and of itself is sufficient to presume irreparable harm to justify a preliminary injunction. *Hernandez v. Sessions*, 872 F.3d 976, 994–95 (9th Cir. 2017) ("It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury.") (internal quotation marks and citation omitted); *Hecox*, 479 F. Supp. 3d at 987 (noting this "dispositive presumption").

122.    A violation of Title IX also causes irreparable harm.  *See Anders v. Cal. State Univ., Fresno*, 2021 WL 1564448, at *18 (E.D. Cal. Apr. 21, 2021) (finding irreparable harm under Title IX given the "presumption of irreparable injury where

1    plaintiff shows violation of a civil rights statute" and in light of "the insult that comes

2    from unequal treatment"); *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 973 (D.

3    Minn. 2016) ("Plaintiffs have a fair chance of succeeding on their Title IX claim, and

4    Congress passed Title IX pursuant to its power to enforce the Fourteenth Amendment.

5    Plaintiffs' expectation that they may be treated unequally in violation of Title IX's terms

6    is an irreparable harm.") (footnote omitted).

7          123.    Plaintiffs will also suffer severe and irreparable mental, physical, and

8    emotional harm if the Ban applies to them.  Plaintiffs' mental health is dependent on

9    living as girls in all aspects of their lives.  (Budge Decl. ¶ 27; Shumer Decl. ¶ 24.)

10   Playing on a boys' team would directly contradict Plaintiffs' medical treatment for

11   gender dysphoria and would be painful and humiliating.  (Budge Decl. ¶¶ 27, 39–41;

12   Shumer Decl. ¶ 51.)

13         124.    Enforcing the Ban against Plaintiffs will effectively exclude Plaintiffs from

14   school sports and deprive them of the social, educational, physical, and emotional health

15   benefits that both sides acknowledge come from school sports.  (Horne Ans. ¶¶ 38–43;

16   Budge Decl. ¶¶ 35–38.)  This exclusion is a cognizable harm.  *See Grabowski*, 69 F.4th at

17   1121.

18         125.    Plaintiffs will also suffer the shame and humiliation of being unable to

19   participate in a school activity simply because they are transgender—a personal

20   characteristic over which they have no control.  (Budge Decl. ¶ 40); *see Grimm v.

21   Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 625 (4th Cir. 2020) (explaining that the stigma

22   of exclusion "publicly brand[s] all transgender students with a scarlet 'T'") (internal

23   quotation marks and citation omitted).

24         126.    In addition, Plaintiffs will suffer the cognizable and irreparable "dignitary

25   wounds" associated with the passage of a law expressly designed to communicate the

26   state's moral disapproval of their identity, wounds that "cannot always be healed with the

27   stroke of a pen." *Obergefell v. Hodges*, 576 U.S. 644, 678 (2015); *Hecox*, 479 F. Supp.

28   3d at 987 (finding such wounds to constitute irreparable harm).

127.    Plaintiffs have established that they will suffer irreparable harm if the Ban is enforced against them.

**C. The Public Interest and Balance of Equities Favor Injunctive Relief.**

128.    When an injunction is sought against a governmental entity, the public interest and balance-of-the-hardships factors merge.  *Nken*, 556 U.S. at 435–36.

129.    As an initial matter, "it is always in the public interest to prevent the violation of a party's constitutional rights."  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal citation and quotation marks omitted).

130.    The balance of equities favors Plaintiffs as well.  Defendant Horne and Permissive Intervenors "cannot suffer harm from an injunction that merely ends an unlawful practice."  *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).  Plaintiffs, however, face serious and ongoing harm if the Ban is enforced against them.

131.    The alleged harm to Defendants and Permissive Intervenors—"that biological girls will be forced to compete against transgender girls who allegedly have an athletic advantage"—is unsupported by the record.  *A.M.*, 617 F. Supp. 3d at 968.  Moreover, there is no evidence in the record "that allowing [Plaintiffs] to play on the girls' [teams] will make this [purported] harm a reality."  *Id*.  On the contrary, the record suggests the opposite.  As previously discussed, Plaintiffs do not have a competitive advantage over other girls, and they do not pose a safety risk.  (Shumer Reb. Decl. ¶¶ 9–27, 41.)  In addition, but for the Ban, Defendants TGS, Kyrene School District, Superintendent Toenjes, and the AIA would all permit Plaintiffs to play on girls' teams.  (Dkt. 36, Defendant TGS's Response to Plaintiffs' Motion for a Preliminary Injunction at 3; Compl. ¶ 54; Dkt. 51 at 2–3; Kyrene/Toenjes Stip. ¶ 1.)

132.    There is no evidence that any Defendant will be harmed by allowing Plaintiffs to continue playing with their peers as they have done until now.  *Hecox*, 479 F. Supp. 3d at 988 ("[A] preliminary injunction would not harm Defendants because it would merely maintain the status quo while Plaintiffs pursue their claims.").

1   133.   Accordingly, the public interest and balance of equities favor a preliminary

2   injunction.

3   134.   Because Plaintiffs have satisfied all elements necessary to obtain a

4   preliminary injunction, the Court grants Plaintiffs' motion for a preliminary injunction.

5   **II.   PLAINTIFFS ARE NOT REQUIRED TO POST A BOND.**

6   135.   The Court has the discretion to determine whether the moving party is

7   required to post a bond as a condition for the granting of a preliminary injunction.  *Diaz*

8   *v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (citing *Johnson v. Couturier*, 572 F.3d

9   1067, 1086 (9th Cir. 2009)).

10   136.   Here, a bond is not required because "there is no realistic likelihood of

11   harm to the defendant from enjoining his or her conduct."  *Jorgensen v. Cassiday*, 320

12   F.3d 906, 919 (9th Cir. 2003).  Accordingly, the Court holds that Plaintiffs are not

13   required to post a bond.

14   ## CONCLUSION

15   For the reasons stated above, Plaintiffs' motion for a preliminary injunction is

16   GRANTED.

17

18

19   Dated: July _____ , 2023                    SO ORDERED

20

21

22

23

24                                               _____

25                                               Jennifer G. Zipps, U.S. District Judge

26

27

28

21