D. John Sauer, Mo. Bar No. 58721*
Justin D. Smith, Mo. Bar No. 63253*
James Otis Law Group, LLC
13321 North Outer Forty Road, Suite 300
St. Louis, Missouri 63017
Telephone: (314) 562-0031
John.Sauer@james-otis.com

*Attorneys for Intervenor-Defendants President Petersen and Speaker Toma*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA
# TUCSON DIVISION

| | |
|---|---|
| Jane Doe, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Thomas C. Horne, in his official capacity as State Superintendent of Public Instruction, *et al.*, <br><br> Defendants. | Case No. 4:23-cv-00185-JGZ <br><br> **Motion for Stay Pending Appeal and Request for Administrative Stay** |

Pursuant to Rule 8(a)(1)(A) of the Federal Rules of Appellate Procedure and Rule 62(c) of the Federal Rules of Civil Procedure, Intervenor-Defendants Arizona Senate President Warren Petersen and Arizona House Speaker Ben Toma ("Movants") respectfully move this Court for a stay pending appeal of the preliminary injunction granted on July 20, 2023. Movants conferred with Plaintiffs regarding this Motion. Plaintiffs oppose a stay of the preliminary injunction and do not consent to this Motion. In support of the Motion, Movants state as follows:

**INTRODUCTION**

A stay pending appeal of the preliminary injunction should be entered because all four stay factors favor Movants.

First, Movants are likely to prevail on appeal. The Court misapplied intermediate scrutiny by not assessing the validity of the classification that Plaintiffs challenge as a whole and instead requiring perfect tailoring as to these Plaintiffs. The Court's finding that there is no competitive advantage for biological boys over girls pre-puberty also is clearly erroneous and against the overwhelming weight of evidence in this case. Rational basis review should have been applied, and the Act satisfies this level of scrutiny because there is a clear justification based on extensive scientific evidence. Finally, the Act does not violate Title IX because Title IX authorizes separation of sports teams based on biological sex, which *Bostock* and *Grabowski* did not change.

Second, issuing a stay will impose no cognizable harm on Plaintiffs. Plaintiffs would have an unfair competitive advantage if they played on girls' teams. Their exclusion from girls' teams is due to a medical condition, not the States' sex-based separation of sports teams. Plaintiffs' long delay before seeking judicial relief also strongly undercuts their claim of irreparable injury.

Third, the injunction imposes irreparable harm on other interested parties and on the State. The Court erred by overlooking the injuries to displaced biological girls. Any success by Plaintiffs in try-outs and meets will displace biological girls in making a team, getting playing time, and succeeding in final results. The Court also gave no weight to the irreparable injury to the State of Arizona in enforcing its valid statutes.

Fourth and finally, the public interest strongly favors a stay. The public has an interest in upholding the law passed by their elected officials. Girls in Arizona also have an interest in not competing against, being injury by, or being displaced by, biological boys in women's sports.

For these reasons, the Court should enter a stay pending appeal of the preliminary injunction.

**ARGUMENT**

In considering whether to grant a stay pending appeal, "a court considers four factors: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Nken v. Holder*, 556 U.S. 418, 426 (2009). These factors favor Movants here.

Moreover, as the Court acknowledged, a mandatory injunction that changes the status quo "requires a heightened burden of proof and is particularly disfavored." Doc. 127, at 24 (citing *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). The Court held that its injunction is prohibitory, not mandatory, *id.* at 24-25, but this holding is incorrect. The Act went into effect on September 24, 2022, *id.* at 2, and neither Plaintiff brought a challenge at that time. Instead, both Plaintiffs complied with the Act for many months, encompassing multiple sports seasons, before challenging it. *See id.* at 12. The "status quo" is that the Act was continuously in effect before the injunction, and the injunction is thus a "particularly disfavored" *mandatory* injunction that required a "heightened burden of proof," which the Court did not apply. *Id.* at 24.

**I.   Movants Are Likely to Prevail on Appeal.**

The first factor, likelihood of success on the merits, favors Movants here, for at least four reasons.

