D. John Sauer, Mo. Bar No. 58721*
Justin D. Smith, Mo. Bar No. 63253*
James Otis Law Group, LLC
13321 North Outer Forty Road, Suite 300
St. Louis, Missouri 63017
Telephone: (314) 562-0031
John.Sauer@james-otis.com

*Attorneys for Intervenor-Defendants President Petersen and Speaker Toma*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
## TUCSON DIVISION

| | |
|---|---|
| Jane Doe, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Thomas C. Horne, in his official capacity as State Superintendent of Public Instruction, *et al.*,<br><br>Defendants,<br><br>and<br><br>Warren Petersen, Senator, President of the Arizona State Senate; Ben Toma, Representative, Speaker of the Arizona House of Representatives,<br><br>Intervenor-Defendants. | Case No. 4:23-cv-00185-JGZ<br><br>**Intervenor-Defendants' Motion to Dismiss and Memorandum of Law in Support Thereof** |

1

## INTRODUCTION

2      Plaintiffs' Count III, which this Court has not yet addressed, should be dismissed
3  because it fails to state a claim.  Count III raises claims under the Americans with
4  Disabilities Act (ADA) and Section 504 of the Rehabilitation Act.  Plaintiffs' alleged
5  disability is gender dysphoria, which is *not* a disability for purposes of the ADA or the
6  Rehabilitation Act.  Both laws exclude from their scope people whose claimed disability
7  constitutes "gender identity disorders not resulting from physical impairments" or "other
8  sexual behavior disorders."  The original public meaning of "gender identity disorders" at
9  the time Congress enacted the exclusions—as shown by prevalent diagnostic criteria—
10 matches the definition of gender dysphoria today.  In addition, gender dysphoria falls
11 within the laws' exclusion for "other sexual behavior disorders."

12      Plaintiffs do not point to any "physical impairment" that gave rise to their gender
13 dysphoria diagnoses—and even if they could, they would still fall within the exclusion for
14 other sexual behavior disorders.  Plaintiffs also do not allege that a "major life activity" has
15 been substantially impaired.  Courts have consistently held that playing sports does not
16 constitute a major life activity—even when sports is part of a student's academic career.

17      Counts I and II of the Complaint also fail to state a claim for relief for the reasons
18 stated in Intervenors' previous briefing, which is incorporated by reference herein. This
19 Court, to be sure, held that Plaintiffs were likely to succeed on Counts I and II in granting
20 their motion for a preliminary injunction.  Arizona Senate President Warren Petersen and
21 Speaker of the Arizona House of Representatives Ben Toma (the "Legislative Leaders")
22 acknowledge that ruling but respectfully submit that Counts I and II also fail to state a
23 claim for relief for the reasons discussed in their preliminary-injunction briefing.

24

## LEGAL STANDARD

25      A complaint should be dismissed under Rule 12(b)(6) if it fails "to state a claim to
26 relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).
27 "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient
28 facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901

1

1   F.2d 696, 699 (9th Cir. 1988) (internal citation omitted).   "Conclusory allegations of

2   law … are insufficient to defeat a motion to dismiss."  *Lee v. City of Los Angeles*, 250 F.3d

3   668, 679 (9th Cir. 2001).  "On a motion to dismiss, the court accepts the facts alleged in

4   the complaint as true."  *Balistreri*, 797 F.2d at 745.

5                                          **ARGUMENT**

6   **I.     Plaintiffs fail to state a claim in Count III.**

7          Count III alleges violations of the Americans with Disabilities Act (ADA) and

8   Section 504 of the Rehabilitation Act.  *See* Compl., Doc. 1, ¶¶ 81–85.  "The Ninth Circuit

9   has indicated that the ADA is to be judicially interpreted in the same manner as the

10  Rehabilitation Act."  *Armstrong v. Wilson*, 942 F. Supp. 1252, 1259 (N.D. Cal. 1996).

11  Indeed, the provisions at issue are effectively the same.  *See* 29 U.S.C. § 705(20)(B)

12  (defining "individual disability" as "any person who has a disability as defined in" the

13  ADA, 42 U.S.C. § 12102).  The result should also be the same.  *Williams v. Kincaid*, 45

14  F.4th 759, 766 n.1 (4th Cir. 2022) ("plaintiffs' ADA and Rehabilitation Act claims rise and

15  fall together"); *accord Csutoras v. Paradise High Sch.*, 12 F.4th 960, 969 n.11 (9th Cir.

