**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| HELEN DOE, parent and next friend of Jane Doe; JAMES DOE, parent and next friend of Jane Doe; KATE ROE, parent and next friend of Megan Roe; ROBERT ROE, parent and next friend of Megan Roe, | No. 23-16026 <br><br> D.C. No. 4:23-cv-00185-JGZ |
| *Plaintiffs-Appellees*, | OPINION |
| v. | |
| THOMAS C. HORNE, in his official capacity as State Superintendent of Public Instruction; LAURA TOENJES, in her official capacity as Superintendent of the Kyrene School District; KYRENE SCHOOL DISTRICT; GREGORY SCHOOL; ARIZONA INTERSCHOLASTIC ASSOCIATION INCORPORATED, | |
| *Defendants*, | |
| and | |
| WARREN PETERSEN, Senator, President of the Arizona State Senate; | |

BEN TOMA, Representative, Speaker
of the Arizona House of
Representatives,

       *Intervenor-Defendants-
Appellants*.

HELEN DOE, parent and next friend
of Jane Doe; JAMES DOE, parent and
next friend of Jane Doe; KATE ROE,
parent and next friend of Megan Roe;
ROBERT ROE, parent and next friend
of Megan Roe,

       *Plaintiffs-Appellees*,

  v.

THOMAS C. HORNE, in his official
capacity as State Superintendent of
Public Instruction,

       *Defendant-Appellant*,

 and

LAURA TOENJES, in her official
capacity as Superintendent of the
Kyrene School District; KYRENE
SCHOOL DISTRICT; GREGORY
SCHOOL; ARIZONA
INTERSCHOLASTIC

No. 23-16030

D.C. No. 4:23-cv-
00185-JGZ

ASSOCIATION INCORPORATED,

*Defendants*,

WARREN PETERSEN, Senator,
President of the Arizona State Senate;
BEN TOMA, Representative, Speaker
of the Arizona House of
Representatives,

*Intervenor-Defendants*.

Appeal from the United States District Court
for the District of Arizona
Jennifer G. Zipps, District Judge, Presiding

Argued and Submitted March 14, 2024
San Francisco, California

Filed September 9, 2024

Before:  M. Margaret McKeown and Morgan Christen,
Circuit Judges, and David A. Ezra,[*] District Judge.

Opinion by Judge Christen

---

[*] The Honorable David A. Ezra, United States District Judge for the
District of Hawaii, sitting by designation.

## SUMMARY[**]

### Preliminary Injunction/Equal Protection

The panel affirmed the district court's order preliminarily enjoining Arizona from barring Plaintiffs Jane Doe and Megan Roe from playing school sports consistent with their gender identity.

Plaintiffs are transgender girls who have not gone through male puberty and who wish to play girls' sports at their Arizona schools. In 2022, Arizona enacted the Save Women's Sports Act, which prohibits "students of the male sex," including transgender women and girls, from participating in women's and girls' sports. The complaint alleges that the Act's transgender ban violates, *inter alia*, the Equal Protection Clause of the Fourteenth Amendment and Title IX. Plaintiffs challenge enforcement of the Act solely as applied to them. The district court concluded that Plaintiffs were likely to succeed on their equal protection and Title IX claims, and preliminarily enjoined enforcing the Act against them.

The panel held that the district court did not clearly err by finding that, before puberty, there are no significant differences in athletic performance between boys and girls; treating small differences as insignificant; and finding that transgender girls who receive puberty-blocking medication do not have an athletic advantage over other girls.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel affirmed the district court's holding that Plaintiffs were likely to succeed on the merits of their equal protection claim. The district court did not clearly err by finding that the Act was adopted for the discriminatory purpose of excluding transgender girls from playing on girls' sports teams. Accordingly, the district court properly concluded that the Act is subject to heightened scrutiny.

The panel held that Arizona's transgender ban discriminates on its face based on transgender status. To survive heightened scrutiny, a classification must serve important governmental objectives and must be substantially related to the achievement of those objectives. The panel held that, given the district court's well-supported factual findings, the district court properly concluded that Appellants—the State Superintendent of Public Instruction and several legislators—are unlikely to establish that the Act's sweeping transgender ban is substantially related to the achievement of the State's important governmental objectives in ensuring competitive fairness and equal athletic opportunity for female student-athletes. The Act's transgender ban applies not only to all transgender women and girls in Arizona, regardless of circulating testosterone levels or other medically accepted indicia of competitive advantage, but also to all sports, regardless of the physical contact involved, the type or level of competition, or the age or grade of the participants. The district court therefore did not err by concluding that Plaintiffs are likely to succeed on the merits of their equal protection claim. Because Plaintiffs are likely to succeed on the merits of their equal protection claim, the panel did not reach the issue of whether Plaintiffs are likely to succeed on the merits of their Title IX claim as well.

6                          DOE V. HORNE

The panel held that the district court did not abuse its discretion in addressing the remaining preliminary injunction factors—the likeliness of irreparable harm in the absence of relief, the balance of the equities, and the public interest. Accordingly, the panel held that the district court did not abuse its discretion by granting Plaintiffs' motion for a narrow preliminary injunction.

---

## COUNSEL

Justin R. Rassi (argued), Amy C. Zimmerman, and Jyotin R. Hamid, Debevoise & Plimpton LLP, New York, New York; Eric M. Fraser and Colin M. Proksel, Osborn Maledon PA, Phoenix, Arizona; Rachel H. Berg and Amy Whelan, National Center for Lesbian Rights, San Francisco, California; for Plaintiffs-Appellees.

Justin D. Smith (argued), Michael E. Talent, and Dean John Sauer, James Otis Law Group LLC, St. Louis, Missouri; Maria Syms (argued), Arizona Department of Education, Phoenix, Arizona; Dennis I. Wilenchik and Karl Worthington, Wilenchik & Bartness PC, Phoenix, Arizona; for Intervenor-Defendants-Appellants and Defendants-Appellants.

Emily Jones and Ryan Lawson, Jones Law Firm PLLC, Billings, Montana; for Amici Curiae Female Olympic Rowers Mary I. O'Connor, Carol Brown, Patricia Spratlen Etem, Valerie McClain, and Jan Palchikoff.

Christopher E. Mills, Spero Law LLC, Mt. Pleasant, South Carolina; for Amici Curiae Concerned Women for America and Samaritan's Purse.

William Bock III, Kroger Gardis & Regas LLP, Indianapolis, Indiana, for Amici Curiae International Consortium on Female Sport and Independent Council on Women's Sports.

Jacob P. Warner and Jonathan A. Scruggs, Alliance Defending Freedom, Scottsdale, Arizona; John J. Bursch, Alliance Defending Freedom, Washington, D.C.; for Amicus Curiae Alliance Defending Freedom.

John M. Connolly and James F. Hasson, Consovoy McCarthy Park PLLC, Arlington, Virginia; for Amicus Curiae Counsel for Parents Defending Education.

Gene P. Hamilton and James K. Rogers, America First Legal Foundation, Washington, D.C.; for Amici Curiae Anna Van Hoek, Lisa Fink, Amber Zenczak, and Arizona Women of Action.

Gene C. Schaerr and Annika B. Barkdull, Schaerr Jaffe LLP, Washington, D.C.; Jennifer C. Braceras, Independent Women's Law Center, Washington, D.C.; for Amicus Curiae Independent Women's Law Center.

Dylan L. Jacobs, Deputy Solicitor General; Nicholas J. Bronni, Solicitor General; Tim Griffin, Attorney General; Office of the Arkansas Attorney General, Little Rock, Arkansas; Edmund G. LaCour Jr., Solicitor General; Steve Marshall, Attorney General; Office of the Alabama Attorney General, Montgomery, Alabama; Treg Taylor, Alaska Attorney General, Office of the Alaska Attorney General, Anchorage, Alaska; Chris Carr, Georgia Attorney General, Office of the Georgia Attorney General, Atlanta, Georgia; Theodore E. Rokita, Indiana Attorney General, Office of the Indiana Attorney General, Indianapolis, Indiana; Brenna Bird, Iowa Attorney General, Office of the Iowa Attorney

General, Des Moines, Iowa; Daniel Cameron, Kentucky Attorney General, Office of the Kentucky Attorney General, Frankfort, Kentucky; Jeff Landry, Louisiana Attorney General, Office of the Louisiana Attorney General, Baton Rouge, Louisiana; Lynn Fitch, Mississippi Attorney General, Office of the Mississippi Attorney General, Jackson, Mississippi; Andrew Bailey, Missouri Attorney General, Office of the Missouri Attorney General, Kansas City, Missouri; Austin Knudsen, Montana Attorney General, Office of the Montana Attorney General, Helena, Montana; Michael T. Hilgers, Nebraska Attorney General, Office of the Nebraska Attorney General, Lincoln, Nebraska; Gentner Drummond, Oklahoma Attorney General, Office of the Oklahoma Attorney General, Oklahoma City, Oklahoma; Alan Wilson, South Carolina Attorney General, Office of the South Carolina Attorney General, Columbia, South Carolina; Jonathan Skrmetti, Tennessee Attorney General, Office of the Tennessee Attorney General, Nashville, Tennessee; Sean D. Reyes, Utah Attorney General, Office of the Utah Attorney General, Salt Lake City, Utah; Patrick Morrisey, West Virginia Attorney General, Office of the West Virginia Attorney General, Charleston, West Virginia; Bridget Hill, Wyoming Attorney General, Office of the Wyoming Attorney General, Cheyenne, Wyoming; for Amici Curiae State of Alabama, State of Arkansas, State of Alaska, State of Georgia, State of Indiana, State of Iowa, State of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Oklahoma, State of South Carolina, State of Tennessee, State of Utah, State of West Virginia, and State of Wyoming.

