D. John Sauer, Mo. Bar No. 58721*
Justin D. Smith, Mo. Bar No. 63253*
Michael E. Talent, Mo. Bar No. 73339*
Kenneth C. Capps, Mo. Bar No. 70908*
James Otis Law Group, LLC
13321 North Outer Forty Road, Suite 300
St. Louis, Missouri 63017
Telephone: (816) 678-2103
Justin.Smith@james-otis.com

*Attorneys for Intervenor-Defendants President Petersen and Speaker Montenegro*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jane Doe, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Thomas C. Horne, in his official capacity as State Superintendent of Public Instruction, *et al.*,<br><br>Defendants,<br><br>and<br><br>Warren Petersen, President of the Arizona State Senate; Steve Montenegro, Speaker of the Arizona House of Representatives,<br><br>Intervenor-Defendants. | Case No. 4:23-cv-00185-JGZ<br><br>**Motion to Exclude Expert Testimony and Reports of Dr. Daniel Shumer** |

**INTRODUCTION**

President of the Arizona State Senate Warren Petersen and Speaker of the Arizona House of Representatives Steve Montenegro respectfully move this Court to exclude the expert testimony and reports of Plaintiffs' expert Dr. Daniel Shumer. Dr. Shumer's opinions are not reliable because he plagiarized them, he lacks the qualifications to offer them, and he has presented no objective proof that his opinions represent good science.

Dr. Shumer plagiarized the majority of the substantive paragraphs in his report. His report contains language that is identical or virtually identical to earlier-filed reports by two experts in unrelated litigation. Despite his extensive plagiarism, Dr. Shumer attempted to conceal his plagiarism through inaccurate testimony. Dr. Shumer repeatedly testified that the words in his report were his own. Although he had not cited either expert report that he plagiarized, Dr. Shumer testified that he had cited all the sources he relied on for his opinions. Dr. Shumer even denied reviewing the other expert reports. And when asked point-blank whether he had plagiarized the other experts, Dr. Shumer initially denied it.

But after he was confronted with the blatant examples, Dr. Shumer admitted that he had committed plagiarism under his university's definition, if that definition applied in this case. Dr. Shumer also admitted that it was a mistake not to cite the other experts.

Courts around the country have excluded experts who plagiarized other experts and, like Dr. Shumer, testified otherwise under oath. Like the experts in those cases, Dr. Shumer should be excluded because of his plagiarism and his attempt to conceal it through inaccurate testimony.

In addition to his plagiarism, Dr. Shumer's opinions are not reliable because he does not have the education, experience, or other necessary qualifications to offer sports opinions. Many of Dr. Shumer's opinions do not contain any support, such as peer-reviewed journal articles or independent research. In fact, only one paragraph in Dr. Shumer's sports opinions contains a citation, and it is to a single journal article that does not support all the propositions that Dr. Shumer claims. This is insufficient and unreliable.

Dr. Shumer should be excluded from this case.

## BACKGROUND

Dr. Shumer is a key witness for transgender plaintiffs challenging State laws and Presidential executive orders. Dr. Shumer estimates that he has served as an expert witness in "about 15" cases around the country. Deposition of Daniel Shumer, M.D., Feb. 18, 2025, attached as Exhibit 1, 22:20-23. Dr. Shumer has never testified in support of a law or policy on transgender issues. *Id.* at 37:14-17. Instead, Dr. Shumer has opposed laws in more than a dozen States: Alabama, Arizona, Florida, Georgia, Indiana, Kentucky, Missouri, New Hampshire, North Carolina, North Dakota, South Carolina, Texas, and Utah. *Id.* at 24:14-33:8, 39:16-41:16, 247:4-16; Expert Report of Dr. Daniel Shumer, M.D., MPH, attached as Exhibit 2, ¶ 14; *see also* footnote 1, *infra*. During the previous presidential administration, Dr. Shumer served as an expert witness for the Department of Justice in litigation against Alabama. Ex. 1, 30:9-17. Now, in at least two pending cases, Dr. Shumer is an expert witness against President Trump's executive order protecting children from chemical and surgical mutilation. *Id.* at 245:17-246:20; *see Washington v. Trump*, No. 2:25-cv-00244 (W.D. Wash. Feb. 7, 2025), ECF No. 19; *PFLAG, Inc. v. Trump*, No. 8:25-cv-00337 (D. Md. Feb. 18, 2025), ECF 69-50.

Dr. Shumer has been paid handsomely for his work. Over the past 4-5 years, Dr. Shumer has received about $150,000 for his testimony against State laws protecting children. Ex. 1, 23:8-11.

