1

2

3

4

5

Colin M. Proksel (034133)
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:    (602) 640-9000
Facsimile:    (602) 640-9050
Email:    cproksel@omlaw.com

6

*Attorney for Plaintiffs*
*Additional counsel listed in signature block*

7

8

9

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**
**TUCSON DIVISION**

10

11

12

13

14

Jane Doe, by her next friend and parents
Helen Doe and James Doe; and Megan Roe,
by her next friend and parents, Kate Roe and
Robert Roe,

                Plaintiffs,

    v.

15

16

17

18

19

Thomas C. Horne in his official capacity as
State Superintendent of Public Instruction;
Laura Toenjes, in her official capacity as
Superintendent of the Kyrene School
District; Kyrene School District; The
Gregory School; and Arizona Interscholastic
Association Inc.,

20

                Defendants,

21

22

23

Warren Petersen, in his official capacity as
President of the Arizona State Senate, and
Ben Toma, in his official capacity as
Speaker of the Arizona House of
Representatives,

24

                Intervenor-Defendants.

Case No. 4:23-cv-00185-JGZ

**PLAINTIFFS' OPPOSITION TO
INTERVENOR-DEFENDANTS'
MOTION TO EXCLUDE
TESTIMONY AND REPORTS OF
DR. DANIEL E. SHUMER, M.D. AND
REQUEST FOR EXPEDITED
RULING**

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Intervenor-Defendants have moved to exclude evidence from Dr. Daniel E. Shumer, M.D., by wrongly accusing him of "plagiarizing" two declarations—one from Dr. Stephen Rosenthal[1] and one from Dr. Joshua Safer[2]—filed in other cases in 2022. However, Intervenor-Defendants failed to mention a critical fact in both their deposition of Dr. Shumer and motion to this Court:[3] that Dr. Shumer's testimony in this case is consistent with publicly-available evidence he gave in this District in 2020 (Ex. E)—***before*** the 2022 Rosenthal Declaration and 2022 Safer Declaration. Intervenor-Defendants' allegations against Dr. Shumer are baseless.

*First*, Intervenor-Defendants' accusations in their motion regarding so-called "plagiarism" are false. Dr. Shumer's own prior testimony shows that Dr. Shumer's opinions and language in this case pre-date the 2022 Rosenthal Declaration and 2022 Safer Declaration, have remained consistent over time, and reflect his own thoughts and ideas. Moreover, to the extent there is any overlap between Dr. Shumer's and another endocrinologists' discussion of standard endocrinological principles, such similarities reflect established medical knowledge rather than case-specific opinions, and do not constitute plagiarism or provide grounds for excluding Dr. Shumer's testimony in this case.

*Second*, Dr. Shumer is eminently qualified to offer his opinion as an expert in this case. He is a highly distinguished pediatric endocrinologist at a world-class children's hospital and the only medical doctor in this case with experience treating transgender adolescents. Dr. Shumer is an expert on puberty and specifically on the impact of sex hormones on the body during puberty. He is an expert on the impact of puberty-suppressing medication and hormone replacement therapy taken in adolescence. And he

---

[1]    *See* ECF No. 265-3 ("2022 Rosenthal Declaration").
[2]    *See* ECF No. 265-4 ("2022 Safer Declaration").
[3]    Intervenor-Defendants also omitted this fact in their actions outside this Court against Dr. Shumer. For example, Intervenor-Defendant Petersen omitted this fact in a press release accusing Dr. Shumer of plagiarism and implying "criminal and academic consequences" against him may follow. (*See* Ex. A.) Intervenor-Defendant Petersen omitted this fact in social media posts to the same effect on his official X account. (*See* Ex. B; Ex. C). And both Intervenor-Defendants omitted this fact in their letter to U.S. Attorney General Bondi about Dr. Shumer. (*See* Ex. D.)

is an expert regarding the treatment of patients with gender dysphoria.  The depth of his real-world, relevant expertise explains why Intervenor-Defendants seek to exclude his testimony.  But there is no basis to do so or to question his reliability and credibility.

For these reasons and those that follow, Intervenor-Defendants' motion to exclude Dr. Shumer's reports and testimony should be denied with prejudice.

