1    Colin M. Proksel (034133)
2    OSBORN MALEDON, P.A.
     2929 North Central Avenue, Suite 2000
3    Phoenix, Arizona 85012
     State Bar No. 034133
4    Telephone:    (602) 640-9000
     Facsimile:    (602) 640-9050
5    Email:        cproksel@omlaw.com

6
     *Attorney for Plaintiffs*
7    *Additional counsel listed in signature block*

8                    **UNITED STATES DISTRICT COURT**
9                    **FOR THE DISTRICT OF ARIZONA**
                             **TUCSON DIVISION**
10
     Jane Doe, by her next friend and parents        Case No. 4:23-cv-00185-JGZ
11   Helen Doe and James Doe; and Megan Roe,
     by her next friend and parents, Kate Roe and
12   Robert Roe,                                      **PLAINTIFFS' CONSOLIDATED
                                                      MOTION FOR SUMMARY
13                          Plaintiffs,               JUDGMENT AND OPPOSITION TO
                                                      DEFENDANTS' MOTIONS FOR
14            v.                                      SUMMARY JUDGMENT**

15   Thomas C. Horne in his official capacity as
     State Superintendent of Public Instruction;
16   Laura Toenjes, in her official capacity as
     Superintendent of the Kyrene School
17   District; Kyrene School District; The           ***ORAL ARGUMENT REQUESTED***
     Gregory School; and Arizona Interscholastic
18   Association Inc.,

19                          Defendants,

20
     Warren Petersen, in his official capacity as
21   President of the Arizona State Senate, and
     Steve Montenegro, in his official capacity as
22   Speaker of the Arizona House of
     Representatives,
23
                       Intervenor-Defendants.
24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND .............................................................................. 3

I.  MEDICAL BACKGROUND ON TRANSGENDER YOUTH AND
    TREATMENT FOR GENDER DYSPHORIA ........................................ 3

II. JANE AND MEGAN ARE TRANSGENDER GIRLS WHO ENJOY
    PLAYING SPORTS ................................................................................ 5

III. TRANSGENDER GIRLS, LIKE JANE AND MEGAN, DO NOT HAVE
     AN ATHLETIC ADVANTAGE OVER OTHER GIRLS ...................... 6

IV. THE BAN ................................................................................................ 8

    A.  Status Quo Prior to the Ban ........................................................ 8

    B.  The Ban's Legislative History and Enactment ............................ 8

    C.  The Ban's Impact on Jane and Megan ....................................... 10

V.  THE PRELIMINARY INJUNCTION .................................................. 12

LEGAL STANDARD ....................................................................................... 14

ARGUMENT .................................................................................................... 14

I.  THE BAN VIOLATES JANE'S AND MEGAN'S EQUAL PROTECTION
    CLAUSE RIGHTS ................................................................................ 15

    A.  The Ban Is Subject to Heightened Scrutiny .............................. 15

    B.  The Ban Fails Heightened Scrutiny Because It Is Not Substantially
        Related to Any Important Governmental Interest ...................... 17

        1.  *The Ban's Blanket Exclusion of Transgender Girls Is Not
            Substantially Related to Protecting Fairness in Women's
            Sports.* ............................................................................ 17

        2.  *The Ban's Exclusion of Transgender Girls Is Not
            Substantially Related to Protecting Women's Safety in
            Women's Sports.* .............................................................. 18

    3. *The Ban's Categorical Exclusion As Applied to Jane and Megan Is Not Substantially Related to the State's Proffered Interests.* ................................................................. 20

  C. The Ban Fails Any Level of Scrutiny ........................................... 22

II. APPLYING THE BAN TO JANE VIOLATES TITLE IX ................................... 23

III. THE BAN VIOLATES JANE'S AND MEGAN'S RIGHTS UNDER THE AMERICANS WITH DISABILITIES ACT AND JANE'S RIGHTS UNDER THE REHABILITATION ACT ............................................................. 25

IV. JANE AND MEGAN ARE ENTITLED TO DECLARATORY AND PERMANENT INJUNCTIVE RELIEF .................................................. 27

V. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT SHOULD BE DENIED ................................................................................. 30

  A. Defendants Fail to Show That the Ban Satisfies the Equal Protection Clause ................................................................... 30

    1. *This Court and the Ninth Circuit Have Already Determined That the Ban Is Subject to Heightened Scrutiny.* ............................ 30

    2. *Defendants Have Not Demonstrated That the Ban Is Substantially Related to Any Important Governmental Interest.* ...................................................................... 31

      (a) Defendants Have Not Shown That the Ban Is Substantially Related to Ensuring Fairness and Equal Opportunities. ................................................ 31

      (b) Defendants Have Not Shown That the Ban Is Substantially Related to Safety for Women in Athletics. ..................................................... 33

      (c) Defendants' Other Purported Government Interests All Fail. ........................................................ 35

    3. *Deference to the Legislature Cannot Insulate an Otherwise Unconstitutional Law from Scrutiny.* ................................ 36

  B. Defendants Fail to Show That the Ban Complies with Title IX ................ 38

  C. Defendants Fail to Show That the Ban Complies with the ADA and Rehabilitation Act ................................................................ 40

    1. *Jane's and Megan's Gender Dysphoria Substantially Limits Their Major Life Activities and Is Therefore a Qualifying Disability Under the ADA.* ................................................. 40

          2.     *Jane and Megan Are Excluded from Participating on Girls' Teams Because of Their Disability.* .................................................. 42

          3.     *Jane's and Megan's Transgender Status Is Connected to Their Gender Dysphoria.* ................................................................ 43

CONCLUSION ........................................................................................ 43

# TABLE OF AUTHORITIES

**Cases**

*A.M. by E.M. v. Indianapolis Pub. Sch.*,
   617 F. Supp. 3d 950 (S.D. Ind. 2022) ........................................................................ 25

*Anders v. Cal State Univ., Fresno*,
   2021 WL 1564448 (E.D. Cal. Apr. 21, 2021) ............................................................ 28

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................................................... 14

*Ariz. Dream Act Coal. v. Brewer*,
   81 F. Supp. 3d 795 (D. Ariz. 2015), *aff'd*, 818 F.3d 901 (9th Cir. 2016) .................. 28

*Armstrong v. Wilson*,
   942 F. Supp. 1252 (N.D. Cal. 1996) .......................................................................... 25

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
   729 F.3d 937 (9th Cir. 2013) ...................................................................................... 33

*Ass'n of Nat. Advertisers, Inc. v. Lungren*,
   44 F.3d 726 (9th Cir. 1994) ........................................................................................ 36

*B.P.J. by Jackson v. W. Va. State Bd. of Educ.*,
   98 F.4th 542 (4th Cir.), *cert. denied sub nom. W. Va. Secondary Sch.*
   *Activities Comm'n v. B.P.J. Next Friend Jackson*, 145 S. Ct. 568 (2024) ...... 20, 25, 29

*Bostock v. Clayton Cnty.*,
   590 U.S. 644 (2020) ........................................................................................ 15, 24, 39

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .................................................................................................... 14

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985) .................................................................................................... 23

*Clark v. Ariz. Interscholastic Ass'n*,
   695 F.2d 1126 (9th Cir. 1982) .............................................................................. 17, 35

*Doe v. Hanover Cnty. Sch. Bd.*,
   2024 WL 3850810 (E.D. Va. Aug. 16, 2024) ............................................................ 29

*Doe v. Horne*,
   115 F.4th 1083 (9th Cir. 2024) ...........................................................................*passim*

*Doe v. Hosp. of Univ. of Pa.*,
   546 F. Supp. 3d 336 (E.D. Pa. 2021) .................................................................. 26, 41

*Doe v. Snyder*,
  28 F.4th 103 (9th Cir. 2022) ................................................................ 24, 39

*Duvall v. Cnty. of Kitsap*,
  260 F.3d 1124 (9th Cir. 2001) .................................................................... 26

*Edmo v. Corizon, Inc.*,
  935 F.3d 757 (9th Cir. 2019) ...................................................................... 29

*Est. of Tucker v. Interscope Records, Inc.*,
  515 F.3d 1019 (9th Cir. 2008) .................................................................... 14

*F.C.C. v. Beach Commc'ns*,
  508 U.S. 307 (1993) .................................................................................... 36

*Facchiano Constr. Co. v. U.S. Dep't of Lab.*,
  987 F.2d 206 (3rd Cir. 1993) ...................................................................... 39

*G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*,
  822 F.3d 709 (4th Cir. 2016), *vacated and remanded on other grounds*,
  137 S. Ct. 1239 (2017) ................................................................................ 40

*Galvez v. Jaddou*,
  52 F.4th 821 (9th Cir. 2022) ...................................................................... 28

*Gonzales v. Carhart*,
  550 U.S. 124 (2007) ............................................................................ 36, 37

*Grabowski v. Ariz. Bd. of Regents*,
  69 F.4th 1110 (9th Cir. 2023) .......................................................... 24, 28, 39

*Grimm v. Gloucester Cnty. Sch. Bd.,*
  972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ...................... 24

*Halpern v. Wake Forest Univ. Health Scis.*,
  669 F.3d 454 (4th Cir. 2012) ...................................................................... 42

*Hecox v. Little*,
  104 F.4th 1061 (9th Cir. 2024) ............................................................ *passim*

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) ...................................................................... 28

*J.E.B. v. Alabama ex rel. T.B.*,
  511 U.S. 127 (1994) .................................................................................... 18

*Karnoski v. Trump*,
  926 F.3d 1180 (9th Cir. 2019) .............................................................. 15, 20

*Latta v. Otter*,
    771 F.3d 456 (9th Cir. 2014) ............................................................... 35, 37

*Lesofski v. Lash*,
    2012 WL 4711909 (D. Ariz. Oct. 3, 2012) ................................................. 26

*Lopez-Valenzuela v. Arpaio*,
    770 F.3d 772 (9th Cir. 2014) (*en banc*) ..................................................... 37

*M.H. v. Jeppesen*,
    677 F. Supp. 3d 1175 (D. Idaho 2023), *aff'd in part, rev'd in part sub*
    *nom. M.H. v. Hamso*, 2024 WL 4100235 (9th Cir. Sept. 6, 2024) ............................. 20

*Mai v. United States*,
    952 F.3d 1106 (9th Cir. 2020) ................................................................ 32

*Marshall v. United States*,
    414 U.S. 417 (1974) .............................................................................. 36

*Martinez v. Cnty. of Alameda*,
    2025 WL 240767 (N.D. Cal. Jan. 17, 2025) ............................................... 28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .............................................................................. 14

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) .................................................................. 29

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) .............................................................................. 29

*Pac. Shores Props., LLC v. City of Newport Beach*,
    730 F.3d 1142 (9th Cir. 2013) ................................................................ 16

*Parents for Priv. v. Barr*,
    949 F.3d 1210 (9th Cir. 2020) ................................................................ 25

*Pedersen v. Off. of Pers. Mgmt.*,
    881 F. Supp. 2d 294 (D. Conn. 2012) ...................................................... 36

*Pers. Adm'r v. Feeney*,
    442 U.S. 256 (1979) .............................................................................. 16

*PFLAG, Inc. v. Trump*,
    2025 WL 685124 (D. Md. Mar. 4, 2025) ................................................... 39

*Reed v. Reed*,
    404 U.S. 71 (1971) ............................................................................... 36

*Rivera v. Nat'l R.R. Passenger Corp.*,
  331 F.3d 1074 (9th Cir. 2003) .................................................. 14

*Rodriguez Diaz v. Garland*,
  53 F.4th 1189 (9th Cir. 2022) .................................................. 32

*Romer v. Evans*,
  517 U.S. 620 (1996) ................................................................ 22

*S. Bay United Pentecostal Church v. Newsom*,
  140 S. Ct. 1613 (2020) ............................................................ 36

*Schwake v. Ariz. Bd. of Regents*,
  967 F.3d 940 (9th Cir. 2020) .................................................. 24

*Sell v. U.S.*,
  539 U.S. 166 (2003) ................................................................ 20

*Shields v. Credit One Bank, N.A.*,
  32 F.4th 1218 (9th Cir. 2022) ................................................ 40

*SmithKline Beecham Corp. v. Abbott Lab'ys*,
  740 F.3d 471 (9th Cir. 2014) .................................................. 35

*Snapp v. United Transp. Union*,
  889 F.3d 1088 (9th Cir. 2018) .......................................... 42–43

*State of Minnesota v. Trump*,
  No. 0:25-cv-01608, Dkt. 1 (D. Minn. April 22, 2025) .............. 39

*Tirrell v. Edelblut*,
  No. 1:24-cv-00251, Dkt. 95 (D.N.H. Feb. 12, 2025) ............... 39

*Tirrell v. Edelblut*,
  2024 WL 4132435 (D.N.H. Sept. 10, 2024) ............................ 24

*Turner Broad. Sys., Inc. v. F.C.C.*,
  520 U.S. 180 (1997) ................................................................ 36

*U.S. Airways, Inc. v. Barnett*,
  535 U.S. 391 (2002) ................................................................ 42

*U.S. Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973) ................................................................ 22

*United States v. Torres*,
  911 F.3d 1253 (9th Cir. 2019) ................................................ 32

vii

*United States v. Virginia*,
   518 U.S. 515 (1996) ............................................................................ *passim*

*Verdugo v. Target Corp.*,
   770 F.3d 1203 (9th Cir. 2012) ......................................................... 34

*Washington v. Trump*,
   2025 WL 659057 (W.D. Wash. Feb. 28, 2025) ............................... 39

*Williams v. Kincaid*,
   45 F.4th 759 (4th Cir. 2022) ............................................................ 26

*Witt v. Dep't of Air Force*,
   527 F.3d 806 (9th Cir. 2008) ................................................... 20, 23

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ........................................................................... 38

**Statutes**

20 U.S.C. § 1681 *et seq.* .......................................................................... *passim*

29 U.S.C. § 794 (1973) ............................................................................ *passim*

29 U.S.C. § 705(20)(B) ............................................................................. 25

42 U.S.C. § 12102 *et seq.* ....................................................................... *passim*

Ariz. Rev. Stat. § 15-120.02 ................................................................. *passim*

**Other Authorities**

Exec. Order No. 14168, 90 C.F.R. 8615 (2025) ............................... 38

Exec. Order No. 14201, 90 C.F.R. 9279 (2025) ............................... 39

**Constitutional Provisions**

U.S. Const. amend. XIV ......................................................................... *passim*

**Rules**

Fed. R. Civ. P. 56(c) ................................................................................. 14

1

**INTRODUCTION**

2      Plaintiffs Jane Doe and Megan Roe are two transgender girls who want an equal

3  opportunity to try out for and participate on girls' sports teams at their schools.  Like other

4  girls, Jane and Megan enjoy the friendships, camaraderie, competition, and benefits that

5  come from playing on a school sports team.  But, unlike other girls in Arizona, Jane and

6  Megan are deprived by state law—Arizona Rev. Stat. § 15-120.02 (the "Ban")—from

7  having those opportunities.  Under the Ban, every single transgender girl from kindergarten

8  through college is categorically excluded from participation in any girls' sport at any level.

