Justin D. Smith, Mo. Bar No. 63253*
Kenneth C. Capps, Mo. Bar No. 70908*
James Otis Law Group, LLC
530 Maryville Centre Drive, Suite 230
St. Louis, Missouri 63141
Telephone: (816) 678-2103
Justin.Smith@james-otis.com

*Attorneys for Intervenor-Defendants President Petersen and Speaker Montenegro*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jane Doe, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Thomas C. Horne, in his official capacity as State Superintendent of Public Instruction, *et al.*,<br><br>Defendants. | Case No. 4:23-cv-00185-JGZ<br><br>**Intervenor-Defendants' Reply in Support of Their Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment**<br><br>**Oral Argument Requested** |

President of the Arizona State Senate Warren Petersen and Speaker of the Arizona House of Representatives Steve Montenegro (the "Legislative Leaders") file this brief as a reply in support of the Legislative Leaders' motion for summary judgment (Doc. 283) and in opposition to Plaintiffs' motion for summary judgment (Doc. 302). The Legislative Leaders also join the reply and opposition brief filed by Superintendent Horne and incorporate those arguments by reference. Based on these arguments, the Court should grant summary judgment in favor of the Legislative Leaders and deny summary judgment to the Plaintiffs.

**INTRODUCTION**

The writing is on the wall: Girls sports can and should be protected. The Court should confirm that the Save Women's Sports Act is constitutional.

It is undisputed that the Arizona Legislature received uncontradicted witness testimony that biological boys have physiological advantages over girls, including before puberty, that result in boys possessing sports performance advantages over girls. Pls.' Opp'n to SUMF, at ¶¶ 18-22. It is undisputed that the Arizona Legislature made findings that, from age six, boys score higher than girls on muscular strength, muscular endurance, and speed/agility tests, and that the physiological differences conferred by biological sex create a sports performance gap that appears insurmountable. *Id.* at ¶¶ 31-36. The Supreme Court recently re-emphasized that courts "afford States 'wide discretion to pass legislation in areas where there is medical and scientific uncertainty.'" *United States v. Skrmetti*, 145 S. Ct. 1816, 1836 (2025) (citation omitted).

The uncontroverted science verifies the Arizona Legislature's findings. Plaintiffs present no evidence to dispute the mountain of peer-reviewed scientific evidence establishing that, before puberty, boys run faster, jump higher, jump farther, and throw farther than girls. Pls.' Opp'n to SUMF, at ¶¶ 86, 89, 90, 93. Plaintiffs cannot identify a single peer-reviewed article finding that the male-female performance gap was caused by a non-biological factor, *id.* at ¶ 102, and thus they cannot controvert peer-reviewed studies finding that at least some of the gap is due to biological factors and excluding social factors as a cause, *id.* at ¶¶ 99-101. Consistent with the Ninth Circuit's instruction, this record supports a "different outcome" because "the evolving science supports different findings." *Doe v. Horne*, 115 F.4th 1083, 1109 (9th Cir. 2024).

The stampede continues to join the Arizona Legislature in protecting girls sports. The University of Pennsylvania apologized and restored to female swimmers all records and titles misappropriated to Lia Thomas. Defs.' Addtl. SUMF, at ¶¶ 25-26. The Arizona Interscholastic Association revised its policies "to clearly identify compliance with the Keeping Men out of Women's Sports Federal Executive Order, signed on 2/5/25." *Id.* at

2

¶ 3.    And in July 2025, the Supreme Court agreed to review circuit court decisions enjoining athletic participation laws in Idaho and West Virginia. *See Little v. Hecox*, No. 24-38, 2025 WL 1829165, at *1 (U.S. July 3, 2025); *W. Virginia v. B. P. J.*, No. 24-43, 2025 WL 1829164, at *1 (U.S. July 3, 2025).[1]

Plaintiffs have dominated girls sports by winning races and leading the volleyball team in aces and other key plays. Pls.' Opp'n to SUMF, at ¶¶ 149-154, 165. Plaintiffs have displaced girls by taking playing time and roster spots. *Id.* at ¶¶ 148, 155-156, 162-164. The record before the Court does not support the preliminary injunction. The Court should move expeditiously to enter summary judgment for Defendants to protect more girls from being dominated and displaced by the Plaintiffs.

## ARGUMENT

**I.    The Save Women's Sports Act Is Valid Under the Equal Protection Clause.**

**A. Rational basis review applies and is satisfied here.**

Rational basis review should be applied for three independent reasons.

*First*, in an equal protection case involving transgender claims, the Supreme Court rejected arguments that heightened scrutiny applied because of statutory references and who was affected by a statute. *Skrmetti*, 145 S. Ct. at 1829-30. Instead, "[o]n its face," the Supreme Court identified two classifications: age and medical use, both of which are subject to rational basis review. *Id.* at 1829. As the Legislative Leaders have consistently argued, on its face, the Save Women's Sports Act ("SWSA") classifies on the basis of sex by separating girls' sports teams from boys. *See* A.R.S. § 15-120.02. Plaintiffs have not challenged this classification. *Horne*, 115 F.4th at 1102 n.8. This renders Plaintiffs' challenge an underinclusiveness challenge subject to rational basis review. *See Jana-Rock Constr., Inc. v. New York State Dep't of Econ. Dev.*, 438 F.3d 195 (2d Cir. 2006).

This Court can apply rational basis review because of *Skrmetti*. "Circuit precedent is considered effectively overruled if intervening Supreme Court authority has 'undercut

---

[1] Plaintiffs cited the *Hecox* and *B.P.J.* decisions a dozen times in their motion for summary judgment. *See* Pls.' MSJ, at 15-16, 19-20, 25, 29, 32-33, 35, 37.

1   the theory or reasoning underlying the prior circuit precedent in such a way that the cases

2   are clearly irreconcilable.'" *Rodney v. Garrett*, 116 F.4th 947, 955 (9th Cir. 2024) (citation

3   omitted).  Indeed, "a district court may deviate from a mandate in light of recent, dispositive

4   Supreme Court decisions."  *Gallagher v. San Diego Unified Port Dist.*, 14 F. Supp. 3d

5   1380, 1390 (S.D. Cal. 2014), *aff'd,* 668 F. App'x 786, 786 (9th Cir. 2016) ("the district

6   court correctly held that [the Supreme Court's decision] was intervening controlling

7   authority that allowed it to reconsider causation on remand").  Decisions that "adjusted the

8   focus" and "alter[ed] the analysis" "can warrant a departure from the rule of mandate and

9   law of the case doctrines."  *Parra v. Bashas', Inc.*, 291 F.R.D. 360, 372 (D. Ariz. 2013).

10  These principles apply here.  The Court should follow *Skrmetti*'s reasoning and apply

11  rational basis review.

12      *Second*, Plaintiffs have no response to the argument that rational basis review

13  applies because the SWSA excludes them from girls sports because of their medical

14  condition.[2]  *See* Leg. MSJ, at 7; Pls.' MSJ.  Instead, Plaintiffs doubled down on their

15  medical condition argument, claiming that the SWSA excludes them from school sports

16  "because they have mitigated their gender dysphoria."  Pls.' MSJ at 27, 43; *see also id.* at

17  19.  Classification based on medical condition is subject to rational basis review.  *See*

18  *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1048 (9th Cir. 2017) (en banc); *see also*

19  *Skrmetti*, 145 S. Ct. at 1829.  Because Plaintiffs allege exclusion based on a medical

20  condition, rational basis review applies.

21      *Third*, Plaintiffs now claim that Defendants must "demonstrate that Jane and Megan

22  have … unfair athletic advantage over other girls or that their participation on girls' teams

23  in the nearly two years since this Court enjoined the [SWSA] as to them has increased the

24  risk of injury to other girls."  *Id.* at 30; *see also id.* at 20-21, 23 n.5, 32-33.  This is a "class

25  of one" claim because "the plaintiff alleges that she has been intentionally treated

26  differently from others similarly situated and that there is no rational basis for the

27

28  [2] Plaintiffs' medical condition argument is part of their ADA claim, which was not included
    in Plaintiffs' preliminary injunction motion.  *See* Doc. 3.

