Justin D. Smith, Mo. Bar No. 63253*
Kenneth C. Capps, Mo. Bar No. 70908*
James Otis Law Group, LLC
530 Maryville Centre Drive, Suite 230
St. Louis, Missouri 63141
Telephone: (816) 678-2103
Justin.Smith@james-otis.com

*Attorneys for Intervenor-Defendants President Petersen and Speaker Montenegro*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Jane Doe, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Thomas C. Horne, in his official capacity as State Superintendent of Public Instruction, *et al.*,<br><br>Defendants. | Case No. 4:23-cv-00185-JGZ<br><br>**Opposition to Plaintiffs' Additional Statement of Undisputed Facts by Senate President Warren Petersen, Speaker of the House of Representatives Steve Montenegro, and State Superintendent of Public Instruction Thomas C. Horne**<br><br>**Oral Argument Requested** |

President of the Arizona State Senate Warren Petersen, Speaker of the Arizona House of Representatives Steve Montenegro, and State Superintendent of Public Instruction Thomas C. Horne submit this consolidated Opposition to Plaintiffs' Additional Statement of Undisputed Facts (*see* Docs. 303 & 307 (sealed)), along with their consolidated Statement of Additional Undisputed Material Facts in support of their Oppositions to Plaintiffs' Cross-Motion for Summary Judgment (*see* LRCiv 56.1(b)).

1

2

**RESPONSES AND OBJECTIONS TO PLAINTIFFS'**

**ADDITIONAL STATEMENT OF UNDISPUTED FACTS**

3

4

    1.    A transgender person's gender identity differs from their assigned sex at birth. (Pls.' Ex. 1 ¶¶ 15, 17; Pls.' Ex. 2 ¶ 25.)

5

6

7

8

9

**Response:[1]  Disputed.  The terms "gender identity" and "assigned sex at birth" are undefined.  However, if Plaintiffs intend "gender identity" to refer to a person's subjective belief about his or her gender and intend "assigned sex at birth" to mean the observation of a newborn's biological sex shortly after birth, Defendants would no longer dispute this asserted fact.**

10

11

    2.    "Gender identity" is the medical term for a person's internal, innate sense of belonging to a particular sex. (Pls.' Ex. 1 ¶¶ 14, 17; Pls.' Ex. 2 ¶¶ 16, 21.)

12

13

14

15

16

17

18

19

20

21

22

23

24

**Response:  Disputed.  The sources cited by Plaintiffs conflict with each other as to whether "gender identity" refers to belonging to a particular *sex* or a having a particular *gender*, and thus cannot render this asserted fact undisputed.  *See, e.g.*, Defs.' Ex. 24 (Budge Dep.), at 35:7-14, 36:14-22.  Moreover, Plaintiffs' expert Dr. Budge defines "sex" to include "gender identity" as a component thereof, and for this additional reason Plaintiffs' own proffered evidence cannot support this asserted fact. Pls.' Ex. 1 (Budge Report), ¶ 16.  Furthermore, the Endocrine Society defines "gender identity" as a "psychological concept," and the American Psychiatric Association's DSM-5-TR defines "gender identity" as a "category of social identity."  Defs.' Ex. 24 (Budge Dep.), at 63:5-23, 69:4-8, 73:20-74:6, 75:23-76:7.  Additionally, multiple scientific authorities do not define "gender identity" as "innate" and unable to be changed.  *Id.* at 63:5-23, 69:4-8, 73:20-74:6, 75:23-76:7 (Endocrine Society & American Psychiatric Association).**

25

    3.    There is a medical consensus that a person's gender identity is innate and

26

27

28

[1] Defendants' object to the admissibility of the opinions of Plaintiffs' experts, as argued more fully in their briefs opposing Plaintiffs' Motion for Summary Judgment.  Defendants thus object to all instances in which Plaintiffs rely on those experts to support their factual assertions.

cannot be changed, including by psychological or medical intervention. (Pls.' Ex. 1 ¶¶ 18, 25; Pls.' Ex. 2 ¶¶ 21, 23, 26–31; see Defs.' Ex. 24 at 80:14–21.)

**Response:  Disputed.  Multiple scientific authorities do not define "gender identity" as "innate" and unable to be changed.  Defs.' Ex. 24 (Budge Dep.), at 63:5-23, 69:4-8, 73:20-74:6, 75:23-76:7 (Endocrine Society & American Psychiatric Association).  Moreover, Plaintiffs' expert, Dr. Budge, admitted that at least some individuals' gender identity can change.  *Id.* at 83:13-85:1.  Additionally, the American Academy of Pediatrics has published a study documenting individuals whose gender identities apparently changed.  *Id.* at 86:4-88:7.  Supreme Court justices also recently observed that "transgender status does not turn on an 'immutable ... characteristi[c].'" *United States v. Skrmetti*, 145 S. Ct. 1816, 1851 (2025) (Barrett, J., concurring) (citation omitted); *see also id.* at 1861 (Alito, J., concurring in part and concurring in the judgment).  Dr. Shumer published an article reporting that "[t]he majority of children diagnosed with [gender identity disorder] appear to 'desist] and identify with their biological sex by adolescence or adulthood.  The percentage of 'persisters' appears to be between 10 and 27%." Defs.' Ex. 23 (Shumer Dep.), at 82:12-21.**

4.    When a child is born, a healthcare provider typically identifies the child's sex based on the child's observable anatomy. (Pls.' Ex. 1 ¶ 15; Pls.' Ex. 2 ¶ 25; Pls.' Ex. 3 ¶ 81; Defs.' Ex. 23 at 57:16–20.)

**Response:  Undisputed.**

5.    This identification is known as an "assigned sex" and in most cases turns out to be consistent with the person's gender identity. (Pls.' Ex. 1 ¶ 15; Pls.' Ex. 2 ¶ 25; Pls.' Ex. 3 ¶ 81.)

**Response:  Disputed.  The evidence cited by Plaintiffs for this asserted fact only supports the idea that "assigned sex" is, sometimes, used to refer to the results of the observation of a newborn's biological sex.**

6.    Gender dysphoria is a serious medical condition characterized by significant and disabling distress due to the incongruence between a person's gender identity and

3

1    assigned sex. (Pls.' Ex. 1 ¶¶ 23–24; Pls.' Ex. 2 ¶ 26; Defs.' Ex. 24 at 79:6–18; Defs.' Ex.
2    23 at 73:20–24)

3    **Response:  Disputed.  The terms "gender identity" and "assigned sex" are vague and**
4    **undefined.  *See* Response to ¶ 1, *supra*.  A report published by the U.S. Department**
5    **of Health and Human Services defined gender dysphoria as "a condition that involves**
6    **distress regarding one's sexed body and/or associated social expectations."  Defs.' Ex.**
7    **88, at 13.**

8          7.       Gender dysphoria is highly treatable. (Pls.' Ex. 1 ¶ 25; Pls.' Ex. 2 ¶ 26.)
9    **Response:  Undisputed.**

10         8.       Every major medical association in the United States agrees that medical
11   treatment for gender dysphoria is necessary, safe, and effective. (Pls.' Ex. 1 ¶ 25; Pls.' Ex.
12   2 ¶¶ 26–29; Pls.' Ex. 4 ¶¶ 5, 12.)

13   **Response:  Disputed.  The Agency for Healthcare Research and Quality in the United**
14   **States found a "lack of current evidence-based guidance for care of children and**
15   **adolescents who identify as transgender regarding the benefits and harms of pubertal**
16   **suppression, medical affirmation with hormone therapy, and surgical affirmation."**
17   **Defs.' Ex. 24 (Budge Dep.), at 131:16-133:13.  A report published by the U.S.**
18   **Department of Health and Human Services found that "[t]here is currently no**
19   **international consensus about best practices for the care of children and adolescents**
20   **with gender dysphoria."  Defs.' Ex. 88, at 14.**

21         9.       The American Medical Association, the American Academy of Pediatrics,
22   the American Psychiatric Association, the American Psychological Association, and the
23   Pediatric Endocrine Society have all endorsed medical standards of care for treating gender
24   dysphoria in both adults and youth, which were developed by the World Professional
25   Association for Transgender Health ("WPATH") and the Endocrine Society. (Pls.' Ex. 2
26   ¶¶ 31–33; Pls.' Ex. 3 ¶¶ 61, 77; Pls.' Ex. 4 ¶ 12.)

27   **Response:  Disputed.  The evidence shows that the American Medical Association**
28   ***declined* to endorse the WPATH standards of care, since they do "not endorse or**

4

**support standards of care," and the American Academy of Pediatrics nearly**
**_denounced_ the WPATH standards of care. Defs.' Ex. 24 (Budge Dep.), at 204:4-206:5,**
**209:14-23.    In fact, the evidence suggests the only endorsements the WPATH**
**standards of care received were from the World Association for Sexual Health and**
**the International Society for Sexual Medicine. _Id._ at 209:8-12. A report published by**
**the U.S. Department of Health and Human Services found that U.S. medical**
**associations "played a key role in creating a perception that there is a professional**
**consensus in support of pediatric medical transition." Defs.' Ex. 88, at 14. However,**
**the "apparent consensus … is driven primarily by a small number of specialized**
**committees, influenced by WPATH." _Id._ According to the report, "[i]t is not clear**
**that the official views of these associations are shared by the wider medical**
**community, or even by most of their members. There is evidence that some medical**
**and mental health associations have suppressed dissent and stifled debate about this**
**issue among their members." _Id._**

      10.    Treatment to alleviate gender dysphoria is commonly referred to as "transition." (Pls.' Ex. 2 ¶ 32; see also Pls.' Ex. 1 ¶ 27.)

**Response:   Disputed.   The cited sources refer to "transition" in this context as**
**involving "[u]ndergoing treatment" or an "aspect of treatment," as opposed to such**
**things as puberty-blockers, cross-sex hormone therapies, or sex-reassignment**
**surgeries. Dr. Shumer also testified that it may be better for a biological boy who**
**identifies as a girl to play sports with biological boys, which would not be a**
**"transition." _See_ Defs.' Ex. 23 (Shumer Dep.), 129:10-130:4.**

      11.    Transition is intended to alleviate a transgender patient's distress by allowing them to live consistently with their gender identity. (Pls.' Ex. 1 ¶ 27; Pls.' Ex. 2 ¶ 28; Pls.' Ex. 3 ¶ 60.)

**Response:  Disputed.  The terms "gender identity" and transition are undefined. _See_**
**Responses to ¶¶ 1, 10, _supra_.  Dr. Shumer testified that it may be better for a biological**
**boy who identifies as a girl to play sports with biological boys, which would not be a**

1    "transition."  *See* Defs.' Ex. 23 (Shumer Dep.), 129:10-130:4.

2          12.    Transition can include one or more of the following components: (*i*) social

3    transition, including adopting a new name, pronouns, appearance, and clothing, correcting

4    identity documents, and participating in gender-matched school sports; (*ii*) medical

5    transition, including puberty-blocking medication and hormone therapy; and (*iii*) for

6    adults, surgeries to alter the appearance and functioning of primary and secondary- sex

7    characteristics. (Pls.' Ex. 1 ¶¶ 27–28, 30; Pls.' Ex. 2 ¶ 32; Pls.' Ex. 3 ¶ 64; Defs.' Ex. 23 at

8    76:21–77:16, 125:10–20.)

9    **Response:  Disputed.  The cited sources say nothing about "participating in gender-**

10   **matched school sports" as somehow being a component of "transition."  In fact,**

11   **Plaintiffs' expert, Dr. Shumer, suggested otherwise.  Defs.' Ex. 23 (Shumer Dep.), at**

12   **125:24-127:19.**

13         13.    To be clinically effective, transition must be respected consistently across all

14   aspects of a transgender individual's life. (Pls.' Ex. 1 ¶ 27; Defs.' Ex. 23 at 125:14–20.)

15   **Response:  Disputed.  Defendants dispute Plaintiffs' use of the term "transition," *see***

16   **Response to ¶ 10, *supra*.  As relevant to the issues in this case, Plaintiffs' expert, Dr.**

17   **Shumer, admitted that he did not "necessarily have a specific area of expertise in**

18   **telling you that in general all trans girls do better playing sports on girls teams," and**

19   **instead suggested that "I don't understand how playing on a co-ed team would**

20   **conflict with [a transgender individual's] standards of care."  Defs.' Ex. 23 (Shumer**

21   **Dep.), at 125:24-126:2, 126:20-22.**

22         14.    For a transgender girl who is being treated for gender dysphoria, being

23   required to play on a boys' sports team would conflict with her transition. (Defs.' Ex. 23

24   at 250:21–251:2.)

25   **Response:  Disputed.  Defendants dispute Plaintiffs' use of the term "transition," *see***

26   **Response to ¶ 10, *supra*.  As relevant to the issues in this case, Plaintiffs' expert, Dr.**

27   **Shumer, admitted that he did not "necessarily have a specific area of expertise in**

28   **telling you that in general all trans girls do better playing sports on girls teams," and**

instead suggested that "I don't understand how playing on a co-ed team would conflict with [a transgender individual's] standards of care." Defs.' Ex. 23 (Shumer Dep.), at 125:24-126:2, 126:20-22. Dr. Shumer testified that there may be situations in which a transgender girl should play on a boys team. *Id.* at 129:10-130:4. Moreover, there is no evidence Plaintiffs are, or will ever be, "required to play on a boys sports team." *Id.* at 254:1-4. Finally, "transgender girl" is undefined. Defendants object to the extent "transgender girl" means something other than a young biological male who identifies as a young female.

15. At the onset of puberty, adolescents diagnosed with gender dysphoria may be prescribed puberty-blocking medication to prevent the distress of developing physical characteristics that conflict with the adolescent's gender identity. (Pls.' Ex. 1 ¶ 28; Pls.' Ex. 2 ¶ 33.)

**Response:** **Undisputed insofar as puberty-blockers are sometimes prescribed in such circumstances, but disputed inasmuch as puberty-blockers are effective in "prevent[ing] the distress." *See generally* Defs.' Ex. 24 (Budge Dep.), at 111:14-135:23 (discussing lack of evidence for efficacy of puberty-blockers). A report published by the U.S. Department of Health and Human Services found that "[t]he evidence for benefit of pediatric medical transition is very uncertain, while the evidence for harm is less uncertain." Defs.' Ex. 88, at 16.**

16. For older adolescents, doctors may also prescribe hormone therapy to induce the puberty associated with the adolescent's gender identity. (Pls.' Ex. 1 ¶ 28; Pls.' Ex. 2 ¶ 34.)

**Response:** **Undisputed insofar as cross-sex hormones are sometimes prescribed in such circumstances, but disputed inasmuch as cross-sex hormones are effective treatments. *See generally* Defs.' Ex. 24 (Budge Dep.), at 111:14-135:23 (discussing lack of evidence for efficacy of cross-sex hormones). A report published by the U.S. Department of Health and Human Services found that "[t]he evidence for benefit of pediatric medical transition is very uncertain, while the evidence for harm is less**

7

uncertain." **Defs.' Ex. 88, at 16.**

17.    Transgender girls treated with hormone therapy may appear indistinguishable from other girls. (Pls.' Ex. 1 ¶ 29; Pls.' Ex. 2 ¶ 34; *see also* Pls.' Ex. 3 ¶ 133.)

**Response:  Disputed.  The sources cited by Plaintiffs in support of the asserted fact are likewise equivocal.  As Dr. Shumer explained in a published article, "the patients who do present to centres equipped to follow the guidelines often present late, after Tanner stage 3, making pubertal suppression less effective."  Defs.' Ex. 23 (Shumer Dep.), at 86:18-87:1.  In a textbook chapter, Dr. Shumer further explained that "[m]any transgender adolescents do not present for care at the time of onset of puberty.  In our clinic, for example, approximately two-thirds of patients are presenting for care at puberty stage 4 or 5."  *Id.* at 98:20-99:7.  Dr. Shumer testified that "[m]any people at Tanner stage 4 will have significant changes to the rest of their body whereas others won't."  *Id.* at 100:19-21.  In addition, "transgender girls" is undefined.  Defendants object to the extent "transgender girls" means something other than young biological males who identify as young females.**

18.    Transgender girls' physical characteristics overlap with those of other girls. (Pls.' Ex. 3 ¶¶ 48, 104, 106.)

**Response:  Disputed.  Defendants provided voluminous evidence that biological males have physiological and athletic advantages over biological girls due to their male bodies, both before male puberty and after male puberty.  *See* Defs.' SUMF, ¶¶ 51-102.  The source cited by Plaintiffs does not support such a broadly asserted fact.  In addition, "transgender girls" is undefined.  Defendants object to the extent "transgender girls" means something other than young biological males who identify as young females.**

19.    Untreated gender dysphoria can cause serious harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicide. (Pls.' Ex. 1 ¶ 33; Pls.' Ex. 2 ¶ 26.)

1    **Response:  Disputed.  A report published by the U.S. Department of Health and**
2    **Human Services "found that the overall quality of evidence concerning the effects of**
3    **any intervention on psychological outcomes, quality of life, regret, or long-term**
4    **health, is very low."  Defs.' Ex. 88, at 14.  The report also found that "[t]he evidence**
5    **for benefit of pediatric medical transition is very uncertain, while the evidence for**
6    **harm is less uncertain."  *Id.* at 15.  In addition, according to the report, "[n]o**
7    **independent association between gender dysphoria and suicidality ahs been found,**
8    **and there is no evidence that pediatric medical transition reduces the incidence of**
9    **suicide, which remains, fortunately, very low."  *Id.* at 16.**

10            20.     When transgender adolescents are provided with appropriate and consistent
11   medical treatment and have parental and societal support they can thrive. (Pls.' Ex. 1 ¶ 19;
12   Pls.' Ex. 2 ¶ 27.)

13   **Response:  Disputed.  A report published by the U.S. Department of Health and**
14   **Human Services "found that the overall quality of evidence concerning the effects of**
15   **any intervention on psychological outcomes, quality of life, regret, or long-term**
16   **health, is very low."  Defs.' Ex. 88, at 14.  The report also found that "[t]he evidence**
17   **for benefit of pediatric medical transition is very uncertain, while the evidence for**
18   **harm is less uncertain."  *Id.* at 15.  In addition, according to the report, "[n]o**
19   **independent association between gender dysphoria and suicidality ahs been found,**
20   **and there is no evidence that pediatric medical transition reduces the incidence of**
21   **suicide, which remains, fortunately, very low."  *Id.* at 16.**

22           21.     Jane Doe is a 13-year-old transgender girl. (Pls.' Ex. 5 ¶ 1; Pls.' Ex. 6 ¶ 3, 5;
23   see also Pls.' Ex. 7 No. 1; Pls.' Ex. 8 No. 1.)

24   **Response:  Disputed.  The term "transgender girl" is undefined.  Defendants also**
25   **move to strike Plaintiffs' conclusory, self-serving affidavits without sufficient**
26   **supporting evidence as incapable of establishing undisputed material facts for**
27   **summary judgment.  *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th**
28   **Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015); *SEC v.***

1    ***Phan***, 500 F.3d 895, 909 (9th Cir. 2007).  **However, if this asserted fact intends**

2    **"transgender girl" to mean a young biological male who identifies as a young female,**

3    **then Defendants would no longer dispute the asserted fact.  *See* Pls.' Ex. 7 No. 1; Pls.'**

4    **Ex. 8 No. 1; *see also* Pls.' Ex. 22, at 81:7-16 ("Transgender women are biologically**

5    **male.").**

6       22.    Jane is a rising eighth grader at Kyrene Aprende Middle School ("Kyrene")

7    and plays interscholastic sports. (Pls.' Ex. 5 ¶ 1; *see also* Defs.' Ex. 77 at 9:20–25.)

8    **Response:  Undisputed.**

9       23.    Jane has always known she is a girl. (Pls.' Ex. 5 ¶ 2; Pls.' Ex. 6 ¶ 3; Pls.' Ex.

10   33 at -147.)

11   **Response:  Disputed.  Defendants object to the extent that "known" means something**

12   **other than "believed" or mere subjective knowledge.  *See, e.g.*, Pls.' Ex. 22, at 81:7-16**

13   **("Transgender women are biologically male.").  Defendants also move to strike**

14   **Plaintiffs' conclusory, self-serving affidavits without sufficient supporting evidence**

15   **as incapable of establishing undisputed material facts for summary judgment.  *See***

16   ***FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v.***

17   ***Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895,**

18   **909 (9th Cir. 2007).  Furthermore, Defendants move to strike Plaintiffs' medical**

19   **record evidence because it lacks foundation and authentication.  *Allen v. Rivera*, No.**

20   **1:05-cv-146, 2013 WL 5670862, at \*5 (E.D. Cal. Oct. 15, 2013) ("Plaintiff cannot lay**

21   **a foundation for these records composed by third parties" … the medical records**

22   **"contain medical … opinions which can only be offered by a medical … expert);**

23   ***Morgan v. Doran*, 308 F. App'x 231, 231-32 (9th Cir. 2009).  Defendants also move to**

24   **strike Plaintiffs' medical record evidence because it consists of hearsay and hearsay**

25   **within hearsay.  *Pope v. Las Vegas Metro. Police Dep't*, 647 F. App'x 817, 819 (9th Cir.**

26   **2016) (affirming exclusion of medical records as hearsay which "do not fall under any**

27   **of the hearsay exceptions"); *Angelo v. Thomson Int'l, Inc.*, No. 1:21-cv-1609, 2024 WL**

28   **3202513, at \*4 (E.D. Cal. June 27, 2024) (Fed. R. Evid. 803(4) "applies only to**

statements made by the patient to the doctor").  Finally, Defendants move to strike Plaintiffs' medical record evidence because it lacks expert testimony to interpret it. *Cervantes v. Pratt*, No. 04-cv-1004, 2008 WL 11424110, at *11 (D. Ariz. Aug. 5, 2008) (burden is on proffering party to provide "expert testimony to interpret the medical records."); *Cottrell v. Igbinosa*, No. 1:13-cv-1530, 2017 WL 550580, at *16 (E.D. Cal. Feb. 9, 2017), *report and recommendation adopted*, 2017 WL 1064724 (E.D. Cal. Mar. 20, 2017) ("The interpretation of medical test results requires specialized education and training, and therefore evidence must come from a medical expert."); *Hill v. Clark*, No. 1:13-cv-386, 2016 WL 696433, at *1 (E.D. Cal. Feb. 22, 2016); *Lim v. Adler*, No. 1:09-cv-1753, 2010 WL 2348743, at *7 n.3 (E.D. Cal. June 8, 2010).

