**WILENCHIK & BARTNESS**
A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW
The Wilenchik & Bartness Building
2810 North Third Street Phoenix, Arizona 85004

Telephone: 602-606-2810    Facsimile: 602-606-2811

Dennis I. Wilenchik, #005350
Caitlin B Fitz-Maurice, #039867
admin@wb-law.com

Maria Syms, # 023019
Director of Legal Services
Arizona Department of Education
1535 W Jefferson, BIN #50
Phoenix, AZ 85007
602-542-5240
Maria.Syms@azed.gov

*Attorneys for Defendant Thomas C. Horne*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Jane Doe, by her next friends and parents Helen Doe and James Doe; and Megan Roe, by her next friends and parents; Kate Roe and Robert Roe, <br><br> Plaintiffs, <br><br> v. <br><br> Thomas C. Horne, in his official capacity as State Superintendent of Public Instruction; Laura Toenjes, in her official capacity as Superintendent of the Kyrene School District; Kyrene School District; The Gregory School; Arizona Interscholastic Association, Inc., <br><br> Defendants. | Case No. 4:23-cv-00185-JGZ <br><br><br> **DEFENDANT HORNE'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT AND CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE PLAINTIFFS' EXPERT EVIDENCE IN SUPPORT OF THEIR MOTION** |

Defendant Thomas C. Horne, in his official capacity as State Superintendent of Public Instruction, files his consolidated response to Plaintiffs' Motion for Summary Judgment as to Title IX (Doc. 302) with Motion to strike Plaintiffs' evidence in support of their motion, expert support by Dr. Stephanie Budge and Dr. William Shannon pursuant to LRCiv 7.2(m)(2).  Defendant Horne also joins in the reply and opposition brief filed by President of the Arizona State Senate Warren Petersen and Speaker of the Arizona House of Representatives Steve Montenegro, by F.R.C.P. 10(c). Defendant Horne also files his Reply in Support of his Motion for Summary Judgment (Doc. 294).

The record before the Court does not support a preliminary injunction in this case, and the Court should enter summary judgment in Defendant's favor.

## I.     This Court is Respectfully Requested to Grant Defendant Horne's Motion for Summary Judgment on Plaintiff Jane Doe's Title IX Claim and Deny Plaintiffs' Motion Because Her Title IX Fails

The Court has already reasoned that case law and science is ever-changing on the issues presented in this case. *See Doe v. Horne*, 115 F.4th 1083, 1109 (9th Cir. 2024)(finding, "[t]he district court was bound to rule on Plaintiffs' request for limited injunctive relief based on the evidence in the record before it. To be sure, future cases may have different outcomes if the evolving science supports different findings. But the court did not have the luxury of waiting for further research to be conducted."). Since this Court granted injunctive relief, not only is there additional factual support in favor of Defendant's position, (as referenced in detail in Intervenor-Defendants' Reply and Opposition to Plaintiffs' Motion for Summary Judgment), but also the addition of case precedent.

First, Plaintiffs primarily rely on the reasoning in *Bostock v. Clayton County, Georgia* to argue, generally, that Title VII must be construed consistently with Title IX that discriminating against transgender individuals is based on sex. 590 U.S. 644, 681 (2020). However, this reliance completely disregards the Court's obvious intention to narrow its holding to only Title VII cases. *See id.* In *Bostock*, the Court clarified: "The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination. . . But none of these other

laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today. . . The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'" *Id.*

Second, while Plaintiffs try to compare the holding in *Grimm v. Gloucester County School Board* to support the supposition that the SWSA violates Title IX, their support completely disregards the current controlling precedent. 972 F.3d 586 (4th Cir. 2020)(finding summary judgment proper in favor of a transgender male who brought action against a school district alleging its policy that required students to use bathrooms based on their biological sex violated the Equal Protection Clause and constituted discrimination on the basis of sex in violation of Title IX). *But see Roe v. Critchfield,* 137 F.4th 912 (9th Cir. Mar. 20, 2025)(dismissing Title IX and Equal Protection Clause claims where a high school student brought action challenging a statute that required students to use bathrooms and changing facilities corresponding to student's sex rather than gender identity).

Plaintiffs use *Grimm* to argue: 1.) Title IX nor its guidance specifies whether a transgender individual should be designated as male or female; and, 2.) that the SWSA discriminates against transgender status on the basis of sex as a cognizable harm under Title IX. In *Critchfield*, the Court found that Title IX does not so clearly prohibit designating intimate spaces by biology so that there can be a violation of Title IX; therefore, the controlling precedent is that there cannot definitively be a cognizable harm under Title IX, on this basis. *See id.* at 928-931. Reasonably, this holding can also be compared to the fact that there cannot be a cognizable harm under Title IX where sport is designated by biology.

In fact, by its plain language, Title IX facially precludes discrimination on the basis of sex, not gender or gender identity. 20 U.S.C. § 1681 (a). *But see Schwake v. Arizona Board of Regents,* 967 F.3d 940, 951 (9th Cir. 2020)(addressing how one-sided comments made about a sexual

assault constituted gender bias in a disciplinary proceeding).[1] Consistent with the statute's language, the SWSA only precludes Plaintiff from playing on girls' sports teams because of male biology, which is not in violation of Title IX. Plaintiff's reliance on 9th Circuit cases like *Schwake* and *Grabowksi v. Arizona Board of Regents* is also arguably misapplied as neither case addresses the issues presented, here. 69 F.4th 1110, 1117-18 (9th Cir. 2023)(finding no Title IX violation when a teammate made remarks to someone due to sexual orientation, not gender identity). Title IX does not state anywhere that schools *must* allow transgender girls to play on sports consistent with their gender identity. *See c.f., Critchfield*, 137 F.4th at 928-931.

