Colin M. Proksel (034133)
John S. Bullock (034950)
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
State Bar No. 034133
Telephone: (602) 640-9000
Facsimile: (602) 640-9050
Emails: cproksel@omlaw.com
         jbullock@omlaw.com

*Attorneys for Plaintiffs*
*Additional counsel listed in signature block*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
### TUCSON DIVISION

| | |
|---|---|
| Jane Doe, by her next friend and parents Helen Doe and James Doe; and Megan Roe, by her next friend and parents, Kate Roe and Robert Roe,<br><br>Plaintiffs,<br>v.<br><br>Thomas C. Horne in his official capacity as State Superintendent of Public Instruction; Laura Toenjes, in her official capacity as Superintendent of the Kyrene School District; Kyrene School District; The Gregory School; and Arizona Interscholastic Association Inc.,<br><br>Defendants,<br><br>Warren Petersen, in his official capacity as President of the Arizona State Senate, and Steve Montenegro, in his official capacity as Speaker of the Arizona House of Representatives,<br><br>Intervenor-Defendants. | Case No. 4:23-cv-00185-JGZ<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STRIKE DR. BUDGE AND DR. SHANNON**<br><br>**\*ORAL ARGUMENT REQUESTED\*** |

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 1

I.   DR. STEPHANIE BUDGE, PH.D. ................................................................................. 1

II.  DR. WILLIAM D. SHANNON, PH.D., MBA................................................................ 2

ARGUMENT ............................................................................................................................. 3

I.   DR. BUDGE'S REPORTS AND TESTIMONY SHOULD NOT BE
     EXCLUDED .................................................................................................................... 3

     A.   Dr. Budge's Testimony and Opinions Are Relevant ............................................ 3

     B.   Dr. Budge Is Qualified to Provide Her Opinions In This Case............................ 5

     C.   Dr. Budge Relied on Scientifically Valid Principles ........................................... 5

II.  DR. SHANNON'S REPORT AND TESTIMONY SHOULD NOT BE
     EXCLUDED .................................................................................................................... 7

     A.   Dr. Shannon Is Exceedingly Qualified to Provide the Opinions in His
          Rebuttal Report..................................................................................................... 7

     B.   Dr. Shannon's Opinions Should Not Be Excluded on the Basis That
          He Did Not Perform Any Independent Research................................................. 8

     C.   Dr. Shannon's Expert Rebuttal Report Is Not "Full of Mistakes" ....................... 9

CONCLUSION ........................................................................................................................ 10

# TABLE OF AUTHORITIES

**Cases**

*Baker v. SeaWorld Ent., Inc.*,
    423 F. Supp. 3d 878 (S.D. Cal. 2019) ......................................................................... 8

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ..................................................................................................... 9

*In re Incretin-Based Therapies Prods. Liability Litig.*,
    524 F. Supp. 3d 1007 (S.D. Cal. 2021) ....................................................................... 9

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., &*
    *Prod. Liab. Litig.*,
    978 F. Supp. 2d 1053 (C.D. Cal. 2013) ...................................................................... 8

*Mighty Enters., Inc. v. She Hong Indus. Co.*,
    745 F. App'x 706, 709 (9th Cir. 2018)………………………….. ........................ 9

*Mitchell v. Geo Grp. Inc.*,
    2022 WL 874287 (D. Ariz. Mar. 24, 2022) ................................................................ 4

*Siring v. Or. State Bd. of Higher Educ. ex. Rel. E. Or Univ.*,
    927 F. Supp. 2d 1069 (D. Or. 2013) ........................................................................... 4

*TCL Commc'ns Tech. Holdings Ltd. v. Telefonaktenbologet LM Ericsson*,
    2016 WL 7042085 (C.D. Cal. Aug. 17, 2016) ............................................................ 8

*United States v. Skrmetti*,
    145 S. Ct. 1816 (2025) ................................................................................................. 7

**Other Authorities**

Fed. R. Evid. 703 ................................................................................................................ 9

**INTRODUCTION**

The Court should not exclude the testimony or reports of Dr. Stephanie Budge and Dr. William Shannon. Both Dr. Budge and Dr. Shannon are eminently qualified to offer their opinions as experts in this case. Dr. Budge is a distinguished clinical psychologist at a world-class research university who focuses on the treatment of transgender adolescents and specializes in the treatment of gender dysphoria in adolescents. Dr. Shannon is a distinguished biostatistician and professor emeritus at a top-tier medical school with decades of expertise in data analysis and the use of proper statistical methods. The depth of their relevant expertise explains exactly why Defendants seek to exclude their testimony. But there is no basis to do so.

