Colin M. Proksel (034133)
John S. Bullock (034950)
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
State Bar Nos. 034133 and 034950
Telephone: (602) 640-9000
Facsimile: (602) 640-9050
Email: cproksel@omlaw.com
Email: jbullock@omlaw.com

*Attorneys for Plaintiffs*
*Additional counsel listed in signature block*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
## TUCSON DIVISION

| | |
|---|---|
| Jane Doe, by her next friend and parents Helen Doe and James Doe; and Megan Roe, by her next friend and parents, Kate Roe and Robert Roe,<br><br>               Plaintiffs,<br><br>   v.<br><br>Thomas C. Horne in his official capacity as State Superintendent of Public Instruction; Laura Toenjes, in her official capacity as Superintendent of the Kyrene School District; Kyrene School District; The Gregory School; and Arizona Interscholastic Association Inc.,<br><br>               Defendants,<br><br>Warren Petersen, in his official capacity as President of the Arizona State Senate, and Steve Montenegro, in his official capacity as Speaker of the Arizona House of Representatives,<br><br>             Intervenor-Defendants. | Case No. 4:23-cv-00185-JGZ<br><br>**PLAINTIFFS' CONSOLIDATED REPLY IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>***ORAL ARGUMENT REQUESTED*** |

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

I.    THERE IS NO GENUINE DISPUTE OF MATERIAL FACT THAT THE BAN
      VIOLATES JANE'S AND MEGAN'S EQUAL PROTECTION CLAUSE
      RIGHTS ................................................................................................... 2

      A.    The Ban Is Subject to Heightened Scrutiny ..................................... 2

      B.    The Ban Fails Heightened Scrutiny ................................................. 5

            1.    Blind Deference to the Legislature Is Not Required Here ................. 5

            2.    The Ban Does Not Promote Competitive Fairness or Equal
                  Opportunities for Women in Athletics ................................................ 7

            3.    The Ban Does Not Promote Safety for Women in Athletics ............. 8

            4.    The Ban Does Not Redress Past Discrimination Against
                  Women in Athletics ............................................................................ 9

            5.    The Ban Does Not Provide "Clear and Consistent Rules for
                  Sex Separation in Athletics" .............................................................. 9

            6.    The Ban Does Not "Provide Democratic Accountability for
                  Sex Separation in Athletics" ............................................................ 10

      C.    In the Alternative, the Ban Fails Rational Basis Review ............................ 11

II.   THERE ARE NO GENUINE DISPUTES OF MATERIAL FACT THAT
      APPLYING THE BAN TO JANE VIOLATES TITLE IX ......................................... 13

      A.    The Ban Discriminates Against Jane in Violation of Title IX ..................... 13

      B.    Defendant Horne Was on Notice That Title IX Prohibits
            Discrimination Against Transgender Students, Like Jane, in School
            Sports. ............................................................................................. 15

III.  THERE ARE NO GENUINE DISPUTES OF MATERIAL FACT THAT THE
      BAN VIOLATES JANE'S AND MEGAN'S RIGHTS UNDER THE
      AMERICANS WITH DISABILITIES ACT AND JANE'S RIGHTS UNDER
      THE REHABILITATION ACT ................................................................. 16

      A.    There Is No Question of Material Fact That Plaintiffs Have a
            Disability ......................................................................................... 17

B.    Plaintiffs Are Excluded from Girls' Sports, and This Exclusion Is Because of Their Gender Dysphoria. ........................................... 18

C.    Defendants' Motion to Strike the Medical Records Lacks Merit ............... 20

IV. PLAINTIFFS ARE ENTITLED TO DECLARATORY AND INJUNCTIVE RELIEF ....................................................................................................... 21

CONCLUSION ...................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Al Otro Lado v. Wolf*,
    952 F.3d 999 (9th Cir. 2020) ....................................................................... 22

*B.P.J. by Jackson v. W. Va. State Bd. of Educ.*,
    98 F.4th 542 (4th Cir. 2024) ....................................................................... 14

*Bennett v. Ky. Dep't of Educ.*,
    470 U.S. 656 (1985) ..................................................................................... 15

*Benning v. Georgia*,
    391 F.3d 1299 (11th Cir. 2004) ................................................................... 15

*Bostock v. Clayton Cnty.*,
    590 U.S. 655 (2020) ........................................................................... 13, 14, 15

*Cervantes v. Pratt*,
    2008 WL 11424110 (D. Ariz. Aug. 5, 2008) ............................................... 21

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) ............................................................................... 10, 12

*Corbitt v. Sec'y of the Ala. L. Enf't Agency*,
    115 F.4th 1335 (11th Cir. 2024) .................................................................. 10

*Cottrell v. Igbinosa*,
    2017 WL 550580 (E.D. Cal. Feb. 9, 2017) .................................................. 21

*Davis v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999) ..................................................................................... 16

*Doe v. Horne*,
    115 F.4th 1083 (9th Cir. 2024) ............................................................. passim

*Doe v. Snyder*,
    28 F.4th 103 (9th Cir. 2022) ....................................................................... 14

*Engquist v. Or. Dep't of Agric.*,
    553 U.S. 591 (2008) ....................................................................................... 4

*Fraser v. Goodale*,
    342 F.3d 1032 (9th Cir. 2003) ..................................................................... 20

*Frontiero v. Richardson*,
    411 U.S. 677 (1973) ....................................................................................... 9

*G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*,
   822 F.3d 709 (4th Cir. 2016) .................................................................... 14

*Gonzales v. Carhart*,
   550 U.S. 124 (2007) ................................................................................... 5

*Gore v. Lee*,
   107 F.4th 548 (6th Cir. 2024) ................................................................. 10

*Grabowski v. Ariz. Bd. of Regents*,
   69 F.4th 1110 (9th Cir. 2023) .......................................................... 13, 14

*Hecox v. Little*,
   104 F.4th 1061 (9th Cir. 2024) ......................................................... 3, 15

*Hill v. Clark*,
   2016 WL 696433 (E.D. Cal. Feb. 22, 2016) ......................................... 21

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005) ................................................................................. 16

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019) .................................................................. 3

*Kennedy v. Allied Mut. Ins. Co.*,
   952 F.2d 262 (9th Cir. 1991) .................................................................. 18

*L.E. by Esquivel v. Lee*,
   728 F. Supp. 3d 806 (M.D. Tenn. 2024) ............................................... 11

*Latta v. Otter*,
   771 F.3d 456 (9th Cir. 2014) .................................................................... 5

*Lim v. Adler*,
   2010 WL 2348743 (E.D. Cal. June 8, 2010) ......................................... 21

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) .................................................................. 22

*Minority Television Project, Inc. v. F.C.C.*,
   736 F.3d 1192 (9th Cir. 2013) (en banc) ................................................. 6

*Morgan v. Doran*,
   308 F. App'x 231 (9th Cir. 2009) .......................................................... 21

*Pena v. Lindley*,
   898 F.3d 969 (9th Cir. 2018) .................................................................... 6

iv

*Roe v. Critchfield*,
   137 F.4th 912 (9th Cir. 2025) ........................................................ 14, 15, 16