**A. The Court misapprehended and misapplied intermediate scrutiny.**

First, the Court's formulation and application of intermediate scrutiny contradicts precedent from the U.S. Supreme Court. The Act provides that sports teams shall be designated "based on the biological sex of the students who participate on the team or in the sport," and that "[a]thletic teams or sports designated for 'females,' 'women' or 'girls' may not be open to students of the male sex." A.R.S. § 15-120-02. As the Court notes, the act classifies by biological sex for student-athletes of all ages: "The Act applies equally

to kindergarten through college teams….” Doc. 127, at 13.  The Court does not dispute that the Act advances the State's interests in fairness, equality of opportunity, and safety for female student-athletes at least at the older age ranges; the Court states, "the problems identified as being addressed by the act—opportunity and safety—are limited to high school and college sports." *Id.*  In addition, the Court finds biological males who have gone through male puberty *do* have a significant competitive advantage in sports. *See id.* at 16.  Thus, the exclusion of such athletes from girls' and women's teams significantly advances the Act's interests of fairness, safety, and equality of opportunity for biologically female athletes.

Nevertheless, the Court concludes that this substantial body of undisputed evidence establishing the competitive advantage of biological male athletes who transition after going through puberty is "not relevant to the question before the Court: whether transgender girls *like Plaintiffs, who have not experienced male puberty*, have performance advantages that place other girls at a competitive disadvantage or at risk of injury." *Id.* at 16 (emphasis added).  The Court thus disregards the extensive, highly probative evidence of competitive advantages for the large majority of transgender-female athletes, *i.e.*, those who transition *after* undergoing male puberty, simply because the two individual Plaintiffs *in this case* claim that they did not or will not undergo male puberty. *Id.*  As the Court states, evidence of male competitive advantage after puberty "is not relevant because the Plaintiffs have not and never will experience male puberty." *Id.* at 17.

This is error.  Under intermediate scrutiny, which the Court applies, the validity of the classification that Plaintiffs challenge must be assessed by considering *the classification as a whole*, not by considering only the narrow *application of that classification* to the individual Plaintiffs in their unique circumstances.  By reasoning otherwise, the Court effectively applied strict scrutiny by requiring perfect tailoring as to these Plaintiffs—which is not required.

The Supreme Court's precedent makes this clear.  Under intermediate scrutiny, the question whether the Act advances the government's asserted interests "cannot be

answered by limiting the inquiry to whether the governmental interest is directly advanced *as applied to a single person or entity*. Even if there were no advancement as applied in that manner … there would remain the matter of the regulation's general application to others …." *United States v. Edge Broadcasting Co.*, 509 U.S. 418, 427 (1993) (emphasis added). Thus, by focusing solely on whether the Act advances its fairness, safety, and opportunity interests *solely when it applies to Plaintiffs*—to the point of treating extensive evidence of the Act's success in advancing its interests as to others as "not relevant," Doc. 127, at 16—the Court "thus asked the wrong question." *Edge Broadcasting*, 509 U.S. at 472.

Even if the Act did not substantially advance the State's interests by excluding *these specific Plaintiffs* from girls' teams (which, in fact, it does, *see infra*), "that fact is beside the point, for the validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989). "Here, the regulation's effectiveness must be judged by considering all the varied groups" that it affects—*including* biological males who transition post-puberty—"and it is valid so long as [Arizona] could reasonably have determined that its interests overall would be served less effectively without the … guideline than with it." *Id.* "Considering [the State's] proffered justifications together," under intermediate scrutiny the Act is valid if it "directly furthers the [State's] legitimate government interests and … those interests would have been less well served in the absence of the … guideline." *Id.*

Indeed, this requirement of considering the Act as a whole under intermediate scrutiny—instead of requiring the State to provide a case-specific justification *for each individual excluded*—is inherent in the very concept of intermediate scrutiny. Intermediate scrutiny for sex- and gender-based classifications does not require perfect tailoring. On the contrary, to justify a sex-based classification, the State need only show an important governmental interest and a "substantial relationship" between the classification and that interest: "The State must show at least that the challenged classification serves important

governmental objectives and that the discriminatory means employed are *substantially related* to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (emphasis added) (cleaned up); *see also, e.g., Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) ("The burden is met only by showing at least that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.") (quotation marks omitted). As the West Virginia district court concisely observed in its merits ruling: "Sex-based classifications fall under intermediate scrutiny and therefore do not have a 'narrowly-tailored' requirement." *B.P.J.*, 2023 WL 111875, at *8.