16  2021).

17         **A.     Plaintiffs' gender dysphoria is not a "disability" under the ADA and**

18               **Rehabilitation Act.**

19         Count III requires Plaintiffs to have a disability within the meaning of the ADA and

20  the Rehabilitation Act.  *See Taylor v. City and County of Honolulu*, 2023 WL 2753162, at

21  *17 (D. Haw. Mar. 31, 2023).  But gender dysphoria is not a "disability" under either law.

22  *See Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 611 (4th Cir. 2020) (noting the fact).

23         Both the ADA and the Rehabilitation Act exclude "gender identity disorders not

24  resulting from physical impairments" from the definition of disability.   42 U.S.C.

25  § 12211(b)(1); 29 U.S.C. § 705(20)(F)(i).   And in enacting that exclusion, Congress

26  intended to exclude gender dysphoria from the definition of "disability."

27         Statutory interpretation principles support this conclusion.  Courts interpret words

28  in a statute "consistent with their ordinary meaning … at the time Congress enacted the

statute." *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (internal citation omitted).  Because both exclusions were enacted within a year of each other, *see Grimm*, 972 F.3d at 611 (noting the fact), they are interpreted similarly.  And the relevant interpretative aid is the diagnostic criteria for "gender identity disorders" in use at the time of the laws' passage—criteria in the Diagnostic and Statistical Manual (DSM) that Congress was well aware of when it enacted the exclusions.  *See* 135 Cong. Rec. 19,871, 19,884-885 (1989); H.R. Rep. No. 101-596, at 88 (Conf. Rep.).

The DSM-III-R definition of "gender identity disorder of childhood" in effect at the time Congress enacted the exclusions encompasses Plaintiffs' gender dysphoria.  *See* Am. Psych. Ass'n, Diagnostic and Statistical Manual 71-78 (3d ed., rev. 1987) (DSM-III-R), attached as Exhibit 1;[1] *see also Williams*, 45 F.4th at 781-84 (Quattlebaum, J., dissenting). In the DSM-III-R, for example, the "essential features" of "gender identity disorder of childhood" are "persistent and intense distress in a child about his or her assigned sex and the desire to be, or insistence that he or she is, of the other sex."  DSM-III-R, at 71.  One court examining this diagnostic criteria said "the 'gender identity disorders' subclass of psychosexual disorders [is] 'characterized by the individual's feelings of discomfort and inappropriateness about his or her anatomic sex and by persistent behaviors generally associated with the other sex.'"  *Lange v. Houston County*, 608 F. Supp. 3d 1340, 1362 (M.D. Ga. 2022) (quoting APA, *Diagnostic and Statistical Manual of Mental Disorders – Third Edition* 261 (1980) [hereinafter DSM-III]); *see also* DSM-III-R at 71 (noting that "mild" cases of "gender identity disturbance" involve "discomfort and a sense of inappropriateness about the assigned sex").  Likewise, "the 'essential feature' of the gender identity disorders subclass" in the DSM-III is "'an incongruence between anatomic sex and gender identity.'"  *Lange*, 608 F. Supp. 3d at 1362 (quoting DSM-III, *supra*, at 261); *see also* DSM-III-R, *supra*, at 71.