Kristine L. Brown, Kristine L. Brown LLC, Denver, Colorado; for Amici Curiae 88 Female Athletes, Coaches, Sports Officials, and Parents of Female Athletes.

Omar Gonzalez-Pagan, Lambda Legal Defense & Education
Fund Inc., New York, New York; Sasha Buchert, Lambda
Legal Defense & Education Fund Inc., Washington D.C.;
Kell L. Olson, Lambda Legal Defense & Education Fund
Inc., Los Angeles, California; for Amici Curiae 196 Athletes
in Women's Sports, The National Women's Soccer League
Players Association, The Women's National Basketball
Players Association, Athletes Unlimited, The Women's
Sports Foundation, and Athlete Ally.

Shireen Barday and Mark C. Davies, Pallas Partner (US)
LLP, New York, New York; Kelly Herbert, Gibson Dunn &
Crutcher LLP, New York, New York; Abbey J. Hudson and
Kate M. Googins, Gibson Dunn & Crutcher LLP, Los
Angeles, California; for Amicus Curiae The Trevor Project,
Inc..

Jordan D. Hershman, Morgan Lewis & Bockius LLP,
Boston, Massachusetts; Stephanie Schuster, Morgan Lewis
& Bockius LLP, Washington, D.C.; for Amici Curiae
GLBTQ Legal Advocates & Defenders, the Human Rights
Campaign Foundation, and the National Center for
Transgender Equality.

Jessica R. Amunson and Illyana A. Green, Jenner & Block
LLP, Washington, D.C.; Matthew D. Cipolla, Jenner &
Block LLP, New York, New York; Chasel Lee, Jenner &
Block LLP, San Francisco, California; Howard S. Suskin
and David M. Kroeger, Jenner & Block LLP, Chicago,
Illinois; for Amici Curiae American Medical Association
and Seven Other Health Care Organizations.

Maia H. Jorgensen and Oren S.A. Kreps, Hogan Lovells
LLP, San Francisco, California; Carolyn A. DeLone and
Katherine I. Culora, Hogan Lovells LLP, Washington, D.C.;
Sarah W. Keller, Hogan Lovells LLP, Tysons, Virginia;

Anaya Marino, Shiwali Patel, Emily Martin, and Auden Perino, National Women's Law Center, Washington, D.C.; for Amici Curiae National Women's Law Center and 33 Additional Organizations.

Mark S. Grube, Senior Assistant Solicitor General; Judith N. Vale, Deputy Solicitor General; Barbara D. Underwood, Solicitor General; Letitia James, New York Attorney General; Office of the New York Attorney General, New York, New York; Lauren K. Chun, Deputy Solicitor General; Kaliko'onalandi D. Fernandes, Solicitor General; Anne E. Lopez, Hawaii Attorney General; Office of the Hawaii Attorney General, Honolulu, Hawaii; Rob Bonta, California Attorney General, Office of the California Attorney General, Sacramento, California; Philip J. Weiser, Attorney General of Colorado, Office of the Colorado Attorney General, Denver, Colorado; Kathleen Jennings, Attorney General of Delaware, Office of the Delaware Attorney General, Wilmington, Delaware; Kwame Raoul, Illinois Attorney General, Office of the Illinois Attorney General, Chicago, Illinois; Aaron M. Frey, Maine Attorney General, Office of the Maine Attorney General, Augusta, Maine; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General, Baltimore, Maryland; Andrea J. Campbell, Massachusetts Attorney General, Office of the Massachusetts Attorney General, Boston, Massachusetts; Dana Nessel, Michigan Attorney General, Office of the Michigan Attorney General, Lansing, Michigan; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, St. Paul, Minnesota; Aaron D. Ford, Nevada Attorney General, Office of the Nevada Attorney General, Carson City, Nevada; Matthew J. Platkin, New Jersey Attorney General, Office of the New Jersey Attorney General, Trenton, New Jersey;

Ellen F. Rosenblum, Oregon Attorney General, Office of the
Oregon Attorney General, Salem, Oregon; Michelle A.
Henry, Pennsylvania Attorney General, Office of the
Pennsylvania Attorney General, Harrisburg, Pennsylvania;
Peter F. Neronha, Rhode Island Attorney General, Office of
the Rhode Island Attorney General, Providence, Rhode
Island; Charity R. Clark, Vermont Attorney General, Office
of the Vermont Attorney General, Montpelier, Vermont;
Robert W. Ferguson, Washington Attorney General, Office
of the Washington Attorney General, Olympia, Washington;
Brian L. Schwalb, District of Columbia Attorney General,
Office of the District of Columbia Attorney General,
Washington, D.C.; for Amici Curiae States of New York,
Hawaii, California, Colorado, Delaware, Illinois, Maine,
Maryland, Massachusetts, Michigan, Minnesota, Nevada,
New Jersey, Oregon, Pennsylvania; Rhode Island, Vermont,
and Washington, and the District of Columbia.

---

## OPINION

CHRISTEN, Circuit Judge:

We address whether the district court abused its
discretion by preliminarily enjoining Arizona from barring
Plaintiffs Jane Doe and Megan Roe from playing school
sports consistent with their gender identity. Given our
limited and deferential review and the district court's well-
supported factual findings, including its finding that
"[t]ransgender girls who have not undergone male puberty
do not have an athletic advantage over other girls," *Doe v.
Horne*, 683 F. Supp. 3d 950, 964 (D. Ariz. 2023), we affirm
the district court's order granting Plaintiffs' motion for a
preliminary injunction.

I.

A.[1]

Gender identity, "the medical term for a person's internal, innate, deeply held sense of their own gender," is a "largely biological phenomenon." *Id.* at 956. "Research suggests that differences in prenatal hormonal exposures, genetic factors, and brain structural differences may all contribute," Decl. of Dr. Daniel Shumer, M.D., MPH, ¶ 19, and "[t]here is a consensus among medical organizations that gender identity is innate and cannot be changed through psychological or medical treatments," *Doe*, 683 F. Supp. 3d at 956–57. "When a child is born, a health care provider identifies the child's sex based on the child's observable anatomy." *Id.* at 957. "This identification is known as an 'assigned sex,' and in most cases turns out to be consistent with the person's gender identity." *Id.* For a transgender person, however, "that initial designation does not match the person's gender identity." *Id.* A transgender girl is a girl who was identified as a male at birth but whose gender identity is female, while a cisgender girl is a girl who was identified as female at birth and whose gender identity is also female. Some individuals are nonbinary, meaning they identify with or express a gender identity that is neither entirely male nor entirely female. *Nonbinary, Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/nonbinary (last visited Aug. 27, 2024).

Transgender persons may suffer from gender dysphoria, "a serious medical condition characterized by significant and

---

[1] At this stage, we accept this uncontested background information as true.

disabling distress due to the incongruence between a person's gender identity and assigned sex." *Doe*, 683 F. Supp. 3d at 957. "Untreated gender dysphoria can cause serious harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicide." *Id.* at 958. "Attempts to 'cure' transgender individuals by forcing their gender identity into alignment with their birth sex are harmful and ineffective." *Id.* "Those practices have been denounced as unethical by all major professional associations of medical and mental health professionals, such as the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, and the American Psychological Association, among others." *Id.*

"At the onset of puberty, adolescents with gender dysphoria may be prescribed puberty-delaying medications to prevent the distress of developing physical characteristics that conflict with the[ir] gender identity." *Id.* A transgender girl given puberty blockers "will experience no progression of physical changes caused by testosterone, including male muscular development, facial and body hair, an Adam's apple, or masculinized facial structures." Shumer Decl. ¶ 35. "Thereafter, the treating provider may prescribe cross-sex hormones to induce the puberty associated with the adolescent's gender identity." *Id.* ¶ 36. "[A] transgender girl who receives hormone therapy will typically have the same levels of circulating estrogen and testosterone . . . as other girls and significantly lower than boys who have begun pubertal development." *Id.*

B.

On March 30, 2022, Arizona enacted Senate Bill 1165, the Save Women's Sports Act, codified at Arizona Revised

Statutes § 15-120.02. The Act prohibits "students of the
male sex," including transgender women and girls, from
participating in women's and girls' sports. *Id.* § 15-
120.02(B). It states:

> A. Each interscholastic or intramural athletic
> team or sport that is sponsored by a public
> school or a private school whose students or
> teams compete against a public school shall
> be expressly designated as one of the
> following based on the biological sex of the
> students who participate on the team or in the
> sport:
>
> > 1. "Males," "men" or "boys."
> >
> > 2. "Females," "women" or "girls."
> >
> > 3. "Coed" or "mixed."
>
> B. Athletic teams or sports designated for
> "females," "women" or "girls" may not be
> open to students of the male sex.
>
> C. This section does not restrict the eligibility
> of any student to participate in any
> interscholastic or intramural athletic team or
> sport designated as being for "males," "men"
> or "boys" or designated as "coed" or
> "mixed."
>
> D. A government entity, any licensing or
> accrediting organization or any athletic
> association or organization may not entertain
> a complaint, open an investigation or take
> any other adverse action against a school for
> maintaining separate interscholastic or

intramural athletic teams or sports for students of the female sex.

E. Any student who is deprived of an athletic opportunity or suffers any direct or indirect harm as a result of a school knowingly violating this section has a private cause of action for injunctive relief, damages and any other relief available under law against the school.

F. Any student who is subject to retaliation or another adverse action by a school or an athletic association or organization as a result of reporting a violation of this section to an employee or representative of the school or the athletic association or organization, or to any state or federal agency with oversight of schools in this state, has a private cause of action for injunctive relief, damages and any other relief available under law against the school or the athletic association or organization.

G. Any school that suffers any direct or indirect harm as a result of a violation of this section has a private cause of action for injunctive relief, damages and any other relief available under law against the government entity, the licensing or accrediting organization or the athletic association or organization.