**Dr. Shumer plagiarized his opinions.**

At least 22 times found in 19 paragraphs of his expert report, Dr. Shumer plagiarized the reports of two experts not involved in this litigation, Dr. Stephen Rosenthal and Dr. Joshua Safer. *Id.* at 203:24-232:5. Shockingly, Dr. Shumer plagiarized the majority of the substantive paragraphs in his report. *See id.* (identifying plagiarism in 19 of Dr. Shumer's 34 paragraphs after the "Qualifications and Experience" section, including Ex. 2, ¶¶ 16, 18, 19, 20, 21, 23, 24, 25, 26, 28, 29, 30, 31, 32, 33, 34, 36, 37, 47).

Dr. Shumer's plagiarism is evident by comparing his report (Ex. 2) with the reports of Dr. Rosenthal (attached as Exhibit 3) and Dr. Safer (attached as Exhibit 4).

| Dr. Rosenthal's April 19, 2022 Declaration (publicly filed April 21, 2022) (Ex. 3) | Dr. Shumer's October 10, 2024 Report (Ex. 2) |
|---|---|
| ¶ 22: Any **attempts to "cure" transgender individuals by forcing their gender identity into alignment with their assigned sex are harmful,** dangerous, **and ineffective**. **Those practices have been denounced as unethical by all major professional associations of medical and mental health professionals, such as** WPATH, **the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, and the American Psychological Association**. | ¶ 23: **Attempts to "cure" transgender individuals by forcing their gender identity into alignment with their birth sex are harmful and ineffective. Those practices have been** widely **denounced as unethical by all major professional associations of medical and mental health professionals, such as the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, and the American Psychological Association**, among others. |
| ¶ 24: **Due to the incongruence between their assigned sex and gender identity, transgender people experience varying degrees of "gender dysphoria," a serious condition** listed **in both the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") and the World Health Organization's International Classification of Diseases ("ICD-10"),** and has been **recognized** as such for decades. | ¶ 26: **Due to the incongruence between their assigned sex and gender identity, transgender people experience varying degrees of gender dysphoria, a serious medical condition recognized in** the **American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5**-TR**") and the World Health Organization's International Classification of Diseases ("ICD-10"),** where it is referred to as "gender incongruence." |
| ¶ 26: **Gender dysphoria is highly treatable and can be effectively managed. If left untreated, however, it can result in severe anxiety and depression, self-harm, and suicidality.** Spack NP, Edwards-Leeper L, Feldmain HA, et al. Children and adolescents with gender identity disorder referred to a pediatric medical center. *Pediatrics*. 2012; 129(3):418-425. Olson KR, Durwood L, DeMeules M, McLaughlin KA. Mental health of transgender children who are supported in their identities. *Pediatrics*. 2016; 137:1-8. | ¶ 26: **Gender dysphoria is highly treatable and can be effectively managed. If left untreated, however, it can result in severe anxiety and depression,** eating disorders, substance abuse, **self-harm, and suicidality**. |
| ¶ 32: **Undergoing treatment to alleviate gender dysphoria is commonly referred to as** a **transition. The transition process typically includes one or more of the following three components: (i) social transition, including adopting a new name, pronouns, appearance, and clothing, and correcting identity documents; (ii) medical** | ¶ 32: **Undergoing treatment to alleviate gender dysphoria is commonly referred to as transition. The transition process typically includes one or more of the following three components: (i) social transition, including adopting a new name, pronouns, appearance, and clothing, and correcting identity documents; (ii) medical** |

3

| Dr. Rosenthal's April 19, 2022 Declaration (publicly filed April 21, 2022) (Ex. 3) | Dr. Shumer's October 10, 2024 Report (Ex. 2) |
|---|---|
| **transition, including puberty-delaying medication and hormone-replacement therapy; and (iii)** surgical transition, including **surgeries to alter the appearance and functioning** of **primary- and secondary-sex characteristics**. | **transition, including puberty-suppressing medication** (also sometimes referred to as puberty-blocking medication) **and hormone-replacement therapy; and (iii)** for adults, **surgeries to alter the appearance and functioning primary- and secondary-sex characteristics**. Surgery is rarely indicated for transgender minors. |