## **BACKGROUND**

Plaintiffs are two transgender girls challenging Arizona Revised Statute § 15-120.02 (the "Ban") as applied to them because it categorically bans Plaintiffs as transgender girls from playing on girls' sports teams in violation of the Equal Protection Clause, Title IX, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act.  In support of their claims, Plaintiffs identified and disclosed expert reports from, among others, Dr. Shumer, a pediatric endocrinologist and Clinical Director of Child and Adolescent Gender Services ("CAGS") at C.S. Mott Children's Hospital in Michigan.

Dr. Shumer is a highly regarded medical practitioner with many years of experience working with transgender adolescents.  In addition to his work at the C.S. Mott Children's Hospital, Dr. Shumer is the Medical Director of the Comprehensive Gender Services Program at Michigan Medicine, University of Michigan and a Clinical Associate Professor of Medicine at the University of Michigan where he focuses on the treatment of transgender adolescents.  (ECF No. 265-2 ("Shumer Rep.") ¶ 1; ECF No. 265-1 ("Shumer Dep. Tr.") 17:1–2.)  The CAGS Clinic has treated over 1,000 patients since it was founded in 2015, and Dr. Shumer has personally treated approximately 450 of those patients, including 300 transgender girls.  (Shumer Rep. ¶¶ 4–5; Shumer Dep. Tr. 47:8–19; Ex. F ("Shumer Rebuttal") ¶¶ 43, 109.)  In addition to his extensive clinical work, Dr. Shumer has published numerous peer-reviewed articles related to the development and treatment of transgender children and adolescents.  (Shumer Rep. ¶ 8.)  Relying on medical literature and his deep experience working with transgender children and youth, Dr. Shumer provided background information on gender identity and gender dysphoria from a medical perspective and provided the following opinions, among others, as a pediatric endocrinologist:

1. Gender identity is an innate, immutable biological component of sex. (*Id.* ¶¶ 16, 17, 20, 21, 24.)

2. Being transgender is not an accurate proxy for athletic performance or ability. (*Id.* ¶¶ 35, 40; Shumer Rebuttal ¶ 43.)

3. The biological driver of average group differences in athletic performance is circulating testosterone, not anatomy or genetics. (Shumer Rep. ¶¶ 37, 47; Shumer Rebuttal ¶ 4.)

4. There is no medical justification for Arizona to exclude Plaintiffs from girls' sports teams because they have not undergone male puberty and "have not experienced increased testosterone levels that accompany male puberty." (Shumer Rep. ¶¶ 41–45, 48; Shumer Rebuttal ¶¶ 20, 108, 125.)

5. Forcing Plaintiffs to play on boys' teams would conflict with the standards of care for treating gender dysphoria in adolescents, and would be harmful to Plaintiffs' mental, emotional, and physical health. (Shumer Rep. ¶¶ 27, 32, 49.)

Dr. Shumer's training and experience working with transgender children and youth makes him highly qualified to give these opinions and provide expert testimony in this action. He has provided an expert opinion in approximately 15 litigations related to transgender individuals in the past five years (Shumer Dep. Tr. 22:20–23), such testimony has never been excluded, and his reports and declarations have been consistent throughout that period.

A review of Dr. Shumer's declarations and reports from various actions dating back to 2016 demonstrate that his written opinions are consistent. They each begin with Dr. Shumer's background and qualifications, followed by a section containing scientific and medical definitions of sex, gender identity, and gender dysphoria. These definitions largely mirror the language contained in the Endocrine Society's clinical guidelines and the WPATH Standards of Care, which Dr. Shumer discusses in his reports. The reports

then generally discuss the medical treatment for gender dysphoria, before engaging in the specific questions relevant to the particular matter for which they are offered.