9  Thus, although Jane and Megan live as girls, are known to their classmates and teammates

10  as girls, and have not and will not undergo male puberty, the Ban prohibits them from

11  playing on girls' sports teams because they are transgender girls.

12      Nearly two years ago, this Court preliminarily enjoined the Ban as to Jane and

13  Megan, finding that it likely violates the Equal Protection Clause of the Fourteenth

14  Amendment and Title IX as applied to Plaintiffs, and that enforcing the Ban against Jane

15  and Megan would cause them irreparable harm.  (Dkt. 127, "PI Order.")  The Court found

16  that the Ban is subject to intermediate scrutiny because it discriminates based on

17  transgender status, and that it failed heightened scrutiny because Defendants had not

18  offered an exceedingly persuasive justification that the Ban was substantially related to an

19  important government interest.  The Ninth Circuit unanimously affirmed, emphasizing that

20  the Ban's proffered fairness and safety justifications "cannot be squared with the fact that

21  the [Ban] bars students from female athletics based entirely on *transgender status* and not

22  at all based on factors the district court found bear a genuine connection to athletic

23  performance and competitive advantage, such as circulating testosterone."  *Doe v. Horne*,

24  115 F.4th 1083, 1103 (9th Cir. 2024) (emphasis in original).

25      Since this Court's preliminary injunction, Jane and Megan have participated in

26  school sports on girls' teams without incident and with the support of their families, peers,

27  schools, and athletics organizers, just as they had done prior to the Ban's enactment.  The

28

Court's reasoning in granting Jane and Megan a preliminary injunction nearly two years ago remains valid today, and discovery has only served to confirm that reasoning.

*First*, the Court should grant summary judgment to Jane and Megan on their Equal Protection claims because the Ban's categorical exclusion of all transgender girls in Arizona is not substantially related to any government interest. Under settled Ninth Circuit law, heightened scrutiny applies to laws that discriminate based on transgender status. As the Ninth Circuit has already found, the Ban discriminates on its face based on transgender status because only transgender girls are prohibited from playing on teams consistent with their gender identity. The Ban fails heightened scrutiny because Defendants have failed to offer any justification—let alone an exceedingly persuasive one—that the Ban is substantially related to either of the two purported government interests it was allegedly enacted to advance: promoting equality and equity in athletic opportunities and protecting girls from physical injury in sports. Moreover, in this as-applied case, Defendants do not point to a single instance of unfairness or safety risk caused by Jane's or Megan's participation on girls' teams. On the contrary, the evidence demonstrates that neither Jane nor Megan has any unfair athletic advantage. In addition, as this Court already determined, the Ban sweeps so broadly that it fails even rational basis review. The categorical bar of all transgender girls of every age from participating in girls' sports at every level of competition in every sport, regardless of their individual circumstances, is too far removed from Defendants' purported justifications for the Ban.

*Second*, the Court should grant summary judgment to Jane on her Title IX claim because the Ban discriminates against her based on sex in two ways. The Ban discriminates based on transgender status, which Supreme Court and Ninth Circuit precedent clearly holds is discrimination based on sex. The Ban also discriminates based on sex because it applies only to transgender *girls* and not to transgender *boys*.

*Third*, the Court should grant summary judgment to Jane and Megan on their Americans with Disabilities Act ("ADA") and Rehabilitation Act claims, as there is no question of material fact that they are diagnosed with gender dysphoria—a qualifying

disability under the ADA—or that the Ban excludes them from school sports based on their gender dysphoria. Jane's and Megan's gender dysphoria means that they cannot participate on boys' teams; rather, they must participate on sports teams consistent with their gender identity.

*Fourth*, Jane and Megan are entitled to a permanent injunction. As this Court already found, enforcing the Ban against Jane and Megan would cause them severe and irreparable mental, physical, and emotional harm that cannot be remedied with monetary damages. The balance of hardships and public interest also weigh heavily in favor of a permanent injunction, especially where, as here, Jane's and Megan's rights under the Constitution and federal civil rights laws have been violated.

*Finally*, this Court should deny Defendants' Motions for Summary Judgment in their entirety, as Defendants have not shown that the Ban is substantially related to any proffered governmental interest in satisfaction of heightened scrutiny or that the Ban complies with Title IX, the ADA, or the Rehabilitation Act.

For these reasons, and those discussed below, the Court should grant summary judgment to Plaintiffs on each of their three claims and deny summary judgment to Defendants.[1]

## FACTUAL BACKGROUND

## I. MEDICAL BACKGROUND ON TRANSGENDER YOUTH AND TREATMENT FOR GENDER DYSPHORIA

A transgender person's gender identity differs from their assigned sex at birth. (Plaintiffs' Additional Statement of Undisputed Facts in Support of Motion for Summary Judgment ("SOF") ¶ 1.) "Gender identity" is the medical term for a person's internal, innate sense of belonging to a particular sex; there is a medical consensus that a person's

---

[1] In light of the stipulations executed with Defendants Laura Toenjes, in her official capacity as Superintendent of the Kyrene School District, Kyrene School District, The Gregory School, and Arizona Interscholastic Association Inc. (*see* Dkt. Nos. 59, 128, 215–16, 279, 281), Plaintiffs move for summary judgment only against Defendant Horne and Intervenor-Defendants (collectively, "Defendants").

gender identity is innate and cannot be changed, including by psychological or medical intervention. (SOF ¶¶ 2–3.) When a child is born, a healthcare provider typically identifies the child's sex based on the child's observable anatomy. (SOF ¶ 4.) This identification is known as an "assigned sex" and in most cases turns out to be consistent with the person's gender identity. (SOF ¶ 5.) For a transgender person, however, that initial designation does not match the person's gender identity. (SOF ¶ 1.)

Gender dysphoria is a serious, but highly treatable, medical condition characterized by significant and disabling distress due to the incongruence between a person's gender identity and assigned sex. (SOF ¶¶ 6–7.) Every major medical association in the United States agrees that medical treatment for gender dysphoria is necessary, safe, and effective. (SOF ¶ 8.) For example, the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, and the Pediatric Endocrine Society have all endorsed medical standards of care for treating gender dysphoria in both adults and youth, which were developed by the World Professional Association for Transgender Health ("WPATH") and the Endocrine Society. (SOF ¶ 9.)

Treatment for gender dysphoria—commonly referred to as "transition"—is intended to alleviate a transgender patient's distress by allowing them to live consistently with their gender identity. (SOF ¶¶ 10–11.) Transition can include one or more of the following components: (*i*) social transition, including adopting a new name, pronouns, appearance, and clothing, correcting identity documents, and participating in gender-matched school sports; (*ii*) medical transition, including puberty-blocking medication and hormone therapy; and (*iii*) for adults, surgeries to alter the appearance and functioning of primary and secondary-sex characteristics. (SOF ¶ 12.) To be clinically effective, transition must be respected consistently across all aspects of a transgender individual's life. (SOF ¶ 13.) Forcing a transgender girl being treated for gender dysphoria to play on a boys' sports team would directly conflict with her transition. (SOF ¶ 14.)

At the onset of puberty, adolescents diagnosed with gender dysphoria may be

prescribed puberty-blocking medications to prevent the distress of developing physical characteristics that conflict with the adolescent's gender identity. (SOF ¶ 15.) For older adolescents, doctors may also prescribe hormone therapy to induce the puberty associated with the adolescent's gender identity. (SOF ¶ 16.) Transgender girls treated with hormone therapy may therefore appear indistinguishable from other girls. (SOF ¶ 17.) Untreated gender dysphoria can cause serious harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicide. (SOF ¶ 19.) When transgender adolescents are provided with appropriate and consistent medical treatment and have parental and societal support, however, they can thrive. (SOF ¶ 20.)

## II.    JANE AND MEGAN ARE TRANSGENDER GIRLS WHO ENJOY PLAYING SPORTS

*Jane Doe.* Jane Doe is a 13-year-old transgender girl and rising eighth grader at Kyrene Aprende Middle School ("Kyrene") who plays interscholastic sports. (SOF ¶¶ 21–22.) Jane has always known she is a girl and has lived as a girl in all aspects of her life since she was five years old, including at home, school, and among friends. (SOF ¶¶ 23–24.) At age five, Jane began wearing skirts and dresses to school; despite being teased by other children, Jane decided that she ███████████████████████████████████ ███████████████████████████ (SOF ¶ 25.) Jane was diagnosed with gender dysphoria at age seven. (SOF ¶ 26.) If Jane's gender dysphoria went untreated or if her treatment was disrupted, she would struggle "to focus, learn at school," and "get through the day." (SOF ¶ 131.) She would "close herself off from the people she loves" such that she would become "isolated and depressed." (SOF ¶¶ 132, 134.) Jane stated that it would be "intolerable" if she could not live her life fully as a girl. (SOF ¶ 135.)

Sports have always been important to Jane and her family. (SOF ¶ 27.) Jane has participated in sports since she was young, including running, recreational basketball, soccer, and swimming. (SOF ¶ 28.) She has a particular passion for soccer and has played on girls' club and recreational soccer teams for many years. (SOF ¶ 29.) Jane also loves to run cross-country and track and field, and play club futsal, among other sports. (SOF ¶

30.)

*Megan Roe.*  Megan Roe is a 17-year-old transgender girl and a rising senior in high school at The Gregory School ("TGS") who plays interscholastic sports.  (SOF ¶¶ 31–32.) ███████████████████████████████████████████████ Megan ████████████████████ ███████████████████ (SOF ¶ 33.) ███████████████████████████████████ ███████████████████████████████████ living as a girl in all aspects of her life since she was seven years old.  (SOF ¶¶ 34–35.)  Megan was diagnosed with gender dysphoria at age ten.  (SOF ¶ 36.)  If Megan's gender dysphoria went untreated or if her treatment was disrupted, she would "not be able to leave the house or go to school" and would struggle "to get through the day altogether."  (SOF ¶¶ 148, 150.)  Megan stated that it would be "unbearable" if she could not live her life fully as a girl.  (SOF ¶ 151.)  Megan's mother, too, worries that without her treatment, Megan would be "uncomfortable in her own body, which would affect her self-esteem, mental health, appetite, keep her from sleeping, and caring for herself."  (SOF ¶ 149.)

Sports have always been a part of Megan's life.  (SOF ¶ 37.)  When she was younger, Megan swam and liked to do many different types of dance, including ballet, ballroom, and hip-hop.  (SOF ¶ 38.)  In eighth grade, Megan started playing volleyball on her middle school's girls' volleyball team.  (SOF ¶ 39.)  She has continued to play volleyball—a sport she loves—ever since.  (SOF ¶¶ 40–41.)

## III.    TRANSGENDER GIRLS, LIKE JANE AND MEGAN, DO NOT HAVE AN ATHLETIC ADVANTAGE OVER OTHER GIRLS

The fact that Jane and Megan are transgender girls reveals nothing about their athletic ability.  (SOF ¶ 42.)  Neither an individual's genetic makeup nor anatomy at birth are reliable indicators of athletic performance because chromosomes and genitals alone do not meaningfully affect athletic performance.  (SOF ¶¶ 43–44.)