4

1    difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  A "class
2    of one" claim can include at least five members, *id.* at 564 *, and thus it applies to both
3    Plaintiffs' claims here.  Rational basis review applies in cases proceeding under the "class
4    of one" theory.  *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 602 (2008).

5           Rational basis review is satisfied here.  "The rational basis inquiry 'employs a
6    relatively relaxed standard reflecting the Court's awareness that the drawing of lines that
7    create distinctions is peculiarly a legislative task and an unavoidable one.'"  *Skrmetti*, 145
8    S. Ct. at 1835 (citation omitted).  "Under this standard, we will uphold a statutory
9    classification so long as there is 'any reasonably conceivable state of facts that could
10   provide a rational basis for the classification.'"  *Id.* (quoting *FCC v. Beach Commc'ns, Inc.*,
11   508 U.S. 307, 313 (1993)).  "Where there exist 'plausible reasons' for the relevant
12   government action, 'our inquiry is at an end.'"  *Id.* (quoting *Beach Commc'ns*, 508 U.S. at
13   313–314).  The SWSA is related to the rational bases of fairness, equal opportunities,
14   safety, redressing past discrimination, uniformity, and democratic accountability.  *See* Leg.
15   MSJ, at 9.  It thus passes rational basis review.

16          Plaintiffs' contrary argument in favor of heightened scrutiny has been undermined
17   by recent Supreme Court actions.  Plaintiffs rely heavily on *Hecox v. Little*, 104 F.4th 1061
18   (9th Cir. 2024), and reasoning in *Horne* that itself relied on *Hecox*.  *See* Pls.' MSJ, at 15-
19   16, 30.  However, the Supreme Court cast doubt on *Hecox* by granting certiorari to review
20   it.  *Little v. Hecox*, 2025 WL 1829165, at *1.  Plaintiffs also rely on exporting the Supreme
21   Court's decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020), from Title VII.  But
22   in *Skrmetti*, the Supreme Court declined to apply *Bostock* in the equal protection context
23   and emphasized that it had never exported *Bostock*: "We have not yet considered whether
24   *Bostock*'s reasoning reaches beyond the Title VII context, and we need not do so here."
25   *Skrmetti*, 145 S. Ct. at 1834.  Plaintiffs also repeatedly cite the preliminary injunction order.
26   But in addition to that order's reliance on the district court decision that *Hecox* affirmed as
27   well as *Bostock*, "decisions on preliminary injunctions are just that—preliminary—and
28   must often be made hastily and on less than a full record."  *S. Oregon Barter Fair v.*

5

1    *Jackson Cnty.*, 372 F.3d 1128, 1136 (9th Cir. 2004) (citations omitted).  Thus, preliminary

2    injunction decisions "are not binding at trial on the merits" and "do not constitute the law

3    of the case."  *Id.* (citations omitted).

4        In their meritless alternative argument to rational basis review, Plaintiffs are

5    incorrect that the SWSA is a form of proxy discrimination.  The SWSA classifies based on

6    biological sex, meaning that all biological boys are excluded from girls sports, regardless

7    of transgender status.  Thus, the SWSA does not "discriminate[] against individuals on the

8    basis of criteria that are almost exclusively indicators of membership in the disfavored

9    group."  *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th

10   Cir. 2013).  Plaintiffs also present no evidence of animus.  Statements quoted by Plaintiffs

11   reflect good-faith consideration of legislative issues and "must be considered in light of the

12   strong 'presumption of good faith' on the part of legislators."  *United States v. Carrillo-*

13   *Lopez*, 68 F.4th 1133, 1140 (9th Cir. 2023) (citation omitted).  Thus, "the statements of a

14   handful of lawmakers" are generally insufficient to show discriminatory intent because

15   they "may not be probative of the intent of the legislature as a whole."  *Id.*  In addition, the

16   comments quoted express concern about biological males competing with females—a

17   concern that Plaintiffs admit is valid for at least post-pubertal males, *see, e.g.*, Pls.' Opp'n

18   to SUMF, at ¶ 51-56, and is one shared by athletics associations, *see, e.g.*, *id.* at ¶ 9, female

19   athletes, *see, e.g.*, *Hecox*, 79 F.4th at 1038–39, and courts, *see, e.g.*, *O'Connor v. Board of*

20   *Education of School District 23*, 449 U.S. 1301, 1307 (1980) (Stevens, Circuit Justice)

21   ("Without a gender–based classification in competitive contact sports, there would be a

22   substantial risk that boys would dominate the girls' programs and deny them an equal

23   opportunity to compete in interscholastic events."); *see also Clark ex rel. Clark v. Ariz.*

24   *Intersholastic Ass'n (Clark I)*, 695 F.2d 1126, 1131 (9th Cir. 1982).  Plaintiffs have not

25   come close to showing the required "sensitive inquiry into [the] circumstantial and direct

26   evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Housing Dev.*

27   *Corp.*, 429 U.S. 252, 266 (1977).

28       For these reasons, the Court should apply rational basis review, not heightened

1   scrutiny.

2   **B. Deference to Legislative Findings Supporting the SWSA.**

3       Plaintiffs have no response to the binding authority that requires deference to the

4   legislature in cases that they implicitly concede are on point and involve heightened

5   scrutiny analysis. *See* Pls.' MSJ, at 36 ("Defendants' argument … relies *almost* entirely

6   on inapposite case—the *vast majority* of which do not involve either a protected class or

7   heightened scrutiny analysis.") (emphasis added).  In cases that the Legislative Leaders

8   cited involving heightened scrutiny, Leg. MSJ, at 7-9, the Ninth Circuit has repeatedly

9   deferred to legislative findings to uphold laws.  *See Pena v. Lindley*, 898 F.3d 969, 979

10  (9th Cir. 2018); *Minority Television Project, Inc. v. F.C.C.*, 736 F.3d 1192, 1199 (9th Cir.

11  2013) (en banc); *World Wide Video of Washington, Inc. v. City of Spokane*, 368 F.3d 1186,

12  1195 (9th Cir. 2004).  Plaintiffs do not explain, distinguish, or even cite these decisions.

13  *See* Pls.' MSJ.  These decisions apply here because equal protection analysis is co-

14  extensive with First and Second Amendment heightened scrutiny inquiries.  *See Pena*, 898

15  F.3d at 986; *Orin v. Barclay*, 272 F.3d 1207, 1213 n.3 (9th Cir. 2001).

16      Plaintiffs waive away other legislative deference decisions as "inapposite" without

17  grappling with their holdings.  Pls.' MSJ, at 36 n.14.  But these cases cannot be

18  distinguished so easily.  Contrary to Plaintiffs' assertion, some cases did involve

19  heightened scrutiny.  *See Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195 (1997)

20  (applying intermediate scrutiny); *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct.

21  1613, 1614 (2020) (Kavanaugh, J., dissenting from denial of application for injunctive

22  relief) (applying strict scrutiny).  In addition, the Ninth Circuit has repeatedly relied on the

23  legislative deference requirements in *Turner Broadcasting Systems*.  *See Pena*, 898 F3d. at

24  979; *Minority Television Project*, 736 F.3d at 1199.

25      Together, these cases require deference to the undisputed witness testimony and

26  legislative findings supporting the SWSA.