24.    Jane has lived as a girl in all aspects of her life since she was five years old, including at home, at school, and among her friends. (Pls.' Ex. 5 ¶ 4; Pls.' Ex. 6 ¶¶ 3–5; Pls.' Ex. 34; Pls.' Ex. 35 at -288.)

<u>Response:</u>  Disputed.  Jane Doe is a biological boy who has identified as a girl since age five.  Defendants move to strike Plaintiffs' conclusory, self-serving affidavits without sufficient supporting evidence as incapable of establishing undisputed material facts for summary judgment.  *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).  Furthermore, Defendants move to strike Plaintiffs' medical record evidence because it lacks foundation and authentication.  *Allen v. Rivera*, No. 1:05-cv-146, 2013 WL 5670862, at *5 (E.D. Cal. Oct. 15, 2013) ("Plaintiff cannot lay a foundation for these records composed by third parties" … the medical records "contain medical … opinions which can only be offered by a medical … expert); *Morgan v. Doran*, 308 F. App'x 231, 231-32 (9th Cir. 2009).  Defendants also move to strike Plaintiffs' medical record evidence because it consists of hearsay and hearsay within hearsay.  *Pope v. Las Vegas Metro. Police Dep't*, 647 F. App'x 817, 819 (9th Cir. 2016) (affirming exclusion of medical records as hearsay which "do not fall under any of the hearsay exceptions");

1     **Angelo v. Thomson Int'l, Inc.**, No. 1:21-cv-1609, 2024 WL 3202513, at \*4 (E.D. Cal.

2     **June 27, 2024) (Fed. R. Evid. 803(4) "applies only to statements made by the patient**

3     **to the doctor").  Finally, Defendants move to strike Plaintiffs' medical record evidence**

4     **because it lacks expert testimony to interpret it.  Cervantes v. Pratt**, No. 04-cv-1004,

5     **2008 WL 11424110, at \*11 (D. Ariz. Aug. 5, 2008) (burden is on proffering party to**

6     **provide "expert testimony to interpret the medical records."); Cottrell v. Igbinosa**, No.

7     **1:13-cv-1530, 2017 WL 550580, at \*16 (E.D. Cal. Feb. 9, 2017), report and**

8     **recommendation adopted, 2017 WL 1064724 (E.D. Cal. Mar. 20, 2017) ("The**

9     **interpretation of medical test results requires specialized education and training, and**

10    **therefore evidence must come from a medical expert."); Hill v. Clark**, No. 1:13-cv-386,

11    **2016 WL 696433, at \*1 (E.D. Cal. Feb. 22, 2016); Lim v. Adler**, No. 1:09-cv-1753, 2010

12    **WL 2348743, at \*7 n.3 (E.D. Cal. June 8, 2010).**

13          25.     At age five, Jane began wearing skirts and dresses to school and, although

14    she was teased by other children, Jane ███████████████████

15    ████████████████ (Pls.' Ex. 33 at -147; *see* Pls.' Ex. 5 ¶ 3; Pls.' Ex. 6 ¶ 5; Pls.' Ex. 35

16    at -288.)

17    **Response:  Undisputed given that Plaintiff's subjective belief about Plaintiff's gender**

18    **does not equate to Plaintiff's biological sex.**

19          26.     Jane was diagnosed with gender dysphoria at age seven. (Pls.' Ex. 6 ¶ 10;

20    Pls.' Ex. 35 at -288, -290; *see also* Pls.' Ex. 7 No. 2; Pls.' Ex. 8 No. 2.)

21    **Response:  Undisputed.**

22          27.     Sports have always been important to Jane and her family. (Pls.' Ex. 5 ¶ 8;

23    Pls.' Ex. 6 ¶¶ 11, 17.; *see also* Pls.' Ex. 36 at 43:19–24.)

24    **Response:  Undisputed.**

25          28.     Jane has participated in sports since she was young, including running,

26    recreational basketball, soccer, and swimming. (Pls.' Ex. 5 ¶ 9; Defs.' Ex. 76 No. 4; Defs.'

27    Ex. 77 at 51:2–5.)

28    **Response:  Undisputed.**

29.     Jane has a particular passion for soccer and has played on girls' club and recreational soccer teams for many years. (Pls.' Ex. 5 ¶ 9; Pls.' Ex. 6 ¶ 12; Defs.' Ex. 76 No. 4; Defs.' Ex. 77 at 9:9–10, 31:22–32:12, 46:10–13, 48:2–49:1.)

**Response:  Undisputed.**

30.     Jane also loves to run cross-country and track and field, and play club futsal, among other sports. (Defs.' Ex. 77 at 9:6–8, 46:10–47:6.)

**Response:  Undisputed.**

31.     Megan Roe is a 17-year-old transgender girl. (Pls.' Ex. 9 ¶ 2; *see also* Pls.' Ex. 7 No. 1; Pls.' Ex. 8 No. 1.)

**Response:  Disputed.  The term "transgender girl" is undefined.  Defendants also move to strike Plaintiffs' conclusory, self-serving affidavits without sufficient supporting evidence as incapable of establishing undisputed material facts for summary judgment.  *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).  However, if this asserted fact intends "transgender girl" to mean a young biological male who identifies as a young female, then Defendants would no longer dispute the asserted fact.  *See* Pls.' Ex. 7 No. 1; Pls.' Ex. 8 No. 1.**

32.     Megan is a rising high school senior at The Gregory School ("TGS") and plays interscholastic sports. (Pls.' Ex. 9 ¶¶ 4-5; Defs.' Ex. 82 at 6:22–24, 7:21–23.)

**Response:  Undisputed.**

33.     ██████████████████████ Megan ████████ ████████████████ (Pls.' Ex. 37 at -073; *see* Pls.' Ex. 38 at -124; *see also* Pls.' Ex. 10 at -1252, -1258.)

**Response:  Disputed.  Megan Roe is a biological boy who has identified as a girl from an early age.  Defendants' move to strike Plaintiffs' medical record evidence because it lacks foundation and authentication.  *Allen v. Rivera*, No. 1:05-cv-146, 2013 WL 5670862, at *5 (E.D. Cal. Oct. 15, 2013) ("Plaintiff cannot lay a foundation for these**

records composed by third parties" … the medical records "contain medical … opinions which can only be offered by a medical … expert); *Morgan v. Doran*, 308 F. App'x 231, 231-32 (9th Cir. 2009). Defendants also move to strike Plaintiffs' medical record evidence because it consists of hearsay and hearsay within hearsay. *Pope v. Las Vegas Metro. Police Dep't*, 647 F. App'x 817, 819 (9th Cir. 2016) (affirming exclusion of medical records as hearsay which "do not fall under any of the hearsay exceptions"); *Angelo v. Thomson Int'l, Inc.*, No. 1:21-cv-1609, 2024 WL 3202513, at *4 (E.D. Cal. June 27, 2024) (Fed. R. Evid. 803(4) "applies only to statements made by the patient to the doctor"). Finally, Defendants move to strike Plaintiffs' medical record evidence because it lacks expert testimony to interpret it. *Cervantes v. Pratt*, No. 04-cv-1004, 2008 WL 11424110, at *11 (D. Ariz. Aug. 5, 2008) (burden is on proffering party to provide "expert testimony to interpret the medical records."); *Cottrell v. Igbinosa*, No. 1:13-cv-1530, 2017 WL 550580, at *16 (E.D. Cal. Feb. 9, 2017), *report and recommendation adopted*, 2017 WL 1064724 (E.D. Cal. Mar. 20, 2017) ("The interpretation of medical test results requires specialized education and training, and therefore evidence must come from a medical expert."); *Hill v. Clark*, No. 1:13-cv-386, 2016 WL 696433, at *1 (E.D. Cal. Feb. 22, 2016); *Lim v. Adler*, No. 1:09-cv-1753, 2010 WL 2348743, at *7 n.3 (E.D. Cal. June 8, 2010).

34.    Megan ████████████████████████████████████
████████████████ (Pls.' Ex. 39 at -344; *see also* Pls.' Ex. 10 at -1255; Pls.' Ex. 11 ¶ 3.)

**Response:** Disputed. Defendants move to strike Plaintiffs' medical record evidence because it lacks foundation and authentication. *Allen v. Rivera*, No. 1:05-cv-146, 2013 WL 5670862, at *5 (E.D. Cal. Oct. 15, 2013) ("Plaintiff cannot lay a foundation for these records composed by third parties" … the medical records "contain medical … opinions which can only be offered by a medical … expert); *Morgan v. Doran*, 308 F. App'x 231, 231-32 (9th Cir. 2009). Defendants also move to strike Plaintiffs' medical record evidence because it consists of hearsay and hearsay within hearsay. *Pope v.*

**Las Vegas Metro. Police Dep't**, 647 F. App'x 817, 819 (9th Cir. 2016) (affirming exclusion of medical records as hearsay which "do not fall under any of the hearsay exceptions"); **Angelo v. Thomson Int'l, Inc.**, No. 1:21-cv-1609, 2024 WL 3202513, at *4 (E.D. Cal. June 27, 2024) (Fed. R. Evid. 803(4) "applies only to statements made by the patient to the doctor").  Defendants move to strike Plaintiffs' medical record evidence because it lacks expert testimony to interpret it.  **Cervantes v. Pratt**, No. 04-cv-1004, 2008 WL 11424110, at *11 (D. Ariz. Aug. 5, 2008) (burden is on proffering party to provide "expert testimony to interpret the medical records."); **Cottrell v. Igbinosa**, No. 1:13-cv-1530, 2017 WL 550580, at *16 (E.D. Cal. Feb. 9, 2017), **report and recommendation adopted**, 2017 WL 1064724 (E.D. Cal. Mar. 20, 2017) ("The interpretation of medical test results requires specialized education and training, and therefore evidence must come from a medical expert."); **Hill v. Clark**, No. 1:13-cv-386, 2016 WL 696433, at *1 (E.D. Cal. Feb. 22, 2016); **Lim v. Adler**, No. 1:09-cv-1753, 2010 WL 2348743, at *7 n.3 (E.D. Cal. June 8, 2010).  Finally, Defendants move to strike Plaintiffs' conclusory, self-serving affidavits without sufficient supporting evidence as incapable of establishing undisputed material facts for summary judgment.  **See FTC v. Publ'g Clearing House, Inc.**, 104 F.3d 1168, 1171 (9th Cir. 1997); **Nigro v. Sears, Roebuck and Co.**, 784 F.3d 495, 497 (9th Cir. 2015); **SEC v. Phan**, 500 F.3d 895, 909 (9th Cir. 2007).

35.    Megan has lived as a girl in all aspects of her life since she was seven years old. (Pls.' Ex. 9 ¶ 3; Pls.' Ex. 11 ¶ 4; Pls.' Ex. 39 at -344.)

**Response:  Disputed.  Megan Roe is a biological boy who has identified as a girl since age seven.  The cited sources do not support the "in all aspects of" portion of this statement.  Defendants move to strike Plaintiffs' conclusory, self-serving affidavits without sufficient supporting evidence as incapable of establishing undisputed material facts for summary judgment.  See FTC v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997); Nigro v. Sears, Roebuck and Co., 784 F.3d 495, 497 (9th Cir. 2015); SEC v. Phan, 500 F.3d 895, 909 (9th Cir. 2007).  Furthermore,**

15

1    **Defendants move to strike Plaintiffs' medical record evidence because it lacks**

2    **foundation and authentication.** ***Allen v. Rivera***, **No. 1:05-cv-146, 2013 WL 5670862,**

3    **at \*5 (E.D. Cal. Oct. 15, 2013) ("Plaintiff cannot lay a foundation for these records**

4    **composed by third parties" … the medical records "contain medical … opinions**

5    **which can only be offered by a medical … expert);** ***Morgan v. Doran***, **308 F. App'x**

6    **231, 231-32 (9th Cir. 2009). Defendants also move to strike Plaintiffs' medical record**

7    **evidence because it consists of hearsay and hearsay within hearsay.** ***Pope v. Las Vegas***

8    ***Metro. Police Dep't***, **647 F. App'x 817, 819 (9th Cir. 2016) (affirming exclusion of**

9    **medical records as hearsay which "do not fall under any of the hearsay exceptions");**

10   ***Angelo v. Thomson Int'l, Inc.***, **No. 1:21-cv-1609, 2024 WL 3202513, at \*4 (E.D. Cal.**

11   **June 27, 2024) (Fed. R. Evid. 803(4) "applies only to statements made by the patient**

12   **to the doctor"). Finally, Defendants move to strike Plaintiffs' medical record evidence**

13   **because it lacks expert testimony to interpret it.** ***Cervantes v. Pratt***, **No. 04-cv-1004,**

14   **2008 WL 11424110, at \*11 (D. Ariz. Aug. 5, 2008) (burden is on proffering party to**

15   **provide "expert testimony to interpret the medical records.");** ***Cottrell v. Igbinosa***, **No.**

16   **1:13-cv-1530, 2017 WL 550580, at \*16 (E.D. Cal. Feb. 9, 2017),** ***report and***

17   ***recommendation adopted***, **2017 WL 1064724 (E.D. Cal. Mar. 20, 2017) ("The**

18   **interpretation of medical test results requires specialized education and training, and**

19   **therefore evidence must come from a medical expert.");** ***Hill v. Clark***, **No. 1:13-cv-386,**

20   **2016 WL 696433, at \*1 (E.D. Cal. Feb. 22, 2016);** ***Lim v. Adler***, **No. 1:09-cv-1753, 2010**

21   **WL 2348743, at \*7 n.3 (E.D. Cal. June 8, 2010).**

22   36.    Megan was diagnosed with gender dysphoria at age ten. (Pls.' Ex. 11 ¶ 6;

23   Pls.' Ex. 37 at -73; *see* Pls.' Ex. 7 No. 2; Pls.' Ex. 8 No. 2.)

24   **Response:  Undisputed.**

25   37.    Sports have always been a part of Megan's life. (Pls.' Ex. 9 ¶ 4; Pls.' Ex. 11

26   ¶ 8.)

27   **Response:  Undisputed.**

28   38.    When she was younger, Megan swam and liked to do many different types

1    of dance, including ballet, ballroom, and hip-hop. (Pls.' Ex. 9 ¶ 4; Pls.' Ex. 11 ¶ 8; Defs.'
2    Ex. 82 at 11:5–8, 19:16–20.)

3    **Response:  Undisputed.**

4        39.    In eighth grade, Megan started playing volleyball on TGS's middle school
5    girls' volleyball team. (Pls.' Ex. 9 ¶ 4; Pls.' Ex. 11 ¶ 9; Defs.' Ex. 76 No. 4; Defs.' Ex. 82
6    at 18:12–22.)

7    **Response:  Undisputed.**

8        40.    Megan has continued playing volleyball since eighth grade. (Pls.' Ex. 12 No.
9    2; Defs.' Ex. 76 No. 4; Defs.' Ex. 82 at 20:25–21:16.)

10   **Response:  Disputed.  The cited sources show that Plaintiff stopped playing volleyball**
11   **for a period of time after initially playing in eighth grade.  *See* Defs.' Ex. 82, at 18:12-**
12   **19:1.  Moreover, Plaintiff "did not compete" on the TGS team in ninth grade.  Defs.'**
13   **Ex. 76 No. 4.**

14       41.    Megan loves playing volleyball. (Pls.' Ex. 9 ¶ 15; Pls.' Ex. 11 ¶ 9; Defs.' Ex.
15   82 at 10:16–18.)

16   **Response:  Undisputed.**

17       42.    An individual's transgender status reveals nothing about their athletic ability.
18   (Pls.' Ex. 2 ¶¶ 35, 40, 47; Pls.' Ex. 3 ¶¶ 42–43.)

19   **Response:  Disputed.  Plaintiffs rely exclusively on Dr. Shumer for this asserted fact,**
20   **but Dr. Shumer testified that he considers himself "an expert on body … changes …**
21   **over time with respect to puberty" and could not "extrapolat[e] those to how each of**
22   **those changes impact sports performance."  Defs.' Ex. 23 (Shumer Dep.), at 143:22-**
23   **25.  Moreover, Dr. Shumer testified that he is not "an expert in what constitutes, you**
24   **know, a significant competitive advantage," *id.* at 141:3-5, that "what constitutes an**
25   **unfair advantage or a significant advantage for each sport I don't have an expert**
26   **opinion in," *id.* at 142:14-16, and that he would not "consider [himself] an expert on**
27   **what constitutes an unfair competitive advantage in sports," *id.* at 121:24-122:1.**
28   **Furthermore, Defendants provided voluminous evidence that biological males**

1   **identifying as females have *inherent* athletic advantages due to their male bodies both**

2   **before male puberty and after male puberty. *See* Defs.' SUMF ¶¶ 51-102. Thus, an**

3   **individual's status as a transgender female—meaning a biological male identifying as**

4   **female—does reveal athletic ability.**

5           43.     Neither an individual's genetic makeup nor anatomy at birth are reliable

6   indicators of athletic performance. (Pls.' Ex. 2 ¶ 47; Pls.' Ex. 3 ¶ 86.)

7   **Response:  Disputed.  Plaintiffs rely exclusively on Dr. Shumer for this asserted fact,**

8   **but Dr. Shumer testified that he considers himself "an expert on body … changes …**

9   **over time with respect to puberty" and could not "extrapolat[e] those to how each of**

10  **those changes impact sports performance." Defs.' Ex. 23 (Shumer Dep.), at 143:22-**

11  **25. Moreover, Dr. Shumer testified that he is not "an expert in what constitutes, you**

12  **know, a significant competitive advantage," *id.* at 141:3-5, that "what constitutes an**

13  **unfair advantage or a significant advantage for each sport I don't have an expert**

14  **opinion in," *id.* at 142:14-16, and that he would not "consider [himself] an expert on**

15  **what constitutes an unfair competitive advantage in sports," *id.* at 121:24-122:1.**

16  **Furthermore, Defendants have provided evidence that athletic performance is**

17  **directly impacted by a body's genetic makeup and anatomy. *See, e.g.*, Defs.' Ex. 41**

18  **(Hilton Report), ¶¶ 2.1, 5.1-5.5; Defs.' Ex. 42 (Blade Report), at 10, 17-18; Defs.'**

19  **SUMF ¶¶ 51-102.**

20          44.     Chromosomes and genitals alone do not meaningfully affect athletic

21  performance. (Pls.' Ex. 2 ¶ 35; Pls.' Ex. 3 ¶ 87.)

22  **Response:  Disputed.  Plaintiffs rely exclusively on Dr. Shumer for this asserted fact,**

23  **but Dr. Shumer testified that he considers himself "an expert on body … changes …**

24  **over time with respect to puberty" and could not "extrapolat[e] those to how each of**

25  **those changes impact sports performance." Defs.' Ex. 23, at 143:22-25. Moreover,**

26  **Dr. Shumer testified that he is not "an expert in what constitutes, you know, a**

27  **significant competitive advantage," *id.* at 141:3-5, that "what constitutes an unfair**

28  **advantage or a significant advantage for each sport I don't have an expert opinion**

1    in," *id.* at 142:14-16, and that he would not "consider [himself] an expert on what
2    constitutes an unfair competitive advantage in sports," *id.* at 121:24-122:1.  Moreover,
3    Defendants have provided evidence that chromosomal makeup, affecting every cell of
4    an athlete's body, has direct impacts on athletic performance.  *See* Defs.' Ex. 41
5    (Hilton Report), ¶¶ 2.1, 5.1-5.5; Defs.' SUMF ¶¶ 51-102.

6         45.    Prolonged exposure to testosterone during male puberty is the driver of
7    differences in athletic performance between males and females. (Pls.' Ex. 2 ¶ 37; Pls.' Ex.
8    3 ¶¶ 4, 7–8; Defs.' Ex. 23 at 137:11–21, 140:20–23.)