The Ninth Circuit has also acknowledged "narrowly drawn policies" such as the United States Department of Education's 2023 proposed Title IX regulations that restrict transgender athletes' eligibility in sport—aimed at balancing transgender inclusion with competitive fairness— ***are policy questions that "such regulatory bodies are best equipped to address."*** *See Hecox v. Little*, 104 F.4th 1061, 1090 (9th Cir. 2024). Plaintiffs try to completely disregard the existing policy where executive orders have the force and effect of law when they are grounded in congressional authorization or statutory authority, and as intended by the President to serve as a legal framework enforceable by private civil action. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 304 (1979). These executive orders do not control if they conflict with governing statutes, and there is no controlling authority that these orders conflict with any governing statutes. Furthermore, while different circuits have interpreted the 'nexus' requirement differently— that the Executive Order must have some connection to legislative authority by Congress— none have required exacting precision. *See e.g., Am. Fed. Of Labor and Congr. Of Indus. Orgs. v. Kahn*, 618 F.2d 784, 792 (D.C. Cir. 1979)(requiring a "sufficiently close nexus" between an Executive Order and the statutory goals of economy and efficiency); *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 170 (4th Cir. 1981)(finding executive branch policies "reasonably related to the Procurement Act's purpose."). The United States Department of Education, who has been charged by Congress

---

[1] Plaintiffs cite to this case to support their argument that Title IX precludes discrimination on the basis of gender, but the Court in *Schwake* only considered gender in the context of initiating disciplinary proceedings and "gender-based decision-making against men." *See* 967 F.3d at 948.

pursuant to 20 U.S.C. § 1682 to effectuate Title IX's antidiscrimination mandate, has already confirmed it would enforce the Title IX interpretation from Executive Order 14168, which is consistent with SWSA. While Plaintiffs have argued there are pending cases with regards to President Trump's Executive Orders, none have rendered decisions that are controlling on this Court. Therefore, Defendant cannot be in violation of Title IX for enforcing the SWSA, which is consistent with federal policy.

In sum, Plaintiffs argue, the point is not whether sex-segregated sports are permitted by Title IX, but whether sex-segregated sports on the basis of biological sex are permitted. Transgender status was simply not contemplated when Title IX was drafted; therefore, Title IX was implicitly drafted with the intent to allow sex-segregated sports on the basis of biological sex, not on someone's gender identity. There was no need for guidance to this effect. To interpret Title IX otherwise encroaches on the argument that Defendant could not have possibly violated Title IX due to lack of notice under the Spending Clause. *See c.f. Critchfield*, 137 F.4th at 928-929 ("Title IX does not 'so clearly' prohibit designating intimate spaces by biology that states could 'fairly … make an informed choice' before accepting federal funds."). Plaintiffs, in their complaint and motion/response, even admit that neither Title IX nor its regulations define sex, nor does the statute include guidance on how a school can determine whether a transgender individual is a male or female.

Indeed, Plaintiffs have not argued that Title IX contemplated gender identity at its inception, but that Title IX does not include guidance on how a school determines whether a transgender student is male or female. However, there is no need for guidance and where none exists to support Plaintiffs' argument, the SWSA permissibly excludes those of the biological male sex from participation on girls' sports teams, which includes biological males who choose to identify as girls. *See United States v. Skrmetti*, 145 S.Ct. 1816, 1836 (2025)(finding courts "afford States 'wide discretion to pass legislation in areas where there is medical and scientific uncertainty.'")(quoting *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). Plaintiff cannot succeed on any Title IX claim, and Defendant Horne's motion for summary judgment should be granted.

5

## II.   *United States v. Skrmetti* Does Not Support Plaintiffs' Motion for Summary Judgment on Title IX

Contrary to Plaintiffs' position in their supplemental briefing (Doc. 314), *United States v. Skrmetti* does not support Plaintiffs' Title IX claim. *See* 146 S.Ct. 1816, 1824 (2025). The Court explicitly did not extend the but-for causation standard to the Court's holding because it did not find the analysis relevant to the facts presented in the case. *See id.* at 1834 ("We have not yet considered whether *Bostock*'s reasoning reaches beyond the Title VII context, and we need not do so here."). In fact, the Court acknowledged that States are afforded discretion to pass laws in areas of uncertainty, and underscored this flexibility based on the evolving science regarding puberty blockers and hormones to treat transgender minors as "remarkably weak" with "no good evidence on the long-term outcomes of interventions to manage gender-related distress." *Id.* at 1836 (quoting H. Cass, Ind. Rev. of Gender Identity Svs. For Children and Young People: Final Report 13 (Apr. 2024). Similarly, in this case, there is relatively weak evidence from Plaintiffs to support their argument that these interventions eliminate any differences between biological girls and transgender girls, like Plaintiff. In fact, there is no reliable evidence to show that Plaintiff performs as a biological girl in sport and there are no meaningful differences between the two.