Dr. Budge and Dr. Shannon also offer testimony that is both relevant to this case and reliable. Each of Defendants' arguments to the contrary fails. For these reasons and those discussed herein, the Court should deny Defendants' Motion to Strike Dr. Budge and Dr. Shannon with prejudice.

**BACKGROUND**

**I.    DR. STEPHANIE BUDGE, PH.D.**

Dr. Budge is a licensed psychologist who has specialized in issues of gender identity and gender transition for over 17 years. (Dkt. 303-2 ("Budge Rep.") ¶ 1.) Dr. Budge received her Ph.D. in counseling psychology from the University of Wisconsin-Madison ("UW-Madison"), with a particular concentration on the mental health of transgender individuals. (*Id.*) Transgender youth have comprised the bulk of Dr. Budge's clinical practice for nearly 15 years, and she has seen over 250 transgender clients through the provision of therapy, evaluations, and other psychological interventions. (*Id.* ¶ 3.) Dr. Budge has held appointments at the UW Health Pediatric and Adolescent Transgender Health Clinic, as well as the Counseling Psychology Training Clinic at the University of Wisconsin-Madison, where she provided psychological services primarily to transgender adolescents. (*Id.*) Dr. Budge provides her opinions based on her own clinical experience as a psychologist

who works with transgender youth suffering from gender dysphoria and regularly assesses their eligibility for gender-transition related care. (*Id.*)

In addition to her clinical experience, Dr. Budge acts as the Director of the Trans CARE Collaborative at UW-Madison, where she designs research projects on the mental health of transgender individuals. (*Id.* ¶ 5.) Dr. Budge has published over 100 peer-reviewed articles and book chapters, the majority of which focused on transgender individuals. (*Id.* ¶ 6.) Her research has explored the impact of discrimination on the mental health of transgender individuals, as well as interventions that improve the mental health and wellbeing of transgender individuals with gender dysphoria. (*Id.*) Dr. Budge's clinical and scholarly contributions to the field of psychotherapeutic practice with transgender patients have earned her several awards from the American Psychological Association, the leading professional organization for psychologists in the United States. (*Id.* ¶ 7.)

Plaintiffs have offered Dr. Budge's expert testimony in this case on several topics, including but not limited to gender identity; gender dysphoria; the evidence regarding biological factors causing gender dysphoria; the safety and efficacy of the medical treatment for gender dysphoria in adolescence; the psychological benefits of medical treatment for gender dysphoria on the body; the benefits that sports provides to the psychological wellbeing of youth; and the psychological impact of the Ban for transgender girls, like Plaintiffs.

## II.     DR. WILLIAM D. SHANNON, PH.D., MBA

Dr. Shannon was retained as a rebuttal expert to examine the opinions of Defendants' experts that prepubertal boys have an athletic advantage over prepubertal girls. (Dkt. 303-4 ("Shannon Rep.") ¶ 11.) He is eminently qualified to serve as a rebuttal expert regarding Defendants' experts' use of data and statistical methods (or lack thereof) in their expert reports. Unlike Defendants' experts—none of whom have a degree or professional experience in statistics—Dr. Shannon is a biostatistician who has worked in the field for approximately 30 years. (*Id.* ¶ 14.) He received a Ph.D. in Biostatistics from the University of Pittsburgh in 1995. (*Id.* ¶ 3.) After completing his Ph.D., he became a professor of