*Romer v. Evans*,
   517 U.S. 620 (1996) .................................................................................. 10

*S. Bay United Pentecostal Church v. Newsom*,
   140 S. Ct. 1613 (2020) ............................................................................... 6

*Sandoval v. Cnty. of San Diego*,
   985 F.3d 657 (9th Cir. 2021) .................................................................... 20

*Shields v. Credit One Bank, N.A.*,
   32 F.4th 1218 (9th Cir. 2022) .................................................................. 18

*Tate v. Kaiser Found. Hosp.*,
   2014 WL 176625 (C.D. Cal. 2014) ..................................................... 20, 21

*Turner Broad. Sys., Inc. v. F.C.C.*,
   520 U.S. 180 (1997) ................................................................................... 6

*U.S. Dep't of Agric. v. Moreno*,
   413 U.S. 528 (1973) ................................................................................. 12

*United States v. Carrillo-Lopez*,
   68 F.4th 1133 (9th Cir. 2023) .................................................................... 6

*United States v. Skrmetti*,
   145 S. Ct. 1816 (2025) ..................................................... 2, 3, 13, 14

*United States v. Virginia*,
   518 U.S. 515 (1996) ................................................................................... 5

*Vill. of Willowbrook v. Olech*,
   528 U.S. 562 (2000) ................................................................................... 4

*Washington v. Ind. High Sch. Athletic Ass'n, Inc.*,
   181 F.3d 840 (7th Cir. 1999) ................................................................... 18

*Williams v. Koenig*,
   2024 WL 1477067 (9th Cir. Apr. 5, 2024) .............................................. 19

*World Wide Video of Wash., Inc. v. City of Spokane*,
   368 F.3d 1186 (9th Cir. 2004) ................................................................... 6

**Statutes**

20 U.S.C. § 1681 ........................................................................... 15, 16

42 U.S.C. § 12102 *et seq.* (1990) ..................................................................*passim*

Ariz. Rev. Stat. § 15-120.02 ........................................................................*passim*

**Other Authorities**

Federal Rule of Evidence 803(4)........................................................................ 21

Federal Rule of Evidence 803(6)........................................................................ 21

Federal Rule of Evidence 901(b)(4) .................................................................. 20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **INTRODUCTION**

Defendants' case rests on the unsupported claim that excluding Plaintiffs Jane Doe and Megan Roe from girls' sports without regard to their individual circumstances is justified by considerations of fairness and safety simply because they are transgender.[1]  But after more than two years of discovery and litigation, Defendants have not offered any evidence—as they must—to support their purported justifications for Ariz. Rev. Stat. § 15-120.02 (the "Ban"), which categorically excludes every transgender girl from kindergarten to college from participating on any girls' sports teams at any level regardless of an individual's circumstances.

Instead, Defendants continue to rely on studies that, among other things, do not include transgender athletes, or that extrapolate flawed data from the performance results of elite athletes, to make unsupported conclusions about the alleged athletic advantages of all transgender girls.  (*See* Dkt. 317, Intervenor-Defendants' Opposition to Plaintiffs' Motion for Summary Judgment ("MSJ Opp."), at 2, 14–17.)  That other states and institutions have joined the "stampede" of people discriminating against transgender girls such as Plaintiffs (*id.* at 2), does not make such discrimination legal or constitutional.  Nor does the legislative record rehabilitate or justify the Ban.  (*Id*. at 7–11.)  In fact, the animus towards transgender people displayed by the legislative leaders and other witnesses before the Arizona State Legislature further supports the Court's prior ruling that the Ban likely violates Plaintiffs' Equal Protection rights.  Despite Defendants' arguments to the contrary, there are no disputes of material fact that would preclude this Court from granting Plaintiffs' motion for summary judgment on their Equal Protection Clause claims, Title IX claim, and Americans with Disabilities Act and Rehabilitation Act claims.

The undisputed facts warrant summary judgment for Jane and Megan on all three claims.  Nothing in Defendants' opposition briefs requires a ruling to the contrary.  *First*, the

---

[1] While Intervenor-Defendants and Defendant Horne submitted separate briefing, because they joined each other's motions, Plaintiffs refer throughout simply to "Defendants'" arguments.

Supreme Court's recent decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), does not change this Court's or the Ninth Circuit's finding that heightened scrutiny applies to the Ban. Moreover, the Ban's discrimination against Jane and Megan based on transgender status violates the Equal Protection Clause under any level of review, and thus, the Court should find the Ban unconstitutional as applied to Plaintiffs. *Second*, the undisputed facts similarly establish that the Ban's exclusion of Jane from girls' sports because she is a transgender girl violates Title IX as a matter of law. *Third*, the Ban excludes Jane and Megan from playing school sports because of their gender dysphoria in violation of the ADA and similarly violates Jane's rights under the Rehabilitation Act. Declaratory relief and a permanent injunction are therefore necessary to avoid irreparable harm to Jane and Megan.

## ARGUMENT

## I. THERE IS NO GENUINE DISPUTE OF MATERIAL FACT THAT THE BAN VIOLATES JANE'S AND MEGAN'S EQUAL PROTECTION CLAUSE RIGHTS

This Court should grant summary judgment to Jane and Megan on their Equal Protection claims because there is no genuine dispute of material fact that the Ban's categorical exclusion of all transgender girls in Arizona is not substantially related to any government interest and therefore that the Ban fails any level of scrutiny.

### A. The Ban Is Subject to Heightened Scrutiny

The Ninth Circuit has already found that the Ban discriminates on its face based on transgender status and is therefore subject to heightened scrutiny. *Doe v. Horne*, 115 F.4th 1083, 1104–05 (9th Cir. 2024); (*see also* Dkt. 127 ("PI Order") ¶¶ 147–48). None of Defendants' arguments in opposition warrant a different result.

*First*, contrary to Defendants' assertions, nothing in the Supreme Court's recent decision in *United States v. Skrmetti* requires this Court to apply rational basis review to the Ban. *Skrmetti* says nothing about whether laws discriminating against individuals based on transgender status should be subject to heightened scrutiny as a matter of law. Nor did *Skrmetti* overrule Ninth Circuit precedent requiring heightened scrutiny for laws that discriminate based on transgender status, which continues to bind this Court. *See Hecox*

*v. Little*, 104 F.4th 1061, 1079 (9th Cir. 2024) (discrimination against transgender individuals is "a form of sex-based discrimination" subject to heightened scrutiny); *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019) (policy barring transgender individuals from military service is subject to heightened scrutiny).   Rather, the Supreme Court's decision in *Skrmetti* was based on a holding that the law in question—which limited the provision of certain medical treatments for gender dysphoria to minors—did not discriminate based on sex or transgender status, but rather on age and medical use.  *See Skrmetti*, 145 S. Ct. at 1829.  Accordingly, the holding in *Skrmetti* is inapplicable here.