By considering only the Act *as applied* to the individual Plaintiffs, and disregarding how the Act serves its purposes when applied to the large majority of transgender-female athletes who transition after undergoing male puberty, the Court incorrectly conflated the nature of Plaintiffs' challenge with the substantive standard governing the Act's validity. As the Supreme Court has held, "classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding breadth of the remedy, but it does not speak at all *to the substantive rule of law necessary to establish a constitutional violation*." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) (emphasis added).

When the correct "substantive rule of law" is applied, *id.*, it is clear that the Act substantially advances its important government interests in fairness, safety, and equality of opportunity for female athletes. The Court agrees that these are important government interests, Doc. 127, at 28; *see also Clark, By & Through Clark v. Arizona Interscholastic Ass'n* ("*Clark I*"), 695 F.2d 1126, 1131 (9th Cir. 1982), and the Court's own findings demonstrate that the large majority of transgender-female athletes—*i.e.*, those who transition *after* undergoing male puberty—have a significant athletic advantage over biological-female athletes. *See, e.g.,* Doc. 127, at 17. For example, the Court notes "specific male physiological advantages" that "are a result of testosterone levels in men post-puberty," and does not dispute that "such advantages are not reversed by testosterone

suppression after puberty or are reduced only modestly, leaving a large advantage over female athletes." *Id.* at 17. These facts alone demonstrate that the Act is "substantially related" to the interests it advances. *Virginia*, 458 U.S. at 724.

**B. The Court's finding that biological males who do not undergo male puberty have no competitive disadvantage over female athletes is clearly erroneous.**

Second, even if the State were required to provide a case-specific justification for its exclusion of these particular Plaintiffs instead of justifying *the Act as a whole*—which it is not—the injunction is still unlikely to be upheld on appeal. The Court's key factual findings used to undermine the Act's justification—*i.e.*, that there is no competitive advantage for biological boys over girls *pre-puberty*, and thus no competitive advantage for transgender-female athletes who suppress male puberty—are clearly erroneous. All the competent evidence in the record points in the opposite direction. As virtually any elementary-school sports coach can attest, there *is* a competitive advantage for boys over girls in sports before puberty, and there is not a scintilla of evidence that puberty blockers and hormone therapy eliminate this advantage.

As for the competitive advantage for biological boys before puberty, the Court itself acknowledged some of this evidence:

> 50% of 6-year-old boys completed more laps in the 20-meter shuttle (14) than girls (12). (Brown Decl. (Doc. 82-1; 92-1) ¶ 84.) Other fitness data reflects differences between 9 through 17-year-old boys and girls, with 9-year-old boys always exceeding girls' running times by various percentages ranging from 11.1-15.2%, *id.* ¶ 89; arm hang fitness scores (7.48 boys, 5.14 girls), *id.* ¶ 92; standing broad jump (128.3 boys, 118.0 girls), *id.* ¶ 99. (*See also* Brown Decl. (Doc. 82-1; 92-1) ¶106 (quoting Thomas 1985 study at 266) ("Boys exceed girls in throwing velocity by 1.5 standard deviation units as early as 4 to 7 years of age . . ." and throwing distance by 1.5 standard deviation units as early as 2 to 4 years of age).)

Doc. 127, at 17-18. And there is much more. The evidence of male competitive advantage pre-puberty is overwhelming and effectively uncontradicted. Declaration of Dr. Gregory A. Brown ("Brown Decl."), Doc. 82-1, ¶¶ 77-115; Rebuttal Declaration of Dr. Gregory A. Brown ("Brown Rebuttal Decl."), Doc. 87-1, ¶¶ 6-15, 20, 23, 25, 31-32; Declaration of Dr.