So at the time Congress passed the gender-identity-disorders exclusions in the ADA

---

[1] The Court may take judicial notice of DSM-III-R.  *Hoffmann v. Life Ins. Co. of N. Am.*, 669 F. App'x 399, 400 (9th Cir. 2016).

and Rehabilitation Act, a person suffering from a "gender identity disorder" was experiencing an incongruence between sex and gender identity plus discomfort about the incongruence.  That tracks the current diagnostic of gender dysphoria, including the diagnosis for gender dysphoria in children.  *See* APA, *Diagnostic and Statistical Manual of Mental Disorders – Fifth Edition* 451–52 (2013) [hereinafter DSM-V]; *see also* APA, *Diagnostic and Statistical Manual of Mental Disorders – Fifth Edition Text Revision* 511—12 (2022) [hereinafter DSM-V-TR].  It also tracks the definition of gender dysphoria presented by Plaintiffs and their experts.  Compl., Doc. 1, ¶ 32; Decl. of Dr. Stephanie Budge, Doc. 4, ¶¶ 23-24; Decl. of Dr. Daniel Shumer, Doc. 5, ¶¶ 27-28.  "The clear result is that Congress intended to exclude from the ADA's protection both disabling and non-disabling gender identity disorders that do not result from a physical impairment.  The majority of federal cases have concluded as much."  *Parker v. Strawser Constr., Inc.*, 307 F. Supp. 3d 744, 754 (S.D. Ohio 2018) (citing *Gulley–Fernandez v. Wis. Dep't of Corr.*, 2015 WL 7777997, at *2 (E.D. Wis. Dec. 1, 2015); *Mitchell v. Wall*, 2015 WL 10936775, at *1 (W.D. Wis. Aug. 6, 2015); *Diamond v. Allen*, 2014 WL 6461730, at *4 (M.D. Ga. Nov. 17, 2014); *Kastl v. Maricopa Cty. Cmty. Coll. Dist.*, 2004 WL 2008954, at *4 (D. Ariz. June 3, 2004)).

The Fourth Circuit took a different course and held that gender dysphoria is not excluded as a gender identity disorder.  *See Williams v. Kincaid*, 45 F.4th 759, 766–71 (4th Cir. 2022).  The panel majority's reasoning rests on the APA's decision to remove "'gender identity disorder' from the DSM-[V]" and to add "the diagnosis of 'gender dysphoria.'"  *Id.* at 767.  Thus, the panel majority concluded, even "if there are similarities between the now-obsolete definition of gender identity disorder and the DSM-[V]'s definition of gender dysphoria, the diagnosis of gender identity disorder referred to in § 12211(b) no longer exists."  *Id.* at 769 n.5; *see also Kincaid v. Williams*, 143 S. Ct. 2414, 2416 (2023) (Alito, J., dissenting from the denial of certiorari) (summarizing the analysis).  Put simply, the panel majority treated the ADA's (and, by extension, the Rehabilitation Act's) exclusion of "gender identity disorders" not to be "fixed at the time the [laws were] enacted,"

*Williams*, 45 F.4th at 785 (Quattlebaum, J., dissenting), but subject to revision and erasure by the APA.

That is not how statutory analysis works.  "[E]very statute's meaning is fixed at the time of enactment."  *Badgley v. United States*, 957 F.3d 969, 977 (9th Cir. 2020) (quoting *Wisc. Cent. Ltd.*, 138 S. Ct. at 2070).  For that matter, it is not how the Constitution works; Congress cannot "delegate regulatory power to private individuals."  *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989).  A private organization like the APA cannot be delegated "power to effectively modify statutes passed by Congress and signed into law by the President."  *Williams*, 45 F.4th at 785 (Quattlebaum, J., dissenting).  The *Williams* majority never justifies its departure from basic tenets of statutory interpretation and non-delegation principles.

The *Williams* majority also ignored statutory context.  Both the ADA and Rehabilitation Act exclude "other sexual behavior disorders" as well as gender identity disorders from their scope.  29 U.S.C. § 705(20)(F)(i); 42 U.S.C. § 12211(b)(1).  That "final catch-all category suggests that Congress sought to prohibit the ADA's [and Rehabilitation Act's] application to conditions that are sufficiently similar to the more specific categories of conditions that precede," *Kincaid*, 143 S. Ct. at 2417 (Alito, J., dissenting from the denial of certiorari), which would mean the exclusion covers gender dysphoria even if the other listed exclusions do not.  And that is the second reason why Plaintiffs are not disabled for purposes of the ADA and the Rehabilitation Act.

Thus, gender dysphoria is not a disability for purposes of the ADA and Rehabilitation Act.  It either falls within the statutory exclusions for "gender identity disorders" or for "other sexual disorders."