H. All civil actions must be initiated within two years after the alleged violation of this section occurred. A person or organization

>           that prevails on a claim brought pursuant to
>           this section is entitled to monetary damages,
>           including damages for any psychological,
>           emotional or physical harm suffered,
>           reasonable attorney fees and costs and any
>           other appropriate relief.
>
>           I. For the purposes of this section, "school"
>           means either:
>
>               1. A school that provides instruction in
>               any combination of kindergarten
>               programs or grades one through twelve.
>
>               2. An institution of higher education.

*Id.* § 15-120.02.   The Act's ban on transgender female
students playing female sports resides in subsections A and
B.  Subsection A requires schools to classify sports and
students by "biological sex," and Subsection B bans
"students of the male sex" from female-designated sports.
The Act does not define "biological sex," but the parties
agree that the term is synonymous with sex assigned at birth.
*See Doe*, 683 F. Supp. 3d at 957.[2]   Thus, the Act bans
transgender women and girls from women's and girls'
sports.

   Although the Act purports to ban all "students of the
male sex" from female-designated athletics, including both

---

[2] Although the Act treats sex as binary (male or female), about "two
percent of all babies are born 'intersex,' or with 'a wide range of natural
variations in physical traits—including external genitals, internal sex
organs, chromosomes, and hormones—that do not fit typical binary
notions of male and female bodies.'"  *Hecox v. Little (Hecox II)*, 104
F.4th 1061, 1076–77 (9th Cir. 2024), *petition for cert. filed* (U.S. July
11, 2024) (No. 24-38).

cisgender male students and transgender female students, the
Act in fact has no effect on the ability of cisgender men and
boys to engage in female sports, because they were already
excluded from female sports under the pre-Act status quo.
*See, e.g.*, *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n
(Clark I)*, 695 F.2d 1126, 1127 (9th Cir. 1982) (upholding an
Arizona Interscholastic Association (AIA) policy precluding
cisgender boys from playing on girls' teams); *Clark ex rel.
Clark v. Ariz. Interscholastic Ass'n (Clark II)*, 886 F.2d
1191, 1192, 1194 (9th Cir. 1989) (same).  But the Act has a
profound impact on transgender women and girls.  Under
Arizona's pre-Act status quo, transgender women and girls
in grade school, high school, and college were permitted to
participate in women's and girls' sports, albeit under limited
circumstances, consistent with policies established by the
National Collegiate Athletic Association (NCAA), the AIA,
and individual schools.  Under current NCAA policy, for
example, transgender women are permitted to compete in
women's sports when they meet sport-specific standards for
documented testosterone levels.  *See Transgender Student-
Athlete   Participation   Policy*,   NCAA   (May   2024),
https://www.ncaa.org/sports/2022/1/27/transgender-
participation-policy.aspx (last visited Aug. 27, 2024).  Under
AIA policy, which states that "students should have the
opportunity to participate in [AIA] activities in a manner that
is consistent with their gender identity," transgender female
students were permitted to play on girls' teams when a
committee of experts found "that the student's request is
appropriate and is not motivated by an improper purpose and
there are no adverse health risks to the athlete."  AIA, *AIA
Policies & Procedures*, art. 41, § 41.9 ( 2022-23).**[3]**  The AIA

---

[3] The AIA is a voluntary association of public and private high schools.
In the dozen or so years before the Act's passage, the AIA fielded

policy also permitted each school district to set its own rules
governing transgender students' participation in
intramural—i.e., non-interscholastic—sports. *Doe*, 683 F.
Supp. 3d at 960.

The Act abrogates these policies by categorically
banning transgender women and girls from women's and
girls' sports. As the district court explained, "[u]nlike the
prior case-by-case basis used to approve a transgender girl's
request to play on a team consistent with her gender identity,
which considered among other things the age and
competitive level relevant to the request, the Act
categorically bans all transgender girls' participation." *Id.* at
962.

The Act's sweeping transgender ban admits of no
exceptions. The ban applies to all transgender female
students, from kindergarten through graduate school; and for
all sports, including intramural games, regardless of whether
physical contact is involved. Significantly, the ban turns
entirely on a student's transgender or cisgender *status*, and
not at all on factors—such as levels of circulating
testosterone—that the district court found bear a genuine
relationship to athletic performance and competitive
advantage. The ban thus applies to many transgender
women and girls who, according to the district court's
findings, lack an athletic or competitive advantage over
cisgender women and girls, including, for example:
transgender girls such as kindergartners who are too young
to have gone through male puberty; transgender women and

approximately 12 requests from transgender students seeking to play on
teams consistent with their gender identities and approved seven of those
requests. *Doe*, 683 F. Supp. 3d at 961. The record does not reveal
whether these students were transgender boys or transgender girls. *Id.*

girls who have received puberty-blocking medication and
hormone therapy and have never gone through male puberty;
and transgender women and girls who have experienced
male puberty but have received sustained hormone therapy
to suppress their circulating testosterone levels.

On its face, the Act treats transgender women and girls
less favorably than all other students.  After passage of the
Act, Arizona allows other students—including cisgender
women and girls, cisgender men and boys, and transgender
men and boys—to play on teams corresponding with their
gender identities; only transgender women and girls are
barred from doing so.**⁴**

The Act also singles out women's and girls' *athletics* for
unfavorable treatment.  As the district court explained, "[t]he
Act's creation of a private cause of action against a school
for any student who is deprived of an athletic opportunity or
suffers any harm, whether direct or indirect, related to a
school['s] failure to preclude participation of a transgender
girl on a girls' team places an onerous burden on girls' sports
programs, not faced by boys' athletic programs." *Id.* at 963.

---

⁴ That the Act allows transgender men and boys to play on men's and
boys' teams does not preclude a finding that the Act discriminates based
on transgender status. As we explained in *Hecox II*, 104 F.4th at 1079,
"a law is not immune to an equal protection challenge if it discriminates
only against some members of a protected class but not others."  *See,
e.g.*, *Rice v. Cayetano*, 528 U.S. 495, 516–17 (2000) ("Simply because a
class defined by ancestry does not include all members of the race does
not suffice to make the classification race neutral."); *Nyquist v. Mauclet*,
432 U.S. 1, 9 (1977) ("The fact that the statute is not an absolute bar does
not mean that it does not discriminate against the class."); *Mathews v.
Lucas*, 427 U.S. 495, 504–05 n.11 (1976) ("That the statutory
classifications challenged here discriminate among illegitimate children
does not mean, of course, that they are not also properly described as
discriminating between legitimate and illegitimate children.").

"[O]nly girls' teams fac[e] potential challenges, including litigation, related to suspected transgender players." *Id.*; *cf. Hecox II*, 104 F.4th at 1080 (holding that Idaho's transgender sports ban discriminated based on sex because it subjected "only participants in women's and girls' sports, whether cisgender or transgender, to the risk and humiliation of having their sex 'disputed' and then suffering intrusive medical testing [to have their biological sex verified] as a prerequisite for participation on school sports teams").

In legislative findings, the Arizona Legislature suggested that a categorical transgender ban was justified because, "[i]n studies of large cohorts of children from six years old, '[b]oys typically scored higher than girls on cardiovascular endurance, muscular strength, muscular endurance, and speed/agility, but lower on flexibility,'" and "[t]he benefits that natural testosterone provides to male athletes is not diminished through the use of testosterone suppression." 2022 Ariz. Legis. Serv. ch. 106 (S.B. 1165) (West), at § 2, ¶¶ 6, 13 (second alteration in original) (citation omitted). The legislature also found that "[h]aving separate sex-specific teams furthers efforts to promote sex equality by providing opportunities for female athletes to demonstrate their skill, strength and athletic abilities while also providing them with opportunities to obtain recognition, accolades, college scholarships and the numerous other long-term benefits that flow from success in athletic endeavors." *Id.* ¶ 14. In a signing statement, Governor Ducey stated that the Act:

> creates a statewide policy to ensure that biologically female athletes at Arizona public schools, colleges, and universities have a level playing field to compete. This bill does

> not deny student-athletes the eligibility to
> play on teams not designated as "female,"
> and it doesn't impact club sports leagues
> offered outside of schools.   Every young
> Arizona athlete should have the opportunity
> to participate in extracurricular activities that
> give them a sense of belonging and allow
> them to grow and thrive.
>
> This legislation simply ensures that the girls
> and young women who have dedicated
> themselves to their sport do not miss out on
> hard-earned opportunities including their
> titles, standings and scholarships due to
> unfair competition.  This bill strikes the right
> balance of respecting all students while still
> acknowledging that there are inherent
> biological distinctions that merit separate
> categories to ensure fairness for all.

2022 Ariz. Legis. Serv. ch. 106 (S.B. 1165) (West)
(Governor's Approval Message, Mar. 30, 2022).  The Act
became effective on September 24, 2022.

C.

In April 2023, Plaintiffs Jane Doe and Megan Roe, by
and through their parents, brought this as-applied challenge
to the Act.  Plaintiffs are transgender girls who have not gone
through male puberty and wish to play girls' sports at their
Arizona schools.