| Dr. Safer's January 21, 2022 Report and Declaration (publicly filed April 21, 2022) (Ex. 4) | Dr. Shumer's October 10, 2024 Report (Ex. 2) |
|---|---|
| ¶ 17: **"Gender identity" is the medical term for a person's internal, innate sense of belonging to a particular sex.** *See* Endocrine Society Guidelines, Tbl.1 *and* Safer JD, Tangpricha V. Care of transgender persons. *N Engl J Med* 2019; 381:2451–2460, Tbl.1. | ¶ 16: **"Gender identity" is the medical term for a person's internal, innate sense of belonging to a particular sex.** Everyone has a gender identity. |
| ¶ 20: **Gender roles are behaviors, attitudes, and personality traits that a society** (**in a given culture and historical period**) **designates** as **masculine or feminine** and/**or** that society **associates with** or considers typical of the **social role** of **men or women**. *See* Endocrine Society Guidelines Tbl.1. **The convention that girls wear pink and have longer hair, or that boys wear blue and have shorter hair, are** examples of **socially constructed gender roles from a particular culture and historical period.** | ¶ 19: **Gender roles are behaviors, attitudes, and personality traits that a particular society considers masculine or feminine**, or **associates with male or female social roles**. For example, **the convention that girls wear pink and have longer hair, or that boys wear blue and have shorter hair, are socially constructed gender roles from a particular culture and historical period.** |
| ¶ 21: **By contrast, "gender identity" does not refer to** a set of **socially contingent behaviors, attitudes, or personality traits** that a society designates as masculine or feminine. It **is an internal and** largely **biological phenomenon**. | ¶ 20: **By contrast, gender identity is an internal and biologically** influenced **phenomenon**. It **does not refer to socially contingent behaviors, attitudes, or personality traits.** |
| ¶ 49: **By** excluding girls who are transgender based on "**biological sex**," and defining that term **to mean** "**reproductive biology and genetics at birth**," West Virginia categorically **prevents girls who are transgender from participating on girls' teams** regardless of whether they are pre- | ¶ 47: **By** suggesting sex **to mean** only **biological sex determined at fertilization and revealed in utero or at birth**, Arizona **prevents Plaintiffs from participating on girls' teams** because they are transgender girls. **But the biological driver of average differences in athletic performance** |

4

| Dr. Safer's January 21, 2022 Report and Declaration (publicly filed April 21, 2022) (Ex. 4) | Dr. Shumer's October 10, 2024 Report (Ex. 2) |
|---|---|
| pubertal, receiving puberty blockers, or receiving gender-affirming hormone therapy. **But** based on current research, **the** primary known **biological cause of average differences in athletic performance between nontransgender men as a group and non-transgender women as a group is circulating testosterone**—not "reproductive biology and genetics at birth." A person's **genetic makeup and** internal and external reproductive **anatomy are not useful indicators of athletic performance** and have not been used in elite competition for decades. | **between men and women is circulating testosterone—not a person's transgender status or their biological sex determined at fertilization and revealed in utero or at birth**. **A person's genetic makeup and anatomy** at birth alone **are not reliable indicators of athletic performance**. |

These are just a few examples of Dr. Shumer's plagiarism. To assist the Court, Exhibit 5 contains a counsel-prepared demonstrative of Dr. Shumer's plagiarism in this case based on Exhibits 2, 3, and 4.

**Dr. Shumer admitted that he plagiarized his opinions.**

Dr. Shumer's employer, the University of Michigan, defines plagiarism as "the appropriation of another person's ideas, processes, results, or words without giving appropriate credit." Ex. 1, 239:10-14; *see also* U-M Standard Practice Guide, *Procedures for Investigating Allegations of Misconduct in the Pursuit of Scholarship and Research under SPG 303.03*, B.3, attached as Exhibit 6. After being confronted with his pervasive plagiarism, Dr. Shumer admitted that "it's clear that some of the words I used were used from other sources without appropriate credit and that that meets [the University of Michigan's] definition." Ex. 1, 240:21-24. Dr. Shumer questioned whether the University of Michigan policy applied to his expert report—which is irrelevant to the definition of plagiarism—but he conceded that his actions satisfied the definition. *Id.* at 240:14-241:1. For that matter, Dr. Shumer's own definition of plagiarism—"using other people's work without incorporating your own thoughts into it," *id.* at 202:19-23—also would apply to the paragraphs he took from the reports of Dr. Rosenthal and Dr. Safer.

5

After being confronted with his pervasive plagiarism, Dr. Shumer repeatedly admitted that he should have cited the other expert reports. *Id.* at 234:1-13, 235:10-11, 235:25-236:1. He ultimately recognized that it was a mistake to not do so. *Id.* at 234:11-13.

**Dr. Shumer's plagiarism does not appear to be confined to this case.**

A cursory review of Dr. Shumer's expert reports in other cases indicates that this case is not the first time that he has used plagiarized material. For example, paragraphs substantially similar to those that Dr. Shumer plagiarized in this litigation have been located in his declarations and reports in a dozen other federal cases.[1] This means that plagiarism questions surround every federal case disclosed by Dr. Shumer, and some that he did not disclose, in which he has participated since Dr. Rosenthal and Dr. Safer issued their expert reports. These cases include challenges to other State laws as well as President Trump's executive orders.