For example, Dr. Shumer's <u>November 2, 2020</u>, Declaration from *Roe v. Herrington*, 4:20-cv-00484-JAS (D. Ariz. November 4, 2020), ECF No. 3-3 (attached hereto as Exhibit E), contains much of the same language that Intervenor-Defendants accuse him of "plagiarizing" from the 2022 Rosenthal Declaration in *Boe v. Marshall*, 2:22-cv-184-LCB (M.D. Ala.) dated <u>April 19, 2022</u>:

| Dr. Shumer's November 2, 2020, Declaration (*Roe v. Herrington,* 4:20-cv-484-JAS (D. Ariz), Dkt. 3-3) | Dr. Shumer's Oct. 10, 2024, Report in this case (ECF No. 265-2) |
|---|---|
| ¶ 25: Gender identity is a person's inner sense of belonging to a particular gender, such as male or female. It is a deeply felt and core component of human identity. Everyone has a gender identity. | ¶ 16: "Gender identity" is the medical term for a person's internal, innate sense of belonging to a particular sex.  Everyone has a gender identity. |
| ¶ 26: A person's gender identity is innate, cannot be voluntarily changed, and is not undermined by the existence of other sex-related characteristics that do not align with it. | ¶ 21: A person's gender identity is innate and cannot be changed, including by medical or psychological intervention. |
| ¶ 27: Any attempts "cure" [sic] transgender individuals by forcing their gender identity into alignment with their assigned sex are harmful, dangerous, and ineffective. Those practices have been denounced as unethical by all major professional associations of medical and mental health professionals, such as the American Medical Association, the American Psychiatric Association, the American Psychological Association, and WPATH. | ¶ 23: Attempts to "cure" transgender individuals by forcing their gender identity into alignment with their birth sex are harmful and ineffective. Those practices have been widely denounced as unethical by all major professional associations of medical and mental health professionals, such as the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, and the American Psychological Association, among others. |

| | |
|---|---|
| ¶ 19: Instead, a person's sex is comprised of a number of components, including, among others, internal reproductive organs, external genitalia, chromosomes, hormones, gender identity, and secondary-sex characteristics. Diversity and incongruence in these components of sex are a naturally occurring source of human biological diversity. | ¶ 24: From a medical perspective, a person's sex is comprised of several components, including, among others, internal reproductive organs, external genitalia, chromosomes, hormones, gender identity, and secondary-sex characteristics. Diversity and incongruence in these components of sex are a naturally occurring source of human biological diversity. |
| ¶ 23: At birth, newborns are assigned a sex, either male or female, based solely on the appearance of their external genitalia. For most people, that assignment turns out to be accurate and their assigned sex matches that person's gender identity. However, for transgender people, their assigned sex does not align with their gender identity | ¶ 25: When a child is born, a healthcare provider designates the child's sex as male or female based on the child's observable anatomy. For most people, that initial designation (often referred to as "assigned sex") turns out to be consistent with the person's gender identity. For a transgender person, however, that initial designation turns out to be inaccurate because it does not reflect the person's gender identity. |
| ¶ 29: Due to the incongruence between their assigned sex and gender identity, transgender people experience varying degrees of gender dysphoria, a serious medical condition listed in both the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5") and the World Health Organization's *International Classification of Diseases* ("ICD-10"). | ¶ 26: Due to the incongruence between their assigned sex and gender identity, transgender people experience varying degrees of gender dysphoria, a serious medical condition recognized in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5-TR") and the World Health Organization's *International Classification of Diseases* ("ICD-10"), where it is referred to as "gender incongruence." |
| ¶ 28: For more than four decades, the goal of medical treatment for transgender patients has been to alleviate their distress by bringing their lives into closer alignment with their gender identity. | ¶ 28: The goal of medical treatment for transgender patients is to alleviate their distress by allowing them to live consistently with their gender identity. |

A complete side-by-side comparison of each of the allegedly plagiarized paragraphs from Intervenor-Defendants' motion confirms that Dr. Shumer could not have plagiarized the 2022 Rosenthal Declaration as Intervenor-Defendants allege.  (*See* Ex. G (Comparison

Chart)).  Rather, they demonstrate that Dr. Shumer has consistently held and conveyed these background ideas over time.[4]

Likewise, a comparison of Dr. Shumer's 2020 declaration and the 2022 Safer Declaration in *B.P.J. v West Virginia*, 2:21-cv-316 (S.D.W.Va.) dated January 21, 2022, demonstrates the same point.  (*See* Ex. G.)  To the extent that there is overlapping language, it is because both endocrinologists cited to the same underlying sources, some of which— like the Endocrine Society clinical practice guidelines—provide the foundational language for care relating to transgender persons and are thus ubiquitous in the field.  *See, e.g.*, Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3875, Tbl. 1 (2017) (defining terms such as "gender identity" and "gender roles").