Rather, prolonged exposure to testosterone during male puberty is the driver of differences in athletic performance between biological males and females.  (SOF ¶ 45.) Exposure to these higher levels of testosterone during and after male puberty results in

increased muscle mass and muscle strength. (SOF ¶ 46.) It is normal for males to begin puberty starting at nine years old, and the age of pubertal onset depends on the individual. (SOF ¶ 47.) Before puberty, girls and boys perform athletically at the same level with at most small differences at the margins, some favoring girls and some favoring boys. (SOF ¶ 48.) These small differences in athletic performance between pre-pubertal boys and girls could be the result of a range of factors, including social ones such as greater opportunities for boys to play sports than girls and greater encouragement of boys to play sports. (SOF ¶ 49.)

Transgender girls who receive puberty-blocking medication, like Jane and Megan, do not undergo male puberty and thus do not experience the physiological changes caused by prolonged and increased exposure to testosterone. (SOF ¶¶ 50–51.) Instead, transgender girls who receive hormone therapy after receiving puberty-blocking medication develop the skeletal structure, fat distribution, muscle and breast development, and circulating levels of estrogen and testosterone typical of other girls. (SOF ¶ 52.) Consequently, transgender girls who have not yet undergone male puberty or who have received puberty-blocking medication at the onset of puberty do not present any unique safety risks to other girls. (SOF ¶ 53.) In fact, transgender girls on puberty-blocking medication or hormone therapy are at the same or similar risk for such injury as non-transgender girls. (SOF ¶ 54.)

As part of her medical treatment for gender dysphoria, Jane has taken puberty-blocking medication since she was 11 years old, at the onset of male puberty. (SOF ¶ 55.) Accordingly, Jane has not and does not expect to experience any of the physiological changes associated with male puberty, including any that may be caused by increased testosterone levels in pubescent boys. (SOF ¶ 56.) For example, ███████████ ██████████████████████████████████████████████ (SOF ¶¶ 57–58.) Jane's most recent lab results show that ██████████████████████ ████████████████████████ (SOF ¶ 59.)

1    As part of her medical treatment for gender dysphoria, Megan has taken puberty-
2    blocking medication since the age of 11, at the onset of male puberty.  (SOF ¶ 60.)  When
3    she was 12 years old, Megan began receiving hormone therapy.  (SOF ¶ 61.)  Because of
4    ███████████████████████████, Megan has not undergone male puberty and
5    ███████████████████ (SOF ¶ 62.)  Rather, Megan's hormone treatment has caused
6    her to develop many of the physiological changes associated with puberty in females and
7    ██████████████████████████ (SOF ¶¶ 64–65.)  Like Jane, Megan's most
8    recent lab results show that ████████████████████████████████████
9    █████████████ (SOF ¶ 67.)

10   **IV.    THE BAN**

11       **A.    Status Quo Prior to the Ban**

12       Since at least 1982, Arizona has provided separate sports teams for girls and boys.
13   (SOF ¶ 68.)  Before the Ban, with regard to transgender athletes, each school or school
14   district set its own rules for intramural sports.  (SOF ¶ 69.)  For interscholastic sports, the
15   Arizona Interscholastic Association, Inc. (the "AIA") set rules for its member schools that
16   allowed those schools to appeal on behalf of transgender students who wished to participate
17   on teams consistent with their gender identity.  (SOF ¶ 70.)  In the past ten years, the AIA
18   has received 18 such requests and, finding no health or safety concerns, has granted all 18.
19   (SOF ¶¶ 71–72.)  The AIA has not received any complaints regarding the participation of
20   any transgender student.  (SOF ¶ 73.)

21       **B.    The Ban's Legislative History and Enactment**

22       The Ban was introduced to the Arizona Legislature in 2022.  (SOF ¶ 74.)  During
23   legislative hearings held prior to the Ban's enactment, Intervenor-Defendant Petersen
24   stated that he was "not aware of a specific instance" where any non-transgender girl was
25   displaced by a transgender girl in Arizona athletics.  (SOF ¶ 74.)  Multiple witnesses
26   testified that athletic ability is not necessarily the result of biological differences between
27   men and women and that "[a] person's ability to excel in sports goes far beyond their
28   gender assigned at birth."  (SOF ¶¶ 76–77.)  A member of the Sports Medicine Advisory

8

Committee of the AIA testified that the AIA's policy allowing transgender students who go through the proper process to play on teams in accordance with their gender identity "demonstrates that gender diverse athletes are participating safely and equitably." (SOF ¶ 78.) While one individual testified at the Ban's hearings that she had observed "what appear[ed] to be a male" playing on a girls' basketball team in the Canyon Athletic Association, there was no testimony from any other witness regarding transgender girls playing on any girls' teams in Arizona. (SOF ¶¶ 79–80.) Defendant Horne, who oversees Arizona's public schools and districts, including their athletic programs, and receives federal funds, was a vocal supporter of the Ban. (SOF ¶ 81.)

On March 30, 2022, Arizona enacted the Ban. (SOF ¶ 82.) The Ban's scope is broad—it excludes transgender girls from kindergarten through college from participating in all girls' sports, regardless of their circulating testosterone levels or other evidence-based markers of competitive advantage, and it does not distinguish between contact and non-contact sports. (SOF ¶¶ 84–86.) The Ban requires all teams sponsored by a public school or private school that compete against a public school team to be designated as "male," "female," or "coed," based on the "biological sex of the students who participate." (SOF ¶ 87.) While the Ban does not define "biological sex," the accompanying legislative findings state that "a person's sex is determined at fertilization and revealed at birth, or, increasingly, *in utero*." (SOF ¶ 88–89.) The Ban requires that "athletic teams or sports designated for 'females', 'women' or 'girls' may not be open to students of the male sex" but contains no similar prohibition for transgender boys. (SOF ¶¶ 90–91.) The legislative findings also cited several studies. The single legislative finding specific to the athletic performance of children was supported by studies that included post-pubertal children in the studied population and drew no conclusions about the causes of the phenomena observed. (SOF ¶¶ 92–94.) Similarly, the study the Legislature relied upon to conclude that the benefits of natural testosterone could not be diminished through hormone therapy focused exclusively on post-pubertal transgender athletes. (SOF ¶ 95.)

The Ban was specifically enacted to exclude transgender girls from playing on girls'

teams.  (SOF ¶ 96.)  Lawmakers supporting the Ban stated that they were voting in its favor to ensure that "transgenders" could not "take over female sports."  (SOF ¶ 97.)  Intervenor-Defendants, who co-sponsored the Ban, similarly explained that they voted for the Ban to ████████████████████████████████████████████████████████████████████████ and ████████████████████████████████████████████████████████████████████████████ ███████████████  (SOF ¶¶ 83, 98, 101.)  Additionally, the Ban's legislative findings cite to an article that questions whether policies that allow transgender girls to participate in girls' sports "can be justified at all."  (SOF ¶¶ 95, 104.)

While the Ban is purportedly justified by concerns regarding fairness in women's sports and protecting women's and girls' safety, Defendants identify no evidence of any safety or fairness issues in Arizona prior to the Ban (or since) related to Jane and Megan.  (SOF ¶¶ 105, 111, 117.)  Worse, Defendants identify no evidence of any issues in Arizona prior to the Ban (or since) relating to the participation of any transgender girl.  Intervenor-Defendant Petersen admits that ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ (SOF ¶ 106.)  Former Intervenor-Defendant Toma ███████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ███████████████████████  (SOF ¶¶ 108–109.)  Moreover, even Defendants' proffered expert, Dr. Carlson, admits that he does not know whether transgender girls who have not and will not go through male puberty cause any increased risk to other girls and concedes that transgender girls do not pose any additional risk of injury to other girls in non-contact sports, such as cross-country and track.  (SOF ¶¶ 112–115.)  Dr. Carlson likewise admits that to the extent girls are more likely to suffer certain athletic injuries, transgender girls who take puberty-blocking medication and/or receive gender-affirming hormones might themselves be at an increased risk for those same injuries.  (SOF ¶ 116.)

## C.    The Ban's Impact on Jane and Megan

But for the Ban, both Jane and Megan would be able to play on girls' teams at their schools.  Jane's and Megan's families have discussed with Kyrene and TGS, respectively,

that their daughters are transgender.  (SOF ¶¶ 124, 137.)  With regard to Jane, the Kyrene School District has stipulated that it would permit Jane to play on girls' teams if not for the Ban.  (SOF ¶ 125.)  With regard to Megan, because TGS is a member of the AIA, in August 2022, TGS and Megan appealed to the AIA seeking permission for her to participate on the girls' volleyball team.  (SOF ¶¶ 138–139.)  The AIA's Gender Identity Eligibility Sub-Committee reviewed the appeal and, "finding no health or safety concern . . . emphatically support[ed] her request."  (SOF ¶ 140.)  Megan's request to participate was approved during the September 22, 2022 AIA Executive Board meeting.  (SOF ¶ 141.)  Both Jane's and Megan's teammates and coaches are supportive of their participation on girls' teams.  (SOF ¶¶ 126, 136.)

If applied to Jane and Megan, however, the Ban would prevent them from playing in *all* school sports.  The Ban categorizes both Jane and Megan as "biologically male" and thus excludes them from all girls' sports.  (SOF ¶ 118.)  And neither Jane nor Megan can play on boys' teams because they are not boys and because playing on boys' teams would directly contradict their medical treatment for gender dysphoria, thereby jeopardizing their health.  (SOF ¶¶ 130, 147.)  It would also be humiliating, uncomfortable, and distressing for Jane and Megan, as girls, to be forced to play on boys' teams.  (SOF ¶¶ 127, 142.)  Indeed, before and during her transition when she was seven years old, Megan ███ ███████████████████████████████████████  (SOF ¶ 143.)

Jane and Megan will be devastated if the Ban is applied to them.  (SOF ¶¶ 128, 145.)  Megan is a rising senior in high school, and next season is therefore her last opportunity to participate on the girls' volleyball team at her school.  (SOF ¶ 144.)  If she is prohibited from playing in her last year of high school, Megan would feel robbed of her final opportunity to play volleyball with her friends.  (SOF ¶ 146.)  Jane, too, will be distressed if she cannot continue to play on her school's girls' teams.  (SOF ¶ 128.)  Playing and competing on different teams at her school is an essential part of Jane's life.  (SOF ¶ 123.)  Without school sports, Jane would lose the opportunity to strengthen her friendships and connection to her school community at a pivotal time in her development.  (SOF ¶ 129.)

In addition, if the Ban is applied to Jane and Megan, they would also be denied the numerous uncontested social, emotional, physical, and mental health benefits that sports provide, including the opportunity to make friends and become part of a supportive community of teammates and peers. (SOF ¶ 119.) Their academic outcomes could also suffer, as participation in sports at any level has a positive impact on academic achievement, and students who participate in high school sports are more likely to finish college. (SOF ¶ 120.) Both their physical and mental health could suffer irreversibly as well—in addition to numerous physical consequences, they would be at increased risk for anxiety, depression, trauma, and suicidal ideation and/or attempts. (SOF ¶ 121.) They could also internalize the shame and stigma of being excluded from girls' sports simply for being transgender, a characteristic over which they have no control and that already subjects them to prejudice and social stigma. (SOF ¶ 122.)

## V.    THE PRELIMINARY INJUNCTION

On July 20, 2023, this Court granted Plaintiffs' Motion for a Preliminary Injunction, finding that Jane and Megan were likely to succeed on their claims that the Ban violates both the Equal Protection Clause of the Fourteenth Amendment and Title IX and that the Ban would cause them irreparable harm. (PI Order.) The Ninth Circuit affirmed. (No. 23-16026, Dkt. 123.) Intervenor-Defendants subsequently filed a Petition for Certiorari before the Supreme Court of the United States on October 17, 2024, which remains pending. (No. 24-449.) In the year between the Ban's enactment and this Court's preliminary injunction, Defendant Horne, who is charged with the Ban's enforcement, admitted that he had not "adopted any regulations or policies" to either implement or enforce the Ban. (SOF ¶ 155.)

Recent studies cited by Defendants and published since the preliminary injunction largely evaluate populations irrelevant to this litigation. (SOF ¶¶ 177–181.) Those studies that do study children do not support the premise that any alleged differences are due to biology. (SOF ¶¶ 95, 179–181.) None of these studies contradict the fact that any of these alleged differences are due to social or other factors. (SOF ¶¶ 179–181.)

As a result of the preliminary injunction, both Jane and Megan have been permitted

1  to try out for and participate on girls' sports teams for the past two school years. (PI Order;

2  SOF ¶ 152.) The record is devoid of even a single fact showing that their participation

3  over those two years has posed any safety risk to any other athletes, or that it has been

4  unfair to other girls. (SOF ¶¶ 117, 153–154.)

5      **Jane Doe.** During the 2023–2024 school year, Jane participated on Kyrene's girls'

6  cross-country, soccer, and track and field teams. (SOF ¶ 156.) During the 2024–2025

7  school year, Jane participated on the girls' soccer team. (SOF ¶ 157.) Both years, Jane

8  tried out for, but did not make, the girls' basketball team. (SOF ¶ 158.) Kyrene's cross-

9  country and track teams are "non-cut," meaning that anyone who wants to participate can

10  do so. (SOF ¶ 159.) On the soccer team, Jane's favorite position to play was striker. (SOF

11  ¶ 160.) When playing striker, Jane ████████████████████████████████████████

12  ████████████████████████████████████ (SOF ¶ 161.) Jane did not remember

13  scoring any goals for her team in the 2023–2024 season. (SOF ¶ 162.)