27      **1.  Undisputed Witness Testimony Supports the SWSA.**

28      Plaintiffs do not dispute material facts relating to witness testimony that supports

                                        7

the substantial relationship between important government objectives and the SWSA. Starting with physiologically-based advantages, Plaintiffs do not dispute that witnesses before the Arizona Legislature testified that biological sex provides boys with physiological advantages over girls, including before puberty.  Pls.' Opp'n to SUMF, at ¶ 18.  Plaintiffs do not dispute that no witness before the Arizona Legislature presented studies or data showing that boys do not have physiological advantages over girls, including before puberty.  *Id.* at ¶ 19.  Plaintiffs do not dispute that witnesses before the Arizona Legislature testified that the physiological advantages that boys have over girls result in boys possessing sports performance advantages over girls.  *Id.* at ¶ 20.  Plaintiffs do not identify any "specific facts" or evidence, *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007), controverting the fact that no witness before the Arizona Legislature presented studies or data showing that the physiological advantages that boys have over girls do not result in boys possessing sports performance advantages over girls.  Pls.' Opp'n to SUMF, at ¶ 21.  In addition, Plaintiffs do not dispute that a transgender woman testified before the Arizona Legislature that biological males have a sports performance advantage over biological females of 10-50%, depending on the sport, because "the reality is we're stronger, we're taller, we have bigger bones.  We can take in more oxygen.  We have a better fat distribution. … We have stronger ligaments."  *Id.* at ¶ 22.

Plaintiffs also do not dispute material facts relating to the implications of these physiological and performance advantages.  Plaintiffs do not dispute that witnesses before the Arizona Legislature testified that biological females would lose scholarship opportunities if they had to compete against biological males.  *Id.* at ¶ 26.  Plaintiffs do not dispute that witnesses before the Arizona Legislature testified that biological females would not be safe competing against biological males and that "[i]f you allow the boys to play against the girls, the girls are seriously going to get injured."  *Id.* at ¶ 27.

And Plaintiffs do not dispute material facts establishing that a problem existed. Plaintiffs do not dispute that witnesses before the Arizona Legislature testified that biological males were displacing and defeating biological females in high school and

college sports competitions across the country.  Pls.' Opp'n to SUMF, at ¶ 25.  Plaintiffs do not identify any "specific facts" or evidence, *Bias*, 508 F.3d at 1218, to controvert the fact that a witness before the Arizona Legislature testified that a biological boy displaced members of an Arizona junior high school girls basketball team and dominated opposing girls teams.  *Id.* at ¶ 24.  As the witness told the Arizona Legislature, she "invited every senator to see and witness what appears to be a male playing on a female's team that dominated a CAA league game."  Defs.' Ex. 4, at 12:8-10.  In that email invitation, which Plaintiffs do not challenge, the witness reported that the "transgender player single handedly scored all the shots in two play-off games this weekend against 2 all … girls teams."  Defs.' Ex. 22, at 20.  The witness asked senators to "[w]atch him solely score every point for his team completely blocking out any other players on the court," "[w]atch him demolish an all biologically girls team and steal their chance to compete in the state finals," and "[w]atch him push around our girls on the court and the refs too afraid to make a call, as he runs around unnecessary [*sic*] touching every girl on the court."[3]  *Id.*  Plaintiffs downplay this witness' testimony but offer nothing to dispute it.[4]  Pls.' MSJ, at 32. Plaintiffs also do not dispute that "[a] harm need not have occurred before a legislature can act."  *Roe v. Critchfield*, 137 F.4th 912, 925 (9th Cir. 2025).

The Ninth Circuit has held that citizen testimony to a legislative body can be enough by itself to uphold a law.  *See World Wide Video*, 368 F.3d at 1195.  In *World Wide Video*, the Ninth Circuit held that citizen testimony supporting the government interests at issue, "standing alone, was sufficient" to uphold the challenged ordinance under an intermediate scrutiny review.  *Id.*  Quoting a case approvingly, the Ninth Circuit noted that "anecdotal

---

[3] Plaintiffs' claims regarding Arizona examples of transgender sports participation, Pls.' MSJ, at 10, are wrong.  *See* Defs.' Resp. to Plaintiffs' SUMF, at ¶¶ 106, 110.  The Legislative Leaders move to strike the deposition transcripts of President Petersen and former Speaker Toma because neither legislator made an "explicit and unequivocal renunciation" of the legislative privilege, if a waiver can even be made.  *United States v. Helstoski*, 442 U.S. 477, 491 (1979) (excluding evidence).

[4] Plaintiffs incorrectly claim that a fact relating to the secrecy of proceedings "mischaracterizes the cited evidence."  Pls.' Opp'n to SUMF, at ¶ 28.  Witnesses complained about organizational secrecy under then-existing private participation policies. *See* Defs.' Ex. 4, at 11:12-21; Defs.' Ex. 5, at 5:7-20, 13:13-24, 15:9-21.  Plaintiffs thus did not properly controvert this fact, which should be deemed admitted.

1   evidence and reported experience can be as telling as statistical data …." *Id.* at 1195-96

2   (quoting *Stringfellow's of N.Y., Ltd. v. City of New York,* 694 N.E.2d 407, 417 (N.Y. 1998)).

3          The undisputed witness testimony supports the SWSA's substantial relationship to

4   important government objectives.  Citizen testimony, "standing alone," *id.* at 1195, is

5   sufficient to show that the SWSA is substantially related to important government

6   objectives of competitive fairness and equal opportunities for women in athletics, safety

7   for women in athletics, redressing past discrimination against women in athletics,

8   providing clear and consistent application of sex separation rules in athletics, and providing

9   democratic accountability for sex separation rules in athletics.

10                 **2.  Undisputed Legislative Findings Support the SWSA.**

11         Plaintiffs do not dispute material facts relating to the Arizona Legislature's findings

12   that support the substantial relationship between important government objectives and the

13   SWSA.  Plaintiffs do not dispute that the Arizona Legislature found that "[i]n studies of

14   large cohorts of children from six years old, '[b]oys typically scored higher than girls on

15   cardiovascular endurance, muscular strength, muscular endurance, and speed/agility, but

16   lower on flexibility.'" Pls.' Opp'n to SUMF, at ¶ 31.  Plaintiffs do not dispute that muscle

17   strength translates to farther throws (*id.* at ¶ 65), higher jumps (*id.* at ¶ 67), and faster runs

18   (*id.*).  Plaintiffs also do not dispute that throwing (*id.* at ¶ 92), jumping (*id.* at ¶ 88), and

19   running (*id.* at ¶ 85) are elements in many sports.  In Plaintiffs' view—which the

20   Legislative Leaders dispute—"[i]t is considered normal for boys to begin puberty at nine

21   years old." Pls.' Addtl. SUMF, at ¶ 47.  Based on the Arizona Legislature's findings on

22   studies of children from six years old, and Plaintiffs' admissions relating to the impact of

23   those studies and when they believe that puberty begins, Plaintiffs have no basis to dispute

24   that the Arizona Legislature expressly found that pre-pubescent boys possess athletic

25   advantages over pre-pubescent girls, which advantages are not attributable to pubertal

26   increases in male testosterone.  *See* Pls.' Opp'n to SUMF, at ¶ 30.

27         Plaintiffs also do not dispute that "[p]hysiological differences between males and

28   females relative to sports performance 'include a larger body size with more skeletal-

10

muscle mass, a lower percentage of body fact, and greater maximal delivery of anaerobic and aerobic energy.'" *Id.* at ¶ 32. Plaintiffs do not properly controvert the fact that the Arizona Legislature found that "[t]he benefits that natural testosterone provides to male athletes is not diminished through the use of testosterone suppression." *Id.* at ¶ 33. Plaintiffs also do not properly controvert the fact that the Arizona Legislature's findings cited peer-reviewed studies and court decisions in support.[5] *Id.* at ¶ 34. When asked, each of Plaintiffs' experts testified that they did not have opinions on the Arizona Legislature's legislative findings for the SWSA.[6] *Id.* at ¶ 37.

Plaintiffs do not dispute that the Arizona Legislature found that "[t]here is a sports performance gap between males and females, such that 'the physiological advantages conferred by biological sex appear, on assessment of performance data, insurmountable." *Id.* at ¶ 35. In addition, Plaintiffs do not dispute that the Arizona Legislature found that "[h]aving separate sex-specific teams furthers efforts to promote sex equality by providing opportunities for female athletes to demonstrate their skill, strength, and athletic abilities while also providing them with opportunities to obtain recognition, accolades, college scholarships and the numerous other long-term benefits that flow from success in athletic endeavors." *Id.* at ¶ 36. The Court did not consider any of these undisputed legislative findings in its preliminary injunction order. *See* Doc. 127.