9    **Response:  Disputed.  Plaintiffs rely exclusively on Dr. Shumer for this asserted fact,**
10   **but Dr. Shumer testified that he considers himself "an expert on body … changes …**
11   **over time with respect to puberty" and could not "extrapolat[e] those to how each of**
12   **those changes impact sports performance."  Defs.' Ex. 23 (Shumer Dep.), at 143:22-**
13   **25.  Moreover, Dr. Shumer testified that he is not "an expert in what constitutes, you**
14   **know, a significant competitive advantage," *id.* at 141:3-5, that "what constitutes an**
15   **unfair advantage or a significant advantage for each sport I don't have an expert**
16   **opinion in," *id.* at 142:14-16, and that he would not "consider [himself] an expert on**
17   **what constitutes an unfair competitive advantage in sports," *id.* at 121:24-122:1.**
18   **Moreover, the cited testimony of Dr. Shumer includes his admission that testosterone**
19   **is one driver in addition to other "independent drivers." *Id.* at 137:11-21.  Defendants**
20   **also have provided evidence that athletic performance differences exist before**
21   **puberty.  Defs.' SUMF ¶¶ 51-102.**

22        46.    Exposure to higher levels of testosterone during and after male puberty
23   results in increased muscle mass and muscle strength. (Pls.' Ex. 2 ¶ 37; Pls.' Ex. 3 ¶¶ 7–8;
24   Defs.' Ex. 23 at 137:17–138:6, 141:24–142:5.)

25   **Response:  Undisputed.**

26        47.    It is considered normal for boys to begin puberty at nine years old, although
27   at what age an individual experiences pubertal onset depends on that individual. (Pls.' Ex.
28   3 ¶ 27; Defs.' Ex. 23 at 90:4–18, 152:22–24, 252:1–8.)

**Response:    Disputed.    Plaintiffs cite Dr. Shumer's testimony, but in the cited testimony, Dr. Shumer testified that "[t]he average age of onset of puberty is 10-11 years in females and age 11-12 years in males," Defs.' Ex. 23 (Shumer Dep.), at 90:4-18, that "normal puberty starts within a range of 8 to 13," *id.* at 152:22, and that "[i]t would be unusual to start puberty [in males] [b]efore age 9," *id.* at 252:6-8. Defendants have provided evidence that male puberty typically begins after age 9. *See, e.g.*, Defs.' Ex. 39 (Brown Report), ¶ 173; Defs.' Ex. 41 (Hilton Report), ¶ 4.4. Defendants do not dispute that pubertal onset varies from individual to individual.**

48.    Before puberty, girls and boys perform athletically at the same level with at most small differences at the margins, some favoring girls and some favoring boys. (Pls.' Ex. 2 ¶ 36; Pls.' Ex. 3 ¶¶ 20–29; Defs.' Ex. 23 at 130:21–131:6, 133:8–134:1.)

**Response:  Disputed.  Plaintiffs rely exclusively on Dr. Shumer for this asserted fact, but Dr. Shumer testified that he considers himself "an expert on body … changes … over time with respect to puberty" and could not "extrapolat[e] those to how each of those changes impact sports performance."  Defs.' Ex. 23 (Shumer Dep.), at 143:22-25.  Moreover, Dr. Shumer testified that he is not "an expert in what constitutes, you know, a significant competitive advantage," *id.* at 141:3-5, that "what constitutes an unfair advantage or a significant advantage for each sport I don't have an expert opinion in," *id.* at 142:14-16, and that he would not "consider [himself] an expert on what constitutes an unfair competitive advantage in sports," *id.* at 121:24-122:1. Moreover, Defendants have provided evidence demonstrating prepubertal male physiological and athletic advantages.  Defs.' SUMF ¶¶ 51-102.**

49.    Any alleged small differences in athletic performance between pre-pubertal boys and girls could be the result of a range of factors, including social ones such as greater opportunities for boys to play sports than girls and greater encouragement of boys to play sports. (Pls.' Ex. 3 ¶ 21; Pls.' Ex. 13 ¶¶ 17, 32–33; Defs.' Ex. 23 at 133:8–134:1, 196:1–11, 196:16–197:7; Defs.' Ex. 25 at 136:24-137:14.)

**Response:    Disputed.    Defendants have provided evidence demonstrating a lack of**

**evidence that environmental or social factors, as opposed to biological factors, cause the male advantages in athletic performance.** *See, e.g.*, **Defs.' Ex. 32, at 3, 8; Defs.' Ex. 33, at 8; Defs.' Ex. 34, at 9; Defs.' Ex. 35, at 8-9; Defs.' Ex. 36, at 3-4; Defs.' Ex. 37, at 7-8; 11-13; Defs.' Ex. 38, at 9-10; Defs.' Ex. 41, ¶ 8.5. Plaintiffs' expert could not identify a peer-reviewed journal article that the male-female performance gap was caused by a non-biological factor. Defs.' Ex. 23 (Shumer Dep.), at 198:8-18, 200:1-6.**

50.    Transgender girls who receive puberty-blocking medication and thus do not undergo male puberty "do not gain the increased muscle mass or strength that accounts for why post-pubertal boys as a group have an advantage over post-pubertal girls as a group." (Pls.' Ex. 3 ¶¶ 30–33.)

**Response:  Disputed.  Plaintiffs rely exclusively on Dr. Shumer for this asserted fact, but Dr. Shumer testified that he considers himself "an expert on body … changes … over time with respect to puberty" and could not "extrapolat[e] those to how each of those changes impact sports performance."  Defs.' Ex. 23, at 143:22-25.  Moreover, Dr. Shumer testified that he is not "an expert in what constitutes, you know, a significant competitive advantage,"** *id.* **at 141:3-5, that "what constitutes an unfair advantage or a significant advantage for each sport I don't have an expert opinion in,"** *id.* **at 142:14-16, and that he would not "consider [himself] an expert on what constitutes an unfair competitive advantage in sports,"** *id.* **at 121:24-122:1.  Moreover, Defendants have provided evidence of male athletic advantage before puberty, advantages that are not dependent upon undergoing puberty.**  *See* **Defs.' SUMF ¶¶ 57-102.  Further, Defendants provided evidence that puberty-blockers do not eliminate the physiological advantages enjoyed by biological males. Defs.' Ex. 31, at 8-12; Defs.' Ex. 36, at 4-5; Defs.' Ex. 38, at 9; Defs.' Ex. 39 (Brown Report), ¶¶ 192– 207, 216–330; Defs.' Ex. 41 (Hilton Report), ¶¶ 11.1–11.6;** *see also* **Defs.' Ex. 40 (Carlson Report), ¶¶ 79–96.  In addition, "transgender girls" is undefined. Defendants object to the extent "transgender girls" means something other than**

1    **young biological males who identify as young females.**

2        51.    Puberty-blocking medication prevents transgender girls from experiencing
3    the physiological changes caused by prolonged and increased exposure to testosterone.
4    (Pls.' Ex. 2 ¶¶ 33, 35–40; Pls.' Ex. 3 ¶¶ 30–33, 35–39, 42.)

5    **Response:  Disputed.  Defendants provided evidence contraindicative of the efficacy**
6    **of puberty-blockers.  *See generally* Defs.' Ex. 24 (Budge Dep.), at 111:14-135:23**
7    **(discussing lack of evidence for efficacy of puberty-blockers).  Moreover, Defendants**
8    **presented evidence that puberty-blockers do not eliminate the physiological**
9    **advantages that biological males have over biological females. Defs.' Ex. 31, at 8-12;**
10   **Defs.' Ex. 36, at 4-5; Defs.' Ex. 38, at 9; Defs.' Ex. 39 (Brown Report), ¶¶ 192–207,**
11   **216–330; Defs.' Ex. 41 (Hilton Report), ¶¶ 11.1–11.6; *see also* Defs.' Ex. 40 (Carlson**
12   **Report), ¶¶ 79–96.  In addition, "transgender girls" is undefined.  Defendants object**
13   **to the extent "transgender girls" means something other than young biological males**
14   **who identify as young females.**

15       52.    Transgender girls who receive hormone therapy after receiving puberty-
16   blocking medication develop the same skeletal structure, fat distribution, muscle and breast
17   development, and circulating levels of estrogen and testosterone typical of other girls. (Pls.'
18   Ex. 1 ¶ 29; Pls.' Ex. 2 ¶¶ 33–34; Pls.' Ex. 3 ¶ 34.)

19   **Response:  Disputed.  The cited sources do not support the asserted fact; in particular,**
20   **that the "same" levels of development will be attained by means of hormone therapy.**
21   **Pls.' Ex. 1, ¶ 29 (stating only that breast development, fat redistribution, musculature,**
22   **and hair and skin will be "typical" of other girls); Pls.' Ex. 2, ¶¶ 33-34 (stating only**
23   **that testosterone and estrogen levels following hormone therapy "typically" will be**
24   **identical to those of girls); Pls.' Ex. 3, ¶ 34 (hormone therapy may instill "many," but**
25   **not all, characteristics of other girls).  Defendants presented evidence that puberty-**
26   **blockers do not eliminate the physiological advantages that biological males have over**
27   **biological females.  Defs.' Ex. 31, at 8-12; Defs.' Ex. 36, at 4-5; Defs.' Ex. 38, at 9;**
28   **Defs.' Ex. 39 (Brown Report), ¶¶ 192–207, 216–330; Defs.' Ex. 41 (Hilton Report), ¶¶**

11.1–11.6; *see also* **Defs.' Ex. 40 (Carlson Report), ¶¶ 79–96. Moreover, Defendants have provided evidence contraindicative of the efficacy of puberty blockers and cross-sex hormones. *See generally* Defs.' Ex. 24 (Budge Dep.), at 111:14-135:23 (discussing lack of evidence for efficacy of cross-sex hormones). In addition, "transgender girls" is undefined. Defendants object to the extent "transgender girls" means something other than young biological males who identify as young females.**

53.    Transgender girls who have not undergone male puberty or who have received puberty-blocking medication at the onset of puberty do not present any unique safety risks to other girls. (Pls.' Ex. 3 ¶¶ 46–49.)

**<u>Response:</u>    Disputed.    Defendants provided evidence that both before and after puberty, biological females are more likely than biological males to suffer concussions in sports. Defs.' Ex. 40 (Carlson Report), ¶¶ 58, 62-63. Defendants also provided evidence that biological males generate more energy, force, and acceleration that is more likely to cause injury. *Id.* at ¶¶ 29-57. Additionally, Defendants provided evidence contraindicative of the efficacy of puberty-blockers. *See generally* Defs.' Ex. 24 (Budge Dep.), at 111:14-135:23 (discussing lack of evidence for efficacy of puberty-blockers). Moreover, Defendants presented evidence that puberty-blockers do not eliminate the physiological advantages that biological males have over biological females. Defs.' Ex. 31, at 8-12; Defs.' Ex. 36, at 4-5; Defs.' Ex. 38, at 9; Defs.' Ex. 39 (Brown Report), ¶¶ 192–207, 216–330; Defs.' Ex. 41 (Hilton Report), ¶¶ 11.1–11.6; *see also* Defs.' Ex. 40 (Carlson Report), ¶¶ 79–96. In addition, "transgender girls" is undefined. Defendants object to the extent "transgender girls" means something other than young biological males who identify as young females.**

54.    Transgender girls receiving puberty-blocking medication or hormone therapy are at the same or similar risk for injury as non-transgender girls. (Pls.' Ex. 3 ¶ 46; *see also* Pls.' Ex. 20 at 161:4–163:7.)

**<u>Response:</u>    Disputed.    The testimony of Dr. Carlson cited by Plaintiffs does not support the asserted fact; in particular that there is a "same or similar" risk. Pls.'**

Ex. 20, at 161:4-163:7 (Dr. Carlson discussing only an "increase[d]" risk of undescribed magnitude). **Additionally, Defendants provided evidence that both before and after puberty, biological females are more likely than biological males to suffer concussions in sports. Defs.' Ex. 40 (Carlson Report), ¶¶ 58, 62-63. Moreover, Defendants have provided evidence contraindicative of the efficacy of puberty-blockers and cross-sex hormones. *See generally* Defs.' Ex. 24 (Budge Dep.), at 111:14-135:23 (discussing lack of evidence for efficacy of puberty-blockers and cross-sex hormones). Defendants presented evidence that puberty-blockers do not eliminate the physiological advantages that biological males have over biological females. Defs.' Ex. 31, at 8-12; Defs.' Ex. 36, at 4-5; Defs.' Ex. 38, at 9; Defs.' Ex. 39 (Brown Report), ¶¶ 192–207, 216–330; Defs.' Ex. 41 (Hilton Report), ¶¶ 11.1–11.6; *see also* Defs.' Ex. 40 (Carlson Report), ¶¶ 79–96. In addition, "transgender girls" is undefined. Defendants object to the extent "transgender girls" means something other than young biological males who identify as young females.**

55.    Since Jane was 11 years old, when Jane's doctors determined she was at the onset of male puberty, Jane has taken puberty-blocking medication as part of her treatment for gender dysphoria. (Pls.' Ex. 6 ¶ 10; Pls.' Ex. 40 at -948–52; Pls.' Ex. 41 at -1544–47; Defs.' Ex. 76 No. 3.)

**Response:  Disputed.  None of the cited sources say anything about when Plaintiff's onset of puberty occurred or was about to occur, nor do they say she initiated puberty-blockers at such alleged onset. Defendants move to strike Plaintiffs' medical record evidence because it lacks foundation and authentication. *Allen v. Rivera*, No. 1:05-cv-146, 2013 WL 5670862, at \*5 (E.D. Cal. Oct. 15, 2013) ("Plaintiff cannot lay a foundation for these records composed by third parties" … the medical records "contain medical … opinions which can only be offered by a medical … expert); *Morgan v. Doran*, 308 F. App'x 231, 231-32 (9th Cir. 2009). Defendants also move to strike Plaintiffs' medical record evidence because it consists of hearsay and hearsay within hearsay. *Pope v. Las Vegas Metro. Police Dep't*, 647 F. App'x 817, 819 (9th Cir.**

1    **2016) (affirming exclusion of medical records as hearsay which "do not fall under any**

2    **of the hearsay exceptions");** ***Angelo v. Thomson Int'l, Inc.*,** **No. 1:21-cv-1609, 2024 WL**

3    **3202513, at \*4 (E.D. Cal. June 27, 2024) (Fed. R. Evid. 803(4) "applies only to**

4    **statements made by the patient to the doctor").  Defendants further move to strike**

5    **Plaintiffs' medical record evidence because it lacks expert testimony to interpret it.**

6    ***Cervantes v. Pratt*,** **No. 04-cv-1004, 2008 WL 11424110, at \*11 (D. Ariz. Aug. 5, 2008)**

7    **(burden is on proffering party to provide "expert testimony to interpret the medical**

8    **records.");** ***Cottrell v. Igbinosa*,** **No. 1:13-cv-1530, 2017 WL 550580, at \*16 (E.D. Cal.**

9    **Feb. 9, 2017),** ***report and recommendation adopted*,** **2017 WL 1064724 (E.D. Cal. Mar.**

10   **20, 2017) ("The interpretation of medical test results requires specialized education**

11   **and training, and therefore evidence must come from a medical expert.");** ***Hill v.***

12   ***Clark*,** **No. 1:13-cv-386, 2016 WL 696433, at \*1 (E.D. Cal. Feb. 22, 2016);** ***Lim v. Adler*,**

13   **No. 1:09-cv-1753, 2010 WL 2348743, at \*7 n.3 (E.D. Cal. June 8, 2010).  Finally,**

14   **Defendants move to strike Plaintiffs' conclusory, self-serving affidavits without**

15   **sufficient supporting evidence as incapable of establishing undisputed material facts**

16   **for summary judgment.** ***See FTC v. Publ'g Clearing House, Inc.*,** **104 F.3d 1168, 1171**

17   **(9th Cir. 1997);** ***Nigro v. Sears, Roebuck and Co.*,** **784 F.3d 495, 497 (9th Cir. 2015);**

18   ***SEC v. Phan*,** **500 F.3d 895, 909 (9th Cir. 2007).**

19   56.    Jane has not and does not expect to experience any of the physiological

20   changes associated with male puberty, including any that may be caused by increased

21   testosterone levels in pubescent boys. (Pls.' Ex. 41 at -1538, -1544–47; Pls.' Ex. 42 at -

22   001–3; *see also* Pls.' Ex. 1 ¶ 28; Pls.' Ex. 2 ¶ 43; Pls.' Ex. 3 ¶ 65.)

23   **Response:  Disputed.  The cited sources do not support the asserted fact.  Plaintiffs**

24   **rely on Dr. Budge and Dr. Shumer for the asserted fact, but they cannot properly do**

25   **so, as neither Dr. Budge nor Dr. Shumer ever medically examined Plaintiff, ever**

26   **reviewed Plaintiff's medical records, or ever knew Plaintiff's testosterone levels at**

27   **any point.** ***See* Defs.' Ex. 23 (Shumer Dep.), at 241:22-23, 242:3-8; Defs.' Ex. 24**

28   **(Budge Dep.), at 9:8-22, 12:15-21, 17:12-17.  Moreover, Defendants provided evidence**

contraindicative of the efficacy of puberty-blockers. *See generally* Defs.' Ex. 24 (Budge Dep.), at 111:14-135:23 (discussing lack of evidence for efficacy of puberty-blockers). Defendants move to strike Plaintiffs' medical record evidence because it lacks foundation and authentication. *Allen v. Rivera*, No. 1:05-cv-146, 2013 WL 5670862, at *5 (E.D. Cal. Oct. 15, 2013) ("Plaintiff cannot lay a foundation for these records composed by third parties" … the medical records "contain medical … opinions which can only be offered by a medical … expert); *Morgan v. Doran*, 308 F. App'x 231, 231-32 (9th Cir. 2009). Defendants also move to strike Plaintiffs' medical record evidence because it consists of hearsay and hearsay within hearsay. *Pope v. Las Vegas Metro. Police Dep't*, 647 F. App'x 817, 819 (9th Cir. 2016) (affirming exclusion of medical records as hearsay which "do not fall under any of the hearsay exceptions"); *Angelo v. Thomson Int'l, Inc.*, No. 1:21-cv-1609, 2024 WL 3202513, at *4 (E.D. Cal. June 27, 2024) (Fed. R. Evid. 803(4) "applies only to statements made by the patient to the doctor"). Finally, Defendants move to strike Plaintiffs' medical record evidence because it lacks expert testimony to interpret it. *Cervantes v. Pratt*, No. 04-cv-1004, 2008 WL 11424110, at *11 (D. Ariz. Aug. 5, 2008) (burden is on proffering party to provide "expert testimony to interpret the medical records."); *Cottrell v. Igbinosa*, No. 1:13-cv-1530, 2017 WL 550580, at *16 (E.D. Cal. Feb. 9, 2017), *report and recommendation adopted*, 2017 WL 1064724 (E.D. Cal. Mar. 20, 2017) ("The interpretation of medical test results requires specialized education and training, and therefore evidence must come from a medical expert."); *Hill v. Clark*, No. 1:13-cv-386, 2016 WL 696433, at *1 (E.D. Cal. Feb. 22, 2016); *Lim v. Adler*, No. 1:09-cv-1753, 2010 WL 2348743, at *7 n.3 (E.D. Cal. June 8, 2010).

If the Court denies Defendants' motion to strike and allows Plaintiffs' medical record evidence, Defendants cite the following contradictory evidence that refute this factual assertion. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

1

2      57.                                              (Pls.' Ex. 42 at -002.)

3  **Response:  Disputed.  Defendants move to strike Plaintiffs' medical record evidence**

4  **because it lacks foundation and authentication.  *Allen v. Rivera*, No. 1:05-cv-146, 2013**

5  **WL 5670862, at \*5 (E.D. Cal. Oct. 15, 2013) ("Plaintiff cannot lay a foundation for**

6  **these records composed by third parties" … the medical records "contain medical …**

7  **opinions which can only be offered by a medical … expert); *Morgan v. Doran*, 308 F.**

8  **App'x 231, 231-32 (9th Cir. 2009).  Defendants also move to strike Plaintiffs' medical**

9  **record evidence because it consists of hearsay and hearsay within hearsay.  *Pope v.***

10 **_Las Vegas Metro. Police Dep't_, 647 F. App'x 817, 819 (9th Cir. 2016) (affirming**

11 **exclusion of medical records as hearsay which "do not fall under any of the hearsay**

12 **exceptions"); *Angelo v. Thomson Int'l, Inc.*, No. 1:21-cv-1609, 2024 WL 3202513, at**

13 **\*4 (E.D. Cal. June 27, 2024) (Fed. R. Evid. 803(4) "applies only to statements made**

14 **by the patient to the doctor").  Finally, Defendants move to strike Plaintiffs' medical**

15 **record evidence because it lacks expert testimony to interpret it.  *Cervantes v. Pratt*,**

16 **No. 04-cv-1004, 2008 WL 11424110, at \*11 (D. Ariz. Aug. 5, 2008) (burden is on**

17 **proffering party to provide "expert testimony to interpret the medical records.");**

18 **_Cottrell v. Igbinosa_, No. 1:13-cv-1530, 2017 WL 550580, at \*16 (E.D. Cal. Feb. 9, 2017),**

19 **_report and recommendation adopted_, 2017 WL 1064724 (E.D. Cal. Mar. 20, 2017)**

20 **("The interpretation of medical test results requires specialized education and**

21 **training, and therefore evidence must come from a medical expert."); *Hill v. Clark*,**

22 **No. 1:13-cv-386, 2016 WL 696433, at \*1 (E.D. Cal. Feb. 22, 2016); *Lim v. Adler*, No.**

23 **1:09-cv-1753, 2010 WL 2348743, at \*7 n.3 (E.D. Cal. June 8, 2010).**

24     58.                                              (Pls.' Ex. 41 at -

25 1538.)