Admittedly, the Court cites to the H. Cass study to show there is uncertainty in the emerging area of science with regards to treatment for gender dysphoria (administering hormones and/or puberty blockers), but that "[t]he calculus of effects, the manner in which a particular law reverberates in a society, is a legislative and not a judicial responsibility." *See id.* at 1838 (citing *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 272 (1979)). Similar to this case, the evidence that Plaintiffs present is weak with regards to combatting the fact that there are physiological differences conferred by biological sex despite any hormonal treatment. Again, as the Court also acknowledged in *Skrmetti*, Plaintiffs cannot present any sound long-term evidence on the effects of their hormone treatment to refute the differences between biological girls and transgender girls to support any violation of Title IX or any discrimination based on sex.

**III.    Evidence from Plaintiffs' Experts, and as Used as Support for Plaintiffs' Motion for Summary Judgment, Should be Stricken in Their Entirety.**

Plaintiffs rely on three experts: Dr. Daniel Shumer, Dr. Stephanie Budge, and Dr. William Shannon. Defendants already have moved to exclude Dr. Shumer. *See* Docs. 265, 273, 297. Defendants also argue the opinions of Plaintiffs' experts, Dr. Budge and Dr. Shannon should be stricken.

**a.    Only relevant and reliable testimony from qualified experts should be admitted.**

The district court has a "gatekeeping role" that it must apply to all expert testimony. *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020). Under the Federal Rules of Evidence and *Daubert*, expert testimony must be both relevant and reliable. *Guidroz-Brault v. Missouri Pac. R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001). "[T]he court's task is to analyze not what the experts say, but what basis they have for saying it." *Grodzitsky v. Am. Honda Motor Co., Inc.*, 957 F.3d 979, 985 (9th Cir. 2020) (quoting *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017)).

"[T]he proponent of the challenged expert testimony … has the burden of showing that the proposed testimony is admissible under Rule 702." *Sullivan v. Multnomah Cnty.*, No. 3:19-cv-995-JGZ, 2023 WL 2537822, at *2 (D. Or. Mar. 16, 2023). An expert must be "qualified" by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The key is whether "the expert's findings are based on sound science." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995). Courts consider "whether the theory or technique employed by the expert is generally accepted in the scientific community." *Grodzitsky*, 957 F.3d at 985 (quoting *Wendell*, 858 F.3d at 1232). "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a *precondition to admissibility*." *Daubert*, 43 F.3d at 1320 (emphasis added).

### b.    Dr. Budge's opinions should be excluded as irrelevant and unreliable because she disavowed any relevant expertise or opinions.

Dr. Budge has disqualified herself under *Daubert* from serving as an expert. "[W]hen an expert affirmatively repudiates or disavows an opinion … courts have not hesitated to conclude that the expert should be precluded from offering that opinion at trial." *Mitchell v. Geo Grp. Inc.*, No. 2:19-cv-4445-DWL, 2022 WL 874287, at *5 & n.3 (D. Ariz. Mar. 24, 2022) (citing *inter alia*, *Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, No. 2:06-cv-1750-JLR, 2014 WL 1494026, at *8 (W.D. Wash. Apr. 16, 2014) (excluding expert from testifying on an issue where expert's testimony amounted to "unequivocal repudiation of any opinion on the issue" (cleaned up))); *see also United States v. Thabateh*, 40 F. App'x 392, 395 (9th Cir. 2002) (affirming district court's exclusion of expert where expert "admitted … to having no expertise" in the pertinent area).

*Mitchell v. Geo Group Inc.* is instructive, here.  In that case, the court considered, at the summary judgment stage, a motion to exclude expert testimony. *Mitchell*, 2022 WL 874287, at *4–*6. The expert witness, when deposed, made "statements amount[ing] to a disavowal" of opinions on a key issue. *Id.* at *5. The court noted that the expert was asked "point-blank" to "verify that he wasn't offering any [issue-relevant] opinions and he responded by confirming that he wasn't doing so." *Id.* at *6. The court held that "[e]xclusion is warranted in this circumstance." *Id.* "[W]hen an expert affirmatively repudiates or disavows an opinion …, courts have not hesitated to conclude that the expert should be precluded from offering that opinion at trial." *Id.* at *5.

Here, as in *Mitchell*, Dr. Budge was asked "point-blank" to "verify" that she was making no expert opinions regarding what she considered the central issue in this case, and she "affirmatively … disavow[ed]" any notion that she was doing so. *See Mitchell*, 2022 WL 874287, at *5–*6. Dr. Budge testified that she considered "the central issue in this case to be whether Plaintiffs, who are transgender girls, should be able to participate and compete on girls' sports teams." *See* Doc. 283 ("LL") Ex. 24, at 214:25–215:7; *see also* Doc. 65-1, at 8. Dr. Budge then disavowed any opinions or expertise on this topic: "[my opinions] did not address the biological differences between males and females and competitive fairness of transgender girls competing

8

on girls' teams. … I do not have expertise in these areas and therefore will not provide an expert opinion on them."  LL Ex. 24, at 214:12–23; *see also* Doc. 65-1, at 6. Thus, Dr. Budge "verif[ied] that [s]he wasn't offering any [relevant] opinions." *See Mitchell*, 2022 WL 874287, at *6.