1  Biostatistics in Medicine at the Washington University School of Medicine in St. Louis. (*Id.*)
2  He served in that position for approximately 21 years. (*Id.*) His duties included performing
3  research related to statistical methods that are involved in evaluating medical research data.
4  (*Id.*) During the same period, Dr. Shannon was also the Director of the Department of
5  Medicine's Biostatistics Consulting Center at the Washington University School of
6  Medicine in St. Louis. (*Id.* ¶ 4.) In that role, he provided statistical consulting services for
7  all researchers in the medical school and supervised statistical and computer science staff
8  providing the same service. (*Id.*)

9  After his tenure at the Washington University School of Medicine in St. Louis,
10 Dr. Shannon co-founded the company BioRankings. (*Id.* ¶ 5.) BioRankings is a statistical
11 consulting firm primarily serving clients in the biomedical field. (Dkt. 286-5 ("Shannon
12 Dep. Tr.") at 13:5–25.) Dr. Shannon has also written approximately 130 peer-reviewed
13 publications and has been involved with statistics-related professional associations.
14 (Shannon Rep. ¶¶ 6–7.)

15 Dr. Shannon was specifically asked to examine the articles and data that Defendants'
16 experts attempt to use to support their opinions, including paragraphs 107–191 and Appendix
17 1 of Dr. Brown's report; pages 7–9, 19, 21 of Coach Blade's report; Sections 7–8 and
18 Appendices 3–5 of Dr. Hilton's report; and Paragraph 17 of Dr. Carlson's report. (*Id.*)
19 Dr. Shannon was not retained to address any other opinion of Defendants' experts. (*Id.*)

**ARGUMENT**

I.  **DR. BUDGE'S REPORTS AND TESTIMONY SHOULD NOT BE EXCLUDED**

    A.  **Dr. Budge's Testimony and Opinions Are Relevant**

Defendants argue that Dr. Budge's testimony and opinions should be excluded as irrelevant because she does not offer an opinion on the following issues in this litigation: (*i*) "the biological differences between males and females" and (*ii*) the "competitive fairness of transgender girls competing on girls' teams." (Dkt. 322 ("Horne MSJ Opp.") at 8–9.) But those are not the only two issues in this litigation.

Contrary to Defendants' assertions, Dr. Budge's opinions on topics such as the benefits that sports provide to the psychological wellbeing of youth and the psychological impact of the Ban for transgender girls, like Plaintiffs, are *directly relevant* to proving the serious injury that the Ban inflicts on Jane and Megan.[1] Dr. Budge's expert evidence on gender identity, gender dysphoria, the biological factors causing gender dysphoria, and the safety and efficacy of the medical treatment for gender dysphoria in minors is directly relevant to proving why Jane and Megan cannot play on boys' sports teams, why the Ban is harmful to them, and the disabling nature of gender dysphoria. That Dr. Budge does not have an opinion on the two specific issues that Defendants reference cannot and does not render her entire opinion irrelevant. *See Siring v. Or. State Bd. of Higher Educ. ex rel. E. Or. Univ.*, 927 F. Supp. 2d 1069, 1078 (D. Or. 2013) ("Expert testimony need not address every element of a claim, but need only help the jury understand the evidence or 'a fact in issue.'").

Defendants' discussion of *Mitchell v. Geo Group, Inc.*, 2022 WL 874287 (D. Ariz. Mar. 24, 2022), holds no water. In that case, the expert in question had offered in his report an opinion on causation of a medical injury, only to "retreat[]" from that opinion at deposition. *Id.* at *5. In that context, the court held that the expert should be precluded from offering an opinion on causation at trial. *Id.* ("[W]hen an expert "affirmatively repudiates or disavows an opinion expressed in the expert's report, courts have not hesitated to conclude that the expert should be precluded from offering that opinion at trial.") In contrast, Dr. Budge has neither repudiated nor disavowed any opinions in her report. Her report never purports to opine on the biological difference between males and females or the competitive fairness of transgender girls competing on girls' teams. She thus had nothing to "disavow."

---

[1] Defendants state that Plaintiffs cite Dr. Budge for the statement that Plaintiffs have not and will not "experience any of the physiological changes associated with male puberty" such that "their participation on girls' teams would [not] create unfair competition." (Horne MSJ Opp. at 9.) However, Plaintiffs do not cite Dr. Budge for the second part of that sentence. (*See* Dkt. 302 at 18 (citing Dkt. 303 ¶¶ 48–54, 56, and 63, in which Dr. Budge is cited only twice, both simply to discuss physiological changes).)