*Second*, Defendants' argument that the Ban in fact excludes Plaintiffs due to their medical condition and not based on sex or transgender status (MSJ Opp. at 4) similarly ignores this Court's and the Ninth Circuit's holdings to the contrary.  (PI Order ¶ 147 ("The [Ban's] disparate treatment of transgender girls because they are transgender is clear on the face of the statute and makes it facially discriminatory even if the statute does not expressly employ the term 'transgender.'"));  *see also Horne*, 115 F.4th at 1104–05 (holding that the Ban "discriminates on its face based on transgender status" because its definition of biological sex was drawn to target transgender women and girls).  Nor is there any support in the text of the Ban itself that it is intended to prohibit only individuals diagnosed with gender dysphoria from playing on girls' teams.  The Ban applies only to transgender *girls*, not transgender boys who may also have gender dysphoria.

*Third*, this is not a "class of one" claim.  Plaintiffs do not allege that they are being treated differently from other similarly situated individuals—*i.e.*, other transgender girls who want to play on their schools' girls' sports teams—and, as a result, have not brought a "class of one" claim.  The main case cited by Defendants, *North Pacifica LLC v. City of Pacifica*, only underscores the inapplicability of the "class of one" argument to the facts here.  526 F.3d 478, 486 (9th Cir. 2008).  In that case, the plaintiff, a developer, argued that the City of Pacifica's imposition on his development of a unique restriction that had "never been imposed on another development project" was a violation of his Equal Protection rights, such that it constituted a "class of one" claim based on this unique treatment.  *Id.*  Unlike in that

case, Jane and Megan are not arguing that the Defendants "intentionally, and without rational basis, treated the plaintiff[s] differently from others similarly situated." *Id.* To the contrary, Jane and Megan are treated like every other transgender girl in Arizona—each of whom is banned from playing on girls' sports teams solely because they are transgender, without regard to their individual circumstances.[2]

Furthermore, Defendants' argument that the Ban "separates student athletes into two groups:  females and males" misinterprets the text of the Ban and this Court's and the Ninth Circuit's prior holdings.  (MSJ Opp. at 23.)  On its face, the Ban "treats transgender women and girls less favorably than all other students." *Horne*, 115 F.4th at 1095.  "The [B]an applies to all transgender female students, from kindergarten through graduate school; and for all sports . . . [and] turns entirely on a student's transgender or cisgender status, and not at all on factors—such as levels of circulating testosterone—that the district court found bear a genuine relationship to athletic performance and competitive advantage." *Id.* at 1094. Thus, as both this Court and the Ninth Circuit have previously concluded, the Ban discriminates based on sex and transgender status. *Id.* at 1104–05; (*see also* PI Order ¶¶ 147–48).

*Fourth*, Defendants' attempt to obtain rational basis review by framing Plaintiffs' claims as an "underinclusiveness challenge" fails because the Ninth Circuit already held that this is *not* an underinclusiveness challenge. *Horne*, 115 F.4th at 1106.  Specifically, the Ninth Circuit rejected Defendants' argument that "rational basis review applies . . . because

---

[2] Defendants' other cited cases are similarly distinguishable, because they each consider allegedly unique treatment of the plaintiff compared to other similarly situated individuals. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (finding valid "class of one" claim where defendant-village intentionally demanded a 33-foot easement as a condition of connecting plaintiff's property to the municipal water supply though the Village required only a 15-foot easement from other similarly situated property owners); *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 596, 606 (2008) (state employee's claims of termination for "arbitrary, vindictive, and malicious reasons" was not a "class of one" Equal Protection claim, as the "class of one" framework "is simply contrary to the concept of at-will employment").

Plaintiffs assert an underinclusiveness challenge to a remedial statute," finding that Defendants' argument "rests on the flawed premise that the [Ban] qualifies as remedial legislation." *Id.* at 1106.

Accordingly, heightened scrutiny is the appropriate level of review.

### B.    The Ban Fails Heightened Scrutiny

It is not Plaintiffs' burden to prove that Defendants' proffered justifications are weak, post-hoc, or unsubstantiated. Rather, *Defendants* must establish that the Ban is substantially related to an important government interest. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("*VMI*"). And as Defendants' briefs demonstrate, there is no justification for the Ban—let alone an exceedingly persuasive one—that survives heightened scrutiny. (MSJ Opp. at 14–17.) Instead of directly promoting equality or safety in girls' sports, the Ban's scope is unjustifiably broad—it excludes all transgender girls, of all ages and skill levels, from participating in any girls' sports, whether contact or non-contact, regardless of the transgender girl's medical treatment or evidence-based markers of individual competitive advantage. (Dkt. 303, Plaintiffs' Additional Statement of Undisputed Facts in Support of Motion for Summary Judgment ("SOF") ¶¶ 84–86.) Even Defendants' proffered expert, Dr. Carlson, concedes that transgender girls do not pose any safety risk to other girls in non-contact sports like the girls' cross-country and volleyball teams at issue here. (SOF ¶ 112.) Defendants therefore have failed to satisfy their burden.

#### 1.    *Blind Deference to the Legislature Is Not Required Here.*

While Defendants seek absolute deference to the Arizona legislature, such deference does not apply here. (MSJ Opp. at 7–12.) To the contrary, the Court bears "an independent constitutional duty to review factual findings" of the legislature. *Latta v. Otter*, 771 F.3d 456, 469 (9th Cir. 2014) (*quoting Gonzales v. Carhart*, 550 U.S. 124, 165–66 (2007)); *see also Horne*, 115 F.4th at 1099. Defendants' cited cases involve different contexts where the laws at issue were directly and substantially supported by the relevant evidence, and unlike

here, the courts found no evidence that lawmakers had acted with a discriminatory purpose.[3] (*See* PI Order ¶ 149.)

Here, the Ban "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group," namely, transgender girls. *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1139 (9th Cir. 2023). The Ninth Circuit agreed, noting that the Ban's "burdens . . . fall exclusively on transgender women and girls." *Horne*, 115 F.4th at 1104. Nothing in Defendants' opposition suggests otherwise. The witnesses to whom Defendants point as providing justification for the Ban clearly target transgender girls in their testimony. Each speaks of speculative rather than actual, observed harms (*see* MSJ Opp. at 8 ("witnesses . . . testified that biological females would lose scholarship opportunities if they had to compete with biological males"; "witnesses . . . testified that biological females would not be safe competing against biological males and that if you allow the boys to play against the girls, the girls are seriously going to get injured") (internal quotations omitted)), even though transgender girls like Jane

---

[3] *See Pena v. Lindley*, 898 F.3d 969, 979 (9th Cir. 2018) (upholding law requiring gunmakers to imprint bullets with unique identification markers where California legislature found that 48% of homicides in California went unsolved for lack of evidence and more than 60% of homicides in California involved guns); *Minority Television Project, Inc. v. F.C.C.*, 736 F.3d 1192, 1207 (9th Cir. 2013) (en banc) (upholding law banning certain advertisements on public broadcasting despite First Amendment challenge because "substantial evidence" before Congress supported its determination that "the selling of airtime to political and issue advertisers, as with for-profit advertisers, would distort programming decisions"); *World Wide Video of Wash., Inc. v. City of Spokane*, 368 F.3d 1186, 1195 (9th Cir. 2004) (holding "citizen testimony concerning pornographic litter and public lewdness" was sufficient to support ordinance regulating the locations of "adult-oriented retail businesses" in First Amendment challenge); *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 211 (1997) (after 18 months of substantive factfinding, the record "clearly establishe[d]" that broadcast networks were on the verge of bankruptcy due to competition from cable networks; thus, Congress's passage of law requiring cable television channels to carry local broadcast stations "was reasonable and supported by substantial evidence" and did not violate First Amendment); *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1614 (2020) (declining to stay enforcement of Covid-era law restricting attendance at houses of worship to 25% of building capacity or maximum of 100 people, where no Covid vaccine yet existed, over 100,000 people so far had died nationwide, and secular activities were similarly restricted).