7

1  Emma Hilton ("Hilton Decl."), Doc. 92-8, ¶¶ 7.1-7.22; Declaration of Dr. Linda Blade,
2  Doc. 92-9, at 6-11.

3  Plaintiffs' experts contend, and the Court holds, that this overwhelming evidence of pre-puberty male competitive advantage should be discounted entirely because it supposedly arises from "other factors such as greater societal encouragement of athleticism in boys, greater opportunities for boys to play sports, *or* differences in the preferences of the boys and girls surveyed." Doc. 127, at 19 (emphasis added). Notably, by stating "or," the Court declines to specify *which* of these three "other factors" (or combination thereof) causes the observed pre-pubescent male advantages—*i.e.*, the Court holds that *some* other factor(s) must cause the competitive advantages, but does not determine what. This is based on speculation, not evidence. And indeed, Plaintiffs' experts offered only speculation and conjecture—not hard evidence—for their conclusion that other "social" factors cause this discrepancy. Second Rebuttal Declaration of Dr. Daniel Shumer, Doc. 113, ¶¶ 21, 24, 46. Based on the record evidence before the Court, therefore, the only credible conclusion is that biological males have a significant competitive advantage pre-puberty. The Court's conclusion to the contrary contradicts the overwhelming weight of the evidence and common sense.

The Court also cited three studies by Handelsman, Senefeld, and McKay. But all three studies found that in children younger than Plaintiffs, boys had competitive advantages over girls. Handelsman reported a pre-pubertal difference between boys and girls in swimming, running, and jumping. Brown Decl., Doc. 82-1, ¶ 127; Brown Rebuttal Dec., Doc. 87-1, ¶ 20 ("This figure demonstrates an average male performance advantage of ~3% in running at age 10, ~4% at age 11, and ~5% at age 12, and this figure also demonstrates an ~6% male advantage in jumping at age 10, and ~5% at ages 11 and 12."). Senefeld reported that the top 100 boy swimmers had greater swim velocity than the top 100 girl swimmers beginning around age 8 (Figure 1), and "beginning at age 10, boys had faster swimming performance than girls." Jonathon W. Senefeld et al., *Sex Differences in Youth Elite Swimming*, (Doc. 88-2), at 39, 41. And McKay's data showed males were

stronger in 11 of 12 tests from ages 3-9 years (Table 1), and that from 10 years of age "males are significantly stronger in all measures." M.J. McKay, *Normative reference values for strength and flexibility of 1000 children and adults* (Doc. 88-3) at 12, 14

Likewise, no evidence supports the Plaintiffs' contention that puberty blockers and hormone treatment eliminate the competitive advantage enjoyed by pre-pubescent males. Brown Decl., Doc. 82-1, ¶¶ 116-125; Brown Rebuttal Decl., Doc. 87-1, ¶ 33; Hilton Decl., Doc. 92-8, ¶¶ 11.1-11.4.

### C. The Act easily satisfies rational-basis review.

For the reasons stated in Intervenor-Defendants' prior briefing, the Act is subject to rational-basis review. The Court's alternative holding that the Act fails rational-basis review, Doc. 127, at 30-31, is not likely to be upheld on appeal. The Act satisfies rational-basis scrutiny "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S. Ct. 2096, 2101, 124 L. Ed. 2d 211 (1993). Here, there is not just a "conceivable" justification, but an overwhelming one based on extensive scientific evidence, discussed above. *See supra*.