## B.   Plaintiffs do not provide factual allegations that their gender identity results from a physical impairment.

Plaintiffs cannot avoid the gender identity disorder exclusion unless their gender dysphoria came from a physical impairment.  *See* 29 U.S.C. § 705(20)(F)(i) (Rehabilitation Act); 42 U.S.C. § 12211(b)(1) (ADA).  Plaintiffs' allegation that their gender dysphoria

results from physical impairments, Compl., Doc. 1, ¶ 84, is nothing more than a "conclusory allegation[ ] of law" that cannot "defeat a motion to dismiss for failure to state a claim," *Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996). Courts have thus been properly skeptical of similar allegations and found no physical impairment was alleged. *See, e.g.*, *Lange*, 608 F. Supp. 3d at 1362–63; *Parker*, 307 F. Supp. 3d at 755.

The DSM-III-R informs what Plaintiffs needed to plead. As set forth in the DSM-III-R "gender identity disorder" sections, "[p]hysical abnormalities of the sex organs are rarely associated with Gender Identity Disorder of Childhood; when they are present, the physical disorder should be noted on Axis III." DSM-III-R, *supra*, at 73. That suggests "physical impairment" under the ADA and Rehabilitation Act refers to "a manifest physical condition that causes one's gender identity disorder." *Lange*, 608 F. Supp. 3d at 1363 n.18. There is nothing like that in the Complaint.

Here again, the Fourth Circuit concluded otherwise. *See Williams*, 45 F.4th at 770–72. "The ground on which the majority [so] concluded . . . is not entirely clear, but . . . appears to be that Williams has a physical need for hormonal treatment because, without it, Williams experiences 'physical distress.' " *Kincaid*, 143 S. Ct. at 2416 (quoting *Williams*, 45 F.4th at 771) (Alito, J., dissenting from the denial of certiorari). But that conflates the treatment with the cause and so ignores the statutory text. *See Williams*, 45 F.4th at 788 (Quattlebaum, J., dissenting) ("At most, it implies hormone therapy and/or surgery may be—not that it always is—helpful to treat the condition. But § 12211(b)(1) requires that a person's gender identity disorder result from a physical impairment. That means the physical impairment must come first."); *see also Kincaid*, 143 S. Ct. at 2418 (Alito, J., dissenting from the denial of certiorari) ("Many common mental impairments, such as depression and anxiety disorders, cause real and sometimes powerful physical distress and are treated by chemical interventions. That does not mean, however, that those mental impairments are caused by an independent physical trait that itself qualifies as an impairment.").

The *Williams* court also pointed to emerging "medical and scientific research

identifying possible physical bases of gender dysphoria." 45 F.4th at 771. But that "is not even an *ipse dixit*, it is an evolving possible *ipse dixit*." *Lange*, 608 F. Supp. 3d at 1363. In all events, it is unhelpful to Plaintiffs because nothing in the complaint links that emerging scientific research to their diagnoses. *See id.* ("Even if the Court were to accept Lange's expert report at face value, there is nothing in that report or anywhere else in the record suggesting Lange's gender dysphoria results from a 'physical impairment.'").

It is also unhelpful to Plaintiffs because gender dysphoria also falls within the carveouts in the ADA and Rehabilitation Acts for "other sexual behavior disorders." That carveout applies regardless of the existence of physical impairments. *See* 29 U.S.C. § 705(20)(F)(i); 42 U.S.C. § 1221(b)(1).

## C.   Excluding gender dysphoria from the ADA's and Rehabilitation Act's scope does not raise constitutional issues.

The *Williams* court bolstered its analysis by claiming that excluding gender dysphoria from the ADA's reach—and, by extension, the Rehabilitation Act's reach, *see* 45 F.4th at 764 n.1—would raise constitutional issues under the Equal Protection Clause. *See id.* at 772–74. That was because, the panel said, the exclusions were driven by animus: "[W]e see no legitimate reason why Congress would intend to exclude from the ADA's protections transgender people who suffer from gender dysphoria. The only reason we can glean from the text and legislative record is a bare desire to harm a politically unpopular group, which cannot constitute a legitimate governmental interest." *Id.* at 773 (citations, quotations, and alterations omitted). In support, the panel pointed to statements from two senators. *Id.*