Jane is an 11-year-old transgender girl who attends the
Kyrene Aprende Middle School, a public school located in
Chandler, Arizona, near Phoenix. *Doe*, 683 F. Supp. 3d at
958.  She has lived as a girl in all aspects of her life since she

was five years old and was diagnosed with gender dysphoria at age seven. *Id.* She has changed her name through a court order to a more traditional female name, and she has a female gender marker on her passport. *Id.* at 958–59. Jane began receiving Supprelin, a puberty-blocking medication, in 2023, at age 11. *Id.* at 959. The district court found that Jane will not experience any of the physiological changes that increased testosterone levels would cause in a pubescent boy. *Id.*

Sports are important to Jane, and she has played soccer for many years. *Id.* Aside from its physical and emotional health benefits, soccer has helped Jane make new friends and connect with other girls, and Jane's teachers, coaches, friends, and members of her soccer team have all been supportive of her gender identity. *Id.* At Aprende, Jane plays (or is interested in playing) on the girls' soccer, girls' basketball, and coed cross-country teams.[5] *Id.* Aprende, which participates in the AIA, has no objection to Jane playing on girls' teams. *Id.*

Megan is a 15-year-old transgender girl attending the Gregory School, a private school in Tucson. *Id.* Megan has always known she is a girl, has lived as a girl in all aspects of her life since she was seven, and was diagnosed with gender dysphoria at age 10. *Id.* at 959–60. Through a court order, Megan has changed her name to a more traditional female name and her gender to female, and she has a female gender marker on her passport. *Id.* at 960.[6] Megan has been

---

[5] Boys and girls train together but compete separately on the coed cross-country team. *Doe*, 683 F. Supp. 3d at 959.

[6] The court ordered Megan's name changed; ordered the Office of Vital Records to amend Megan's birth record to reflect her new name; and authorized Megan and her parents to correct her gender designation on

taking puberty blockers since she was 11 and began receiving hormone therapy at age 12. *Id.* As a result of these treatments, the district court found that Megan has not experienced the physiological changes that increased testosterone levels would cause in a pubescent boy. *Id.* On the contrary, the district court found that she has developed many of the physiological changes associated with female puberty. *Id.*

As with Jane, sports have figured prominently in Megan's life. *Id.* When she was about seven, Megan joined a swim team, and the coach of the swim team was supportive of her and her gender identity. *Id.* At the Gregory School, Megan is a member of the girls' volleyball team, although the Act has barred her from competing in interscholastic games. *Id.* at 960, 962. Her teammates, coaches, and school are all highly supportive of her and have welcomed her participation on the team. *Id.* at 960. Like Kyrene Aprende Middle School, the Gregory School participates in the AIA.

The complaint alleges that the Act's transgender ban violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681; the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*; and the Rehabilitation Act of 1973, 29 U.S.C. § 794. The complaint names five defendants: Thomas C. Horne, in his official capacity as State Superintendent of Public Instruction; Laura Toenjes, in her official capacity as Superintendent of the Kyrene School District; the Kyrene School District; the Gregory School; and the AIA. In addition, Warren Petersen, President of the Arizona State

---

her personal, vital, medical, financial, educational, and other public documents.

Senate, and Ben Toma, Speaker of the Arizona House of Representatives (the "Legislators"), have intervened as defendants.

Plaintiffs neither challenge the existence of separate teams for girls and boys nor challenge the Act facially. Rather, they challenge enforcement of the Act solely as applied to them. They seek injunctive and declaratory relief in the form of an order allowing them to participate in their chosen sports.

### D.

Contemporaneous with the filing of the complaint, Plaintiffs moved to preliminarily enjoin the defendants from enforcing the Act as applied to them. Plaintiffs sought relief on the grounds that they were likely to succeed on their equal protection and Title IX claims. In July 2023, after considering the parties' briefs, evidentiary submissions from numerous experts, and argument presented at a hearing, the district court granted the motion. *Doe*, 683 F. Supp. 3d at 955–77. The preliminary injunction order includes a number of factual findings relevant to this appeal. The district court found that "[t]he Act was adopted for the purpose of excluding transgender girls from playing on girls' sports teams." *Id.* at 963. The district court also found that, "[b]efore puberty, there are no significant differences in athletic performance between boys and girls." *Id.* at 968. The court acknowledged studies showing that prepubertal boys outperform prepubertal girls on school physical fitness tests, but the court found "no basis . . . to attribute those small differences to physiology or anatomy instead of to other factors such as greater societal encouragement of athleticism in boys, greater opportunities for boys to play

sports, or differences in the preferences of the boys and girls surveyed." *Id.* at 966.

The district court also found that "[t]he biological driver of average group differences in athletic performance between adolescent boys and girls is the difference in their respective levels of testosterone, which only begin to diverge significantly after the onset of puberty," and that puberty typically begins at around age 12. *Id.* at 968. More specifically, the court cited "the scientific consensus that the biological cause of average differences in athletic performance between men and women is . . . the presence of circulating levels of testosterone beginning with male puberty . . . between the ages of about 12 and 18." *Id.* at 964–65. Accordingly, the court found that transgender girls such as Plaintiffs, who begin puberty-blocking medication and hormone therapy at an early age, "do not have an athletic advantage over other girls." *Id.* at 964. The court found that "[t]ransgender girls who receive puberty-blocking medication do not have an athletic advantage over other girls because they do not undergo male puberty and do not experience the physiological changes caused by the increased production of testosterone associated with male puberty." *Id.* at 968. It also found that "[t]ransgender girls who receive hormone therapy after receiving puberty-blocking medication will develop the skeletal structure, fat distribution, and muscle and breast development typical of other girls" and "will typically have the same levels of circulating estrogen and testosterone as other girls." *Id.* Finally, the district court found that "transgender girls who have not yet undergone male puberty or who have received puberty-blocking medication at the onset of puberty do not present any unique safety risk to other girls." *Id.*

On the strength of these findings, the district court concluded that Plaintiffs were likely to succeed on their equal protection challenge to the transgender ban. As a threshold matter, the court concluded that heightened scrutiny applies because the Act discriminates against transgender girls both purposely and on its face. *Id.* at 971–72. Applying heightened scrutiny, the court concluded that Horne and the Legislators—the only defendants actively defending the ban—failed to "establish[] that categorically banning all transgender girls from playing girls' sports is substantially related to an important government interest." *Id.* at 973. The court concluded that their "argument that the Act is necessary to protect girls' sports by barring transgender girls, who purportedly have an unfair athletic advantage over other girls and/or pose a safety risk to other girls, is based on overbroad generalizations and stereotypes that erroneously equate transgender status with athletic ability." *Id.* at 973–74.

The district court also determined that Plaintiffs were likely to succeed on their Title IX claim, that Plaintiffs would suffer irreparable harm if relief were not granted, and that the public interest and the balance of the equities favored relief. *Id.* at 974–76. Accordingly, the court granted Plaintiffs motion and preliminarily enjoined Horne from enforcing the Act against Plaintiffs. *Id.* at 977. Horne and the Legislators (collectively, "Appellants") filed separate timely appeals that we subsequently consolidated.

II.

"The 'purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits.'" *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (quoting *Sierra Forest*

*Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009)). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Johnson v. Couturier*, 572 F.3d 1067, 1078 (9th Cir. 2009) (brackets in original) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The third and fourth factors, harm to the opposing party and weighing the public interest, "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). With respect to the fourth factor, "it is always in the public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002), *abrogated on other grounds by Winter*, 555 U.S. 7), because "all citizens have a stake in upholding the Constitution," *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). But "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24.

"We review the grant or denial of a preliminary injunction for abuse of discretion." *Johnson*, 572 F.3d at 1078 (quoting *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)). "This review is 'limited and deferential,' and it does not extend to the underlying merits of the case." *Id.* (quoting *Am. Trucking Ass'ns*, 559 F.3d at 1052). "A district court 'necessarily abuses its discretion when it bases its decision on an erroneous legal standard or on clearly erroneous findings of fact.'" *Id.* at 1078–79 (quoting *Am. Trucking Ass'ns*, 559 F.3d at 1052). "But '[a]s long as the district court got the

law right, it will not be reversed simply because the appellate
court would have arrived at a different result if it had applied
the law to the facts of the case.'" *Id.* at 1079 (alteration in
original) (quoting *Am. Trucking Ass'ns*, 559 F.3d at 1052);
*accord Wildwest Inst. v. Bull*, 472 F.3d 587, 590 (9th Cir.
2006). "A district court's factual finding is clearly erroneous
'if it is illogical, implausible, or without support in
inferences that may be drawn from the facts in the record.'"
*Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021)
(quoting *Arc of California v. Douglas*, 757 F.3d 975, 984
(9th Cir. 2014)).    "Although we review [legislative]
factfinding under a deferential standard, . . . [t]he Court
retains an independent constitutional duty to review factual
findings where constitutional rights are at stake." *Gonzales
v. Carhart*, 550 U.S. 124, 165 (2007) (citing *Crowell v.
Benson*, 285 U.S. 22, 60 (1932)).    We review a district
court's finding of discriminatory purpose for clear error. *See
Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221,
1240–41 (2024); *Hernandez v. New York*, 500 U.S. 352,
364–65 (1991) (collecting cases); *Hunter v. Underwood*, 471
U.S. 222, 229 (1985).

## III.

We begin with Appellants' contention that the district
court's factual findings regarding the expert medical
evidence are clearly erroneous.    Specifically, Appellants
argue that the district court clearly erred by: (1) finding that,
before puberty, there are no significant differences in athletic
performance between boys and girls; (2) treating small
differences as insignificant; and (3) finding that transgender
girls who receive puberty-blocking medication do not have
an athletic advantage over other girls.    We sustain these
findings because they are not "illogical, implausible, or
without support in inferences that may be drawn from the

record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).  Appellants have not shown that the district court clearly erred.

A.