---

[1] Expert Declaration of Daniel Shumer, M.D., *PFLAG, Inc. v. Trump*, No. 8:25-cv-337 (D. Md. Feb. 18, 2025), ECF No. 69-50, ¶¶ 27-29, 31, 38, 46, 48, 52, 55, 59; Expert Declaration of Daniel Shumer, MD, *Washington v. Trump*, No. 2:25-cv-244 (W.D. Wash. Feb. 7, 2025), ECF No. 19, ¶¶ 27-29, 31, 38, 46, 48, 52, 55, 59; Expert Report of Daniel Shumer, M.D., *Voe v. Mansfield*, No. 1:23-cv-864 (M.D.N.C. Oct. 10, 2024), ECF No. 138-19, ¶¶ 27-29, 31, 37, 45, 47, 50, 53, 58; Expert Declaration of Daniel Shumer, M.D., *Misanin v. Wilson*, No. 2:24-cv-4734 (D.S.C. Aug. 30, 2024), ECF No. 7-4, ¶¶ 25-27, 35, 39, 43, 46, 50, 55, 58; Declaration of Daniel Shumer, M.D. in Support of Plaintiffs' Motions for Preliminary Injunction and Plaintiff Parker Tirrell's Motion for Temporary Restraining Order, *Tirrell v. Edelblut*, No. 1:24-cv-251 (D.N.H. Aug. 16, 2024), ECF No. 7-6, ¶¶ 14, 16-17, 19, 21, 23-27, 29-30; Plaintiff-Intervenor United States' Disclosure of Expert Testimony of Daniel Shumer, MD, MPH, *Boe v. Marshall*, No. 2:22-cv-184 (M.D. Ala. June 24, 2024), ECF No. 592-14, ¶¶ I.2-5, III.1, IV.1, IV.3, IV.5-6, IV.9; Expert Report of Dr. Daniel Shumer, MD, MPH, *Roe v. Cunico*, No. 4:20-cv-484 (D. Ariz. Nov. 17, 2023), ECF No. 233-2, ¶¶ 18, 22, 24-34; Declaration of Daniel Shumer, M.D., *Koe v. Noggle*, No. 1:23-cv-2904 (N.D. Ga. June 29, 2023), ECF No. 2-8, ¶¶ 24-27, 37, 42, 46, 49, 53, 59; Declaration of Daniel Shumer, M.D., *Doe v. Thornbury*, No. 3:23-cv-230 (W.D. Ky. May 22, 2023), ECF No. 17-1, ¶¶ 25-27, 35, 39, 43, 46, 50, 56; Expert Declaration of Daniel Shumer, M.D., *Doe v. Ladapo*, No. 4:23-cv-114 (N.D. Fla. Apr. 24, 2023), ECF No. 30-4, ¶¶ 24-27, 35, 39, 43, 46, 50, 56; Expert Declaration of Daniel Shumer, M.D., *K.C. v. The Individual Members of the Med. Licensing Bd. of Indiana*, No. 1:23-cv-595 (S.D. Ind. Apr. 21, 2023), ECF No. 26-2, ¶¶ 26-28, 30, 35, 43, 44, 49; Expert Report of Daniel Shumer, M.D., *Dekker v. Weida*, No. 4:22-cv-325 (N.D. Fla. Apr. 7, 2023), ECF No. 120-22, ¶¶ 25-28, 36, 41, 45, 48, 52, 57. These declarations and reports also may contain other instances of plagiarism in addition to the paragraphs identified in this case.

**ARGUMENT**

The district court has a "gatekeeping role" that it must apply to all expert testimony. *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020). Under the Federal Rules of Evidence and *Daubert*, expert testimony must be both relevant and reliable. *Guidroz-Brault v. Missouri Pac. R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001). The key is whether "the expert's findings are based on sound science." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995).

Even in a bench trial, the court must still "exclude . . . or disregard" expert testimony "if it turns out not to meet the standard of reliability established by Rule 702." *United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018) (quotations omitted). Furthermore, "the *Daubert* standard can be invoked at the summary judgment stage" and can often "be dispositive" or "at the very least, . . . limit the issues for trial." *Nixon-Egli Equip. Co. v. John A. Alexander Co.*, 949 F. Supp. 1435, 1447 (C.D. Cal. 1996). In this case, Dr. Shumer's proposed testimony is not reliable because he plagiarized most of his expert report and otherwise lacks the qualifications and objective support for his opinions.