Intervenor-Defendants deposed Dr. Shumer on February 18, 2025, and rushed to file their motion on March 5, 2025, before the motion for summary judgment deadline.  In their motion, Intervenor-Defendants failed to draw the Court's attention to Dr. Shumer's evidence from 2020 predating both the 2022 Rosenthal Declaration and 2022 Safer Declaration.

On March 6, 2025, Intervenor-Defendant Warren Petersen published a press release on the Arizona Senate Republicans' website titled *Allegations of Plagiarism from Key Witness Uncovered in Arizona's Save Women's Sports Act Case*.  (Ex. A.)  In relevant part, it reads: "A motion filed Wednesday with the court alleges expert witness Dr. Daniel Shumer copied significant portions of his work and testimony in the case, compromising the credibility of the plaintiffs' position."  (*Id.*)  The release goes on to state, "[t]he alleged plagiarism may have serious implications in Arizona's case and similar cases around the country, with possible subsequent criminal and academic consequences."  (*Id.*)  Intervenor-Defendant Petersen is quoted in the release, adding that "[t]he ultimate gaslight is to say

---

[4]    Moreover, as discussed in more detail herein, it is not possible for these background ideas to be "stolen" from Dr. Rosenthal or Dr. Safer.  These are basic descriptions of bedrock endocrinological principles.  At no point has Dr. Shumer represented that he invented these basic concepts, definitions, or ideas in the field of endocrinology.

that a boy is a girl.  Now, we have learned that the expert witness did more than gaslight. We have presented the court with multiple examples of identical or virtually identical phrasing used by other academics without any attribution." (*Id.*)  Intervenor-Defendant Petersen also reposted this press release on his official X account, which has received over 67,000 views.  (Ex. B.)

On March 11, 2025, Intervenor-Defendant Petersen and Speaker Montenegro wrote a letter to U.S. Attorney General Bondi with the subject line: "Legal and Ethical Issues in Save Women's Sports Act Case." (Ex. D.)  This letter reads: "[W]e moved to exclude Dr. Shumer's testimony and reports from our litigation, primarily on the basis of what the motion calls 'extensive plagiarism.'" (*Id.*)  This letter was published on the Daily Caller, a news website, on March 17, 2025, and Intervenor-Defendant Petersen posted this article on his official X account on the same day.  (*See* Ex. C.)

## ARGUMENT

There is no basis to exclude Dr. Shumer's evidence.  Unlike the opinions of Intervenor-Defendants' and Defendant Horne's experts, Dr. Shumer's evidence is based on "trustworth[y]" science and more than "meet[s] the standard of reliability established by Rule 702." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 n.9 (1993); *United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018).

### I.      Intervenor-Defendants' Allegations Are Factually and Legally Baseless and Do Not Constitute Grounds for Exclusion.

Dr. Shumer's prior testimony contradicts Intervenor-Defendants' allegations that he drew these opinions from the 2022 Rosenthal Declaration and 2022 Safer Declaration; to the contrary, the opinions provided by Dr. Shumer in this case are fully consistent with those he voiced before.  In addition, any incidental similarities in wording between Dr. Shumer's report and those of Dr. Rosenthal or Dr. Safer regarding basic methodology or background information reflect universally accepted principles in pediatric endocrinology.   Such overlap concerning established medical knowledge does not

constitute plagiarism and provides no legal basis for excluding Dr. Shumer's testimony under the relevant case law.