14      Jane has thoroughly enjoyed playing on school teams with her friends the last two

15  years. (SOF ¶ 163.) Aside from the physical and emotional health benefits she has

16  garnered, Jane has made many friends on her teams who she now sees around school in the

17  hallways and in classes. (SOF ¶¶ 119, 164.) Jane feels proud to represent her school at

18  competitions with other schools, even if her team does not win the game or race. (SOF

19  ¶ 165.) Jane is excited to continue to participate and compete on girls' teams with her

20  friends and classmates. (SOF ¶ 166.)

21      **Megan Roe.** During the fall of both 2023 and 2024, Megan played on the TGS

22  girls' junior varsity volleyball team, which she captained in 2024. (SOF ¶¶ 167–168.) At

23  TGS, the girls' volleyball team does not hold tryouts—anyone who wants to participate

24  can be on the team, which is then split between junior varsity and varsity. (SOF ¶ 169.) In

25  the fall of 2024, Megan also played a few games on the girls' varsity volleyball team,

26  though she did not get much playing time. (SOF ¶ 170.) There is no evidence that Megan's

27  participation has prevented any other girl at TGS from playing volleyball. (SOF ¶ 171.)

28

13

1    Megan likes that the TGS community is social, and volleyball is an important part
2    of that community because many students attend the girls' volleyball games. (SOF ¶¶ 172–
3    173.)  Many of Megan's closest friends play volleyball with her.  (SOF ¶ 174.)  Playing
4    and competing on the girls' volleyball team has been one of Megan's favorite parts of high
5    school because she can enjoy herself outside of classes with her friends from school and
6    feel as though she is a part of a team.  (SOF ¶ 175.)  Megan hopes to play on the girls'
7    volleyball team in the fall 2025 season for her senior year of high school.  (SOF ¶ 176.)

## LEGAL STANDARD

9    Summary judgment is warranted if there are no genuine issues of material fact and
10   the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  There
11   is no genuine issue for trial if, based on the record as a whole, no reasonable trier of fact
12   could find for the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
13   475 U.S. 574, 587 (1986).  The party moving for summary judgment bears the burden of
14   showing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.
15   317, 325 (1986).  In turn, the non-moving party must come forward with "concrete
16   evidence" from which a reasonable trier of fact could return a decision in his favor.
17   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also Est. of Tucker
18   v. Interscope Records, Inc.*, 515 F.3d 1019, 1029–30 (9th Cir. 2008).  "Conclusory
19   allegations unsupported by factual data cannot defeat summary judgment."  *Rivera v. Nat'l
20   R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003).

21   Because Plaintiffs' Equal Protection claim is subject to heightened scrutiny, the
22   ultimate burden of justifying the law's constitutionality "rests entirely on the State."
23   *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("*VMI*").

## ARGUMENT

25   The undisputed facts warrant summary judgment for Jane and Megan—and a denial
26   of summary judgment for Defendants—on all three claims. [2]  *First*, the Ban's

27

28   [2]    While Intervenor-Defendants and Defendant Horne submitted separate briefing,
       because they joined each other's motions, Plaintiffs refer throughout simply to
       "Defendants'" arguments.

14

discrimination against Jane and Megan based on transgender status is a textbook violation of the Equal Protection Clause. Because Defendants have not offered any evidence to support a sufficient governmental justification under *any* level of scrutiny, the Court should find the Ban unconstitutional as applied to Plaintiffs. *Second*, the facts similarly establish that the Ban's exclusion of Jane from girls' sports because she is a transgender girl violates Title IX. *Third*, the Ban excludes Jane and Megan from playing school sports because of their gender dysphoria in violation of the ADA and similarly violates Jane's rights under the Rehabilitation Act. Declaratory relief and a permanent injunction are therefore necessary to avoid irreparable harm to Jane and Megan. For these same reasons, Defendants' motions for summary judgment are incompatible with both the law and the facts and should be rejected.

## I.    THE BAN VIOLATES JANE'S AND MEGAN'S EQUAL PROTECTION CLAUSE RIGHTS

This Court correctly held, and the Ninth Circuit affirmed, that Jane and Megan demonstrated a clear likelihood of success on the merits of their Equal Protection claim. (PI Order ¶¶ 141–62); *see Horne*, 115 F.4th at 1083. Discovery has confirmed that Plaintiffs are entitled to summary judgment on this claim.

### A.    The Ban Is Subject to Heightened Scrutiny

Under settled Ninth Circuit law, heightened scrutiny applies to laws that discriminate based on transgender status because transgender individuals constitute at least a "quasi-suspect class" and because discrimination against transgender individuals is "a form of sex-based discrimination." *Hecox v. Little*, 104 F.4th 1061, 1079 (9th Cir. 2024); *see also Horne*, 115 F.4th at 1102; *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019) (policy barring transgender individuals from military service is subject to heightened scrutiny); *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020) (holding in the context of Title VII that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex").

1  As the Ninth Circuit and this Court correctly recognized, the Ban "discriminates on
2  its face based on transgender status" because "only transgender female students are
3  prohibited from playing on teams consistent with their gender identity." *Horne*, 115 F.4th
4  at 1104–05; (*see also* PI Order ¶¶ 147–48.)  Under the Ban, all transgender girls, including
5  Jane and Megan, are categorized based on their birth sex as "biologically male" and are
6  therefore prohibited from participating on girls' teams or sports.  (SOF ¶ 118.)  "The
7  [Ban's] disparate treatment of transgender girls because they are transgender is clear on the
8  face of the statute and makes it facially discriminatory even if the statute does not expressly
9  employ the term 'transgender.'"  (PI Order ¶ 147.)  *See Horne*, 115 F.4th at 1104–05
10  (holding that the Ban "discriminates on its face based on transgender status" because its
11  definition of biological sex was drawn to target transgender women and girls).  The Ban's
12  "use of biological sex functions as a form of proxy discrimination."  *Hecox*, 104 F.4th
13  at 1078 (internal quotation marks and alterations omitted); *see also Pac. Shores Props.,*
14  *LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013) (explaining that
15  proxy discrimination is a form of facial discrimination that arises when a law or policy
16  distinguishes on the basis of criteria "that are almost exclusively indicators of membership
17  in the disfavored group").

18  Beyond its text, the Ban is also subject to heightened scrutiny as a blunt, overbroad
19  tool fashioned to serve a discriminatory purpose. *See Pers. Adm'r v. Feeney*, 442 U.S. 256,
20  279 (1979).  The Ninth Circuit correctly held that the Ban's "burdens . . . fall *exclusively*
21  on transgender women and girls" and have "no real-world impact on cisgender male
22  students." *Horne*, 115 F.4th at 1104 (emphasis in original).  Defendants have offered no
23  contrary evidence; indeed, discovery has only further established that the Ban's purpose is
24  to burden transgender women and girls.  (SOF ¶¶ 96–104.)  For example, Intervenor-
25  Defendant Petersen testified that he ███████████████████████████████
26  ████████████████  (SOF ¶ 99.)

27

28

16

**B.    The Ban Fails Heightened Scrutiny Because It Is Not Substantially Related to Any Important Governmental Interest**

Discovery has also confirmed that the Ban cannot survive heightened scrutiny. Defendants have failed to show that the exclusion of transgender girls from girls' teams "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *VMI*, 518 U.S. at 524 (citation and quotation marks omitted). The burden "rests entirely on the State" to provide an "exceedingly persuasive" justification for the challenged law that is "genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.* at 533. Defendants could not meet their "exacting" burden at the preliminary injunction stage, and they cannot meet it now. *Id.* at 555.

Instead, discovery has demonstrated that Defendants' justifications impermissibly rely entirely on "overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.* at 533. Defendants have asserted that the categorical Ban is substantially related to two important governmental interests: (*i*) promoting equality and equity in athletic opportunities and (*ii*) protecting girls from physical injury in sports. (SOF ¶¶ 105, 111.) Neither assertion succeeds.

*1.    The Ban's Blanket Exclusion of Transgender Girls Is Not Substantially Related to Protecting Fairness in Women's Sports.*

Although providing equal athletic opportunities is an important governmental interest, "the discriminatory means employed" by the Ban—the blanket exclusion of transgender girls at all ages from every level of athletics in every sport—are not substantially related to that interest. *VMI*, 518 U.S. at 533 (internal quotations marks omitted). Arizona already provided separate sports teams for girls and boys before the Ban and has done so since at least 1982. (SOF ¶ 68.)[3] As a result, Defendants have not—and cannot—provide an "exceedingly persuasive" reason for why the exclusion of all

---

[3]    *See also Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) (analyzing constitutional challenge to policy prohibiting boys from playing on girls' teams in Arizona).

transgender girls, regardless of their individual circumstances, is necessary to promote equality in women's sports. *VMI*, 518 U.S. at 533. Instead, the Ban improperly "perpetuate[s] invidious, archaic, and overbroad stereotypes." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 131 (1994).[4]

There is no evidence in the record that transgender girls like Jane and Megan, who have not undergone male puberty, have any physiological advantage over other girls such that their participation on girls' teams would create unfair competition. (SOF ¶¶ 48–54, 56, 63.) The fact that a girl is transgender, by itself, does not indicate that she has *any* athletic advantage over other girls. (SOF ¶ 42.) To the contrary, the driver of average differences in athletic performance between men and women is circulating testosterone. (SOF ¶ 45.) Accordingly, there is a well-established scientific consensus that, before puberty, there are no significant differences in athletic performance between boys and girls. (SOF ¶¶ 48–49.)

Furthermore, Defendants have produced no evidence proving that even a single transgender girl has displaced or threatened the competitive fairness of non-transgender girls in Arizona either at the time the Ban was passed or in the two years since it was enjoined as to Plaintiffs. (SOF ¶¶ 73, 106–110, 117, 153–154.) Notably, neither of the legislative leaders who co-sponsored the Ban could identify a single Arizona-specific instance of unfair competition. (SOF ¶¶ 74, 106, 110.)

> 2. *The Ban's Exclusion of Transgender Girls Is Not Substantially Related to Protecting Women's Safety in Women's Sports.*

Defendants also provide no evidence demonstrating that the Ban is substantially related to any asserted safety interest. Rather, the Ban sweeps far too broadly in at least three ways.

---

[4] Defendants' own actions belie their argument that the Ban serves an important government interest. Indeed, in the year between the Ban's enactment and this Court's preliminary injunction, Defendant Horne, who is charged with the Ban's enforcement, admitted that he had not "adopted any regulations or policies" to either implement or enforce the Ban. (*See* SOF ¶ 155.)

*First*, as the Ninth Circuit explained, the Ban applies "to all sports, regardless of the physical contact involved, the type or level of competition, or the age or grade of the participants." *Horne*, 115 F.4th at 1109; Ariz. Rev. Stat. § 15-120.02; *see also VMI*, 518 U.S. at 535–36 ("[B]enign justifications proffered in defense of categorical exclusions [based on sex] will not be accepted automatically."). Even Defendants' proffered expert, Dr. Carlson, concedes that transgender girls do not pose any safety risk to other girls in non-contact sports. (SOF ¶ 112.)

*Second*, the Ban categorically excludes all transgender girls irrespective of their medical treatment. *See Hecox*, 104 F.4th at 1083–84 (finding a similar law's "sweeping prohibition on transgender female athletes . . . encompassing all students, regardless of whether they have gone through puberty or hormone therapy" to be too unrelated to the asserted governmental interests). There is no evidence of unique safety risks because of the participation of transgender girls in girls' sports, and particularly not transgender girls who, like Jane and Megan, will never experience male puberty due to medical treatment. (SOF ¶ 53.) As explained, there is scientific consensus that any athletic advantage of boys over girls emerges during puberty when boys experience prolonged exposure to increased testosterone levels. (SOF ¶¶ 45–46.) Therefore, there is no distinctive injury risk posed by transgender girls like Jane and Megan that justifies the Ban.

*Third,* as this Court already noted, any purported safety justification is belied by the fact that the Ban permits transgender boys, whom it classifies as "biological girls," to play on boys' teams. (*See* PI Order ¶ 158; SOF ¶ 91); Ariz. Rev. Stat. § 15-120.02. "Biological girls" participation on boys' teams would implicate the same alleged safety concerns, but the Ban does nothing to protect them. Instead, the Ban prohibits every transgender girl from competing on girls' teams, regardless of whether they pose a risk to safety due to their specific circumstances or sport. (SOF ¶¶ 84–86.)

*3.    The Ban's Categorical Exclusion As Applied to Jane and Megan Is Not Substantially Related to the State's Proffered Interests.*

Critically in this as-applied challenge, the facts indisputably demonstrate that the Ban is not substantially related to the asserted governmental interests as applied to Jane and Megan specifically.  For this reason alone, Plaintiffs are entitled to summary judgment.