In an equal protection case involving transgender claims, the Supreme Court

---

[5] Plaintiffs did not cite any "specific facts" or evidence to controvert this fact, and it is easily verifiable that the journals cited by the Arizona Legislature are peer-reviewed. *See* Communicative & Integrative Biology, https://www.tandfonline.com/journals/kcib20/about-this-journal#aims-and-scope; BJPsych Bulletin, https://www.cambridge.org/core/journals/bjpsych-bulletin; Chromosome Research, https://link.springer.com/journal/10577/submission-guidelines#Instructions%20for%20Authors_Editorial%20procedure; Sports Medicine, https://www.springer.com/gp/editorial-policies/peer-review-policy-process (see also Defs.' Ex. 41 (Hilton Report), at 33); European Journal of Sports Science, https://www.tandfonline.com/journals/tejs20/about-this-journal#aims-and-scope (see also Defs.' Ex. 25 (Shannon Dep.), at 109:6-8); British Journal of Sports Medicine, https://bjsm.bmj.com/; International Journal of Sports Physiology & Performance, https://journals.humankinetics.com/view/journals/ijspp/ijspp-overview.xml?tab_body=about.

[6] Plaintiffs fail to controvert this fact by citing to expert reports that do not question the Arizona Legislature's legislative findings but instead offer opinions quibbling with two studies cited in those findings. Pls.' Opp'n to SUMF, at ¶ 37.

recently reemphasized that courts "afford States 'wide discretion to pass legislation in areas where there is medical and scientific uncertainty.'" *Skrmetti*, 145 S. Ct. at 1836 (quoting *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007)). The Supreme Court noted that "[r]ecent developments" in the use of puberty blockers and hormones to treat transgender minors "only underscore the need for legislative flexibility in this area." *Id.* The Supreme Court relied on Tennessee's legislative findings to uphold the statute at issue. *Id.* at 1826, 1835-36. The Arizona Legislature is entitled to deference here just like the Tennessee Legislature was in *Skrmetti*.

Plaintiffs rely on cases involving "factually incorrect" legislative findings, such as provably false statements that no medical schools provided certain instruction or that a medical consensus found that a procedure "is never medically necessary," *Gonzales*, 550 U.S. at 165–66, or "[u]nsupported legislative conclusions" that contained no citations, particularly when it was not clear that the legislatures actually made the findings, *Latta v. Otter*, 771 F.3d 456, 469 (9th Cir. 2014); *see also Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 783 (9th Cir. 2014) (en banc) (one relevant factor in strict scrutiny analysis was "no findings, studies, statistics or other evidence" in the record supporting proposition's justifications). Those cases are not relevant here, since the Arizona Legislature supported its findings with peer-reviewed studies and court decisions, and Plaintiffs' contrary opinion testimony does not prove that the findings are factually incorrect. After all, the Supreme Court has not overruled legislative judgments just because "some part of the medical community were disinclined to follow the proscription." *Gonzales*, 550 U.S. at 166. Indeed, "[w]hen policy disagreements exist in the form of conflicting legislative 'evidence,' [courts] owe [the legislature's] findings deference in part because the institution is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions." *Pena*, 898 F.3d at 979 (quoting *Turner Broad. Sys.*, 520 U.S. at 195).

The evidence on key issues like competitive fairness and safety was undisputed before the Arizona Legislature and supported by witness testimony, peer-reviewed journal

articles, and court decisions.  Because Plaintiffs "[don't] like what [the Arizona Legislature] found," Plaintiffs improperly ask the Court to "rewrite the legislation, ignore the [legislative] evidence, and substitute … its own policy judgment for that of [the Arizona Legislature]." *Minority Television Project, Inc.*, 736 F.3d at 1199.  Plaintiffs cannot prevail by pointing to their hired expert's opinions on the effect of puberty blockers[7] and the prepuberty performance gap.  Pls.' MSJ, at 37-38.  The courts' "role is not to re-litigate a policy disagreement that the [Arizona] legislature already settled."  *Pena*, 898 F.3d at 980.  Instead, policy questions are left "to the people, their elected representatives, and the democratic process."  *Skrmetti*, 145 S. Ct. at 1837.

**C.  The SWSA serves important governmental objectives.**

The SWSA satisfies heightened scrutiny if it applies.  Plaintiffs do not dispute that competitive fairness, equal opportunities, safety, and redressing past discrimination are important governmental objectives.  Pls.' MSJ, at 17-18, 31-35.[8]

Plaintiffs contest other important government objectives based on their argument, lacking any support, that an objective must have been previously recognized in an equal protection case.  *Id.* at 35.  This argument is baseless because no case is required at all to recognize important governmental objectives in equal protection cases.  *See, e.g.*, *Nguyen v. I.N.S.*, 533 U.S. 53, 62-68 (2001); *Green v. City of Tucson*, 340 F.3d 891, 903 (9th Cir. 2003).  Even though authority was not required, the Legislative Leaders demonstrated that the Supreme Court and Ninth Circuit have recognized the important government objectives asserted here.[9]  Leg. MSJ, at 13-14.  Like the Legislative Leaders, the Ninth Circuit has

---

[7] Plaintiffs' argument is further undermined by their admission that no studies exist on the effect of puberty blockers on sports performance.  Pls.' Opp'n to SUMF, at ¶ 83.

[8] Although Plaintiffs focus on whether a state official has enforced the SWSA through regulations or policies, Pls.' MSJ, at 18 n.4, the SWSA provides enforcement through a private right of action, not through authority delegated to any state official, *see* A.R.S. § 15-120.02(E), (F).

[9] Plaintiffs dispute the important governmental objectives of clarity, uniformity, and certainty by citing to a case that did not dispute that uniformity was an important governmental objective.  *Pedersen v. Off. of Pers. Mgmt.*, 881 F. Supp. 2d 294, 346 (D. Conn. 2012).  That court's rational basis analysis—finding that a law would create "complexity and inconsistency," *id.*—is not applicable to the SWSA, which removed complexity and inconsistency.

1   looked to a non-equal protection case to recognize an important governmental objective.
2   *See Critchfield*, 137 F.4th at 923 (citing *Sepulveda v. Ramirez*, 967 F.2d 1413, 1416 (9th
3   Cir. 1992) (involving Section 1983 claim).

4        Plaintiffs *post hoc* justification argument is also wrong.  The sponsor of the
5   legislation testified regarding the need for uniformity, the problems with secrecy, and the
6   powerlessness that athletes had under the rules set by the AIA and CAA.  Defs.' Ex. 5,
7   13:19-24; 15:9-21, 18:10-14.  The Governor's signing statement also emphasized that the
8   bill "creat[ed] a statewide policy."  Defs.' Ex 20, at 3.  "Evidence of legislative intent
9   generally arises from the contemporaneous record, although a court may consider
10  testimony from members of the legislative body in question regarding that record."
11  *California Tow Truck Ass'n v. City & Cnty. of San Francisco*, 693 F.3d 847, 864 n.15 (9th
12  Cir. 2012).  Plaintiffs also do not claim that the interests asserted "conflict with the
13  contemporaneous legislative record."  *Id.*  Furthermore, Plaintiffs' *post hoc* argument is
14  also irrelevant under rational basis review.  *Beach Commc'ns*, 508 U.S. at 315 ("it is
15  entirely irrelevant for constitutional purposes whether the conceived reason for the
16  challenged distinction actually motivated the legislature").[10]

17     **D.  The SWSA is substantially related to achievement of those objectives.**

18        **1.  The SWSA provides competitive fairness and equal opportunities for**
19            **women in athletics.**

20        Plaintiffs have no evidence to counter the voluminous record showing that boys
21  have physiological advantages over girls that translate into athletic advantages, including
22  before puberty: boys run faster, jump higher, jump farther, and throw farther than girls.
23  Pls.' Opp'n to SUMF, at ¶¶ 38-102.  Lacking any contrary data, Plaintiffs claim these on-
24  point studies are not good enough by pointing to red herrings: what athletes were studied,
25  how many years of data were included, and what other factors were conclusively disproven.
26  *See id.*  But the Ninth Circuit has "never forced an experimenting state to prove its

27
28  ───────────────
    [10] Contrary to Plaintiffs' claims, Pls.' MSJ, at 31, this is not the first time these arguments
    have been made.  *See, e.g.*, Doc. 114; PI Hearing Transcript, 58:9-59:22.