26 **Response:  Disputed.  The cited source does not support the asserted fact.  Further,**

27 **the asserted fact**

28                                              .  *See* **Pls.' Ex. 41 at -1538.  Defendants**

27

move to strike Plaintiffs' medical record evidence because it lacks foundation and authentication. *Allen v. Rivera*, No. 1:05-cv-146, 2013 WL 5670862, at *5 (E.D. Cal. Oct. 15, 2013) ("Plaintiff cannot lay a foundation for these records composed by third parties" … the medical records "contain medical … opinions which can only be offered by a medical … expert); *Morgan v. Doran*, 308 F. App'x 231, 231-32 (9th Cir. 2009). Defendants also move to strike Plaintiffs' medical record evidence because it consists of hearsay and hearsay within hearsay. *Pope v. Las Vegas Metro. Police Dep't*, 647 F. App'x 817, 819 (9th Cir. 2016) (affirming exclusion of medical records as hearsay which "do not fall under any of the hearsay exceptions"); *Angelo v. Thomson Int'l, Inc.*, No. 1:21-cv-1609, 2024 WL 3202513, at *4 (E.D. Cal. June 27, 2024) (Fed. R. Evid. 803(4) "applies only to statements made by the patient to the doctor"). Finally, Defendants move to strike Plaintiffs' medical record evidence because it lacks expert testimony to interpret it. *Cervantes v. Pratt*, No. 04-cv-1004, 2008 WL 11424110, at *11 (D. Ariz. Aug. 5, 2008) (burden is on proffering party to provide "expert testimony to interpret the medical records."); *Cottrell v. Igbinosa*, No. 1:13-cv-1530, 2017 WL 550580, at *16 (E.D. Cal. Feb. 9, 2017), *report and recommendation adopted*, 2017 WL 1064724 (E.D. Cal. Mar. 20, 2017) ("The interpretation of medical test results requires specialized education and training, and therefore evidence must come from a medical expert."); *Hill v. Clark*, No. 1:13-cv-386, 2016 WL 696433, at *1 (E.D. Cal. Feb. 22, 2016); *Lim v. Adler*, No. 1:09-cv-1753, 2010 WL 2348743, at *7 n.3 (E.D. Cal. June 8, 2010).

If the Court denies Defendants' motion to strike and allows Plaintiffs' medical record evidence, Defendants cite the following contradictory evidence that refute this factual assertion. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

59.    Jane's most recent lab results show ███████████████████████

1    ████████████████████████████ (Pls.' Ex. 41 at -1542.)

2    **Response:  Disputed.  Defendants move to strike Plaintiffs' medical record evidence**

3    **because it lacks foundation and authentication.  *Allen v. Rivera*, No. 1:05-cv-146, 2013**

4    **WL 5670862, at \*5 (E.D. Cal. Oct. 15, 2013) ("Plaintiff cannot lay a foundation for**

5    **these records composed by third parties" … the medical records "contain medical …**

6    **opinions which can only be offered by a medical … expert); *Morgan v. Doran*, 308 F.**

7    **App'x 231, 231-32 (9th Cir. 2009).  Defendants also move to strike Plaintiffs' medical**

8    **record evidence because it consists of hearsay and hearsay within hearsay.  *Pope v.***

9    ***Las Vegas Metro. Police Dep't*, 647 F. App'x 817, 819 (9th Cir. 2016) (affirming**

10   **exclusion of medical records as hearsay which "do not fall under any of the hearsay**

11   **exceptions"); *Angelo v. Thomson Int'l, Inc.*, No. 1:21-cv-1609, 2024 WL 3202513, at**

12   **\*4 (E.D. Cal. June 27, 2024) (Fed. R. Evid. 803(4) "applies only to statements made**

13   **by the patient to the doctor").  Finally, Defendants move to strike Plaintiffs' medical**

14   **record evidence because it lacks expert testimony to interpret it.  *Cervantes v. Pratt*,**

15   **No. 04-cv-1004, 2008 WL 11424110, at \*11 (D. Ariz. Aug. 5, 2008) (burden is on**

16   **proffering party to provide "expert testimony to interpret the medical records.");**

17   ***Cottrell v. Igbinosa*, No. 1:13-cv-1530, 2017 WL 550580, at \*16 (E.D. Cal. Feb. 9, 2017),**

18   ***report and recommendation adopted*, 2017 WL 1064724 (E.D. Cal. Mar. 20, 2017)**

19   **("The interpretation of medical test results requires specialized education and**

20   **training, and therefore evidence must come from a medical expert."); *Hill v. Clark*,**

21   **No. 1:13-cv-386, 2016 WL 696433, at \*1 (E.D. Cal. Feb. 22, 2016); *Lim v. Adler*, No.**

22   **1:09-cv-1753, 2010 WL 2348743, at \*7 n.3 (E.D. Cal. June 8, 2010).**

23           60.    Since Megan was 11 years old, when Megan's doctors determined she was

24   at the onset of male puberty, Megan has taken puberty-blocking medication as part of her

25   treatment for gender dysphoria. (Pls.' Ex. 9 ¶ 6; Pls.' Ex. 10 at -1252; Pls.' Ex. 11 ¶ 6; Pls.'

26   Ex. 38 at -124; Pls.' Ex. 43 at -57; Pls.' Ex. 44 at -116–20; Defs.' Ex. 76 No. 3.)

27   **Response:  Disputed.  None of the cited sources say anything about when Plaintiff's**

28   **onset of puberty occurred or was about to occur, nor do they say Megan initiated**

puberty-blockers at such alleged onset.  In fact, Plaintiffs cite Pls.' Ex. 38, at -124, but that indicates ███████████████████████████████████.  *See also* Pls.' Ex. 43, at -58 (███████████████).

Defendants move to strike Plaintiffs' medical record evidence because it lacks foundation and authentication.  *Allen v. Rivera*, No. 1:05-cv-146, 2013 WL 5670862, at *5 (E.D. Cal. Oct. 15, 2013) ("Plaintiff cannot lay a foundation for these records composed by third parties" … the medical records "contain medical … opinions which can only be offered by a medical … expert); *Morgan v. Doran*, 308 F. App'x 231, 231-32 (9th Cir. 2009).  Defendants also move to strike Plaintiffs' medical record evidence because it consists of hearsay and hearsay within hearsay.  *Pope v. Las Vegas Metro. Police Dep't*, 647 F. App'x 817, 819 (9th Cir. 2016) (affirming exclusion of medical records as hearsay which "do not fall under any of the hearsay exceptions"); *Angelo v. Thomson Int'l, Inc.*, No. 1:21-cv-1609, 2024 WL 3202513, at *4 (E.D. Cal. June 27, 2024) (Fed. R. Evid. 803(4) "applies only to statements made by the patient to the doctor").  In addition, Defendants move to strike Plaintiffs' medical record evidence because it lacks expert testimony to interpret it.  *Cervantes v. Pratt*, No. 04-cv-1004, 2008 WL 11424110, at *11 (D. Ariz. Aug. 5, 2008) (burden is on proffering party to provide "expert testimony to interpret the medical records."); *Cottrell v. Igbinosa*, No. 1:13-cv-1530, 2017 WL 550580, at *16 (E.D. Cal. Feb. 9, 2017), *report and recommendation adopted*, 2017 WL 1064724 (E.D. Cal. Mar. 20, 2017) ("The interpretation of medical test results requires specialized education and training, and therefore evidence must come from a medical expert."); *Hill v. Clark*, No. 1:13-cv-386, 2016 WL 696433, at *1 (E.D. Cal. Feb. 22, 2016); *Lim v. Adler*, No. 1:09-cv-1753, 2010 WL 2348743, at *7 n.3 (E.D. Cal. June 8, 2010).  Defendants move to strike Plaintiffs' reliance on conclusory, self-serving affidavits without sufficient supporting evidence as incapable of establishing undisputed material facts for summary judgment.  *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895,

1    **909 (9th Cir. 2007).**

2         61.    When she was 12 years old, Megan began receiving hormone therapy. (Pls.'

3    Ex. 9 ¶ 6; Pls.' Ex. 11 ¶ 6; Pls.' Ex. 39 at -342; Pls.' Ex. 45 at -40–43.)

4    **<u>Response:</u>  Disputed.  Defendants move to strike Plaintiffs' medical record evidence**

5    **because it lacks foundation and authentication.  *Allen v. Rivera*, No. 1:05-cv-146, 2013**

6    **WL 5670862, at \*5 (E.D. Cal. Oct. 15, 2013) ("Plaintiff cannot lay a foundation for**

7    **these records composed by third parties" … the medical records "contain medical …**

8    **opinions which can only be offered by a medical … expert); *Morgan v. Doran*, 308 F.**

9    **App'x 231, 231-32 (9th Cir. 2009).  Defendants also move to strike Plaintiffs' medical**

10   **record evidence because it consists of hearsay and hearsay within hearsay.  *Pope v.***

11   ***Las Vegas Metro. Police Dep't*, 647 F. App'x 817, 819 (9th Cir. 2016) (affirming**

12   **exclusion of medical records as hearsay which "do not fall under any of the hearsay**

13   **exceptions"); *Angelo v. Thomson Int'l, Inc.*, No. 1:21-cv-1609, 2024 WL 3202513, at**

14   **\*4 (E.D. Cal. June 27, 2024) (Fed. R. Evid. 803(4) "applies only to statements made**

15   **by the patient to the doctor").   In addition, Defendants move to strike Plaintiffs'**

16   **medical record evidence because it lacks expert testimony to interpret it.  *Cervantes***

17   ***v. Pratt*, No. 04-cv-1004, 2008 WL 11424110, at \*11 (D. Ariz. Aug. 5, 2008) (burden is**

18   **on proffering party to provide "expert testimony to interpret the medical records.");**

19   ***Cottrell v. Igbinosa*, No. 1:13-cv-1530, 2017 WL 550580, at \*16 (E.D. Cal. Feb. 9, 2017),**

20   ***report and recommendation adopted*, 2017 WL 1064724 (E.D. Cal. Mar. 20, 2017)**

21   **("The interpretation of medical test results requires specialized education and**

22   **training, and therefore evidence must come from a medical expert."); *Hill v. Clark*,**

23   **No. 1:13-cv-386, 2016 WL 696433, at \*1 (E.D. Cal. Feb. 22, 2016); *Lim v. Adler*, No.**

24   **1:09-cv-1753, 2010 WL 2348743, at \*7 n.3 (E.D. Cal. June 8, 2010).  Defendants move**

25   **to strike Plaintiffs' reliance on conclusory, self-serving affidavits without sufficient**

26   **supporting evidence as incapable of establishing undisputed material facts for**

27   **summary judgment.  *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th**

28   **Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015); *SEC v.***

1    ***Phan***, 500 F.3d 895, 909 (9th Cir. 2007).

2         62.    Megan's medical records show ████████████████████

3    ██████████████████████████████████████████ (Pls.' Ex. 39 at -343.)

4    **Response: Disputed. Plaintiff** ████████████████████████████████

5    ████████████████████████████████. ***See*** **Pls.' Ex. 43, at -58.  Moreover, Defendants**

6    **provided evidence contraindicative of the efficacy of puberty-blockers.  *See generally***

7    **Defs.' Ex. 24 (Budge Dep.), at 111:14-135:23 (discussing lack of evidence for efficacy**

8    **of puberty-blockers).  Defendants move to strike Plaintiffs' medical record evidence**

9    **because it lacks foundation and authentication.  *Allen v. Rivera*, No. 1:05-cv-146, 2013**

10   **WL 5670862, at \*5 (E.D. Cal. Oct. 15, 2013) ("Plaintiff cannot lay a foundation for**

11   **these records composed by third parties" … the medical records "contain medical …**

12   **opinions which can only be offered by a medical … expert); *Morgan v. Doran*, 308 F.**

13   **App'x 231, 231-32 (9th Cir. 2009).  Defendants also move to strike Plaintiffs' medical**

14   **record evidence because it consists of hearsay and hearsay within hearsay.  *Pope v.***

15   ***Las Vegas Metro. Police Dep't*, 647 F. App'x 817, 819 (9th Cir. 2016) (affirming**

16   **exclusion of medical records as hearsay which "do not fall under any of the hearsay**

17   **exceptions"); *Angelo v. Thomson Int'l, Inc.*, No. 1:21-cv-1609, 2024 WL 3202513, at**

18   **\*4 (E.D. Cal. June 27, 2024) (Fed. R. Evid. 803(4) "applies only to statements made**

19   **by the patient to the doctor").  Finally, Defendants move to strike Plaintiffs' medical**

20   **record evidence because it lacks expert testimony to interpret it.  *Cervantes v. Pratt*,**

21   **No. 04-cv-1004, 2008 WL 11424110, at \*11 (D. Ariz. Aug. 5, 2008) (burden is on**

22   **proffering party to provide "expert testimony to interpret the medical records.");**

23   ***Cottrell v. Igbinosa*, No. 1:13-cv-1530, 2017 WL 550580, at \*16 (E.D. Cal. Feb. 9, 2017),**

24   ***report and recommendation adopted*, 2017 WL 1064724 (E.D. Cal. Mar. 20, 2017)**

25   **("The interpretation of medical test results requires specialized education and**

26   **training, and therefore evidence must come from a medical expert."); *Hill v. Clark*,**

27   **No. 1:13-cv-386, 2016 WL 696433, at \*1 (E.D. Cal. Feb. 22, 2016); *Lim v. Adler*, No.**

28   **1:09-cv-1753, 2010 WL 2348743, at \*7 n.3 (E.D. Cal. June 8, 2010).**

1    63.    Megan has not undergone male puberty. (Pls.' Ex. 10 at -1252–53; Pls.' Ex.

2    38 at -121; Pls.' Ex. 39 at -342–43; *see also* Pls.' Ex. 2 ¶ 45.)

3    **Response: Disputed. The cited sources do not support the asserted fact. Plaintiff** ▮

4    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮**.**

5    ***See* Pls.' Ex. 43, at -58. Plaintiffs rely on Dr. Shumer for the asserted fact, but they**

6    **cannot properly do so, as Dr. Shumer never medically examined Plaintiff, never**

7    **reviewed Plaintiff's medical records, nor ever knew Plaintiff's testosterone levels at**

8    **any point. *See* Defs.' Ex. 23 (Shumer Dep.), at 241:22-23, 242:3-8. Moreover,**

9    **Defendants provided evidence contraindicative of the efficacy of puberty-blockers.**

10   ***See generally* Defs.' Ex. 24 (Budge Dep.), at 111:14-135:23 (discussing lack of evidence**

11   **for efficacy of puberty-blockers). Defendants move to strike Plaintiffs' medical**

12   **record evidence because it lacks foundation and authentication. *Allen v. Rivera*, No.**

13   **1:05-cv-146, 2013 WL 5670862, at *5 (E.D. Cal. Oct. 15, 2013) ("Plaintiff cannot lay**

14   **a foundation for these records composed by third parties" … the medical records**

15   **"contain medical … opinions which can only be offered by a medical … expert);**

16   ***Morgan v. Doran*, 308 F. App'x 231, 231-32 (9th Cir. 2009). Defendants also move to**

17   **strike Plaintiffs' medical record evidence because it consists of hearsay and hearsay**

18   **within hearsay. *Pope v. Las Vegas Metro. Police Dep't*, 647 F. App'x 817, 819 (9th Cir.**

19   **2016) (affirming exclusion of medical records as hearsay which "do not fall under any**

20   **of the hearsay exceptions"); *Angelo v. Thomson Int'l, Inc.*, No. 1:21-cv-1609, 2024 WL**

21   **3202513, at *4 (E.D. Cal. June 27, 2024) (Fed. R. Evid. 803(4) "applies only to**

22   **statements made by the patient to the doctor"). Finally, Defendants move to strike**

23   **Plaintiffs' medical record evidence because it lacks expert testimony to interpret it.**

24   ***Cervantes v. Pratt*, No. 04-cv-1004, 2008 WL 11424110, at *11 (D. Ariz. Aug. 5, 2008)**

25   **(burden is on proffering party to provide "expert testimony to interpret the medical**

26   **records."); *Cottrell v. Igbinosa*, No. 1:13-cv-1530, 2017 WL 550580, at *16 (E.D. Cal.**

27   **Feb. 9, 2017), *report and recommendation adopted*, 2017 WL 1064724 (E.D. Cal. Mar.**

28   **20, 2017) ("The interpretation of medical test results requires specialized education**

1    **and training, and therefore evidence must come from a medical expert.");** *Hill v.*

2    *Clark*, **No. 1:13-cv-386, 2016 WL 696433, at \*1 (E.D. Cal. Feb. 22, 2016);** *Lim v. Adler*,

3    **No. 1:09-cv-1753, 2010 WL 2348743, at \*7 n.3 (E.D. Cal. June 8, 2010).**

4        64.    Megan's hormone treatment has caused her to develop many of the

5    physiological changes associated with puberty in females. (See Pls.' Ex. 1 ¶ 29; Pls.' Ex.

6    3 ¶ 34.)

7    **Response:  Disputed.  Plaintiffs rely on Dr. Budge and Dr. Shumer for the asserted**

8    **fact, but they cannot properly do so, as neither Dr. Budge nor Dr. Shumer ever**

9    **medically examined Plaintiff, ever reviewed Plaintiff's medical records, or ever knew**

10    **Plaintiff's testosterone levels at any point.** *See* **Defs.' Ex. 23 (Shumer Dep.), at 241:22-**

11    **23, 242:3-8; Defs.' Ex. 24 (Budge Dep.), at 9:8-22, 12:15-21, 17:12-17.  Defendants**

12    **have provided evidence contraindicative of the efficacy of puberty-blockers and**

13    **cross-sex hormones.** *See generally* **Defs.' Ex. 24 (Budge Dep.), at 111:14-135:23**

14    **(discussing lack of evidence for efficacy of puberty-blockers and cross-sex hormones).**

15        65.    Megan's medical records show ███████████████████████████████

16    ███████████████████████ (Pls.' Ex. 39 at -343; *see also* Pls.' Ex. 10 at -1252–

17    53.)

18    **Response:  Disputed.  Defendants move to strike Plaintiffs' medical record evidence**

19    **because it lacks foundation and authentication.** *Allen v. Rivera*, **No. 1:05-cv-146, 2013**

20    **WL 5670862, at \*5 (E.D. Cal. Oct. 15, 2013) ("Plaintiff cannot lay a foundation for**

21    **these records composed by third parties" … the medical records "contain medical …**

22    **opinions which can only be offered by a medical … expert);** *Morgan v. Doran*, **308 F.**

23    **App'x 231, 231-32 (9th Cir. 2009).  Defendants also move to strike Plaintiffs' medical**

24    **record evidence because it consists of hearsay and hearsay within hearsay.** *Pope v.*

25    *Las Vegas Metro. Police Dep't*, **647 F. App'x 817, 819 (9th Cir. 2016) (affirming**

26    **exclusion of medical records as hearsay which "do not fall under any of the hearsay**

27    **exceptions");** *Angelo v. Thomson Int'l, Inc.*, **No. 1:21-cv-1609, 2024 WL 3202513, at**

28    **\*4 (E.D. Cal. June 27, 2024) (Fed. R. Evid. 803(4) "applies only to statements made**

by the patient to the doctor"). **Finally, Defendants move to strike Plaintiffs' medical record evidence because it lacks expert testimony to interpret it.** *Cervantes v. Pratt*, No. 04-cv-1004, 2008 WL 11424110, at \*11 (D. Ariz. Aug. 5, 2008) (burden is on proffering party to provide "expert testimony to interpret the medical records."); *Cottrell v. Igbinosa*, No. 1:13-cv-1530, 2017 WL 550580, at \*16 (E.D. Cal. Feb. 9, 2017), *report and recommendation adopted*, 2017 WL 1064724 (E.D. Cal. Mar. 20, 2017) ("The interpretation of medical test results requires specialized education and training, and therefore evidence must come from a medical expert."); *Hill v. Clark*, No. 1:13-cv-386, 2016 WL 696433, at \*1 (E.D. Cal. Feb. 22, 2016); *Lim v. Adler*, No. 1:09-cv-1753, 2010 WL 2348743, at \*7 n.3 (E.D. Cal. June 8, 2010). **Additionally, Defendants have provided evidence contraindicative of the efficacy of puberty-blockers and cross-sex hormones.** *See generally* Defs.' Ex. 24 (Budge Dep.), at 111:14-135:23 (discussing lack of evidence for efficacy of puberty-blockers and cross-sex hormones).

66.    Megan has undergone female puberty. (Pls.' Ex. 10 at -1255, -1252-55; Pls.' Ex. 39 at -342–43; *see also* Pls.' Ex. 2 ¶ 45.)