Indeed, Plaintiffs cite Dr. Budge precisely for the argument that they supposedly have not and will not "experience any of the physiological changes associated with male puberty" such that "their participation on girls' teams would [not] create unfair competition." Pls.' MSJ, at 7, 18. However, Dr. Budge testified she was "not provid[ing] an expert opinion" on that issue. LL Ex. 24, at 214:12-23.

Dr. Budge's testimony is not "relevant to the task at hand." *Daubert*, 43 F.3d at 1315 (citation omitted); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993). Just as in *Mitchell* here, this Court should exclude the opinions of Dr. Budge.

c.    **Dr. Budge's opinions should be excluded as irrelevant and unreliable because she lacks any relevant qualifications.**

Expert witnesses must be "qualified … by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702. An expert must demonstrate "a reliable basis in the knowledge and experience of [her] discipline." *Jinro Am. Inc. v. Secure Investments, Inc.*, 266 F.3d 993 (9th Cir. 2001), *as amended by* 272 F.3d 1289 (quoting *Daubert*, 509 U.S. at 592). If an expert's qualifications are "glaringly inadequate," exclusion is indicated. *Id.* at 1005–06.

Plaintiffs rely on Dr. Budge when arguing that their use of puberty-blockers and cross-sex hormones negates the possibility of unfairness when they compete on female sports teams. *See* Pls.' SOF, at ¶¶ 56, 64; Pls.' MSJ, at 7-8, 18, 21, 29, 33, 42. Similarly, they rely on Dr. Budge to argue that failure to play on female teams would be detrimental to their health. Pls.' SOF, at ¶¶ 119, 130, 134, 147, 150; Pls.'. MSJ at 11-12, 27, 29, 41-42.  But Plaintiffs cannot properly rely on Dr. Budge, because she never medically examined Plaintiffs, never reviewed Plaintiffs' medical records, never knew Plaintiffs' testosterone levels at any point, and never observed Plaintiffs playing sports.  *See* LL Ex. 24, at 9:8-22, 12:15-21, 17:12-17.

Moreover, Dr. Budge denied any formal or professional training in exercise physiology. LL Ex.24, at 14:23–25. She denied any formal or professional training in kinesiology. *Id.* at

14:20–22. She denied any formal or professional training in sports science. *Id.* at 15:1–3. She denied any formal or professional training in sports medicine. *Id.* at 15:4–6. She denied any formal or professional training in developmental biology (aside from "courses," pointing only to a pharmacology course). *Id.* at 14:4–19. She denied any athletic coaching experience, including any experience coaching children or adolescents in any sports. *Id.* at 15:7–11.

"One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert*, 43 F.3d at 1317. Dr. Budge denied ever authoring any instructional materials on athletic training for prepubescent children or adolescents. LL Ex. 24, at 15:12–15. She denied ever conducting any scholarly research into sex differences in athletic performance for prepubescent children or adolescents. *Id.* at 15:16–19. She denied ever authoring any scholarly papers or other publications on transgender athletes in school sports. *Id.* at 16:6–9. Dr. Budge cannot "claim[] to have studied … before being hired to testify in this or related cases," *Daubert*, 43 F.3d at 1317, "the biological differences between males and females and competitive fairness of transgender girls competing on girls' teams," LL Ex. 24, at 214:12–20.

Furthermore, Dr. Budge is not a medical doctor; she has never attended medical school. *Id.* at 11:19–25. She is not a Board-Certified psychologist. *Id.* at 11:15–16; 12:3–5. In her practice, she does not see patients under the age of 12 or otherwise interact with prepubertal children. *Id.* at 12:21.

This is not a case where the expert has merely weak qualifications, where such disputes "go to the weight, not the admissibility" of her testimony. *See Unknown Party v. Ariz. Bd. of Regents*, No. 2:18-cv-1623-DWL, 2022 WL 4481519, at *1 (D. Ariz. Sept. 27, 2022). Nor is this a case where an expert purports to opine "not based on firsthand knowledge or observation" but, nevertheless, based "in the knowledge and experience of [her] discipline." *Jinro*, 266 F.3d at 1004. On the contrary, Dr. Budge can demonstrate *no* adequate experience in *any* relevant discipline upon which to base her opinions.

Recognizing this fact, Dr. Budge testified that she "do[es] not have expertise" regarding "the biological differences between males and females and competitive fairness of transgender girls competing on girls' teams." LL Ex. 24, at 214:12–20. Acknowledging her lack of qualifications, she testified that she "will not provide an expert opinion on [those issues]." *Id.* at 214:19–20.

As in *Jinro*, here, Dr. Budge's testimony demonstrates no relevant experience or qualifications that could assist the Court and is "simply … unreliable." *See Jinro*, 266 F.3d at 1010. Therefore, the Court should exclude the opinions of Dr. Budge.