4

Accordingly, Defendants' argument that Dr. Budge's opinion should be excluded as irrelevant fails.

### B. Dr. Budge Is Qualified to Provide Her Opinions In This Case

Defendants' arguments that Dr. Budge "lacks any relevant qualifications" to provide her opinion all fail.

*First*, as discussed above, Plaintiffs are not offering Dr. Budge's evidence on the specific question of whether Plaintiffs have an unfair athletic advantage. Accordingly, Defendants' argument that Dr. Budge is not qualified to render an opinion on this topic is futile.

*Second*, contrary to Defendants' assertions (Horne MSJ Opp. at 9), Dr. Budge is well qualified to offer the opinion that requiring Plaintiffs to play on boys' teams would interfere with their medical treatment, including their social transition, and harm their mental health. Dr. Budge is a licensed psychologist who has treated hundreds of transgender adolescents. (Budge Rep. ¶ 3.) In addition to her deep clinical experience treating transgender patients, she has deep research and academic experience studying gender dysphoria. (*Id.* ¶¶ 4–6.) Defendants' argument that—despite this considerable experience—Dr. Budge is not qualified to offer an opinion here because she never medically examined Plaintiffs or reviewed their medical records therefore fails. (Horne MSJ Opp. at 9.)

### C. Dr. Budge Relied on Scientifically Valid Principles

Dr. Budge's opinions are based on reliable sources and methods. All of Defendants' arguments to the contrary fail.

*First*, Defendants state that the Endocrine Society Clinical Practice Guidelines and DSM-5-TR, upon which Dr. Budge relies, refute her opinions as scientifically invalid. (Horne MSJ Opp. at 11.) This argument misrepresents the texts of those documents and Dr. Budge's deposition testimony.[2] It also focuses on slight differences between Dr. Budge's

---

[2] Dr. Budge's alleged disagreement with the Endocrine Society Clinical Practice Guidelines at her deposition related more to Defendants' vague and misleading questions about that document—which they repeatedly misread—than to any substantive difference between

5

definition of biological sex and those in the Endocrine Society Clinical Practice Guidelines and DSM-5-TR, while ignoring the larger point: gender dysphoria is a medical condition caused by biological factors that is "highly treatable." (Budge Rep. ¶¶ 20–25.)

*Second*, Defendants argue that Dr. Budge's opinion should be excluded because she relies on the WPATH Standards of Care, which Defendants state are not generally accepted by the scientific community. (Horne MSJ Opp. at 13.) As an initial matter, as the Court already held in its order granting Plaintiffs' motion for a preliminary injunction, the safety and efficacy of medical treatment for transgender youth is not an issue in this case. (Dkt. 127 ("PI Order") ¶ 99) ("The appropriateness of medical treatment for gender dysphoria is not at issue in this case."). Moreover, the WPATH Standards of Care and Endocrine Society Guidelines were "derived from rigorous scientific review of all available studies on the safety and efficacy of gender transition care for adolescents." (Dkt. 303-3, Ex. 3 ¶¶ 76–79.) In any event, Dr. Budge relies not only on the WPATH Guidelines but also on the Endocrine Society Clinical Practice Guidelines, which comprise the standards of care for the treatment of gender dysphoria in adolescents and have been endorsed by "the major associations of medical and mental health providers in the United States." (PI Order ¶ 10.) As both Dr. Budge and Dr. Shumer have testified in this case, use of puberty-suppressing medication and hormone replacement therapy are the standards of care for the treatment of gender dysphoria in minors and are widely considered safe and effective by the medical community in the United States. (Budge Rep. ¶ 25; Dkt. 303-3, Ex. 2 ("Shumer Rep.") ¶ 28.) There also exists strong support for these treatments in countries outside the United States. (Shumer Rep. ¶ 30; Budge Rep. ¶¶ 9–10.)