and Megan had been playing on girls sports teams in Arizona long before this legislative hearing and without any reported complaints. (Dkt. 284, Defendants' Statement of Undisputed Material Facts ("Defs.' SUMF"), ¶¶ 11, 13; SOF ¶¶ 73, 78, 117.) In fact, the only witness who testified about a transgender girl's participation on any girls' teams in Arizona, by Defendants' own admission, could not even confirm that the individual about whom she was complaining was actually transgender. (*See* MSJ Opp. at 9 ("[T]he witness . . . 'invited every senator to see and witness what *appears* to be a male playing on a female's team . . .'" (emphasis added); *see* also SOF ¶¶ 79–80.) Accordingly, no deference is owed to the Legislature, much less absolute deference.[4]

> 2.    *The Ban Does Not Promote Competitive Fairness or Equal Opportunities for Women in Athletics.*

None of Defendants' arguments establish that the Ban is substantially related to promoting "competitive fairness and equal opportunities for women in athletics." (MSJ Opp. at 10.)

*First*, as required in this as-applied challenge, Defendants have still failed to identify any facts proving that Jane or Megan have unfairly displaced other girls or threatened the competitive fairness of girls' sports in Arizona either at the time the Ban was passed or in the two years since it was enjoined as to Plaintiffs. (SOF ¶¶ 73, 106–110, 117, 153–154.) The fact that Jane and Megan have received playing time does not, as Defendants illogically claim, threaten competitive fairness. All student athletes, regardless of background, compete for limited roster spots and playing time based on their individual skills, training, and performance, and coaches select players they believe will help their teams succeed based on

---

[4] The court should deny Defendants' request to strike the Intervenor-Defendants' depositions on the grounds that they did not waive their legislative privilege. (MSJ Opp. at 9 n.3.) This Court has already determined that "Intervenor-Defendants waived their legislative privilege by voluntarily participating in this lawsuit and putting their intent at issue" (Dkt. 211 at 6), and the Ninth Circuit and the Supreme Court affirmed that decision when they denied Intervenor-Defendants' petition for a writ of mandamus. (*See* No. 23-70111, Dkt. 2 (June 29, 2023) (denying mandamus at the Ninth Circuit); No. 24-219, Dkt. 7 (Nov. 4, 2024) (affirming that denial at the Supreme Court).)

a variety of traits.  The relevant legal question is not whether competition for positions exists, but whether simply being transgender confers any unfair competitive advantage.  Defendants have produced no credible evidence that it does.

*Second*, as explained above, this Court should not blindly defer to unsupported and irrelevant Legislative findings.  Thus, Defendants' argument that categorically excluding Plaintiffs promotes competitive fairness by neutralizing some unproven athletic advantage should be rejected.

> ### 3.    *The Ban Does Not Promote Safety for Women in Athletics.*

Defendants' briefs present no credible evidence that the Ban promotes "safety for women" in athletics, particularly given that the Ban encompasses all sports (regardless of whether they are contact sports) played at all levels and by all ages.  (MSJ Opp. at 10.) Defendants highlight that "Plaintiffs do not dispute that biological females are more likely than biological males to suffer concussions in sports," while ignoring the fact that there is no evidence that transgender girls cause more concussions than other girls, or that banning transgender girls will achieve any reduction in the number of concussions amongst female athletes.  (*Id.* at 18.)  Defendants make similar statements regarding knee injuries while ignoring their own expert's testimony that such injuries may well affect transgender girls like Jane and Megan at similar rates to other girls.  (SOF ¶¶ 53–54, 116.)  Furthermore, as noted above and in Plaintiffs' opening brief (Dkt. 302, Plaintiffs' Consolidated Motion for Summary Judgment ("Mot.") at 21), Defendants have not introduced any evidence that *Jane's* or *Megan's* presence has caused higher risk of injury to any of her teammates or competitors.

Finally, if Defendants truly cared about the safety of women and girls in sports, for the reasons they allege, they would not permit transgender boys (whom they consider to be girls) to play on boys' or men's teams, as the Ban currently allows.

1           *4.*     *The Ban Does Not Redress Past Discrimination Against Women in*

2                 *Athletics.*

3          Defendants' argument that the Ban is substantially related to "redressing past

4    discrimination" (MSJ Opp. at 19), has already been rejected by this Court and the Ninth

5    Circuit.  (PI Order ¶¶ 155–56); *Horne*, 115 F.4th at 1107–08 (explaining that while

6    "redressing past discrimination against women in athletics" was an important government

7    interest, "[n]one of these conditions is present here").  Moreover, the Ninth Circuit found

8    that "the [Ban] is not remedial," and nothing in Defendants' brief suggests otherwise. *Horne*,

9    115 F.4th at 1106.

10          *5.*     *The Ban Does Not Provide "Clear and Consistent Rules for Sex*

11                *Separation in Athletics."*

12         Defendants argue that "[t]he [Ban] set a single standard applicable to all school sports

13   in Arizona" and thus is "substantially related to the important governmental objectives of

14   providing clarity, uniformity, and certainty to athletes and their parents."  (MSJ Opp. at 21.)

15   This assertion would justify any blanket exclusionary rule simply because it provides

16   administrative convenience.  Under Defendants' logic, a rule categorically excluding all

17   students of a particular race, religion, or national origin from sports would be constitutional

18   so long as it was applied uniformly across all schools and sports.  The Supreme Court has

19   repeatedly rejected the notion that administrative efficiency alone can justify discrimination

20   against protected classes.  *See, e.g., Frontiero v. Richardson*, 411 U.S. 677, 690 (1973)

21   ("administrative convenience" cannot justify gender-based classifications).  A

22   discriminatory rule does not become constitutional merely because it is consistently applied;

23   rather, uniform application of an unconstitutional policy simply ensures that the

24   constitutional violation is systematic rather than sporadic.  In addition, as discussed in

25   Plaintiffs' opening brief, *post hoc* justifications, such as this one, cannot survive heightened

26   scrutiny.  (Mot. at 17 (quoting *VMI*, 518 U.S. at 533).)  Tellingly, in the year between the

27   Ban's enactment and this Court's preliminary injunction, Defendant Horne, who is charged

28   with the Ban's enforcement, admitted that he had not "adopted any regulations or policies"

to either implement or enforce the Ban. (*See* SOF ¶ 155.)[5]  Thus, even if "providing clarity, uniformity, and certainty" were a legitimate government objective, Defendants have failed to demonstrate that the Ban was genuinely intended to advance that objective.