The Court nevertheless holds that the Act fails rational-basis scrutiny because it reflects a "bare … desire to harm a politically unpopular group." Doc. 127, at 30-31 (quoting *USDA v. Moreno*, 413 U.S. 528, 534 (1973)). This conclusion is insupportable. No competent evidence supports it, and the Court cited none. As *Moreno* makes clear, this conclusion applies only when "[t]he challenged statutory classification … is clearly irrelevant to the stated purposes of the Act." *Id.* Here, the separation of sports based on biological sex is *not* "clearly irrelevant to the stated purposed of the Act," *id.*, as the Ninth Circuit's case law demonstrates. *Clark I*, 695 F.2d at 1131. Separating sports teams by biological sex "simply recogniz[es] the physiological fact that males would have an undue advantage competing against women," and "there is clearly a substantial relationship between the exclusion of males from the team and the goal of redressing past discrimination and providing equal opportunities for women." *Id.* Furthermore, because

the Act does not involve a traditionally suspect class, Plaintiffs' animus claim cannot succeed if the Act serves a legitimate government interest, which the Act does. *Boardman v. Inslee*, 978 F.3d 1092, 1119 (9th Cir. 2020); *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1201 (9th Cir. 2018).

### D. The Act does not violate Title IX.

The Court's brief discussion of Title IX, Doc. 127, at 31-32, is unlikely to be upheld on appeal. The Act is valid under Title IX for many of the same reasons that it is valid under the Equal Protection Clause.

The Court ignores and does not cite evidence that Title IX, from its inception, is understood to specifically *authorize* the separation of sports teams based on biological sex—exactly what the Act does. Title IX's contemporaneous implementing regulation, 34 C.F.R. § 106.41(b) (entitled "Separate teams")—which the Court does not acknowledge or cite—makes this point very clear: "Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* "Title IX permits sex-separate athletic teams 'where selection for such teams is based upon competitive skill or the activity involved is a contact sport.'" *B.P.J.*, 2023 WL 111875, at *9 (quoting 34 C.F.R. § 106.41(b)). "[I]t would require blinders to ignore that the motivation for the promulgation of the regulation was to increase opportunities for women and girls in athletics." *Williams v. Sch. Dist. of Bethlehem, Pa.*, 998 F.2d 168, 175 (3d Cir. 1993). The Act, "which largely mirrors Title IX," does not violate Title IX. *B.P.J.*, 2023 WL 111875, at *10.

In holding to the contrary, the Court relies heavily on *Grabowski v. Arizona Board of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023), and its discussion of *Bostock v. Clayton County*, 140 S. Ct. 1731, 1746-47 (2020). Doc. 127, at 31-32. This was error. *Bostock* explicitly recognized that "sexual orientation" and "gender identity" (including transgender status) are distinct concepts. *Bostock*, 140 S. Ct. at 1746-47. Pervasive harassment based on perceived sexual orientation violates Title IX under *Grabowski*, see

2023 WL 3961123, at *2, just as employment discrimination based on sexual orientation may violate Title VI under *Bostock*, but neither *Bostock* nor *Grabowski* addressed whether separating sports teams based on biological sex violates Title IX. *See id.* Title IX and its implementing regulations provide that sports teams separated by biological sex are permissible, see 34 C.F.R. § 106.41(b), and binding Ninth Circuit precedent holds the same. *Clark I*, 695 F.2d at 1127. Nothing in *Grabowski* purports to overrule *Clark I* or *Clark II*—nor could it.

## II.    Issuing a Stay Will Impose No Cognizable Harm on Plaintiffs.

Because the Act is valid, it imposes no cognizable harm on Plaintiffs. As discussed above, as biological males, Plaintiffs would have an unfair competitive advantage if they played on girls' teams and forced biological girls to compete against them. Being required to compete on an even biological footing is not a cognizable harm, while forcing girls to compete on an uneven footing against biological boys *is* a cognizable harm—which the Court ignores. *See infra.*

To be sure, as the Court held, Plaintiffs contend that they have a medical condition—gender dysphoria—that prevents them from competing on boys' sports teams. *See* Doc. 127, at 22-24. But it is not uncommon for biological males to have medical conditions that prevent them from participating on male sports teams, and those males suffer the same injury of being unable to participate in sports. Ultimately, that exclusion is due to their medical condition, not due to the States' sex-based separation of sports teams.