That analysis ignores that "the statements of a handful of lawmakers may not be probative of the intent of the legislature as a whole." *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1140 (9th Cir. 2023) (gathering sources). It also gives short shrift to the "strong 'presumption of good faith' on the part of legislators," *id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 915 (1995)), that reflects "the many considerations that [legislators] may have had in mind in adopting a piece of major legislation like the ADA" beyond animus,

1    *Kincaid*, 143 S. Ct. at 2418 (Alito, J., dissenting from the denial of certiorari); *see also*
2    *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252,
3    265 (1977).

4          The *Williams* majority also ignores many legitimate governmental interests the
5    ADA's and Rehabilitation Act's exclusion for gender identity disorders advance.  For
6    example, "Congress may also have thought that coverage of gender-identity-related
7    conditions would raise special free speech and free exercise concerns."  *Kincaid*, 143 S.
8    Ct. at 2418 (Alito, J., dissenting from the denial of certiorari).  Congress could have also
9    decided that gender identity disorders that do not stem from physical impairments are
10   sufficiently different from other types of disabilities the ADA and Rehabilitation Acts
11   cover—for example, gender identity disorders stemming from physical impairments—so
12   as to justify different treatment.  The "legislature need not strike at all evils at the same
13   time, and … reform may take one step at a time, addressing itself to the phase of the
14   problem which seems most acute to the legislative mind."  *Katzenbach v. Morgan*, 384
15   U.S. 641, 657 (1966) (quotations and citations omitted).

16         **D.     Plaintiffs do not allege a major life activity has been substantially**
17         **limited.**

18         Plaintiffs' claim falters even if they could somehow surmount the statutory
19   exclusion.  Under the ADA, "disability" is defined as "a physical or mental impairment
20   that substantially limits one or more major life activities of such individual . . . ."  42 U.S.C.
21   § 12102(1)(A).  The Rehabilitation Act contains the same requirement.  *See* 29 U.S.C.
22   § 705(20)(B) (incorporating the ADA's definition for purposes of 29 U.S.C. § 794).  "Thus,
23   to be disabled for purposes of the [the two laws], a person must have an impairment, that
24   impairment must limit a major life activity, and the limitation on the major life activity
25   must be substantial."  *E.E.O.C. v. United Parcel Serv., Inc.*, 306 F.3d 794, 801 (9th Cir.),
26   *opinion amended on denial of reh'g*, 311 F.3d 1132 (9th Cir. 2002).

27         Plaintiffs have not alleged that a major life activity has been impaired, nor have they
28   specified which major life activity they believe has been impaired.  It cannot be athletics.

Playing sports is not a "major life activity" under the ADA. Regulations define "major life activities" to include, but not be limited to, "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i)(1)(i). But "courts [have] consistently held that sporting activities ... d[o] not qualify as major life activities." *Marsh v. Terra Int'l (Okla.), Inc.*, 122 F. Supp. 3d 1267, 1279 (N.D. Okla. 2015) (citing *Griego v. Barton Leasing Inc.*, 2010 WL 618281, at \*4 (D. Colo. Feb. 19, 2010) (holding that "participating in sports" and "playing sports with children" were not major life activities); *Robinson v. Lockheed Martin Co.,* 2006 WL 5629118, at \*7 (E.D. Pa. Feb. 1, 2006) (holding that sporting activities were not major life activities); *Rosa v. Brink's Inc.,* 103 F. Supp. 2d 287, 290 (S.D.N.Y.2000) (holding that sports activities "are not major life activities at all")); *see also id.* at 1279 (concluding that the 2008 amendments to the ADA do not change the conclusion).