The district court's finding that, "[b]efore puberty, there are no significant differences in athletic performance between boys and girls," *Doe*, 683 F. Supp. 3d at 968, is not clearly erroneous.   Dr. Daniel Shumer is a Pediatric Endocrinologist and Medical Director of the Comprehensive Gender Services Program at Michigan Medicine, University of Michigan; the Clinical Director of Child and Adolescent Gender Services at C.S. Mott Children's Hospital; and an Assistant Professor of Medicine at the University of Michigan, where the major focus of his clinical and research work pertains to transgender adolescents. Shumer Decl. ¶ 3. He has personally evaluated and treated over 400 patients for gender dysphoria and has knowledge of the scientific literature concerning the issues raised in this litigation.  *Id.* ¶¶ 7, 14. Dr. Shumer stated that, "[b]efore puberty, there are no significant differences in athletic performance between boys and girls." *Id.* ¶ 38. He acknowledged that "some studies have found small differences between the performance of boys and girls with respect to some discrete activities," but he noted that "these studies did not control for other factors, particularly age, location, or socioeconomic factors." Rebuttal Decl. of Daniel Shumer, M.D., ¶ 10.  He further explained, "When research has controlled for those factors by using representative data, researchers have found . . . 'no statistical difference in the capabilities of girls and boys until high-school age (commonly age 12).'" *Id.* ¶ 11. According to Dr. Shumer, "[t]here is no reliable basis . . . to attribute those small differences to physiology or anatomy instead of other

factors, such as greater societal encouragement of athleticism in boys, greater opportunities for boys to play sports, or different preferences of the boys and girls surveyed." *Id.* ¶ 13; *see also* Second Rebuttal Decl. of Daniel Shumer, M.D., ¶¶ 16–24.

Appellants point to a handful of studies suggesting that prepubertal boys may be taller, weigh more, have more muscle mass, have less body fat, or have greater shoulder internal rotator strength than prepubertal girls. These studies, however, neither attributed these differences to biological rather than sociological factors nor concluded that these differences translated into competitive athletic advantages. Moreover, the results of these studies are disputed. Dr. Shumer, for example, testified that studies have found "no statistical difference in the [muscle strength] of girls and boys until high-school age" and that height differences between boys and girls "disappear around age 6 to 8 years of age, and do not begin diverging again until puberty," when girls acquire an advantage. Shumer 2d Rebuttal Decl. ¶¶ 13, 18. On appeal, Appellants cite the findings of these studies selectively. For example, although a 2017 study found that prepubertal boys had greater shoulder internal rotator strength than prepubertal girls, the study also found "no significant . . . differences between strength measures of boys or girls aged 3–9 years" with respect to the 12 other muscle groups studied. Marnee J. McKay et al., *Normative Reference Values for Strength and Flexibility of 1,000 Children and Adults*, 88 Neurology 36, 38 (2017). And Appellants' reliance on a 2023 study, Mira A. Atkinson et al., *Sex Differences in Track and Field Elite Youth* 10–11 (2023) (preprint), https://sportrxiv.org/index.php/server/preprint/view/324/65 4 (last visited Aug. 27, 2024), is misplaced because it does

not appear that Appellants presented this evidence to the district court. "Our review of the district court's findings, pursuant to its action on a motion for preliminary judgment is . . . restricted to the limited record available to the district court when it granted or denied the motion." *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 753 (9th Cir. 1982).

On the record before it, the district court did not clearly err by finding that there are no significant differences in athletic performance between prepubescent boys and girls. We recognize that Appellants' experts—including Dr. Emma Hilton, Ph.D., a postdoctoral researcher in developmental biology at the University of Manchester, UK, and Dr. Gregory A. Brown, Ph.D., FACSM, a Professor of Exercise Science in the Department of Kinesiology and Sport Sciences at the University of Nebraska Kearney— disagree with these findings, but our review of a district court's factual findings is limited and deferential, especially at this stage of the proceedings. Because the challenged findings are firmly grounded in evidence in the record, they are not clearly erroneous.

B.

Appellants contend the district court clearly erred by treating small differences between prepubertal boys and girls as insignificant. They note that small differences can "have an enormous influence in competitive sports, where outcomes are routinely decided by tiny margins." Opening Br. at 56. Appellants overlook the court's finding that the small differences that have been identified by some studies have not been shown to be attributable to biological rather than sociological factors. *Doe*, 683 F. Supp. 3d at 966. The court found that "any prepubertal differences between boys

and girls in various athletic measurements are minimal or nonexistent" and that there is "no basis . . . to attribute" the small differences observed in school-based fitness testing of prepubertal boys and girls "to physiology or anatomy instead of to other factors such as greater societal encouragement of athleticism in boys, greater opportunities for boys to play sports, or differences in the preferences of the boys and girls surveyed." *Id.* at 966–67. These findings are supported by the record and are not clearly erroneous.[7]

C.

Appellants also take issue with the district court's finding that "[t]ransgender girls who receive puberty-blocking medication do not have an athletic advantage over other girls because they do not undergo male puberty and do not experience the physiological changes caused by the increased production of testosterone associated with male puberty." *Id.* at 968. Appellants point to what they describe as "abundant evidence showing that preventing male puberty does not eliminate the advantages that [transgender females] have over [cisgender] females." Opening Br. at 52.

The district court's finding is grounded in the record evidence. Dr. Shumer testified that transgender girls receiving treatment consistent with current standards of care begin puberty blockers "at the first onset of puberty, . . . long before the development of increased muscle mass and strength associated with the later stages of male puberty,"

---

[7] Because Appellants failed to show that there are differences in athletic performance between prepubertal boys and girls that are attributable to biology, the district court had no occasion to address whether slight differences of that nature would justify a categorical ban on transgender women and girls playing women's and girls' sports. We likewise express no opinion on that question.

and "receive hormone therapy to allow them to go through puberty consistent with their female gender identity." Shumer 2d Rebuttal Decl. ¶¶ 26–27. Consequently, Dr. Shumer testified that these transgender girls "will develop many of the same physiological and anatomical characteristics of non-transgender girls, including bone size, skeletal structure, and distinctive aspects of the female pelvis geometry that cut against athletic performance. . . . Because such girls do not undergo male puberty, they do not gain the increased muscle mass or strength that accounts for why post-pubertal boys as a group have an advantage over post-pubertal girls as a group." *Id.* ¶¶ 27–28. Dr. Shumer testified, there is "no evidence that transgender girls on puberty suppression medication or hormone therapy have an athletic advantage over other girls," there are "no studies that have documented any such advantage," and there is "no medical reason to posit that any such advantage would exist." *Id.* ¶ 36; *see also* Shumer Rebuttal Decl. ¶¶ 14–27. Dr. Shumer also cited "the scientific consensus that the biological cause of average differences in athletic performance between men and women is the rise of circulating levels of testosterone beginning in endogenous male puberty." Shumer Rebuttal Decl. ¶ 8. Dr. Shumer further testified that "a transgender girl who receives hormone therapy will typically have the same levels of circulating estrogen and testosterone levels as other girls." Shumer Decl. ¶ 36.

Relying on several studies, Appellants argue that transgender females who receive puberty blockers have advantages over cisgender females in lean body mass, grip strength, and height. But Appellants overlook that in these studies, male puberty was only *partially* blocked. In the lean body mass study, for example, the transgender women

participants "had much more testosterone exposure than transgender girls treated with modern protocols" because they started puberty blockers at an average age of 14.5 years. Shumer 2d Rebuttal Decl. ¶ 33; *see* Maartje Klaver et al., *Early Hormonal Treatment Affects Body Composition and Body Shape in Young Transgender Adolescents*, 15 J. Sexual Med. 251 (2018). Plaintiffs, by contrast, began receiving puberty blockers at age 11. Similarly, the height study upon which Appellants rely considered "transgender girls who had received puberty blockers from around 13 years of age" and "cross-sex hormones at 16 years of age"—far later than Plaintiffs and others following current protocols. Statement of Emma Hilton, Ph.D., ¶ 11.2; *see* Lidewij Sophia Boogers et al., *Transgender Girls Grow Tall: Adult Height Is Unaffected by GnRH Analogue and Estradiol Treatment*, 107 J. Clinical Endocrinology & Metabolism 3805 (2022). The medications in the grip strength study cited by Appellants "did not fully block puberty" and were "less effective" than the puberty blockers used in the United States. Shumer 2d Rebuttal Decl. ¶ 34; *see* Lloyd J.W. Tack et al., *Proandrogenic and Antiandrogenic Progestins in Transgender Youth: Differential Effects on Body Composition and Bone Metabolism*, 103 J. Clinical Endocrinology & Metabolism 2147 (2018). Given the limited relevance of these studies, the district court did not clearly err.

## IV.

The district court concluded that Plaintiffs were likely to succeed on their equal protection and Title IX claims. We discuss these claims in turn, beginning with equal protection.

A.

1.

In *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019), and *Hecox II*, 104 F.4th at 1079, we held that heightened scrutiny applies to laws that discriminate based on transgender status.  Thus, if the Act discriminates based on transgender status, either purposefully or on its face, heightened scrutiny applies.**[8]**

a.

A discriminatory purpose is shown when "the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979).  "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).  "The 'important starting point' for assessing discriminatory intent under *Arlington Heights* is 'the impact of the official action

---

[8] We recognize that the Act also classifies based on sex, but Plaintiffs do not challenge the State's decision to require that schools maintain separate teams for girls and boys, so we do not address it.  *See Doe*, 683 F. Supp. 3d at 967 ("The Plaintiffs do not challenge the existence of separate teams for girls and boys."); *cf. B.P.J. ex rel. Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 557 (4th Cir. 2024) ("Because [the challenged law's] requirement that all teams be designated male, female, or co-ed . . . is conceded to be valid and is necessary to the relief [plaintiff] seeks (being allowed to participate in girls cross country and track teams) we need go no further in determining whether the State can justify it."), *petitions for cert. filed* (July 16, 2024) (Nos. 24-43, 24-44).

whether it 'bears more heavily on one race than another.'"
*Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 489 (1997)
(quoting *Village of Arlington Heights*, 429 U.S. at 266).
"Other considerations relevant to the purpose inquiry
include, among other things, 'the historical background of
the [jurisdiction's] decision'; '[t]he specific sequence of
events leading up to the challenged decision'; '[d]epartures
from the normal procedural sequence'; and '[t]he legislative
or administrative history, especially . . . [any] contemporary
statements by members of the decisionmaking body.'" *Id.*
(alterations in original) (quoting *Village of Arlington
Heights*, 429 U.S. at 268).   Although we start with a
presumption that a legislature acted in good faith, a plaintiff
need demonstrate only that discrimination against a
protected class "was a substantial or motivating factor in
enacting the challenged provision," not the sole or
predominant factor. *United States v. Carrillo-Lopez*, 68
F.4th 1133, 1139–40 (9th Cir. 2023).  Here, the district court
found that "[t]he Act was adopted for the purpose of
excluding transgender girls from playing on girls' sports
teams." *Doe*, 683 F. Supp. 3d at 963.  This finding is not
clearly erroneous.