**I.   Dr. Shumer should be excluded as unreliable because of his pervasive plagiarism.**

Dr. Shumer's extensive plagiarism warrants excluding him as an expert in this case. The Northern District of California excluded an expert's opinions that were "almost entirely copied and pasted" from another expert report. *Snyder v. Bank of Am., N.A.*, No. 15-CV-04228, 2020 WL 6462400, at *4 (N.D. Cal. Nov. 3, 2020) (identifying 11 plagiarized paragraphs). The *Snyder* court found that the plagiarism "emphasizes that Plaintiff lacks expertise in these areas." *Id.*

Here, Dr. Shumer plagiarized at least 19 of the 34 substantive paragraphs in his report. Dr. Shumer admitted that paragraphs in his report contained identical text to reports by Dr. Rosenthal and Dr. Safer. *See* Ex. 1, 204:15-17, 211:19-24, 222:25-223:3, 225:7-8. He also admitted that other paragraphs were virtually identical to the other experts' reports. *Id.* at 205:18-20, 216:22-217:1, 226:2-4, 226:21-25, 227:12-15, 228:18-229:1.

Dr. Shumer plagiarized "a report written by an unrelated expert in a different case." *In re Cathode Ray Tube Antitrust Litig.*, No. 07-CV-05944, 2022 WL 4596621, at *2 (N.D. Cal. Aug. 1, 2022). The Middle District of Florida excluded an expert who "copied and pasted large sections of her report from a report written by . . . an apparel expert whom [the defendant] retained in another trademark case." *Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*, No. 6:15-CV-641, 2017 WL 11457208, at *2 (M.D. Fla. Apr. 13, 2017). Similarly, the Eastern District of Louisiana excluded an expert because "many of his sentences were nearly identical" to another expert. *Moore v. BASF Corp.*, No. CIV.A. 11-1001, 2012 WL 6002831, at *7 (E.D. La. Nov. 30, 2012). Like the excluded experts in *Spiral Direct* and *Moore*, Dr. Shumer plagiarized unrelated experts in different cases pending in West Virginia and Alabama.

Dr. Shumer even plagiarized "his case-specific opinions." *Contrast Thomsen v. NaphCare, Inc.*, No. 3:19-CV-00969-AR, 2023 WL 8701971, at *7 (D. Or. Dec. 15, 2023). Dr. Shumer's opinions on athletic performance and testosterone came from Dr. Safer. *See* Ex. 5 (comparing Shumer ¶¶ 36-37, 47 *with* Safer ¶¶ 25, 49). Dr. Shumer's opinions on gender dysphoria and transition came from Dr. Rosenthal. *See id.* (comparing Shumer ¶¶ 23, 26, 28-34 *with* Rosenthal ¶¶ 22-24, 26-27, 29, 32, 36, 39).

Dr. Shumer's plagiarism should be undisputed. Once confronted with the numerous identical and virtually identical paragraphs, Dr. Shumer initially said that his words were "close enough to plagiarism that I wish I would have cited the materials differently." Ex. 1, 235:25-236:1. He acknowledged that it was a mistake not to cite Dr. Rosenthal or Dr. Safer. *Id.* at 234:11-13. Then when presented with the University of Michigan's definition for plagiarism, Dr. Shumer testified that "it's clear that some of the words [he] used were from other sources without appropriate credit and that that meets this definition." *Id.* at 240:21-24.

Dr. Shumer should be excluded because of his pervasive plagiarism of other experts, including plagiarism of his case-specific opinions. This is even more true considering the possible plagiarism in at least 12 other cases. Dr. Shumer is not a reliable expert witness.

**II.     Dr. Shumer should be excluded as unreliable because of his attempts to conceal his pervasive plagiarism.**

"An expert's attempt to conceal plagiarism may also undercut his reliability." *Thomsen*, 2023 WL 8701971, at *6. Dr. Shumer should be excluded because he covered up his plagiarism until confronted at his deposition.

First, Dr. Shumer testified that his report contained his words. He claimed that the words in the report were his. Ex. 1, 13:2-6, 59:5-7. He testified that he took sources identified in his report and distilled them into his own words. *Id.* at 114:12-22, 115:5-16. He explained that his "Sports and Gender" opinions "came from me thinking about the -- the question at hand and providing my expert opinion." *Id.* at 14:12-13.

In a case involving another plagiarizing expert, the Eastern District of Louisiana excluded an expert after finding it "particularly problematic" that the expert "testified that the report he [proffered] was his original drafting . . . ." *Moore*, 2012 WL 6002831, at *7. The Court of Federal Claims also refused to rely on the opinion of an expert who "attempted to pass off another's work as his own." *Raymo v. Sec'y of Health & Hum. Servs.*, No. 11-0654V, 2014 WL 1092274, at *16 (Fed. Cl. Feb. 24, 2014). And the Middle District of Florida excluded an expert as unreliable after the expert "attempt[ed] to appropriate the opinions of [another expert] and play them off as her own, . . ." *Spiral Direct*, 2017 WL 11457208, at *2. Like the experts in *Moore*, *Raymo*, and *Spiral Direct*, Dr. Shumer's opinions should be excluded because he wrongly attempted to pass off the work of others as his own.