### A. Intervenor-Defendants Fail to Prove that Dr. Shumer Plagiarized His Report.

The opinions in Dr. Shumer's report are his own and reflect his extensive experience as a pediatric endocrinologist and his knowledge of the medical literature. (Shumer Dep. Tr. 142:17–143:3, 144:2–19, 250:8–20, 252:9–23, 253:5–17.) Dr. Shumer's reports since 2016 show that Dr. Shumer's opinions and language have remained consistent during that time. A side-by-side comparison of Dr. Shumer's report in this action with a declaration he provided in another action in this District in 2020, demonstrates the consistency of his testimony before the 2022 Rosenthal Declaration and 2022 Safer Declaration. (*See* Ex. G.)

Every paragraph that Intervenor-Defendants cite as being "plagiarized" from the 2022 Rosenthal Declaration can be found in an earlier declaration made by Dr. Shumer in 2020. (Ex. E.) There is no prohibition on Dr. Shumer reusing portions of his prior reports to provide background information about the topics on which he opines for this matter. Where, as here, concepts such as "sex" and "gender identity" have an accepted meaning and there is a consensus in the medical community over the standards of care for treating transgender youth, Dr. Shumer's reuse of language from one of his earlier reports that is still accurate today is not plagiarism but an indicator of consistent reliability.

Intervenor-Defendants' argument that Dr. Shumer both denied *and* admitted during his deposition that he had plagiarized from the 2022 Rosenthal Declaration rests on distortions of, and failures to address critical portions of, the record. (*Compare* Mot. at 8 *with* Mot. at 9.) In fact, both assertions are incorrect. Dr. Shumer did not deny that he knew Dr. Rosenthal and even acknowledged that he had probably seen the 2022 Rosenthal Declaration because they both served as experts in that same case. (Shumer Dep. Tr. 201:15–24, 232:23–233:7.) When asked why his report was similar to Dr. Rosenthal's, Dr. Shumer did not state that he had plagiarized anything. Rather, he candidly explained that he could "imagine" that he "incorporated elements of that report in writing [his]

Alabama report which formed a general structure for the introduction to these topics in the report for this case." (*Id.* at 233:4–7.) As it turns out, Dr. Shumer did not incorporate elements of the 2022 Rosenthal Declaration. Looking at the chart at Exhibit G, it is easy to see why Dr. Shumer would have been led to believe that he had incorporated elements of the 2022 Rosenthal Declaration in light of the obvious similarities between the two. (Ex. G.) However, as explained above, Dr. Shumer had already used this language in his own evidence from 2020. (Ex. E.) Any alleged "admission" of so-called plagiarism during Dr. Shumer's deposition is therefore misguided and based on a false premise—that the language in his report post-dated the language in Dr. Rosenthal's—and misleading questions put to him in the deposition. Any such "admission" carries no weight in light of the concrete evidence that Dr. Shumer did not plagiarize from the 2022 Rosenthal Declaration.[5]

Intervenor-Defendants' allegations regarding the 2022 Safer Declaration are equally baseless. As with Dr. Rosenthal's report, most of the language in the earlier sections of Dr. Shumer's report—"Medical and Scientific Background on Gender Identity and Gender Dysphoria" and "The Medical Treatment of Gender Dysphoria in Adolescents"—was language Dr. Shumer had already used as early as 2020. While there is some limited overlap in structure and themes between Dr. Shumer's "Sports and Gender" section and the 2022 Safer Declaration, Dr. Shumer explained at his deposition that he was familiar with Dr. Safer's work and might have Dr. Safer's report for an Idaho case. Dr. Shumer stated that "in thinking through how I was wanting to present information around puberty and testosterone as it relates to sports, it certainly seems that I was inspired by some of the points that Dr. Safer made." (*Id.* at 233:7–13, 201:2–14.) Dr. Shumer acknowledged that given these structural similarities, he should have cited Dr. Safer in his report. (*Id.* at 233:12–13.)

---

[5]    The academic plagiarism standards at the University of Michigan that Intervenor-Defendants reference are wholly inapposite because they are confined to the specific context of academic scholarship. (Mot. at 5, 8, 11.) The University of Michigan's academic standards do not apply to expert reports in a civil litigation in a U.S. federal court.