The Ninth Circuit has indicated that courts should employ an as-applied, rather than facial, heightened scrutiny analysis in as-applied constitutional challenges such as this one. *Witt v. Dep't of Air Force*, 527 F.3d 806, 819 (9th Cir. 2008) (holding that "heightened scrutiny analysis is as-applied rather than facial"); *see also M.H. v. Jeppesen*, 677 F. Supp. 3d 1175, 1191 (D. Idaho 2023), *aff'd in part, rev'd in part sub nom. M.H. v. Hamso*, 2024 WL 4100235 (9th Cir. Sept. 6, 2024) ("[A] plaintiff must demonstrate only that the particular execution of the law or policy—*as applied to the facts of his or her case*—fails to satisfy the requisite level of scrutiny implicated by the law or policy" (emphasis added)).  To do so, courts are directed to analyze the relevant law "as applied to the specific plaintiffs," *Witt*, 527 F.3d at 819, and "consider the facts of the individual case in evaluating the Government's interest," *Sell v. U.S.*, 539 U.S. 166, 180 (2003).   The relevant determination therefore is not whether the Ban "has some hypothetical post hoc rationalization in general, but whether a justification exists for the application of the policy as applied to" Jane and Megan. *Karnoski*, 926 F.3d at 1200 (9th Cir. 2019); *see also B.P.J. by Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 559 (4th Cir.), *cert. denied sub nom. W. Va. Secondary Sch. Activities Comm'n v. B.P.J. Next Friend Jackson,* 145 S. Ct. 568 (2024) (finding the relevant question in a case involving a similar law to be:  "Is the decision to *exclude B.P.J. from the teams she seeks to join* substantially related to an important government interest?" (emphasis added)).

Defendants offer *no* evidence indicating how the Ban's prohibition of transgender girls is substantially related to their purported state interests as applied to Jane and Megan. *First*, Defendants do not point to a single instance of unfairness caused by Jane's or Megan's participation on girls' teams. (SOF ¶¶ 117, 153–154.)  To start, because of Jane's

20

and Megan's consistent treatment for their gender dysphoria, neither has undergone male puberty. (SOF ¶¶ 56, 63.) In addition, Megan has received hormone therapy and has therefore undergone female puberty. (SOF ¶¶ 61, 64–66.) Accordingly, neither Jane nor Megan has any of the athletic advantages that are associated with circulating testosterone. (SOF ¶¶ 45, 56, 60–65.) In fact, due to their medical treatment, Jane's and Megan's physical characteristics "overlap with those of other girls" their age. (SOF ¶ 18.)

Jane's and Megan's sports participation since the preliminary injunction was ordered confirms that they have no unfair athletic advantage. There is no evidence that Jane has had an unfair athletic advantage on any teams at Kyrene, or that her participation has disadvantaged other girls. (SOF ¶¶ 158–159, 162.) In fact, Jane failed to make the girls' basketball team two years in a row, and the cross-country and track teams on which she participates are open to all. (SOF ¶¶ 158–159.) Similarly, there is no evidence that Megan's participation on the girls' volleyball team has been unfair to any other girl. (SOF ¶ 169–171.) Because TGS allows all girls to participate on the girls' volleyball team, Megan's participation has not prevented any other girl at TGS from playing. (SOF ¶¶ 169, 171.) And while TGS has both varsity and junior varsity girls' volleyball teams, Megan primarily played on the junior varsity team in both tenth and eleventh grade. (SOF ¶¶ 167, 170.)

*Second*, there are no facts that demonstrate that either Jane or Megan poses any increased safety risk to their peers or that any safety concerns have been raised about their participation in school sports. Instead, because neither Jane nor Megan has undergone male puberty, they are similarly situated to their peers and carry the same risk of both sustaining and inflicting injury. (SOF ¶ 54.) Moreover, the Ban would even prevent Jane from participating on Kyrene's cross-country and track and field teams, both of which are non-contact sports for which Defendants' proffered expert admits there are no safety concerns. (SOF ¶¶ 86, 112–113.)

## C.    The Ban Fails Any Level of Scrutiny

The Court previously determined that the Ban "fail[ed] even under the rational basis test" and there are no facts that should now lead to any different determination.  (PI Order ¶ 162.)

As explained above, the Ban is sweeping:  it bars transgender girls' participation in school sports from kindergarten through college, regardless of whether they have gone through endogenous puberty, the age at which they transitioned, the level of their circulating testosterone, or the level and sport in which they want to compete.  (SOF ¶¶ 84–86.)  The undisputed facts demonstrate a total disconnect between this categorical mandate, its proffered justifications, and the actual circumstances in Arizona.  (*See supra* Argument § I.B.)  The categorical exclusion of all transgender girls from participating in girls' sports, regardless of their individual circumstances, "is so far removed from the[] particular justifications" put forward in its support that it is "impossible to credit them." *Romer v. Evans*, 517 U.S. 620, 635 (1996).  Rather, the Ban's "sheer breadth is so discontinuous with the reasons offered for it that the [Ban] seems inexplicable by anything but animus toward the class it affects." *Id.* at 632.

As the Court already held, instead of furthering a legitimate governmental interest, the Ban's plain text, legislative history, and operation demonstrate a "bare . . . desire to harm a politically unpopular group."  (PI Order ¶ 162 (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)).  During legislative hearings about the Ban, its proponents were explicit that the Ban's intent was to target transgender women and girls, with one Senator stating he voted for the Ban because "if we allow transgenders to take over female sport[s], [y]ou will not have females participating."  (SOF ¶ 97.) Similarly, in his signing letter enacting the Ban into law, Governor Douglas Ducey announced that the Ban "creates a statewide policy to ensure biologically female athletes . . . have a level playing field to compete."  (SOF ¶ 102.)

Testimony from the Ban's sponsors further emphasizes that it hinges on the illegitimate interest of excluding transgender women and girls from women's sports

1   entirely, regardless of their physiological characteristics, solely because they are

2   transgender girls.    Intervenor-Defendant Petersen described the Ban's purpose as

3   ███████████████████████████████████████████████████████████████████████

4   (SOF ¶ 98.)  And former Intervenor-Defendant Toma ███████████████████████

5   ███████████████████████████████████████████████████████████████████████

6   ███████████████████████████████████████████████████████  (SOF ¶¶ 101,

7   109.)  Additionally, the Ban's legislative findings cite to an article that questions whether

8   policies that allow transgender girls to participate in girls' sports "can be justified at all,"

9   further indicating the suspicion of transgender people motivating the Ban's enactment.

10   (SOF ¶¶ 95, 104.)

11        Under any standard of scrutiny, the Ban's exclusion of transgender girls because of

12   generalized fear, discomfort, or moral disapproval is not a legitimate governmental interest

13   for imposing unequal treatment.[5]  *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473

14   U.S. 432, 448 (1985) (laws based on "mere negative attitudes, or fear, unsubstantiated by

15   factors which are properly cognizable" could not survive rational basis review).

16   **II.    APPLYING THE BAN TO JANE VIOLATES TITLE IX**

17        The Court should grant summary judgment to Jane on her Title IX claim,[6] as the

18

---

19   [5]    Nor can Defendants satisfy rational basis review as applied to Jane and Megan.  As
20   discussed, beyond establishing that the Ban furthers a legitimate government
     interest generally, Defendants must also show that the Ban furthers a legitimate
21   governmental purpose *as applied to Plaintiffs*.  *See Witt*, 527 F.3d at 81.  But, as
     explained, Defendants fail to identify any facts that Jane's or Megan's participation
22   on girls' sports teams causes any unfairness whatsoever, nor any facts
     demonstrating that Jane or Megan's participation jeopardizes safety.  *See supra*
23   Argument § I.B.3.
24   [6]    Title IX prohibits exclusion or discrimination by any educational program receiving
     federal financial assistance.  Megan attends TGS, which is a private school that does
25   not receive federal financial assistance.  (*See* Dkt. 172 at 2 ("TGS does not receive
     monetary grants or property from the federal government").)  The AIA, which
26   organizes and runs interscholastic athletics in which TGS sports' teams participate,
     stipulated that it would continue to allow transgender girls like Megan to participate
27   on girls' teams.  (*See* Dkt. 279.)  Therefore, this section focuses exclusively on Jane,
     who attends a public middle school in the Kyrene Aprende School District that
28   receives Title IX funding.

23

Ban would (*i*) exclude her from participation in, deny her the benefits of, or subject her to discrimination in (*ii*) an educational program receiving federal financial assistance (*iii*) on the basis of sex or gender.  20 U.S.C. § 1681(a); *see Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 946 (9th Cir. 2020).  As this Court has already found, her "[e]xclusion from athletics on the basis of [her transgender status] is a cognizable harm under Title IX."  (PI Order ¶¶ 163–70.)  *See Grimm v. Gloucester Cnty. Sch. Bd.,* 972 F.3d 586, 618 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (granting summary judgment for Title IX claim where at-issue policy would "invite more scrutiny and attention from other students" to transgender plaintiff, "publicly brand [him] with a scarlet 'T'," and send the message that he "was not welcome" (internal quotations omitted).)

    *First*, as discussed *supra*, the Ban excludes Jane from playing school sports at Kyrene.  (*See* §§ Background IV.B–C.)  *Second*, it is undisputed that Kyrene is a public school that receives federal funding and that its athletic programs are "educational programs" for the purposes of Title IX.  *Third*, as the Court has already held, the Ban excludes Jane from participating on girls' teams *because* of her status as a transgender girl, which constitutes impermissible discrimination "based on sex" for Title IX purposes.  (*See* PI Order ¶ 165 (quoting *Bostock*, 140 S. Ct. at 1741)).  *See also Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023) (finding harassment based on gender stereotypes and sexual orientation to be impermissible forms of discrimination under Title IX); *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) (applying *Bostock* and construing "Title IX's protections consistently with those of Title VII" when considering a discrimination claim*); see also Tirrell v. Edelblut*, 2024 WL 4132435 (D.N.H. Sept. 10, 2024) ("Title IX unequivocally and explicitly proscribes discrimination 'on the basis of sex'" and "sex discrimination necessarily encompasses a prohibition on transgender-based discrimination").

    The Ban violates Title IX in two ways.  *First*, it excludes transgender girls like Jane from playing on girls' teams, thereby treating them differently because they were not identified as female at birth.  (SOF ¶ 118.)  Although Title IX expressly allows for sex-

separated teams, that does not mean that those teams "must be segregated based only on biological sex and cannot accommodate gender identity" and transgender status. *Parents for Priv. v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020) (stating "[n]owhere does [Title IX] explicitly state, or even suggest, that schools may not allow transgender students to use the facilities that are most consistent with their gender identity" but dismissing Title IX hostile environment claim for failure to show discrimination). Because the Ban treats Jane differently from other girls on the basis of sex, it violates Title IX regardless of the existence of separate teams for boys and girls.

*Second*, the Ban discriminates against transgender girls like Jane by treating her differently from transgender boys. *See B.P.J.*, 98 F.4th at 563 (policy preventing transgender girls from participating on girls' sports' teams "discriminates based on sex" under Title IX because it "forbid[s] transgender girls—but not transgender boys—from participating in teams consistent with their gender identity"). It is uncontested that the Ban does not prohibit *all* transgender athletes from playing with the team of the sex with which they identify—it only forbids transgender *girls* like Jane from doing so. *See* Ariz. Rev. Stat. § 15-120.02; (SOF ¶ 91.) "[S]ingling out . . . transgender [girls] is unequivocally discrimination on the basis of sex" and violates Title IX "regardless of the policy argument as to why the choice was made." *A.M. by E.M. v. Indianapolis Pub. Sch.*, 617 F. Supp. 3d 950, 966 (S.D. Ind. 2022) (policy that applied only to transgender girls and not transgender boys violated Title IX), *vacated on other grounds*, 2023 WL 11852464 (S.D. Ind. Jan. 19, 2023).

## III. THE BAN VIOLATES JANE'S AND MEGAN'S RIGHTS UNDER THE AMERICANS WITH DISABILITIES ACT AND JANE'S RIGHTS UNDER THE REHABILITATION ACT

The undisputed facts establish that the Ban's exclusion of Jane and Megan from girls' teams violates both the ADA and the Rehabilitation Act.[7] Specifically, Jane and

---

[7] The ADA is to be judicially interpreted in the same way as the Rehabilitation Act. *See Armstrong v. Wilson*, 942 F. Supp. 1252, 1258 (N.D. Cal. 1996); *see also* 29 U.S.C. § 705(20)(B) (defining "individual with a disability" as "any person who has a disability as defined in" the ADA, 42 U.S.C. § 12102). The Rehabilitation Act also only applies to entities receiving federal financial assistance, which includes

1    Megan have demonstrated that: (*i*) they have a qualifying disability; (*ii*) they were either

2    excluded from participation in or denied the benefits of the services or activities of a public

3    entity (Kyrene School) or of a private entity operating a public accommodation (TGS), or

4    subjected to discrimination by such entity; and (*iii*) such discrimination was because of

5    their disability.  *See* 42 U.S.C. §§ 12132, 12182; *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124,

6    1135 (9th Cir. 2001).[8]

7        *First*, there is no question of material fact that Jane and Megan have been diagnosed

8    with gender dysphoria—a disability characterized by the "incongruence between [a

9    person's] gender identity and their assigned sex."  *Williams v. Kincaid*, 45 F.4th 759, 767

10   (4th Cir. 2022) (citing DSM-5 at 451–53), *cert. denied*, 143 S. Ct. 2414 (2023); (SOF ¶¶ 6,

11   26, 36.)  The undisputed facts demonstrate that Jane "has always known she is a girl" and

12   received a gender dysphoria diagnosis at age seven. (SOF ¶¶ 23, 26.)  The facts similarly

13   show that Megan has stated she was a girl since she could verbalize it, lived as a girl in all

14   aspects of her life since age seven, and received a gender dysphoria diagnosis at age ten.