14

policymaking judgment with scientific precision, especially when expert opinion supports the decision." *Pena*, 898 F.3d at 984.  To satisfy intermediate scrutiny, "the state need not don lab coats, equip … technology, and test the technological feasibility results itself.". *See id.*  Thus, the evidence showing that prepuberty boys have physiological and athletic advantages over prepuberty girls is sufficient to uphold the SWSA.

Plaintiffs' challenges are also baseless.  For example, to dispute a dozen exhibits showing that before puberty, biological males run faster than biological females, Plaintiffs provide the following citation-less response: "The findings in these studies are observational, cannot be generalized to the entire prepubertal population in Arizona, and did not involve solely prepubertal athletes, among other issues as outlined in the rebuttal expert reports by Dr. Shumer and Dr. Shannon."  Pls.' Opp'n to SUMF, at ¶ 86.  Of course the studies are observational—they record how fast boys and girls run, which is a key factor here.  The studies collectively include data from more than one million children broken out by age to show that the male advantage is consistent both before puberty and after puberty.  Plaintiffs cannot show that student athletes in Arizona are so different from the children studied that the results should be discarded.  Ironically, despite their objections to the studies cited by Defendants, Plaintiffs' sole authority in opposition is an Internet column[11] discussing data (observational) from 300 Australian children (which, per Plaintiffs, would not be generalizable to Arizona) between the ages of 3 and 19 (not solely prepubertal).  *See id.* at ¶¶ 57, 62, 64, 66, 68-70, 73, 77, 80, 82.  "[I]n the face of policy disagreements, or even conflicting legislative evidence, '[courts] must allow the government to select among reasonable alternatives in its policy decisions.'"  *Pena*, 898 F.3d at 980 (citation omitted).

Despite the mountain of evidence showing that prepubertal boys have physiological and athletic advantages over prepubertal girls, Plaintiffs cling to their theory that these

---

[11] Dr. Shumer cited to Marnee McKay & Joshua Burns, *When it Comes to Sport, Boys "Play Like a Girl,"* The Conversation (Aug. 3, 2017), https://theconversation.com/when-it-comes-to-sport-boys-play-like-a-girl-80328.  *See* Pls.' Ex. 3, ¶ 21.  Dr. Shumer likely cited the Internet website because the underlying journal article in his FN2 contained only a fraction of the measurements touted in the Internet column (none on walking or jumping), and the article showed that boys at every age, including ages 3-9 and 10-19, had greater strength than girls in every measurement reported.  *See* McKay, Table 1.

advantages do not emerge until testosterone exposure during puberty.  Pls.' MSJ, at 6-7, 9, 18-19, 21.  Plaintiffs' theory relies on a single journal article.  Defs.' Ex. 23 (Shumer Dep.), at 137:7-10.  The article contained no primary research, *id.* at 147:2-4, and did not report any data before age 10, *id.* at 152:16-18.  Plaintiffs' expert admitted that the article did not have data to support any prepuberty conclusions.  *Id.* at 155:20-156:23.  The data that the article did report showed that boys had an advantage over girls at every age measured.  *Id.* at 153:3-11, 156:24-157:9.

Plaintiffs also suggest that "differences in athletic performance between pre-pubertal boys and girls could be the result of a range of factors, including social ones such as greater opportunities for boys to play sports than girls and greater encouragement of boys to play sports."  Pls.' MSJ, at 7; *see also id.* at 12.  But Plaintiffs' experts could not identify a single peer-reviewed journal article finding that social factors play a role in the sports performance gap.  Pls.' Opp'n to SUMF, at ¶ 102.  On the other hand, a peer-reviewed article found that social factors did not contribute to the sex differences in athletic performance.  *Id.* at ¶ 101.  In addition, the article determined that focusing on elite sports performances limited the potential impact of sociocultural factors.  *Id.* at ¶ 100.  Other peer-reviewed articles found that at least some of the male-female performance gap among prepubertal children is due to biological factors.  *Id.* at ¶ 99.

Finally, Plaintiffs claim that their individual circumstances matter despite being unable to explain away (at 32 n.10) an intermediate scrutiny case holding that the court "assess[es] congressional judgment about a category of persons, not about Plaintiff himself."  *Mai v. United States*, 952 F.3d 1106, 1119 (9th Cir. 2020); *see also Pena*, 898 F.3d at 986 (holding that an equal protection challenge "is subsumed in the Second Amendment inquiry").  But even if these circumstances are considered, Plaintiffs do not dispute that Jane Doe won a girls track event the first time running that distance, had the third-fastest time in two girls running competitions, and finished in the top 11 in five girls running competitions.  Pls.' Opp'n to SUMF, at ¶¶ 149-151.  Plaintiffs also do not dispute that Jane Doe made the school soccer team and some girls did not.  *Id.* at ¶¶ 148, 155.  In

addition, Plaintiffs do not dispute that Megan Roe testified to having more service aces, tips, and dumps than teammates on the school junior varsity volleyball team. *Id.* at ¶ 165. And Plaintiffs do not dispute that Jane Doe and Megan Roe received playing time on their school soccer and volleyball teams, respectively. *Id.* at ¶¶ 156, 162. These undisputed facts demonstrate that girls have been displaced and disadvantaged by Plaintiffs' participation in girls sports.

The medical records upon which Plaintiffs rely should be stricken because they lack expert support, foundation, or authentication, and they contain hearsay. None of Plaintiffs' experts medically examined Plaintiffs, reviewed Plaintiffs' medical records, knew Plaintiffs' testosterone levels, or took any steps to independently verify any information about Plaintiffs. Pls.' Opp'n to SUMF, at ¶¶ 141-147. Plaintiffs cannot rely on medical records because they have not provided expert testimony to interpret them. *See Cervantes v. Pratt*, No. 04-cv-1004, 2008 WL 11424110, at *11 (D. Ariz. Aug. 5, 2008) (burden is on proffering party to provide "expert testimony to interpret the medical records"); *Cottrell v. Igbinosa*, No. 1:13-cv-1530, 2017 WL 550580, at *16 (E.D. Cal. Feb. 9, 2017), *report and recommendation adopted*, 2017 WL 1064724 (E.D. Cal. Mar. 20, 2017) ("The interpretation of medical test results requires specialized education and training, and therefore evidence must come from a medical expert."); *Hill v. Clark*, No. 1:13-cv-386, 2016 WL 696433, at *1 (E.D. Cal. Feb. 22, 2016); *Lim v. Adler*, No. 1:09-cv-1753, 2010 WL 2348743, at *7 n.3 (E.D. Cal. June 8, 2010). Plaintiffs also cannot rely on medical records because they lack foundation and authentication. *Allen v. Rivera*, No. 1:05-cv-146, 2013 WL 5670862, at *5 (E.D. Cal. Oct. 15, 2013) ("Plaintiff cannot lay a foundation for these records composed by third parties" … the medical records "contain medical … opinions which can only be offered by a medical … expert"); *Morgan v. Doran*, 308 F. App'x 231, 231-32 (9th Cir. 2009). Finally, Plaintiffs cannot rely on medical records because they consist of hearsay and hearsay within hearsay. *Pope v. Las Vegas Metro. Police Dep't*, 647 F. App'x 817, 819 (9th Cir. 2016) (affirming exclusion of medical records as hearsay which "do not fall under any of the hearsay exceptions"); *Angelo v.*

1   *Thomson Int'l, Inc.*, No. 1:21-cv-1609, 2024 WL 3202513, at \*4 (E.D. Cal. June 27, 2024)

2   (Fed. R. Evid. 803(4) "applies only to statements made by the patient to the doctor").

3         **2. The SWSA safety for women in athletics**.