**Response: Disputed. The cited sources do not support the asserted fact. Plaintiffs cite Pls.' Ex. 39, at -342-43, but absent from that evidence is any claim that Plaintiff "has undergone female puberty." On the contrary, it indicates Plaintiff is** ███████████████████████████████████████████ *Id.* **Plaintiffs cite Pls.' Ex. 10, at -1252-55, but again, absent is any claim that Plaintiff "has undergone female puberty." In fact, page -1255 indicates** ████████████████████ ████████████████████████████ **which itself lacks the medical foundation necessary to establish the asserted fact and is also inconsistent with it. Defendants move to strike Plaintiffs' medical record evidence because it lacks foundation and authentication.** *Allen v. Rivera*, No. 1:05-cv-146, 2013 WL 5670862, at \*5 (E.D. Cal. Oct. 15, 2013) ("Plaintiff cannot lay a foundation for these records composed by third parties" … the medical records "contain medical … opinions which can only be

35

1  offered by a medical … expert); *Morgan v. Doran*, 308 F. App'x 231, 231-32 (9th Cir.

2  2009).  Defendants also move to strike Plaintiffs' medical record evidence because it

3  consists of hearsay and hearsay within hearsay.  *Pope v. Las Vegas Metro. Police Dep't*,

4  647 F. App'x 817, 819 (9th Cir. 2016) (affirming exclusion of medical records as

5  hearsay which "do not fall under any of the hearsay exceptions"); *Angelo v. Thomson*

6  *Int'l, Inc.*, No. 1:21-cv-1609, 2024 WL 3202513, at *4 (E.D. Cal. June 27, 2024) (Fed.

7  R. Evid. 803(4) "applies only to statements made by the patient to the doctor").

8  Finally, Defendants move to strike Plaintiffs' medical record evidence because it lacks

9  expert testimony to interpret it.  *Cervantes v. Pratt*, No. 04-cv-1004, 2008 WL

10  11424110, at *11 (D. Ariz. Aug. 5, 2008) (burden is on proffering party to provide

11  "expert testimony to interpret the medical records."); *Cottrell v. Igbinosa*, No. 1:13-

12  cv-1530, 2017 WL 550580, at *16 (E.D. Cal. Feb. 9, 2017), *report and recommendation*

13  *adopted*, 2017 WL 1064724 (E.D. Cal. Mar. 20, 2017) ("The interpretation of medical

14  test results requires specialized education and training, and therefore evidence must

15  come from a medical expert."); *Hill v. Clark*, No. 1:13-cv-386, 2016 WL 696433, at *1

16  (E.D. Cal. Feb. 22, 2016); *Lim v. Adler*, No. 1:09-cv-1753, 2010 WL 2348743, at *7 n.3

17  (E.D. Cal. June 8, 2010).  Plaintiffs rely on Dr. Shumer for the asserted fact, but they

18  cannot properly do so, as Dr. Shumer never medically examined Plaintiff, never

19  reviewed Plaintiff's medical records, nor ever knew Plaintiff's testosterone levels at

20  any point.  *See* Defs.' Ex. 23 (Shumer Dep.), at 241:22-23, 242:3-8.  Additionally,

21  Defendants have provided evidence contraindicated of the efficacy of cross-sex

22  hormones.  *See generally* Defs.' Ex. 24 (Budge Dep.), at 111:14-135:23 (discussing lack

23  of evidence for efficacy of cross-sex hormones).

24      67.    Megan's most recent lab results show █████████████████████

25  ██████████████████████████████ (Pls.' Ex. 46 at -1660.)

26  **Response:  Disputed.  Defendants move to strike Plaintiffs' medical record evidence**

27  **because it lacks foundation and authentication.  *Allen v. Rivera*, No. 1:05-cv-146, 2013**

28  **WL 5670862, at *5 (E.D. Cal. Oct. 15, 2013) ("Plaintiff cannot lay a foundation for**

36

1  these records composed by third parties" … the medical records "contain medical …
2  opinions which can only be offered by a medical … expert); *Morgan v. Doran*, 308 F.
3  App'x 231, 231-32 (9th Cir. 2009).  Defendants also move to strike Plaintiffs' medical
4  record evidence because it consists of hearsay and hearsay within hearsay.  *Pope v.*
5  *Las Vegas Metro. Police Dep't*, 647 F. App'x 817, 819 (9th Cir. 2016) (affirming
6  exclusion of medical records as hearsay which "do not fall under any of the hearsay
7  exceptions"); *Angelo v. Thomson Int'l, Inc.*, No. 1:21-cv-1609, 2024 WL 3202513, at
8  *4 (E.D. Cal. June 27, 2024) (Fed. R. Evid. 803(4) "applies only to statements made
9  by the patient to the doctor").  Finally, Defendants move to strike Plaintiffs' medical
10 record evidence because it lacks expert testimony to interpret it.  *Cervantes v. Pratt*,
11 No. 04-cv-1004, 2008 WL 11424110, at *11 (D. Ariz. Aug. 5, 2008) (burden is on
12 proffering party to provide "expert testimony to interpret the medical records.");
13 *Cottrell v. Igbinosa*, No. 1:13-cv-1530, 2017 WL 550580, at *16 (E.D. Cal. Feb. 9, 2017),
14 *report and recommendation adopted*, 2017 WL 1064724 (E.D. Cal. Mar. 20, 2017)
15 ("The interpretation of medical test results requires specialized education and
16 training, and therefore evidence must come from a medical expert."); *Hill v. Clark*,
17 No. 1:13-cv-386, 2016 WL 696433, at *1 (E.D. Cal. Feb. 22, 2016); *Lim v. Adler*, No.
18 1:09-cv-1753, 2010 WL 2348743, at *7 n.3 (E.D. Cal. June 8, 2010).

19     68.    Since at least 1982, Arizona has provided separate sports teams for girls and
20 boys. (Defs.' Ex. 3 No. 4; Defs.' Ex. 16 No. 11.)

21 <u>Response:</u>    Disputed.    The cited sources reference a policy by the Arizona
22 Interscholastic Association, which is just one of the organizations that regulates
23 school sports in Arizona.  Defs.' SUMF ¶ 8.  Arizona did not have a statewide policy
24 until 2022 when it enacted the Save Women's Sports Act.  Defs.' Ex. 20, at 3.

25     69.    With regard to transgender athletes, each school or school district set its own
26 rules for intramural sports before the Ban was enacted. (Pls.' Ex. 14 at -993.)

27 <u>Response:</u>  Disputed.  The cited source does not support the asserted fact.  Defendants
28 provided evidence that, prior to the enactment of the Save Women's Sports Act, the

37

**Arizona Interscholastic Association (AIA) and the Canyon Athletic Association (CAA) policies governed participation on athletic teams and sports for females and girls at high schools in Arizona.** *See* **Defs.' SUMF ¶ 8. Similarly, Defendants supplied evidence that the AIA and the CAA provided a process for biological males to participate on athletic teams and sport for females and girls at high schools in Arizona, prior to the enactment of the Save Women's Sports Act.** *Id.* **at ¶ 9.**

70. For interscholastic sports, the Arizona Interscholastic Association, Inc. (the "AIA") set rules for its member schools which allowed those schools to appeal on behalf of transgender students who wished to participate on teams consistent with their gender identity. (Pls.' Ex. 7 No. 6; Pls.' Ex. 8 No. 6; Pls.' Ex. 14 at -878, -993; Defs.' Ex. 3 No. 3.)

**Response:  Undisputed.**

71. In the past ten years, the AIA has received 18 requests from transgender students to participate on teams consistent with their gender identity. (Defs.' Ex. 17 No. 4; Defs.' Ex. 18 No. 2.)

**Response:  Undisputed.**

72. The AIA's Gender Identity Eligibility Sub-Committee found no health or safety concerns with regard to any of the 18 requests and approved all 18 requests over the past 10 years. (Defs.' Ex. 16 No. 9.)

**Response:  Undisputed.**

73. The AIA has not received any complaints regarding the participation of any transgender student. (Pls.' Ex. 15 No. 4; *see also* Defs.' Ex. 3 No. 6.)

**Response:  Undisputed.**

74. During legislative hearings held in 2022 after the Ban had been introduced earlier that year, but prior to the Ban's enactment, Intervenor-Defendant Petersen stated that "[w]e're not aware of a specific instance" where any non-transgender girl has lost a place on a team to a transgender girl in Arizona athletics. (Defs.' Ex. 4 at 8:17–20.)

**Response:  Undisputed that President Petersen stated: "So I think what we're saying**

38

here is we think it's a problem here.  We're not aware of a specific instance where it has happened yet." Defs.' Ex. 4, at 8:17–20.  Undisputed that the statement was made during legislative hearings held in 2022 after S.B. 1165, the Save Women's Sports Act, had been introduced earlier that year, but prior to the Save Women's Sports Act's enactment.  Disputed as to the characterization of a "Ban," and disputed that the statement referenced "any non-transgender girl has lost a place on a team to a transgender girl in Arizona athletics" as not supported by the cited evidence; the discussion involved losing a state championship and having records broken.  *Id.* at 7:16-24, 8:6-10.

75.    Multiple witnesses testified before the Arizona Legislature against the Ban. (Pls.' Ex. 36 at 8:12–9:3; Defs.' Ex. 4 at 19:14–20:24, 22:9–23:15, 24:14–26:5, 33:7–34:20, 35:1–36:2, 36:10–37:10, 37:18–39:3, 39:12–40:18, 40:21–41:14, 56:21–57:23, 58:16–8, 59:16–61:13; Defs.' Ex. 5 20:17–21:22, 25:12–26:13, 32:6–24, 52:16–54:2.)

**Response:  Undisputed.**

76.    Multiple witnesses testified before the Legislature that athletic ability and biology are not inextricably linked and that many other factors influence athletic performance. (*See, e.g.*, Defs.' Ex. 5 at 33:20–34:6, 57:22–58:12.)

**Response:  Disputed.  The cited sources do not support the asserted fact.  Plaintiffs cite to the testimony of two witnesses.  The first testified that professional athletes must work hard to achieve their elite status.  Defs.' Ex. 5, at 33:10-34:6.  The second testimony cited by Plaintiffs points out various *biological* attributes ("[m]uscle fiber, typing, genetics") as well as other factors such as "nutrition" and "training" that contribute to athletic ability.  *Id.* at 58:8-11.  Neither witness testified that biology was irrelevant to athletic performance.**

77.    One constituent testified before the Legislature that "[a] person's ability to excel in sports goes far beyond their gender assigned at birth." (Defs.' Ex. 5 at 58:3–4.)

**Response:  Undisputed.**

78.    A member of the Sports Medicine Advisory Committee of the AIA testified

before the Legislature that the use of the AIA's policy allowing transgender students to appeal to the AIA to play on teams in accordance with their gender identity "demonstrates that gender diverse athletes are participating safely and equitably." (Defs.' Ex. 5 at 53:7–12.)

**Response:  Undisputed.**

79.    One individual testified at the Ban's hearings that she had observed "what appear[ed] to be a male" playing on a girls' basketball team in the Canyon Athletic Association. (Defs.' Ex. 4 at 12:6–13; Defs.' Ex. 6 at 18–20 (Ex. E); Defs.' Ex. 22 at 19–21 (Ex. E).)

**Response:  Undisputed.**

80.    No other individual testified in the Ban's legislative hearings regarding a transgender girls' participation on any girls' team in Arizona. (*See generally* Defs.' Ex. 4; Defs.' Ex. 5.)

**Response:  Disputed.  The cited sources do not support the asserted fact.  On the contrary, the cited sources demonstrate other witnesses testifying to biological males competing against females.  *See, e.g.*, Defs.' Ex. 4, at 6:17-25; Defs.' Ex. 5, at 5:7-11, 13:18-24, 41:24-42:3, 48:11-16.   In addition, "transgender girls" is undefined. Defendants object to the extent "transgender girls" means something other than young biological males who identify as young females.**

81.    Defendant Horne, who oversees Arizona's public schools and districts, including their athletic programs, and receives federal funding, was a vocal supporter of the Ban. (Pls.' Ex. 7 Nos. 8, 15–16.)

**Response:  Undisputed.**

82.    On March 30, 2022, Arizona enacted the Ban. (Defs.' Ex. 2; Pls.' Ex. 16.)

**Response:  Undisputed that then-Governor Ducey signed the Save Women's Sports Act on March 30, 2022.  Disputed as to the characterization of a "Ban."**

83.    Intervenor-Defendant Warren Petersen and former Intervenor-Defendant Benjamin Toma were co-sponsors of the Ban. (Pls.' Ex. 17 at 59:10–12; Pls.' Ex. 18 at

1  30:2–4.)

2  **Response:   Undisputed as it relates to S.B. 1165, the Save Women's Sports Act.**

3  **Disputed as to the characterization of a "Ban."**

4      84.   The Ban excludes transgender girls from kindergarten through college from

5  participating in all girls' sports. (*See* Ariz. Rev. Stat. § 15-120.02; Pls.' Ex. 7 No. 13; Pls.'

6  Ex. 8 No. 9.)

7  **Response:   Disputed.   The cited sources do not support the asserted fact.   Plaintiffs**

8  **have not presented evidence that any Arizona schools have interscholastic or**

9  **intermural teams below sixth grade.   Defendants provided evidence that the Save**

10 **Women's Sports Act applies to those interscholastic or intramural athletic teams or**

11 **sports that are sponsored by a public school or a private school whose students or**

12 **teams compete against a public school.   *See* Defs.' Ex. 1, at 3 (Ariz. Rev. Stat. § 15-**

13 **120.02(A)).   The Act prohibits biological males from competing on female sports**

14 **teams.   *Id.*   In addition, "transgender girls" is undefined.   Defendants object to the**

15 **extent "transgender girls" means something other than young biological males who**

16 **identify as young females.   To the extent Plaintiffs here admit that transgender girls**

17 **are biological males, Defendants do not dispute that.   Finally, Defendants dispute the**

18 **characterization of the Save Women's Sports Act as a "Ban."**

19     85.   The Ban excludes transgender girls from participating in girls' sports

20 regardless of their circulating testosterone levels or other evidence-based markers of

21 competitive advantage. (*See* Ariz. Rev. Stat. § 15-120.02; Pls.' Ex. 7 No. 13; Pls.' Ex. 8

22 No. 9.)

23 **Response:   Disputed.   The cited sources do not support the asserted fact.   Defendants**

24 **have provided evidence that the Save Women's Sports Act does not permit biological**

25 **males to compete on female sports teams.   *See* Defs.' Ex. 1, at 3 (Ariz. Rev. Stat. §**

26 **15-120.02(B)).   Defendants have provided evidence of the inherent competitive**

27 **athletic advantages enjoyed by biological males both before and after puberty.   *See***

28 **Defs.' SUMF §§ 51-102.   Defendants also provided evidence showing similar evidence-**

41

**based findings made by the Legislature in conjunction with the Save Women's Sports Act.** *See* **Defs.' Ex. 1, at 4-6 (Legislative Findings).** **Additionally, Defendants provided evidence that the Save Women's Sports Act applies to those interscholastic or intramural athletic teams or sports that are sponsored by a public school or a private school whose students or teams compete against a public school.** *See id.* **at 3 (ARIZ. REV. STAT. § 15-120.02(A)).** **In addition, "transgender girls" is undefined. Defendants object to the extent "transgender girls" means something other than young biological males who identify as young females. To the extent Plaintiffs here admit that transgender girls are biological males, Defendants do not dispute that. Finally, Defendants dispute the characterization of the Save Women's Sports Act as a "Ban."**

86.    The Ban does not distinguish between contact and non-contact sports. (*See* Ariz. Rev. Stat. § 15-120.02; Pls.' Ex. 7 No. 13; Pls.' Ex. 8 No. 9.)

**Response:** **Undisputed as it relates to the Save Women's Sports Act. Disputed as to the characterization of a "Ban."**

87.    The Ban requires all teams sponsored by a public school or private school that compete against a public-school team to be designated as "male," "female," or "coed," based on the "biological sex of the students who participate." (Ariz. Rev. Stat. § 15-120.02.)

**Response:** **Undisputed as it relates to the Save Women's Sports Act. Disputed as to the characterization of a "Ban."**

88.    The Ban does not define biological sex. (Ariz. Rev. Stat. § 15-120.02.)

**Response:** **Disputed. Defendants provided evidence to the contrary. The Legislative Findings contained in Section 2 of the Save Women's Sports Act do discuss the definition of "biological sex."** *See* **Defs.' Ex. 1, at 4 (subsections 1-3). Plaintiffs' expert, Dr. Shumer, understood the Save Women's Sports Act to be based on "biological sex determined at fertilization and revealed in utero or at birth." Pls.' Ex. 2 (Shumer Report), at ¶ 47. Finally, Defendants dispute the characterization of the**

**Save Women's Sports Act as a "Ban."**

89.    The Ban's legislative findings state that "a person's sex is determined at fertilization and revealed at birth, or, increasingly, *in utero*." (Defs.' Ex. 1 § 2(2).)

**Response:  Undisputed as it relates to the Save Women's Sports Act.  Disputed as to the characterization of a "Ban."**

90.    The Ban requires that "athletic teams or sports designated for 'females,' 'women' or 'girls' may not be open to students of the male sex." (Ariz. Rev. Stat. § 15-120.02.)

**Response:  Undisputed as it relates to the Save Women's Sports Act.  Disputed as to the characterization of a "Ban."**

91.    The Ban does not require that athletic teams or sports designated "males," "men," or "boys" be closed to transgender boys or students of the female sex. (*See* Ariz. Rev. Stat. § 15-120.02; *see* Pls.' Ex. 19 at -1141.)

**Response:  Undisputed as it relates to the Save Women's Sports Act.  Disputed as to the characterization of a "Ban."  Defendants note that "transgender boys" is undefined.  Defendants object to the extent "transgender boys" means something other than young biological females who identify as young males.**

92.    Only one of the Ban's legislative findings specifically addresses the athletic performance of children. (*See* Defs.' Ex. 1 § 2(6).)

**Response:  Disputed.  Defendants provided evidence that other sections of the Legislative Findings address the athletic performance of children.  *See, e.g.*, Defs.' Ex. 1, at 5 (§ 2(12)) (specifically discussing that "boys and girls are not similarly situated as they enter athletic competition"); *see also id.* (§ 2(3), (9), (13)).**

93.    "Normative Health-Related Fitness Values for Children: Analysis of 84347 Test Results on 9–17 Year Old Australians Since 1985" by Mark J. Catley & Grant R. Tomkinson, which is cited to support the Ban's legislative findings regarding the athletic performance of children, studied post-pubertal children. (*See* Pls.' Ex. 20 at 122:21–23; Defs.' Ex. 1 § 2(6); *see also* Pls.' Ex. 3 ¶ 27; Pls.' Ex. 21 at 73:24–74:7; Defs.' Ex. 23 at

1    90:4–18, 152:22–24, 252:7–8; Defs.' Ex. 39 ¶ 120.)

2    **Response:  Disputed.  The cited sources do not support the asserted fact.  The Catley**

3    **2013 study analyzed data of boys and girls aged 9-17, presenting data of each age for**

4    **each biological sex *in isolation from* the other ages, including, *e.g.*, age 9 in isolation**

5    **from the other ages.  *See* Defs.' Ex. 26, at 5-12.  Plaintiffs cite Dr. Shumer's testimony,**

6    **but in the cited testimony, Dr. Shumer testified that "[t]he average age of onset of**

7    **puberty is 10-11 years in females and age 11-12 years in males," Defs.' Ex. 23 (Shumer**

8    **Dep.), at 90:4-18, that "normal puberty starts within a range of 8 to 13," *id.* at 152:22,**

9    **and that "[i]t would be unusual to start puberty [in males] [b]efore age 9," *id.* at 252:6-**

10   **8.  Defendants have provided evidence that male puberty typically begins after age 9.**

11   ***See, e.g.*, Defs.' Ex. 39 (Brown Report), ¶ 173; Defs.' Ex. 41 (Hilton Report), ¶ 4.4.**

12   **Finally, Defendants dispute the characterization of the Save Women's Sports Act as**

13   **a "Ban."**

14          94.    "Physical Fitness Normative Values for 6–18-Year Old Greek Boys and

15   Girls, Using the Empirical Distribution and the Lambda, Mu, and Sigma Statistical

16   Method" by Konstantinos Tambalis et al., cited to support the Ban's legislative findings

17   regarding the athletic performance of children, is observational data presenting results from

18   physical fitness tests that does not draw conclusions about the causes of the phenomena

19   observed. (Defs.' Ex. 1 § 2(6); Defs.' Ex. 28; *see also* Pls.' Ex. 13 ¶ 17; Defs.' Ex. 23 at

20   192:23–197:7.)