### d.    Dr. Budge relied upon scientifically invalid principles.

Because Dr. Budge's testimony "is not based on [her] independent research," she must demonstrate "other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'" *Daubert*, 43 F.3d at 1317–18. An expert's testimony must be "the product of reliable principles and methods." Fed. R. Evid. 702(c). In determining "what basis [experts] have" for their opinions, courts "may consider 'whether the theory or technique employed by the expert is generally accepted in the scientific community; whether it's been subjected to peer review and publication; [and] whether it can be and has been tested ….'" *Grodzitsky*, 957 F.3d at 985 (quoting *Wendell*, 858 F.3d at 1232). Plaintiffs rely on Dr. Budge for their arguments and assertions regarding gender dysphoria, gender identity, treatments for gender dysphoria, standards of care, and a supposed "medical consensus" surrounding these principles and treatments. Pls.' MSJ, at 3-5.  However, Dr. Budge relied upon scientifically invalid principles and theories.

### i.    The Endocrine Society and DSM-5-TR, upon which Dr. Budge relies, refute her opinions as scientifically invalid.

Dr. Budge relied upon the Endocrine Society Clinical Practice Guidelines and the DSM-5-TR in forming her opinions.[2] LL Ex. 24, at 58:3–6, 73:5–8. However, each source refutes the central thesis of Dr. Budge's testimony. Dr. Budge's testimony relies upon the theory that gender identity, which she defines as "a person's internal or psychological sense of having a particular

---

[2] By Defendant citing to these guidelines, it is not an adoption nor to approve of them, but to show the conflict between their content and Dr. Budge, who relied on them.

gender," *id.* at 34:14–16, is a component of biological sex, which she defines as "being and including different components such as chromosomes, hormones, different types of reproductive organs, secondary sex characteristics and gender identity," *id.* at 36:23–37:2. Critically, Dr. Budge emphasized of those components, gender identity is the "primary one" that trumps all others in the determination of an individual's biological sex, should there be any apparent conflicts. *Id.* at 41:20–43:4, 44:7–10.

The Endocrine Society, which Dr. Budge considers "an authoritative resource on transgender-related health," *id.* at 58:7–9, soundly refutes this thesis as not scientifically valid. For example, the Endocrine Society states that "[b]iological sex is separate from gender identity, which may or may not align with an individual's biological sex"; Dr. Budge disagreed. *Id.* at 61:25–62:4. The Endocrine Society states that "[a]ll sex differences" from the moment of conception "stem from harboring two different sex chromosomes"; Dr. Budge disagreed. *Id.* at 60:9–24. The Endocrine Society states that "[s]ex is dichotomous"; but Dr. Budge believes there are "as many biological sexes as there are gender identities," specifically, "a host of different gender identities." *Id.* at 64:7–9, 65:2–7; *see also id.* at 66:25–67:11. The Endocrine Society states that "[a] clear causative biological underpinning of gender identity remains to be demonstrated"; again, Dr. Budge disagreed. *Id.* at 70:3–71:8, 106:6–8.

The same is true regarding the DSM-5-TR, which Dr. Budge considers "an authoritative resource on gender dysphoria." *Id.* at 73:14–16. The DSM-5-TR, the "Diagnostic and Statistical Manual" published by the American Psychiatric Association, *id.* at 73:9–13, defines biological sex and gender identity separately, *id.* at 74:14–25, 76:14–77:16. Again, Dr. Budge's primary thesis is undermined by her own source, demonstrating that it is not "sound science." *Daubert*, 43 F.3d at 1316.

Both the Endocrine Society and the DSM-5-TR demonstrate that Dr. Budge's opinions are not "generally accepted in the scientific community." *Id.* On the contrary, the published works of each show that Dr. Budge's outlier opinions on gender identity and biological sex are not reliable. Thus, Dr. Budge's opinions on biological sex should be excluded.

ii.    **WPATH's Standards of Care, upon which Dr. Budge relied, are not generally accepted by the scientific community and are based on insufficient evidence.**

Plaintiffs rely on Dr. Budge for their assertions and arguments regarding the efficacy of Plaintiffs' use of puberty-blockers and cross-sex hormones for gender dysphoria, as well as their arguments regarding the utility of social transition and the alleged harms from lack thereof. Pls.' MSJ, at 3-7, 11-12, 21, 27-29, 41-43. Dr. Budge, in turn, relied upon WPATH's Standards of Care ("SOC") and considered WPATH the "preeminent authority on gender dysphoria treatment." LL Ex. 24, at 155:4–6. Indeed, she is a member of WPATH. *Id.* at 154:24–25. However, WPATH's SOC are neither generally accepted by the scientific community nor evidence-based. *See Skrmetti*, 145 S. Ct. at 1847 (Thomas, J., concurring).

Dr. Budge inaccurately claims that the WPATH SOC "are endorsed by … the American Academy of Pediatrics, … and the American Medical Association, among others." LL Ex. 24, at 154:17–23, 203:15–19. Indeed, Plaintiffs rely on Dr. Budge for this same argument. Pls.' MSJ, at 4. However, the evidence says otherwise. Eli Coleman, the lead author of the SOC, and an acquaintance of Dr. Budge, (*see* LL Ex. 24 at 180:6–15), stated, "I have no idea how it was ever said that so many medical organizations have endorsed SOC 7 … [t]his statement is made in many legal briefs and court proceedings. But is that true? How did that ever come about? My suspicion is that these organizations never formally endorsed …". *See* LL Ex. 24 at 209:8–210:21. Eli Coleman even admitted to a near-*denouncement* from the American Academy of Pediatrics, one of the entities Dr. Budge claims endorsed the SOC. *Id.* at 209:18–22. Additional evidence demonstrates that the American Medical Association, also among the entities listed by Dr. Budge, was specifically asked by WPATH to endorse its SOC but *declined* to do so: "the AMA does not endorse or support standards of care – that falls outside of our expertise. Thus, we are unable to respond affirmatively to [WPATH's endorsement] request." *Id.* at 205:13–206:4. WPATH's SOC's generally unendorsed status, all while dodging denouncements, undercuts Dr. Budge's assertion that the SOC are the "internationally recognized guidelines for the treatment of persons with gender dysphoria." *See id.* at 154:12–16. The evidence shows the opposite; certainly, they