*Third*, Defendants discuss Justice Thomas's concurrence in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), to support their assertion that the WPATH Standards of Care are not generally accepted by the scientific community and are not evidence based. (Horne MSJ

---

Dr. Budge's opinion and the Guidelines. (*See* Dkt. 286-4 at 60:9–62:17, 71:3–73:2.) And Dr. Budge did not express any disagreement with the DSM-5 at her deposition. (*See id.* at 73:20–78:13.)

Opp. at 16.) However, the Court's majority did not accept Justice Thomas's assertion about the WPATH Standards of Care, which in any event, involves evidence outside the record in this case and has no relevance here.

## II.   DR. SHANNON'S REPORT AND TESTIMONY SHOULD NOT BE EXCLUDED

### A.   Dr. Shannon Is Exceedingly Qualified to Provide the Opinions in His Rebuttal Report

Defendants provide no critique of Dr. Shannon's qualifications related to statistics, despite the fact that statistics is the basis of his entire rebuttal report and testimony in this case. Nor could they. Dr. Shannon has a distinguished, decades-long career in the field of data and statistics at one of the nation's leading medical schools.

Dr. Shannon's rebuttal report and testimony in this case is specifically directed at the flawed data analysis and lack of proper statistical methods that Defendants' experts utilize to support their opinion that boys have an athletic advantage over girls before puberty. (Shannon Rep. ¶ 11.) Dr. Shannon answers, in the negative, a simple question: does the data support what Defendants' experts say? (*Id.* ¶ 15.) He answers that question using the statistical and data analysis tools in which he has expertise and that he has applied, over decades, to answer similar hypotheses across a range of inquiries within medicine and science. (*Id.* ¶ 8.)

Contrary to Defendants' arguments, Dr. Shannon does not need to be an expert in the areas those statistics underlie, including the cause of any alleged difference in athletic performance between prepubertal boys and girls, whether the greater encouragement of athleticism in boys or more opportunities for boys to participate in sports is related to a difference in athletic performance, or whether transgender girls should be excluded from girls' sports teams. (Horne MSJ Opp. at 16–17.) Nor does Dr. Shannon need degrees in exercise medicine, sports performance, or physiology, expertise in puberty or biological differences between children in Arizona and elsewhere, or expertise with elite and non-elite athletes.

1    Defendants' argument that Dr. Shannon has no knowledge of Plaintiffs (*id.* at 17)
2 similarly fails because, as discussed above, that is not the purpose of Dr. Shannon's opinion.
3 Rather, Dr. Shannon's rebuttal opinion is related to Defendants' experts' faulty analysis of
4 data and the lack of proper statistical methods to support their opinion that boys have an
5 athletic advantage over girls before puberty.  (Shannon Rep. ¶¶ 14–16.)   Accordingly,
6 Dr. Shannon's rebuttal report and testimony should not be excluded based on relevance or
7 his qualifications.

   **B.    Dr. Shannon's Opinions Should Not Be Excluded on the Basis That He Did Not Perform Any Independent Research**

10   Defendants' argument that Dr. Shannon's report and testimony should be excluded
11 because he "failed to perform any independent research or verify the data presented to him
12 by Plaintiffs' counsel" misses the mark.  (Horne MSJ Opp. at 17.)  "[I]dentifying flaws in
13 [an expert's] analysis is proper rebuttal testimony."  *Baker v. SeaWorld Ent., Inc.*, 423
14 F. Supp. 3d 878, 918 (S.D. Cal. 2019); *see also In re Toyota Motor Corp. Unintended*
15 *Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 978 F. Supp. 2d 1053, 1069 (C.D.
16 Cal. 2013) ("As a rebuttal witness, he may rely largely on other expert reports . . . and point
17 out flaws in their methodologies or conclusions."); *TCL Commc'ns Tech. Holdings Ltd.*
18 *v. Telefonaktenbologet LM Ericsson,* 2016 WL 7042085, at *5 (C.D. Cal. Aug. 17, 2016)
19 ("[D]efendant [may] properly present expert rebuttal of the plaintiff's expert by putting forth
20 its own expert who . . . claims that . . . the plaintiff's expert's methodology was conducted
21 improperly in some way.").  Dr. Shannon's rebuttal opinion involves a critique of the
22 purported data and analysis that Defendants' experts present to support their opinion that
23 boys have an athletic advantage over girls before puberty.  He does not present his own
24 opinion on that specific question.[3]