> 6. *The Ban Does Not "Provide Democratic Accountability for Sex Separation in Athletics."*

Defendants argue that "[t]he [Ban] created a statewide policy by elected officials accountable to the people" and thus is "substantially related to the important governmental objective of democratic accountability."  (MSJ Opp. at 22.)  However, Defendants' amorphous arguments in favor of "democratic accountability" fail.  Otherwise, every unconstitutional law could be upheld as relating to an important government interest based solely on the fact that a legislature enacted it.  This is not and cannot be true.

The Supreme Court has firmly rejected the notion that democratic pedigree alone can justify discriminatory legislation.  In *Romer v. Evans*, 517 U.S. 620, 635 (1996), the Court struck down a state constitutional amendment passed by popular vote, explaining that constitutional protections "would be empty words if the equal protection of the laws could be eliminated simply by the device of a popular vote."  Similarly, in *VMI*, the Court emphasized that intermediate scrutiny requires an "exceedingly persuasive justification" that cannot be satisfied merely by invoking legislative authority.  518 U.S. at 567.  And as the Court noted in *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 448 (1985), "[m]ere negative attitudes, or fear" expressed through the democratic process "are not permissible bases for treating [a protected group] differently."  Democratic accountability is not itself a constitutional imperative that can override equal protection guarantees.

---

[5] Defendants' cited out-of-circuit cases are distinguishable as both dealt with standardizing sex designations on government documents.  *See Corbitt v. Sec'y of the Ala. L. Enf't Agency*, 115 F.4th 1335, 1348 (11th Cir. 2024) (law requiring amended birth certificate or physician's note showing gender-reassignment surgery to change driver's license sex markers satisfied rational basis review because law "rationally achieves the State's goal by 'consistently defining sex' across government documents"); *Gore v. Lee*, 107 F.4th 548, 561 (6th Cir. 2024) (policy defining sex on birth certificate as sex assigned at birth, and prohibiting changes absent factual error satisfied rational basis review).

10

1

### C.    In the Alternative, the Ban Fails Rational Basis Review

Even if the Court agrees with Defendants that rational basis review applies here, it has already determined that the Ban fails even rational basis review.  (PI Order ¶ 162.)

The scope of the Ban is sweeping: it bars transgender girls' participation in school sports from kindergarten through college, regardless of whether they have gone through endogenous puberty, the age at which they transitioned, their medical treatment, or the level and sport in which they want to compete.  There is no evidence in the record that transgender girls like Jane and Megan, who have not undergone male puberty, have any physiological advantage over other girls such that their participation on girls' teams would create unfair competition.  (SOF ¶¶ 48–54, 56, 63.)  As a result, this Court previously found the categorical bar of all transgender girls of every age from participating in girls' sports at every level of competition in every sport, regardless of their individual circumstances, "fails even under the rational basis test because it is not related to any important government interest."  (PI Order ¶¶ 161–62.)

Crucially, in this as-applied challenge, there is no evidence that in the two years since this Court's preliminary injunction went into effect, Megan and Jane have created any increased risk of injury for their teammates and opponents in volleyball, soccer, track and field, or cross-country.  *See, e.g., L.E. by Esquivel v. Lee*, 728 F. Supp. 3d 806, 836–37 (M.D. Tenn. 2024) (holding Tennessee law that determined a student's gender for public middle or high school sports by a student's birth sex failed rational basis review in as-challenge because none of the government's asserted interests were legitimate).  In addition, neither Jane nor Megan has undergone male puberty, and thus neither has any of the athletic advantages associated with circulating testosterone.  (SOF ¶¶ 45, 56, 60–65.)  In fact, Jane has failed to make her school's girls' basketball team for two years in a row, and Megan played primarily on the girls' junior varsity volleyball team during her sophomore and junior years (SOF ¶¶ 158, 167)—hardly evincing the "dominat[ion]" of girls' sports by transgender girls that Defendants fear.  (MSJ Opp. at 3, 28.)

11

Furthermore, under any standard of scrutiny, the Ban's exclusion of transgender girls because of generalized fear, discomfort, or moral disapproval is not a legitimate governmental interest for imposing unequal treatment. *See Cleburne*, 473 U.S. at 448 (laws based on "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable" could not survive rational basis review). As this Court already held, the Ban's plain text, legislative history, and operation demonstrate a "bare . . . desire to harm a politically unpopular group"—transgender girls. (PI Order ¶ 162 (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)).) The Ninth Circuit agreed with this Court that "[t]he [Ban] was adopted for the purpose of excluding transgender girls from playing on girls' sports teams." *Horne*, 115 F.4th at 1103.

Defendants have failed to introduce any new facts to controvert this Court's previous finding that the record, including the legislative findings, contains "no empirical evidence . . . that transgender girls who have not experienced puberty[] have any physiological advantages over other girls that create unfair competition for positions on girls' sports teams and other athletic opportunities, or pose a safety risk to other girls." (PI Order ¶ 158.) Accordingly, there is no rational basis to categorically exclude Jane and Megan from participating on girls' sports teams.

As explained in detail in Plaintiffs' opening papers, that Jane and Megan are transgender girls reveals nothing about their athletic ability. (Mot. at 6, 31; SOF ¶ 42.) This is because prolonged exposure to testosterone during male puberty drives average differences in athletic performance between males and females, and Jane and Megan have not undergone male puberty. (SOF ¶¶ 45, 56, 63.) Furthermore, Defendants' statement that boys have physiological advantages over girls before puberty is not a material fact that would preclude granting Plaintiffs' motion for summary judgment. (MSJ Opp. at 2, 14.) Defendants fail to adequately demonstrate that any alleged physiological advantages in discrete areas before puberty are caused by innate biology or translate into a difference in athletic performance. (SOF ¶¶ 42–49.) Nor do they relate any such purported differences to Plaintiffs, who have lived their lives as girls from a young age. Moreover, even with respect

12

to any purported small physiological differences between prepubertal boys and girls, unlike the post-pubertal production of testosterone, those differences exist on an overlapping spectrum.  (SOF ¶ 48.)

## II.     THERE ARE NO GENUINE DISPUTES OF MATERIAL FACT THAT APPLYING THE BAN TO JANE VIOLATES TITLE IX.

### A.     The Ban Discriminates Against Jane in Violation of Title IX

Defendants offer no material fact to dispute that the Ban violates Jane's rights under Title IX or that the Court should deviate from settled Ninth Circuit precedent.  *See Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023) (holding that discrimination based on transgender status constitutes impermissible discrimination under Title IX).  As this Court already held, the Ban excludes Jane from participation on girls' teams because of her status as a transgender girl, which constitutes impermissible discrimination "based on sex" under Title IX.  (PI Order ¶¶ 163–70.)  Contrary to Defendants' assertion, so-called "ever-changing" issues in the law or science fail to disturb this Court's prior holding.  (Dkt. 322, Defendant Horne's Opposition to Plaintiffs' Motion for Summary Judgment ("Horne MSJ Opp.") at 2.)