Likewise, Plaintiffs' assertions of dignitary harms, "shame," and "humiliation," Doc. 127, at 33, fail to identify cognizable injuries. Requiring Plaintiffs to participate on a competitively even footing presents no objective affront to their dignity and provides no objective basis to experience shame or humiliation. And merely *subjective* feelings of anger, shame, or embarrassment as a result of a government policy, however sincerely felt, do not constitute cognizable irreparable harm—otherwise, every government policy would be subject to an "emotional heckler's veto." *See, e.g.*, *Mungia v. Judson Indep. Sch. Dist.*, No. CIV.A SA-09-CV-395-X, 2009 WL 3431397, at *2 (W.D. Tex. Oct. 19, 2009)

("[Plaintiff] has not provided, nor can this Court locate, any authority in which a Court found irreparable harm based on 'humiliation' or 'embarrassment.'"); *Sharon City Sch. Dist. v. Pennsylvania Interscholastic Athletic Ass'n, Inc.*, No. CIV.A. 9-213, 2009 WL 427373, at *2 (W.D. Pa. Feb. 20, 2009) (rejecting Plaintiff's argument claiming irreparable harm based on "embarrassment and humiliation"); *United Steelworkers Of Am. Loc. 13792 v. Mikocem Corp. Cemeteries*, No. 05-73184, 2005 WL 2090884, at *4 (E.D. Mich. Aug. 30, 2005) (finding "stigmatization and humiliation" not sufficient to establish irreparable harm").

Finally, Plaintiffs' long delay before seeking judicial relief strongly undercuts their claim of irreparable injury. As the Court held, Plaintiffs delayed through three sports seasons—almost a year—before challenging the Act. Plaintiff Roe participated in sports in accordance with the Act for many months before challenging the Act. Doc. 127, at 12. This significant delay strongly undercuts the urgency of Plaintiffs' asserted injuries. *See, e.g., Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *see also Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) ("[D]elay between the institution of an action and the filing of a motion for preliminary injunction, not attributable to intervening events, detracts from the movant's claim of irreparable harm."); *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered."); *Young v. Motion Picture Ass'n of Am., Inc.*, 299 F.2d 119, 121 (D.C. Cir. 1962) ("The delay in filing this action negatives any finding of urgency necessary to justify the interlocutory relief sought.").

### III. The Injunction Imposes Irreparable Harm on Other Parties Interested in the Proceeding and on the State.

The Court's analysis emphasizes the injury to Plaintiffs from exclusion in sports, but it disregards the greater injury to the biological girls unfairly displaced by Plaintiffs'

participation in girls' sports. Doc. 127, at 32-34. In the Court's discussion of the last three equitable factors, this critical issue is not mentioned at all. *Id.* Overlooking the commensurate injuries to the displaced biological *girls* is error.

The Court's finding of irreparable injury to Plaintiffs rests heavily on the Court's findings of social, emotional, and physical benefits from participation in sports:

> School sports offer social, emotional, physical, and mental health benefits. The social benefits of school sports include the opportunity to make friends and become part of a supportive community of teammates and peers. School sports provide an opportunity for youth to gain confidence and reduce the effects of risk factors that lead to increases in depression. Students who play school sports have fewer physical and mental health concerns than those that do not. Students who participate in high school sports are more likely to finish college and participation in high school sports has a positive impact on academic achievement.

Doc. 127, at 15 (citations and paragraph divisions omitted). Needless to say, these same benefits of participating in competitive sports—"social, emotional, physical, and mental health benefits," *id.*—are just as applicable to biological girls as transgender girls. *See Clark I*, 695 F.2d at 1131.

Here, the Court's own findings demonstrate that Plaintiffs' participation in sports threatens to displace biological girls from limited places on sports teams and competitions. The teams on which Doe and Roe wish to compete have competitive try-outs and competitive meets. Doc. 127, at 7 (Doe "intends to … try out for the girls' soccer and basketball teams"); *id.* at 8 ("the first cross-country competitive meet will occur the week of August 14, 2023"); *id.* at 9 (Roe "intends to try out for the girls' volleyball team"). This means that Doe and Roe, to the extent that they succeed in try-outs and meets, *ipso facto* will displace biological girls. In every competitive try-out, a Plaintiff making the team displaces a biological girl who otherwise would have made the team. In every volleyball and basketball game, a Plaintiff getting coveted playing time displaces a biological girl who thus does not get that playing time. Cross-country meets are scored by ordering *all* runners who participate from first to last. That means that a transgender runner who takes

any place but last displaces *every* biological girl who finishes after the transgender runner by at least one place. Competitive sports are zero-sum by their very nature. The Court's analysis ignores the injuries to the biological girls unfairly displaced by biological boys, and it thus relegates them to the status of anonymous, voiceless victims.