The intrinsic benefits sports can provide do not convert playing sports into a major life activity. "Unlike standing, sitting, breathing, thinking, communicating, interacting with others, or other examples in the regulation, a person can live (and many do) without ever participating in sports," reasoned the *Marsh* court. *Id.* "These activities may enhance one's life and may be important to particular individuals, but the ADA is ultimately aimed at ferreting out discrimination and ensuring that employers provide reasonable accommodations to disabled individuals." *Id.* Other courts have reached the same conclusion that playing sports is not a major life activity under the ADA. *Pritchard v. Fla. High Sch. Athletic Ass'n, Inc.*, 2020 WL 3542652, at \*4 (M.D. Fla. June 30, 2020) ("From the outset, the Court finds that the inability to play sports does not constitute a substantial impairment of a major life activity.") (internal quotation omitted); *Walter v. Birdville Indep. Sch. Dist.*, 2018 WL 3974714, at \*3 (N.D. Tex. Aug. 20, 2018) ("Participating in sports is not a major life activity.).

Nor is it sufficient to link sports to academic and social successes. *See Knapp v.*

9

1    *Nw. Univ.*, 101 F.3d 473, 481 (7th Cir. 1996) ("Because learning through playing
2    intercollegiate basketball is only one part of the education available to Knapp at
3    Northwestern, even under a subjective standard, Knapp's ability to learn is not substantially
4    limited.").  For example, in *Pahulu v. University of Kansas*, 897 F. Supp. 1387 (D. Kan.
5    1995), the court concluded that prohibiting the plaintiff from playing football due to a
6    medical condition he suffered was "not a substantial limitation upon the plaintiff's
7    opportunity to learn." *Id.* at 1393.  That same conclusion applies here.  Moreover, "there
8    are a myriad of other educational opportunities available to" Plaintiffs at their schools.  *Id.*
9    Thus, even without considering the fact that Plaintiffs could participate in school sports by
10   playing on boys' or coed teams, *see* Ariz. Rev. Stat. § 15-120.02(B), Plaintiffs have failed
11   to allege a major life activity is substantially limited.

12   Accordingly, because playing sports is not a major life activity under the ADA,
13   Plaintiffs' ADA claim fails.

14   **II.    Count I and Count II should be dismissed for the reasons set out in the**
15   **opposition to Plaintiffs' preliminary injunction motion.**

16   The Court should dismiss Counts I and II for the reasons set forth in the two
17   oppositions to Plaintiffs' motion for a preliminary injunction.  *See* Doc. 40 (Superintendent
18   Horne's opposition); Doc. 82 (Legislative Leaders' opposition).  "[A] complaint cannot
19   state a plausible claim for relief if there is no chance of success on the merits."  *Angelotti*
20   *Chiropractic, Inc. v. Baker*, 791 F.3d 1075, 1087 (9th Cir. 2015) (quotation omitted).  The
21   same arguments and the same legal reasoning undermine Plaintiffs' complaint and motion
22   for preliminary injunction.  This overlap is because Plaintiffs have no chance of success on
23   the merits.  *See id.*  The Legislative Leaders acknowledge the Court granted Plaintiffs'
24   motion for a preliminary injunction on Counts I and II, *see* Doc. 127, but they respectfully
25   submit that Counts I and II warrant dismissal for the reasons stated in their prior briefing.

26   **CONCLUSION**
27   The Court should dismiss Plaintiffs' Complaint for failure to state a claim.

28

10

1    Dated: September 12, 2023                Respectfully submitted,

2

3                                            JAMES OTIS LAW GROUP, LLC

4                                            */s/ Justin D. Smith*

5                                            D. John Sauer, Mo. Bar No. 58721*

6                                            Justin D. Smith, Mo. Bar No. 63253*
                                             13321 North Outer Forty Road, Suite 300
7                                            St. Louis, Missouri 63017
                                             (816) 678-2103
8                                            Justin.Smith@james-otis.com

9                                            * *pro hac vice*

10                                           *Attorneys for Intervenor-Defendants President*

11                                           *Petersen and Speaker Toma*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11

1

## **CERTIFICATE OF SERVICE**

2          I hereby certify that, on September 12, 2023, I caused a true and correct copy of the

3  foregoing to be filed by the Court's electronic filing system, to be served by operation of

4  the Court's electronic filing system on counsel for all parties who have entered in the case.

5                                                                                  */s/ Justin D. Smith*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28