First, Appellants' contention that the legislature adopted
the Act to ensure competitive fairness and equal athletic
opportunities for cisgender female athletes cannot be
squared with the fact that the Act bars students from female
athletics based entirely on *transgender status* and not at all
based on factors the district court found bear a genuine
connection to athletic performance and competitive
advantage, such as circulating testosterone.   The district
court concluded that "[t]he Arizona legislature intentionally
created a classification, specifically 'biological girls,' that
necessarily excludes transgender girls," *id.* at 971, and that

"[t]he categorical preclusion of transgender women, especially girls who have not experienced male puberty, appears unrelated to the interests the Act purportedly advances," *id.* at 967.

Second, the Supreme Court has long recognized that a policy's discriminatory impact may support a finding of discriminatory purpose. *See Crawford v. Bd. of Educ.*, 458 U.S. 527, 544 (1982) ("In determining whether . . . a [discriminatory] purpose was the motivating factor, the racially disproportionate effect of official action provides 'an important starting point.'" (quoting *Feeney*, 442 U.S. at 274 (in turn quoting *Village of Arlington Heights*, 429 U.S. at 266))). Here, the Act's transgender ban affects *only* transgender female students. To be sure, the statutory language bans all "students of the male sex" from female sports. Ariz. Rev. Stat. § 15-120.02(B). But Appellants have not shown that the Act had any real-world impact on cisgender male students, who have long been excluded from female sports in Arizona and elsewhere. *See Clark I*, 695 F.2d at 1127; *Clark II*, 886 F.2d at 1192.[9]

The Act's burdens instead fall *exclusively* on transgender women and girls. Under the pre-Act status quo, transgender women and girls were permitted to participate in women's and girls' sports consistent with AIA, NCAA, and

___

[9] Appellants contend the Act affects cisgender males because there was no state law explicitly barring cisgender males from female sports before the Act's adoption and because AIA and NCAA policies excluding cisgender males from female sports applied only to *member* schools, not to other schools, and only to *colleges and high schools*, not to kindergarten through eighth grade. This argument fails because the Act merely codifies preexisting rules barring cisgender males from participating on girls' sports teams, and it had no practical effect on cisgender males.

individual-school policies.  The Act functions solely to
abrogate those policies, and thus burdens only transgender
female students. *Cf. Hecox II*, 104 F.4th at 1077 ("[T]he
Act's discriminatory purpose is . . . evidenced by the Act's
prohibition of 'biological males' from female-designated
teams because that prohibition affects one group of athletes
only—transgender women. . . .  The Act's *only* contribution
to Idaho's student-athletic landscape is to entirely exclude
transgender women and girls from participating on female
sports teams."); *B.P.J.*, 98 F.4th at 556 (applying heightened
scrutiny where the challenged legislation's "only effect" was
"to exclude transgender girls . . . from participation on girls
sports teams").**[10]**

In sum, the district court did not clearly err by finding a
discriminatory purpose.  Accordingly, the district court
properly concluded that the Act is subject to heightened
scrutiny on this basis.

b.

Turning to facial discrimination, Appellants contend the
Act "is 'facially' neutral with respect to gender identity"

---

[10] The district court also found evidence of discriminatory purpose in the
legislative history, noting that Senator Vince Leach explained his vote
for the bill by stating, "if we allow transgenders to take over female
sports, you will not have females participating," and that Senator
Petersen, Chairman of the Senate Committee on Judiciary, questioned
whether critics of the bill would "be opposed to having just a trans
league, so that they can all compete in their own league." *Doe*, 683 F.
Supp. 3d at 963.  Speakers at the legislative hearing on the bill also
referred to transgender women and girls as "males" and "men." *See*
Hearing on Senate Bill 1165, Arizona State Senate, Committee on the
Judiciary,    Jan.    20,    2022,    available    at
https://www.azleg.gov/videoplayer/?eventID=2022011057&startStrea
mAt=508 (last visited Aug. 27, 2024).

because it "describes who may play on what sports teams 'without referring to' gender identity."  Opening Br. at 32. They rely on *Martin v. International Olympic Committee*, 740 F.2d 670, 678 (9th Cir. 1984), which held that an IOC rule was gender neutral because it "describe[d] the procedures for determining events to be included in the Olympic Games without referring to the competitors' sex." Under circuit precedent, however, the Act discriminates on its face based on transgender status.

In *Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014), we held that state laws defining marriage as between a man and a woman, but making no mention of sexual orientation, discriminated on their face based on sexual orientation.  *Id.* at 464 n.2, 467–68.  Although the challenged laws prohibited *all* same-sex couples from marrying, whether gay or straight, the laws facially discriminated based on sexual orientation because only gay couples were barred from marrying *consistent with their sexual orientation*.   This precedent applies here.  The Act bars all "students of the male sex" from playing on female teams, but only transgender female students are prohibited from playing on teams consistent with their gender identity, and this distinction is plain from the face of the statute.    Thus, under *Latta*, the Act discriminates on its face based on transgender status.

In *Hecox II*, moreover, we held that an Idaho transgender ban similar to the Arizona law challenged here discriminated on its face based on transgender status.  We reasoned that "the Act's use of 'biological sex' functions as a form of '[p]roxy discrimination'" because the Act's "definition of 'biological sex'" was "carefully drawn to target transgender women and girls, even if it does not use the word 'transgender' in the definition." *Hecox II*, 104 F.4th at 1078 (quoting *Pac. Shores Props., LLC v. City of Newport Beach*,

730 F.3d 1142, 1160 n.23 (9th Cir. 2013)).**11**  We reach the same conclusion here; under *Hecox II*, Arizona's transgender ban discriminates on its face based on transgender status.

This conclusion is consistent not only with common sense—there is simply no denying that a transgender sports ban discriminates based on transgender status—but also with the decisions of other courts, which have held that transgender sports bans like the one challenged here discriminate on their face against transgender women and girls. *See id.* ("In addition to having a discriminatory purpose and effect, the Act is also facially discriminatory against transgender female athletes."); *B.P.J.*, 98 F.4th at 555–56 ("If B.P.J. were a cisgender girl, she could play on her school's girls teams.  Because she is a transgender girl, she may not.  The Act declares a person's sex is defined only by their 'reproductive biology and genetics at birth.'  The undisputed purpose—and the only effect—of that definition is to exclude transgender girls from the definition of 'female'

---

[11] In *Pacific Shores Properties*, we explained:

> Proxy discrimination is a form of facial discrimination.  It arises when the defendant enacts a law or policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group.  For example, discriminating against individuals with gray hair is a proxy for age discrimination because "the 'fit' between age and gray hair is sufficiently close."

730 F.3d at 1160 n.23 (quoting *McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992)).

and thus to exclude them from participation on girls sports teams. That is a facial classification based on gender identity."); *Hecox v. Little (Hecox I)*, 479 F. Supp. 3d 930, 975 (D. Idaho 2020) ("[T]he Act on its face discriminates between cisgender athletes, who may compete on athletic teams consistent with their gender identity, and transgender women athletes, who may not compete on athletic teams consistent with their gender identity.").

c.

Citing *Katzenbach v. Morgan*, 384 U.S. 641 (1966), and *Jana-Rock Construction, Inc. v. New York State Department of Economic Development*, 438 F.3d 195 (2d Cir. 2006), Appellants argue that rational basis review applies to the Plaintiffs' equal protection claim because Plaintiffs assert an underinclusiveness challenge to a remedial statute.

In *Morgan*, 384 U.S. at 656, the Supreme Court considered a Fifth Amendment equal protection challenge to a Voting Rights Act provision prohibiting states from denying the vote to *some* non-English speakers (those educated in schools in Puerto Rico or other U.S. territories) but not to *other* non-English speakers (those educated beyond U.S. territories). Although classifications based on national origin ordinarily trigger strict scrutiny, the Court held that rational basis review applied because "the distinction challenged by appellees is presented only as a limitation on a reform measure aimed at eliminating an existing barrier to the exercise of the franchise." *Id.* at 657. The Court noted that a "statute is not invalid under the Constitution because it might have gone farther than it did," that a legislature need not "strike at all evils at the same time," and that "reform may take one step at a time, addressing itself to the phase of the problem which seems

most acute to the legislative mind." *Id.* (first quoting *Roschen v. Ward*, 279 U.S. 337, 339 (1929), then quoting *Semler v. Oregon State Bd. of Dental Examiners*, 294 U.S. 608, 610 (1935), and then quoting *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 489 (1955)). In *Jana-Rock*, the Second Circuit considered a Fourteenth Amendment equal protection challenge to a New York affirmative action program providing benefits to *some* Hispanics (those from Latin America) but not to *other* Hispanics (those from Spain and Portugal). Although racial classifications ordinarily prompt strict scrutiny, the Second Circuit applied rational basis review because "once the government has shown that its decision to resort to explicit racial classifications survives strict scrutiny by being narrowly tailored to achieve a compelling interest, its program is no longer presumptively suspect." 438 F.3d at 200. The court declined "to apply automatically strict scrutiny a second time in determining whether an otherwise valid affirmative action program is underinclusive for having excluded a particular plaintiff." *Id.*; *see also id.* at 206–11.