Second, Dr. Shumer testified that he had cited all the scientific research he gathered for his report. Ex. 1, 15:1-16:3. Dr. Shumer expressly said that he cited to "the research that I used in forming my opinion." *Id.* at 15:4-5. Dr. Shumer also reported that he relied on only a single source for his "Sports and Gender" opinions. *Id.* at 122:9-25. And Dr. Shumer did not cite to the reports by Dr. Safer or Dr. Rosenthal. *See* Ex. 2; *see also* Ex. 1, 232:6-14.

"Courts have also excluded as unreliable experts who gave 'deliberately misleading'

9

answers to questions about their reports or falsely swore under oath that they had provided all documents relied upon in creating their reports." *Thomsen*, 2023 WL 8701971, at *6. In one case, for example, the expert "testified under oath that all of the documents she relied upon in this case were attached as exhibits to her report." *Spiral Direct*, 2017 WL 11457208, at *2. However, the report that the expert plagiarized "was not among" the "nearly two hundred pages of documents attached to the report." *Id.* The expert "did not provide any citation or attribution to [the other expert] as the source of large sections of her report." *Id.* Like the expert in *Spiral Direct*, Dr. Shumer's opinions should be excluded because he did not cite the expert reports that he was plagiarizing.

Third, Dr. Shumer testified that he had not read expert reports from Dr. Rosenthal or Dr. Safer. When specifically asked if he had reviewed "any expert report that Dr. Rosenthal has written in any case," Dr. Shumer responded that he was "not aware of seeing anything like that." Ex. 1, 202:3-5. Dr. Shumer also initially testified that he had not reviewed any of the expert reports in West Virginia or any other sports case in which he was not involved. *Id.* at 43:25-44:3. For that matter, Dr. Shumer said that he did not even know who the experts were in those cases. *Id.* at 44:4-5.

"Reliability is undermined, for example, when an expert falsely testifies under oath that he has not reviewed any other expert reports, despite having copied his conclusions from another expert report in the same case." *Thomsen*, 2023 WL 8701971, at *6. In addition to criticizing the plagiarizing expert for claiming his report "was his original drafting," the Eastern District of Louisiana found it "particularly problematic" that the expert testified "that he had not reviewed other expert reports." *Moore*, 2012 WL 6002831, at *7. Only after being confronted with the copying did the expert concede "he saw" the other report "and at the very least took notes." *Id.* "The likelihood that substantial portions of [plaintiffs' expert] report do not reflect his original work is yet another reason the Court finds that [plaintiffs' expert] opinions in general are unreliable." *Id.* Like the expert in *Moore*, Dr. Shumer's opinions should be excluded because he denied reviewing other expert reports.

Fourth, Dr. Shumer testified that he did not plagiarize Dr. Safer or Dr. Rosenthal. When directly asked if he plagiarized either expert's report, Dr. Shumer denied it. Ex. 1, 202:6-17.

"[W]hen the plagiarism is so blatant that it represents deliberate lack of candor, it may cause the report to be unreliable enough to justify exclusion." *Henderson v. Lockheed Martin Corp.*, 723 F. Supp. 3d 1147, 1151 (M.D. Fla. 2024). Like in *Henderson*, "[h]ere, there is no question that Dr. [Shumer] extensively plagiarized his report." *Id.* "A side-by-side comparison speaks for itself." *Id.*; *see also* Ex. 5. "Because the report indicates a lack of intellectual rigor that one would expect from *any* expert, the plagiarism in itself is sufficient reason for exclusion here." *Henderson*, 723 F. Supp. 3d at 1152 (emphasis original). Due to the expert's plagiarism, the *Henderson* court excluded the expert at the summary judgment stage. *Id.* at 1154.

Dr. Shumer's plagiarism, and his attempts to avoid acknowledging it, are substantively no different than what happened in the *Henderson*, *Moore*, *Raymo*, and *Spiral Direct* cases. Dr. Shumer passed the work off as his own. He claimed to have cited all the sources for his opinions, even though he did not cite to either expert report that he plagiarized. He also denied reviewing the expert reports. Finally, Dr. Shumer directly denied plagiarizing the reports before he was presented with numerous examples of his plagiarism.