The evidence also shows Dr. Shumer did not copy the 2022 Safer Declaration. Any overlapping language stems from both experts discussing the same underlying materials and clinical guidelines that reflect medical consensus on transgender adolescent treatment and the effects of testosterone. Such overlap when describing accepted principles in the field is expected, and importantly, these discussions involve established medical knowledge rather than case-specific opinions.

### B. Dr. Shumer's Evidence Should Not Be Excluded.

Even if Intervenor-Defendants' contentions were not so wholly at odds with the facts, they provide no basis to exclude Dr. Shumer's evidence. At most, arguments based on similarity between expert reports are credibility arguments that "go to the weight and not the admissibility of the testimony." *In re Cathode Ray Tube Antitrust Litig.*, 2022 WL 4596621, at *3 (N.D. Cal. Aug. 1, 2022) (declining to exclude an expert opinion on the grounds that the report shared language with another expert's report and explaining that, to extent the opinions of the two experts overlapped, it was because the expert at issue here held those same opinions and believed those words effectively expressed his opinions). Even an expert's "partial reliance" on the opinions of another expert "does not require the exclusion of his testimony" where, as here, "the expert conducted an independent evaluation of th[e] evidence." *Guadiana v. State Farm Fire & Cas. Co.*, 2013 WL 12172621, at *3–4 (D. Ariz. Oct. 18, 2013) (declining to exclude an expert who "parrot[ed]" another expert's report because the record demonstrated that while the expert in question was "informed" by the other expert's work, his opinions were also based on his own extensive experience and "an independent evaluation of that evidence"). Dr. Shumer acknowledged that he may have been "informed" by Dr. Safer's work but still conducted his own "independent evaluation" of the facts before him here. *See id.* at *4; (*see also* Shumer Dep. Tr. 13:2–6, 233:7–11, 234:23–24.)

Exclusion is especially unwarranted where, as here, the allegedly "plagiarized" information "provide[s] general, broadly, applicable information" and not the expert's "case-specific opinions." *Thomsen v. NaphCare, Inc.*, 2023 WL 8701971, at *7 (D. Or.

Dec. 15, 2023) (alleged plagiarism did "not undermine the reliability of [expert's] ultimate conclusions" where allegedly copied sections dealt with general information about alcohol withdrawal and did not go to the ultimate question of whether individual was suffering from alcohol withdrawal).  There are no claims that Dr. Shumer's case-specific opinions about Plaintiffs (Shumer Rep. ¶¶ 41–49) were copied from another source.

Intervenor-Defendants' cited cases are inapposite.  *First*, the cited cases involve experts who were unqualified to testify on the subject matter in issue.  *See Snyder v. Bank of Am., N.A.*, 2020 WL 6462400, at *4 (N.D. Cal. Nov. 3, 2020) (granting unopposed motion to exclude "expert" report where expert accused of plagiarism was also the plaintiff who had failed to state she had any "relevant professional experience or training regarding [the subjects relevant to the case]"); *Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*, 2017 WL 11457208, at *3 (M.D. Fla. Apr. 13, 2017) (excluding an expert whose opinions on the trademark issues in the case "demonstrate[d] her unfamiliarity with the subject area and [were] either unreliable or [] unhelpful to the finder of fact[,]" and the fact that she had "copied and pasted large sections of her report" from one written by another expert "undermine[d] her credibility and further support[ed] that her opinions should be excluded from trial").  In contrast, Dr. Shumer is eminently qualified to testify as a pediatric endocrinologist.

*Second*, the cited cases involve experts who copied case-specific findings from another action to support what should have been case-specific findings in the experts' own reports.  *See Raymo v. Sec'y of Health & Human Servs.*, 2014 WL 1092274, at *13–14 (Fed. Cir. Feb. 24, 2014)  (declining to rely on a medical doctor's expert report because, after he testified under oath that he formed his fact-specific opinion about the cause of a child's paralysis "after complete review of [the medical] records," it was discovered that his report was "virtually identical" to another doctor's report about a different patient in different action from almost a year earlier); *Henderson v. Lockheed Martin Corp.*, 723 F. Supp. 3d 1147, 1151–53 (M.D. Fla.) (excluding an export report that the Court described as "a mess," because it copied "hundreds" of pages from a research agency's monograph

1    and incorrectly used the findings in the monograph to opine on causation, a case-specific

2    determination, while omitting the portions of the monograph that were counter to his

3    opinion); *Moore v. BASF Corp.*, 2012 WL 6002831, at *3–4 (E.D. La. Nov. 30, 2012)

4    (excluding plaintiff's expert because his case-specific calculations of the amount of

5    benzene in a certain type of paint and the types of warnings required were based on

6    calculations and opinions in other experts' reports and untested sources that the expert did

7    not corroborate, rendering his opinion that plaintiff was harmed by exposure to benzene in

8    the paint unreliable).