15   (SOF ¶¶ 33–36.)  As this Court has already determined, Jane's and Megan's "gender

16   dysphoria qualifies as a disability under the ADA." (Dkt. 213 ("MTD Order") at 8.)  *See*

17   *also Williams*, 45 F.4th at 766–74 (finding gender dysphoria to be a qualified disability

18   under the ADA); *Doe v. Hosp. of Univ. of Pa.*, 546 F. Supp. 3d 336, 350 (E.D. Pa. 2021)

19

20

21       the Kyrene School District and Defendant Horne.  *See* 29 U.S.C. § 794.  Because
22       TGS is not a public entity that receives federal funding, the Rehabilitation Act claim
         applies only to Jane.  Accordingly, all of Jane's arguments regarding the ADA apply
         equally to the Rehabilitation Act.
23   [8]  Kyrene is a public school and, therefore, subject to the ADA under Title II.  *See*
24       42 U.S.C. § 12132.  TGS, as a "private school or other place of education," *see*
         42 U.S.C. § 12181(7)(J), is subject to Title III of the ADA, which prohibits
25       discrimination on the basis of disability "in the full and equal enjoyment of the
         goods, services, facilities, privileges, advantages, or accommodations of any place
26       of public accommodation by any person who owns, leases (or leases to), or operates
         a place of public accommodation."  42 U.S.C. § 12182; *see also Lesofski v. Lash*,
27       2012 WL 4711909, at *3 (D. Ariz. Oct. 3, 2012) (finding private school qualifies as
         "a 'public accommodation' subject to Title III of the ADA.") (*See* Dkt. 172 at 8–
28       9.)

                                        26

(finding that plaintiff "ha[d] sufficiently pled that she suffered limitations of the major life activities" such that her gender dysphoria qualified as a disability under the ADA).

Further, untreated gender dysphoria interferes with daily activities because its symptoms include "anxiety, depression, eating disorders, substance abuse, self-harm, and suicide." (MTD Order at 7 (quoting DSM-5 at 451–59).) Discovery has confirmed that, if left untreated, Jane's and Megan's gender dysphoria could substantially limit their "major life activities including, but not limited to, eating, sleeping, learning, reading, concentrating, thinking, communicating, and working." (*Id.*; SOF ¶¶ 131–135, 148–151.)

*Second*, Defendants do not dispute that the Ban explicitly excludes Jane or Megan from girls' sports at their respective schools. (SOF ¶ 118.) It is not an option for Jane or Megan to play on boys' teams—Jane and Megan are not boys and forcing them to play on a boys' team would contradict their medical treatment. (*See supra* Background § IV.C.) Accordingly, the Ban effectively prohibits Jane and Megan from participating in school sports. (SOF ¶¶ 130, 147.) Indeed, to force Jane and Megan to participate in an activity in a way incompatible with their disability violates the ADA.

*Third*, this exclusion is because of Jane's and Megan's gender dysphoria. Jane's and Megan's treatment for gender dysphoria encompasses "social" transition, which requires them to live as girls in all aspects of their lives and includes their participation on sports' teams corresponding with their gender identity. (SOF ¶¶ 12–14.) The Ban thus excludes Jane and Megan from school sports simply because they have mitigated their gender dysphoria by living as the girls they are.

For these reasons, Plaintiffs are entitled to summary judgment on their ADA and Rehabilitation Act claims.

## IV.    JANE AND MEGAN ARE ENTITLED TO DECLARATORY AND PERMANENT INJUNCTIVE RELIEF

This Court should permanently enjoin Defendant Horne from enforcing the Ban against Jane and Megan. To obtain a permanent injunction, Jane and Megan must show that: (*i*) they have suffered or will suffer an irreparable injury; (*ii*) the remedies available

at law are inadequate to compensate for that injury; (*iii*) considering the balance of hardships, a remedy in equity is warranted; and (*iv*) the public interest would not be disserved by a permanent injunction. *See Ariz. Dream Act Coal. v. Brewer*, 81 F. Supp. 3d 795, 808 (D. Ariz. 2015), *aff'd,* 818 F.3d 901 (9th Cir. 2016), and *aff'd,* 855 F.3d 957 (9th Cir. 2017). The third and fourth factors merge where, as here, "the Government is the party opposing the injunction." *Galvez v. Jaddou*, 52 F.4th 821, 831 (9th Cir. 2022). Plaintiffs meet all four criteria.

*First*, as this Court already correctly found, Jane and Megan will "suffer severe and irreparable mental, physical, and emotional harm if the [Ban] applies to them." (PI Order ¶ 174.) "Enforcement of the Act in violation of the Equal Protection Clause in and of itself is sufficient to presume irreparable harm" and a "violation of Title IX also causes irreparable harm." (*Id.* ¶¶ 172–73 (citing *Hernandez v. Sessions*, 872 F.3d 976, 994–95 (9th Cir. 2017) ("It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury.") and *Anders v. Cal State Univ., Fresno*, 2021 WL 1564448, at *18 (E.D. Cal. Apr. 21, 2021) (finding irreparable harm under Title IX due to the "presumption of irreparable injury where plaintiff shows violation of a civil rights statute")).) Additionally, a plaintiff is irreparably harmed under the ADA where, absent a permanent injunction, they are faced with "the prospect of . . . being denied . . . an equal opportunity to enjoy the benefits of [a governmental] service." *Martinez v. Cnty. of Alameda*, 2025 WL 240767, at *22 (N.D. Cal. Jan. 17, 2025). Further, without a permanent injunction, Jane and Megan will be excluded from school sports and the myriad related benefits that both sides acknowledge. (*See* PI Order ¶ 175 (citing *Grabowski*, 69 F.4th at 1121); SOF ¶ 119.)

Indeed, it is only due to the Court's preliminary injunction that Jane and Megan have been able to live fully as girls, including playing on girls' teams alongside their friends, and experiencing the benefits of school sports without fear or stigma. (SOF ¶¶ 119, 152.) Denying Jane and Megan the opportunity to play on their school teams or forcing them to play on boys' teams—which is not an option—would also contradict their medical

28

care with potentially dire consequences.  (SOF ¶¶ 14, 127–135, 145–151; *see supra* Background § IV.C.)  Permanent injunctive relief is thus necessary to save Jane and Megan from humiliation, shame, and discomfort, all of which are "[d]ignitary wounds" that cannot be easily rectified.  *Obergefell v. Hodges*, 576 U.S. 644, 678 (2015); *Doe v. Hanover Cnty. Sch. Bd.*, 2024 WL 3850810, at *14 (E.D. Va. Aug. 16, 2024) ("[c]ontinued exclusion from participation in school sports will deny [plaintiff] sport and fellowship and opportunities to build camaraderie and team-building skills at a critical point in her adolescent development" (internal quotations omitted); *B.P.J.*, 98 F.4th at 563–64 ("[I]t requires no feat of imagination to appreciate '[t]he stigma of being' unable to participate on a team with one's friends and peers." (internal citation omitted)).

*Second*, monetary damages cannot remedy the harm Jane and Megan will experience if they are excluded from girls' teams.  *See, e.g.*, *Edmo v. Corizon, Inc.*, 935 F.3d 757, 798 (9th Cir. 2019) (holding that the deprivation of constitutional rights cannot be remedied through damages).  Absent a permanent injunction, Jane and Megan "will be barred from . . . participating on any [girls'] sports" and will be deprived of the unique and time-sensitive opportunities of school sports, which are "specific harms for which there is no adequate legal remedy in the absence of an injunction."  *Hecox*, 104 F.4th at 1088 (internal quotations and alterations omitted).

*Third*, the balance of hardships and the public interest weigh heavily in favor of granting a permanent injunction.  (PI Order ¶¶ 179–85.)  In the nearly two years since the Ban was enjoined, Jane and Megan have participated on girls' teams without incident.  (SOF ¶ 153–154.)  Neither girl has a competitive advantage or poses a safety risk.  (SOF ¶¶ 51–53, 56, 63, 117, 153–154, 158–159, 162, 169–171.)  And both girls' teammates, coaches, and schools continue to be supportive of them and welcome their participation on girls' teams.  (SOF ¶¶ 126, 136.)  Defendants have not shown that permanently maintaining this status quo causes them any injury.  As for the public interest, "it is always in the public interest to prevent the violation of a party's constitutional rights."  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

## V.    DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT SHOULD BE DENIED

Fatally for Defendants, nothing emerged in discovery that provides any basis to upend this Court's and the Ninth Circuit's holdings that Plaintiffs are likely to succeed on their Equal Protection Clause and Title IX claims.  Defendants therefore resort to so-called "evolving science," "evolving standards," and "evolving facts" in their motions for summary judgment.

But Defendants' "evolutionary" theories fail.  The scientific studies Defendants tout as "new" rely on similarly flawed processes and reach similarly broad and unsupported conclusions as the studies that the Court considered in 2023.  The standards Defendants point to in elite sports and other inapposite contexts ignore that Jane and Megan are worlds removed from competing on the international stage at an elite level—they are directly impacted by this Ban on these facts because it sweeps so broadly to every sport, at every level, and to every transgender girl in Arizona.    And, collectively, Defendants' evolutionary theories ignore what is most salient in this as-applied challenge:  there are simply no facts in the record that demonstrate that Jane and Megan have any unfair athletic advantage over other girls or that their participation on girls' teams in the nearly two years since this Court enjoined the Ban as to them has increased the risk of injury to other girls.

For these reasons, and those set forth below, Defendants' motions should be denied.

### A.    Defendants Fail to Show That the Ban Satisfies the Equal Protection Clause

#### 1.    *This Court and the Ninth Circuit Have Already Determined That the Ban Is Subject to Heightened Scrutiny.*

As Defendants admit, (Dkt. 283 ("Legislators' MSJ") at 7), the Ninth Circuit has already determined that the Ban is subject to heightened scrutiny because it discriminates on the basis of transgender status.  *Horne*, 115 F.4th at 1105.  (PI Order ¶¶ 147–48.) Nothing in discovery has changed this result.  Defendants' previously rejected arguments regarding underinclusiveness and rational basis review must continue to be rejected.  In

1    any event, the Ban cannot survive even rational basis review for the reasons explained in

2    Plaintiffs' Motion for Summary Judgment.  (*See supra* Argument § I.C.)

3                    2.      *Defendants Have Not Demonstrated That the Ban Is Substantially*
                            *Related to Any Important Governmental Interest.*

4

5           Defendants now argue that five purported important government interests—two of

6    which they have raised for the first time—justify the Ban.  But they have not and cannot

7    provide any "exceedingly persuasive" justification for the Ban that is "genuine, not

8    hypothesized or invented post hoc in response to litigation." *VMI*, 518 U.S. at 524.  Instead,

9    the evidence shows that Defendants' purported justifications rest on "overbroad

10   generalizations" regarding the "different talents []or capacities" of boys and girls or have

11   been "invented *post hoc* in response to litigation." *Id.* at 531, 533.  The Court should

12   therefore deny Defendants' motion for summary judgment on Plaintiffs' Equal Protection

13   claims.

14                   (a)     Defendants Have Not Shown That the Ban Is Substantially
                            Related to Ensuring Fairness and Equal Opportunities.

15

16          As discussed extensively (*see supra* Argument § I.B.1), Defendants have not shown

17   that the Ban is substantially related to "promot[ing] competitive fairness and equal

18   opportunities for women in athletics."  (Legislators' MSJ at 9).  All of Defendants'

19   arguments to the contrary fail.

20          *First*, Defendants' assertion that the Legislature nevertheless heard "uncontroverted

21   evidence" regarding athletic advantage (Legislators' MSJ at 9–10) misrepresents the

22   record.  To the contrary, multiple witnesses testified before the Legislature that athletic

23   ability and biology are not inextricably linked and that many other factors influence athletic

24   performance.  (SOF ¶¶ 75–76.)  The single legislative finding specific to children

25   references inapposite studies that included post-pubertal children in the studied population

26   and drew no conclusions about the *causes* of the phenomena observed.  (Dkt. 284,

27   Defendants' Statement of Undisputed Material Facts ("Defs.' SUMF") ¶ 31; SOF ¶¶ 92–

28   94.)  Similarly, the study upon which the Legislature relied to conclude that the benefits of

31

natural testosterone could not be diminished through hormone therapy focused on *post-pubertal* transgender athletes, which Jane and Megan are not. (Defs.' SUMF ¶ 33; SOF ¶ 95); *see also Hecox*, 104 F.4th at 1084 (finding similar ban did not satisfy heightened scrutiny where legislature relied upon "flawed" studies to support the conclusion that the "benefits of 'natural testosterone' could not be diminished through hormone therapy"). The "new scientific publications" which Defendants cite to try and salvage the Legislature's infirm findings (Legislators' MSJ at 10–11) are similarly flawed, rely on broad generalizations, and do not stand for the premises for which Defendants proffer them. (Defs.' SUMF ¶¶ 70–76; SOF ¶¶ 177–181.)[9]

Defendants' assertion that the Legislature received "uncontroverted evidence" that alleged athletic advantages of transgender girls "were causing problems in Arizona school athletics" also grossly overstates the record. (Legislators' MSJ at 10.) Defendants muster only a single instance of such testimony, given by a mother who believed she had observed "what appear[ed] to be a male" playing on a girls' basketball team in the Canyon Athletic Association. (SOF ¶ 79.) Intervenor-Defendant Petersen himself stated in the Ban's legislative hearings that he was "not aware of a specific instance" where any non-transgender girl was displaced by a transgender girl in Arizona athletics. (SOF ¶ 74.)