4         The undisputed facts prove that biological females are less safe when competing

5   against biological males. Plaintiffs do not dispute that biological females are more likely

6   than biological males to suffer concussions in sports, Pls.' Opp'n to SUMF, at ¶ 108, and

7   that biological females on average suffer more severe and longer lasting disability than

8   biological males if a concussion occurs, *id.* at ¶ 109. Plaintiffs do not dispute that

9   biological females are at a greater risk of concussive injury when competing in sports

10  against biological males. *Id.* at ¶ 110. Similarly, Plaintiffs do not dispute that biological

11  females are more vulnerable to anterior cruciate ligament ("ACL") injuries than biological

12  males. *Id.* at ¶ 111. Plaintiffs also do not dispute that biological females are at a greater

13  risk of ACL injury when competing in sports against biological males. *Id.* at 112.

14        Plaintiffs complain that the SWSA applies to all sports, regardless of whether they

15  involve contact. Pls.' MSJ, at 19. First, "the fact the line might have been drawn differently

16  at some points is a matter for legislative, rather than judicial, consideration." *Skrmetti*, 145

17  S. Ct. at 1836 (citation omitted). Second, other important governmental objectives, such

18  as the fairness and equality interest just discussed, apply to a broader category of sports

19  than just contact sports. Third, Plaintiffs play sports—basketball, soccer, and volleyball—

20  that are contact sports. Pls.' Ex. 20, 105:18-25; Defs.' SUMF, at ¶¶ 156-57, 162.

21        Plaintiffs also criticize the SWSA for not considering Plaintiffs', or any other

22  individual athlete's, medical treatment. Pls.' MSJ at 19, 35. But the Equal Protection

23  Clause "does not demand 'an individualized hearing' to assess Plaintiff's own personal

24  level of risk." *Mai*, 952 F.3d at 1119. The evidence of prepubertal physiological and sports

25  advantages, and the lack of evidence supporting Plaintiffs' testosterone theory, establishes

26  that medical treatment is not relevant. But even if Plaintiffs' argument were not baseless,

27  "[i]n the area of economics and social welfare, a State does not violate the Equal Protection

28  Clause merely because the classifications made by its laws are imperfect." *Skrmetti*, 145

1    S. Ct. at 1836 (citation omitted).

2        Plaintiffs' argument about the SWSA allowing girls to play on boys teams overlooks

3    Title IX's requirements that girls at schools without a girls team must be allowed to

4    compete on boys teams in non-contact sports. *See* 34 C.F.R. § 106.41(b). The SWSA does

5    not differentiate between contact and non-contact sports, and the Court should "decline the

6    plaintiffs' invitation to second-guess the lines that [the SWSA] draws." *Skrmetti*, 145 S.

7    Ct. at 1836. The SWSA also advances its safety interest by protecting every female athlete

8    who does not assume the risk of playing against males.

9        Finally, Plaintiffs mischaracterize the testimony of the only sports medicine doctor

10    in this case. Pls.' MSJ, at 34. Dr. Carlson opined that "participation by biological males

11    in these types of girls' or women's sports, based on gender identity, creates significant

12    additional risk of injury for the biologically female participants competing alongside these

13    transgender athletes." Defs.' Ex. 40 (Carlson Report), at 4-5. Dr. Carlson further opined

14    that "eligibility policies based on ideology or gender identity rather than science, will, over

15    time, result in increased, and more serious, injuries to girls and women who are forced to

16    compete against biologically male transgender athletes." *Id.* at 64. Plaintiffs offer no

17    competing testimony by any doctor with experience in sports medicine. Therefore, the

18    undisputed sports medicine testimony in this case supports the safety interests advanced by

19    the SWSA.

20        **3. The SWSA redresses past discrimination against women in athletics.**

21        The undisputed facts prove that the SWSA advances an important governmental

22    objective in redressing past discrimination. Plaintiffs do not dispute that female-only sports

23    exploded in popularity after the passage of Title IX. Pls.' Opp'n to SUMF, at ¶ 103.

24    Plaintiffs also do not dispute that the Arizona Legislature received testimony that biological

25    males were displacing and defeating biological females in high school and college sports

26    competitions across the country. *Id.* at ¶ 25. And Plaintiffs do not dispute that according

27    to information received by the United Nations Special Rapporteur on violence against

28    women and girls, over 600 female athletes in more than 400 competitions have lost more

1    than 890 medals in 29 different sports by competing against male athletes.  *Id.* at ¶ 138.

2        Plaintiffs argue that alleged "historic discrimination" against transgender

3    individuals distinguishes the Ninth Circuit's decision in *Clark I*, 695 F.2d 1126 (9th Cir.

4    1982).  Pls.' MSJ, at 35.   But "[f]or purposes of the Fourteenth Amendment, the relevant

5    question is whether the group has been subject to a longstanding pattern of discrimination

6    *in the law*."  *Skrmetti*, 145 S. Ct. at 1853 (Barrett, J., concurring).  This "poses a problem

7    for the plaintiffs' argument," *id.*, because Plaintiffs here have never presented evidence of

8    "a history of *de jure* discrimination as a class," *id.* at 1855; *see also Skrmetti*, 145 S. Ct. at

9    1866 (Alito, J., concurring in part and concurring in the judgment).  Without this evidence,

10   Plaintiffs cannot disprove that the SWSA is substantially related to the important

11   government objective of redressing past discrimination against women in athletics.

### 4.  The SWSA provides clear and consistent application of sex separation rules in athletics.

14       Plaintiffs do not contest that Arizona has an important government objective in clear

15   and consistent application of sex separation rules in athletics, or that the SWSA is

16   substantially related to that important objective.  Pls.' MSJ, at 35.  As already discussed,

17   Plaintiffs wrongly claim that this is a *post hoc* justification.  *See* Argument § I.C, *supra*.

18   Plaintiffs also incorrectly dismiss a case recognizing the important governmental interest

19   in uniformity by claiming that it must be an equal protection case.  *See id*.  But even if that

20   were the rule, other circuit court decisions recognize this important governmental objective

21   in the context of equal protection claims involving transgender plaintiffs.  *See Corbitt v.*

22   *Sec'y of the Alabama L. Enf't Agency*, 115 F.4th 1335, 1349 (11th Cir. 2024) ("developing

23   and maintaining a uniform legal scheme and consistent policies and procedures" is an

24   important governmental objective); *Gore v. Lee*, 107 F.4th 548, 561 (6th Cir. 2024)

25   ("Maintaining a consistent definition [of sex] ... is a legitimate State interest.").  And the

26   Arizona Constitution specifically charges the Arizona Legislature with providing for

27   uniformity in public education: "The legislature shall enact such laws as shall provide for

28   the establishment and maintenance of a general and uniform public school system …."

1    ARIZ. CONST. art. XI, § 1(A).

2          The SWSA set a single standard applicable to all school sports in Arizona.  This

3    was substantially related to the important governmental objectives of providing clarity,

4    uniformity, and certainty to athletes and their parents.

5          **5.  The SWSA provides democratic accountability for sex separation rules**

6              **in athletics.**

7          Contrary to Plaintiffs' mischaracterization, Pls.' MSJ, at 36, the interest in

8    democratic accountability is directly relevant to one of Plaintiffs' core arguments.

9    Plaintiffs emphasize the "status quo prior to the ban," *id.* at 8, which involved unelected

10   officials in multiple organizations making confidential, case-specific determinations,

11   Defs.' SUMF ¶¶ 3-16.  In Plaintiffs' view, this action by unelected officials preempted the

12   Arizona Legislature from making a different decision.  As the bill sponsor and a witness

13   put it, this left Arizonans feeling "powerless."  Defs.' Ex. 5, at 15:14; *see also* Defs.' Ex.

14   4, at 12:14-18.

15         Plaintiffs' view conflicts with the law.  "The [Arizona] legislature has plenary power

16   to deal with any topic unless otherwise restrained by the Constitution." *Seisinger v. Siebel*,

17   203 P.3d 483, 490 (Ariz. 2009) (citation omitted).  "Title 15," in which the SWSA is

18   located, "by providing for virtually every area of concern in the field, makes clear the fact

19   that the [Arizona] legislature has plenary power over public education in this state."