21   **Response:  Disputed.  Plaintiffs cite the Tambalis 2016 study, but that study concluded**

22   **that "[b]oys performed better in all measurements except flexibility than girls of the**

23   **same age." Defs.' Ex. 28, at 10.  In reaching that conclusion, the study provided peer-**

24   **reviewed data from ages 6, 7, and 8 (as well as older ages), each age in isolation from**

25   **the other ages, for various physical fitness exercises.  *Id.* at 6-9.  It utilized an**

26   **enormous dataset of 424,328 individuals, *id.* at 3, provided p-values to show statistical**

27   **significance, *see, e.g.*, *id.* at 5, and even observed its findings to be consistent with**

28   **similar studies performed in Latvia, Portugal, and Australia, *id.* at 5, 10.  Plaintiffs**

1   cite Dr. Shannon for their asserted fact, but Dr. Shannon admitted to "a mistake" in
2   criticizing Dr. Brown's use of this informative study, admitting that the data "has
3   been peer reviewed" contrary to his assertion in his expert report.  *See* **Defs.' Ex. 25**
4   **(Shannon Dep.), at 107:19-24, 109:15; Pls.' Ex. 13 (Shannon Report), ¶ 25.  To the**
5   **extent Plaintiffs are admitting that "the phenomena observed" demonstrate the**
6   **existence, regardless of cause, of better athletic performance by boys than girls from**
7   **age 6 onwards, Defendants do not dispute that.  Finally, Defendants dispute the**
8   **characterization of the Save Women's Sports Act as a "Ban."**

9          95.    "Transgender Women in the Female Category of Sport: Perspectives on
10   Testosterone Suppression and Performance Advantage" by Emma N. Hilton & Tommy R.
11   Lundberg (hereinafter "Hilton 2021"), cited to support the Ban's legislative findings
12   including that "[t]he benefits that natural testosterone provide to male athletes is not
13   diminished through the use of testosterone suppression," studied post-pubertal transgender
14   athletes. (*See* Defs.' Ex. 1 § 2(13); *see also* Pls.' Ex. 22 at 108:17–25, 113:21–23; Defs.'
15   Ex. 31.)

16   **Response:  Undisputed that Hilton 2021 studied post-pubertal transgender athletes.**
17   **However, to the extent Plaintiffs suggest Hilton 2021 is irrelevant to prepubertal**
18   **athletic performance, Defendants dispute that, since the study directly discusses**
19   **prepubertal athletic advantages of boys.  *See* Defs.' Ex. 31, at 3-4 ("pre-puberty**
20   **performance differences are not unequivocally negligible," noting differences in**
21   **genetic makeup, skeletal muscle, growth velocity, and oxygen uptake).  Finally,**
22   **Defendants dispute the characterization of the Save Women's Sports Act as a "Ban."**

23          96.    The Ban was specifically enacted to exclude transgender girls from playing
24   on girls' teams. (*See* Defs.' Ex. 1 § 2(13); Defs.' Ex. 4 at 21:1–5; Pls.' Ex. 16; Pls.' Ex. 17
25   at 37:23–25; 51:5–6, 54:18–21, 73:18–74:20; Pls.' Ex. 18 at 38:19–39:13, 18:10–18, 32:1–
26   12; Pls.' Ex. 19 at -1141; Pls.' Ex. 23.)

27   **Response:  Disputed.  The cited sources do not support the asserted fact.  All the**
28   **evidence cited by Plaintiffs demonstrates that the Save Women's Sports Act was**

**enacted to prevent biological males from competing in female sports.  In addition, "transgender girls" is undefined.  Defendants object to the extent "transgender girls" means something other than young biological males who identify as young females. To the extent Plaintiffs here admit that "transgender girls" are biological males, Defendants agree that the Save Women's Sports Act would prevent them from playing on female sports teams for that reason.  Finally, Defendants dispute the characterization of the Save Women's Sports Act as a "Ban."**

97.    Lawmakers supporting the Ban stated that they were voting in its favor because "if we allow transgenders to take over female sports[,] [y]ou will not have females participating[.]" (Defs.' Ex. 4 at 66:12–14.)

**Response:  Disputed.  The cited evidence does not support the asserted fact.  Plaintiffs cite a single statement from a single lawmaker, not "[l]awmakers."  Defs.' Ex. 4, at 66:10-17.   In addition, the lawmaker pointed to the physiological and athletic advantages that biological males have over biological females.  *Id.* at 64:3-65:11. Finally, Defendants dispute the characterization of the Save Women's Sports Act as a "Ban."**

98.    Intervenor-Defendant Petersen described the goal of the Ban as ███████ ███████████████████████████████████████████████████████ (Pls.' Ex. 17 at 59:18–19.)

**Response:  Undisputed as the statement.  Disputed as to the characterization of the Save Women's Sports Act as a "Ban."**

99.    Intervenor-Defendant Petersen testified that ████████████████ ██████████████████████████████ (Pls.' Ex. 17 at 46:2–11.)

**Response:  Disputed.  The cited testimony makes clear that President Petersen was speaking in the context of** ████████████████████████████████████ ███████████████████████████████████████████ **Pls.' Ex. 17, at 46:2-11.**

100.    Former Intervenor-Defendant Toma testified that ██████████████

46

1 ████████████████████████████████████████
2 ████████████████████████████████████████
3 ██████████████ (Pls.' Ex. 18 at 32:1–12.)

4 **Response:** **Undisputed as the statement. Disputed as to the characterization of the**
5 **Save Women's Sports Act as a "Ban."**

6     101.   Former Intervenor-Defendant Toma testified that ████████████████
7 ████████████████████████████████████████
8 (Pls.' Ex. 18 at 38:19–39:13.)

9 **Response:** **Disputed. Former Speaker Toma was asked** ██████████████████
10 ██████████████████████████████████. **Pls.' Ex. 18, at 38:9-39:13.**
11 **Also disputed as to the characterization of the Save Women's Sports Act as a "Ban."**

12     102.   In his signing letter enacting the Ban into law, Governor Douglas Ducey
13 announced that the Ban "creates a statewide policy to ensure biologically female athletes .
14 . . have a level playing field to compete." (Pls.' Ex. 16.)

15 **Response:** **Undisputed as the statement. Disputed as to the characterization of the**
16 **Save Women's Sports Act as a "Ban."**

17     103.   Defendant Horne wrote that without the Ban, all boys would be "enable[d] .
18 . . to participate in girls' sports if they declare that they are a girl." (Pls.' Ex. 23 at -1359.)

19 **Response:** **Undisputed as the statement. Disputed as to the characterization of the**
20 **Save Women's Sports Act as a "Ban."**

21     104.   Hilton 2021 questions whether policies that allow transgender girls to
22 participate in girls' sports "can be justified at all." (Defs.' Ex. 31 at 14.)

23 **Response:** **Disputed. The cited source does not support the asserted fact. The cited**
24 **passage from Hilton et al. states that "it may be questioned as to whether a**
25 **requirement to lower testosterone below a certain level to ensure sporting**
26 **participation can be justified at all." Defs.' Ex. 31, at 14.**

27     105.   One proposed justification for the Ban is fairness in women's sports. (Pls.'
28 Ex. 17 at 78:18–23; Ex. 18 at 34:1–11; Pls.' Ex. 19 at -1135, -137; Pls.' Ex. 24; Pls.' Ex.

1    25 No. 6; *see also* Defs.' Ex. 1 § 2(13).)

2    **Response:  Undisputed as the statement.  Disputed as to the characterization of the**

3    **Save Women's Sports Act as a "Ban."**

4        106.    Intervenor-Defendant Petersen testified that ███████████████

5    ██████████████████████████████████████████████████████████

6    ████████████████ (Pls.' Ex. 17 at 69:1–13.)

7    **Response:    Disputed.    In the same testimony dialogue referenced by Plaintiffs,**

8    **President Petersen** ██████████████████████████████████**.  Pls.'**

9    **Ex. 17, at 69:14-17;** *see* **Defs.' Ex. 22, at 20 (Exhibit E);** *see also* **Pls.' Ex. 17, at 38:18-**

10    **25, 75:17-21, 77:23-24.  In addition, "transgender girl" is undefined.  Defendants**

11    **object to the extent "transgender girl" means something other than a young biological**

12    **male who identifies as a young female.**

13        107.    Intervenor-Defendant Petersen testified that ██████████████

14    ████████████████████ (Pls.' Ex. 17 at 38:10–12.)

15    **Response:  Undisputed.**

16        108.    Former Intervenor-Defendant Toma testified that ████████████

17    ████████████████████ (Pls.' Ex. 18 at 19:16–19.)

18    **Response:  Undisputed.**

19        109.    Former Intervenor-Defendant Toma ██████████████████

20    ████████████ (Pls.' Ex. 18 at 16:17–19.)

21    **Response:    Disputed  to  the  extent  it  implies** ████████████████

22    ██████████████████████████████████████████████████████████

23    ██████████████████████████████████████████████████████████

24    ████████████████████ **Pls.' Ex. 18, at 20-23.**

25        110.    Former Intervenor-Defendant Toma testified that ████████████

26    ██████████████████████████████████████████████ (Pls.' Ex. 18 at

27    32:13–23.)

28    **Response:    Disputed  to  the  extent  Plaintiffs  suggest** ██████████████

1

2    ████████████████████████████████████████████████████████

     ██████████████████████████████████████  **Pls.' Ex. 18, at 32:21-23.**

3        111.    The Ban has also been justified as protecting women's and girls' safety. (Pls.'

4    Ex. 17 at 75:17–20; Pls.' Ex. 25 No. 6; Pls.' Ex. 26 at 8:25–10:2; Defs.' Ex. 5 at 24:22–

5    24.)

6    **Response:  Undisputed as the statement.  Disputed as to the characterization of the**

7    **Save Women's Sports Act as a "Ban."**

8        112.    Defendants' expert, Dr. Carlson, testified that transgender girls do not pose

9    any additional risk of injury to other girls in non-contact sports. (Pls.' Ex. 20 at 105:7–12;

10   Defs.' Ex. 40 ¶¶ 57-58.)

11   **Response:  Disputed.  The cited sources do not support the asserted fact.  The cited**

12   **testimony of Dr. Carlson merely explains that his opinions on "risk of injury" are**

13   **limited to contact sports, not that "transgender girls do not pose any additional risk**

14   **of injury to other girls in non-contact sports" as Plaintiffs assert.  *See* Pls.' Ex. 20, at**

15   **105:7-12.   Dr. Carlson opined that "permitting male-bodied athletes to compete**

16   **against,  or  on  the  same  team  as  females—even  when  undergoing  testosterone**

17   **suppression—must  be  expected  to  create  predictable,  identifiable,  substantially**

18   **increased, and unequal risks of injuries to the participating women."  Defs.' Ex. 40**

19   **(Carlson Report), at p. 58.  Moreover, as relevant to this case, Dr. Carlson testified**

20   **that sports each Plaintiff plays, including basketball, soccer, and volleyball, fall within**

21   **his definition of "contact sports."  *Id.* at 105:18-25; Defs.' SUMF ¶¶ 156-57, 162.  In**

22   **addition,  "transgender  girls"  is  undefined.    Defendants  object  to  the  extent**

23   **"transgender girls" means something other than young biological males who identify**

24   **as young females.**

25       113.    Cross-country and track and field are non-contact sports. (Pls.' Ex. 20 at

26   106:1–19; Pls.' Ex. 27 No. 4.)

27   **Response:  Undisputed.**

28       114.    Dr. Carlson testified that he does not know whether transgender girls who

49

1  have not and will not go through male puberty cause any increased risk to other girls. (Pls.'
2  Ex. 20 at 112:1–10, 155:8–156:9.)

3  **Response:  Disputed.  The cited sources do not support the asserted fact.  Plaintiffs**
4  **cite testimony from page 112, but there, the discussion concerns whether "there is a**
5  **well-studied performance gap between transgender girls who have been treated for**
6  **gender dysphoria with puberty-suppressing medication and gender-affirming**
7  **hormones and other girls," which has nothing to do with the asserted fact.  Pls.' Ex.**
8  **20, at 112:1-10.  Similarly, Plaintiffs cite to pages 155-56, but there, the discussion**
9  **concerns "whether transgender girls who have taken puberty-suppressing medication**
10 **at the onset of male puberty and then received gender-affirming hormones are also**
11 **more vulnerable than the male body to certain types of injury," which also has**
12 **nothing to do with the asserted fact.  *Id.* at 155:8-156:9.  In addition, "transgender**
13 **girls" is undefined.  Defendants object to the extent "transgender girls" means**
14 **something other than young biological males who identify as young females.**

15     115.    Dr. Carlson testified that his expert opinion is not based on any articles that
16 studied transgender girls who have taken puberty-blocking medication at the onset of
17 puberty and who later took hormone therapy. (Pls.' Ex. 20 at 172:21–173:10; 175:19–
18 176:16.)

19 **Response:  Disputed.  The cited sources do not support the asserted fact.  Dr. Carlson**
20 **testified, in the same sections cited by Plaintiffs, to a study that was responsive.  Pls.'**
21 **Ex. 20, at 172:21-173:10; 175:19-176:16.  Plaintiffs also admit that no studies exist on**
22 **the effect of puberty blockers on sports performance.  Pls.' Opp'n to Defs.' SUMF, at**
23 **¶ 83.  In addition, "transgender girls" is undefined.  Defendants object to the extent**
24 **"transgender girls" means something other than young biological males who identify**
25 **as young females.**

26     116.    Dr. Carlson testified that to the extent girls are more likely to suffer certain
27 athletic injuries, transgender girls who take puberty-blocking medication and/or receive
28 gender-affirming hormones might be at increased risk for those same injuries. (Pls.' Ex. 20

at 161:4–163:7.)

**Response:  Disputed.  The cited sources do not support the asserted fact.  The cited testimony of Dr. Carlson discusses possible increased risk for ACL injury due to the "effect of estrogen on that ligament," which is inconsistent with the "same injuries" (multiple) as asserted by Plaintiffs.  Pls.' Ex. 20, at 161:9-12.  Moreover, Dr. Carlson made clear that, to the extent there may be any injury vulnerability to biological males who take feminizing hormones relative to other biological males, that does not equate to elimination of the risk to biological *females* who compete against biological males taking feminizing hormones.  *Id.* at 162:17-23.  In addition, "transgender girls" is undefined.  Defendants object to the extent "transgender girls" means something other than young biological males who identify as young females.**

117.    There is no evidence of any safety or fairness issues in Arizona related to Jane's or Megan's participation in girls' sports at any time. (Pls.' Ex. 7 No. 12; Pls.' Ex. 8 No. 8; *see also* Pls.' Ex. 6 ¶¶ 8, 13; Pls.' Ex. 9 ¶ 16; Pls.' Ex. 47 at 30:2–25; Defs.' Ex. 77 at 10:17–19, 38:23; Defs.' Ex. 82 at 28:18–22.)

**Response:  Disputed.  The cited sources do not support the asserted fact.  Defendants provided evidence demonstrating the negative impact on girls sports by each Plaintiff, *see* Defs.' SUMF ¶¶ 148-57, 162-65, as well as evidence demonstrating the inherent advantages of biological males even before puberty, *see id.* ¶¶ 57-102.  Defendants also move to strike Plaintiffs' conclusory, self-serving affidavits without sufficient supporting evidence as incapable of establishing undisputed material facts for summary judgment.  *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

118.    The Ban categorizes transgender girls like Jane and Megan as "biologically male" and excludes them from all girls' sports' teams at their schools. (Ariz. Rev. Stat. § 15-120.02(A); *see also* Pls.' Ex. 7 Nos. 1, 13; Pls.' Ex. 8 Nos. 1, 9.)

**Response:  Undisputed to the extent that Plaintiffs admit that they are biological**

males.  Defendants note that "transgender girls" is undefined and object to the extent "transgender girls" means something other than young biological males who identify as young females.   Finally, Defendants dispute the characterization of the Save Women's Sports Act as a "Ban."

119.   All parties agree that there are numerous social, emotional, physical, and educational benefits that school sports provide, including the opportunity to make friends and become part of a supportive community of teammates and peers. (Pls.' Ex. 1 ¶¶ 35–39; Pls.' Ex. 7 Nos. 3–5; Pls.' Ex. 8 Nos. 3–5; Pls.' Ex. 27 Nos. 8–10; Dkt. 39, Defendant Horne's Answer ("Horne Answer") ¶¶ 38–43; Dkt. 38-2, Intervenors' Opposition to Plaintiffs' Motion for Preliminary Injunction ("Intervenors' Opp.") at 7; *see also* Pls.' Ex. 28 at 124:13–127:20.)

**Response:  Undisputed.**

120.   Participation in sports has a positive impact on academic achievement and students who participate in high school sports are more likely to finish college. (Pls.' Ex. 1 ¶ 38.)

**Response:  Undisputed.**

121.   If prevented from playing school sports, transgender girls face increased risks of negative mental and physical health consequences, including anxiety, depression, trauma, and suicidal ideation/attempts. (Pls.' Ex. 1 ¶¶ 39–41; *see also* Pls.' Ex. 2 ¶ 26.)

**Response:  Disputed.  Plaintiffs cite Dr. Shumer, but the cited section of his report does not support the asserted fact.  Paragraph 26 discusses treatment of gender dysphoria and makes no mention of any effects from lack of sports participation. *See* Pls.' Ex. 2, ¶ 26.  Plaintiffs cite Dr. Budge, but inappropriately so, because Dr. Budge does not work with individuals under age 12, nor does she have any expertise or professional training in kinesiology, exercise physiology, sports science, or sports medicine, and has never coached children in any sports.  Defs.' Ex. 24 (Budge Dep.), at 12:21, 14:20-15:11.  Moreover, Dr. Budge testified that she understood "the central issue in this case to be whether Plaintiffs, who are transgender girls, should be able to**

1   **participate and compete on girls' sports teams," and, at the same time, testified that**
2   **"as a mental health professional, I do not have expertise in" the "biological differences**
3   **between males and females and competitive fairness of transgender girls competing**
4   **on girls teams" and "therefore will not provide an expert opinion on them." *Id.* at**
5   **214:12-215:7.  Thus, Dr. Budge disavowed any ability to testify as to the asserted fact.**
6   **In addition, "transgender girls" is undefined.   Defendants object to the extent**
7   **"transgender girls" means something other than young biological males who identify**
8   **as young females.**

9         122.    Transgender girls will also internalize the shame and stigma of being
10  excluded from girls' sports simply for being transgender, a characteristic over which they
11  have no control and which already subjects them to prejudice and social stigma. (Pls.' Ex.
12  1 ¶ 40; *see also* Pls.' Ex. 6 ¶ 20–21; Pls.' Ex. 9 ¶ 20; Pls.' Ex. 11 ¶ 20; Pls.' Ex. 36 at 27:23–
13  28:3.)

14  **<u>Response:</u>  Disputed.  Plaintiffs cite Dr. Budge, but inappropriately so, because Dr.**
15  **Budge does not work with individuals under age 12, nor does she have any expertise**
16  **or professional training in kinesiology, exercise physiology, sports science, or sports**
17  **medicine, and has never coached children in any sports.  Defs.' Ex. 24 (Budge Dep.),**
18  **at 12:21, 14:20-15:11.  Moreover, Dr. Budge testified that she understood "the central**
19  **issue in this case to be whether Plaintiffs, who are transgender girls, should be able to**
20  **participate and compete on girls' sports teams," and, at the same time, testified that**
21  **"as a mental health professional, I do not have expertise in" the "biological differences**
22  **between males and females and competitive fairness of transgender girls competing**
23  **on girls teams" and "therefore will not provide an expert opinion on them." *Id.* at**
24  **214:12-215:7.  Thus, Dr. Budge disavowed any ability to testify as to the asserted fact.**
25  **Defendants move to strike Plaintiffs' conclusory, self-serving affidavits without**
26  **sufficient supporting evidence as incapable of establishing undisputed material facts**
27  **for summary judgment.  *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171**
28  **(9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015);**

53

**SEC v. Phan, 500 F.3d 895, 909 (9th Cir. 2007). In addition, "transgender girls" is undefined. Defendants object to the extent "transgender girls" means something other than young biological males who identify as young females.**

123.    Playing and competing on different teams at her school is an essential part of Jane's life. (Pls.' Ex. 5 ¶¶ 8, 15–17; Pls.' Ex. 6 ¶¶ 11-12, 16-17.)

**Response: Disputed. Defendants move to strike Plaintiffs' conclusory, self-serving affidavits without sufficient supporting evidence as incapable of establishing undisputed material facts for summary judgment. See FTC v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997); Nigro v. Sears, Roebuck and Co., 784 F.3d 495, 497 (9th Cir. 2015); SEC v. Phan, 500 F.3d 895, 909 (9th Cir. 2007).**

124.    Before Jane started middle school, Jane's family informed a social worker at Kyrene that Jane is transgender and explained her treatment for gender dysphoria. (Pls.' Ex. 6 ¶ 9.)

**Response: Disputed. Defendants move to strike Plaintiffs' conclusory, self-serving affidavits without sufficient supporting evidence as incapable of establishing undisputed material facts for summary judgment. See FTC v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997); Nigro v. Sears, Roebuck and Co., 784 F.3d 495, 497 (9th Cir. 2015); SEC v. Phan, 500 F.3d 895, 909 (9th Cir. 2007).**

125.    The Kyrene School District has stipulated that it would permit Jane to play on girls' teams if not for the Ban. (*See* Dkt. 59, Stipulation in Lieu of Answer By Defendants Kyrene School District and Laura Tojenes ("Kyrene/Toenjes Stip.") ¶ 1; *see also* Pls.' Ex. 29 at -6.)

**Response: Undisputed.**

126.    Jane's teammates, coaches, and school are supportive of her participation on girls' sports teams. (Pls.' Ex. 5 ¶¶ 9–10, 12, 16–17; Pls.' Ex. 6 ¶ 13; Kyrene/Toenjes Stip. ¶ 1; *see also* Pls.' Ex. 29 at -6.)