cannot be considered "generally accepted in the scientific community." *Daubert*, 43 F.3d at 1316. And while WPATH's leaders may believe that "the statement that the SOC has so many endorsements has been an extremely powerful argument" such that they "need to be able to get support of these important organizations and know how to indicate their support accurately or this argument in [transgender-related] court cases could be challenged," LL Ex. 24, at 210:22–211:6, that belief only highlights the lack of support in the scientific community. *See also Skrmetti*, 145 S. Ct. at 1840 (Thomas, J., concurring) (finding "no medical consensus on how best to treat gender dysphoria in children"); *id.* at 1843 ("medical and regulatory authorities are not of one mind about the treatments' risks and benefits").

WPATH's methods behind the development of its SOC are also "scientifically [in]valid." *Daubert*, 43 F.3d at 1316. Despite Dr. Budge's claim that WPATH's SOC was developed "using the same evidence-based approach used to develop standards of care and practice guidelines for the treatment of many other medical conditions," LL Ex. 24, at 155:14–23, and despite Dr. Budge's understanding that "systematic reviews [are] the highest level of analysis and the most trusted way to determine what the available research tells us," *id.* at 162:7–16, Dr. Budge acknowledged that WPATH disclaimed any ability to perform a systematic review to supports its recommendations regarding treatments for transgender adolescents, *id.* at 160:19–161:1, 162:17–19 (WPATH's SOC asserting that "a systematic review regarding outcomes of treatment in adolescents is not possible"). However, it turns out that WPATH had actually *commissioned* a systematic review for this very purpose. *Id.* at 167:4–173:13. WPATH, when confronted with the unfavorable results of their own systematic review that found "strength of evidence" to be "low" and "[m]ore research" to be "needed … especially among adolescents," *id.* at 170:12–171:3, instead asserted that "a systematic review … is not possible.". *See id.* at 173:4–7, 22–24. Perhaps this was because WPATH's "concerns, echoed by the social justice lawyers [they] spoke with, is that [it would] put[] us in an untenable position in terms of affecting policy or winning lawsuits." *Skrmetti*, 145 S. Ct. at 1847 (Thomas, J., concurring) (citation omitted).

Lack of supportive systematic review evidence is not the only example of WPATH's methods behind its SOC failing to be "derived by the scientific method," as *Daubert* demands.

14

*See Daubert*, 43 F.3d at 1316. In fact, the SOC's evidence base is demonstrably violative of the "scientific method." *See id.* The review commissioned by NHS England revealed that "[e]arly versions of two international guidelines, the Endocrine Society 2009 and [WPATH SOC 7] guidelines influenced nearly all the other guidelines" regarding treatment of children and adolescents diagnosed with gender dysphoria." LL Ex. 24, at 165:3–8. NHS England's review further found that "[t]hese two guidelines are also closely interlinked with WPATH adopting Endocrine Society recommendations, and acting as a co-sponsor and providing input to drafts of the Endocrine Society guideline," and that "WPATH [SOC] 8 cited many of the other national and regional guidelines to support some of its recommendations, despite these guidelines having been considerably influenced by WPATH." *Id.* at 165:9–18. NHS England's review concluded that "[t]he circularity of this approach may explain why there has been an apparent consensus on key areas of practice despite the evidence being poor." *Id.* at 165:19–23; *see Skrmetti*, 145 S. Ct. at 1848 (Thomas, J., concurring). Indeed, such a "circularity" in WPATH's methods undergirding its SOC betrays an absence of the "scientific method" or "standard scientific procedures" required by *Daubert*. *See Daubert*, 43 F.3d at 1316, 1319.

WPATH's lead author of the SOC, Eli Coleman, admitted to the lack of evidence: "All of us [WPATH colleagues] are painfully aware that there are *many gaps* in research to back up our recommendations." LL Ex. 24, at 208:16–19 (emphasis added). This directly contradicts Dr. Budge's claim that WPATH's SOC enjoy sufficient evidentiary support. *See id.* at 155:24–156:1; *see also Skrmetti*, 145 S. Ct. at 1847 (Thomas, J., concurring) ("WPATH itself recognizes that evidence supporting the efficacy of puberty blockers [and] cross-sex hormones … for treating gender dysphoria in children is lacking."). Compounding the issue, WPATH apparently failed to mitigate conflicts of interest when promulgating its SOC. Evidence shows that WPATH failed to perform "necessary management of potential conflicts" "prior to selection of [SOC] members," despite asserting in its SOC that "[c]onflicts of interest were reviewed as part of the selection process for committee members." *Id.* at 190:7–19, 191:1–7. Dr. Budge admitted that conflicts of interest could "impact the reliability of" research and further admitted that WPATH was required, as with similar entities "in [its] field," to "disclose conflicts of interest." *Id.* at 188:2–15.