---

[3] Defendants' discussion of *In re Incretin-Based Therapies Products Liability Litigation*, 524 F. Supp. 3d 1007 (S.D. Cal. 2021) is distinguishable for this same reason.  The expert that Defendants reference in that case was *not* solely providing rebuttal expert testimony but instead was evaluating in the first instance whether statistical evidence of a causal association exists between incretin mimetics and pancreatic cancer.  *Id.* at 1035–37.

Defendants further argue that Dr. Shannon's opinion should be excluded because, according to Defendants, Dr. Shannon did not check to see if the packet of information from Plaintiffs' counsel was "true." (Horne MSJ Opp. at 19.) Defendants, however, do not assert that Plaintiffs sent Dr. Shannon false expert reports or false articles. In fact, Dr. Shannon testified that Plaintiffs' counsel sent him a file of all the expert reports and articles that *Defendants'* experts cite in their reports related to the topic of whether boys have an athletic advantage over girls before puberty, and that he would not know how to check if such information was "true." (Shannon Dep. Tr. at 173:22–174:16.) In any event, for his opinion to be reliable, Dr. Shannon is not required to verify the accuracy of the other expert reports in this litigation through some other means or to independently pull the relevant journal articles. This has never been the standard under *Daubert*. *See Mighty Enters., Inc. v. She Hong Indus. Co.*, 745 F. App'x 706, 709 (9th Cir. 2018) ("Experts can rely on data provided to them without independent verification."); *see also* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of.").

### C. Dr. Shannon's Expert Rebuttal Report Is Not "Full of Mistakes"

Defendants' description of Dr. Shannon's report as "full of 'mistakes' and 'error'" is absurd and flatly mischaracterizes Dr. Shannon's testimony. (Horne MSJ Opp. at 19.) Dr. Shannon acknowledged only two minor errors in his qualifications section: omitting his recent Utah expert testimony and misstating BioRankings' founding year.[4] (Shannon Dep. Tr. 11:18–12:2; 36:9–14.) He *never* testified that his report contained widespread mistakes, and Defendants have provided no evidence for that apparent concession—because there is none. These two immaterial issues (both corrected at his deposition) are not a basis for exclusion. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1048 (9th Cir. 2014)

---

[4] Defendants also misrepresent to the Court Dr. Shannon's deposition testimony regarding peer-reviewed journal articles. Dr. Shannon's report does not state that Dr. Brown relied on journal articles that were not peer-reviewed, as Defendants argue (Horne MSJ at 19). Rather, Dr. Shannon's critique was that *Dr. Brown's* original analysis based on the data in those articles was neither published nor peer reviewed. (*See* Shannon Rep. ¶ 25; Shannon Dep. Tr. 113:19–114:10; 130:13–131:9.)

("A minor flaw in an expert's [report] does not render expert testimony inadmissible") (citation modified).

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Strike Dr. Budge and Dr. Shannon should be denied with prejudice.

Respectfully submitted this 29th day of July, 2025

        *s/ John S. Bullock*
Colin M. Proksel (034133)
John S. Bullock (034950)
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Fl.
Phoenix, Arizona 85012-2793
Telephone: (602) 640-9000
Facsimile: (602) 640-9050
Email: cproksel@omlaw.com
Email: jbullock@omlaw.com

Jyotin Hamid*
Justin R. Rassi*
Amy C. Zimmerman*
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
Email: jhamid@debevoise.com
Email: jrassi@debevoise.com
Email: azimmerman@debevoise.com

Amy Whelan*
Rachel Berg*
NATIONAL CENTER FOR LGBTQ RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone: (415) 343-7679
Facsimile: (415) 392-8442
Email: awhelan@nclrights.org
Email: rberg@nclrights.org

*Admitted pro hac vice.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of July, 2025, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF System.

*s/ John S. Bullock*