As explained in Plaintiffs' opening brief, the Ban discriminates against Jane based on her sex in violation of Title IX in two ways.  (Mot. at 24–25.)  *First*, the Ban explicitly discriminates based on transgender status because it classifies Jane as "male," thereby intentionally excluding her from participating on girls' teams because she is a transgender girl.  (SOF ¶ 118); *See Bostock v. Clayton Cnty.*, 590 U.S. 655, 660 (2020) ("[I]t is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex.").  *Second*, the Ban treats transgender students differently based on their birth sex, applying only to transgender girls but not to transgender boys, as Defendants admit.  (SOF ¶¶ 90–91.)  Accordingly, the Ban "discriminates based on sex assigned at birth by forbidding transgender girls—but not transgender boys—from participating in teams consistent with their gender identity."  *B.P.J. by Jackson v. W. Va. State Bd. of Educ.*, 98

1    F.4th 542, 563 (4th Cir. 2024).  This discrimination—based on Jane's transgender status—

2    violates Title IX.  (PI Order ¶ 166 (citing *Grabowski*, 69 F.4th at 1116).)

3        Defendants ask the Court to ignore the clear Ninth Circuit precedent holding that

4    discrimination based on transgender status constitutes impermissible sex discrimination

5    under Title IX.  (Horne MSJ Opp. at 6 (citing *Skrmetti*, 146 S. Ct. at 1834).)   That the

6    Supreme Court did not address whether the reasoning of *Bostock* "reaches beyond the Title

7    VII context" in *Skrmetti* (Horne MSJ Opp. at 6) does not undermine Ninth Circuit precedent

8    applying *Bostock*'s holding to Title IX.  *See Grabowski*, 69 F.4th at 1116; *Doe v. Snyder*, 28

9    F.4th 103, 114 (9th Cir. 2022) ("We construe Title IX's protections consistently with those

10   of Title VII.").   This Court is bound by that precedent, which confirms that the Ban

11   impermissibly discriminates based on transgender status in violation of Title IX.

12       Defendants' reliance on *Roe v. Critchfield*, 137 F.4th 912 (9th Cir. 2025), likewise

13   gives this Court no reason to disturb its preliminary injunction finding that the Ban

14   discriminates against Jane based on her status as a transgender girl in violation of Title IX.

15   (*See* PI Order ¶ 167.)[6]  In fact, *Critchfield* confirms that "[c]ircuit precedent establishes that

16   discrimination on the basis of transgender status is a form of sex-based discrimination."  137

17   F.4th at 928.  And, though Defendants make much of Title IX's "plain language" (Horne

18   MSJ Opp. at 3, 5), "[n]either Title IX nor its implementing regulations defines" sex as used

19   in Title IX.  *Critchfield*, 137 F.4th at 927; *see also G.G. ex rel. Grimm v. Gloucester Cnty.*

20   *Sch. Bd.*, 822 F.3d 709, 720 (4th Cir. 2016), *vacated and remanded on other grounds*, 580

21   U.S. 1168 (2017) (explaining that "how a school should determine whether a transgender

22   individual is a male or female" is not outlined in Title IX or its regulations).  Nothing in

23   *Critchfield* disturbs this Court's prior holding that "[e]xclusion from athletics on the basis of

24   sex is a cognizable harm under Title IX because it deprives [Jane] of the benefits of sports

25   programs and activities" that her non-transgender classmates enjoy.  (PI Order ¶ 169.)

---

[6] As previously discussed, the flurry of Executive Orders cited by Defendants have no bearing on whether the Ban violates Title IX as to Jane.  (*See* Mot. at 38–39.)

1

2

**B.**    **Defendant Horne Was on Notice That Title IX Prohibits Discrimination Against Transgender Students, Like Jane, in School Sports**

3    Defendant Horne was sufficiently on notice that Title IX barred transgender

4 discrimination in school sports, and there is no other ambiguity in the statute that offends the

5 Spending Clause.  As a threshold matter, Title IX's text makes clear that it unequivocally

6 prohibits discrimination "on the basis of sex," 20 U.S.C. § 1681(a), and, as the Supreme

7 Court found in 2020—two years before the Ban's enactment—a prohibition on sex-based

8 discrimination necessarily encompasses a prohibition on transgender-based discrimination.

9 *See Bostock*, 590 U.S. at 660 ("it is impossible to discriminate against a person for being

10 . . . transgender without discriminating against that individual based on sex"); *Hecox*, 104

11 F.4th at 1079–80 (same).   *Bostock* is unambiguous in proclaiming that a prohibition of

12 transgender-based discrimination is a "necessary consequence" of Congress's decision to

13 prohibit sex-based discrimination.  590 U.S. at 683; *see also id*. at 669 ("there [is no] such

14 thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific

15 case that falls within a more general statutory rule creates a tacit exception").

16    Title IX's prohibition on sex discrimination includes a proscription of transgender

17 discrimination in school sports even if not stated explicitly on the statute's face.  Congress

18 is not required to "specifically identif[y] and proscribe[] in advance" every possible act for

19 which a party may be liable under a statute.  *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656,

20 666, 669 (1985).  This is especially true for major federal civil rights legislation, like Title

21 IX, that is "written in starkly broad terms" and "has repeatedly produced unexpected

22 applications, at least in the view of those on the receiving end of them."  *Bostock*, 590 U.S.

23 at 680.  Rather, "so long as a spending condition has a clear and actionable prohibition of

24 discrimination, it does not matter that the manner of discrimination can vary widely."

25 *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004).  Indeed, the Supreme Court has

26 "consistently interpreted Title IX's private cause of action broadly to encompass diverse

27 forms of intentional sex discrimination."  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167,

28 183 (2005) (interpreting Title IX to prohibit retaliation against student for reporting sexual

harassment); *see also, e.g.*, *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 653–54 (1999) (finding peer-on-peer sexual harassment to be prohibited sex-based discrimination under Title IX).

The Ninth Circuit's decision in *Critchfield* does not change this consistently broad interpretation of Title IX.  There, the Ninth Circuit was narrowly focused on the Idaho statute's application to intimate spaces.  *See Critchfield*, 137 F.4th at 926–29 (discussing "carve-outs" in Title IX amendments regarding "living facilities[,] . . . toilet[s], locker room[s], and shower facilities").  Given the specificity of these carve-outs within Title IX, the court held that Idaho was not on notice when accepting federal funding that Title IX "prohibits the exclusion of transgender students" from these spaces "corresponding to their gender identity."  *Id.* at 929.  In contrast, no such intimate spaces are at issue in this case.  Moreover, the Ninth Circuit did not amend its prior holdings that discrimination based on transgender status is discrimination on the basis of sex, and it simultaneously reiterated the ambiguity of "sex" as utilized in Title IX.  *See id.* at 928 (declining to address the ambiguity presented by Title IX's use of the word "sex" due to Defendants' "alternative[] argu[ment]" regarding "designating intimate spaces by biology").  The Ban's discrimination against transgender girls in school sports, including Jane, fits into the broad scope of discrimination that Defendant Horne was on notice is prohibited by Title IX.