The Court holds that there will not be much impact on Arizona girls because there are relatively few transgender athletes in Arizona, reasoning as follows: "Less than one percent of the population is transgender, with male and female transgender people being roughly the same in number…. It appears untenable that allowing transgender women to compete on women's teams would substantially displace female athletes." Doc. 127, at 11 (quoting *Hecox v. Little*, 479 F. Supp. 3d at 977-78). This holding contradicts the Ninth Circuit's reasoning in *Clark II*, which emphasized the displacement injury that occurs "even to the extent of one player." *Clark By & Through Clark v. Arizona Interscholastic Ass'n*, 886 F.2d 1191, 1193 (9th Cir. 1989) ("*Clark II*"). "If males are permitted to displace females on the school volleyball team *even to the extent of one player* like Clark, the goal of equal participation by females in interscholastic athletics is set back, not advanced." *Id.* (emphasis added).

The Court also errs by giving no weight to the irreparable injury to the sovereign interest of the State of Arizona in enforcing its valid statutes, which is a considerable injury under our system of federalism. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (internal quotation omitted); *see also Coalition for Economic Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[I]t is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined"); *L.W., et al. v. Skrmetti*, et al., No. 23-5600 at 14 (6th Cir. July 8, 2023) (holding that a State faces irreparable harm if its law is enjoined, including the inability "to enforce the will of its legislature").

**IV.     The Public Interest Strongly Favors a Stay.**

The final factor—public interest—"merge[s]" with the injury to the State and its

citizens. *Nken v. Holder*, 556 U.S. 418, 435 (2009) ("[T]he harm to the opposing party and weighing the public interest … merge when the Government is the opposing party."). As noted, the Court holds that there are relatively few transgender athletes who have sought access to girls' and women's teams in Arizona so far, and thus it concludes that the injunction will have little impact on the public interest. Doc. 127, at 11. This is error. *Nken* held that "courts must be mindful that the Government's role as the respondent in every removal proceeding does not make the public interest in each individual one negligible, as some courts have concluded." *Nken*, 556 U.S. at 435. The fact that such proceedings apply to a single person does not undermine the strong public interest in upholding the law. Permitting a single transgender-female athlete to participate on girls' teams "permits and prolongs a continuing violation of … law." *Id.* (square brackets omitted). The Act, as a duly enacted law adopted by Arizona's elected representatives, is itself a clear and authoritative declaration of the public interest in Arizona. *See, e.g., Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (holding that a policy enacted in a statute "is in itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief"). The Court errs by disregarding these public interests.

## CONCLUSION

Intervenor-Defendants respectfully request that the Court grant this Motion to Stay. In the alternative, should the Court deny this Motion, Intervenor-Defendants respectfully request an administrative stay of the preliminary injunction for seven days to allow time for the Ninth Circuit to consider an emergency motion to stay and request for administrative stay. Intervenor-Defendants respectfully request a ruling by this Court on this Motion by Monday, July 31, 2023, to allow Intervenor-Defendants time to seek prompt appellate relief, if necessary.

Dated: July 24, 2023

Respectfully submitted,

JAMES OTIS LAW GROUP, LLC

<u>/s/ Justin D. Smith</u>
D. John Sauer, Mo. Bar No. 58721*
Justin D. Smith, Mo. Bar No. 63253*
13321 North Outer Forty Road, Suite 300
St. Louis, Missouri 63017
(816) 678-2103
Justin.Smith@james-otis.com
* *pro hac vice*

*Attorneys for Proposed Intervenor-Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on July 24, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

<u>/s/ Justin D. Smith</u>