Relying on *Morgan* and *Jana-Rock*, Appellants argue that rational basis review applies here. They argue that the Act "is a remedial statute" because "[t]he Arizona legislature passed the law to provide girls and women a benefit— participation on their own sports teams—for the purpose of promoting opportunities for female athletes, ensuring the safety of female athletes, and remedying past discrimination." Opening Br. at 18. Further, they argue that Plaintiffs' equal protection claim should be understood as an underinclusiveness challenge because, rather than challenging Arizona's adoption of "sex-segregated sports teams," in their view Plaintiffs' claim is "that the definition of 'females,' 'women,' and 'girls' in the [Act] is

underinclusive—that the definition should be expanded to include not just biological females, but also at least some biological males who identify as females, *i.e.*, transgender athletes like themselves." *Id.* at 2.

Appellants' argument rests on the flawed premise that the Act qualifies as remedial legislation. The district court found that "[t]he Act was adopted for the purpose of excluding transgender girls from playing on girls' sports teams," *Doe*, 683 F. Supp. 3d at 963, and, as discussed earlier, that finding is not clearly erroneous. Thus, the Act is not remedial, and *Morgan* and *Jana-Rock* do not control. Furthermore, even in the context of an underinclusiveness challenge to a remedial statute, heightened scrutiny applies where, as here, the plaintiff "demonstrate[s] that his or her exclusion was motivated by a discriminatory purpose." *Jana-Rock*, 428 F.3d at 200. Thus, even under *Jana-Rock*, heightened scrutiny applies here.

2.

To withstand heightened scrutiny, a classification "must serve important governmental objectives and must be substantially related to achievement of those objectives." *Clark I*, 695 F.2d at 1129 (quoting *Craig v. Boren*, 429 U.S. 190, 197 (1976)). The State bears the burden of demonstrating an "exceedingly persuasive justification" for the classification, *United States v. Virginia*, 518 U.S. 515, 531 (1996), and "[t]he justification . . . must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females," *id.* at 533. Here, it is undisputed that the State's asserted interests in ensuring competitive fairness, student safety, and equal athletic opportunities for women and girls are important governmental objectives. The question is whether the

transgender ban is substantially related to the achievement of these objectives.

Four decades ago, we addressed whether an Arizona policy excluding cisgender boys from girls' sports violated the Equal Protection Clause. We upheld that policy because it was substantially related to the state's objectives in "redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes." *Clark I*, 695 F.2d at 1131. We reached that conclusion because: (1) "boys' overall opportunity" to play school sports was "not inferior to girls'"; (2) "males would displace females to a substantial extent" if cisgender boys were allowed to play on girls' teams; and (3), most importantly, "average physiological differences" between boys and girls "allow[ed] gender to be used as . . . an *accurate* proxy" for athletic ability and competitive advantage. *Id.* (emphasis added). None of these conditions is present here.[12]

First, the Act does not afford transgender women and girls equal athletic opportunities. The Act permits cisgender women and girls to play on *any* teams, male or female, while transgender women and girls are permitted to play *only* on male teams. The Act also permits all students other than transgender women and girls to play on teams consistent with their gender identities; transgender women and girls alone are barred from doing so. This is the essence of discrimination. *See Bostock v. Clayton County*, 590 U.S. 644, 657 (2020) ("To 'discriminate against' a person . . .

---

[12] As we noted in *Hecox II*, *Clark I* is also distinguishable from this case because the policy challenged in *Clark I* adversely affected cisgender boys, a historically favored group, rather than transgender women and girls, a historically disfavored minority. *Hecox II*, 104 F.4th at 1082.

mean[s] treating that individual worse than others who are similarly situated.").

Although the Act allows transgender women and girls to play male sports, the district court found that Plaintiffs "cannot play on boys' sports teams." *Doe*, 683 F. Supp. 3d at 968.   The court reasoned that Plaintiffs have "athletic capabilities like other girls [their] age," that they would find playing on boys' teams "humiliating and embarrassing," and that "playing on a boys' sports team and competing against boys would directly contradict [their] medical treatment for gender dysphoria and jeopardize [their] health." *Id.* at 968–69.   In fact, the court found that "[p]articipating in sports on teams that contradict one's gender identity is equivalent to gender identity conversion efforts, which every major medical association has found to be dangerous and unethical." *Id.* (quoting *Hecox I*, 479 F. Supp. 3d at 977). As we explained in *Hecox II*, "[t]he argument . . . that the Act does not discriminate against transgender women because they can . . . play on men's teams is akin to the argument we rejected in *Latta*[] that same-sex marriage bans do not discriminate against gay men because they are free to marry someone of the opposite sex."   104 F.4th at 1083 (citing *Latta*, 771 F.3d at 467).[13]

---

[13] The generally accepted medical practice is to treat people who suffer from gender dysphoria with "necessary, safe, and effective" gender-affirming medical care. *Doe*, 683 F. Supp. 3d at 957. "The goal of medical treatment for gender dysphoria is to alleviate a transgender patient's distress by allowing them to live consistently with their gender identity."   *Id.* at 958.   This treatment, "commonly referred to as 'transition,'" includes "one or more of the following components: (i) social transition, including adopting a new name, pronouns, appearance, and clothing, and correcting identity documents; (ii) medical transition, including puberty-delaying medication and

Second, the record does not demonstrate that transgender females would displace cisgender females to a substantial extent if transgender females were allowed to play on female teams. As the district court noted in distinguishing *Clark I*, "[i]t is inapposite to compare the potential displacement [of] allowing approximately half of the population (cisgender men) to compete with cisgender women, with any potential displacement one half of one percent of the population (transgender women) could cause cisgender women." *Doe*, 683 F. Supp. 3d at 961 (footnote omitted) (quoting *Hecox I*, 479 F. Supp. 3d at 977). In the dozen or so years before adoption of the Act, the AIA approved just seven transgender students to play on teams consistent with their gender identities—a tiny number when compared to the roughly 170,000 students playing school sports in Arizona each year. *Id.* During legislative hearings, proponents of the Act were unable to cite a single instance of a transgender girl displacing a cisgender girl on a girls' sports team in Arizona.

Third, after carefully considering the extensive expert evidence in the preliminary injunction record, the district court found that a student's transgender status is *not* an accurate proxy for average athletic ability or competitive advantage. As noted, the district court cited "the scientific consensus" that "the biological cause of average differences in athletic performance between men and women is . . . the presence of circulating levels of testosterone beginning with male puberty," *Doe*, 683 F. Supp. 3d at 964, and that "[t]he biological driver of average group differences in athletic

---

hormone-replacement therapy; and (iii) for adults, surgeries to alter the appearance and functioning of primary- and secondary-sex characteristics." *Id.* "For social transition to be clinically effective, it must be respected consistently across all aspects of a transgender individual's life." *Id.*

performance between adolescent boys and girls is the
difference in their respective levels of testosterone, which
only begin to diverge significantly after the onset of
puberty," *id.* at 968.

Contrary to the expert opinion evidence relied upon by
the district court, the Act applies to all transgender women
and girls, including those who the district court found do not
have an average athletic advantage over cisgender women
and girls.  The district court found that, "[b]efore puberty,
there are no significant differences in athletic performance
between boys and girls," *id.*, yet the ban applies to
transgender kindergartners who are too young to have
experienced male puberty.  Although prepubertal boys
sometimes outperform prepubertal girls on school-based
fitness testing, the district court found "no basis . . . to
attribute those small differences to physiology or anatomy
instead of" sociological factors.  *Id.* at 966.

The categorical ban includes transgender women and
girls, such as Plaintiffs, who receive puberty blockers and
hormone therapy and never experience male puberty.  The
district court found that "[t]ransgender girls who receive
puberty-blocking medication do not have an athletic
advantage over other girls because they do not undergo male
puberty and do not experience the physiological changes
caused by the increased production of testosterone
associated with male puberty."  *Id.* at 968.  The court also
found that "[t]ransgender girls who receive hormone therapy
after receiving puberty-blocking medication will develop the
skeletal structure, fat distribution, and muscle and breast
development typical of other girls," and "will typically have

the same levels of circulating estrogen and testosterone as other girls." *Id.***[14]**

Given these well-supported factual findings, the district court properly concluded that Appellants are unlikely to establish that the Act's sweeping transgender ban is substantially related to achievement of the State's important governmental objectives in ensuring competitive fairness and equal athletic opportunity for female student-athletes. The Act's transgender ban applies not only to all transgender women and girls in Arizona, regardless of circulating testosterone levels or other medically accepted indicia of competitive advantage, but also to all sports, regardless of the physical contact involved, the type or level of competition, or the age or grade of the participants. Heightened scrutiny does not require narrow tailoring, but it does require a substantial relationship between the ends sought and the discriminatory means chosen to achieve them. *See Virginia*, 518 U.S. at 533. Appellants have not made that showing here.