For these reasons, Dr. Shumer's extensive plagiarism requires his exclusion. Dr. Shumer admitted that he committed plagiarism as defined in the Standard Practice Guide of his employer, the University of Michigan. *See* Ex. 1, 240:21–241:1. Accordingly, he failed to "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

**III.  Dr. Shumer should be excluded as unreliable because his opinions lack the necessary qualifications and support.**

Plagiarism "may demonstrate the proffered expert's lack of expertise." *Thomsen*,

2023 WL 8701971, at *6. Dr. Shumer's extensive plagiarism underscores his lack of expertise on the issues relevant to this case.

### A. Dr. Shumer is not qualified to offer expert opinions on sports.

"The question of admissibility only arises if it is first established that the individuals whose testimony is being proffered are experts in a particular scientific field; . . ." *Daubert*, 43 F.3d at 1315. Rule 702 requires an expert to be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Dr. Shumer lacks the sufficient qualifications to serve as an expert on sports-related issues.

Dr. Shumer does not have any education or training relevant to his sports performance opinions. Dr. Shumer does not have a degree in sports science, exercise science, kinesiology, athletic training, or physical education. Ex. 1, 115:19-21, 116:3-4, 116:11-12, 116:19-20, 117:2-3. Dr. Shumer also has not taken any classes in his formal education on exercise science, kinesiology, physical education, exercise physiology, motor control, or sports psychology. *Id.* at 118:22-119:8.

Dr. Shumer also does not have any experience or skill relevant to his sports performance opinions. Dr. Shumer has not competed in the Olympics or any level beyond high school. *Id.* at 120:8-12. Dr. Shumer has not coached athletes in middle school, high school, college, professional sports, or the Olympics. *Id.* at 120:14-23. Dr. Shumer has never coached girls' sports. *Id.* at 121:7-8. Furthermore, Dr. Shumer has not observed any of his patients playing sports, timed them running, or measured their jumps, grip strength, or muscle mass. *Id.* at 143:4-17. When it came to his knowledge of body changes due to puberty, Dr. Shumer admitted that he was not an expert in "[e]xtrapolating those to how each of those changes impact sports performance in various sports." *Id.* at 143:24-144:1.

Dr. Shumer further testified that he was not an expert in sports participation, track and field, volleyball, basketball, or cross-country. *Id.* at 121:7-23. Dr. Shumer also acknowledged that he was not an expert on what constitutes an unfair competitive advantage in sports. *Id.* at 121:24-122:1, 141:3-5, 142:11-16, 176:10-15. Dr. Shumer explained that he was "not presenting any expertise in inclusion or exclusion from sports,"

and he was "not an expert on a body of literature related to that." *Id.* at 123:11-17. Dr. Shumer also testified that he was not an expert on when it was appropriate to separate men and women on the basis of sex in sports. *Id.* at 147:19-148:4, 149:7-10.

Dr. Shumer does not possess the qualifications needed to testify on issues relating to sports. His opinions should be excluded.

### B. Dr. Shumer has no objective proof of his own demonstrating that his opinions are good science.

"One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert*, 43 F.3d at 1317. "That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science." *Id.*

Dr. Shumer has no independent research related to his opinions in this case. Dr. Shumer has not published any peer-reviewed articles on sports science, exercise science, kinesiology, athletic training, or physical education. Ex. 1, 115:22-24, 116:5-7, 116:13-15, 116:21-23, 117:4-6. Nor has Dr. Shumer published or conducted research on the prepubertal differences between natal boys and girls. *Id.* at 123:1-6. "That plaintiffs' experts have been unable or unwilling to publish their work undermines plaintiffs' claim that the findings these experts proffer are 'ground[ed] in the methods and procedures of science' and 'derived by the scientific method.'" *Daubert*, 43 F.3d at 1318 n. 9 (citation omitted). Indeed, "the lack of any peer review or publication" of Dr. Shumer's sports performance theories "cuts against the reliability of [Dr. Shumer's] opinions regarding such in this case. *Martinez v. Terex Corp.*, 241 F.R.D. 631, 639 (D. Ariz. 2007).

Dr. Shumer also has not conducted any primary research on sports science, exercise science, kinesiology, athletic training, or physical education. Ex. 1, 115:25-116:2, 116:8-10, 116:16-18, 116:24-117:1, 117:7-9. Furthermore, Dr. Shumer has not gathered or evaluated any sports data at any level. *Id.* at 185:17-22. "[I]t is clear that the opinion is

not based upon any independent research, but rather has arisen solely in the context of this litigation." *Martinez*, 241 F.R.D. at 640.

In short, Dr. Shumer did not "base[] his testimony on preexisting or independent research." *Daubert*, 43 F.3d at 1317.