9    **II.    Dr. Shumer is Highly Qualified to Provide Expert Testimony Here.**

10    Intervenor-Defendants' argument that Dr. Shumer lacks relevant expertise fails.

11    Dr. Shumer's background and many years of experience as a pediatric endocrinologist

12    specializing in treating transgender children and adolescents make him highly qualified to

13    provide his expert opinions in this matter.

14    Intervenor-Defendants' argument that Dr. Shumer is not qualified to offer an

15    opinion on "sports" and "sports-related issues" misses the point. (Mot. at 12.) Dr. Shumer

16    does not purport to be an expert on "sports"—rather, he offers an expert opinion on the

17    treatment and hormonal development of transgender adolescents and the biological cause

18    for general differences in athletic performance between men and women. (Shumer Rep.

19    ¶¶ 35, 37, 47, 48; Shumer Dep. Tr. 10:1–7.) As a practicing, Board-certified, pediatric

20    endocrinologist at CAGS, Dr. Shumer is clearly an expert on the physical effects of

21    testosterone (a hormone) on the human body at all stages of human development. And as

22    a pediatric endocrinologist who specializes in adolescent development, he is certainly

23    qualified to discuss the biological effects of testosterone in young people before, during,

24    and after puberty. (Shumer Rep. ¶¶ 33–34, 36–37.) He does not need a non-medical degree

25    in kinesiology, sports science, exercise science, athletic training, or physical education to

26    opine that "the biological cause of average differences in athletic performance between

27    men and women is the rise in circulating levels of testosterone beginning in endogenous

28    male puberty." (Shumer Rebuttal ¶ 8; Shumer Rep. ¶ 37.)

Puzzlingly, Intervenor-Defendants also challenge Dr. Shumer's qualifications to offer "sports performance opinions" because, among other things, he "has not competed in the Olympics" or "coached athletes in middle school, high school, college, professional sports, or the Olympics." (Mot. at 12.) But Dr. Shumer obviously does not need to be an athlete or coach to offer an opinion on the biological impact of testosterone on the body. By that same faulty reasoning, a mechanical engineer would be unqualified to explain how an engine works in a car racing case simply because they were never a Formula 1 driver. That has never been the test on a *Daubert* motion.

Intervenor-Defendants' argument that Dr. Shumer is not qualified to testify on "issues relating to sports" (*id.* at 13) also misrepresents the scope of Dr. Shumer's opinion. He was not retained to give an opinion on performance differences between males and females in any particular sport or activity or at the more elite levels of competition. (*See* Shumer Dep. Tr. 10:1–7.) Nor is such an opinion relevant because the Ban does not draw lines based on the type of sport played, an athlete's age, or the level of competition; it applies categorically to all transgender girls. Rather, Dr. Shumer was asked whether there is any medical reason to exclude Plaintiffs, who have not undergone male puberty and have taken certain medications, from playing on the girls' sports teams at their schools, just because they are transgender. (Shumer Rep. ¶¶ 40–41; Shumer Rebuttal ¶¶ 57, 125.) In Dr. Shumer's medical opinion, the rise of testosterone during male puberty is the driver of average group differences in athletic performance between boys and girls. (Shumer Rep. ¶¶ 37, 39, 47, 48; Shumer Rebuttal ¶¶ 8, 108–109.) Intervenor-Defendants have not proven why performance metrics are required to support this valid medical opinion.