*Second*, contrary to Defendants' assertion (Legislators' MSJ at 11), it is not only appropriate but necessary for the Court to consider Jane's and Megan's circumstances at this juncture.[10] (*See supra* Argument § I.B.3.) *See also, e.g.*, *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1203 (9th Cir. 2022) ("An as-applied challenge . . . focuses on the statute's

---

[9]     Defendants' statement that these flawed publications are "consistent with the opinions of all the sports experts" in this case is meaningless. (Legislators' MSJ at 11.) As laid out in Plaintiffs' motions to exclude each of Defendants' purported experts, their opinions are unreliable and irrelevant to the facts of this case, not to mention disputed by all three of Plaintiffs' experts.

[10]    Defendants' citation to a Second Amendment case is inapplicable here. In *Mai v. United States*, the court found that "the Second Amendment does not demand 'an individualized hearing' to assess plaintiff's own personal level of risk" relying on cases that hold that "some amount of over-inclusiveness *for a firearms prohibition* is permissible." 952 F.3d 1106, 1119 (9th Cir. 2020) (emphasis added) (citing *United States v. Torres*, 911 F.3d 1253, 1264 n.9 (9th Cir. 2019)).

application to the plaintiff, and requires the court to only assess the circumstances of the case at hand.") (internal quotation marks omitted).  The evidence does not demonstrate that Jane and Megan have any unfair athletic advantage over other girls; rather, Jane's and Megan's physical characteristics—██████████████████████—"overlap with those of other girls" their age.  (SOF ¶¶ 17–18, 45, 48–49, 56, 59, 64–67.)  Defendants' argument that "Plaintiffs are evidence of the 'sport performance gap' that the legislature sought to close" relies on the nonsensical assertion that by being anything better than the worst performer on their teams, Jane and Megan are unfairly succeeding in their sports. (*See* Legislators' MSJ at 5–6, 11.)  Simply because someone does not always place last does not prove that they have an unfair athletic advantage.  Nor can Defendants overcome the striking lack of evidence that Jane's or Megan's participation on girls' teams presents any fairness issue whatsoever—if anything, Jane's and Megan's unremarkable athletic records make plain that the Ban relies on stereotypes and overbroad generalizations about the athletic abilities of transgender girls.  (*See supra* Argument § I.B.3.)  *See also Hecox*, 104 F.4th at 1088 (finding law that was "unrelated to" the asserted interests and "serve[d] to ratify and perpetuate invidious, archaic, and overbroad stereotypes" discriminated against transgender plaintiffs in violation of the Equal Protection Clause) (internal quotation marks omitted)).

*Third*, Defendants' argument that the Court should not "second-guess" the judgment of the Legislature (Legislators' MSJ at 10) misstates the law.  Their single citation in support involves neither an Equal Protection challenge nor a protected class.  *See Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 953 (9th Cir. 2013) (affirming denial of preliminary injunction challenging statute banning sale of products that were the result of force-feeding birds).

(b)    Defendants Have Not Shown That the Ban Is Substantially Related to Safety for Women in Athletics.

Defendants' assertion that the Ban is substantially related to an interest in "safety for women" in athletics (Legislators' MSJ at 11–12) is based on overbroad generalizations

33

that are insufficient to withstand heightened scrutiny, particularly given that the Ban encompasses all sports (regardless of whether they are contact sports) played at all levels and by all ages.  (*See supra* Argument § I.B.2.)  None of Defendants' arguments to the contrary succeed.

*First*, Defendants refer to male athletic advantages (Legislators' MSJ at 12) but do not demonstrate that any such advantages necessarily lead to increased risk of injury for girls.  Nor can one mother's personal opinion that "girls are seriously going to get injured" if transgender girls are allowed to play demonstrate that the Ban is substantially related to safety especially in the face of in-depth scientific and analytical evidence to the contrary put forth by Plaintiffs' experts.  (*Id.*)[11]

*Second*, Dr. Carlson's testimony—which, as Plaintiffs have argued separately, should be excluded—undermines, rather than supports, Defendants' argument. Dr. Carlson concedes that he does not know whether transgender girls who have not and will not go through male puberty cause any increased risk to other girls.  (SOF ¶¶ 114–115.)  Dr. Carlson concedes that transgender girls would not increase the risk for other girls in non-contact sports, to which the Ban applies.  (SOF ¶¶ 86, 112–113.)  And Dr. Carlson also concedes that—to the extent girls *are* more likely to suffer certain athletic injuries— Jane and Megan (and other girls like them who take puberty-blocking medication and/or receive gender-affirming hormones)—might *themselves* be at increased risk for those same injuries.  (SOF ¶¶ 53–54, 116.)  Indeed, as this Court has already found, the Ban's purported safety justification is belied by the fact that the Ban permits transgender boys to play on boys' sports teams.  (PI Order ¶ 84.)

---

[11]    Defendants cite *Verdugo v. Target Corp.*, 770 F.3d 1203 (9th Cir. 2012) for the assertion that the Ban is substantially related to safety because the "Legislature stands in the best position to identify and weight the competing . . . public safety considerations" (Legislator's MSJ at 12).  But that case has no application in the Equal Protection context, as it simply states that in light of its holding that commercial property owners do not owe a common law duty to maintain defibrillators, courts can leave policy decisions regarding businesses' responsibility to maintain defibrillators to the California State Legislature.  *Verdugo*, 770 F.3d at 1228.

*Third*, Defendants do not—and cannot—point to any record evidence demonstrating that, in the two years since the injunction, there have been *any* safety concerns due to Jane's or Megan's participation on girls' sports.  (SOF ¶¶ 153–154.)

(c)    Defendants' Other Purported Government Interests All Fail.

None of Defendants' other purported important government interests fare any better.

*First*, Defendants' argument that the Ban is substantially related to "redressing past discrimination" has already been rejected by this Court and the Ninth Circuit, and there is no reason to find otherwise at this juncture.  (PI Order ¶¶ 155–56); *Horne*, 115 F.4th at 1107–08.  And, contrary to Defendants' continued assertions (Legislators' MSJ at 13), *Clark v. Arizona Interscholastic Association*, 695 F.2d 1126 (9th Cir. 1982), has no relevance here, as the Ninth Circuit and this Court have already determined.  *Horne*, 115 F.4th at 1107, n.12 (distinguishing *Clark* "because the policy challenged [in that case] adversely affected cisgender boys, a historically favored group, rather than *transgender women and girls, a historically disfavored minority*") (emphasis added); (PI Order ¶¶ 155–56); *see also Hecox,* 104 F.4th at 1082–83 ("Unlike the policy in *Clark I*, the Act perpetuates historic discrimination against both cisgender and transgender women by categorically excluding transgender women from athletic competition.").

*Second*, Defendants' *post hoc* justifications, elevated "in response to litigation," that the Ban serves the purportedly important governmental interests of either (*i*) "clarity, uniformity, and certainty" or (*ii*) "democratic accountability" cannot justify the Ban.  *See, e.g.*, *VMI*, 518 U.S. at 533; *SmithKline Beecham Corp. v. Abbott Laby's*, 740 F.3d 471, 481 (9th Cir. 2014); *Latta v. Otter*, 771 F.3d 456, 468 n.8 (9th Cir. 2014) ("*SmithKline* instructs us to consider the states' actual reasons, and not post-hoc justifications, for enacting the laws at issue.").  Defendants provide no support—because there is none—that either "clarity, uniformity, and certainty" or "democratic accountability" are important governmental interests in the Equal Protection context.[12]  Indeed, Defendants' asserted

---

[12]    Defendants' single citation to a First Amendment case in which the court discusses the "standardization of terms used in commercial representations about a product's environmental attributes" is completely beside the point.  *See Ass'n of Nat'l*

35

democratic accountability interest could be used to justify *any* law regardless of whether it is constitutionally infirm. The Constitution may entrust lawmaking powers to the states, but it recognizes that those powers can infringe on fundamental rights and thus sets appropriate limits. *See, e.g.*, *Reed v. Reed*, 404 U.S. 71, 75–76 (1971). If a "politically accountable" legislative action could provide the requisite level of justification under heightened scrutiny, every "duly enacted state law" would be insulated from a Constitutional challenge. (Legislators' MSJ at 14.) In any event, Defendants have failed to detail any facts about how the Ban is substantially related to either purported interest.[13]

> 3.    *Deference to the Legislature Cannot Insulate an Otherwise Unconstitutional Law from Scrutiny.*

Defendants' argument that this Court's hands are tied because of the Ban's legislative findings is plainly wrong and relies almost entirely on inapposite cases—the vast majority of which do not involve either a protected class or heightened scrutiny analysis. (Legislators' MSJ at 7–9.)[14] In any event, as Defendants admit (*id.* at 7),

---

*Advertisers, Inc. v. Lungren*, 44 F.3d 726, 733 (9th Cir. 1994) (applying *Central Hudson* test to determine that California state statute requiring manufacturers and distributors of commercial goods who advertise their products as "ozone friendly," "biodegradable," and "recyclable," among other things, to meet certain standards). Even there, the asserted governmental interest was "ensuring truthful environmental advertising and encouraging recycling," *id.* at 732, *not* "clarity, uniformity, and certainty" (Legislators' MSJ at 13).

[13]    Indeed, courts analyzing an asserted "uniformity" justification in the Equal Protection context have found it unable to withstand even rational basis review. *See, e.g., Pedersen v. Off. of Pers. Mgmt.*, 881 F. Supp. 2d 294, 345–47 (D. Conn. 2012) (rejecting the Defense of Marriage Act's justification of "Maintaining Consistency and Uniformity with Regard to Eligibility for Federal Benefits" as irrational).

[14]    *See, e.g., Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180 (1997) (First Amendment challenge to "must-carry" requirements for cable television systems); *Gonzales v. Carhart*, 550 U.S. 124 (2007) (challenging validity of Partial-Birth Abortion Ban Act of 2003 due to vagueness); *F.C.C. v. Beach Commc'ns*, 508 U.S. 307 (1993) (applying rational basis review to challenge to FCC order); *Marshall v. United States*, 414 U.S. 417(1974) (recognizing no "suspect" classification at issue in suit challenging Title II of the Narcotic Addict Rehabilitation Act of 1966); *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (denying church's request for emergency relief after California executive order restricted public gathering during COVID-19 pandemic).

1    deference to the legislature is not absolute and cannot insulate the Ban from constitutional
2    scrutiny.  Where, as here, constitutional rights are at stake, "[u]ncritical deference to" the
3    legislature is not appropriate, and the Court retains "an independent constitutional duty to
4    review factual findings."  *Latta*, 771 F.3d at 469 (citing *Gonzales v. Carhart*, 550 U.S. 124,
5    165–66 (9th Cir. 2014); *see also Horne*, 115 F.4th at 1099.

6          As this Court already recognized, independent judicial inquiry into the Legislature's
7    factual findings is particularly necessary here because "[t]he legislative history
8    demonstrates that the purpose of the [Ban] is to exclude transgender girls from girls' sports
9    teams."  (PI Order ¶ 149); *see also Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 784 (9th
10   Cir. 2014) (*en banc*) (the "absence of any credible showing that the [challenged law]
11   addressed a particularly acute problem" was "quite relevant" to a showing that the law did
12   not survive heightened scrutiny).  Defendants have failed to adduce any new facts to
13   controvert this Court's previous finding that the record, including the legislative findings,
14   contains "no empirical evidence . . . that transgender girls who have not experienced
15   puberty, have any physiological advantages over other girls that create unfair competition
16   for positions on girls' sports teams and other athletic opportunities, or pose a safety risk to
17   other girls."  (PI Order ¶ 158); *see also Hecox*, 104 F.4th at 1084–86 (declining to defer to
18   the Idaho Legislature's findings where the studies the Legislature relied upon were
19   "flawed"); *Latta*, 771 F.3d at 469 ("[U]nsupported legislative conclusions as to whether
20   particular policies will have societal effects of the sort at issue in this case—determinations
21   which often, as here, implicate constitutional rights—have not been afforded deference by
22   the [Supreme] Court.").

23         And contrary to Defendants' contentions (Legislators' MSJ at 8), Plaintiffs' expert
24   opinions addressed and rebutted the Legislature's findings.  For example, in contrast to the
25   legislative findings that testosterone suppression does not diminish the benefits of natural
26   testosterone in male athletes (Defs.' SUMF ¶ 33), Dr. Shumer opined that transgender girls
27   who take puberty-blocking medication and thus do not undergo male puberty "do not gain
28   the increased muscle mass or strength that accounts for why post-pubertal boys as a group

have an advantage over post-pubertal girls as a group." (SOF ¶ 50.) Dr. Shumer's evidence that there are no significant pre-pubertal differences in athletic performance between pre-pubertal boys and girls (SOF ¶ 48–49) also contravenes the Legislature's conclusion that the "sports performance gap between males and females" is "insurmountable" due to "the physiological advantages conferred by biological sex." (Defs.' SUMF ¶ 35.)