20   *Amphitheater Unified Sch. Dist. No. 10 v. Harte*, 624 P.2d 1281, 1284 (Ariz. 1981)

21   (Cameron, J., dissenting); *see also* ARIZ. CONST. art. XI, § 1(A).  Exercising this authority,

22   the Arizona Legislature has passed numerous laws regulating school athletics.  *See, e.g.*,

23   A.R.S. §§ 15-341(24), 15-347(B), 15-795.01, 15-802.01(A), 15-1772, 15-1892(A).  Under

24   Arizona's Constitution, action by unelected officials cannot preempt the Arizona

25   Legislature from making its own decision on school athletic participation policies.

26         Circuit court opinions reinforce the important principle of democratic accountability

27   by limiting when a legislative body can delegate its authority to outside actors.  The

28   legislative branch "has express constitutional authority to legislate" and "is directly

1   accountable to the American people," but "[n]either is true of administrative agencies."
2   *Texas v. Rettig*, 993 F.3d 408, 412 (5th Cir. 2021) (Ho, J., dissenting from denial of
3   rehearing en banc).  "[I]f people outside government could wield the government's
4   power—then the government's promised accountability to the people would be an
5   illusion." *Consumers' Rsch., Cause Based Com., Inc. v. F.C.C.*, 88 F.4th 917, 925 (11th
6   Cir. 2023).
7           The SWSA created a statewide policy by elected officials accountable to the people.
8   This was substantially related to the important governmental objective of democratic
9   accountability.
10          **E.  Plaintiffs' "class of one" claim fails.**
11          Relying on substantive due process analysis, *see Sell v. United States*, 539 U.S. 166,
12  177 (2003), *Witt v. Dep't of Air Force*, 527 F.3d 806, 819 (9th Cir. 2008) (rejecting equal
13  protection claim under rational basis review), Plaintiffs argue that an "as applied" equal
14  protection challenge should apply the SWSA to their individual circumstances.  *See* Pls.'
15  MSJ, at 20-21.  This is a "class of one" claim, *see* Argument § I.A, *supra*, that Plaintiffs
16  have failed to establish.  "In order to claim a violation of equal protection in a class of one
17  case, the plaintiff must establish that the [government] intentionally, and without rational
18  basis, treated the plaintiff differently from others similarly situated."  *N. Pacifica LLC v.
19  City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008) (citations omitted).  "A class of one
20  plaintiff must show that the discriminatory treatment 'was intentionally directed just at
21  him, as opposed ... to being an accident or a random act.'"  *Id.*  Plaintiffs have not presented
22  evidence, because there is none, that Arizona intentionally directed the SWSA at them or
23  that Arizona treated them differently from others similarly situated without a rational basis.
24          Traditional "classification" equal protection claims, which Plaintiffs also assert to
25  pursue heightened scrutiny, consider classes, not individuals.  For example, "SB1 divides
26  minors into two groups: those who might seek puberty blockers or hormones to treat the
27  excluded diagnoses, and those who might seek puberty blockers or hormones to treat other
28  conditions." *Skrmetti*, 145 S. Ct. at 1833.  The Supreme Court emphasized the "lack of

identity" between transgender status and the medical diagnoses excluded by the state law: "Because only transgender individuals seek puberty blockers and hormones for the excluded diagnoses, the first group includes only transgender individuals; the second group, in contrast, encompasses both transgender and nontransgender individuals." *Id*. The Court thus declined to find that the state law "exclude[d] any individuals on the basis of transgender status." *Id.* at 1833-34.

The SWSA separates student athletes into two groups: females and males.  A.R.S. § 15-120.02(A).  The first group includes both transgender individuals and nontransgender individuals, both of which are allowed to play in girls sports.  The second group includes both transgender individuals and nontransgender individuals, neither of which are allowed to play in girls sports.  Under the Supreme Court's reasoning in *Skrmetti*, the SWSA does not "exclude[] any individuals on the basis of transgender status." *Skrmetti*, 145 S. Ct. at 1833-34.  Plaintiffs cannot construct a class that matches their individual circumstances and is consistent with the statutory text without excluding transgender girls who have only socially transitioned or who medically transitioned after puberty.

## II.   The Save Women's Sports Act Is Valid Under the ADA/RA.

### A. Plaintiffs have failed to prove substantial limitation of a major life activity.

Plaintiffs present no evidence that a disability has substantially limited a major life activity of either Plaintiff.  *See* Pls.' MSJ at 26-27, 40-41.  Plaintiffs also do not dispute that they testified in their depositions that the major life activities they identified earlier in the litigation are not substantially limited.  Pls.' Opp'n to SUMF, at ¶¶ 160-61, 166-67.  Yet now Plaintiffs claim that this absence of evidence is due entirely to their treatment, and they would have suffered all the symptoms of gender dysphoria but for treatment.[12]  *See* Pls.' MSJ, at 40-41.

The law demands evidence, not a laundry list of possible symptoms associated with a years-old diagnosis.  "Under the ADA … 'disability' is a carefully defined term of art,

---

[12] In May 2025, the U.S. Department of Health and Human Services published a report finding that "[t]here is currently no international consensus about best practices for the care of children and adolescents with gender dysphoria."  Defs.' Addtl. SUMF, ¶ 15.

1    which is measured by reference to limitations on major life activities, not by reference to

2    doctors' past assessments of the plaintiff's condition." *Amyette v. Providence Health Sys.*,

3    388 F. App'x 606, 607 (9th Cir. 2010); *see also Toyota Motor Mfg., Ky., Inc. v. Williams,*

4    534 U.S. 184, 198 (2002), *superseded by statute on other grounds,* ADA Amendments Act

5    of 2008, Pub.L. No. 110–325 ("It is insufficient for individuals attempting to prove

6    disability status under this test to merely submit evidence of a medical diagnosis of an

7    impairment."). Evidence is necessary, even in mental health cases, *Amyette*, 388 F. App'x

8    at 607, to evaluate whether the disability substantially limits a major life activity. For

9    example, the Ninth Circuit rejected the argument that a shoulder injury substantially limited

10   a worker's sleeping and lifting because he was only limited from sleeping on his left side

11   and from lifting more than 25 pounds. *Sanchez v. United Parcel Serv. Inc.*, 625 F. App'x

12   806, 808 (9th Cir. 2015). The Ninth Circuit has affirmed summary judgment in other ADA

13   cases lacking evidence of a substantial limitation of a major life activity. *Vinson v. Gen.*

14   *Motors Co.*, No. 22-15907, 2024 WL 412530, at *1 (9th Cir. Feb. 5, 2024); *Glass v. Asic*

15   *N., Inc.*, 848 F. App'x 255, 257 (9th Cir. 2021); *Amyette*, 388 F. App'x at 607.

16       The only case cited by Plaintiffs, from a district court in Pennsylvania, does not

17   support a different outcome. *See* Pls.' MSJ, at 26-27, 41 (citing *Doe v. Hosp. of Univ. of*

18   *Pa.*, 546 F. Supp. 3d 336, 340 (E.D. Pa. 2021)). In a "close call" denying a motion to

19   dismiss, the court's decision turned in part on "draw[ing] all inferences in [the plaintiff's]

20   favor." *Id.* at 350. Besides the general allegations relating to gender dysphoria, the court

21   also noted "at least one specific allegation." *Id.* ("Doe alleges that, after the incident, her

22   'GD flared up and she experienced difficulty in returning to HUP, her workplace.'"). The

23   court warned that the plaintiff "must prove far more to survive a future summary judgment

24   motion." *Id.* Here, Plaintiffs have presented no more than the general gender dysphoria

25   allegations that the Pennsylvania court predicted would not survive summary judgment.