**Response: Disputed. The cited sources do not support the asserted fact. The cited sections of the affidavits concern Plaintiff's teammates or otherwise focus on soccer,**

**as opposed to other teams.   Moreover, Defendants move to strike Plaintiffs' conclusory, self-serving affidavits without sufficient supporting evidence as incapable of establishing undisputed material facts for summary judgment.  *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

127.   Jane would feel embarrassment and discomfort playing on a boys' team because she is a girl and everyone at school knows that she is a girl. (Pls.' Ex. 5 ¶ 21; Pls.' Ex. 6 ¶ 20.)

**Response:  Disputed.  Defendants dispute Plaintiff's assertion that "she is a girl"; Plaintiff is a biological male—*see, e.g.*, Pls.' Ex. 22, at 81:7-16—who identifies as a girl.  Similarly, Defendants dispute Plaintiff's assertion that "everyone at school knows that she is a girl" as lacking foundation and inaccurate inasmuch as the "knowledge" asserted actually refers to "belief."  *See id.*  Further, Defendants move to strike Plaintiffs' conclusory, self-serving affidavits without sufficient supporting evidence as incapable of establishing undisputed material facts for summary judgment.  *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

128.   Jane will be devastated and feel like she is not being accepted for who she is if she cannot continue to play on her schools' girls' teams. (Pls.' Ex. 5 ¶ 19; Pls.' Ex. 6 ¶ 21.)

**Response:  Disputed.  Defendants move to strike Plaintiffs' reliance on conclusory, self-serving affidavits without sufficient supporting evidence as incapable of establishing undisputed material facts for summary judgment.  *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

129.   Without school sports, Jane would lose the opportunity to grow her friendships and connection to her school community at a pivotal time in her development.

1  (Pls.' Ex. 5 ¶¶ 18, 20; Pls.' Ex. 6 ¶ 23.)

2  **Response:  Disputed.  Defendants move to strike Plaintiffs' conclusory, self-serving**

3  **affidavits without sufficient supporting evidence as incapable of establishing**

4  **undisputed material facts for summary judgment.  *See FTC v. Publ'g Clearing House,***

5  ***Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d**

6  **495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

7          130.    Jane also cannot play on boys' sports teams because doing so would directly

8  contradict her medical treatment for gender dysphoria and jeopardize her health. (Pls.'

9  Ex. 1 ¶¶ 33–34; Pls.' Ex. 6 ¶¶ 20–22; *see also* Pls.' Ex. 5 ¶¶ 19, 21.)

10  **Response:  Disputed.  Plaintiffs cite Dr. Budge, but the cited paragraphs do not**

11  **support the asserted fact.  Pls.' Ex. 1, ¶¶ 33-34 say nothing about the effects of Plaintiff**

12  **playing on a boys sports team.  Moreover, Plaintiffs cannot properly rely on Dr.**

13  **Budge, because she never medically examined Plaintiff, never reviewed Plaintiff's**

14  **medical records, and never knew Plaintiff's testosterone levels at any point.  *See* Defs.'**

15  **Ex. 23 (Shumer Dep.), at 241:22-23, 242:3-8; Defs.' Ex. 24 (Budge Dep.), at 9:8-22,**

16  **12:15-21, 17:12-17.  Defendants move to strike Plaintiffs' conclusory, self-serving**

17  **affidavits without sufficient supporting evidence as incapable of establishing**

18  **undisputed material facts for summary judgment.  *See FTC v. Publ'g Clearing House,***

19  ***Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d**

20  **495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

21          131.    If Jane's gender dysphoria treatment is left untreated or treatment is

22  disrupted, she would struggle "to focus and learn at school" and likely "not be able to get

23  through the day." (Pls.' Ex. 6 ¶ 10.)

24  **Response:  Disputed.  Plaintiffs cite only the declaration of Helen Doe for this asserted**

25  **fact, but Helen Doe lacks the qualifications to testify to the medical treatment and**

26  **medical effects that are being asserted here.  Moreover, Defendants move to strike**

27  **Plaintiffs' conclusory, self-serving affidavits without sufficient supporting evidence**

28  **as incapable of establishing undisputed material facts for summary judgment.  *See***

*FTC v. Publ'g Clearing House, Inc.*, **104 F.3d 1168, 1171 (9th Cir. 1997);** *Nigro v. Sears, Roebuck and Co.*, **784 F.3d 495, 497 (9th Cir. 2015);** *SEC v. Phan*, **500 F.3d 895, 909 (9th Cir. 2007).**

132.    Without treatment, Jane would "close herself off from the people she loves" and would "not want to take care of herself." (Pls.' Ex. 6 ¶ 10.)

**<u>Response:</u>  Disputed.  Plaintiffs cite only the declaration of Helen Doe for this asserted fact, but Helen Doe lacks the qualifications to testify to the medical treatment and medical effects that are being asserted here.  Moreover, Defendants move to strike Plaintiffs' conclusory, self-serving affidavits without sufficient supporting evidence as incapable of establishing undisputed material facts for summary judgment.  *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

133.    Jane's ability to sleep and eat would also be impacted if her treatment for gender dysphoria was disrupted. (Pls.' Ex. 6 ¶ 10.)

**<u>Response:</u>  Disputed.  Plaintiffs cite only the declaration of Helen Doe for this asserted fact, but Helen Doe lacks the qualifications to testify to the medical treatment and medical effects that are being asserted here.  Moreover, Defendants move to strike Plaintiffs' conclusory, self-serving affidavits without sufficient supporting evidence as incapable of establishing undisputed material facts for summary judgment.  *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

134.    Not being able to live her life fully as a girl would lead Jane to become "isolated and depressed." (Pls.' Ex. 6 ¶ 21; *see also* Pls.' Ex. 1 ¶¶ 27, 33; Pls.' Ex. 2 ¶ 26; Pls.' Ex. 5 ¶ 19.)

**<u>Response:</u>  Disputed.  Plaintiffs rely on Dr. Budge and Dr. Shumer for the asserted fact, but they cannot properly do so, as neither Dr. Budge nor Dr. Shumer ever**

1    **medically examined Plaintiff, ever reviewed Plaintiff's medical records, or ever knew**
2    **Plaintiff's testosterone levels at any point.**  *See* **Defs.' Ex. 23 (Shumer Dep.), at 241:22-**
3    **23, 242:3-8; Defs.' Ex. 24 (Budge Dep.), at 9:8-22, 12:15-21, 17:12-17.  Defendants**
4    **move to strike Plaintiffs' conclusory, self-serving affidavits without sufficient**
5    **supporting evidence as incapable of establishing undisputed material facts for**
6    **summary judgment.**  *See FTC v. Publ'g Clearing House, Inc.***, 104 F.3d 1168, 1171 (9th**
7    **Cir. 1997);** *Nigro v. Sears, Roebuck and Co.***, 784 F.3d 495, 497 (9th Cir. 2015);** *SEC v.*
8    *Phan***, 500 F.3d 895, 909 (9th Cir. 2007).**

9        135.    Jane would find it "intolerable" if she could not live her life fully as a girl.
10   (Pls.' Ex. 5 ¶ 7.)

11   **<u>Response</u>:  Disputed.  Defendants move to strike Plaintiffs' conclusory, self-serving**
12   **affidavits without sufficient supporting evidence as incapable of establishing**
13   **undisputed material facts for summary judgment.**  *See FTC v. Publ'g Clearing House,*
14   *Inc.***, 104 F.3d 1168, 1171 (9th Cir. 1997);** *Nigro v. Sears, Roebuck and Co.***, 784 F.3d**
15   **495, 497 (9th Cir. 2015);** *SEC v. Phan***, 500 F.3d 895, 909 (9th Cir. 2007).**

16       136.    Megan's teammates, coaches, and school are supportive of her participation
17   on girls' sports teams. (Pls.' Ex. 9 ¶¶ 5, 16; Pls.' Ex. 11 ¶¶ 5, 10, 15–16; Pls.' Ex. 10 at -
18   1251, -1258; *see also* Pls.' Ex. 47 at 38:24–39:18.)

19   **<u>Response</u>:  Disputed.  Defendants move to strike Plaintiffs' reliance on conclusory,**
20   **self-serving affidavits without sufficient supporting evidence as incapable of**
21   **establishing undisputed material facts for summary judgment.**  *See FTC v. Publ'g*
22   *Clearing House, Inc.***, 104 F.3d 1168, 1171 (9th Cir. 1997);** *Nigro v. Sears, Roebuck and*
23   *Co.***, 784 F.3d 495, 497 (9th Cir. 2015);** *SEC v. Phan***, 500 F.3d 895, 909 (9th Cir. 2007).**

24       137.    Megan's family has told TGS administrators that Megan is transgender and
25   explained her gender-affirming medical treatment. (Pls.' Ex. 11 ¶ 10.)

26   **<u>Response</u>:  Disputed.  Defendants move to strike Plaintiffs' reliance on conclusory,**
27   **self-serving affidavits without sufficient supporting evidence as incapable of**
28   **establishing undisputed material facts for summary judgment.**  *See FTC v. Publ'g*

1  *Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and*

2  *Co.*, 784 F.3d 495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).

3        138.    TGS is a member of the AIA. (Pls.' Ex. 27 No. 3.)

4  **Response:  Undisputed.**

5        139.    In August 2022, TGS and Megan appealed to the AIA seeking permission

6  for Megan's participation on the girls' volleyball team. (Pls.' Ex. 47 at 31:1–10; Defs.' Ex.

7  16 No. 8; Dkt. 279, Stipulation Between Plaintiffs Jane Doe and Megan Roe and the

8  Arizona Interscholastic Association ("AIA Stip.") ¶ 2; *see generally* Pls.' Ex. 10.)

9  **Response:  Undisputed.**

10        140.    The AIA's Gender Identity Eligibility Sub-Committee reviewed the appeal

11  and, "finding no health or safety concern . . . emphatically support[ed] her request." (Pls.'

12  Ex. 10 at -250; Defs.' Ex. 16 No. 8; *see also* AIA Stip. ¶ 3.)

13  **Response:  Undisputed.**

14        141.    Megan's request to participate on the girls' volleyball team at TGS was

15  approved during the September 22, 2022, AIA Executive Board meeting. (Defs.' Ex. 16

16  No. 8.)

17  **Response:  Undisputed.**

18        142.    Megan would find it embarrassing, humiliating, and uncomfortable to play

19  on the boys' team because she is a girl and everyone knows her as the girl she is. (Pls.' Ex.

20  9 ¶ 20; Pls.' Ex. 11 ¶ 20.)

21  **Response:  Disputed.  Defendants dispute Plaintiff's assertion that "she is a girl";**

22  **Plaintiff is a biological male—*see, e.g.*, Pls.' Ex. 22, at 81:7-16—who identifies as a**

23  **girl.  Similarly, Defendants dispute Plaintiff's assertion that "everyone knows her as**

24  **the girl she is" as lacking foundation and inaccurate inasmuch as the "knowledge"**

25  **asserted actually refers to "belief."  *See id.*  Further, Defendants move to strike**

26  **Plaintiffs' conclusory, self-serving affidavits without sufficient supporting evidence**

27  **as incapable of establishing undisputed material facts for summary judgment.  *See***

28  ***FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v.***

1  *Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895,
2  909 (9th Cir. 2007).

3        143.   Megan ███████████████████████████████████████████████

4  ███████████████  (Defs.' Ex. 82 at 44:19–21, 45:1–4.)

5  **Response:  Disputed.  The cited source does not support the asserted fact.  The cited**

6  **testimony of Plaintiff expresses** █████████████████████████████████████████

7  ███████.  **Defs.' Ex. 82, at 44:19-21.**

8        144.   As a soon-to-be senior in high school, next season is Megan's last
9  opportunity to participate on the girls' volleyball team at her school. (Pls.' Ex. 9 ¶ 19; Pls.'
10  Ex. 11 ¶¶ 19, 21.)

11  **Response:  Disputed.  Defendants move to strike Plaintiffs' conclusory, self-serving**
12  **affidavits without sufficient supporting evidence as incapable of establishing**
13  **undisputed material facts for summary judgment.  *See FTC v. Publ'g Clearing House,***
14  ***Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d**
15  **495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

16        145.   Megan will be very upset if she cannot play on the girls' volleyball team next
17  year because it has been one of her favorite parts of high school. (Pls.' Ex. 9 ¶¶ 15, 19;
18  Pls.' Ex. 11 ¶¶ 14, 19, 21.)

19  **Response:  Disputed.  Defendants move to strike Plaintiffs' conclusory, self-serving**
20  **affidavits without sufficient supporting evidence as incapable of establishing**
21  **undisputed material facts for summary judgment.  *See FTC v. Publ'g Clearing House,***
22  ***Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d**
23  **495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

24        146.   If she is prohibited from playing in her last year of high school, Megan would
25  feel robbed of her final opportunity to play on teams with her friends and teammates. (Pls.'
26  Ex. 9 ¶¶ 19–20; Pls.' Ex. 11 ¶ 21.)

27  **Response:  Disputed.  The cited sources reference only volleyball, not "teams"**
28  **generally.  Moreover, "robbed" is undefined and argumentative.  Additionally,**

1    **Defendants move to strike Plaintiffs' conclusory, self-serving affidavits without**
2    **sufficient supporting evidence as incapable of establishing undisputed material facts**
3    **for summary judgment.** ***See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171**
4    **(9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015);**
5    ***SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

6    147.    Megan also cannot play on boys' sports teams because doing so would
7    directly contradict her medical treatment for gender dysphoria and jeopardize her health.
8    (Pls.' Ex. 11 ¶ 20; Pls.' Ex. 1 ¶¶ 33–34.)

9    **Response:  Disputed.  Plaintiffs cite Dr. Budge, but the cited paragraphs do not**
10    **support the asserted fact. Pls.' Ex. 1, ¶¶ 33-34 say nothing about the effects of Plaintiff**
11    **playing on a boys sports team.  Moreover, Plaintiffs cannot properly rely on Dr.**
12    **Budge, because she never medically examined Plaintiff, never reviewed Plaintiff's**
13    **medical records, and never knew Plaintiff's testosterone levels at any point. *See* Defs.'**
14    **Ex. 24 (Budge Dep.), at 9:8-22, 12:15-21, 17:12-17.  Defendants also move to strike**
15    **Plaintiffs' conclusory, self-serving affidavits without sufficient supporting evidence**
16    **as incapable of establishing undisputed material facts for summary judgment. *See***
17    ***FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v.***
18    ***Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895,**
19    **909 (9th Cir. 2007).**

20    148.    If Megan's gender dysphoria is left untreated or treatment is disrupted,
21    Megan would "not be able to leave the house or go to school." (Pls.' Ex. 11 ¶ 7.)

22    **Response:  Disputed.  Plaintiffs cite only the declaration of Kate Roe for this asserted**
23    **fact, but Kate Roe lacks the qualifications to testify to the medical treatment and**
24    **medical effects that are being asserted here.  Moreover, Defendants move to strike**
25    **Plaintiffs' conclusory, self-serving affidavits without sufficient supporting evidence**
26    **as incapable of establishing undisputed material facts for summary judgment. *See***
27    ***FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v.***
28    ***Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895,**

1    **909 (9th Cir. 2007).**

2          149.    Without consistent treatment, Megan would "be uncomfortable in her own

3    body, which would affect her self-esteem, mental health, appetite, keep her from sleeping,

4    and caring for herself." (Pls.' Ex. 11 ¶ 7; *see also* Pls.' Ex. 2 ¶ 26.)

5    **Response:  Disputed.  Plaintiffs cite the declaration of Kate Roe for this asserted fact,**

6    **but Kate Roe lacks the qualifications to testify to the medical treatment and medical**

7    **effects that are being asserted here.  Moreover, Plaintiffs rely on Dr. Shumer for the**

8    **asserted fact, but they cannot properly do so, as Dr. Shumer never medically**

9    **examined Plaintiff, never reviewed Plaintiff's medical records, and never knew**

10   **Plaintiff's testosterone levels at any point.  *See* Defs.' Ex. 23 (Shumer Dep.), at 241:22-**

11   **23, 242:3-8.  Defendants move to strike Plaintiffs' conclusory, self-serving affidavits**

12   **without sufficient supporting evidence as incapable of establishing undisputed**

13   **material facts for summary judgment.  *See FTC v. Publ'g Clearing House, Inc.*, 104**

14   **F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497**

15   **(9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

16         150.    Without consistent treatment, Megan "would be completely consumed with

17   how lost she felt and . . . [would] lose her will to get through the day altogether." (Pls.' Ex.

18   11 ¶ 7; *see also* Pls.' Ex. 1 ¶¶ 26–27, 33; Pls.' Ex. 2 ¶ 26.)

19   **Response:  Disputed.  Plaintiffs cite the declaration of Kate Roe for this asserted fact,**

20   **but Kate Roe lacks the qualifications to testify to the medical treatment and medical**

21   **effects that are being asserted here.  Plaintiffs rely on Dr. Budge and Dr. Shumer for**

22   **the asserted fact, but they cannot properly do so, as neither Dr. Budge nor Dr. Shumer**

23   **ever medically examined Plaintiff, ever reviewed Plaintiff's medical records, or ever**

24   **knew Plaintiff's testosterone levels at any point.  *See* Defs.' Ex. 23 (Shumer Dep.), at**

25   **241:22-23, 242:3-8; Defs.' Ex. 24 (Budge Dep.), at 9:8-22, 12:15-21, 17:12-17.**

26   **Defendants move to strike Plaintiffs' conclusory, self-serving affidavits without**

27   **sufficient supporting evidence as incapable of establishing undisputed material facts**

28   **for summary judgment.  *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171**

1    **(9th Cir. 1997);** ***Nigro v. Sears, Roebuck and Co.,*** **784 F.3d 495, 497 (9th Cir. 2015);**

2    ***SEC v. Phan*****, 500 F.3d 895, 909 (9th Cir. 2007).**

3          151.    Megan would find it "unbearable" if she could not live her life fully as a girl.

4    (Pls.' Ex. 9 ¶ 9.)

5    **Response:**  **Disputed.**  **Defendants move to strike Plaintiffs' conclusory, self-serving**

6    **affidavits without sufficient supporting evidence as incapable of establishing**

7    **undisputed material facts for summary judgment.**  ***See FTC v. Publ'g Clearing House,***

8    ***Inc.*****, 104 F.3d 1168, 1171 (9th Cir. 1997);** ***Nigro v. Sears, Roebuck and Co.,*** **784 F.3d**

9    **495, 497 (9th Cir. 2015);** ***SEC v. Phan*****, 500 F.3d 895, 909 (9th Cir. 2007).**

10         152.    As a result of the preliminary injunction, both Jane and Megan have been

11   permitted to try out for and participate on girls' sports teams for the past two years. (Pls.'

12   Ex. 5 ¶¶ 10–14; Pls.' Ex. 9 ¶¶ 11–16; Pls.' Ex. 12 No. 2; Pls.' Ex. 30 No. 2; *see also*

13   Kyrene/Toenjes Stip. ¶ 1; AIA Stip. ¶ 3.)

14   **Response:**  **Undisputed.**

15         153.    Both before the Ban was passed and after its enactment and enjoinment, Jane

16   and Megan have participated on girls' sports at their schools without incident. (Pls.' Ex. 6

17   ¶¶ 8, 13; Pls.' Ex. 7 No. 12; Pls.' Ex. 8 No. 8; Pls.' Ex. 9 ¶ 16; Pls.' Ex. 47 at 30:2–25;

18   Defs.' Ex. 3 No. 6.)

19   **Response:**  **Disputed.**  **Plaintiffs cite Pls.' Ex. 6, ¶ 8, but that describes an "incident,"**

20   **refuting the asserted fact.**  **Moreover, Defendants provided evidence of the negative**

21   **impact on female athletes due to Plaintiffs' participation.**  ***See*** **Defs.' SUMF ¶¶ 148-**

22   **57, 162-65.**  **Defendants move to strike Plaintiffs' conclusory, self-serving affidavits**

23   **without sufficient supporting evidence as incapable of establishing undisputed**

24   **material facts for summary judgment.**  ***See FTC v. Publ'g Clearing House, Inc.,*** **104**

25   **F.3d 1168, 1171 (9th Cir. 1997);** ***Nigro v. Sears, Roebuck and Co.,*** **784 F.3d 495, 497**

26   **(9th Cir. 2015);** ***SEC v. Phan*****, 500 F.3d 895, 909 (9th Cir. 2007).**

27         154.    "There haven't been any problems with [Plaintiffs] playing on the girls'"

28   sports teams at their schools. (Pls.' Ex. 9 ¶ 16; *see also* Pls.' Ex. 6 ¶¶ 8, 13; Pls.' Ex. 7 No.

1   12; Pls.' Ex. 8 No. 8; Pls.' Ex. 47 at 30:2–25; Defs.' Ex. 3 No. 6.)

2   **Response:  Disputed.  Defendants provided evidence of the negative impact on female**

3   **athletes due to Plaintiffs' participation.  *See* Defs.' SUMF ¶¶ 148-57, 162-65.**

4   **Defendants move to strike Plaintiffs' conclusory, self-serving affidavits without**

5   **sufficient supporting evidence as incapable of establishing undisputed material facts**

6   **for summary judgment. *See FTC v. Publ'g Clearing House, Inc.,* 104 F.3d 1168, 1171**

7   **(9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015);**

8   ***SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

9   155.   In the years since the Ban's enactment and the preliminary injunction order,

10  Defendant Horne had not "adopted any regulations or policies" to either implement or

11  enforce the Ban. (Pls.' Ex. 31 Nos. 2–3.)