1  According to Dr. Budge, failure to do so could "call into question the reliability" of the SOC. *Id.*
2  at 188:12–18.

3      The evidence shows WPATH's SOC's (a) generally unendorsed status, all while dodging
4  denouncements; (b) lack of support from systematic reviews and attempt to bury the unfavorable
5  published review demonstrating insufficient evidence behind their recommendations; (c)
6  circularity of their underlying methods to achieve the appearance of consensus notwithstanding
7  poor evidence; (d) admitted "many gaps" in research undergirding their recommendations; and
8  (e) failure to properly manage conflicts of interest. *See Skrmetti*, 145 S. Ct. at 1848 (Thomas, J.,
9  concurring) (discussing evidence that "WPATH's lodestar is ideology, not science" (citation
10 omitted)).  Together, the evidence exposes Dr. Budge's unfounded reliance upon WPATH and its
11 SOC as nothing but mere "assurances of reliability," *Daubert*, 43 F.3d at 1319, in the face of
12 remarkably unreliable scientific methods and "[un]sound science," *id.* at 1316.  "Under *Daubert*,
13 that's not enough." *Id.* at 1319.

14     Because Dr. Budge's opinions relied upon scientifically invalid principles and upon
15 sources and theories not generally accepted by the broader scientific community, her opinions
16 should be excluded as unreliable.

17     **e.    Dr. Shannon's opinions should be excluded as irrelevant and unreliable**
18         **because he lacks any relevant qualifications.**

19     Plaintiffs rely on Dr. Shannon to argue that some of Defendants' scientific evidence cannot
20 suffice to prove biological causes for the phenomena observed by the scientists, as opposed to
21 social causes.  *See* Pls.' SOF ¶ 49, 94; Pls.' MSJ, at 7, 9.  However, Dr. Shannon admitted that he
22 lacks relevant qualifications to render any such opinions.

23     Here, Dr. Shannon denied any expertise in whether "greater encouragement of athleticism
24 in boys or more opportunities for boys to participate in sports is related to a difference in athletic
25 performance."  LL Ex. 25, at 136:11-17. He denied any opinions on "the facts of exclusion from
26 sports."  *Id.* at 176:19-25.

27     While these admissions alone warrant exclusion, Dr. Shannon went on to deny any other
28 relevant qualifications. He admitted that he is not a physiologist or a kinesiologist, he lacks

WILENCHIK & BARTNESS

16

degrees in exercise medicine or sports performance, and he has no expertise in innate physiology. *Id.* at 135:2-15. Further, he denied any expertise in when puberty begins in males or females, denied any expertise in "biological differences between children in Arizona and children living anywhere else in the United States" or "in the world," and denied ever studying "the differences between elite and non-elite athletes." *Id.* at 75:13-25, 80:21-81:6, 160:12-14.

On top of all that, Dr. Shannon denied ever speaking with Plaintiffs or their families, denied ever medically examining Plaintiffs and denied any qualifications to do so, denied ever reviewing Plaintiffs' medical records, denied ever observing Plaintiffs play sports, denied ever reviewing Plaintiffs' sporting records, denied any knowledge of what sports Plaintiffs play, and denied knowledge of Plaintiffs' athletic ability or training level. *Id.* at 69:15, 20-22, 82:18-83:1, 172:20-173:15.

This is not a case where the expert has merely weak qualifications, where such disputes "go to the weight, not the admissibility" of her testimony. *See Unknown Party v. Ariz. Bd. of Regents*, No. 2:18-cv-1623-DWL, 2022 WL 4481519, at *1 (D. Ariz. Sept. 27, 2022). Nor is this a case where an expert purports to opine "not based on firsthand knowledge or observation" but, nevertheless, based "in the knowledge and experience of his discipline." *Jinro*, 266 F.3d at 1004. On the contrary, Dr. Shannon can demonstrate *no* adequate experience in *any* relevant discipline upon which to base his opinions.

As in *Jinro*, here, Dr. Shannon's testimony demonstrates no relevant experience or qualifications that could assist the Court and is "simply … unreliable." *See Jinro*, 266 F.3d at 1010. Therefore, the Court should exclude the opinions of Dr. Shannon.

      **f.    Dr. Shannon failed to perform any independent research or verify the data presented to him by Plaintiffs' counsel.**

"One very significant fact to be considered" is whether the expert is "proposing to testify about matter growing naturally and directly out of research" he has "conducted independent of the litigation," or whether he has "developed [his] opinions expressly for purposes of testifying." *Id.* at 1317. "If the testimony is not based on independent research then what is required is 'proof that the research and analysis supporting the proffered conclusions have been subjected to normal

scientific scrutiny through peer review and publication.'" *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003) (quoting *Daubert*, 43 F.3d at 1318); *see also Akkerman v. Mecta Corp.*, 247 F. App'x 895, 897 (9th Cir. 2007) (affirming exclusion of expert whose "opinions were not derived from independent research").