The Ban undoubtedly excludes Jane from participating in, deprives her the benefit of, and subjects her to discrimination under an educational program because of her transgender status and thus because of sex, in violation of Title IX.  20 U.S.C. § 1681(a).  The Court should therefore find that the Ban violates Title IX as to Jane.

## III.    THERE ARE NO GENUINE DISPUTES OF MATERIAL FACT THAT THE BAN VIOLATES JANE'S AND MEGAN'S RIGHTS UNDER THE AMERICANS WITH DISABILITIES ACT AND JANE'S RIGHTS UNDER THE REHABILITATION ACT

The Ban violates the Americans with Disabilities Act ("ADA") and Rehabilitation Act.  There is no question of material fact that both Jane and Megan have a qualifying

disability under the ADA—gender dysphoria—or that the Ban excludes them from school sports based on their qualifying disability.

## A.     There Is No Question of Material Fact That Plaintiffs Have a Disability

Plaintiffs' gender dysphoria is a disability under the ADA.  First, the Court has already determined that "gender dysphoria qualifies as a disability under the ADA."  (Dkt. 213, Order Denying Intervenor-Defendants' Motion to Dismiss ("MTD Order"), at 8.)   That determination is borne out by the facts here; Plaintiffs' gender dysphoria limits them in their major life activities such that it qualifies as a disability under the ADA.[7]  Far from merely reciting a "laundry list of possible symptoms" (MSJ Opp. at 23), Plaintiffs testify to specific ways in which their gender dysphoria affects them, including by (*i*) stating plainly the myriad ways in which they would be affected mentally and physically by their gender dysphoria if they were not treated (SOF ¶¶ 131–135, 147–151); (*ii*) citing to case law, findings by this Court, and expert testimony that demonstrates the broad scope of what entails a major life activity and that the symptoms Plaintiffs describe are in line with the ways in which gender dysphoria typically limits major life activities (Mot. at 25–27); and (*iii*) citing to case law and findings by this Court that indicate that Plaintiffs' descriptions meet that standard (MTD Order at 4–5, 7).  Contrary to Defendants' argument (MSJ Opp. at 24), Plaintiffs have met their burden to establish that they suffer from a disability.

This substantial evidence as to the impact of Plaintiffs' gender dysphoria must be considered "without regard to the ameliorative effects of mitigating measures."  42 U.S.C. § 12102(4)(E)(i).  Plaintiffs' treatment to ameliorate their symptoms is of no importance in considering whether those symptoms limit their major life activities—a term that should be

---

[7] Defendants' motion to strike Plaintiffs' affirmations is baseless.  (MSJ Opp. at 24–25.) Far from being "conclusory," "self-serving," or "contradictory" (*id.*), Plaintiffs' explanations of their feelings regarding their gender dysphoria and sports participation are in line with their medical records, Plaintiffs' experts' testimony, and the Court's prior findings.  (MTD Order at 8, 7; *see also* SOF ¶ 19 (discussing the same).)  Jane and Megan both report that if their treatment was disrupted, they would struggle to socialize, "sleep[,] and eat"; become depressed; and "lose [their] will to get through the day altogether." (SOF ¶¶ 130–151.)

"construed in favor of broad coverage." *Shields v. Credit One Bank, N.A.*, 32 F.4th 1218, 1227 (9th Cir. 2022) (quoting 42 U.S.C. § 12102(4)(A)). As such, Plaintiffs' declarations do not "create an issue of fact by . . . contradicting [their] prior deposition testimony." (MSJ Opp. at 25 (quoting *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991)).) That Plaintiffs happen not to be suffering those symptoms because of their treatment does not mean their testimony contradicts the fact that they exist. Plaintiffs need not demonstrate unnecessary suffering simply to substantiate their claim.

### B.    Plaintiffs Are Excluded From Girls' Sports, and This Exclusion Is Because of Their Gender Dysphoria

The Ban excludes Plaintiffs from girls' sports because of their gender dysphoria. *First*, Defendants do not dispute that the Ban explicitly excludes Jane or Megan from girls' sports at their respective schools. (SOF ¶ 118; Dkt. 318 ¶ 118 ("Undisputed" that the Ban "excludes [Plaintiffs] from all girls' sports teams at their schools.").) As discussed above, Jane and Megan cannot play on boys' sports teams because it would contradict their medical treatment. As such, the Ban prohibits them from participating in school sports entirely. *See Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840 (7th Cir. 1999) (finding that a policy regarding school sports that "rendered [Plaintiff] ineligible to play 'by reason of' his disability" violated the ADA).

*Second*, this exclusion is *because of* Plaintiffs' gender dysphoria. Defendants misconstrue the relationship between gender dysphoria, transgender status, and the Ban in arguing that Plaintiffs are discriminated against because of their transgender status and not their gender dysphoria. Indeed, while it is true that the Ban also discriminates based on transgender status, and that transgender status does not *always* "translate to a gender dysphoria diagnosis" (MSJ Opp. 26), Plaintiffs *do* have gender dysphoria.[8] Defendants are

---

[8] As this Court has already recognized, the question is not whether transgender status and gender dysphoria are always inextricably intertwined, but rather whether Jane and Megan have gender dysphoria and are discriminated against because of it. (*See* MTD Order at 4–5; *id.* at 8 ("Plaintiffs have sufficiently alleged that they suffer from gender dysphoria, and that gender dysphoria qualifies as a disability under the ADA and RA.").)

incorrect that Plaintiffs have "not presented any admissible evidence that Plaintiffs' treatment requires them to play girls' sports" (*id.* at 25), because Plaintiffs' experts make clear that part of Jane's and Megan's treatment for their gender dysphoria is "social transition," which includes "participating in gender-matched school sports." (SOF ¶ 12.) Defendants' argument that "a transgender girl with gender dysphoria who wants to play on a co-ed team, a club team, a recreational team, or no sports team at all" could do so misses the point. (MSJ Opp. at 25.) Effective social transition does not just mean the ability to play a sport on any team; rather, it is the comprehensive acceptance of Plaintiffs as girls "consistently across *all* aspects of [their] li[ves]." (SOF ¶ 13 (emphasis added).) This includes being able to play school sports with their peers: other girls. To deny Plaintiffs the ability to participate in girls' sports at school specifically—even if other sports teams are available to them—is to deny them effective treatment for their disability. *See Williams v. Koenig*, 2024 WL 1477067, at *2 (9th Cir. Apr. 5, 2024) (finding a violation of the ADA when Plaintiff was denied a certain type of accommodation despite it "being a 'necessary' component of his treatment plan"). Since the Ban would prevent Jane and Megan from mitigating their gender dysphoria by completing a comprehensive social transition, it discriminates against them based on their gender dysphoria.

Finally, playing girls' sports is a reasonable modification. Defendants' assertion that this request is unreasonable because Plaintiffs will never be able to "perform the essential functions" of "biological girls['] sports" (MSJ Opp. at 26) fails for two reasons. *First*, Defendants contradict themselves in claiming simultaneously that Plaintiffs are so advantaged biologically that they can out-compete all of the girls with whom they play (a claim that is demonstrably false), and also that Plaintiffs somehow also cannot even "perform the essential functions" of their sports. (*Id.*) *Second*, Plaintiffs' medical and sports records indicate that, both biologically and in terms of performance, they are in line with their peers. (SOF ¶¶ 59, 67, 119, 162, 167–68, 171.) Perhaps most tellingly, "[t]here haven't been any problems with [Plaintiffs] playing on the girls'" sports teams since the Ban was enjoined,

nor has the AIA "received any complaints regarding the participation of any transgender student." (SOF ¶¶ 154, 73.)