We recognize that the research in this field is ongoing and that standards governing transgender participation in sports are evolving. In the last few years alone, both the NCAA and International Olympic Committee have

---

[14] The Act also includes transgender women and girls who have gone through male puberty but receive gender-affirming hormone therapy to suppress their circulating testosterone levels. Dr. Shumer testified that "studies on transgender women who have undergone testosterone suppression as adults . . . show that testosterone suppression resulted in significant mitigation of muscle mass and development in adult transgender women." *See* Shumer Rebuttal Decl. ¶¶ 17–18. These transgender women do not appear to have a competitive athletic advantage. *See id.* ¶ 19 (citing Joanna Harper, *Race Times for Transgender Athletes*, 6 J. Sporting Cultures & Identities 1 (2015)).

tightened their transgender eligibility policies—although
neither organization has adopted anything like Arizona's
categorical ban on transgender females participating in
female sports.  Legislatures are not prohibited from acting
"in the face of medical uncertainty," *Carhart*, 550 U.S. at
166, and "[l]ife-tenured federal judges should be wary of
removing a vexing and novel topic of medical debate from
the ebbs and flows of democracy by construing a largely
unamendable Constitution to occupy the field," *L.W. ex rel.
Williams v. Skrmetti*, 83 F.4th 460, 471 (6th Cir. 2023), *cert.
granted*, 2024 WL 3089532 (U.S. June 24, 2024) (No. 23-
477).  But neither *Carhart* nor *Skrmetti* applied heightened
scrutiny, as we are obliged to do, and that standard requires
the State to demonstrate an "exceedingly persuasive
justification" for a discriminatory classification, without
relying on "overbroad generalizations about the different
talents, capacities, or preferences of males and females."
*Virginia*, 518 U.S. at 531, 533.[15]  The district court was
bound to rule on Plaintiffs' request for limited injunctive
relief based on the evidence in the record before it.  To be
sure, future cases may have different outcomes if the
evolving science supports different findings.  But the court
did not have the luxury of waiting for further research to be
conducted; "we cannot avoid the duty to decide an issue
squarely presented to us." *United States v. Booker*, 375 F.3d
508, 513 (7th Cir. 2004), *aff'd*, 543 U.S. 220 (2005).

   We reject Appellants' argument that the Act survives
intermediate scrutiny because it directly advances the State's

---

[15] *See Carhart*, 550 U.S. at 166 (addressing whether the challenged law
was "rational and in pursuit of legitimate ends"); *Skrmetti*, 83 F.4th at
486 (applying rational basis review to an equal protection challenge to
state laws prohibiting doctors from providing gender-affirming medical
care to minors).

objectives "roughly 99.996 percent of the time."  Reply Br. at 26.  In Appellants' view, even if the ban does not directly advance the State's legitimate objectives as applied to transgender women and girls who have not experienced male puberty, such as Plaintiffs, the Act is *substantially* related to the State's interests because it advances legitimate State interests as applied to cisgender men and boys, who make up the vast majority of students affected by the legislation. Because, as noted, the Act does not actually affect cisgender men and boys, this argument is unpersuasive.[16]

So, too, is Appellants' argument that the Act satisfies heightened scrutiny because it directly advances the State's objectives as applied to *some* transgender female athletes— those who have experienced male puberty and who have not received hormone therapy to suppress their levels of circulating testosterone.  Appellants correctly point out that "[n]one of [the Supreme Court's] gender-based classification equal protection cases have required that the statute under consideration must be capable of achieving its ultimate objective in every instance." *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 70 (2001).  But the State does not carry its burden by showing that a classification is capable of achieving its ultimate objective in *some* circumstances. Heightened scrutiny requires that the means adopted by the State must be "in *substantial furtherance* of important governmental objectives."  *Id.* (emphasis added).  Moreover, the Act's practical effect is to displace the existing AIA and NCAA policies which already limit the participation of

---

[16] Because Plaintiffs do not challenge the Act's sex classification, the question presented is simply whether "excluding transgender girls from girls sports teams" is substantially related to important governmental interests, not whether excluding all "students of the male sex" from such sports is justified.  *See B.P.J.*, 98 F.4th at 559.

transgender athletes based in part on levels of circulating testosterone.

### B.

The district court concluded that Plaintiffs were likely to succeed not only on their equal protection claim but also on their Title IX claim. *Doe*, 683 F. Supp. 3d at 974–75. Appellants challenge this conclusion, arguing that Title IX is unenforceable in this case because the State lacked clear notice that excluding transgender women and girls from female sports violates the statute. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) ("Congress has broad power to set the terms on which it disburses federal money to the States, but when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out 'unambiguously.'" (citations omitted) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981))).

Although not addressed by the district court, this is a colorable argument because Title IX regulations permit schools to "operate or sponsor separate teams for members of each sex," 34 C.F.R. § 106.41(b), and it may not have been clear to the State when it accepted federal funding that this provision does not authorize distinctions based on assigned sex. *Cf. Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 815–16 (11th Cir. 2022) (en banc) ("Under the Spending Clause's required clear-statement rule, the School Board's interpretation that [Title IX's] bathroom carve-out[, 34 C.F.R. § 106.33,] pertains to biological sex would only violate Title IX if the meaning of 'sex' unambiguously meant something other than biological

sex, thereby providing the notice to the School Board that its understanding of the word 'sex' was incorrect.").**[17]**

We need not address this issue at this time. Because Secretary Horne (the only party formally enjoined by the preliminary injunction, *see Doe*, 683 F. Supp. 3d at 977) was properly enjoined based on the district court's conclusion that Plaintiffs are likely to succeed on the merits of their equal protection claim, we need not decide whether Plaintiffs are likely to succeed on the merits of their Title IX claim as well. The district court should address the Spending Clause issue in the first instance if raised in further proceedings. We express no opinion on how the issue should be resolved.

V.

Having determined that the district court did not err by concluding that Plaintiffs are likely to succeed on their equal protection claim, we turn to whether the district court abused its discretion in addressing the remaining preliminary injunction factors.

A.

Plaintiffs seeking a preliminary injunction must establish that they are likely to suffer irreparable harm in the absence of relief. *Johnson*, 572 F.3d at 1078. Appellants argue that

---

[17] The Department of Education has proposed an amendment to § 106.41(b) that would clarify that Title IX does not authorize the categorical exclusion of transgender female students from female sports. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams*, 88 Fed. Reg. 22,860 (proposed Apr. 13, 2023) (to be codified at 34 C.F.R. § 106.41(b)(2)).

"Plaintiffs' claim of irreparable harm is inconsistent with their delay in seeking injunctive relief," because "[n]early a year passed . . . before they challenged" the Act. Opening Br. at 67. *See Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (en banc) (noting that delay can undercut a claim of irreparable harm).

We disagree. Plaintiffs sought preliminary injunctive relief just seven months after the Act took effect. This was not a long delay in this context, and even if it were, "delay is but a single factor to consider in evaluating irreparable injury," and "'courts are loath to withhold relief solely on that ground.'" *Arc of California*, 757 F.3d at 990 (quoting *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984)). Furthermore, even a long delay "is not particularly probative in the context of ongoing, worsening injuries." *Id.*[18]

Appellants argue that Plaintiffs fail to show irreparable harm because their "claims of harm stem from their gender dysphoria diagnosis" rather than the Act. Opening Br. at 68. This misunderstands Plaintiffs' claims. It is Plaintiffs' gender identity, not their gender dysphoria, that causes them

---

[18] Jane was not affected by the transgender ban during the 2023-24 school year. She played soccer on club and recreational teams, which were not subject to the ban. *See* Ariz. Rev. Stat. § 15-120.02(A) (applying only to school-sponsored sports); *Doe*, 683 F. Supp. 3d at 959. Megan *was* affected by the ban in 2023-24; she was a member of the girls' volleyball team at the Gregory School and was allowed to practice with the team but barred from playing in games. *Doe*, 683 F. Supp. 3d at 962. Megan would have been irreparably harmed were she barred from playing in games for a second school year.

to wish to play on girls' teams, and it is the Act, not their medical condition, that prevents them from doing so. In any event, we ordinarily will not consider arguments raised for the first time on appeal.**19**

B.

Appellants argue that the final two preliminary injunction factors—the balance of the equities and the public interest—favor the denial of preliminary injunctive relief because "Plaintiffs will displace biological female athletes" if they are allowed to play on girls' teams. Opening Br. at 69. The record, however, shows that "Megan's teammates, coaches, and school are highly supportive of her and would welcome her participation on the girls' volleyball team," *Doe*, 683 F. Supp. 3d at 960, and that "Jane's teachers, coaches, friends, and members of her soccer team have all been supportive of Jane's identity," *id.* at 959. Appellants

---

19 Appellants point out that "it is claims that are deemed waived or forfeited, not arguments." *United States v. Blackstone*, 903 F.3d 1020, 1025 n.2 (9th Cir. 2018) (quoting *United States v. Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004)); *see Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487 (2008) ("[O]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." (quoting *Yee v. Escondido*, 503 U.S. 519, 534 (1992))). But these decisions do not alter our general rule that we ordinarily do not consider arguments raised for the first time on appeal. *See Exxon Shipping*, 554 U.S. at 487 ("'It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below,' when to deviate from this rule being a matter 'left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases'" (citations omitted) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120–21 (1976))); *Bolker v. Comm'r*, 760 F.2d 1039, 1042 (9th Cir. 1985) ("As a general rule, we will not consider an issue raised for the first time on appeal, although we have the power to do so.").

have not shown that Plaintiffs would displace other students. In any case, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (quoting *Sammartano*, 303 F.3d at 974).

## VI.

We hold that the district court did not abuse its discretion by granting Plaintiffs' motion for a narrow preliminary injunction. We note that nothing in today's decision, or in the district court's decision, precludes policymakers from adopting appropriate regulations in this field—regulations that are substantially related to important governmental objectives. *See Clark I*, 695 F.2d at 1129. States have important interests in inclusion, nondiscrimination, competitive fairness, student safety, and completing the still unfinished and important job of ensuring equal athletic opportunities for women and girls, who must have an equal opportunity not only to participate in sports but also to compete and win. We hold only that the district court did not abuse its discretion by enjoining Arizona from barring Jane and Megan from playing school sports consistent with their gender identity while this litigation is pending.

**AFFIRMED.**