### C. Dr. Shumer has no objective proof from others demonstrating that his opinions are good science.

"If the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'" *Id.* at 1317-18. Since Dr. Shumer has no independent research on sports performance, this rule requires Plaintiffs to present "other objective, verifiable evidence" supporting Dr. Shumer's opinions. *See id.* "One means of showing this is by proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication." *Id.* at 1318.

Almost all of Dr. Shumer's "Sports and Gender" and case-specific opinions do not identify any scientific support. Of the 15 paragraphs in the final two sections of Dr. Shumer's report, 14 paragraphs are not supported by any citation. Ex. 2, ¶¶ 35-36, 38-49. For example, Dr. Shumer provides no scientific support for his opinion that "[b]efore puberty, girls and boys generally perform at the same level with some small differences at the margins (some favoring boys, some favoring girls)." *Id.* at ¶ 36; Ex. 1, 131:7-9. Dr. Shumer also cited no peer-reviewed literature or other authorities to support his next sentence, in which he opined, "In contrast, post-pubertal boys as a group generally begin to show a significant athletic advantage over post-pubertal girls due to their exposure over time to the elevated levels of testosterone associated with male puberty." Ex. 2, ¶ 36; Ex. 1, 136:17-19. Four other substantive paragraphs came exclusively from information from Plaintiffs' counsel. Ex. 2, ¶¶ 42-45. Dr. Shumer did not independently verify any of this information. Ex. 1, 242:12-18.

Dr. Shumer's unsupported opinions should be excluded. "Rule 702 requires that

expert testimony relate to scientific, technical, or other specialized knowledge, which does not include unsupported speculation and subjective beliefs." *Guidroz-Brault*, 254 F.3d at 829. Courts have excluded experts who failed to cite a single study supporting their opinions. *See, e.g.*, *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998); *Garcia v. Reebok Int'l Ltd.*, CV-13-02785, 2014 WL 12558296, at *4 (C.D. Cal. Feb. 14, 2014); *see also McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004) ("an expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions"). "[T]he *ipse dixit* of the expert" is insufficient. *Gen. Elect. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Only one paragraph in Dr. Shumer's final two sections contains a citation, and it is to a single article. Ex. 2, ¶ 37; Ex. 1, 122:9-12. Dr. Shumer understood that his report should provide all the necessary support for his opinions. Ex. 1, 122:22-25. However, he did not cite any other journal articles or other sources to support his "Sports and Gender" opinions. *Id.* at 122:13-21.

The only article cited by Dr. Shumer, by Handelsman (2018), does not even support Dr. Shumer's opinions. First, Dr. Shumer admitted that boys always had an advantage over girls in a figure in the article that shows running and jumping data. *Id.* at 153:3-24, 156:24-157:5. Second, Dr. Shumer could not identify any data or information in the article relating to prepubertal children. *Id.* at 152:25-153:2, 155:20-156:23. Third and finally, the Handelsman article is secondary research, which means it is simply reviewing articles. *Id.* at 146:21-147:4.

Dr. Shumer's inability to objectively support his opinions casts grave doubt on the reliability of his opinions. This doubt is exacerbated by Dr. Shumer's admissions that at least some of his opinions came as a result of litigation. Dr. Shumer admitted that he was offering opinions on a "scientific question"—the definitions of gender identity and biological sex—that he did not consider until he became a litigation expert witness. *Id.* at 67:1-8, 68:7-10. Dr. Shumer could not remember being asked about the definitions of gender identity or biological sex outside of litigation. *Id.* at 68:17-20.

15

Dr. Shumer's opinions lack reliability because he has failed to present objective proof that they represent good science. His opinions should be excluded.

## CONCLUSION

For these reasons, President Petersen and Speaker Montenegro respectfully request that the Court exclude Dr. Shumer's testimony and reports from this litigation. In the alternative, President Petersen and Speaker Montenegro request that a *Daubert* hearing be held for Dr. Shumer.

Dated: March 5, 2025                    Respectfully submitted,


                                        JAMES OTIS LAW GROUP, LLC

                                        */s/ Justin D. Smith*
                                        D. John Sauer, Mo. Bar No. 58721*
                                        Justin D. Smith, Mo. Bar No. 63253*
                                        Michael E. Talent, Mo. Bar No. 73339*
                                        Kenneth C. Capps, Mo. Bar No. 70908*
                                        13321 North Outer Forty Road, Suite 300
                                        St. Louis, Missouri 63017
                                        (816) 678-2103
                                        Justin.Smith@james-otis.com
                                        * pro hac vice

                                        *Attorneys for Intervenor-Defendants President Petersen and Speaker Montenegro*

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 5, 2025, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ Justin D. Smith*