Dr. Shumer also does not need to have personally performed "peer-reviewed studies" or gathered and reviewed "sports data" to come to this logical conclusion: there is no medical reason to ban transgender girls, such as Plaintiffs, who have taken puberty-suppressing medication at the onset of male puberty and hormone replacement therapy, from playing girls' sports. Dr. Shumer's medical training, clinical experience, and scholarship in endocrinology qualify him to offer the opinions in the "Sports and Gender"

section of his report.  And as Intervenor-Defendants themselves acknowledge, (Mot. at 15), Dr. Shumer cited a peer-reviewed article in support of his opinion.  (*See* Shumer Rep. ¶ 37 (citing a 2018 article by Dr. David J. Handelsman titled *Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance*).)  Dr. Handelsman's own comprehensive review of the scientific evidence on the effects of circulating testosterone on athletic performance, confirmed by Dr. Shumer's own clinical experience working with over 300 transgender girls—not one of whom has shown an apparent athletic advantage over other girls, (Shumer Rebuttal ¶ 109)—adequately supports Dr. Shumer's opinion that "[b]eing transgender is not an accurate proxy for athletic performance or ability."  (Shumer Rep. ¶ 35).  Accordingly, Intervenor-Defendants' motion to exclude Dr. Shumer based on his qualifications should be denied.

## III.    Plaintiffs Request an Expedited Ruling on Intervenor-Defendants' Motion.

The Court should issue an expedited ruling Intervenor-Defendants' motion because Dr. Shumer's report and rebuttal report will be discussed in the upcoming motion for summary judgment briefing.[6]  If the Court issues an expedited ruling, the parties will be able to take that decision into account in their summary judgment briefing, which may help to make the briefing more efficient for the parties and the Court.

In addition, Plaintiffs have refuted Intervenor-Defendants' allegation that Dr. Shumer plagiarized from the 2022 Rosenthal Declaration and 2022 Safer Declaration. These unfounded claims, by their nature, risk causing unwarranted damage to Dr. Shumer's personal and professional reputation—potentially harming Plaintiffs' case—until the Court resolves these matters.  The risk of potential harm to Dr. Shumer has been amplified by Intervenor-Defenders' actions outside this Court.

Accordingly, good cause exists for an expedited ruling on the motion.

---

[6]    Because Dr. Shumer's report has not been entered into evidence yet, Intervenor-Defendants' motion is technically unripe and also in violation of LRCiv 7.2(m)(2). However, given that Plaintiffs plan to use that evidence in their forthcoming summary judgment briefing, the Court can issue an expedited decision.

14

1

## CONCLUSION

2   The Court should deny Intervenor-Defendants' motion to exclude the expert

3   testimony and reports of Dr. Daniel E. Shumer, M.D., with prejudice.   In addition,

4   Plaintiffs respectfully request an expedited ruling from the Court on Intervenor-

5   Defendants' motion.

6

7                                       Respectfully submitted this 19th day of
                                        March, 2025

8                                        s/Colin M. Proksel

9                                       Colin M. Proksel
                                        OSBORN MALEDON, P.A.
10                                      2929 North Central Avenue, Suite 2000
                                        Phoenix, Arizona 85012
11                                      Telephone: (602) 640-9000
                                        Facsimile: (602) 640-9050
12                                      Email: cproksel@omlaw.com

13                                      Jyotin Hamid*
                                        Justin R. Rassi*
14                                      Amy C. Zimmerman*
                                        DEBEVOISE & PLIMPTON LLP
15                                      66 Hudson Boulevard
                                        New York, New York 10001
16                                      Telephone: (212) 909-6000
                                        Facsimile: (212) 909-6836
17                                      Email: jhamid@debevoise.com
                                        Email: jrassi@debevoise.com
18                                      Email: azimmerman@debevoise.com

19                                      Amy Whelan*
                                        Rachel Berg*
20                                      NATIONAL CENTER FOR LESBIAN RIGHTS
                                        870 Market Street, Suite 370
21                                      San Francisco, California 94102
                                        Telephone: (415) 343-7679
22                                      Facsimile: (415) 392-8442
                                        Email: awhelan@nclrights.org
23                                      Email: rberg@nclrights.org

24                                      *Admitted pro hac vice.

25

26

27

28