### B.    Defendants Fail to Show That the Ban Complies with Title IX

Defendants' argument that the Ban violates Title IX ignores settled Supreme Court and Ninth Circuit precedent, instead relying heavily on recent executive orders that are merely policy statements and are the subject of constitutional challenges.    Neither Defendants' arguments, nor anything in discovery, disturb the conclusion that this Court already reached:    the Ban "discriminates against Plaintiffs based on their status as transgender girls by providing that for purposes of school sports a student's sex is fixed 'at birth'" in violation of Title IX.    (PI Order ¶¶ 163–70.)    The Court should thus deny Defendants' motion for summary judgment as to Plaintiffs' Title IX claims.

*First*, the recent executive orders upon which Defendants' argument primarily relies (Dkt. 294, "Horne MSJ" at 3–4)—both of which are currently being challenged as unconstitutional—have no bearing on whether the Ban violates Title IX as to Plaintiffs. These executive orders merely state the President's interpretation of federal law and direct certain federal officials to take future actions—an interpretation that has already been rejected by the Ninth Circuit and other federal courts across the country, as discussed below. In addition, executive orders directing executive agencies to take certain actions are only valid if the President has the proper authority to enact them. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) (the President's authority to act "must stem either from an act of Congress or from the Constitution itself").    Two courts have already determined that Executive Order No. 14168 (90 C.F.R. 8615 (2025), "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government") facially discriminates on the basis of transgender status and sex in violation of the equal protection guarantees of both the Fifth and Fourteenth

Amendments.  *See PFLAG, Inc. v. Trump*, 2025 WL 685124, at \*25 (D. Md. Mar. 4, 2025) (finding executive order is "textbook sex discrimination" and impermissibly classifies based on transgender status); *Washington v. Trump*, 2025 WL 659057, at \*16–26 (W.D. Wash. Feb. 28, 2025) (finding that executive order reflects a bare desire to harm a politically unpopular group).  Executive Order No. 14201 (90 C.F.R. 9279 (2025), "Keeping Men Out of Women's Sports") is also currently being challenged.  *See State of Minnesota v. Trump*, No. 0:25-cv-01608, Dkt. 1 (D. Minn. April 22, 2025); *Tirrell v. Edelblut*, No. 1:24-cv-00251, Dkt. 95 (D.N.H. Feb. 12, 2025).[15]

*Second*, Defendants' contention that Title IX is so distinct from Title VII that it cannot be read to prohibit discrimination based on transgender status (Horne MSJ at 6–7) improperly relies on out-of-circuit cases and flatly ignores settled law in this circuit.  *See, e.g.*, *Grabowski*, 69 F.4th at 1116 (holding that *Bostock*'s conclusion that Title VII prohibits discrimination based on transgender status applies to Title IX); *Snyder*, 28 F.4th at 114 (construing Title IX's protections consistently with those of Title VII to conclude the same).  In an attempt to circumvent this dispositive precedent, Defendants cite cases regarding bathrooms and locker rooms that are not at issue in this case.  (Horne MSJ at 7–

---

[15]    Executive Order No. 14201, by its terms, merely directs federal officials, including the Secretary of Education, the Assistant to the President for Domestic Policy, the Secretary of State , or federal agencies like the Department of Justice to take future actions.  *Id.* at §§ 3, 4.  The Executive Order does not itself create any new law or regulation or otherwise require athletic associations or education institutions to bar transgender athletes.  And this Executive Order has no effect in and of itself: "This order shall be implemented consistent with applicable law and subject to the availability of appropriations."  *Id.* at § 5(b).  Given this language, the Executive Order is not self-executing nor does it impose any obligations on states or state officials.  *See, e.g., Facchiano Constr. Co. v. U.S. Dep't of Lab.*, 987 F.2d 206, 210 (3rd Cir. 1993) ("It is clear from the language of the executive order that it was not intended to be self-executing, but would be dependent upon the issuance of guidelines by the Office of Management and Budget (OMB) and subsequent implementing regulations by the agencies.").  Nor have Defendants shown that this Executive Order, if interpreted as Defendants suggest, would be consistent with the separation of powers mandated by the U.S. Constitution, or that it would be permissible under Title IX or the equal protection component of the Fifth Amendment's Due Process Clause.

8).   Nor has any Defendant ever raised any interest in privacy—such as those that purportedly underlie the cited bathroom cases—as justifying the Ban.

*Third*, Defendants' argument that sex-segregated sports are expressly permitted by Title IX's implementing regulations is beside the point.  Jane and Megan do not challenge the legality of having separate teams for boys and girls; rather, they challenge the Ban because it excludes them from participation on girls' teams based on their transgender status.  In any event, Title IX and its regulations' reference to "both sexes" include no guidance as to "how a school should determine whether a transgender individual is a male or female."  *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 720 (4th Cir. 2016), *vacated and remanded on other grounds*, 580 U.S. 1168 (2017).

### C.    Defendants Fail to Show That the Ban Complies with the ADA and Rehabilitation Act

#### 1.    *Jane's and Megan's Gender Dysphoria Substantially Limits Their Major Life Activities and Is Therefore a Qualifying Disability Under the ADA.*

As a threshold matter, this Court has already determined that Plaintiffs' "gender dysphoria qualifies as a disability under the ADA" (MTD Order at 8; *see also supra* Argument § III), and Defendants do not provide any new facts or law to the contrary. Instead, Defendants make the circular argument that—because Jane and Megan have been treated for their gender dysphoria—it is not a disability.  (Legislators' MSJ at 15.)  This makes no sense and is contrary to law.

Congress has explicitly stated that determining "whether an impairment substantially limits a major life activity" is to be done "*without* regard to the ameliorative effects of mitigating measures," like the gender dysphoria treatment that Jane and Megan undergo.  42 U.S.C. § 12102(4)(E)(i) (emphasis added); *Shields v. Credit One Bank, N.A.*, 32 F.4th 1218, 1227 (9th Cir. 2022) ("[T]he ADA expressly provides that the determination of whether an impairment *substantially limits* a major life activity shall be made without

1   regard to the ameliorative effects of mitigating measures, such as medication, medical

2   supplies, or other aids.") (internal quotation marks omitted).

3        Jane and Megan have received treatment for their gender dysphoria since they were

4   seven and ten years old, respectively.  (SOF ¶¶ 26, 36.)  It is only because they have been

5   able to transition that the impact on their major life activities has been mitigated.  Without

6   their treatment, Jane's and Megan's gender dysphoria would substantially impede their

7   "neurological, brain, social, and occupational functions."  *Hosp. of Univ. of Pa.*, 546 F.

8   Supp. 3d at 350 (finding transgender plaintiff with gender dysphoria sufficiently pleaded a

9   disability under the ADA); (*see also* MTD Order at 4–5, 7 (quoting DSM-5 at 454, 451–

10   59) (the symptoms of gender dysphoria include "anxiety, depression, eating disorders,

11   substance abuse, self-harm, and suicide," all of which can "substantially limit major life

12   activities" ).)

13        Jane's and Megan's deposition testimony in no way contradicts their assertion

14   that—without treatment for gender dysphoria—they would be substantially limited in their

15   life activities.  As Plaintiffs explain in their declarations, if their gender dysphoria went

16   untreated or their treatment was disrupted, Jane and Megan would struggle "to get through

17   the day altogether."  (SOF ¶¶ 131, 150.)  Without treatment, Jane "would struggle to focus

18   and learn at school" and may "close herself off from the people she loves" such that she

19   may become "isolated and depressed."  (SOF ¶¶ 131–134.)  Jane testifies that it would be

20   "intolerable" if she could not live her life fully as a girl.  (SOF ¶ 135.)  Megan, too, feels

21   that such a premise would be "unbearable."  (SOF ¶ 151.)  In fact, Megan's mother worries

22   that without her treatment, Megan would be "uncomfortable in her own body, which would

23   affect her self-esteem, mental health, appetite, keep her from sleeping, and caring for

24   herself."  (SOF ¶ 149.)  And while Defendants assert that Jane and Megan "have not

25   reported themselves as disabled" (Legislators' MSJ at 15), the record demonstrates that

26   they have reported to their schools that they are transgender and are being treated for gender

27   dysphoria, which is a disability under the ADA.  (SOF ¶¶ 124, 137.)

28

1

        2.    *Jane and Megan Are Excluded from Participating on Girls' Teams*
            *Because of Their Disability.*

2          Defendants' contentions that Jane and Megan are not excluded from playing girls'

3  sports *because of* their gender dysphoria and that their request for accommodation is

4  unreasonable miss the point.

5          *First*, contrary to Defendants' assertion (Legislators' MSJ at 16), the record is

6  replete with admissible evidence that neither Jane nor Megan can play on boys' teams

7  (because they are not boys), and that, therefore, the Ban excludes them from school sports

8  in violation of the ADA.  As Plaintiffs' experts have testified and as this Court has already

9  recognized, forcing Jane and Megan to participate on a boys' team would be harmful to

10  their mental, emotional, and physical health, because it "would directly contradict [their]

11  medical treatment for gender dysphoria and would be painful and humiliating."  (*See* PI

12  Order ¶¶ 121–33, 174; SOF ¶¶ 13–14, 127, 130, 142, 147.)  Thus, "[e]nforcing the [Ban]

13  against [Jane and Megan] will effectively exclude [them] from school sports."  (PI Order

14  ¶ 175.)

15          *Second*, Defendants' argument that a permanent injunction of the Ban as applied to

16  Jane and Megan is not a "reasonable modification" because it would undermine and

17  fundamentally alter the Ban's alleged purpose of protecting fairness in girls' sports is

18  unsupported in law or fact.  (Legislators' MSJ at 16.)  As explained *supra* Argument § I,

19  the Ban is neither substantially nor even rationally related to that purpose.  With regard to

20  Jane and Megan specifically, there is no reason to believe that they have any athletic

21  advantage over other girls.  (*See* SOF ¶¶ 42–52, 56, 59, 60–67, 117, 153–154.)  Defendants'

22  argument that Jane's and Megan's request is not reasonable also ignores that, since the Ban

23  was enjoined, "[t]here haven't been any problems with [Plaintiffs] playing on the girls'"

24  sports teams, nor do they provide any facts to the contrary.  (SOF ¶ 154.)  Plaintiffs' claim

25  for relief is also reasonable "on its face" and "in the run of cases."  *Halpern v. Wake Forest*

26  *Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012) (citing *U.S. Airways, Inc. v. Barnett*,

27  535 U.S. 391 (2002)); *see also Snapp v. United Transp. Union*, 889 F.3d 1088, 1102 (9th

28

Cir. 2018) ("To avoid summary judgment, [plaintiffs] need only show that an 'accommodation' *seems reasonable on its face*, i.e., ordinarily or in the run of cases.")

       3.     *Jane's and Megan's Transgender Status Is Connected to Their Gender Dysphoria.*

Defendants' argument that the Ban does not exclude Jane and Megan because of their gender dysphoria but rather because of their "biological sex" or "transgender status" holds no water. (Legislators' MSJ at 17.) Defendants do not dispute Jane's or Megan's gender dysphoria diagnoses. (SOF ¶¶ 26, 36.) Nor is there any triable issue that Jane's and Megan's treatment for gender dysphoria includes social transition—living as girls in all parts of their lives. (SOF ¶¶ 12–13.) The Ban would inhibit that treatment by excluding them from participating on girls' teams. (*See supra* Argument § III.) In so doing, the Ban discriminates against Jane and Megan *both* because they are transgender *and* because they have mitigated the gender dysphoria directly resulting from their transgender status by living as the girls they are.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be granted and Defendants' motions for summary judgment should be denied.

                                    Respectfully submitted this 30th day of May, 2025

                                   */s/ Colin M. Proksel*
                                   Colin M. Proksel
                                   OSBORN MALEDON, P.A.
                                   2929 North Central Avenue, Suite 2000
                                   Phoenix, Arizona 85012
                                   Telephone: (602) 640-9000
                                   Facsimile: (602) 640-9050
                                   Email: cproksel@omlaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jyotin Hamid*
Justin R. Rassi*
Amy C. Zimmerman*
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
Email: jhamid@debevoise.com
Email: jrassi@debevoise.com
Email: azimmerman@debevoise.com

Amy Whelan*
Rachel Berg*
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone: (415) 343-7679
Facsimile: (415) 392-8442
Email: awhelan@nclrights.org
Email: rberg@nclrights.org

*Admitted pro hac vice.

1

## **CERTIFICATE OF SERVICE**

2          I hereby certify that on this 30th day of May, 2025, I caused the foregoing

3   document to be filed electronically with the Clerk of Court through the CM/ECF System

4   for filing; and served on counsel of record via the Court's CM/ECF System.

5

6                                          */s/ Colin M. Proksel*

7

8                                          Colin M. Proksel

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28