26       Plaintiffs' declarations do not provide the missing specific evidence of disability,

27   and their self-serving statements should be excluded. "To survive summary judgment, an

28   affidavit supporting the existence of a disability must not be merely self-serving and must

24

contain sufficient detail to convey the existence of an impairment." *Rohr v. Salt River Project Agric. Imp. & Power Dist.*, 555 F.3d 850, 859 (9th Cir. 2009); *see also Glass*, 848 F. App'x at 257. Plaintiffs' declarations do not contain the necessary detail because they predict, without support, what might happen in the future. In addition, "[t]he general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). Plaintiffs cannot avoid summary judgment by attempting to undo their deposition testimony.

> **B.  Plaintiffs have failed to establish that sports is a required treatment or that their participation is a reasonable modification.**

Plaintiffs rely on their experts for proof that competing on a boys' team "would directly contradict [their] medical treatment for gender dysphoria and would be painful and humiliating." Pls.' MSJ, at 42. But Plaintiffs admit that their experts did not medically examine Jane Doe or Megan Roe, review their medical records, or independently verify anything that Plaintiffs' counsel told them about Plaintiffs. Pls.' Opp'n to SUMF, at ¶¶ 142, 144-145. Plaintiffs have not presented any admissible evidence that Plaintiffs' treatment requires them to play girls' sports. Instead, Plaintiffs' expert testified that he was not aware of a standard of care for treatment of gender dysphoria relating to sports participation. Defs.' Ex. 23 (Shumer Dep.), at 124:13-125:9. Plaintiffs' expert also testified that a transgender girl with gender dysphoria who wants to play on a co-ed team, a club team, a recreational team, or no sports team at all would not conflict with any standard of care for treating gender dysphoria. *Id.* at 127:1-19. Thus, because Plaintiffs meet the essential eligibility requirements, Plaintiffs have not presented evidence that they have been excluded from school sports because of a disability.

Plaintiffs rely on authority that demonstrates that they have not requested a reasonable modification. The Fourth Circuit affirmed summary judgment for a defendant after finding that professionalism was an essential aspect of a medical school program and the plaintiffs' proposed accommodation was "unreasonable on its face" because of its

"indefinite duration and uncertain likelihood of success." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 465 (4th Cir. 2012). Likewise, Plaintiffs' proposed accommodation will not "presently, or in the immediate future, enable[] [them] to perform the essential functions," *id.* at 466 (citation omitted), of biological girls sports teams because they will never be biological girls. *Cf. Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979) ("An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap."). And Plaintiffs have no response to the Supreme Court's decision standing for the proposition that their male physiology gives them "an advantage over others," and so "fundamentally alter[s] the character of the competition." Leg. MSJ, at 16 (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683 (2001)).

## C. Plaintiffs have failed to prove that they have been excluded due to gender dysphoria.

Plaintiffs do not respond to any of the cases establishing a causation requirement for their ADA and RA claims. *See* Leg. MSJ, at 17. For example, the Ninth Circuit affirmed judgment for a defendant when a plaintiff's exclusion from a reduced public transit fare program "was due to his financial circumstances, not to his medical disability." *Weinreich v. Los Angeles Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 979 (9th Cir. 1997). Here, Plaintiffs cannot play girls sports because of their biological sex, not any disability.

Plaintiffs also cannot reconcile their consistent argument that the SWSA discriminates against them based on their transgender status, which does not translate to a gender dysphoria diagnosis, Leg. MSJ, at 17 (citing filings), with their argument now that the SWSA also excludes them based on their gender dysphoria diagnoses, Pls.' MSJ, at 43. According to Plaintiffs, they have always known that they are transgender and began identifying as transgender years before they were diagnosed with gender dysphoria. *See, e.g.*, Doc. 7, at ¶¶ 3-7; Doc. 9, at ¶¶ 3-6. Thus, according to their own arguments about the SWSA and their statements about their identity, Plaintiffs cannot show that they could play on girls sports teams but for their gender dysphoria diagnoses.

1    **III.    Plaintiffs' Request for a Permanent Injunction Should Be Denied.**

2          The Court should not enter a permanent injunction because the relevant factors

3    counsel against it.

4          *Irreparable harm.*  Plaintiffs' main argument in favor of irreparable harm relates to

5    a violation of the law.  However, as demonstrated by Defendants' briefing, the SWSA does

6    not violate the Equal Protection Clause, Title IX, or the ADA.  Plaintiffs' monetary

7    damages and public interest arguments also hinge on the existence of a violation of the law,

8    which there has not been.

9          In addition, the SWSA allows Plaintiffs to participate in school sports, A.R.S. § 15-

10   120.02(C), and it does not prevent them from playing on co-ed or recreational teams.

11   "[M]ost courts seem to lean toward the harm being irreparable only when the person cannot

12   participate in the sport at all."  *Gregor v. W. Va. Secondary Sch. Activities Comm'n*, No.

13   2:20-CV-00654, 2020 WL 6292813, at *4 (S.D. W. Va. Oct. 27, 2020) (citing cases).

14   Courts have found no irreparable harm existed, and denied preliminary injunction motions,

15   when high school athletes claimed harm from not being allowed to compete on a school

16   sports team.  *Id.*; *A.M. by & through McKalip v. Pennsylvania Interscholastic Athletic*

17   *Ass'n, Inc.*, No. 1:20-CV-290-SPB, 2020 WL 5877617, at *4 (W.D. Pa. Oct. 1, 2020)

18   (citing cases); *Dziewa v. Pennsylvania Interscholastic Athletic Ass'n, Inc.*, No. CIV.A. 08-

19   5792, 2009 WL 113419, at *7 (E.D. Pa. Jan. 16, 2009).  If Plaintiffs do not compete in

20   school sports, it will be due to their voluntary choice since they have the option of

21   participating on teams that match their biological sex or on co-ed teams.  "Self-inflicted

22   wounds are not irreparable injury."  *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir.

23   2020) (internal quotation and citations omitted); *see also Epic Games, Inc. v. Apple Inc.*,

24   493 F. Supp. 3d 817, 847-48 (N.D. Cal. 2020) (same); *Volga Dnepr UK Ltd. v. Boeing Co.*,

25   464 F. Supp. 3d 1238, 1247 (W.D. Wash. 2020) ("In circumstances where parties seeking

26   injunctive relief inflicted the harm upon themselves, courts have declined to find

27   irreparable harm.").

28          Finally, Plaintiffs testified that club and recreational sports and extracurricular

27

activities provided many of the benefits that they identified as flowing from school sports. Defs.' Ex. 77, at 52:11-55:24; Defs.' Ex. 82, at 11:6-14:25. Thus, Plaintiffs will not suffer irreparable harm.

*Balance of equities / public interest*. The State of Arizona will suffer irreparable injury from a permanent injunction. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (internal quotation omitted); *see also Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("it is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined").

The public also will suffer irreparable injury. The people of Arizona have an interest in the effectiveness of laws passed by their elected officials. Women in Arizona also have an interest in not competing against, being injured by, or being displaced by, men in women's sports. Plaintiffs already have displaced and dominated biological girls by winning races, scoring more aces and tips than other team members, making cut-sport teams, and receiving playing time. Plaintiffs have the ability to participate in sports on either teams of their biological sex or co-ed teams. Accordingly, the public interest and balance of equities do not favor a preliminary injunction.

## CONCLUSION

For these reasons, the Legislative Leaders respectfully request that the Court grant them summary judgment on all of Plaintiffs' claims, deny Plaintiffs' Motion for Summary Judgment, and enter judgment for the Defendants.

Dated: July 14, 2025                    Respectfully submitted,


                                        JAMES OTIS LAW GROUP, LLC

                                        */s/ Justin D. Smith*
                                        Justin D. Smith, Mo. Bar No. 63253*
                                        Kenneth C. Capps, Mo. Bar No. 70908*
                                        530 Maryville Centre Drive, Suite 230
                                        St. Louis, Missouri 63141
                                        (816) 678-2103
                                        Justin.Smith@james-otis.com
                                        * *pro hac vice*

                                        *Attorneys for Intervenor-Defendants President*
                                        *Petersen and Speaker Montenegro*



## CERTIFICATE OF SERVICE

I hereby certify that, on July 14, 2025, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

                                        */s/ Justin D. Smith*