12  **Response:  Undisputed.**

13  156.   During the 2023–2024 school year, Jane participated on Kyrene's girls'

14  cross-country, soccer, and track and field teams. (Pls.' Ex. 5 ¶¶ 10–11; Pls.' Ex. 6 ¶ 14;

15  Pls.' Ex. 30 No. 2; Pls.' Ex. 36 at 48:25–49:3; Defs.' Ex. 77 at 10:4–5, 10:20–22, 32:23–

16  33:2, 76:16–18, 76:13–15.)

17  **Response:  Undisputed.**

18  157.   During the 2024–2025 school year, Jane participated on the girls' soccer

19  team. (Pls.' Ex. 5 ¶ 14; Pls.' Ex. 6 ¶ 15.)

20  **Response:  Undisputed.**

21  158.   During both the 2023–2024 and 2024–2025 school years, Jane tried out for,

22  but did not make, the girls' basketball team. (Defs.' Ex. 77 at 38:21–23; Pls.' Ex. 5 ¶¶ 13–

23  14; Pls.' Ex. 6 ¶¶ 14–15.)

24  **Response:  Undisputed.**

25  159.   Kyrene's cross country and track teams are "non-cut," meaning that anyone

26  who wants to participate can do so. (Defs.' Ex. 77 at 10:13–19, 39:8-10.)

27  **Response:  Undisputed.**

28  160.   On the soccer team, Jane's favorite position to play was striker. (Defs.' Ex.

1    77 at 34:23–24.)

2    **Response:  Undisputed.**

3         161.    When Jane plays striker on the soccer team, Jane █████████████

4    █████████████████████████████████████████ (Defs.' Ex. 77 at

5    35:16–20.)

6    **Response:  Disputed.  The cited source does not support the asserted fact.  Plaintiff's**

7    **testimony at 35:16-20 involves** ██████████████████████████████████

8    ████████████████████████████████████████████████████████████.

9         162.    Jane does not remember scoring any goals for her team in the 2023-2024

10   soccer season. (Defs.' Ex. 77 at 36:5–7.)

11   **Response:  Undisputed.**

12        163.    Jane has thoroughly enjoyed playing on school teams with her friends the

13   last two years. (Pls.' Ex. 5 ¶¶ 10–16; Pls.' Ex. 6 ¶ 16.)

14   **Response:  Disputed.  Defendants move to strike Plaintiffs' conclusory, self-serving**

15   **affidavits without sufficient supporting evidence as incapable of establishing**

16   **undisputed material facts for summary judgment.  *See FTC v. Publ'g Clearing House,***

17   ***Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d**

18   **495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

19        164.    Jane has made a lot of friends on her teams who she now sees around school

20   in the hallways and in classes. (Pls.' Ex. 5 ¶ 15; Pls.' Ex. 6 ¶¶ 16–17.)

21   **Response:  Disputed.  Defendants move to strike Plaintiffs' conclusory, self-serving**

22   **affidavits without sufficient supporting evidence as incapable of establishing**

23   **undisputed material facts for summary judgment.  *See FTC v. Publ'g Clearing House,***

24   ***Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d**

25   **495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

26        165.    Jane feels proud to represent her school at competitions with other schools,

27   even if her team does not win the game or race. (Pls.' Ex. 5 ¶ 12; Pls.' Ex. 6 ¶ 16.)

28   **Response:  Disputed.  Defendants move to strike Plaintiffs' conclusory, self-serving**

1    **affidavits without sufficient supporting evidence as incapable of establishing**

2    **undisputed material facts for summary judgment.** ***See FTC v. Publ'g Clearing House,***

3    ***Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d**

4    **495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

5    166.    Jane is excited to continue to participate and compete on girls' teams with

6    her friends and classmates. (Pls.' Ex. 5 ¶ 17; Pls.' Ex. 6 ¶ 18.)

7    <u>**Response:**</u> **Disputed. Defendants move to strike Plaintiffs' conclusory, self-serving**

8    **affidavits without sufficient supporting evidence as incapable of establishing**

9    **undisputed material facts for summary judgment.** ***See FTC v. Publ'g Clearing House,***

10    ***Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d**

11    **495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

12    167.    During the fall of 2023 and 2024, Megan played on the TGS girls' junior

13    varsity volleyball team. (Pls.' Ex. 9 ¶ 11–12; Pls.' Ex. 11 ¶ 11–12; Pls.' Ex. 12 No. 2; Defs.'

14    Ex. 82 at 21:13–19.)

15    <u>**Response:**</u> **Undisputed.**

16    168.    Megan captained the TGS junior varsity girls' volleyball team in 2024. (Pls.'

17    Ex. 9 ¶ 12; Defs.' Ex. 82 at 23:14–18.)

18    <u>**Response:**</u> **Undisputed.**

19    169.    At TGS, the girls' volleyball team does not hold tryouts—anyone who wants

20    to participate can be on the team, which is then split between junior varsity and varsity.

21    (Pls.' Ex. 9 ¶ 14; Pls.' Ex. 11 ¶ 13; Defs.' Ex. 82 at 28:18–24.)

22    <u>**Response:**</u> **Undisputed.**

23    170.    In the fall of 2024, Megan also played a few games on the girls' varsity

24    volleyball team, though she did not get a lot of playing time. (Pls.' Ex. 9 ¶ 13; Defs.' Ex.

25    82 at 23:19–24:9.)

26    <u>**Response:**</u> **Disputed as to the assertion that Plaintiff did not see "a lot of playing time"**

27    **on the varsity team, as the cited evidence does not support that assertion, and it is a**

28    **vague statement. Pls.' Ex. 9, ¶ 13 merely states that Plaintiff "didn't play in all of"**

1    the varsity games, and Plaintiff testified ███████████████████. **Defs.'**

2    **Ex. 82, at 24:4-5.    Defendants move to strike Plaintiffs' conclusory, self-serving**

3    **affidavits without sufficient supporting evidence as incapable of establishing**

4    **undisputed material facts for summary judgment. *See FTC v. Publ'g Clearing House,***

5    ***Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d**

6    **495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

7        171.    Megan's participation has not prevented any other girl at TGS from making

8    the girls' volleyball team. (See Pls.' Ex. 7 No. 12; Pls.' Ex. 8 No. 8; Defs.' Ex. 82 at 28:18–

9    24.)

10    **Response: Disputed.    The cited sources do not support the asserted fact.    Plaintiffs**

11    **asserted, *supra* at ¶ 169, that players are split between junior varsity and varsity.**

12    **Plaintiff's participation on varsity takes the place of a female athlete who would**

13    **otherwise have obtained that varsity spot.    However, Defendants do not dispute that**

14    **Plaintiff's participation has not prevented female athletes from participating on the**

15    **junior varsity team generally, although Defendants assert that Plaintiff's**

16    **participation on the junior varsity team takes away playing opportunities and playing**

17    **time from other female athletes. *See* Defs.' SUMF ¶¶ 162-65.**

18        172.    Megan likes that the TGS community is social. (Defs.' Ex. 82 at 8:11–19;

19    Pls.' Ex. 9 ¶ 15; *see also* Pls.' Ex. 47 at 7:18–8:4.)

20    **Response: Undisputed.**

21        173.    Volleyball is an important part of the TGS community because many

22    students attend the girls' volleyball games. (Pls.' Ex. 9 ¶¶ 15, 18; Pls.' Ex. 11 ¶ 15; Defs.'

23    Ex. 82 at 21:21–23.)

24    **Response: Disputed.    The cited testimony of Plaintiff does not support the asserted**

25    **fact, but merely observes that ████████████████████ Defs.' Ex.**

26    **82, at 21:21-23.    Defendants move to strike Plaintiffs' conclusory, self-serving**

27    **affidavits without sufficient supporting evidence as incapable of establishing**

28    **undisputed material facts for summary judgment. *See FTC v. Publ'g Clearing House,***

1    *Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d

2    495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).

3    174.    Many of Megan's closest friends play volleyball with her. (Pls.' Ex. 9 ¶¶ 17–

4    19; Pls.' Ex. 11 ¶ 14.)

5    **Response:  Disputed.  Defendants move to strike Plaintiffs' conclusory, self-serving**

6    **affidavits without sufficient supporting evidence as incapable of establishing**

7    **undisputed material facts for summary judgment.** ***See FTC v. Publ'g Clearing House,***

8    ***Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d**

9    **495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

10    175.    Playing and competing on the girls' volleyball team has been one of Megan's

11    favorite parts of high school because she can enjoy herself outside of classes with her

12    friends from school and feel as though she is a part of a team. (Pls.' Ex. 9 ¶ 15; Pls.' Ex.

13    11 ¶¶ 14–15.)

14    **Response:  Disputed.  Defendants move to strike Plaintiffs' conclusory, self-serving**

15    **affidavits without sufficient supporting evidence as incapable of establishing**

16    **undisputed material facts for summary judgment.** ***See FTC v. Publ'g Clearing House,***

17    ***Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d**

18    **495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

19    176.    Megan hopes to play on the girls' volleyball team in the fall 2025 season for

20    her senior year of high school. (Pls.' Ex. 9 ¶ 17; Pls.' Ex. 11 ¶ 17; Defs.' Ex. 82 at 32:19–

21    21.)

22    **Response:  Disputed.  Defendants move to strike Plaintiffs' conclusory, self-serving**

23    **affidavits without sufficient supporting evidence as incapable of establishing**

24    **undisputed material facts for summary judgment.** ***See FTC v. Publ'g Clearing House,***

25    ***Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Nigro v. Sears, Roebuck and Co.*, 784 F.3d**

26    **495, 497 (9th Cir. 2015); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).**

27    177.    The relevant population for this litigation is all prepubertal children in

28    Arizona who play school sports. (Pls.' Ex. 13 ¶ 19.)

**Response:  Disputed.  Plaintiffs cite only Dr. Shannon for this asserted fact, but Dr. Shannon testified that he "did … not look to see what the relevant population was in this case", Defs.' Ex. 25 (Shannon Dep.), at 75:9-11, and admitted that "when puberty occurs" is "outside of [his] area" of expertise, *id.* at 75:21-76:2.  He admitted that he was unaware of "any biological differences between children in Arizona and children living anywhere else in the world", *id.* at 81:2-6, and thus he clearly "[did not] know about the relevant population," *see id.* at 76:16.  To the extent that Plaintiffs here concede this litigation is not an "as-applied" challenge only as to Plaintiffs, Defendants do not contest that.**

178.    The scientific articles Defendants cite for the premise that there are male physiological advantages before puberty studied populations dissimilar to Jane and Megan. (Defs.' Exs. 31, 32, 33, 34, 35, 36; *see* Pls.' Ex. 22 at 108:17–113:23.)

**Response:  Disputed.  Plaintiffs only reference Defs.' Exs. 31-36, but Defendants cited many more scientific studies than these to demonstrate male physiological advantages before puberty.  *See, e.g.*, Defs.' SUMF ¶ 57 (citing Defs.' Exs. 26-30, 37-38).  The cite to Dr. Hilton's testimony only discusses the Hilton 2021 study (Defs.' Ex. 31) and makes no mention of the other studies put forward by Defendants.  Moreover, the studies Defendants cite involved male and female bodies at ages ranging from 6 to 18, with data specific to each of those ages, which encompass Plaintiffs as well.  The studies encompass prepubertal children living in Arizona.  *See* Response to ¶ 177, *supra*.  To the extent that Plaintiffs here concede that male physiological advantages do exist before puberty generally, Defendants do not contest that.**

179.    The scientific articles Defendants cite focus on elite athletes, which neither Jane nor Megan are, or did not directly study the supposed cause of differences in athletic performance between pre-pubertal boys and girls. (Defs.' Exs. 31, 32, 33, 34, 35, 36.)

**Response:  Disputed.  Defendants provided evidence of scientific studies beyond merely the exhibits cited by Plaintiffs here.  *See* Defs.' Exs. 26-30, 37-38.  Several of the studies did not focus on elite athletes, *e.g.*, Defs.' Exs. 26-30, 37-38, and several of**

**the studies directly discussed the cause of differences in athletic performance between prepubertal boys and girls, *e.g.*, Defs.' Exs. 32-38.**

180.    The "Limitations" section of "Sex Differences in Grip Strength from Birth to Age 16: A Meta-Analysis" by James L. Nuzzo (hereinafter "Nuzzo 2025 (Grip Strength)") states that "the current research does not reveal the cause of the sex difference in grip strength in children and adolescents." (Defs.' Ex. 37 at 13.)

**Response:    Undisputed.    Defendants note that Plaintiffs acknowledge this study's findings of a "sex difference in grip strength in children."**

181.    The "Limitations" section of "Sex Differences in Upper- and Lower-Limb Muscle Strength in Children and Adolescents: A Meta-Analysis" by Nuzzo et al. (hereinafter "Nuzzo 2025 (Muscle Strength)") states that "the cause of the body region-specific sex difference in muscle strength was not studied directly." (Defs.' Ex. 38 at 10.)

**Response:    Undisputed.    Defendants note that Plaintiffs acknowledge this study's findings of "sex difference in muscle strength."**

## DEFENDANTS' LRCiv 56.1(b) CONSOLIDATED STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS IN OPPOSITION TO PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT

Defendants hereby submit the following additional undisputed material facts, pursuant to LRCiv 56.1(b), in opposition to Plaintiffs' Cross-Motion for Summary Judgment:

1.    The Arizona Interscholastic Association ("AIA") eliminated its "Transgender Policy" from its current 2025-2026 Constitution, Bylaws, and Policies & Procedures and replaced it with Rule 43.10, Title IX Participation.  Defs.' Ex. 83 (2026 AIA Bylaws); *see also* Defs.' Ex. 13, at 5.

2.     The AIA's current policy outlined in Rule 43.10 states that "[i]f made in compliance with Title IX and A.R.S. 15-120.02, a school may make a request on behalf of a student …. If the student has been granted eligibility to participate in interscholastic athletics consistent with Title IX and A.R.S. 15-120.02, the eligibility is granted …." Defs.' Ex. 83.

3.     When it adopted Rule 43.10, the AIA Legislative Council stated that the "recommended change in language is provided to clearly identify compliance with the Keeping Men out of Women's Sports Federal Executive Order, signed on 2/5/25." Defs.' Ex. 84, at 8.

4.     Before initiating puberty-blockers, Plaintiff Jane Doe ██████████ ████████████████████████████. Pls.' Ex. 33[2], at -149; *see* Pls.' Ex. 40, at -948.

5.     Before initiating puberty-blockers, Plaintiff Doe ████████████ ████. Defs.' Ex. 85, at -947.

6.     At the time of initiating puberty-blockers, Plaintiff Doe ████████ ██████████. Pls.' Ex. 40, at -949.

7.     When Plaintiff Doe was 12 years old, a medical provider noted that Plaintiff Doe ████████████████████. Defs.' Ex. 86, at -1483, -1487.

8.     At age 13, Plaintiff Doe ████████████████████ ██████. Pls.' Ex. 41, at -1530.

9.     Plaintiff Doe ██████████████. Defs.' Ex. 87, at -1471.

10.     When Plaintiff Roe initiated puberty-blockers, Plaintiff Roe had ████ ██████████████. Pls.' Ex. 43, at -58.

---

[2] Defendants object to Plaintiffs' use of the medical record evidence as lacking authentication and foundation, consisting of hearsay and hearsay within hearsay, and lacking expert testimony to interpret it. However, in the event that the Court finds the evidence admissible notwithstanding these issues, Defendants submit this medical record evidence in response.

11.     On May 1, 2025, the United States Department of Health and Human Services ("HHS") published a report entitled: "Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices" (hereinafter "HHS Report").  Defs.' Ex. 88.

12.     The HHS Report was published "against the backdrop of growing international concern" about the use of puberty-blockers and cross-sex hormone therapies to treat gender dysphoria and recognition of "the experimental nature of these medical interventions and their potential for harm."  Defs.' Ex. 88, at 10.

13.     The HHS Report sought to "provide the most accurate and current information available regarding the evidence base for the treatment of gender dysphoria" in children and adolescents, "the state of the relevant medical field in the United States, and the ethical considerations associated with the treatments offered."  Defs.' Ex. 88, at 11-12.

14.     The HHS Report observed that "health authorities in an increasing number of countries have restricted access to puberty blockers and cross-sex hormones …. These authorities now recommend psychosocial approaches … as the primary treatment."  Defs.' Ex. 88, at 14.

15.     The HHS Report found that "[t]here is currently no international consensus about best practices for the care of children and adolescents with gender dysphoria."  Defs.' Ex. 88, at 14.

16.     The HHS Report observed that "[a] recent systematic review of international guideline quality did not recommend either [the WPATH or the Endocrine Society] guidline[s] for clinical use after determining they 'lack developmental rigour and transparency.'"  Defs.' Ex. 88, at 15 (citing Taylor, Hall, Heathcote et al. (2024a, p. 7)).

17.     The HHS Report found that "[i]n the process of developing SOC-8, WPATH suppressed systematic reviews its leaders believed would undermine its favored treatment approach."  Defs.' Ex. 88, at 15.

18.     The HHS Report found that "[WPATH] SOC-8 developers also violated conflict of interest management requirements and eliminated nearly all recommended age

minimums for medical and surgical interventions in response to political pressures." Defs.' Ex. 88, at 15.

19.     The HHS Report found that "U.S. medical associations played a key role in creating a perception that there is professional consensus in support of pediatric medical transition.  This apparent consensus, however, is driven primarily by a small number of specialized committees, influences by WPATH.  It is not clear that the official views of these associations are shared by the wider medical community, or even by most of their members." Defs.' Ex. 88, at 16.

20.     Following the publication of the HHS Report, HHS issued a letter dated May 28, 2025 to healthcare providers, healthcare risk managers, and state medical boards (hereinafter "HHS Letter").  Defs.' Ex. 89.

21.     The HHS Letter warned providers to "avoid relying on the [WPATH] *Standards of Care* … SOC-8." Defs.' Ex. 89, at 2.

22.     The HHS Letter states that "the creation of SOC-8 was fraudulent and marked 'a clear departure from the principles of unbiased, evidence-driven clinical guideline development.'" Defs.' Ex. 89, at 2.

23.     The HHS Letter states that "[t]o wit, in the context of developing its recommendations, WPATH suppressed systematic reviews of evidence, failed to manage conflicts of interest, and relied on legal and political considerations rather than clinical ones." Defs.' Ex. 89, at 2.

24.     The HHS Letter advised that the WPATH and Endocrine Society guidelines "based on the so-called 'gender-affirming' model of care should not be relied upon to harm children any further." Defs.' Ex. 89, at 2.

25.     On July 1, 2025, the United States Department of Education announced that the University of Pennsylvania had entered into a resolution agreement to resolve its alleged Title IX violations.  Defs.' Ex. 90; *see* Defs.' Ex. 66.

26.     As part of the resolution agreement, the University of Pennsylvania has agreed to cease allowing biological males to compete in female sports and to restore to

female athletes all "swimming records, titles, or similar recognitions which were misappropriated by male athletes allowed to compete in female categories." Defs.' Ex. 90, at 3.

27.    Earlier this year, the American College of Sports Medicine published a scientific article entitled, "Sex Differences in 1600-m Running Performance and Participation for Children Aged 6-12 yr" by Christensen et al. (hereinafter "Christensen 2025") in its peer-reviewed Journal of Exercise, Sport & Movement. Defs.' Ex. 91.

28.    Christensen 2025 found that "a sex difference in aerobic performance exists in young children and the difference is remarkably consistent." Defs.' Ex. 91, at 4.

29.    Christensen 2025 observed that "male children on average have greater heart volume, heart mass relative to body mass, cardiac output, stroke volume, lung volume, pulmonary ventilation, and lean mass; have less fat mass; and are taller with broader shoulders than female children." Defs.' Ex. 91, at 5 (citation omitted).

30.    Christensen 2025 noted that "[s]mall differences in size, muscle mass, and aerobic capacity could translate into significant and meaningful differences in performance for children and, taken together with our data, suggest that sexual dimorphism in physical performance exists in children as young as 6 yr old and persists through adolescence." Defs.' Ex. 91, at 5.

31.    Christensen 2025 stated, "the findings suggest that the differences are the result of physiological differences between the sexes," not "lower female participation percentage." Defs.' Ex. 91, at 5.

32.    Christensen 2025 concluded that "[m]ale children were consistently faster than female children … beginning in grade 1 and continuing through grade 6 at running a 1600-m race." Defs.' Ex. 91, at 6.

33.    Christensen 2025 concluded that its findings "point[] to an innate physiological difference underpinning the sexual dimorphism of children." Defs.' Ex. 91, at 6.

Dated: July 14, 2025                    Respectfully submitted,


                                        JAMES OTIS LAW GROUP, LLC

                                        */s/ Justin D. Smith*
                                        Justin D. Smith, Mo. Bar No. 63253*
                                        Kenneth C. Capps, Mo. Bar No. 70908*
                                        530 Maryville Centre Drive, Suite 230
                                        St. Louis, Missouri 63141
                                        (816) 678-2103
                                        Justin.Smith@james-otis.com
                                        * *pro hac vice*

                                        *Attorneys for Intervenor-Defendants President*
                                        *Petersen and Speaker Montenegro*


## CERTIFICATE OF SERVICE

I hereby certify that, on July 14, 2025, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

                                        */s/ Justin D. Smith*