Instructive, but in *In re Incretin-Based Therapies Prods. Liability Litig.*, the court excluded the plaintiffs' "biostatistics expert" opinions for failure to comport with "good science." 524 F. Supp. 3d 1007, 1035-37 (S.D. Cal. 2021). The court noted that the expert's "analysis was limited to a small universe of data provided to him" and that the expert "did not conduct a comprehensive search of the published peer-reviewed literature for studies evaluating" the issue, "thereby disregard[ing] independent research at odds with his testimony." *Id.* at 1037. The court found that the expert "offered no meaningful explanation as to why he did not search for or consider these studies other than to say, 'It was not what I was asked to do.'" *Id.* "This testimony, coupled with the aforementioned biased selection of data," gave the court "great pause." *Id.* (citing *Daubert*, 43 F.3d at 1317).

Here, just as in *Incretin-Based Therapies*, Dr. Shannon, a purported biostatistics expert, intentionally limited his research "solely on the information that [was] provided by Plaintiffs' attorneys." LL Ex. 25, at 46:22-47:12; Pls.' Ex. 13, ¶ 2. He unequivocally testified that his "task … was to evaluate the reports and not to do … any independent data analysis," and he confirmed that he did not "attempt to design the appropriate analysis that should be done for any of the sports performance issues in this case." LL Ex. 25, at 19:11-15, 54:14-55:7, 96:1-2; *see also id.* at 123:3-8 (Dr. Shannon admitting he "had the opportunity" to do certain statistical analysis, but "didn't do it" because "[i]t wasn't part of my task"). Like the excluded expert in *Incretin-Based Therapies*, Dr. Shannon denied considering any facts or data not contained in his report, (LL Ex. 25 at 44:10-17), and failed to research the scientific literature or data relevant to the issues in this case, *see, e.g.*, LL Ex. 25 at 53:4-55:7, 65:19-66:2, 90:8-20, 92:7-10, 23-25 (admitting failure to review relevant studies or data not provided to him by Plaintiffs' counsel or otherwise perform independent research). Just as the expert in *Incretin-Based Therapies*, here, Dr. Shannon "offered no meaningful explanation as to why he did not search for or consider these studies other than to

say," and *repeatedly*, that doing so was not part of his "task." 524 F. Supp. 3d at 1037. *See, e.g.*, LL Ex. 25, at 19:11, 45:23, 75:11, 82:7, 83:7, 84:2, 90:7, 96:1, 123:8, 124:17, 139:20, 140:2, 8, 146:19, 168:4. Just as in *Incretin-Based Therapies*, here, Dr. Shannon's "testimony, coupled with the aforementioned biased selection of data," should give this Court "great pause."  524 F. Supp. 3d at 1037 (citing *Daubert*, 43 F.3d at 1317).

Dr. Shannon's failures go even further. He admitted that he "did not check to see if the packet of information" from Plaintiffs' counsel "was true" and accurate information. LL Ex. 25, at 174:8-11. Not only did Dr. Shannon fail to perform independent research, but he also failed to demonstrate that the research he did rely upon to support his "proffered conclusions" had "been subjected to normal scientific scrutiny." *See Clausen*, 339 F.3d at 1056. His opinions should be excluded because they do not represent "sound science." *Daubert*, 43 F.3d at 1316; *see also Akkerman*, 247 F. App'x at 897.

### g. The many conceded "mistakes" permeating Dr. Shannon's expert report render it wholly unreliable.

Dr. Shannon admitted that his expert report was full of "mistakes" and "error." This renders his opinions inherently unreliable.

Dr. Shannon admitted "a mistake" in describing his history of expert service. *Id.* at 11:18-12:5; Pls.' Ex. 13, ¶ 12. He admitted "a mistake" in describing the history of his company. *Id.* at 36:9-14; Pls.' Ex. 13, ¶ 5. He admitted "a mistake" and "an error" when inaccurately claiming certain data relied upon by Dr. Brown was not published or peer-reviewed. *Id.* at 107:19-108:4, 109:6-15, 113:19-24; Pls.' Ex. 13, ¶ 25.  These errors preclude any ability to demonstrate that Dr. Shannon's opinions comport with the "scientific method" or otherwise constitute "good science" that "falls within the range of accepted standards governing how scientists conduct their research and reach their conclusions." *Daubert*, 43 F.3d at 1315-17. For this additional reason, Dr. Shannon's opinions should be excluded as unreliable.

### CONCLUSION

Defendant Horne incorporates Intervenor Defendants' reply and response as though set forth herein, pursuant to F.R.C.P. 10(c). Defendant Horne also respectfully requests that this Court

dismiss Plaintiff's Title IX claim, grant Defendant Horne's motion for summary judgment, and strike Plaintiffs' expert support from Dr. Budge and Dr. Shannon in support of their Motion.

**RESPECTFULLY SUBMITTED** on July 14, 2025.

**WILENCHIK & BARTNESS, P.C.**

*/s/ Caitlin B. Fitz-Maurice*
Dennis I. Wilenchik, Esq.
Caitlin B. Fitz-Maurice, Esq.
The Wilenchik & Bartness Building
2810 North Third Street
Phoenix, Arizona 85004
admin@wb-law.com

*and*

Maria Syms
Director of Legal Services
Arizona Department of Education
1535 W Jefferson, BIN #50
Phoenix, AZ 85007
Maria.Syms@azed.gov

*Attorneys for Defendant Thomas C. Horne*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 14, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants.

*/s/ Christine M. Ferreira*