### C.    Defendants' Motion to Strike the Medical Records Lacks Merit

Defendants' motion to strike Plaintiffs' medical records on the grounds that they "lack expert support, foundation, or authentication, and they contain hearsay" (MSJ Opp. at 17; Horne MSJ Opp. ¶ 24), is without merit and must be denied.

*First*, on summary judgment, the Court "do[es] not focus on the admissibility of the evidence's form[, but] instead focus[es] on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). "If the contents of a document can be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document—the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021) (quoting *Fraser*, 342 F.3d at 1036–37). Thus, even if Plaintiffs' medical records are not admissible (which they are for the reasons stated below), the Court may still consider Plaintiffs' medical records, because the contents of those records would be admissible at trial through the direct testimony of Plaintiffs or their medical providers.

*Second*, Plaintiffs' medical records are authentic under Federal Rule of Evidence 901(b)(4), which states that documents can be authenticated based on their "appearance, contents, substance, internal patterns, or other distinctive characteristics." *Tate v. Kaiser Found. Hosp.*, 2014 WL 176625 at *1 n.1 (C.D. Cal. 2014). Plaintiffs' medical records here bear more than sufficient information and identifying characteristics to authenticate them. Namely, as was found sufficient in *Tate*, the records at issue here are "marked with [P]laintiff[s'] name and date of birth, as well as the [name of the hospital and healthcare providers] and the dates of" treatment. *Id.* They are therefore authentic.

*Third*, Defendants are incorrect to claim that "medical records . . . 'do not fall under any of the hearsay exceptions.'" (MSJ Opp. at 17; Dkt. 318 ¶ 23.) Indeed, "medical records could be considered as non-hearsay under Federal Rule of Evidence 803(6)." *Morgan v.*

*Doran*, 308 F. App'x 231, 231–32 (9th Cir. 2009).  Additionally, statements for medical diagnosis or treatment are admissible under Rule 803(4).

*Fourth*, Plaintiffs' records need not be interpreted by an expert in order to be admissible.  Plaintiffs' claims do not rely on the "interpretation of medical test results" that "requires specialized education and training."  *Cottrell v. Igbinosa*, 2017 WL 550580, at *16 (E.D. Cal. Feb. 9, 2017) (requiring a medical expert to interpret test results regarding a party's heart condition and the effect of the prescriptions at issue), *report and recommendation adopted*, 2017 WL 1064724 (E.D. Cal. Mar. 20, 2017).  Rather, Plaintiffs simply use the medical records to (*i*) document non-medical statements made by Plaintiffs as children regarding their gender identity; (*ii*) provide concrete evidence of Plaintiffs' gender dysphoria diagnosis; and (*iii*) demonstrate Plaintiffs' medical treatment regarding their gender dysphoria.  No additional medical expertise beyond what Plaintiffs have already offered in this case is required to understand this evidence.[9]

Accordingly, Defendants' motion to strike the medical records should be denied.

## IV.  PLAINTIFFS ARE ENTITLED TO DECLARATORY AND PERMANENT INJUNCTIVE RELIEF

Finally, for all of the reasons described above and in Plaintiffs' opening brief, this Court should permanently enjoin Defendant Horne from enforcing the Ban against Jane and Megan.  *First*, as this Court has already found, Jane and Megan will "suffer severe and irreparable mental, physical, and emotional harm if the [Ban] applies to them."  (PI Order ¶ 174.)  Defendants' claim that Plaintiffs could simply choose to play on the boys' teams at

---

[9] By comparison, the cases cited by Defendants required the court to interpret medical tests results as a basis for the party's claims.  *See Cervantes v. Pratt*, 2008 WL 11424110, at *11 (D. Ariz. Aug. 5, 2008) (X-ray report that notes degenerative findings consistent with post-traumatic degenerative change); *Lim v. Adler*, 2010 WL 2348743, at *7 n.3 (E.D. Cal. June 8, 2010) (Surgical Pathology Report . . . that diagnoses a "granulation tissue with acute & chronic inflammation"); *but see Hill v. Clark*, 2016 WL 696433, at *1 (E.D. Cal. Feb. 22, 2016) (finding *pro se* plaintiff could testify at trial about "what he felt, the extent of any injuries, and any opinions about causation" though he did not seek to offer medical records as evidence).

school or on co-ed teams (which do not exist at either Plaintiff's school in the sports in which Plaintiffs wish to participate), ignores the reality of Plaintiffs' gender dysphoria diagnoses. And choosing to avoid an option that would cause Plaintiffs mental, physical and emotional harm, and would contradict their medical treatment, can hardly be called a "self-inflicted wound[]." (*See* MSJ Opp. at 27 (quoting *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020)).)  No monetary damages or other legal remedy can provide redress for Plaintiffs' harm.  (Mot. at 29.)

*Second*, the balance of hardships and the public interest weigh heavily in favor of a permanent injunction.  For over two years, Jane and Megan have participated in girls' sports teams at their school without incident or complaint and without any demonstrable competitive advantage or increased safety risk to other girls.  (SOF ¶¶ 51–53, 56, 63, 117, 153–54, 158–59, 162, 169–71.)  Defendants have not provided any concrete evidence that maintaining this status quo will cause real injury to the State or to girls' sports teams in Arizona.  Moreover, as stated in Plaintiffs' opening brief, "it is always in the public interest to prevent the violation of a party's constitutional rights."  (Mot. at 29 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).)

Therefore, the Court should permanently enjoin the Ban's application as to Megan and Jane.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for summary judgment should be granted and Defendants' motions for summary judgment should be denied.

Respectfully submitted this 29th day of July, 2025

*s/ John S. Bullock*
Colin M. Proksel (034133)
John Bullock (034950)
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Fl.
Phoenix, Arizona 85012-2793
Telephone: (602) 640-9000
Facsimile: (602) 640-9050
Email: cproksel@omlaw.com

Email: jbullock@omlaw.com

Jyotin Hamid*
Justin R. Rassi*
Amy C. Zimmerman*
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
Email: jhamid@debevoise.com
Email: jrassi@debevoise.com
Email: azimmerman@debevoise.com

Amy Whelan*
Rachel Berg*
NATIONAL CENTER FOR LGBTQ
RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone: (415) 343-7679
Facsimile: (415) 392-8442
Email: awhelan@nclrights.org
Email: rberg@nclrights.org

*Admitted pro hac vice.*

1

**<u>CERTIFICATE OF SERVICE</u>**

2   I hereby certify that on this 29th day of June, 2025, I caused the foregoing

3 document to be filed electronically with the Clerk of Court through the CM/ECF System

4 for filing; and served on counsel of record via the Court's CM/ECF System.

5

6

7            *s/ John S. Bullock*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28